# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **PATRICIA SLACK, Individually and as the** | § | |
| **surviving mother of CHARLES** | § | |
| **ROUNDTREE, JR., BERNICE** | § | |
| **ROUNDTREE as the representative of the** | § | |
| **estate of CHARLES ROUNDTREE, JR. and** | § | |
| **all Statutory Beneficiaries, TAYLOR** | § | |
| **SINGLETON, and DAVANTE SNOWDEN** | § | |
| *Plaintiffs,* | § | |
| | § | **CIVIL ACTION NO.** |
| **VS.** | § | **5:18-CV-1117-JKP-ESC** |
| | § | |
| **THE CITY OF SAN ANTONIO, TEXAS** | § | |
| **AND STEVE CASANOVA** | § | |
| *Defendants.* | § | |

## DEFENDANT STEVE CASANOVA'S
## MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE U.S. DISTRICT COURT:

COMES NOW Defendant STEVE CASANOVA ("Defendant" or "Casanova") and files this Motion for Summary Judgment asserting his qualified immunity from Plaintiffs' claims, pursuant to Rule 56, Federal Rules of Civil Procedure Defendant respectfully shows the Court the following:

## I. INTRODUCTION

1. This is an action brought by Plaintiffs against Officer Casanova and the City of San Antonio, Texas, on October 23, 2018,[1] alleging Casanova's alleged use of excessive force

---

[1] Plaintiffs' Original Complaint included Patricia Slack, Individually and as surviving mother of Charles Roundtree Jr. (decedent); Bernice Roundtree representative of Estate of Charles Roundtree, Jr. and Statutory Beneficiaries; Taylor Singleton. [Dkt. 1].   Plaintiff Davante Snowden was added in Plaintiffs' First Amended Complaint filed on November 19, 2018. [Dkt. 9].  Plaintiffs added Diajhanae Williams as Next Friend of K.W., a minor, in Plaintiffs' Third Amended Petition filed on November 13, 2021, contending that K.W. was the child of Charles Roundtree, Jr.



resulting in the October 17, 2018, shooting injury sustained by Snowden and resulting in the death of Charles Roundtree, Jr. ("decedent") in violation of 42. U.S.C. §1983 under the Fourth Amendment of the United States Constitution. Plaintiffs Slack and Bernice Roundtree seek wrongful death damages and Plaintiff Bernice Roundtree seeks survival damages for the Estate of Charles Roundtree Jr. Casanova asserts his qualified immunity defense in this suit.

## II.
## BACKGROUND FACTS

2.     On the night of October 16th and early morning of October 17, 2018, Officers Casanova and Panah were on routine patrol at the Lincoln Courts, when they were flagged down by Maria Herrera who told the officers that her husband Esteban Preciado was assaulted by an individual who ran into the house at 217 Roberts Street.[2]  Casanova observed the bodily injury to Mr. Preciado's facial area. Casanova was familiar with 217 Roberts Street as a "dope house."  He patrolled this area many times before.  Casanova drove by Roberts Street earlier that evening using a flood light to detect activity in the area and saw a vehicle's headlights shining on a female with pink pants going into the house at 217 Roberts Street.[3]  Plaintiff Singleton along with Plaintiff Snowden looking through the front window of the house witnessed Casanova's patrol car go by shining a light on the house.[4]

3.     After receiving the citizen complaint of an assault that allegedly occurred only a few minutes before and that the suspect was inside the house at 217 Roberts Street, Casanova decided to conduct a "knock and talk" investigation of the house. Casanova informed Ms. Herrera that he would go to the house to try to make contact to see he could catch the guy; if not, he would

---

[Dkt. 68-1]. Plaintiffs voluntarily dismissed Plaintiff Williams without prejudice on February 11, 2021. [Dkt. 80]. Defendant reserves the right to seek a determination of heirship if necessary, at the appropriate time.
[2] Exhibit A (Casanova Affidavit, Casanova bodycam 06:06:45-06:12:18); Exhibit B (Panah Affidavit, Panah bodycam T06:07:20Z-T06:08:11Z); Exhibit C (Perez Affidavit, C-1 Snowden's statement; C-2, Recording of Snowden statement (15:34:58-15:37:54)).
[3] Exhibit A (Casanova Affidavit).
[4] Exhibit E (Singleton Deposition 35:24-36:20); Exhibit A (Casanova Affidavit, p. 2).

provide Ms. Herrera with a case number and he would file a report.[5]   Prior to approaching the house, Casanova gave instructions to the officers present on where to position themselves.[6] Casanova approached 217 Roberts Street and opened an unlocked chain link fence gate. He walked down the walkway to the front porch where an individual, John Cotton, was sitting. Casanova recognized him as an individual that frequented drug houses in the area but who did not match the description of the alleged assailant. Casanova proceeded to the front door of the residence.[7] With his flashlight in his right hand, Casanova approached the front door wearing his full regulation SAPD uniform, with badge, name plate, and SAPD patch on his arm and on the front of his beanie.[8]   He knocked on the inner wood door three times and the door swung open.[9] Casanova pointed his flashlight downwards with his firearm holstered when the inner door opened. Snowden greeted Casanova first and said: "What's up?" Casanova returned the salutation with "What's up man?"[10] As Casanova stood at the door, he could see an overhead light in the living room illuminating the room and himself at the door.[11] Plaintiff Singleton noted in her written statement and in her deposition testimony that the officer she saw shooting looked Hispanic, and she could see the beanie he was wearing.[12]   Casanova scanned the three occupants in the living room, evaluated the immediate presence of danger and noted that the individual seated directly in front of him about six feet away matched the description of the assailant.[13] Within seconds, Snowden suddenly turned confrontational toward Casanova rising from the

---

[5] Exhibit A (Casanova Bodycam A-1, T06:11:11Z-T06:11:33Z).
[6] Exhibit A (Casanova Affidavit A-1, Bodycam T06:17:36Z-T06:20:26Z).
[7] Exhibit A (Casanova Affidavit, Casanova body cam 06:21:45-06:22:15); Exhibit B (Panah Affidavit, Panah bodycam T06:21:48Z-T06:22:14Z).
[8] Exhibit B-1 (T06:07:22Z - T6:08:08Z) and Exhibit B-2 (Still frame, T06:07:29Z).
[9] Exhibit D (Tanwar Affidavit, A-3 Casanova enhanced bodycam video (T06:21:42Z - T06:22:15Z).
[10] Exhibit D (Tanwar Affidavit, D-3, Casanova enhanced bodycam video (T06:22:16Z - T06:2218Z); D-5, Casanova enhanced bodycam video inverted (T06:22:16Z - T06:2218Z); D-6, Casanova enhanced bodycam audio).
[11] Exhibit D (Tanwar Affidavit, D-1, (T06:22:14Z - T06:22:19Z); D-2 (938 to 1100/1198); D-9, (Image No. 7).
[12] Exhibit E (Singleton Deposition Exhibit No. 2, Statement); Exhibit F-8, Singleton 10/17/18 written statement, COSA 002132 - 002133; Exhibit F-9, Singleton's Deposition page 41, lines 10-14; page 50, lines 2 - 15.
[13] Exhibit F-5 (Ortiz Declaration, Casanova's written statement).

couch saying: "Hey, who the fuck is this!" while gripping a gun with his right hand.[14]  Casanova quickly yelled: "Hey let me see your fucking hands!"[15]  Casanova unholstered his gun for the first time and fired two shots at Snowden who did not obey his command to show his hands.[16] After the shots were fired, Casanova and other officers departed the front yard to establish a perimeter around the house. Casanova commented that he saw Snowden in possession of a nine-millimeter gun.[17]  After the incident, investigators found a nine-millimeter gun just outside the back window of the house and a matching nine-millimeter gun clip inside the house.[18]  The occupants of 217 Roberts Street, other than Charles Roundtree, Jr., departed the house after approximately ten minutes, as instructed by the police. The occupants were transported to the police station to give witness statements. Officer Casanova did not play a role in deciding to detain the occupants of the house for the purpose of providing witness accounts to police.

### CASANOVA DID NOT VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS

### III.
### VIDEO AND AUDIO RECORDINGS ARE CONSISTENT WITH CASANOVA'S VERSION OF THE FACTS.

4.     The video and audio recordings from Defendant, Officer Casanova's and Officer Panah's body worn cameras (BWC) provide undisputed evidence of what took place the night of October 16, and the early morning of October 17, 2018.  The recordings are consistent with, and do not controvert, Officer Casanova's version of the facts.

---

[14] Exhibit D (Tanwar Affidavit at D-3, D-5 and D-7, Casanova bodycam video-slow motion (T06:22:18Z - T06:22:20Z).
[15] Exhibit D (Tanwar Affidavit at D-3, D-5 and D-7 (T06:20:20Z - T06:22:22Z); D-8, Casanova enhanced bodycam frames 170-220); D-9, Tanwar Supplemental Report Images 11, 15-18).
[16] Exhibit D (Tanwar Affidavit at D-3, D-5, D-7 and D-8 (T06:22:20Z); D-9, Images 19-26); Exhibit F-5 (Ortiz Affidavit, Casanova's statement).
[17] Exhibit D (Tanwar Affidavit at D-3, D-5, D-7 and D-8 (T06:22:23-06:22:24Z).
[18] Exhibit C (Perez Affidavit at C-3, COSA (003426-003427) and COSA (003433); Exhibit C-4, COSA (003375), COSA (001981), COSA (001992); Exhibit D (Tanwar Affidavit at D-9, Supplemental Report Images 27-28; D-10, Report Image 18).

5.      "When evaluating a qualified immunity defense, courts 'consider[] only the facts that were knowable to the defendant officers.' *Tucker v. City of Shreveport*, 2021 WL 1973562, *3 (5th Cir. 2021), *citing, White v. Pauly*, 137 S. Ct. 548, 550 (2017) (*per curiam*); *Cole v. Carson*, 935 F.3d 444, 456 (5th Cir. 2019) *(en banc)* ("[W]e consider only what the officers knew at the time of their challenged conduct.").  An official's actions are judged in light of the circumstances that confront him, without the benefit of hindsight. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

6.      Although courts view evidence in the light most favorable to the nonmoving party in a typical summary judgment proceeding, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.  *Valderas v. City of Lubbock*, 937 F. 3d 384, 388 (5th Cir. 2019), reissued 774 Fed. Appx. 173, 176 citing, *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) *citing, Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).  Because of video and audio recordings of the event, Courts are not required to accept factual allegations that are "blatantly contradicted by the record." *Tucker v. City of Shreveport*, No. 19-30247. (5th Cir. 2021), *citing, Scott v. Harris*, 550 U.S. 372, 380 (2007). Rather, the Court should "view[ ] the facts in the light depicted by the videotape." *Id*. at 381.  As shown in Defendant's Motion for Summary Judgment, Plaintiffs' alleged facts leading up to the shooting incident are "blatantly contradicted by the record." *Id*.

## IV.
## CASANOVA HAD DISCRETION TO CONDUCT A "KNOCK AND TALK" INVESTIGATION

7.      The Fifth Circuit recognizes the "knock and talk" approach as a "reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones* 239 F.3d 716, 720 (5th Cir. 2001). American

courts, generally, and the Fifth Circuit in particular, view pristine "knock and talk" incidents as legitimate investigative tactics. *Id*., *U.S. v. Lewis,* 476 F.3d 369 (5th Cir.2007); *U.S. v. Gould,* 364 F.3d 578 (5th Cir. 2004).  Police officers with legitimate business may enter areas impliedly open to the public and are permitted the same license to intrude as a reasonably respectful citizen.  A knock and talk is a consensual encounter between police officers and citizens are not seizures. *U.S. v. Velazco-Durazo,* 372 F. Supp 2d 520, 525 (D. Ariz. 2005), *citing, Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

8.      Even where a gated fence surrounds the property, if the officers "reasonably believe the gate provided the principal means of access ... through which they could approach the front door," the Fourth Amendment is not violated by entering the fenced yard to attempt a knock and talk.  *Rojas v. Kirkpatrick*, 2015 WL 6550441 *8 (W. D. Tex. Oct. 28, 2015) affirmed, 643 Fed. Appx. 451 (5th Cir. Apr. 15, 2016, cert denied), *U.S. v. Thomas,* 120 F.3d 564, 572 (5th Cir. 1997).

9.       "When an officer of the law simply walks up to the door and knocks, (s)he visits the house in the same lawful way that a private citizen would, and the ensuing 'knock and talk' does not implicate the Fourth Amendment or its exceptions because no search or seizure occurs." *U.S. v. Walters,* 529 F. Supp. 2d. 628, 637 (E.D. Tex. 2007).  Plaintiffs assert that Casanova did not have a "no-knock warrant" when he opened the door. [Dkt. 72, ¶13].  However, "No warrant is required to 'knock and talk.'" *U.S. v. McGrath*, 65 Fed. Appx. 508, *1 (5th Cir. 2003). In addition, "[l]aw enforcement officials are not required to obtain a warrant at the first possible

opportunity.  *United States v. Rodea,* 102 F.3d 1401, 1409 (5th Cir.1996).

10.     Although reasonable suspicion alone does not justify a warrantless search of a home, it

can justify a police officer approaching the house to question occupants.  *U.S. v. Tobin*, 923 F.2d

1506, 1510-11 (5th Cir. 1991); *U.S. v. Orozco* 2006 WL 1851709, *2 (W. D. Tex., 2006); *United*

*States v. Jones,* 239 F.3d 716, 720 (5th Cir. (Tex.) Jan. 22, 2001).   As demonstrated on the

bodycam footage, Officer Casanova approached 217 Roberts Street to investigate the complaint

of an alleged assault.  He received credible information that the suspect went into the residence

after the assault.[19]   Casanova's and Panah's bodycams show the complainant confirming the

address and description of the suspect, and the injuries suffered by her husband.[20]

11.     Officer Casanova used proper discretion to conduct a "knock and talk" investigation

pursuant to City of San Antonio Police Department Policies and Procedures.[21]

### A. <u>Identification by police officers is not a requirement in a "knock and talk" investigation.</u>

12.     Plaintiffs assert in their Complaint that, "[a]t no time did Defendant Casanova identify

himself as a San Antonio police officer."  Uniformed police officers conducting "knock and talk"

investigations are **not** required to identify themselves as police officers prior to knocking on a

suspect's door, where the suspect lacks protected privacy interests in the public area outside his

door, the suspect responds voluntarily to the knock, and officers are immediately identifiable as

police officers when the door is opened. *United States v. Anderson*, 160 F. App'x 391, 392-93

(5th Cir. 2005) (Emphasis added).   "This procedure, in which an officer knocks on a person's

door and asks to speak with them and to enter the residence has been approved, so long as it is

---

[19] Exhibit A (Casanova Affidavit, Casanova bodycam T06:47:45Z-T12:20:21Z); Exhibit B (Panah Affidavit, Panah bodycam 06:07:20-06:08:11).
[20] Exhibit A (Casanova Affidavit, Casanova bodycam T06:47:45Z-T12:20:21Z).
[21] Exhibit F (Ortiz Affidavit, SAPD SOP, Exhibit F-3 701-Crime Scene Duties, Section .06; and F-4 Texas Code of Criminal Procedure, Chapter 2, Article 2.13).

not used as a means of avoiding the need to obtain a warrant." *U.S. v. Milikan*, 404 F. Supp. 2d 924, 927 (E.D. Tex. 2005), citing *Jones* at 721. No such allegation is made by Plaintiffs in this suit.

13.     As the bodycam video demonstrates, Officer Casanova walked up to the front door and knocked to make his inquiry.  Casanova's gun was holstered and was not pointed at the door or the house. There is no dispute that Casanova was wearing his SAPD uniform that night.  His initial encounter with Snowden started out as consensual when both exchanged friendly greetings.[22]   Contrary to Singleton's assertions Casanova did not kick down the door.[23]

## V.
## THERE WAS NO WARRANTLESS ENTRY BY CASANOVA.

14.     Plaintiffs Third Amended Complaint asserts that, "[s]tartled and frightened by Defendant Casanova's unauthorized entry to the Residence . . .;"  [Dkt. 72, ¶14].  A warrantless intrusion into an individual's home is presumptively unreasonable unless the individual consents or probable cause and exigent circumstances justify encroachment.  *Jones* at 719. However, Casanova never stepped into the residence at 217 Roberts Street.

15.     There is no entry where an officer's ordinary knock opens a door that was slightly ajar. *U.S. v. Kemp*, 12 F.3d 1140, 1143 (D.C. Cir. 1994) (officers did not "break open" door within meaning of 18 U.S.C. § 3109[24] when door to premises swung open after officers knocked on it with reasonable force); *U.S. v. Moreno*, 217 F.3d 592, 593 (8th Cir. 2000) (no "breaking" occurred when an officer knocked on a door with a normal amount of force and that knocking causes the door to swing open").  After Casanova's knocking using a normal amount of force,

---

[22] Exhibit D (Tanwar Affidavit, D-3, Casanova enhanced bodycam video (T06:22:16Z – T06:2218Z); D-5, Casanova enhanced bodycam video inverted (T06:22:16Z – T06:2218Z); D-6, Casanova enhanced bodycam audio).
[23] Exhibit E (Singleton Deposition 127:6-16).
[24] Applies to execution of warrants, regarding regulation of forced entry.

the inner door opened.[25] Pursuant to the above-referenced case law, Casanova's knock that opened the inner door is not an unauthorized entry.[26]

16.     Casanova did not breach the entry to the front door. In *Payton v. New York*, 445 U.S. 573, 583, 100 S. Ct. 1371, 1378, 63 L. Ed. 2d 639 (1980), the Supreme Court made clear that, ". . . the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  445 U.S. at 590; *Kirkpatrick v. Butler,* 870 F.2d 276, 281 (5th Cir. 1989).  A closed outer iron door was not opened by Casanova.[27]  As clearly shown on the video, Casanova did not kick the door down or demand that the door be opened.  The closed outer iron door was not used by Casanova to enter the home. As such, there was no unauthorized entry into the house.

**VI.**
**SNOWDEN CAUSED EXIGENT CIRCUMSTANCES**
**BY REACHING FOR AND GRIPPING A GUN**

17.     Officer Casanova very suddenly confronted an exigent circumstance that posed an immediate threat risk to his life and that of his fellow officers when he saw Snowden brandish a nine-millimeter handgun near his waist as he became confrontative and belligerent toward the officer. Snowden quickly escalated the investigation from a "knock and talk" to a verbal warning to show his hands to a sudden need for self-preservation.[28]  Snowden stepped toward the officer and did not obey Casanova's command. Only then did Casanova pull his service revolver from

---

[25] Exhibit D (Tanwar Affidavit, T06:22:13Z – T06:22:15Z (Pages 1 to 89/298).

[26] Exhibit D (Tanwar Affidavit, D-3, Casanova enhanced bodycam video (T06:22:16Z – T06:2218Z); D-5, Casanova enhanced bodycam video inverted (T06:22:16Z – T06:2218Z); D-6, Casanova enhanced bodycam audio); D-1, Panah's video (T06:21:42Z— T06:22:00Z and T06:22:06Z – T06:22:08Z); Exhibit D-2, Panah Bodycam Frames (1 to 536 and 697 to 773/1198).

[27] Exhibit D (Tanwar Affidavit, D-3, Casanova enhanced bodycam video (T06:22:16Z – T06:2218Z); D-5, Casanova enhanced bodycam video inverted (T06:22:16Z – T06:2218Z); D-6, Casanova enhanced bodycam audio); D-1, Panah's video (T06:21:42Z— T06:22:00Z and T06:22:06Z – T06:22:08Z); Exhibit D-2, Panah Bodycam Frames (1-536 and 697-773/1198).

[28] Police-citizen encounters may be divided into three tiers or categories for Fourth Amendment purposes: consensual encounters, *Terry*-type stops, and full-blown arrests. U.S. Const. Amend. 4. See footnote 14, Supra.

his holster and fire two shots at Snowden.[29]

18.    At this moment, Snowden changed the material circumstances where Casanova was now faced with probable cause to believe that Snowden was about to discharge a firearm in his direction.  Courts have found the existence of such an exigency where officers have a reasonable belief that a suspect has a weapon, and the suspect demonstrates a willingness to use the weapon. *Naselroad v. Mabry-K & T*, 763 Fed. Appx. 452 (6th Cir. 2019); *United States v. Ponder*, 240 Fed. Appx. 17, 20 (6th Cir. 2007). Although a suspect's "willingness to use" a weapon may involve the occurrence of fired gunshots, "brandishing" a weapon may also indicate a suspect's willingness to use the weapon. *Ewolski v. City of Brunswick*, 287 F.3d 492, 502 (6th Cir. 2002). The plaintiff's "subjective assessment of whether his behavior posed an immediate threat is not the appropriate lens" through which to view the officer's actions. *Deffert v. Moe*, 111 F.Supp.3d 797, 807 (W.D. Mich. 2015).  Instead, the Court conducts an objective inquiry by looking to the facts and circumstances known to the officer. *Id.*

19.    The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene. *Graham* at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

## VII.
## CASANOVA'S PERCEPTION OF AN IMMEDIATE THREAT RESULTED IN A REASONABLE USE OF FORCE

20.    In evaluating whether the use of force was reasonable, courts look to the "totality of the circumstances," giving "careful consideration to the facts and circumstances of each particular

---

[29] Exhibit A (Casanova Affidavit); Exhibit D (Tanwar Affidavit, Exhibits D-3, D-5, D-7, and D-8 (T06:20:20Z - T06:22:22Z).

case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (citing *Graham*, 490 U.S. at 396). "The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive." *Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020). *Estate of Macias v. Texas Department of Public Safety*, 2021 WL 495877 *11 (W. D. Tex., Feb 09, 2021).

21.     In evaluating use of deadly force, the degree of force employed is only permitted to protect the life of the shooting officer or others. *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) citing*, Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "The use of deadly force violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) quoting, *Garner* at p.11. Stated differently, "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009); *Batyukova v. Doege*, 2020 WL 2512987 (W. D. Tex. 2020) *affirmed,* 2021 WL 1557354 *4 (5th Cir. 2021).

22.     Courts are careful to avoid "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Garza*, 943 F.3d at 745, quoting, *Ryburn v. Huff*, 565 U.S. 469, 477 (2012). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865, *Batyukova* at

*4.

23.    Officer Casanova clearly saw Snowden in possession of a firearm. Officer bodycam video and enhancements support his observation.[30]  The sudden transformation of circumstances from a casual greeting of potential witnesses to a life-threatening confrontation occurred in a split-second. This is a fact scenario where any reasonable officer in Casanova's shoes would have drawn his weapon in self-defense. He had no other viable option, including a duty to retreat, as his fellow officers were in the line of potential fire from Snowden. Snowden testified in his deposition that he was not wearing a belt, which rules out any reflective material on or around his waist.[31]  This is not a case of a vague-looking object in the possession of the suspect, such as a cell phone or metal object, from the perspective of the officer.  A nine-millimeter gun was ultimately found outside a back bedroom window, with a nine-millimeter magazine/clip found inside the house in the same bedroom.[32]  Casanova was objectively reasonable in his decision to use deadly force in the face of an immediate and imminent threat. He reasonably assumed his presence in a police uniform was illuminated by the living room light.  Snowden's friendly greeting caused Casanova to believe his presence was not a threat to others initially, thereby leading him to return a casual greeting instead of a police command.  Once Snowden suddenly became hostile and appeared to be drawing a firearm toward Casanova, the intended target was a mere five feet in front of him. Casanova gave a verbal command to Snowden to show his hands. When Snowden failed to comply with the command, Casanova discharged two shots directly aimed at Snowden, as opposed to randomly shooting inside the house. As the Fifth Circuit has repeatedly admonished, rapidly evolving, tense, and uncertain circumstances like this forcing law enforcement officers to make split-second judgments on the appropriate use of force

---

[30] Exhibit D (Tanwar's Affidavit, at D-3, D-4, D-5, D-7, D-8, and D-9).
[31] Exhibit G (Snowden's Deposition pp. 66:16-68:13 & Att. 10).
[32] Exhibit C (Perez Affidavit, Exhibits C-3 and C-4).

should not be second-guessed in Court proceedings. *Tucker,* supra., 2021 WL 1973562, *3; *Cole,* supra., 935 F.3d at 456; *Brown,* supra., 623 F.3d at 253.   Casanova is entitled to qualified immunity from Plaintiffs' claims of excessive force under the Fourth Amendment.

## VIII.
## SINGLETON WAS NOT SEIZED BY OFFICER CASANOVA

24.     As the Supreme Court held in *Graham,* "[a] 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, by means of physical force or show of authority ... in some way restrained the liberty of a citizen."  *Graham v. Connor,* 109 S. Ct. at 1871 n. 10, *quoting, Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S. Ct. 1868, 18 n. 16, 20 L. Ed. 2d 889 (1968)). Plaintiffs' Third Amended Complaint only asserts that the force used by Casanova was excessive and violated Singleton's clearly established constitutional rights and was not objectively reasonable under the circumstances.[33]

25.     In Plaintiff's Third Amended Complaint, Singleton asserts she was in fear of her live as a result of Casanova firing his weapon at her.[34]   However, Casanova did not fire his weapon directly at Singleton nor did he have any intention of doing so.[35]   She testified that the first shot hit Snowden in the back and then it went passed her head.[36]   She testified in her deposition that she did not give Casanova any reason to shoot at her.[37]   In Plaintiffs' Third Amended Complaint, Singleton requests damages because she was in the residence and, ". . . within the line of Casanova's fire when Casanova fatally shot Roundtree and injured Snowden."   In *Torres v. Madrid,* 141 S. Ct. 989, 998 (March 25, 2021), the Supreme Court stressed that not every physical contact between an officer and a member of the public can be considered a Fourth

---

[33] Dkt. 68-1, ¶ 45.
[34] Dkt. 72 ¶ 47.
[35] Exhibit A (Casanova Affidavit).
[36] Exhibit E (Singleton Deposition p. 46:19-24).
[37] Exhibit E (Singleton Deposition p. 62:11-25).

Amendment seizure. *Id*.  **"A seizure requires the use of force with intent to restrain"**. *Id*. (Emphasis added).  "Accidental force will not qualify." *Id*., *citing, County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).  The Supreme Court in *Torres* further found that, "Nor will force intentionally applied for some other purpose satisfy this rule". *Id* at 999. "In this opinion, we consider only force used to apprehend."  *Id*.

26.     The court determined that the appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain.  *Id*. at 998.  The court further noted that, "While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain.  *Id*.   No force was applied against Singleton beyond the presence of an officer at the door.[38]   In addition, there was no intent to apprehend Singleton as part of Casanova's investigation.[39]   As cited within this motion, the Court conducts an objective inquiry by looking to the facts and circumstances known to the officer.  *Deffert at* 807.  Similarly, the Supreme Court in *Torres* held that a seizure does not depend on the subjective perceptions of the complainant. *Torres v. Madrid*, 141 S. Ct. at 999.  In the instant case, it does not matter what Singleton believed.  There was no force applied against her and no intent to restrain, therefore, no seizure occurred.  Singleton only asserts in her Amended Complaint that she was only in the line of fire.[40]   Singleton cannot sustain a Fourth Amendment violation against Casanova.  In addition, nowhere in Plaintiffs' Third Amended Complaint does Singleton assert that she was unlawfully seized.

---

[38] In *Torres*, the force applied, and the seizure occurred when the suspect was actually struck by the officer's bullet. *Id*. at 999.
[39] Exhibit A (Casanova Affidavit).
[40] Dkt. 72, ¶ 76 (d)(1).

## IX.
## DECEDENT WAS AN UNINTENDED VICTIM AND THERE WAS NO SEIZURE WITHIN THE MEANING OF THE FOURTH AMENDMENT

27.     Charles Roundtree Jr., the unintended victim of a shooting, was not "seized" within the meaning of the Fourth Amendment and, therefore, his accidental death cannot give rise to a constitutional violation based on allegations of excessive force or unreasonable seizure.

28.     This Court recently and succinctly addressed the seizure and accidental death issue in the *Estate of Macias v. Texas Department of Public Safety,* 2121 WL 495877 *10 (W. D. Tex. Feb. 9, 2021):

> "It is true that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement, ... but only when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) (emphasis in original). And the "[v]iolation of the Fourth Amendment requires ... [that the] detention or taking itself must be willful." *Id.* at 596. These principles ensure that every "negligent taking of a life" does not become "a constitutional deprivation" and have been applied consistently to foreclose Fourth Amendment claims in the context of the accidental deaths of innocent bystanders. *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985). *See also Moore v. Indehar*, 514 F.3d 756, 760 (8th Cir. 2008) (collecting cases) ("bystanders are not seized for Fourth Amendment purposes when struck by an errant bullet in a shootout"); *Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir. 2000) (finding, in hostage shooting case, no Fourth Amendment "seizure" because "[t]he officers intended to restrain the minivan and the fugitives, not [the hostages]"); *Claybrook v. Birchwell*, 199 F.3d 350, 355, 359 (6th Cir. 2000) (determining that plaintiff struck by errant bullet during police shootout was not seized because officers were aiming at her father-in-law and did not realize she was hiding in nearby parked car); *Medeiros v. O'Connell*, 150 F.3d 164, 167–69 (2nd Cir. 1998) (holding that where a hostage is struck by an errant bullet, there is no Fourth Amendment seizure or violation); *Rucker v. Harford County, Md.*, 946 F.2d 278, 281 (4th Cir. 1991) (explaining that *Brower* "does not mean ... that a seizure occurs just so long as the act of restraint itself is intended ... though it restrains one not intended to be restrained"); *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791, 794–96 (1st Cir. 1990) (declining to hold that hostage was seized for Fourth Amendment purposes when police officers fired at suspect's getaway car and accidentally struck the hostage)".
>
> *Id.* at *10.

29.     The Court also presented analogous cases similar to the fact situation in the instant case. In *Gorman v. Sharp,* 892 F. 3d 172, 174 (5th Cir. 2018), the Fifth Circuit discussed the issue of

accidental deaths in a case involving a firearms training exercise where a firearms instructor forgot to replace his real firearm with a "dummy" firearm and unintentionally shot a colleague in the chest with a live round of ammunition. The Court concluded that the shooting was not willfully performed by the instructor, whose "only intention in pulling the trigger. . .was to educate his audience as a firearms training instructor" and therefore there could be no "seizure" "in the absence of intentional conduct." *Macias* at *10, citing *Gorman* at 174. As in the instant case, Casanova intended to protect himself and his fellow officers from the threat of serious bodily injury caused by Snowden brandishing and gripping a weapon. Casanova's intended target, judging from the sudden life-threatening conduct, was Snowden, and Casanova ostensibly pulled his trigger in order to stop Snowden.  *Id.*, *Macias* at *10.

30.     An analogous case from the Southern District of Texas applied *Gorman* in granting summary judgment in the context of an accidental death during a "shootout" arising from a domestic disturbance. *Garcia v. City of McAllen, Texas* 2020 WL 1660095, *1 (S.D. Tex. Apr. 1, 2020).   In *Garcia,* the McAllen Police Department responded to a domestic disturbance involving several minors and their stepfather. During the shootout, the police officers accidently struck one of the minors, who survived, but suffered injuries.  The district court held that since the officer who discharged his weapon accidentally striking the minor did not intend to shoot the minor, but rather was targeting the stepfather, the plaintiffs did not have an excessive force claim under the Fourth Amendment against the officer.  *Id*. at *4, *Macias* at *10.  The facts are similar as in this case, where Casanova's discharge of his firearm was targeting Snowden and the bullet accidently struck the decedent.  The fact situations in *Gorman* and *Garcia* are on point to the facts presented in this case. As such, the operative facts in this case do not rise to a Fourth Amendment claim, therefore, the decedent does not satisfy the first step to defeat Casanova's

qualified immunity by showing that Casanova violated decedent's constitutional rights. *District of Columbia v. Wesby*, 138 S. Ct. at 589.  Therefore, Casanova maintains his qualified immunity.

## X.
## SINGLETON HAS NO WRONGFUL ARREST AND DETENTION CLAIM AND NO BYSTANDER CLAIM.

### A.  No wrongful arrest and detention.

31.    Singleton cannot maintain a cause of action for wrongful arrest and detention against Casanova.[41]  Casanova had no role in the decision to hold and transport Singleton to the police station to give a statement.[42]

32.    It is well-settled that not all encounters with the police implicate the Fourth Amendment. *Golla v. City of Bossier City*, 687 F. Supp. 2d 645, 656 (W.D. La. 2009) (citing *Florida v. Bostick,* 501 U.S. 429, 434 (1991)). After Singleton came out of the house at 217 Roberts, she was placed in handcuffs and other officers took her in to give a statement.[43]  The United States Supreme Court has recognized the right to detain non-suspect material witnesses on a temporary basis.  *Illinois v. Lidster,* 540 U.S. 419, 427-28 (2004). At a minimum, officers have a right to identify witnesses, obtain the names and addresses of such witnesses, and ascertain whether they are willing to speak voluntarily with the officers.  *Golla v. City of Bossier City*, 687 F. Supp. 2d 645, 657-58, (W.D. La. 2009), *citing, Hiibel v. Sixth Judicial Dist. Ct*., 542 U.S. 177, 186–88 (2004).  Handcuffing a suspect or using force does not automatically convert an investigatory detention into an arrest requiring probable cause. *United States v. Abdo* 733 F. 3d 562, 565 (5th Cir. 2013) *citing* , *United States v. Sanders,* 994 F.2d 200, 206 (5th Cir. 1993).

---

[41] Dkt. 72 ¶¶ 14, 17, 30.
[42] Exhibit A (Casanova Affidavit, pg. 3).
[43] Exhibit E (Singleton Deposition p. 31:15-22).

33.     There is no dispute that Singleton was not arrested after she gave her statement and therefore, cannot maintain a wrongful arrest violation.  As such, Singleton does not have a cause of action for wrongful arrest and detention against Casanova.

**B.  Singleton does not have a 1983 bystander claim.**

34.     The Fifth Circuit has determined that bystander recovery is not permitted under §1983. *Grandstaff v. Borger*, 767 F. 2d 161, 172 (5th Cir. 1985), *quoting, Baker v. McCollan*, 443 U.S. 137, 146 (1979)); *Khansari v. City of Houston*, 14 F.Supp. 3d 842, 863 (S.D. Tex. 2014) (mem. op.).  The Fifth Circuit held in *Grandstaff*, that "there is no constitutional right to be free from witnessing police action." *Id.* at 172. In *Grandstaff,* bystander plaintiffs sought to recover damages "for their own emotional injuries suffered as bystanders when they witnessed the gunfire directed at [decedent] Grandstaff in his pickup truck." *Id*. The *Grandstaff* Court ultimately held that the bystander plaintiffs could not recover damages for emotional injuries because they did not have an independent cause of action under § 1983. *Id.* Essentially, witnessing a police officer commit a tort is not a violation of a Constitutional right sufficient to make a § 1983 claim. The district court in *Khansari* concluded that Plaintiffs' claims for excessive use of force asserted against the individual officers should be dismissed for failure to state a claim because these bystander Plaintiffs did not allege facts capable of showing that the police actions were directed at them or that they suffered a "seizure" as required for a violation of rights protected by the Fourth Amendment. *Id* at 862.  Similarly, the court in *Dantzler v. Hindman*, 2017 WL 6403043 *3 (W. D. Tex. 2017), held that similar to other courts' rejections of claims of emotional injuries for observation of excessive force used against another person, "a bystander who is not the object of police action cannot recover for resulting injuries under §1983." *Id.* at *13.

35.     In this case, Singleton asserts that she suffered a direct personal injury in the form of severe anxiety symptoms, moderate depression and grieve/loss symptoms related to the shooting of the unrelated decedent and of unrelated Snowden by Officer Casanova.[44]  Singleton was not the object of direct police action.[45]  Singleton makes her claim for recovery of emotional damages based on her witnessing the accidental death of the decedent.[46]  Singleton was merely a bystander who is asserting injuries as a result of police conduct directed toward others, which is not a permissible cause of action.

## XI.
## PATRICIA SLACK IS NOT DECEDENT'S PARENT AND CANNOT ASSERT A CLAIM UNDER THE WRONGFUL DEATH ACT OR SURVIVOR STATUTE.

36.     The purpose of the Wrongful Death Act ("Act") is to provide a means whereby surviving spouses, children, and parents can recover for the loss of a family member for wrongful death. Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a), *Garza v. Maverick Market, Inc.,* 768 S.W.2d 273, 275 (Tex. 1989).  Under Texas law, only the surviving spouse, children, and parents of a deceased individual may be the beneficiaries of wrongful death and survival suits. Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a), *Ortega v. United States*, 986 F. 3d 513 (5th Cir. 2021) (Emphasis added); *Byrnes v. Ford,* 642 F. Supp 309 (E.D. Tex., Beaumont Div., 1986) ("Moreover, §71.004(a) states that "An action to recover damages as provided by this subchapter is for the *exclusive* benefit of the surviving spouse, children, and parents of the deceased. (emphasis added))." *Id* at 310, 311. To bring suit under the Wrongful Death Act, a party is required to prove that he or she was the deceased's spouse, child, or parent. Tex. Civ. Prac. & Rem. Code Ann. § 71.004(a); *Garza,* at 275–76; *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 222 (Tex.1988).

---

[44] Exhibit E (Singleton Deposition pp. 20: 9-21; 85:14-88:8; 90:17-93:7).
[45] Exhibit A (Casanova Affidavit, p. 2).
[46] Exhibit E (Singleton Deposition pp. 107:13-23).

37.     Patricia Slack a/k/a Patricia Castillo testified at her deposition that, although she is the biological mother of Charles Roundtree Jr. ("decedent"), he was adopted by Slack's sister-in-law Bernice Roundtree. The adoption occurred on April 14, 2005, when decedent was four years old.[47]

### A. Slack is not the parent of decedent and does not have standing to sue under the Texas Wrongful Death Statute.

38.     "Under statute, adoption results in <u>complete severance</u> of parent-child relationship, . . . upon entry of decree of adoption, new parent-child relationship is created as if child were born to adoptive parents during marriage. *Go Intern., Inc. v. Lewis,* 601 S.W.2d 495 (Tex. Civ. App.—El Paso, June 4, 1980, writ refused n.r.e.), (Emphasis added). When judgment terminating parent-child relationship between natural mother and minor son is signed, all legal rights, privileges, duties, and powers concerning son are divested out of the mother. *Rogers v. Searle*, 533 S.W.2d 440, (Tex. App.—Corpus Christi, 1976, no writ).  Bernice Roundtree is designated as decedent's parent/mother in decedent's adoption papers, birth, and death certificates.[48]   In *Go International*, the court referred to language in the adoption statute that "upon adoption, all legal rights ... between the natural parent and the child with respect to each other are divested upon the adoption." *Id.* at 499.  Based on this language, the *Go International* court held that the adopted children were no longer "children" of their natural parents within the meaning of the Act, even though the adopted children retained the right to inherit from their natural parents.  *Id.* at 498–99. The court reasoned that "if the Legislature had intended to make an exception with regard to those rights which accrue under the wrongful death statute, it could easily have said so." *Id.* at 499. *LG Electronics, USA v. Grigg*, 424 S.W. 3d 804, 807-808 (Tex. App.—Tyler, 2014,

---

[47] Exhibit H (Slack Deposition 50:7-51:5); Exhibit I (Roundtree Deposition 52:4-54:10); Exhibit J (Copy of adoption papers and Powers of Attorney [CR000104-CR000112], produced by Plaintiffs in response to Defendant Casanova's Request for Production).
[48] Exhibit H (Slack Deposition, Att. 2, Death Certificate and Att. 3, Birth Certificate); Exhibit J.

no pet.) citing *Go International* at 498; Broussard v. KLLM, Inc., WL 11348337, *3 (E.D. Tex., May 12, 2008).

39.     The April 14, 2005 Order Granting Adoption to Bernice Roundtree provides,  "IT IS ORDERED that the adoption of the children the subject of this suit by Petitioners [Bernice Roundtree] is GRANTED and that the parent-child relationship is created between the children and Petitioners for all purposes."[49]   There is no evidence that Bernice Roundtree terminated her parental rights to decedent, just the opposite, Ms. Roundtree deposition testimony reaffirmed that she never terminated her parental rights to decedent.[50]   It is clear that Plaintiff Slack is not the decedent's parent under the Act and she does not have standing to sue for  decedent's death.

**B.  Slack cannot claim she is a parent under *"loco parentis"***

 40.     Texas courts have traditionally recognized the rights of persons standing *in loco parentis* to a child.  It is well-established that "*in loco parentis*" means in the place of a parent and refers to a relationship a person assumes toward a child not his or her own. *Coons-Anderson v. Anderson* 104 S.W. 3d 630, 634-635 (Tex. 2003); *McCall v. Hays County Constable Precinct Three*, 2020 WL 2739868, *5 (Tex. App.—Austin, May 21, 2020); citing *McCullough v. Godwin*, 214 S.W.3d 793, 807 (Tex. App.—Tyler 2007, no pet.). "The *in loco parentis* relationship arises when a non-parent assumes the duties and responsibilities of a parent and normally occurs when the parent is unable or unwilling to care for the child."  *McCall* at *5, citing *Coons-Anderson* at 635. As noted above, Bernice Roundtree is decedent's mother and did not terminate her parental rights after decent moved back in with Slack when he was fifteen (15) years old.[51] Texas courts have consistently held that the statutory word "parents" does not

---

[49] Exhibit I (Roundtree Deposition 30:10-31:2, 51:7-52:9); Exhibit H (Slack Deposition 56:19-57:8, 59:17-25); Exhibit J.
[50] Exhibit I (Roundtree Deposition 30:10-31:2, 51:7-52:9); Exhibit J.
[51] Exhibit I (Roundtree Deposition 30:3-31:2); Exhibit J.

incorporate a person standing in *loco parentis* for purposes of a wrongful death action. *Davis v. Bills*, 444 S.W.3d 752, 758 (Tex. App.—El Paso 2014, no pet.); *Robinson v. Chiarello*, 806 S.W.2d 304, 310 (Tex. App.—Fort Worth 1991, writ denied); *Taylor v. Parr*, 678 S.W.2d 527, 529 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) A person standing in *loco parentis* is not a child's parent for purposes of a wrongful death action. V.T.C.A., Civil Practice & Remedies Code § 71.004. *Davis v. Bills* 444 S.W. 3d 752 (Tex. App.—El Paso, 2014, no pet.).

**C.   Joint-Parenting Agreement is not applicable to confer status of *in loco parentis*.**

41.   Slack and Bernice Roundtree testified in their depositions that they had an unwritten joint-parenting agreement concerning the care and management of decedent.  Ms. Slack and Ms. Roundtree also executed two six-month Power of Attorneys to facilitate the agreement.[52] Agreements to share parenting duties cannot alone serve to confer the status of *in loco parentis*. *Coons-Anderson* at 635.

**D.   Slack is not an heir and does not have standing to assert a survival cause of action.**

42.   The Survival Statute provides that only a personal representative, administrator, or heir may sue on behalf of an estate. Tex. Civ. Prac. & Rem. Code § 71.021(b).   In a wrongful death or survival action brought under 42 U.S.C. § 1983, a party must have standing under the state wrongful death and survival statutes. *Turk v. Mangum*, 268 F. Supp. 3d 928, 931-32 (S.D. Tex., July 17, 2017) *citing* , *Pluet v. Frasier*, 355 F.3d 381, 383-84 (5th Cir. 2004); *Rhyne v. Henderson Cty.,* 973 F.2d 386, 390–91 (5th Cir. 1992). Whether a person is an "heir" for purposes of the Texas Survival Statute (TSS) is determined by reference to the relevant sections of the Texas Estates Code.  *Turk* at 935, *citing, Rodgers v. Lancaster Police & Fire Dep't,* 819 F.3d 205, 212 (5th Cir. 2016). Pursuant to Texas. Estates Code § 22.015, " 'Heir' means a person

---

[52] Exhibit I (Roundtree Deposition 30:10-31:2, 51:7-52:9); Exhibit H (Slack Deposition 56:19-57:8, 59:17-25).

who is entitled under the statues of descent and distribution to a part of the estate of a decedent who dies intestate. . ." *Id*. When a person dies intestate—without a spouse or surviving descendants—the estate "passes in equal portions to the person's father and mother." Texas. Estate. Code § 201.001(c).  A parent (biological or adoptive) of the intestate is not considered an heir if parental rights have been terminated. Tex. Fam. Code § 161.206(b)[53]; *see* Tex. Est. Code § 201.054(b).[54]  As such, Slack does not have standing to assert a cause of action under the Texas Survival Statute.  Therefore, her claims should be dismissed from this case.

**WHEREFORE, PREMISES CONSIDERED**, Defendant Casanova prays that his Motion for Summary Judgment be granted and that all of Plaintiffs' claims against him be dismissed.  Alternatively, Defendant prays for such other and further relief to which he is justly entitled.

---

[53] (b) Except as provided by Section 161.2061, an order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other, except that the child retains the right to inherit from and through the parent unless the court otherwise provides.

[54] (b) The natural parent or parents of an adopted child and the kindred of the natural parent or parents may not inherit from or through the adopted child, but the adopted child inherits from and through the child's natural parent or parents, except as provided by Section 162.507(c), Family Code.

Signed this 28th day of May, 2021.

Respectfully submitted,

DENTON NAVARRO ROCHA BERNAL & ZECH
A Professional Corporation
2517 North Main Avenue
San Antonio, Texas 78212
Telephone:     (210) 227-3243
Facsimile:     (210) 225-4481
pbernal@rampagelawa.com
aruiz@rampagelaw.com

By:     */s/ Patrick C. Bernal*
PATRICK C. BERNAL
State Bar No. 02208750
ADOLFO RUIZ
State Bar No. 17385600
COUNSEL FOR DEFENDANT
STEVE CASANOVA

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served upon the below named individual(s) via certified mail, return receipt requested, unless otherwise indicated, and according to the Federal Rules of Civil Procedure on the 28th of May, 2021.

**E-NOTIFICATION**
**CMRRR# 9489 0090 0027 6104 1778 59**
Daryl K. Washington
Washington Law Firm, PC
325 N. St. Paul, Suite 3950
Dallas, Texas 75201
*Counsel for Plaintiffs*

**E-NOTIFICATION**
**CMRRR# 9489 0090 0027 6104 1778**
N. Mark Ralls
HOBLIT DARLING RALLS HERNANDEZ
  & HUDLOW, LLP
6243 IH-10 West, Suite 601
San Antonio, Texas 78201
*Counsel for Defendant COSA*

**E-NOTIFICATION**
**CMRRR# 9489 0090 0027 6104 1778**
Mark Kosanovich
FITZPATRICK & KOSANOVICH, P.C.
P.O. Box 831121
San Antonio, Texas 78283-1121
*Counsel for Defendant COSA*

*/s/ Patrick C. Bernal*
PATRICK C. BERNAL
ADOLFO RUIZ

*Patricia Slack, et al. v. The City of San Antonio, Texas, et al.*
**No. 5:18-CV-1117 (USDC Western District, San Antonio Division)**

**DEFENDANT STEVE CASANOVA'S
MOTION FOR SUMMARY JUDGMENT
EXHIBITS A - J**

**THE VIDEO AND AUDIO RECORDINGS
AND LARGE PHOTOGRAPH FILES
WILL BE MAILED UNDER SEPARATE COVER**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **PATRICIA SLACK, Individually and as the** § | |
| **surviving mother of CHARLES** § | |
| **ROUNDTREE, JR., BERNICE** § | |
| **ROUNDTREE as the representative of the** § | |
| **estate of CHARLES ROUNDTREE, JR. and** § | |
| **all Statutory Beneficiaries, TAYLOR** § | |
| **SINGLETON, and DAVANTE SNOWDEN** § | |
| *Plaintiffs,* § | |
| § | **CIVIL ACTION NO.** |
| **VS.** § | **5:18-CV-1117-JKP-ESC** |
| § | |
| **THE CITY OF SAN ANTONIO, TEXAS** § | |
| **AND STEVE CASANOVA** § | |
| *Defendants.* § | |

---

## AFFIDAVIT OF STEVE CASANOVA

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Before me, the undersigned notary, on this day personally appeared Steve Casanova, a person whose identity is known to me. After being by me duly cautioned to tell the truth, subject to the penalties for perjury, he did affirm and testify as follows:

"My name is Steve Casanova. I am over the age of eighteen (18) years, am of sound mind, and am fully capable of making this affidavit. I am personally familiar with facts recited below, which are true and correct.

Currently, I hold the position of Police Officer for the City of San Antonio Police Department. I have held the position of Police Officer for the San Antonio Police Department for almost eight (8) years.

On Tuesday, October 16, 2018, I wore badge No. 0099 while on duty beginning at 2230 hours working patrol on the West Side of San Antonio. I patrolled the area near the Lincoln Heights Housing Project with my partner, Officer James Panah (Badge No. 0907), in separate patrol units. When I arrived at the location, I observed pedestrian traffic at a known drug house located at 217 Roberts Street. I observed an individual wearing pink pants, who I later learned to


**Exhibit A**

be Taylor Singleton, arrived at the house. I drove by the house and used my patrol unit's flood light to observe the house and activity. I then parked my vehicle at the intersection of Hamilton and Albert Streets where I could see and monitor pedestrian and vehicular activities at 217 Roberts Street. I had monitored 217 Roberts Street in this manner many times before. I estimate I stopped pedestrians and vehicles leaving 217 Roberts Street multiple times before, resulting in arresting people leaving this house in possession of illegal drugs.

A short while later, a vehicle approached my unit and a female complainant approached me to report that her husband had been punched in the face by a tall, thin black male from 217 Roberts Street. My body worn camera captured our conversation and is attached to my affidavit as **Exhibit A-1 (T06:06:46Z – T06:12: 19Z)**. The complainant identified herself as Maria Herrera and the victim was her husband Esteban Preciado. Her report of the assault and the location of the suspect lead me to decide to conduct a knock and talk investigation. The complainant and the victim were delivering soup across the street at 218 Roberts Street purchased over the internet when the assault occurred. I informed the complainant that I would go to the house to investigate. I told the complainant if I could, I would arrest the assailant. If not, I would provide Ms. Herrera with a case number and I would submit a report.

I asked Officer Panah to call other officers to provide back up and to position themselves nearby in the event the suspect attempted to flee. At approximately 1:20 AM on October 17, 2018, I approached the front gate to 217 Roberts Street, wearing my winter uniform including my name tag, arm patch and beanie with the SAPD logo and gun belt. I entered the gate using a flashlight as it was dark. The gate was unlocked. I observed an individual sitting on the porch. I greeted him with "What's up man" and asked if he lived there and who is staying in the house, but he indicated that he did not know. [**Exhibit A-1 (T06:21:44Z – T06:22:08Z)**]. I asked that he take his hat off and I recognized him as a person known by me to regularly be present at drug houses in my patrol area. I knew he did not match the description of the suspect I was looking for. I then walked toward one of the front doors. The outside metal door was closed. I did not open the outside metal door and knocked on the inside wooden door about three times. My last knock caused the inside door to swing open to what appeared to be a well-lighted living room where two individuals were sitting on a couch facing me less than six feet in front of me. The living room had a ceiling light fixture that I knew was shining a bright light on me as I was standing at the door behind the iron outer door. I did not rely on my flashlight to illuminate the room and therefore pointed my flashlight in a downward direction. [**Exhibit A-1 (T06:21:42Z - T06:22:15Z)**]. A third individual was sitting on a chair next to the couch. I scanned the three individuals to see what they had in their possession. The male sitting directly in front of me matched the description of the individual that assaulted the victim and I was focused on him. He greeted me saying: "What's up?" I replied: "What's up, man?" [**Exhibit A-1 (T06:22:16Z – T06:22:23Z)**]. This individual, who I now know to be Davante Snowden, then stood up in an aggressive manner and said:

"Hey, who the fuck is this?" As he stood up, he moved closer to me, while reaching for a gun near his waistband.  I clearly saw the gun in his right hand and described it later at the scene as a nine-millimeter handgun after I retreated to the street in front of 217 Roberts Street.  I indicated on my bodycam that the guy had a gun in his waist and described the handgun as a nine-millimeter.  [**Exhibit A-1 (T06:24:48Z – T06:25:12Z)**].

When I saw Mr. Snowden drawing his weapon, I immediately drew my holstered weapon and shouted, "Let me see your fucking hands!"  Until this point in time, I had not unholstered my weapon while conducting my investigation of the assault incident. When I saw Mr. Snowden drawing his weapon, I knew he intended to shoot at me and in the direction of my partners located behind me.  When he walked toward me, Mr. Snowden was less than five feet in front of me.  He moved to his right as he drew his gun.  I fired two successive rounds from my weapon aiming at Mr. Snowden as the only target.  The other individuals did not pose a threat to me at that moment.  I, along with other officers, retreated to the street in front of 217 Roberts Street. Approximately ten minutes later, the individuals occupying the house exited.  I had no role in the decision to hold and transport Plaintiff Singleton to the police station to give a statement.

Following the incident, I was placed on administrative leave while the San Antonio Police Department and other entities reviewed the incident.

Attached hereto is a true and correct copy of one (1) DVD  reflecting the video recording taken with my body camera on October 16th and 17th, 2018 involving the  shooting incident at 217 Roberts Street in San Antonio, Texas.

**Exhibit A-1**     Video recording taken by my body worn camera during my shift on October 16th and 17th,  2018.

**Exhibit A-2**     My written statement [COSA 002126-002128], taken October 17, 2018

I operated the body camera using a digital recording device, which accurately records and reproduces images, as is consistent with my operation of my body camera while I was on duty on October 16th and 17th, 2018.  The recording attached as **(Exhibit A-1)** has been preserved under the City of San Antonio Police Department's custody and control as required by law and I attest that, based on my personal observations at the time of the shooting incident at 217 Roberts Street, the recordings are true and correct recordings of the incident depicted."

Further Affiant sayeth not.

_____
STEVE CASANOVA

SUBSCRIBED AND SWORN TO BEFORE ME on this 27th day of May 2021, to certify which witness my hand and official seal.



MARLENA GUAJARDO
My Notary ID # 10002580
Expires November 15, 2022

_____
NOTARY PUBLIC, STATE OF TEXAS

**STATE OF TEXAS** §
**COUNTY OF BEXAR** §

**Case Number: SAPD18220885**
**Date and Time: 10/17/2018 0530 hrs**
**Taken by : <u>DET. R. Perez, #2298</u>**

Page 1 of 3

        **BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Steve Casanova who being by me duly sworn upon his/her oath deposes and says:

My name is Steve Casanova and I am a patrol officer with the San Antonio Police Department.  My badge number is #0099.  I have not been given or promised anything in return for my statement.  I have been with the San Antonio Police Department for approximately 5 years.  I have worked the streets the entire time.  I am currently assigned to Central Dogwatch.

I am here today to talk about what happened earlier this morning.  I came to work last night for my shift at 2230 hours.  My shift was from 2230 to 0630 hours.  I work in full SAPD uniform and was a one man unit.   From the time I came to work at 2230 hours to the time of this incident, I was answering calls for service as I would do on any other day.  At approximately 2330 hours, Officer J. Panah #0907 and I decided to go patrol the projects looking for activity.

I had seen a dark colored car with unknown people on Roberts Street.  I know Roberts Street as a street known for drug activity.  I then saw a female with pink pants crossing Roberts and head towards the house where this incident occurred.  She was lit up by the headlights of this dark colored car.  I then drove the block to see what they were doing down there. I let Officer Panah know what I had just seen.

I then parked at Hamilton and Albert streets. As I was parked a vehicle pulled up and parked next to me. A female exited the vehicle and approached me. The female stated she was the wife of the victim of an assault. At this time I realized that this vehicle was the same vehicle I'd just seen parked on Roberts Street. The female told me that a male had just assaulted her husband.  Her husband was driving their vehicle and was sitting in it as she was the only person that had gotten out.  She explained that while she was making a sale of soup on Roberts Street a black male had came out from across the street and had began cussing at them.  The black male then approached the driver's side of the car and opened the door and punched her husband in the face three or four times.  The husband had a busted lip.  The black male had been yelling at her 'why are you parked in front of my aunt's house and don't ever park here again'.  The wife of the victim explained to him that she was just making a sale and that she was sorry.  She was telling them that she wasn't from there and that they were going to be leaving.  The wife told me the husband did not want to file a report because he was nervous because he didn't have his papers. (I took this to mean he was an illegal immigrant).  Basically she was telling me that he didn't want anything to do with the Police but she was the one who'd initiated contact with me because she didn't feel it was right what had happened and she wanted to press charges.

At that point I gathered both their information and I explained that I would try and make contact with someone at the house.  I told her that if I didn't make contact with them I would still come back to her and file a report for her.  Officer Panah and I assigned ourselves.  Officer Panah I believe then sent out messages on the computer to other officers letting them know what we'd be doing.  I believe that the reason he did this was because of our knowledge of past drug activity at that particular house.

Once all the officers arrived, I gave them a rundown of what had occurred.  I then coordinated where everyone should position themselves in case somebody tried to run.  Officer Panah Officer Garza and I then approached 217 Roberts in our vehicles.  We parked one property down.  We all walked up to the house and I opened up the gate on the chain link fence.  I saw an unknown black male eating food on the porch.  I asked him if he lived there and he told me no.  I asked him who lived there and he said he didn't know.  In my opinion, he was being cooperative and I recognized him once he lifted up his hat.  I recognized him as a

Signature _____

**Sworn to and subscribed before me, R. Perez, #2298, a Peace Officer in the State of Texas and pursuant to Chapter 602.002 of the Texas Government Code on  this the 17th day of October, A.D., 2018.**

R. Perez, #2298
Detective, San Antonio Police Department

"EXHIBIT A-2"

**STATE OF TEXAS** §              **Case Number: SAPD18220885**
**COUNTY OF BEXAR** §         **Date and Time: 10/17/2018 0530 hrs**
                                     **Taken by : <u>DET. R. Perez, #2298</u>**

Page 2 of 3

                    **BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Steve Casanova who being by me duly sworn upon his/her oath deposes and says:

male I know as "John"; a male that frequents drug houses in the area.  I went to knock on the door.  When I walked up to the porch, I approached the door on the left; I initially tried to open the screen door but it was tied shut so I moved on to the door on the right.  I see a steel security door; I knocked on the interior wooden door and it just swung open.  I did not forcefully knock; it was light tap.  I was surprised the door opened as easily as it did.  I see a black male sitting directly in front of me; a female in pink pants to his right, they were both sitting on the couch. To her right there was another black male.  I did not recognize either of the black males however I did recognize the female in the pink pants as the female I had seen crossing the street a short time earlier.

The male sitting directly in front of me matched the description of the individual that assaulted the ladies husband.  I was focused on him.  As the door had swung open, this male had jumped up and had started walking towards me when I immediately noticed his right hand holding something in his waistband.  He's saying who the fuck are you; I'm thinking at this time he knows it's the cops.

As he's noticing me he's simultaneously moving to his right and I noticed it was a gun in his waistband and as I start to yell show me your hands, he was starting to pull the gun out of his waistband.  Beliving that the suspect was pulling his gun to try and shoot and kill me, I drew my weapon and fired two rounds.  I yelled to the guys shots fired as I'm falling back to a position of cover back into the street.  At that moment, both my partners had moved to cover.  As I was falling back to the vehicles I got on the police radio and said shots fired. I also noticed the pit bull come out of nowhere and was being very aggressive towards us.

By this time Officer Macias was moving through the empty lot.  He noticed the black male known as John standing by the side of the house; this would be the empty lot side.  Officer Macias told John to crawl towards us.  As he's crawling towards us, we were trying to get him to safety and in doing so, the pit bull actually attacked John.  Officer Panah, in protecting all of us, fired one shot killing the pit bull.  At that point, they took John off to safety.  I fall back from the front of the house to my patrol vehicle to get better cover.  Officer Garza deployed his AR rifle and provided cover for me.  I then deployed my AR rifle and we set up a perimeter at the location.  I did this because there were still subjects located inside the residence.  At this point we didn't know the status of the suspect that I had seen with a gun.

I got on the radio and gave a description of the people I had seen inside of the house; I also made it clear who had the firearm on them.  We sat and waited. Street crimes officers arrived to provide additional cover.  One of the Officers got on the PA and started giving commands to the people inside the location. He was letting them know to come out of the house with their hands up.  I could hear the people inside the house saying I'm coming out but call EMS.  I called for EMS; shortly after that I saw shadows of people coming out of the house.  I believe four people came out.  I could hear them being detained and being secured in patrol vehicles.  As soon as we thought everyone was safely out of the house, street crimes got a group of officers together and they made entry.  They went inside to clear the house.

Sgt. Limon then told me to stay back because I had been involved in the shooting.  Besides Officer Panah and I, no other Officers fired their weapons.  I stood by until I was transported to the Public Safety Headquarters to provide my statement.

                  **Signature** _____

**Sworn to and subscribed before me, R. Perez, #2298, a Peace Officer in the State of Texas and pursuant to Chapter 602.002 of the Texas Government Code on  this the 17th day of October, A.D., 2018.**

                        _____
                        R. Perez, #2298
                        **Detective, San Antonio Police Department**

**STATE OF TEXAS** §      **Case Number: SAPD18220885**
**COUNTY OF BEXAR** §     **Date and Time: 10/17/2018 0530 hrs**
             **Taken by : DET. R. Perez, #2298**

Page 3 of 3

      **BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Steve Casanova who being by me duly sworn upon his/her oath deposes and says:

I have read this statement and everything is true and correct to the best of my knowledge.

Signature _____

**Sworn to and subscribed before me, R. Perez, #2298, a Peace Officer in the State of Texas and pursuant to Chapter 602.002 of the Texas Government Code on  this the 17th day of October, A.D., 2018.**

_____
**R. Perez, #2298**
**Detective, San Antonio Police Department**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **PATRICIA SLACK, Individually and as the** | § | |
| **surviving mother of CHARLES** | § | |
| **ROUNDTREE, JR., BERNICE** | § | |
| **ROUNDTREE as the representative of the** | § | |
| **estate of CHARLES ROUNDTREE, JR. and** | § | |
| **all Statutory Beneficiaries, TAYLOR** | § | |
| **SINGLETON, and DAVENTE SNOWDEN** | § | |
|     *Plaintiffs,* | § | |
| | § | **CIVIL ACTION NO.** |
| **VS.** | § | **5:18-CV-1117-JKP-ESC** |
| | § | |
| **THE CITY OF SAN ANTONIO, TEXAS** | § | |
| **AND STEVE CASANOVA** | § | |
|     *Defendants.* | § | |

---

### AFFIDAVIT OF JAMES PANAH

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Before me, the undersigned notary, on this day personally appeared James Panah, a person whose identity is known to me. After being by me duly cautioned to tell the truth, subject to the penalties for perjury, he did affirm and testify as follows:

"My name is James Panah. I am over the age of eighteen (18) years, am of sound mind, and am fully capable of making this affidavit. I am personally familiar with facts recited below, which are true and correct.

Currently, I hold the position of Police Officer for the City of San Antonio Police Department ("SAPD"), Badge No. 0907. I was a patrol officer on October 16 and 17, 2018, when the incident that is the basis of this lawsuit occurred.

On Tuesday, October 16, 2018, I wore badge No. 0907 while on duty beginning at 2230 hours working patrol on the West Side of San Antonio. I patrolled the area near the Lincoln Heights Housing Project with my partner Officer Steve Casanova (Badge No. 0099) in separate patrol units. Officer Casanova called for my assistance regarding an assault incident where a suspect ran into the house at 217 Roberts Street after the assault. Officer Casanova was wearing his full regulation SAPD uniform, with badge, name plate, and SAPD patch on his arm and

**Exhibit**
**B**

on the front of his beanie. *See* **Exhibit B-1** (T06:07:22Z - T6:08:08Z) and **Exhibit B-2** (Still frame, T06:07:29Z). I followed Officer Casanova as we walked to 217 Roberts to conduct a knock and talk at the residence. I witnessed Officer Casanova walk up the pathway to the house, speak to an individual who was sitting on the porch and step onto the porch to approach the front door. Officer Casanova knocked three times on the inner door and the door swung open. Officer Casanova's firearm was holstered during this time. *See* **Exhibit B-1** (T06:21:42Z—T06:22:12Z -T06:22:14Z) and **Exhibit B-3** (Still frame, T06:22:08Z).

Attached hereto is a true and correct copy of one (1) DVD reflecting the video recording, including still frames from the video recording taken with my body worn camera (BWC) on October 16th and 17th, 2018, involving the incident at 217 Roberts Street in San Antonio, Texas.

**B-1:**   BWC video recording of the subject incident taken during my shift on October 16th and 17th, 2018.

**B-2:**   Still frame taken from BWC video recording at Time stamp, T06:07:29Z.

**B-3:**   Still frame taken from BWC video recording at Time stamp, T06:22:08Z.

I operated the BWC using a digital recording device, which accurately records and reproduces images, as is consistent with my observations of the subject incident while I was on duty on October 16th and 17th, 2018. The recording attached as **(Exhibit B-1)** has been preserved under the City of San Antonio Police Department's custody and control as required by law and I attest that, based on my personal observations at the time of the shooting incident at 217 Roberts Street, the recordings are true and correct recordings of the incident depicted."

Further Affiant sayeth not.

≠907

_____
JAMES PANAH

SUBSCRIBED AND SWORN TO BEFORE ME on this 25th day of May 2021, to certify which witness my hand and official seal.

MELISSA M TIJERINA
Notary ID #125201404
My Commission Expires
October 24, 2022

_____
NOTARY PUBLIC, STATE OF TEXAS

D18220885_00137518_PANAH_JAMES_A-file 1



2018-10-17 T06:07:29Z
AXON BODY 2 X81246568

"EXHIBIT B-2"



"EXHIBIT B-3"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **PATRICIA SLACK, Individually and as the** § | |
| **surviving mother of CHARLES** § | |
| **ROUNDTREE, JR., BERNICE** § | |
| **ROUNDTREE as the representative of the** § | |
| **estate of CHARLES ROUNDTREE, JR. and** § | |
| **all Statutory Beneficiaries, TAYLOR** § | |
| **SINGLETON, and DAVENTE SNOWDEN** § | |
| *Plaintiffs,* § | |
| § | **CIVIL ACTION NO.** |
| **VS.** § | **5:18-CV-1117-JKP-ESC** |
| § | |
| **THE CITY OF SAN ANTONIO, TEXAS** § | |
| **AND STEVE CASANOVA** § | |
| *Defendants.* § | |

---

## AFFIDAVIT OF RUBEN PÉREZ

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF BEXAR | § |

Before me, the undersigned notary, on this day personally appeared Ruben Pérez, a person whose identity is known to me. After being by me duly cautioned to tell the truth, subject to the penalties for perjury, he did affirm and testify as follows:

"My name is Ruben Pérez. I am over the age of eighteen (18) years, am of sound mind, and am fully capable of making this affidavit. I am personally familiar with facts recited below, which are true and correct.

Currently, I hold the position of Detective for the City of San Antonio Police Department Homicide Division ("SAPD"), Badge No. 2298. I was the Investigating Detective for SAPD in October 2018 when I investigated the shooting incident that occurred on or about October 17, 2018.

As part of the investigation, I interviewed Davante Snowden on October 24, 2018. I obtained a recorded DVD statement from Davante Snowden on October 24, 2018, regarding the shooting incident that occurred on or about October 17, 2018. A written record of the recorded statement and the DVD video and audio recording are attached respectively as **Exhibits C-1 and C-2.** During the recorded statement, I asked Davante Snowden about an assault that occurred outside in the

Affidavit of Ruben Perez



**Exhibit C**

Page 1 of 4

yard at 217 Roberts Street. Mr. Snowden stated that it happened when it was dark before the incident. Mr. Snowden stated that he pushed a Mexican man who came into the yard. Mr. Snowden said that was the only altercation that happened.

Soon after the shooting incident, in the early morning of October 17, 2018, a consent to search the property was obtained from the homeowner, Mr. Hence Williams and a search warrant was procured for 217 Roberts Street, including inside and outside the house. A Smith and Wesson nine-millimeter magazine/clip containing eleven (11) live rounds was found in the back bedroom. **[Exhibit C-3, COSA 003426-003427 and COSA 003433].**

A Smith and Wesson nine-millimeter semi-automatic firearm, serial number HEV1574, ("firearm") with one live round removed from the chamber, recorded as E-5, was found a few feet outside the back bedroom window of 217 Roberts. **[Exhibit C-4, COSA 003375, COSA 001981, and COSA 001992].**[1]

I placed a trace on the firearm, which revealed that the original purchaser of this firearm was Darrel Marquis Wiggins, Jr. **[Exhibit C-5, Excerpt of my report, COSA 001820].** On December 4, 2018, I traveled to Converse, Texas and contacted Darrell Wiggins, Jr. Mr. Wiggins reported that he had sold the firearm to a Deshon Winn. **[Exhibit C-6, COSA 004120].** On December 19, 2018, I located a Michael Deshon Winn in the Bexar County Jail. Michael Deshon Winn admitted to buying the firearm that was found in the yard at 217 Roberts on the night of the shooting on October 17, 2018, from a person named Darrell for the sum of $200.00. Mr. Winn said that he did not really want the firearm and that he was buying it for a "homeboy"; a guy named "Slime Dinero". Mr. Winn went on to say that he knew the whole story about the shooting at 217 Roberts but did not want to get involved. Mr. Winn stated that "Slime Dinero's" real name was Marcus. Mr. Winn stated that Marcus had called him the day of the incident at 217 Roberts and reported that Marcus had gone to the "Trap House" at 217 Roberts and left the firearm with Charles. **[Exhibit C-7, COSA- 001831** and see the video recording of the interview with Michael Deshon Winn on **Exhibit C-8, COSA 003464].**

Attached hereto is a true and correct copy of three (3) pages of documents consisting of my investigative report from my interview of Davante Snowden on October 24, 2018 regarding the shooting incident that occurred on or about October 17, 2018. I recall making the report and I identified myself as the "Officer Making Report" on the bottom of pages 1-3 of the report. Also attached is one (1) DVD reflecting one video recorded statement given by Davante Snowden on October 24, 2018.

---

[1] It is important to mention that the back bedroom window near where the Smith and Wesson automatic was found contained a window air conditioning unit with an eight to ten inches gap/opening next to the air conditioner. The window opening was larger than this particular unit. This gap/opening was stuffed with a black/Brown throw pillow. **[Exhibit C-9, photo COSA- 003086, COSA 003142, and COSA 003370].**

**Exhibit C-1** Written record of the DVD recorded statement of Davante Snowden from my Investigation Report, Offense Number 18220885, regarding the shooting incident that occurred on or about October 17, 2018 [**COSA 001788-001790**].

**Exhibit C-2** Two (2) DVD video recordings of the statement given by Davante Snowden on October 24, 2018 regarding the shooting incident that occurred on or about October 17, 2018, and his altercation with the Mexican man. (15:34:58 -15:37:54) [**COSA 003572, Part 1 and Part 2**].

I operated the video camera using a digital recording device, which accurately records and reproduces images, as is consistent with my training and operation of the camera and recording device while I was obtaining a DVD recorded statement from Davante Snowden on October 24, 2018. The attached recording (Exhibit C-2) has been preserved under the City of San Antonio Police Department's custody and control as required by law and I attest that, based on my personal involvement in the interview and observations of the recording, the video recording is a true and correct recording of Davante Snowden's statement that took place on October 24, 2018.

Also, attached hereto is a true and correct copy of seven (7) of crime scene photos; four (4) pages of investigation documents and reports; and one (1) video recording from my Internal Affairs investigation; one (1) video interview with Darrell Wiggins, Jr., and one (1) video interview with Michael Deshon Winn.

C-3:    Photographs of Smith and Wesson nine-millimeter magazine/clip [**COSA-003426-003427 and COSA-003433**]

C-4:    Crime Scene Search Report and photograph of Smith and Wesson firearm [**COSA 003375, COSA 001981, and COSA 001992**]

C-5:    Excerpt of my report regarding a Smith and Wesson firearm [**COSA 001820**]

C-6:    Video recording entitled, "Johnathon Korczynski 201812041437 VHC2009635 73479465" [**COSA 004120**]

C-7:    Excerpt of my report regarding Michael Deshon Winn [**COSA 001831**]

C-8:    Video recording entitled, "Interview at Bexar County Jail by Michael Winn" [**COSA 003464**]

C-9:    Photographs of window and/or pillow [**COSA- 003086, COSA 003142, and COSA 003370**]

The attached digital photos; video interview recordings and/or body camera videos; crime scene investigation documents, and/or Internal Affairs investigation reports are kept by the City of San Antonio Police Department in the regular course of business, and it was in the regular course of business and activity of City of San Antonio Police Department for an employee of City, with knowledge of the act and contains information transmitted by the person with knowledge of the matters of the event, condition, opinion, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the occurrence of the matters set forth in the documents, photos, and/or digital footage and was made by the regularly conducted activity as a usual practice for the City of San Antonio Police Department. The records attached are exact duplicates of the originals which are true and correct."

Further Affiant sayeth not.

_____  #2298

RUBEN PEREZ

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of May, 2021, to certify which witness my hand and official seal.

JENNIFER A TELLEZ
Notary Public, State of Texas
My Commission Expires
August 12, 2023
NOTARY ID 12516357-2

NOTARY PUBLIC, STATE OF TEXAS

| PROSECUTION GUIDE | 3. OFFENSE CLASSIFICATION | | |
|---|---|---|---|
| PAGE 5 OF 50 | **Felon in Poss of firearm** | 4. ASSIGNMENT NO: | 18220885 |
| | | 5. OFFENSE NO: | 520303 |
| | | 6. DATE REPORTED: | 10/17/18 |

ROUTING: Homicide

### SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | | Phone Number |
|---|---|---|---|
| **Casanova, Steve #0099** | ▉ | | ▉ |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report |
|---|---|---|---|
| **217 Roberts S.A., TX** | **2360** | **10/17/2018 0106 hrs** | **12/26/2018 1700 hrs** |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

Patricia Slack (NOK) was notified of Charles Roundtree's (O1)'s death by Det. L. Saiz #2474.

**ARRESTED PERSON:**     **Snowden, Davante M.**          ***O1's friend***
**(AP)**                          B/M ▉

                                ▉

                                                    *Recorded DVD statement obtained*



On Wednesday, October 24th 2018, Davante Snowden (AP) was arrested on a felon in possession of firearm warrant and was transported to the Homicide office for a formal statement; a summary of his interview:

1503 hours-Davante was put in room #3329.  For his comfort, Officer Hebert put his handcuffs in front.

I walked in to the room and offered him water.  He accepted the water.  I exited the room and returned with a bottle of water.

I introduced myself and then I then read Davante his Miranda warning using SAPD form 66-E and he said he understood his rights.  I filled out the SAPD form 66-8L form for him.

1515 hours-Davante said that Hence was not blood related; he calls Hence his "grandfather."  Went on to say that he breeds dogs and keeps them at Hence's and goes by every day.  He said they were "chillin"; he said Charles shut the door and they were chillin' some more then the door swung open and he heard the gunshots.  He tried to go for the hallway and into Hence's room.  He closed the front door.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ARREST | ( XX ) | CLEARED BY JUVENILE ARREST | ( ) | CLEARED BY EXCEPTION OF OTHER MEANS | ( ) | CHANGE OF OFFENSE | ( ) | PROGRESS OF INVESTIGATION | ( ) |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| **Detective R. Perez # 2298** | **Sergeant W. McCourt # 3266** | | **Homicide** |

| SAN ANTONIO POLICE DEPARTMENT | TYPE ONLY | PROSECUTION GUIDE SAPD Form 3-L  Rev. (9-90) |
|---|---|---|

"EXHIBIT C-1"

 ⑦

COSA001788

| PROSECUTION GUIDE | 3. OFFENSE CLASSIFICATION | | |
|---|---|---|---|
| PAGE 6 OF 50 | **Felon in Poss of firearm** | 4. ASSIGNMENT NO: | 18220885 |
| | | 5. OFFENSE NO: | 520303 |
| | | 6. DATE REPORTED: | 10/17/18 |

ROUTING: <u>Homicide</u>

### SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First, Middle Initial | Address of Complainant | Phone Number | |
|---|---|---|---|
| **Casanova, Steve #0099** | ██████████ | ██████████ | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report |
|---|---|---|---|
| **217 Roberts S.A., TX** | **2360** | **10/17/2018 0106 hrs** | **12/26/2018 1700 hrs** |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

He said they tried to say we had "something." (Referring to Officer's saying he had a gun).

He said his girlfriend had dropped him off at Hence's house at approximately 5:00 p.m. on Tuesday, October 16th 2018.

The night of the incident he was wearing black and white Nikes, a black jacket and khaki pants

1521 hours-Davante said that he and Charles are "blood cousins" through their fathers. He talked about Taylor arriving and how he was going to sell a dog but the buyer never arrived.

Davante and Taylor are not related by blood; he said his mother helped raise her.

1525 hours-I asked him if he did anything significant that night and he said no.

1530-Davante talked about himself getting shot and then how Charles got shot as he was behind him. I asked him about how long they'd been inside the house after the shooting; he said he felt it was about a minute, no more than a minute and thirty seconds before they came back out.

1533 hours-Det. Saiz knocked on the door and gave me the copy of the firearms trace report. I asked him about an assault that had occurred outside. He said a "Mexican" had gone into the yard and that he, Davante had pushed him. He said the Mexican came into the yard and he pushed him. He said that was the only altercation that happened.

1539 hours-"I did not have a gun that night."

1550 hours-I stepped out of the room.

1554 hours-I walked back in the room. I asked Davante if he would give me a buccal swab. He said he would not do it without his lawyer. I then asked him if he was willing to take a polygraph exam and he said he needed to contact his lawyer. I walked out of the room.

1559 hours-Det. Espinosa and I walked into the room and Det. Espinosa and Espinosa tried to explain to Davante what he had told him. Davante

1605 hours-Davante was led out of the room.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ARREST | ( XX) | CLEARED BY JUVENILE ARREST | ( ) | CLEARED BY EXCEPTION OF OTHER MEANS | ( ) | CHANGE OF OFFENSE | ( ) | PROGRESS OF INVESTIGATION | ( ) |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| **Detective R. Perez # 2298** | **Sergeant W. McCourt # 3266** | | **Homicide** |

| SAN ANTONIO POLICE DEPARTMENT | TYPE ONLY | PROSECUTION GUIDE SAPD Form 3-L Rev. (9-90) |
|---|---|---|

⑧

| PROSECUTION GUIDE | 3. OFFENSE CLASSIFICATION | | | |
|---|---|---|---|---|
| PAGE 7 OF 50 | **Felon in Poss of firearm** | | 4. ASSIGNMENT NO: | 18220885 |
| | | | 5. OFFENSE NO: | 520303 |
| | | | 6. DATE REPORTED: | 10/17/18 |

ROUTING: <u>Homicide</u>

### SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | | Phone Number | |
|---|---|---|---|---|
| **Casanova, Steve #0099** | | | | |
| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report | |
| **217 Roberts S.A., TX** | **2360** | **10/17/2018 0106 hrs** | **12/26/2018 1700 hrs** | |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

1607 hours-video ends.

Davante never admitted to having a gun on him; also said he never went into the back room.

### VEHICLES:
No vehicle was involved in this incident.

### WITNESSES:

**WITNESS #1:**  Panah, James #0907
**(W1)**  SAPD Central Patrol



\*Written statement obtained by
Det. T. Angell #2395

Officer Panah (W1) reported he was on patrol when he was requested to contact Officer Casanova at the intersection of N. Hamilton and Albert. Officer Casanova advised him that he had been flagged down by two males who reported they were assaulted in front of 217 Roberts. Officer Panah reported when they arrived at 217 Roberts they observed an older B/M sitting on the front porch of the residence. They asked the male if he lived at the residence and he reported he did not. As they knocked on the front door, the door swung open and Officer Panah reported he briefly saw two males and a female inside the front room of the residence.

Officer Panah said Officer Casanova was in front of him and his vision into the room. Panah said he heard one of the males say "who the fuck are you." Officer Panah said he heard Officer Casanova giving the male commands to show his hands. Officer Panah said he then heard Officer Casanova yelling out "drop the gun" just before he (Officer Casanova) fired his duty weapon two times. Officer Panah said he immediately retreated to the side of the residence where a vicious dog began attempting to attack him. Officer Panah said he then retreated further to the street and took cover behind a parked vehicle. Officer Panah said the dog continued to attempt to attack the officers as they tried to take control of the situation. As they tried to detain and search the older male from the front porch, the dog began to bite the male they were trying to detain. At that point Officer Panah shot and killed the animal to protect officers and civilians at the scene.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ARREST | (XX) CLEARED BY JUVENILE ARREST | ( ) CLEARED BY EXCEPTION OF OTHER MEANS | ( ) CHANGE OF OFFENSE | ( ) PROGRESS OF INVESTIGATION | ( ) |
|---|---|---|---|---|---|---|---|
| Officer Making Report (Badge No.) **Detective R. Perez # 2298** | | Approving Authority **Sergeant W. McCourt # 3266** | | Unit Case No. | | Unit Assigned to Follow -up **Homicide** | |

| **SAN ANTONIO POLICE DEPARTMENT** | **TYPE ONLY** | **PROSECUTION GUIDE** SAPD Form 3-L Rev. (9-90) |
|---|---|---|



Case 5:20-cv-00127-JKP-ESC  Document 143  Filed 08/01/21  Page 44 of 305





COSA003427



COSA003433



# City of San Antonio
## San Antonio Police Department
### Crime Scene Search Report



| Crime Scene Case Header |
|---|

*Case No.: SAPD18220885    CFS Case No.: SAPD-2018-1196862    *Off/Incident: Officer-Involved Shooting

*Place of Occurrence: 217 Roberts St    *District: 2360

Reported: *Date: 10/17/2018    Arrived: *Date: 10/17/2018    Completed: *Date: 10/17/2018

*Time: 0210    *Time: 0232    *Time: 0930

Connected Person(s) – Suspect/Victim/Witness/Arrested Person :

| S/V/W AP. | Name | Gender | DOB | Race | Address | Phone | Add |
|---|---|---|---|---|---|---|---|
| SP | Roundtree, Charles | Mal | ▉ | B | ▉ | (000) 000-0000 | Delete |

| Evidence |
|---|

**Photos:** ○ No  ● Yes    ☑ Regular Photos    Quantity: ____    ☑ Add'l Details

Additional Photo Details: SAPD CSI A. Salvatierra #9415 photographed the scene. Refer to her report for further details.

☐ PanoScan Photos

**Video:** ○ No  ● Yes    Minutes: ____    ☑ Add'l Details

Additional Video Details: SAPD CSI C. Crain #9444 video taped the scene. Refer to her report for further details.

**Graphics:** ○ No  ● Yes    ☑ Sketch    ☑ Diagram    ☐ 3D Laser Scan    ☑ Add'l Details

Additional Graphics Details: I completed a rough sketch of the exterior and interior scene to include overall room measurements and measurements from two reference points to each item of evidence. The sketch was scanned into RMS. Diagram to be completed at a later date.

**Physical Evidence:** ○ No  ● Yes

Evidence Collected: SAPD CSI A. Salvatierra #9415 collected the evidence. Refer to her report for further details.

**Prints:**    Latent Prints Found?  ● No  ○ Yes

Prints Attempted with Negative Results?  ● No  ○ Yes

**Firearm(s):**

| Ref | Make | Model | Type | Caliber | Barrel Length | Serial Number | Supp? | Add |
|---|---|---|---|---|---|---|---|---|
| F1 | | | | | | | ☐ | Delete |

**Vehicle(s):**

| Ref | Year | Make/Model | Color | License Number | VIN | Supp? | CoSA Veh? | Add |
|---|---|---|---|---|---|---|---|---|
| MV1 | | | | | | ☐ | ☐ | Delete |

**General Details:**  ○ No  ● Yes

PS.4125-05(a).OFFENSE.INVESTIGATION.RECORD.SAPD Crime Scene Search
Rev.2013-4  05/21/13

(199)

Case No:  SAPD18220885
Page 1 of 2

"EXHIBIT C-4"

COSA001980



# City of San Antonio
## San Antonio Police Department
### Crime Scene Search Report



I was dispatched to the above listed location for a Officer-Involved Shooting. Upon arrival, I contacted SAPD CSI A. Salvatierra #9415 who requested that I sketch the exterior and interior scene. Sergeant A. Johnson #3381 was on scene prior to my arrival.

I conducted an initial search of the exterior scene and observed the firearm West of the above listed location (house) on the ground near a tree. In front of the house there was a spent shell casing in the street near a dead dog, one (1) gray "Nike" shoe, and two (2) spent shell casing next to the front patio area of the house.

I sketched the exterior scene as stated above. SAPD CSI C. Crain #9444 made the scene in the MCL. Once we had a search warrant on scene we entered the house and I observed the apparent bullet hole in one of the entrance door frames and in the opposite wall (East wall) of the South East room. The above listed Suspected Person (SP) was laying in the hallway with a black backpack under his head. There was a cell phone on the ground in the dining room/kitchen area down the hall from the SP. There was a cell phone on the couch in the South West room of the house and a puppy that was initially on the couch in that room. There was one (1) wooden handled apparent long gun leaning against a nightstand in the South West room and two (2) apparent long guns in the closet of the same room. I sketched the interior scene as stated above. CSI Crain, Salvatierra and I searched for the slug that went through the East wall but were unable to find it. The Medical Examiner (ME) made the scene. During the ME's initial examination we found apparent drugs in a plastic bag in the SP's waistband. After they removed the SP's body we found a firearm magazine on the floor at the foot of the bed in the North West bedroom. It appeared to belong to the firearm found outside which was missing the magazine. The scene was cleared by Sergeant Johnson at 0610.

I relocated to the SAPD Crime Scene Unit located at 515 S Frio where I scanned and uploaded the sketch into RMS. No further action taken.

| Signature | |
|---|---|
| Member Making Report: **Nicolas Berrios (SAPD)** | Badge No.: 9401 |
| Assisted By: | Badge No.: |

☑ Report Completed

PS.4125-05(a).OFFENSE.INVESTIGATION.RECORD.SAPD Crime Scene Search
Rev.2013-4  05/21/13

200

Case No:   SAPD18220885
Page 2 of 2

COSA001981



**City of San Antonio**
**San Antonio Police Department**
Crime Scene Search Report



| Crime Scene Case Header |
|---|

*Case No.: 18-220885    CFS Case No.: _____    *Off/Incident: Officer Involved Shooting

*Place of Occurrence: 217 Roberts Street _____    *District: 2360

Reported:    *Date: 10/17/2018    Arrived: *Date: 10/17/2018    Completed: *Date: 10/17/2018

*Time: 0120    *Time: 0125    *Time: 1200

Connected Person(s) — S**uspect**/V**ictim**/W**itness**/A**rrested** P**erson** :

| S/V/W AP | Name | Gender | DOB | Race | Address | Phone | Add |
|---|---|---|---|---|---|---|---|
| SP1 | Charles Roundtree Jr. | Mal | ▮ | B | ▮ | (000) 000-0000 | Delete |
| SP2 | Davante Snowden | Mal | ▮ | B | unknown | (000) 000-0000 | Delete |

| Evidence |
|---|

Photos: ○ No ● Yes    ☑ Regular Photos    Quantity: 333    ☑ Add'l Details

Additional Photo Details: | I took approximately three hundred-thirty-three (333) overall, medium and closeup photographs of the above listed location and surrounding areas to include the following: Photographs of SP2 and his injuries to the buttocks, exterior and interior of the location, SP1 deceased body and his injuries to the chest, and the medical examiner investigator's initial exam of the body. I downloaded the original images to one (1) DVD and submitted the same DVD to the Photo Service Lab for further investigations and preservations.

☐ PanoScan Photos

Video: ● No ○ Yes

Graphics: ● No ○ Yes

Physical Evidence: ○ No ● Yes

Evidence Collected: | I collected the following items of evidence from the above location:

A - One (1) GSR Test Kit performed on a Charles Roundtree Jr. B/M 09-05-2000
E1 - One (1) spent shell casing (stamped: S&W 40 SPEER) (from roadway south of the location)
E1a - One (1) DNA swab from E1
E2 - One (1) NIKE gray running shoe (LEFT) (from roadway/walkway south of the location)
E3 - One (1) spent shell casing (stamped: S&W 40 SPEER) (from ground east of the front porch stairs)
E3a - One (1) DNA swab from E3
E4 - One (1) spent shell casing (stamped: S&W 40 SPEER) (from ground east of the front porch stairs)
E4a - One (1) DNA swab from E4
E5 - One (1) SMITH & WESSON SD 9VE (semi-auto handgun) Serial No. HEV1574 (9mm)
    black in color with a chrome slide (from the ground next to a tree west of location at the north bedroom window) (Weapon made safe)
E5a - One (1) live round from E5 chamber (WIN 9mm Luger)
E5b - One (1) Trace DNA (touch) swab from E5
E5c - One (1) Trace DNA (touch) swab from E5a

COSA001992



# City of San Antonio
## San Antonio Police Department
### Crime Scene Search Report



E6 - One (1) CoolPad Model 3632A (FCC ID No. R38YL3032A) with a black broken screen
   (living room TV stand)
E6a - One (1) Trace DNA swab from E6
E7 - One (1) Iphone X Max black in Otter Case (elderly female image on lock screen) (from kitchen floor)
E7a - One (1) Trace DNA swab from E7
E8 - One (1) LG G7ThinQ cell phone (space gray) with apparent blood (from couch in front bedroom)
E8a - One (1) Trace DNA swab from E8
E9 - One (1) BB gun APX UX rifle #1617220130170542J with misc. loose BB's (weapon made safe)
   One (1) GAMO SWARM Maxxim Pellet rifle (04-1C-084455/17cal. 4.1/1.77 (Empty)
   (front bedroom closet)
E10 - One (1) Pellet gun unknown make model (brown stock) (rusted) unloaded (front bedroom
   along west wall) RIFLE
E11 - One (1) plastic bag with approx. five (5) small cubbed rocks of dry, white, powder like materials
   (2grams) (tucked into the SP1's waistband of pants)
E12 - One (1) black Jansport backpack with misc. clothing, toiletries, watch, chain, and papers
   (under SP2 head)
E12a - US Paper and coin currency from E12 totaling: $303.44
E12b - One (1) ID Card for the SP1: Charles Roundtree Jr. (B/M) ▬▬▬▬▬▬▬
   One (1) Social Security Card for SP1: Charles Roundtree
E13 - One (1) 9mm magazine (Smith & Wesson) with four (4) live rounds (CBC 9mm Luger)
   and seven (7) live rounds (WIN 9mm Luger)
   (from under edge/sheets of the north bedroom bed)
E13a - One (1) Trace DNA swab from E13 (magazine)
E13b - One (1) Trace DNA swab from E13 (live rounds)


I marked with my initials, packaged and placed the above items of evidence into the Property Room with
the appropriate bar code labels with the exception of E5, E5a and E13. These respective items were placed
into the Blood Drying Cabinet #4 to dry and wait for further processing.

**Prints:**   Latent Prints Found?   ○ No   ● Yes   Elimination Prints Taken From: ☐ Complainant   ☐ Other

Prints Collected: Using a single use Black Powder and Brush, I conduced a search for latent prints on the below
mentioned items of evidence. I was able to develop prints from the following items:

1. E13 (magazine)

I submitted the developed prints to the Identification Unit for further examination and preservations.

Prints Attempted with Negative Results?  ● No  ○ Yes

**Firearm(s):**

| Ref | Make | Model | Type | Caliber | Barrel Length | Serial Number | Supp? | Add |
|-----|------|-------|------|---------|---------------|---------------|-------|-----|
| F1 | Smith & Wesson | SD 9VE | semi-auto | 9 | 4 | HEV1574 | ☐ | Delete |

**Vehicle(s):**

| Ref | Year | Make/Model | Color | License Number | VIN | Supp? | CoSA Veh? | Add |
|-----|------|-----------|-------|----------------|-----|-------|-----------|-----|
| MV1 | | | | | | ☐ | ☐ | Delete |

**General Details:**  ○ No  ● Yes



# City of San Antonio
## San Antonio Police Department
### Crime Scene Search Report



I responded to the above location to assist in the processing of an Officer Involved Shooting scene. Upon my arrival to the location, I contacted Sgt. A. Johnson #3381 to inform him of the situation and to request additional personnel for the processing duties at the scene.

Officers at the scene were in the process of securing the location with patrol vehicles, crime scene tape and multiple police officers on foot. Several hostile community members and individuals that claimed to be the family of the SP1, arrived at the scene and made multiple attempts to gain entry in to the secured area.

After confirming with Lt. Padweka that the scene was secured for processing, I immediately began photographing the location and SP2 who was being prepped for transport to a local area hospital by EMS personnel. The SP2 had sustained a gunshot wound to the buttocks. I then began to photograph the exterior of the location and surrounding areas.

CSI Carin Crain #9444 and CSI Nick Berrios #9401 arrived to the location to assist in the processing. At the time of their arrival, it was determined that I would be responsible for photographing the scene and collecting items of evidence. CSI Carin Crain #9444 was responsible for recording the scene by means of a video, assisting with scene search and assisting with the collection of evidence. CSI Nick Berrios #9401 was responsible for recording the scene by means of a rough sketch. CSI Det. Sweeney #2237 responded to University Hospital to photograph and collect the clothing of SP2 at my request. See all respective personnel reports for additional information.

I began the processing of the exterior yard and surrounding locations while waiting for a warrant to be signs fro the interior of the home.

SCENE OBSERVATIONS:

1. The location was a small single-family dwelling in a residential neighborhood.
2. The weather was cold and raining heavily.
3. The scene was secured prior to my arrival with heavy police presence.
4. Several hostile individuals attempted to enter the scene from multiple areas, but were not allowed to gain access to the location or surrounding areas that had been secured by police personnel.
5. In the roadway, south/west of the front yard to the location, I observed one (1) spent shell casing (E1) that had been marked by police prior to my arrival. Just west of the shell casing, I observed a deceased pit bull dog with a gun shot wound to the head lying in the roadway.
6. One (1) Nike gray shoe (E2) was on the ground of the roadway/walkway to the front entry gate of the yard.
7. On the ground, south of the front porch and to the east of the front porch stairs, I observed two (2) spent shell casings (E3 and E4) that had been marked by police personnel prior to my arrival.
8. In the vacant lot west of the location, I observed a black handgun with a chrome slide (E5) lying on the ground next to a tree west of the north bedroom window. The magazine to the handgun was removed.
9. The two (2) front entry doors of the location were opened to the home.

(After warrant was obtained.)

10. An apparent bullet hole was found in the living room entry door frame (trim) on the left side.
11. The living room was small and sparsely furnished with a couch, TV and TV stand, small side table, and a wheeled assistant chair.
12. On the TV stand in the living room, I found a cell phone (E6).
13. I observed an apparent bullet hole to the east wall of the living room north of the couch.
14. The SP1's deceased body was lying on the floor of the central hallway just north of the living room. The SP1's was lying face up with a black backpack placed under his head (E12). His head was in a southern direction with his legs and feet stretched to the north.
15. The victim was clothed in a black velvet hooded jacket that was tied around his neck, a white T-shirt with apparent blood on the chest area, a pair of black pants, black socks and one black house slipper under his right foot. The SP1 wore

PS.4125-05(a).OFFENSE.INVESTIGATION.RECORD.SAPD Crime Scene Search
Rev.2016-6 02/25/16

213

Case No:   18-220885
Page 3 of 5

COSA001994




# City of San Antonio
## San Antonio Police Department
### Crime Scene Search Report

one (1) heart shaped, glittery earring in the left ear and a beaded drop-down earring in the right ear. He also wore a yellow metal colored necklace around his neck.

16. A small plastic bag with five (5) cubbed like rocks of possible cocaine materials was found tucked in the SP1's waistband of his black pants.

17. To the north of the SP1's body, was the entry door to the kitchen. In the kitchen, a cell phone (E7) was found lying on the floor.

18. To the west of the SP1's body was the entry door into the front (south) bedroom. This room was heavily furnished and contained a large amount of clutter. On the couch of this room, I observed a cell phone (E8). In the closet of this room, I observed two (2) long rifle style guns (E9). To the west of the bed in the room, i observed a brown wooden long rifle style gun (E10) that was leaving against the west wall near a window. After collection of the three long guns was made in this room, it was observed that the weapons were only pellet and BB guns.

19. In the north bedroom of the location, I observed the west window opened with a pillow lightly stuffed in the opening made by the A/C unit. Just outside the window is where the black hand gun with the chrome slide (E5) was found.

20. On the final search of the location, I found a chrome magazine with live rounds (E13) in the north bedroom on the floor under the edge of the bed it was covered by the bed sheets.

(During Medical Examiner Investigator's Examination of SP1's deceased body.)

21. The SP1, had one (1) gunshot wound to the chest with bullet holes to the white T-shirt and black hooded jacket. No other signs of injury were observed to the SP1's body at the time. No exit wound was found to the SP1's back. US paper currency was found in the front right pocket of the SP1's pants.

22. I performed a GSR Test Kit on the SP1's hands prior to the ME Investigator bagging the hands.

23. The backpack (E12) was removed from under the SP1's head and I examined the contents of the backpack.

24. A Michael Kors folding wallet was found in the backpack (E12) with the SP1's Identification card (Texas) and a Social Security Card (E12b) along with US currency paper money (E12a). Other misc. clothing, toiletries and items were contained within the backpack.

Once the scene observations and searches were made, I then marked all items of evidence with numerical placards. I rephotographed the scene with the placards in place. CSI C. Crain #9444 and CSI N. Berrios #9401 completed their documentations of the scene.

I collected items from the scene prior to the medical examiner investigator arrival, in order to prevention loss and or destruction from the rain and due to the hostile environment from the neighboring areas.

While collecting the evidence, I made an exhaustive search and sweep of the areas to the east of the location and the adjacent home for the bullet projectile/slug that exited the front living room east wall. I was assisted by scene detectives and CSI personnel, but no items were identified at the time. I used a trajectory laser light to pin point the possible path taken by the spent bullet/projectile. No strikes to the adjacent home were observed.

Once the final scene search was completed, I contacted CSI Sgt. A. Johnson #3381 to have the scene released. The scene was released at approximately 0610 hours.

(Post Scene Processing)

I conducted a latent prints visual search on the three cell phones collected from the location, but no prints were identified. I swabbed all three phones for the possible presence of DNA material (E6am E7a and E8a).

I conducted a search for latent prints on the three (3) spent shell casings that were recovered from the scene using the black powder and brush methods (single use), but no prints were identified. I swabbed the three (3) spent shell casings for the possible presence of DNA materials (E1a, E3a, & E4a).

After allowing the black handgun with the chrome slide (E5) to dry overnight, I processed the item for latent prints using the

PS.4125-05(a).OFFENSE.INVESTIGATION.RECORD.SAPD Crime Scene Search
Rev.2016-6  02/25/16

214

Case No:        18-220885
                Page 4 of 5

COSA001995



# City of San Antonio
## San Antonio Police Department
### Crime Scene Search Report



black powder and brush method (single use), but no prints were developed. I then swabbed the handgun for the possible presence of DNA materials (E5b).

After allowing the live round (E5a) removed from the chamber of (E5) to dry overnight, I processed the item for latent prints using the black powder and brush method (single use), but no latent prints were developed. I then swabbed the live round for the possible presence of DNA materials (E5c).

I processed the loaded magazine containing the live rounds (E13) for latent prints using the black powder and brush method (single use) and swabbed the magazine for the possible presence of DNA materials (E13a) and the live rounds from the magazine (E13b).

No further actions were requested and none were required of me once the scene and evidence processing were completed.

| Signature | |
|---|---|
| Member Making Report: **Angela Salvatierra (SAPD)** | Badge No.: 9415 |
| Assisted By: | Badge No.: |

☑ Report Completed



COSA003375

| PROSECUTION GUIDE | 3. OFFENSE CLASSIFICATION | | 4. ASSIGNMENT NO: | 18220885 |
|---|---|---|---|---|
| PAGE 37 OF 50 | **Felon in Poss of firearm** | | 5. OFFENSE NO: | 520303 |
| | | | 6. DATE REPORTED: | 10/17/18 |

ROUTING: <u>Homicide</u>

**SAN ANTONIO POLICE DEPARTMENT**

| Last name of Complainant,First,Middle Initial | Address of Complainant | | Phone Number |
|---|---|---|---|
| **Casanova, Steve #0099** | | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report |
|---|---|---|---|
| **217 Roberts S.A., TX** | **2360** | **10/17/2018 0106 hrs** | **12/26/2018 1700 hrs** |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

I watched the entire video.

**<u>Wednesday, October 24th 2018</u>**

I received and reviewed the final patient care reports (EMS run sheets) for Charles and Davante; copies were put in the case file.

I received a copy of the firearms trace for the Smith & Wesson 9mm handgun serial #HEV1574 found in the vacant lot next to 217 Roberts.  The report indicated that the purchaser was Darrell Marquis Wiggins Jr.

1400 hours-At approximately this time, I received a phone call from Sgt. C. Johnson #3033 with the street crimes unit; he said that his officers had Davante in custody.  I asked Sgt. Johnson to have officers transport him to HQ so that a statement could be obtained from him.

1425 hours-Det. R. Juarez #2241 started a recorded DVD in room #3329 in the Homicide office.

Officer Hebert #0226 arrived at HQ with Davante.

1503 hours-Davante was put in room #3329.  For his comfort, Officer Hebert put his handcuffs in front.

I walked in to the room and offered him water.  He accepted the water.  I exited the room and returned with a bottle of water.

I introduced myself and then I then read Davante his Miranda warning using SAPD form 66-E and he said he understood his rights.  I filled out the SAPD form 66-8L form for him.

1515 hours-Davante said that Hence was not blood related; he calls Hence his "grandfather."  Went on to say that he breeds dogs and keeps them at Hence's and goes by every day.  He said they were "chillin"; he said Charles shut the door and they were chillin' some more then the door swung open and he heard the gunshots. He tried to go for the hallway and into Hence's room.  He closed the front door.

He said they tried to say we had "something."  (Referring to Officer's saying he had a gun).

| UCR STATUS | UNFOUNDED REPORT | ( ) | CLEARED BY ARREST | (XX) | CLEARED BY JUVENILE ARREST | ( ) | CLEARED BY EXCEPTION OF OTHER MEANS | ( ) | CHANGE OF OFFENSE | ( ) | PROGRESS OF INVESTIGATION | ( ) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Officer Making Report  (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| **Detective R. Perez # 2298** | **Sergeant W. McCourt # 3266** | | **Homicide** |

| SAN ANTONIO POLICE DEPARTMENT | TYPE ONLY | PROSECUTION GUIDE SAPD Form 3-L  Rev. (9-90) |
|---|---|---|

"EXHIBIT C-5"

COSA001820

| PROSECUTION GUIDE | 3. OFFENSE CLASSIFICATION | | 4. ASSIGNMENT NO: | 18220885 |
|---|---|---|---|---|
| PAGE 48 OF 50 | **Felon in Poss of firearm** | | 5. OFFENSE NO: | 520303 |
| | | | 6. DATE REPORTED: | 10/17/18 |

ROUTING: <u>Homicide</u>

### SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | | Phone Number |
|---|---|---|---|
| **Casanova, Steve #0099** | | | |
| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report |
| **217 Roberts S.A., TX** | **2360** | **10/17/2018 0106 hrs** | **12/26/2018 1700 hrs** |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

I drove to the Bexar County Jail and interviewed Michael Deshon Winn. I explained to him what I was investigating and he knew about this incident. Michael admitted to knowing Darrell; said they were friends for about a year and a half.

Michael said that Darrell had told him that he needed money. Michael asked him how much he wanted for the gun and Darrell said, "250." Michael told Darrell he didn't want it but that his homeboy wanted it and had $200. Darrell sold it to a guy that goes by "Slime Dinero."

Michael said he knew the "full story" but didn't want to get involved. He then said that "Slime Dinero" was Marcus, was black and that he stayed off of ██████

Marcus had called Michael the day of this incident; said he went to the "Trap house" (217 Roberts) and left the gun to Charles. I asked Michael if the gun had been left by accident and he said he didn't know.

Michael said: "He (Marcus) left it there, that's all he told me."

Marcus had left the gun there for protection.

Michael said he never had possession of the gun.

Michael said the gun was a Smith and Wesson 9mm or .40 and was chrome and black. He corrected himself and said it was chrome on the top and black on the bottom.

Michael said the gun was sold on Lombrano on or before October of this year.

Michael confirmed that Darrell had tried to buy the gun back but that he told him that he didn't have it.

Towards the end of the interview I asked Michael if he knew Marcus's phone number; he said he didn't know it off hand but said it started with "832" and said that Evelyn might have it. The interview was recorded on a DVD at the jail. I received a copy.

**\*\*\*Michael was concerned about his well-being and safety because he said what he said to me. He asked that his name not be used or brought up if possible.**

<u>**Sunday, December 23rd 2018**</u>

| UCR STATUS | UNFOUNDED  (  ) REPORT | CLEARED BY  ( XX ) ARREST | CLEARED BY  (  ) JUVENILE ARREST | CLEARED BY EXCEPTION  (  ) OF OTHER MEANS | CHANGE OF  (  ) OFFENSE | PROGRESS OF  (  ) INVESTIGATION |
|---|---|---|---|---|---|---|
| Officer Making Report (Badge No.) **Detective R. Perez # 2298** | | Approving Authority **Sergeant W. McCourt # 3266** | | Unit Case No. | | Unit Assigned to Follow -up **Homicide** |

| SAN ANTONIO POLICE DEPARTMENT | TYPE ONLY ⑤⑩ | PROSECUTION GUIDE SAPD Form 3-L  Rev. (9-90) |
|---|---|---|

COSA001831



COSA003086


COSA003142

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

PATRICIA SLACK, Individually and as the §
surviving mother of CHARLES     §
ROUNDTREE, JR., BERNICE      §
ROUNDTREE as the representative of the   §
estate of CHARLES ROUNDTREE, JR. and §
all Statutory Beneficiaries, TAYLOR    §
SINGLETON, and DAVENTE SNOWDEN §
  *Plaintiffs,*         §
             §   **CIVIL ACTION NO.**
VS.             §   **5:18-CV-1117-JKP-ESC**
             §
THE CITY OF SAN ANTONIO, TEXAS   §
AND STEVE CASANOVA      §
  *Defendants.*         §

---

### AFFIDAVIT OF DIGVIJAY TANWAR

---

STATE OF TEXAS     §
          §
COUNTY OF HARRIS    §

  Before me, the undersigned notary, on this day personally appeared Digvijay Tanwar, a person whose identity is known to me. After being by me duly cautioned to tell the truth, subject to the penalties for perjury, he did affirm and testify as follows:

   "My name is Digvijay Tanwar. I am over the age of eighteen (18) years, am of sound mind, and am fully capable of making this affidavit. I am personally familiar with facts recited below, which are true and correct.

   I am employed by Rimkus Consulting Group, Inc. (Rimkus). I hold the position of Director of Visual Media and Technology Practice. Rimkus was retained to enhance and analyze the video and audio recordings provided by Officers Steve Casanova and James Panah's body worn camera recordings taken on or about October 17, 2018.



I have reviewed the bodycam videos worn by Officers Steve Casanova and James Panah and provided video enhancement as referenced below. Under my supervision, Chris Cuellar performed the audio enhancement in parallel.  The video and audio enhancement allowed the following observations:

Officer Casanova is seen and heard knocking on the inner door two times before the door opens on the third knock.  [**Exhibit D-1,** Officer Panah's Enhanced video, (T06:22:12Z); **Exhibit D-2**, Officer Panah's Individual Bodycam Frames (871 to 903/1198); and **Exhibit D-9** my Supplemental Report, Image No. 4].

Officer Casanova's flashlight is seen pointed downwards when the door opens. [**Exhibit D-4**, Officer Casanova's Individual Bodycam Frames (1-298); and **Exhibit D-10** my original Report, Images No. 1 and 2].

Mr. Snowden is seen sitting on the sofa with Ms. Singleton sitting to the right of Mr. Snowden with no flashlight shining on their faces. [**Exhibit D-10**, Image No. 2].

The living room light can be seen casting the shadows of Officer Casanova and the iron door onto the floor of the porch.  [**Exhibit D-1**, (T06:22:14Z - T06:22:19Z); **Exhibit D-2**, (938 to 1100/1198); **Exhibit D-9**, Image No. 7].

Mr. Snowden is the first to greet Officer Casanova saying: "What's up?" [**Exhibit D-3** and **D-5** Officer Casanova's Enhanced Video/Video Inverted (T06:22:16Z – T06:22:18Z)].  Officer Casanova responds to Mr. Snowden by saying: "What's up man?"  [**Exhibit D-3** and **Exhibit D-5** Officer Casanova's Enhanced Video/Video Inverted (T06:22:16Z – T06:22:18Z); and **Exhibit D-6A** and **D-6B**, Officer Casanova's Enhanced Audio].

Mr. Snowden starts to rise from the sofa looking at Officer Casanova and states: "Hey, who the fuck is this?" [**Exhibits D-3, D-5,** and **D-7**, Officer Casanova's Bodycam-Slow motion (T06:22:18Z - T06:22:20Z)].

When Officer Casanova knocks on the door and the door opens, Officer Casanova stands outside the open door and on the other side of the iron door with his right hand to his side and his gun is in the holster**.** [**Exhibit D-9**, Images No. 7-9].

Mr. Snowden can be seen gripping a reflective object with his right hand. [**Exhibits D-3, D-5, D-7 and D-8,** (T06:22:18Z – T06:22:20Z); **Exhibits D-4** and **D-8** (175 to 217/298); **Exhibit D-9,** Images No. 15-17].

Both Enhanced Color and Inverse frames show the object in the area of Mr. Snowden's waist. [**Exhibit D-9,** Images No. 15-17; **Exhibit D-10**, Images No. 5-7; **Exhibit D-4** (205)].

Officer Casanova then states: "Hey let me see your fucking hands" [**Exhibits D-3, D-5, D-7, and D-8** (T06:22:20Z - T06:22:22Z)] and remains outside the house. Officer Casanova then reaches for his gun [**Exhibit D-1,** (T06:22:19Z) ; **Exhibit D-2** (1080 to 1110/1198); **Exhibit D-9**, Image No. 11] and fires two shots at Mr. Snowden while Mr. Snowden moved to his right. Officer Casanova remains standing outside the front door. [**Exhibits D-3, D-5, D-7, and D-8** (T06:22:20Z – T06:22:22Z); **Exhibit D-9,** Images No. 19-26].

In my capacity as Director of Visual Media and Technology Practice, I serve as a Custodian of Records for Rimkus. Of those records, attached hereto is a true and correct copy of the above-referenced videos on a compact disc and/or flash drive of a digital recording reflecting:

**D-1:** Video recording entitled, "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Clip.mp4" (bodycam) taken on October 17, 2018

**D-2:** Individual Video Frames (1-1198) entitled, "SAPD18220885_00137518_PANAH__JAMES_A-file 1_ Enhanced  Frames.pdf" (bodycam) taken on October 17, 2018

**D-3:** Video recording entitled, "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x.mp4" (bodycam) taken on October 17, 2018

**D-4:** Stills from Casanova's bodycam  entitled, "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" (bodycam) taken on October 17, 2018

**D-5:** Inverted Video recording entitled, "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Invert.mp4" taken on October 17, 2018

**D-6A:** Audio recording from Casanova's bodycam recording entitled, "SAPD18220885_00132324_CASANOVA__STEVE-audio clip-enh.wav" taken on October 17, 2018

**D-6B** Video recording from Casanova's bodycam recording entitled, "SAPD18220885_00132324_CASANOVA__STEVE-audio clip-enh.mp4" taken on October 17, 2018

**D-7:** Video recording entitled, "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Slowmotion.mp4" taken on October 17, 2018

**D-8:**   Inverted Stills from Casanova's bodycam entitled, "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" taken on October 17, 2018

**D-9:**   Supplemental Report of Findings, dated April 20, 2021 [DEFT CASANOVA 01315-01372]

**D-10:**   Report of Findings, dated February 16, 2021 [DEFT CASANOVA 00090-00141]

The attached digital footage from the body cameras and video stills are kept by me in the regular course of business, and it was in the regular course of business and activity of Rimkus, with knowledge of the act and contains information transmitted by the person with knowledge of the matters of the event, condition, opinion, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the occurrence of the matters set forth in the documents and/or digital footage and was made by the regularly conducted activity as a usual practice for Rimkus.  The records attached are exact duplicates of the originals which are true and correct."

A true and correct copy of my original and supplemental reports, which contains my educational and professional background and the substance of my opinions and conclusions, are attached hereto as **Exhibits D-9 and D-10.**  I have personal knowledge of the facts stated in the attached **Exhibits D-9 and D-10** and they are true and correct."

Further Affiant sayeth not.

DIGVIJAY TANWAR

SUBSCRIBED AND SWORN TO BEFORE ME on this 25th day of May, 2021, to certify which witness my hand and official seal.

Lisa M. Palomo          8.16.2022
NOTARY PUBLIC, STATE OF TEXAS

LISA M PALOMO
Notary ID #4882648
My Commission Expires
August 16, 2022



**Rimkus Consulting Group, Inc.**
12140 Wickchester Lane, Suite 300
Houston, TX 77079
Telephone: (713) 621-3550

*THE ORIGINAL OF THIS REPORT, SIGNED AND SEALED BY THE PROFESSIONAL WHOSE NAME APPEARS ON THIS PAGE, IS RETAINED IN THE FILES OF RIMKUS CONSULTING GROUP, INC.*

# Supplemental Report of Findings

## Slack vs. COSA - Video Enhancement

### Rimkus File No: 100053745

**Prepared For:**

**Denton Navarro Rocha Bernal & Zech, PC**
**2517 N. Main Avenue**
**San Antonio, TX 78212**

**Attention:**

**Mr. Adolfo Ruiz**

**Digvijay Tanwar**
**Principal Consultant**

April 20, 2021

Exhibit
**D-9**

# TABLE OF CONTENTS

I.     Introduction                                                    1

II.    Conclusions                                                    3

III.   Discussion                                                      4

- Importing Files

- Video Enhancement

- Audio Enhancement

- Analysis

IV.    Basis of Report                                              10

V.     Attachments                                                  11

A.    Images

B.    Curricula Vitae

# Section I

# INTRODUCTION

On October 17, 2018, at about 1:00 a.m., San Antonio Police Department (SAPD) officers responded to a report of an assault with bodily injuries at 217 Roberts Street in San Antonio, Texas.  The SAPD officers were reportedly directed to this residence by the victim's wife, who was also a witness to the assault.  The officers' interactions with people visiting the residence resulted in an officer-involved shooting in which Mr. Charles Roundtree sustained fatal injuries, and another was wounded. The investigation into this case was assisted by audio and video recording instruments housed in the officers' patrol vehicles and Body Worn Cameras, which captured portions of the incident.  Due to the placement of the cameras, the distance between the officers and other participants, and ambient noise, not all the incident was within view of the cameras and the audio recordings are often difficult to understand.

Rimkus Consulting Group, Inc. (Rimkus) was retained to enhance and analyze the video and audio of the provided recording of Officer Steve Casanova's bodycam, showing the approach to the property leading up to the front door and interaction with Mr. Davante Snowden when the shooting occurred.  Furthermore, Rimkus was asked to provide close-up images of Mr. Snowden's right hand and identify the object it was believed he was holding.  The video enhancement portion of this assignment was performed by Mr. Digvijay Tanwar, Principal Consultant, audio enhancement was performed by Mr. Chris Cuellar, Graphic Artist. This report was reviewed by Richard V. Baratta, Ph.D., P.E., Senior Vice President.

Subsequent to our **Report of Findings**, we were asked to enhance and analyze the video of the provided recording of Officer James Panah's bodycam, showing the approach to the property leading up to the front door and interaction with Mr. Snowden when the shooting occurred.  This report was reviewed by Michael A.K. Liebschner, Ph.D., P.E., Principal Consultant.

DEFT  CASANOVA  01317

This report was prepared for the exclusive use of Officer Steve Casanova who is represented by Denton Navarro Rocha Bernal & Zech, PC, and The City of San Antonio, and was not intended for any other purpose.  Our report was based on the information available to us at this time, as described in the **Basis of Report**.  Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

# Section II
# CONCLUSIONS

## Conclusions

We affirm our conclusions made in our original **Report of Findings**.  Conclusions one, and two have been added as stated below to reflect new information gathered during the enhancement and analysis of Officer Panah's bodycam.  The conclusions from our original **Report of Findings** are provided below for reference.

1.  Mr. Snowden's left hand remained positioned low, close to his left thigh in a relaxed position.

2.  Mr. Snowden's right hand was positioned relatively higher around his waist/hip area in a guarded position.

3.  Mr. Snowden's right hand appeared to be holding/gripping an object that was shiny/reflective in nature. However, the images were not sufficiently clear to conclusively identify the object.

### Supplemental Conclusions

1.  From Officer Panah's bodycam view, Officer Casanova can be seen approaching and knocking on the door with his right hand.  The inner door swings open.  The outer black surface-mount security door remained closed.  No other body part, apart from the right hand, made contact with the door.

2.  The video analysis indicated that Officer Casanova did not begin to draw his gun until after Mr.  Snowden can be heard saying "Hey, who the fuck is this", and stands up.

DEFT  CASANOVA  01319

# Section III
# DISCUSSION

On December 2, 2020, Rimkus received a link, via email, that contained Officer Casanova's bodycam video recording from October 17, 2018, at 217 Roberts Street in San Antonio, Texas.  The video contained in the link was 01 hour, 18 minutes, and 14 seconds in length, and was named SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4, which captured Officer Casanova's bodycam angle of view where the incident occurred.

On February 12, 2021, Rimkus received, via email, two PDF's named [3374] Photo of gun (4828-0443-4905.1).pdf, showing one-page gun close-up, Pictures of Gun SAPD-4-Photos (333) (4826-6237-2828.1).pdf, showing one-page with four gun close-ups, gun images, and link via email that contained Officer Panah's bodycam video recording from October 17, 2018, at 217 Roberts Street in San Antonio, Texas.  The video contained in the link was 01 hour, 24 minutes, and 12 seconds in length, and was named SAPD18220885_00137518_PANAH__JAMES_A-file 1.mp4, which captured Officer Panah's bodycam angle of view where the incident occurred.

**Importing Files**

SAPD18220885_00137518_PANAH__JAMES_A-file                1.mp4                 and SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4 videos were imported into Adobe Photoshop 2021.

**Video Enhancement**

Camera View: bodycam looking in front of Officer Panah (**Image 1**).

Camera View: bodycam looking in front of Officer Casanova.  Zoomed 180 percent (%) (**Image 2**).

Section from the video file SAPD18220885_00137518_PANAH__JAMES_A-file 1.mp4 from timestamp T06:21:42Z – T06:22:22Z was selected. Levels and Shadow/Highlights enhancement filters were applied to improve lighting and contrast. The following enhanced files were exported.

I.   SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Clip .mp4

II.  SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf

Section from the video file SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4 from timestamp T06:22:13z – T06:22:22z was selected. Levels, Shadow/Highlights, and Invert enhancement filters were applied to improve lighting and contrast. A timestamp was overlaid on the video. The video was zoomed 180%. The following enhanced files were exported.

III.  SAPD18220885_00132324_CASANOVA__STEVE-file   1_Enhanced   Clip 180x.mp4

IV.  SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Invert.mp4

V.   SAPD18220885_00132324_CASANOVA__STEVE-file   1_Enhanced   Frames 180x.pdf

VI.  SAPD18220885_00132324_CASANOVA__STEVE-file   1_Enhanced   Frames 180x Invert.pdf

VII.  SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 01.jpg

VIII. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 02.jpg

IX.  SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 03.jpg

X.   SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 04.jpg

XI. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 05.jpg

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x.mp4 and SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Invert.mp4, was imported in Adobe Premiere Pro 2020. Speed/Duration was changed to 25%. The following slow-motion enhanced files were exported.

XII. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Slowmotion.mp4

XIII. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Slowmotion Invert.mp4

Side by side, color and invert comparison of gun images from [3374] Photo of the gun (4828-0443-4905.1).pdf and Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf, with Page 209 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf, and SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf, was performed. An invert enhancement filter was applied. The following enhanced files were exported (**Images 27 and 28**).

XIV. Comparison_Color.jpg

XV. Comparison_Invert.jpg

**Audio Enhancement**

Video file SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4 was imported into Adobe Premiere 2021. Section from the video from timestamp T06:22:09z – T06:22:24z was trimmed and exported as SAPD18220885_00132324_CASANOVA__STEVE-file 1.WAV. The WAV audio files were imported into Adobe Audition 2021, to reduce background noise and to re-master the audio file. The enhanced audio file was exported as

DEFT CASANOVA 01322

SAPD18220885_00132324_CASANOVA__STEVE-file 2.wav. The enhanced WAV file was then imported back into Adobe Premiere 2021, and combined with the original video. The following files were exported.

    I.  SAPD18220885_00132324_CASANOVA__STEVE-clip-enh01.mp4

    II.  SAPD18220885_00132324_CASANOVA__STEVE-file 2.wav

Names were updated to stay consistent:

    I.  SAPD18220885_00132324_CASANOVA__STEVE-audio clip-enh.mp4

    II.  SAPD18220885_00132324_CASANOVA__STEVE-audio clip-enh.wav

**Analysis**

SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Clip .mp4

SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x.mp4

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Invert.mp4

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf

[3374] Photo of gun (4828-0443-4905.1).pdf

Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf

DEFT  CASANOVA  01323

The video footage suggests that Officer Panah was following behind Officer Casanova. Officer Panah's bodycam was mounted on the torso, facing forward.  In the video, from timestamp T06:21:42Z – T06:22:00Z and T06:22:06Z – T06:22:08Z (Pages 1 to 536 and 697 to 773/1198), Officer Casanova is in the bodycam's view and can be seen approaching the door.

From T06:22:09Z – T06:22:19Z (Pages 781 to 1110/1198) Officer Casanova can be seen holding his flashlight with his left hand and can be seen and heard knocking on the inner door with his right hand, which resulted in the opening of the inner door.  The outer black surface mount security door remained closed (**Images 3 through 6**).  The living room ceiling light can be seen casting a shadow of the outer black surface mount security door and Officer Casanova, on the porch behind him (**Image 7**).  It is not until, Mr. Snowden stands up and can be heard saying, "Hey, who the fuck is this", that Officer Casanova begins to draw his gun (**Images 8 through 11**).

The video footage suggested that Officer Casanova's bodycam was mounted on the torso, facing forward.  In this video, from timestamp T06:22:13z – T06:22:15z (Pages 1 to 89/298), Officer Casanova can be seen holding his flashlight and heard knocking on the door followed by the sound of the door swinging open.  The black surface mount security door remained closed (**Image 2**).

From T06:22:16z – T06:22:18z (Pages 90 to 155/298), Mr. Snowden can be heard saying "What's up". Officer Casanova can be heard replying "What's up man", holding a flashlight with his left hand pointing downwards at an angle.  Three individuals can be seen sitting inside the residence.  Mr. Snowden to the right, a female individual in the middle with a cellular phone in her hands, and another individual (presumably Mr. Roundtree), who appeared to be a male sitting on the left from where Officer Casanova was standing (**Image 12**).

From T06:22:18z – T06:22:20z (Pages 156 to 220/298), Mr. Snowden can be heard saying "Hey, who the fuck is this" as he stands up.  In the video, Mr. Snowden's left-hand can be seen positioned in front of his left thigh, and the right hand positioned

DEFT  CASANOVA  01324

closer to his right hip/waist area and appeared to be gripping an object that is shiny/reflective in nature. His right-hand stays positioned at the hip location, whereas his left-hand remains in a lower relaxed position (**Image 13, Image 13 Invert, Image 14, Image 14 Invert, Image 15, Image 15 Invert, Image 16, Image 16 Invert, Image 17, and Image 17 Invert**).  At T06:22:20z (Page 221 to 225/298), Mr. Snowden can be seen moving his right arm upwards while his left arm remains in a relaxed position around his left thigh (**Image 18**).

From T06:22:20z – T06:22:22z (Pages 224 to 235/298), Officer Casanova can be heard saying "Hey, let me see your fucking hands" as his right hand appears in the bodycam angle of view, as the gun is unholstered (**Images 19 through 21**).  Mr. Snowden can be seen standing at an angle, taking a step forward towards the wall, which is to the left side of where Officer Casanova is standing.  Mr. Snowden's left-hand remains in front of his left thigh in a relaxed position, clearly visible.  His right hand appears to be relatively higher than his left hand, tucked close to his right-side hip/waist area with body angle covering the right hand (Page 232 to 267/298) (**Image 22, Image 22 Invert, Image 23, Image 23 Invert, Image 24, Image 24 Invert, and Image 25**).  At approximately T06:22:22z (Page 278 to 290/298), two shots were fired by Officer Casanova, as seen/heard on the video (**Image 26**).

The breakdown of the sequence can be viewed by scrolling down the SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf (Pages 1/1198), SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf and SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf (Pages 1/298).

DEFT  CASANOVA  01325

## Section IV
## BASIS OF REPORT

1.  Reviewing, enhancing, and analyzing the following video.

    a.  SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4

2.  Reviewing, enhancing, and analyzing the following PDF.

    a.  [3374] Photo of gun (4828-0443-4905.1).pdf

    b.  Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf

3.  Reviewing, enhancing, and analyzing the received video.

    a.  SAPD18220885_00137518_PANAH__JAMES_A-file 1.mp4

4.  Reviewing

    a. Ms. Singleton's deposition excerpts from February 9th, 2021 (Pages 51, 127,128).

    b. Mr. Snowden's deposition excerpts from March 16th. 2021 (Pages 79, 80, 81).

# Section V
# ATTACHMENTS

A. Images

B. Curricula Vitae

## Section V
## ATTACHMENT A

# Images

Images reviewed or generated during our work, including images that were not included in this report, were retained in our files and are available to you upon request.

## Image 1

Page 775 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing camera angle video from Officer Panah's bodycam.



DEFT  CASANOVA  01329

## Image 2
Page 86 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing camera angle video from Officer Casanova's bodycam.



## Image 3

Page 856 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door. Camera angle video from Officer Panah's bodycam.



DEFT CASANOVA 01331

**Image 4**
Page 880 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door. Camera angle video from Officer Panah's bodycam.



**Image 5**
Page 910 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door. Camera angle video from Officer Panah's bodycam.



DEFT  CASANOVA  01333

## Image 6

Page 960 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door. Camera angle video from Officer Panah's bodycam.



## Image 7

Page 980 from "SAPD18220885_00137518_PANAH_JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door. Living room light casting shadow of Officer Casanova behind him on the porch.



**Image 8**

Page 1007 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door.



**Officer Casanova's right-hand position.**

## Image 9

Page 1030 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door.



**Image 10**
Page 1075 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door.



## Image 11

Page 1105 from "SAPD18220885_00137518_PANAH__JAMES_A-file 1_Enhanced Frames.pdf" showing Officer Casanova outside the door.



## Image 12

Page 155 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing three individuals sitting inside the residence, with Officer Casanova standing outside holding a flashlight with his left hand pointing downwards at an angle.



**Image 13**
Page 185 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



## Image 13 Invert

Page 185 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



DEFT CASANOVA 01342

## Image 14

Page 201 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions. Right hand visible and left hand blocked by black surface mount security door only allowing partial view.



## Image 14 Invert

Page 201 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions. Right hand visible and left hand blocked by black surface mount security door only allowing partial view.



April 20, 2021
Rimkus File No. 100053745

## Image 15

Page 205 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



## Image 15 Invert

Page 205 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



**Image 16**

Page 209 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions. Right hand visible and Left hand covered by black surface mount security door shadow.



**Image 16 Invert**

Page 209 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions. Right hand visible and Left hand covered by black surface mount security door shadow.



**Image 17**

Page 215 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.  Right hand visible and Left hand blocked by black surface mount security door.



## Image 17 Invert

Page 215 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions. Right hand visible and Left hand blocked by black surface mount security door.



## Image 18
Page 221 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 19**
Page 224 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf". Officer Casanova's right hand appears in bodycam angle of view, as the gun is unholstered.



**Image 20**
Page 226 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf". Officer Casanova's right hand appears in bodycam angle of view, as the gun is unholstered.



**Image 21**

Page 228 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf". Officer Casanova's right hand appears in bodycam angle of view, as the gun is unholstered.



## Image 22
Page 236 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 22 Invert**

Page 236 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



## Image 23
Page 238 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



## Image 23 Invert

Page 238 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



## Image 24

Page 239 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 24 Invert**
Page 239 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 25**

Page 263 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's left leg while taking a step forward towards the wall.



**Image 26**

Page 278 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing a shot fired by Officer Casanova.



**Image 27**

Side by side comparison - [3374] Photo of gun (4828-0443-4905.1).pdf, Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf with Page 209 from SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf



**Image 28**
Side by side comparison – Invert
[3374] Photo of gun (4828-0443-4905.1).pdf, Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf   with   SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf



**Section V**

**ATTACHMENT B**

# Curricula Vitae



**FORENSIC ENGINEERS AND CONSULTANTS**



# Chris Cuellar, A.A.S.
Graphic Artist
Visual Media and Technology

## Background

Mr. Cuellar received an Associate of Applied Science Degree in Computer Animation.  He excels in many aspects of 3D computer animation such as, modeling, character rigging/animation, particle effects and advanced lighting. He is proficient in compositing, 2D motion graphics, video editing, as well as illustration in various media and design layouts.

Mr. Cuellar has experience in creating animations for events such as vehicle accident reconstruction, personal injury, fire, weather, equipment failure, construction, and refinery accidents. He has created trial graphics such as large format posters, illustrations for reports and power point presentations.   He has also videotaped or photographed live events, tests and site inspections.

Mr. Cuellar is certified in the use of the FARO 3D Laser Scanner and processing of scan data.  He has experience in scanning large outdoor areas, interior of buildings, vehicles and small objects. He has produced animations that combine 3D computer animation and laser scan data

### Contact Information
(713) 621-3550
cacueller@rimkus.com

Eight Greenway Plaza,
Suite 500
Houston, TX 77046



## Professional Engagements

- Animations
  - Baylor Neurological Center – Houston, TX (2002), Produced an educational animation for children.
  - Corpus Christi Water Department – Corpus Christi, TX (2002), designed and animated a 3D logo for a TV commercial.
  - Baseball Sports Medical Institute – Houston, TX (2001), created animation and visual effects for a TV commercial.
  - The News of Texas – San Antonio, TX (2000), created graphics for news broadcast.
  - Visual Candy, Houston, TX (1999), Provided post-production and animation assistance on a live production for Compaq computers.

## Forensic Engagements

- Animations (2005 – Present)
  - Accident Reconstruction – Low speed vehicle occupant animations to show injury causation, commercial and consumer multi vehicle accidents, show perception reaction times of drivers.
  - Criminal Cases – Police shootings, manslaughter, blunt injury, child abuse cases, show consistency of injuries with depositions and physical evidence.
  - Oil and Gas – Model machinery, oil rigs, drilling equipment, show mechanics of use or failure of system or parts.
  - Environmental – Wind versus hail damage, flood damages, fire spread, fire cause and origin, plant explosions.
  - Construction – Show as built versus as designed plans, animate roof failures, retaining wall collapse, show worker injury accidents on site during construction.
  - Personal Injury – Slip and fall animations, forklift accidents, fall protection equipment failure or improper use, electrocution accidents involving, power lines, transformers, and electrical facilities.

## Professional Experience

- Rimkus Consulting Group, Inc.                                                                    2005 – Present
  - Graphic Artist – Visual Media and Technology

    Create 3D animations and video graphics for litigation support encompassing a multitude of fields from accident reconstruction, personal injury, product failure, fire, etc.  Composite and edit both 3D animations and video. 3D camera matching and tracking to incorporate 3D animations into live video or photos. Responsibilities also include creating multimedia presentations for investigations and expert reports, creating trial graphics such as scale drawings, diagrams and charts.   Other responsibilities include the use of the FARO Laser Scanner and Scene software. Scan accident sites and vehicles.  Process scans for site preservation, analysis, and visualization.  Create animations based on 3D scan data. Added and animated bi-peds, humanoids, and vehicles to 3D scan data to show how accident or incident occurred. Video analysis and enhancement. Vehicle and pedestrian speed analysis from security video or dash cam videos utilizing photogrammetry and reverse projection techniques.



- RGB Solutions — 2002 – 2005
  - Contractor/Animator

- Baylor College of Medicine — 2002
  - Contractor, Animator/Graphic Artist

- The Corpus Christi Water Department — 2002
  - Contractor, Animator/Graphic Artist

- Visual Candy — 2001
  - Contractor, Animator/Graphic Artist/VFX

- Crush Interactive — 2001
  - Contractor/Modeler

- The News of Texas — 2000
  - Graphic Artist

- Visual Candy — 1999
  - Contractor/Animator/Graphic Artist/VFX

- Kno-It Inc. — 1999
  - Internship/Animator

## Education and Certifications
- Computer Animation, A.A.S.: The Art Institute of Houston (2000)

## Continuing Education
- FXPHD: Production Rendering with Mental Ray; Digital Color Theory; After Effects Motion Graphics II, 2010; Advanced Environmental Modelling; Visual Effects Techniques with 3DSMax; Premiere Pro for the Filmmaker, 2011
- Other: FARO Laser Scanner, FARO Technologies, 2013





# Digvijay (VJ) S. Tanwar
Director, Visual Media and Technology Practice

## Background

Mr. Tanwar received his B.A. degree in Animation and has extensive industry experience in forensic visualization, retail virtual reality and video production.

His experience and industry knowledge covers over 12 years in areas of computer graphics, animation and virtual reality application. With over eight years of creating animations and graphics for litigation, Mr. Tanwar has deep and thorough understanding of all phases of animation delivery and operational lifecycle. He has created hundreds of forensic animations and visualizations of events including heavy trucks, trains, motor vehicle, line of sight, UTV and ATV accidents and earth moving equipment among others.

Mr. Tanwar's areas of expertise include creating animations and graphics using state-of-the-art computer software. He works closely with engineers and using their scientific data and findings, generate compelling, accurate and easy to understand graphics and animations to support courtroom and deposition testimony. He has experience in deposition and courtroom testimony.

## Contact Information
(713) 621-3550
vtanwar@rimkus.com

Eight Greenway Plaza,
Suite 500
Houston, TX 77046

## Professional Engagements
- Virtual Reality/Animation
  - VR Research – International (2014-2018), Developed 3D, animation and VR solutions for consumer packaged goods clients in the adult beverage, snack, medical devices, pharmaceutical, confectionery, nonalcoholic beverage, syrups and pet food.
  - Lighting Manufacturer – U.S. (2014-2018), Using the power of 3D and virtual reality, helped top household lighting manufacturer test new point of sale, new packaging and new layout design in a leading retail chain. Based on the recommendations, the manufacturer tested in few small stores and saw a double digit jump in sales within two months.



- Pet Retailer – U.S. (2014-2018),  A leading pet retailer wanted to display their products better within pet pharmacy. A standard PowerPoint or sales pitch would not have shown the end vision to the client and would have made it complicated and taken a big effort to explain. To overcome this, a dynamic animation with audio and titles was created that conveyed the message very clearly and explained the reasoning behind the proposed changes.

- Product Liability
  - Forklift Injury – Product liability/design defect case involving an injury sustained while operating a standup forklift inside a factory. 3D was used extensively to keep the cost down to a minimum. Two forklifts were scanned using FARO. Accident site was surveyed, and the scene was re-created virtually in 3D for further analysis. The same forklift model was then processed and passed over to a biomechanical engineer to do further injury analysis.

- Human Factors
  - Line of Site Animation – For a case involving a pedestrian who got hit by a locomotive. Accident site survey data which included busy road intersection and train tracks, was used to create virtual accident site in 3D.  FARO was used to scan the interior cabin of the subject locomotive and merged it with the scaled 3D model of the locomotive. Based on the scientific data from expert, inspection photographs, depositions and witness statements, pedestrian and locomotive were animated and generated operator and pedestrian points of view. The animated visuals showed exactly what the individuals saw including the blind spot allowing viewers to experience and understand the perspective of both parties involved in the accident.

- Biomechanics
  - Arkansas Children's Hospital – (2012), Teamed with biomechanical engineer to convert simulation of ATV operation into animation for ATV Safety Summit.
  - Vehicle Analysis – U.S. (2005-2014), Generated numerous CAD models for engineers evaluating infant and car seat, automobile interior cabin area (driver/passenger) and exterior using FARO.

- Property
  - Road Damage – (2012), Developed 3D visuals for a case involving damage to access road, due to excessive excavation at the base of a hillside. Due to the evolving nature of the hillside, 3D visuals played an important role in understanding the extent of damage in relation to time and helped put a visual timeline together. Used satellite images, old photos before the excavation, a series of construction photos, inspection photos, CAD survey data, and construction drawings among other materials were used to create accurate, scaled 3D model and 2D graphics of the site.



## Forensic Engagements

- Visual Media
  - Texas (2018), Developed animation and illustrations,  prepares visuals based on drone-gathered site inspection data,  created a visual storyboard and enhances videos.
  - Animations/visualizations – Developed animation and illustrations to support forensic investigations of events involving heavy trucks, trains, motor vehicle, line of sight, UTV and ATV accidents and earth moving equipment as well as energy, oil and gas projects.

## Professional Experience

- Rimkus Consulting Group, Inc.                                                          2018 – Present
  - Director, Visual Media and Technology Practice
    Responsible for producing state-of-the-art visuals based on scientific analysis. Specializing in 3D and FARO forensic documentation, creates hundreds of forensic animations and visualizations of events. Also performs video enhancements.

- Kantar Consulting                                                                     2014 – 2018
  - Creative Team Lead
    Managed and led the creative VR team split between two continents. Directing team in executing all creative efforts: animation, virtual reality, store survey and virtual environment builds. This team created projects from ground up with state-of-the-art 3D software e.g. Autodesk 3ds max, Adobe, Unity and proprietary software as the delivery platform. Successfully executed and coordinated projects with multiple teams working across multiple time zones. Responsibilities included managing timelines, deliverables, quality and communication. Achieved organization's ambitious growth forecast for online research projects.

    Identify and successfully link customer's creative animation, videos and virtual reality needs to overall client's strategy by working in conjunction with outside creative agencies and partners, resulting in 100% success rate and return clients. Manage multiple projects running in parallel with accountability of work prioritization for the creative team and resource allocation. Recognize and address areas of improvement and operational growth, in line with business needs. Successful implementation of recommendations which resulted in strengthening regional and international virtual creative teams in US, UK and India.

- The Engineering Institute                                                             2005 – 2014
  - Sr. Visualization Specialist/Forensic Animator
    Developed animation and video editing pipelines by introducing new and refining old tools, resulting in superior deliveries. Created scaled and accurate 3D environments and models under tight deadlines. Introduced FARO scanner which replaced hand drawings, reducing margin of error. Executed more than 200 forensic visualization projects and testified as a 3D expert.



FORENSIC ENGINEERS AND CONSULTANTS

- Brockman Productions                                                                 2002
  - Animator
    3D Engineering / Forensic Animator. Awarded Outstanding Service Award for work excellence.

## Education and Certifications

- Computer Animation, B.A.: Collins College (2005)
- Computer Animation, A.A.: Collins College (2002)
- Political Science & Public Administration, B.A.: Panjab University (2001)
- Autodesk Maya Certified Professional (2013)



**Rimkus Consulting Group, Inc.**
**12140 Wickchester Lane, Suite 300**
**Houston, TX 77079**

*THE ORIGINAL OF THIS REPORT, SIGNED AND SEALED BY THE PROFESSIONAL WHOSE NAME*
*APPEARS ON THIS PAGE, IS RETAINED IN THE FILES OF RIMKUS CONSULTING GROUP, INC.*
*(Only include statement if seal is an ink seal, remove statement if sealed digitally)*

# Report of Findings

**Slack v COSA Video Enhancement**

**Rimkus File No: 100053745**

**Prepared For:**

**Denton Navarro Rocha Bernal & Zech, PC**
**2517 N. Main Avenue**
**San Antonio, Texas 78212**

**Attention:**

**Mr. Adolfo Ruiz**

---

**Digvijay Tanwar**
**Principal Consultant**

**Exhibit**
**D-10**

# TABLE OF CONTENTS

I.     Introduction                                      1

II.    Conclusions                                       3

III.   Discussion                                        4

- Importing Files

- Video Enhancement

- Audio Enhancement

IV.    Basis of Report                                   9

V.     Attachments                                       10

A.   Images

B.   Curriculum Vitae

# Section I

# INTRODUCTION

On October 17, 2018, at about 1:00 a.m., in the morning, San Antonio Police Department (SAPD) officers responded to a report of an assault with bodily injuries at 217 Roberts Street, in San Antonio, Texas. The SAPD officers were reportedly directed to this residence by the victim's wife, who was also a witness to the assault. The officers' interactions with people visiting the residence resulted in an officer-involved shooting in which Mr. Charles Roundtree sustained fatal injuries, and another was wounded. The investigation into this case was assisted by audio and video recording instruments housed in the officers' patrol vehicles and Body Worn Cameras, which captured portions of the incident. Due to the placement of the cameras, the distance between the officers and other participants, and ambient noise, not all the incident was within view of the cameras and the audio recordings are often difficult to understand.

Rimkus Consulting Group, Inc. (Rimkus) was retained to Enhance and analyze the video and audio of the provided recording of Officer Steve Casanova's bodycam, showing the approach to the property leading up to the front door and interaction with Mr. Davante Snowden when the shooting occurred. Provide close-up images of Mr. Snowden's right hand and identify the object it was believed he was holding. The video enhancement portion of this assignment was performed by Mr. Digvijay Tanwar, Principal Consultant, audio enhancement was performed by Mr. Chris Cuellar, Graphic Artist. This report was reviewed by Dr. Richard V. Baratta, Ph.D., P.E., Senior Vice President.

This report was prepared for the exclusive use of Officer Steve Casanova who is represented by Denton Navarro Rocha Bernal & Zech, PC, and The City of San Antonio, and was not intended for any other purpose.  Our report was based on the information available to us at this time, as described in the **Basis of Report**.  Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

DEFT CASANOVA  00093

## Section II
## CONCLUSIONS

1.  Mr. Snowden's left hand remained positioned low, close to his left thigh in a relaxed position.

2.  Mr. Snowden's right hand was positioned relatively higher around his waist/hip area in a guarded position.

3.  Mr. Snowden's right hand appeared to be holding/gripping an object that was shiny/reflective in nature.   However, the images were not sufficiently clear to conclusively identify the object.

DEFT CASANOVA  00094

# Section III
# DISCUSSION

On December 2, 2020, Rimkus received a link, via email, that contained Officer Steve Casanova's bodycam video recording from October 17, 2018, at 217 Roberts Street, in San Antonio, Texas. The video contained in the link was 01 hour, 18 minutes, and 14 seconds in length, and was named SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4, which captured Officer Steve Casanova's bodycam angle of view where the incident occurred.

On February 12, 2021, Rimkus received, via email, two PDF's named [3374] Photo of gun (4828-0443-4905.1).pdf, showing one-page gun closeup, Pictures of Gun SAPD-4-Photos (333) (4826-6237-2828.1).pdf, showing one-page with four gun close-ups, gun images, and link via email that contained Officer James Panah's bodycam video recording from October 17, 2018, at 217 Roberts Street, in San Antonio, Texas. The video contained in the link was 01 hour, 24 minutes, and 12 seconds in length, and was named SAPD18220885_00137518_PANAH__JAMES_A-file 1.mp4, which captured Officer James Panah's bodycam angle of view where the incident occurred.

**Importing Files**

SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4 video was imported into Adobe Photoshop 2021.

**Video Enhancement**

Camera View: bodycam looking in front of Officer Steve Casanova. Zoomed 180 percent (%) **(Image 1)**

Section from the video file SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4 from timestamp T06:22:13z – T06:22:22z was selected. Levels, Shadow/Highlights and Invert enhancement filters were applied to improve lighting and

contrast. A timestamp was overlaid on the video. The video was zoomed 180 percent (%). The following enhanced files were exported.

I. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x.mp4.

II. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Invert.mp4.

III. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf.

IV. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf.

V. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 01.jpg.

VI. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 02.jpg.

VII. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 03.jpg.

VIII. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 04.jpg.

IX. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Still Frame 05.jpg.

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x.mp4 and SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Invert.mp4, was imported in Adobe Premiere Pro 2020. Speed/Duration was changed to 25% The following slow-motion enhanced files was exported.

X. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Slowmotion.mp4.

XI. SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Slowmotion Invert.mp4.

Side by side, color and invert comparison of gun images from [3374] Photo of the gun (4828-0443-4905.1).pdf and Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf, with Page 209 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf, and SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf, was performed. An invert enhancement filter was applied. The following enhanced files were exported. **(Image 17, Image 18)**

XII. Comparison_Color.jpg.

XIII. Comparison_Invert.jpg.

**Audio Enhancement**

Video file SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4 was imported into Adobe Premiere 2021. Section from the video from timestamp T06:22:09z – T06:22:24z was trimmed and exported as SAPD18220885_00132324_CASANOVA__STEVE-file 1.WAV. The WAV audio files were imported into Adobe Audition 2021, to reduce background noise and to re-master the audio file. The enhanced audio file was exported as SAPD18220885_00132324_CASANOVA__STEVE-file 2.wav. The enhanced WAV file was then imported back into Adobe Premiere 2021, and combined with the original video. The following files were exported.

I. SAPD18220885_00132324_CASANOVA__STEVE-clip-enh01.mp4.

II. SAPD18220885_00132324_CASANOVA__STEVE-file 2.wav.

Names were updated to stay consistent:

I. SAPD18220885_00132324_CASANOVA__STEVE-audio clip-enh.mp4.

II. SAPD18220885_00132324_CASANOVA__STEVE-audio clip-enh.wav.

**Analysis**

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x.mp4.

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Clip 180x Invert.mp4.

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf.

SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf.

[3374] Photo of gun (4828-0443-4905.1).pdf.

Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf.

The video footage suggested that Officer Casanova's bodycam was mounted on the torso, facing forward. In this video, from timestamp T06:22:13z – T06:22:15z (**Pages 1 to 89/298**) Officer Casanova can be seen holding his flashlight and heard knocking on the door followed by the sound of the door swinging open.  The black surface mount security door remained closed. (**Image 1**)

From T06:22:16z – T06:22:18z (**Pages 90 to 155/298**) Mr. Snowden can be heard saying "What's up". Officer Casanova can be heard replying "What's up man", holding a flashlight with his left hand pointing downwards at an angle. Three individuals can be seen sitting inside the residence. Mr. Snowden to the right, a female individual in the middle with a cellular phone in her hands, and another individual (presumably Mr. Roundtree), who appeared to be a male sitting on the left from where Office Casanova was standing (**Image 2**)

From T06:22:18z – T06:22:20z (**Pages 156 to 220/298**) Mr. Snowden can be heard saying "Hey, who the fuck is this" as he stands up. In the video, Mr. Snowden's left-hand can be seen positioned in front of his left thigh, and the right hand positioned closer to his right hip/waist area and appeared to be gripping an object that is

DEFT CASANOVA  00098

shiny/reflective in nature. His right-hand stays positioned at the hip location, whereas his left-hand remains in a lower relaxed position. (**Image 3, Image 3 Invert, Image 4, Image 4 Invert, Image 5, Image 5 Invert, Image 6, Image 6 Invert, Image 7 and Image 7 Invert**). At T06:22:20z (**Page 221 to 225/298**) Mr. Snowden can be seen moving his right arm upwards while his left arm remains in relaxed positioned around his left thigh. (**Image 8**).

From T06:22:20z – T06:22:22z (**Pages 224 to 235/298**) Officer Casanova can be heard saying "Hey, let me see your fucking hands" as his right hand appears in the bodycam angle of view, as the gun is unholstered (**Image 9, Image 10 and Image 11**). Mr. Snowden can be seen standing at an angle, taking a step forward towards the wall, which is to the left side of where Officer Casanova is standing. Mr. Snowden's left-hand remains in front of his left thigh in a relaxed position, clearly visible. His right hand appears to be relatively higher than his left hand, tucked close to his right-side hip/waist area with body angle covering the right hand. (**Page 232 to 267/298**). (**Image 12, Image 12 Invert, Image 13, Image 13 Invert, Image 14, Image 14 Invert, and Image 15**). At approximately T06:22:22z (**Page 278 to 290/298**) two shots were fired by Officer Steve Casanova, as seen/heard on the video. (**Image 16**).

The breakdown of the sequence can be viewed by scrolling down the SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf and SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf (**Pages 1/298**).

DEFT CASANOVA  00099

# Section IV
# BASIS OF REPORT

1.  Reviewing, enhancing, and analyzing the following video.

    a.  SAPD18220885_00132324_CASANOVA__STEVE-file 1.mp4

2.  Reviewing, enhancing, and analyzing the following PDF.

    a.  [3374] Photo of gun (4828-0443-4905.1).pdf

    b.  Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf

3.  Reviewing the following video.

    a.  SAPD18220885_00137518_PANAH__JAMES_A-file 1.mp4

## Section V
## ATTACHMENTS

A. Images

B. Curriculum Vitae

**Section V**

**ATTACHMENT A**

# Images

**Image 1**
Page 86 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced
Frames 180x.pdf" showing camera angle video from Officer Casanova's bodycam.



**Image 2**

Page 155 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing three individuals sitting inside the residence, with Officer Casanova standing outside holding a flashlight with his left hand pointing downwards at an angle.



**Image 3**
Page 185 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 3 Invert**
Page 185 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



**Image 4**

Page 201 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions. Right hand visible and left hand blocked by black surface mount security door only allowing partial view.



**Image 4 Invert**
Page 201 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions. Right hand visible and left hand blocked by black surface mount security door only allowing partial view.



## Image 5

Page 205 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 5 Invert**
Page 205 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



**Image 6**

Page 209 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions. Right hand visible and Left hand covered by black surface mount security door shadow.



**Image 6 Invert**
Page 209 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions. Right hand visible and Left hand covered by black surface mount security door shadow.



DEFT CASANOVA 00112

**Image 7**

Page 215 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions. Right hand visible and Left hand blocked by black surface mount security door.



**Image 7 Invert**
Page 215 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions. Right hand visible and Left hand blocked by black surface mount security door.



## Image 8

Page 221 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 9**
Page 224 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf". Officer Casanova's right hand appears in bodycam angle of view, as the gun is unholstered.



**Image 10**
Page 226 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf". Officer Casanova's right hand appears in bodycam angle of view, as the gun is unholstered.



**Image 11**
Page 228 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf". Officer Casanova's right hand appears in bodycam angle of view, as the gun is unholstered.



## Image 12

Page 236 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



## Image 12 Invert
Page 236 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



**Image 13**
Page 238 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 13 Invert**
Page 238 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced
Frames 180x Invert.pdf" showing Mr. Snowden's hand positions.



## Image 14

Page 239 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 14 Invert**
Page 239 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's hand positions.



**Image 15**
Page 263 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing Mr. Snowden's left leg while taking a step forward towards the wall.



**Image 16**
Page 278 from "SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf" showing a shot fired by Officer Steve Casanova.



**Image 17**
Side by side comparison - [3374] Photo of gun (4828-0443-4905.1).pdf, Pictures of Gun SAPD-4- Photos (333) (4826-6237-2828.1).pdf with Page 209 from SAPD18220885_00132324_CASANOVA__STEVE-file 1_Enhanced Frames 180x.pdf



**Image 18**

Side by side comparison – Invert
[3374] Photo of gun (4828-0443-4905.1).pdf, Pictures of Gun SAPD-4- Photos (333)
(4826-6237-2828.1).pdf with SAPD18220885_00132324_CASANOVA__STEVE-file
1_Enhanced Frames 180x Invert.pdf



**Section V**

**ATTACHMENT B**

# Curriculum Vitae





# Digvijay (VJ) S. Tanwar
Director, Visual Media and Technology Practice

## Background

Mr. Tanwar received his B.A. degree in Animation and has extensive industry experience in forensic visualization, retail virtual reality and video production.

His experience and industry knowledge covers over 12 years in areas of computer graphics, animation and virtual reality application. With over eight years of creating animations and graphics for litigation, Mr. Tanwar has deep and thorough understanding of all phases of animation delivery and operational lifecycle. He has created hundreds of forensic animations and visualizations of events including heavy trucks, trains, motor vehicle, line of sight, UTV and ATV accidents and earth moving equipment among others.

Mr. Tanwar's areas of expertise include creating animations and graphics using state-of-the-art computer software. He works closely with engineers and using their scientific data and findings, generate compelling, accurate and easy to understand graphics and animations to support courtroom and deposition testimony. He has experience in deposition and courtroom testimony.

## Contact Information
(713) 621-3550
vtanwar@rimkus.com

Eight Greenway Plaza,
Suite 500
Houston, TX 77046

## Professional Engagements
- **Virtual Reality/Animation**
  - VR Research – International (2014-2018), Developed 3D, animation and VR solutions for consumer packaged goods clients in the adult beverage, snack, medical devices, pharmaceutical, confectionery, nonalcoholic beverage, syrups and pet food.
  - Lighting Manufacturer – U.S. (2014-2018), Using the power of 3D and virtual reality, helped top household lighting manufacturer test new point of sale, new packaging and new layout design in a leading retail chain. Based on the recommendations, the manufacturer tested in few small stores and saw a double digit jump in sales within two months.



FORENSIC ENGINEERS AND CONSULTANTS

- Pet Retailer – U.S. (2014-2018), A leading pet retailer wanted to display their products better within pet pharmacy. A standard PowerPoint or sales pitch would not have shown the end vision to the client and would have made it complicated and taken a big effort to explain. To overcome this, a dynamic animation with audio and titles was created that conveyed the message very clearly and explained the reasoning behind the proposed changes.

- **Product Liability**
  - Forklift Injury – Product liability/design defect case involving an injury sustained while operating a standup forklift inside a factory. 3D was used extensively to keep the cost down to a minimum. Two forklifts were scanned using FARO. Accident site was surveyed, and the scene was re-created virtually in 3D for further analysis. The same forklift model was then processed and passed over to a biomechanical engineer to do further injury analysis.

- **Human Factors**
  - Line of Site Animation – For a case involving a pedestrian who got hit by a locomotive. Accident site survey data which included busy road intersection and train tracks, was used to create virtual accident site in 3D. FARO was used to scan the interior cabin of the subject locomotive and merged it with the scaled 3D model of the locomotive. Based on the scientific data from expert, inspection photographs, depositions and witness statements, pedestrian and locomotive were animated and generated operator and pedestrian points of view. The animated visuals showed exactly what the individuals saw including the blind spot allowing viewers to experience and understand the perspective of both parties involved in the accident.

- **Biomechanics**
  - Arkansas Children's Hospital – (2012), Teamed with biomechanical engineer to convert simulation of ATV operation into animation for ATV Safety Summit.
  - Vehicle Analysis – U.S. (2005-2014), Generated numerous CAD models for engineers evaluating infant and car seat, automobile interior cabin area (driver/passenger) and exterior using FARO.

- **Property**
  - Road Damage – (2012), Developed 3D visuals for a case involving damage to access road, due to excessive excavation at the base of a hillside. Due to the evolving nature of the hillside, 3D visuals played an important role in understanding the extent of damage in relation to time and helped put a visual timeline together. Used satellite images, old photos before the excavation, a series of construction photos, inspection photos, CAD survey data, and construction drawings among other materials were used to create accurate, scaled 3D model and 2D graphics of the site.



FORENSIC ENGINEERS AND CONSULTANTS

## Forensic Engagements

- Visual Media
  - Texas (2018), Developed animation and illustrations,  prepares visuals based on drone-gathered site inspection data,  created a visual storyboard and enhances videos.
  - Animations/visualizations – Developed animation and illustrations to support forensic investigations of events involving heavy trucks, trains, motor vehicle, line of sight, UTV and ATV accidents and earth moving equipment as well as energy, oil and gas projects.

## Professional Experience

- Rimkus Consulting Group, Inc.                                          2018 – Present
  - Director, Visual Media and Technology Practice
    Responsible for producing state-of-the-art visuals based on scientific analysis. Specializing in 3D and FARO forensic documentation, creates hundreds of forensic animations and visualizations of events. Also performs video enhancements.

- Kantar Consulting                                                      2014 – 2018
  - Creative Team Lead
    Managed and led the creative VR team split between two continents. Directing team in executing all creative efforts: animation, virtual reality, store survey and virtual environment builds. This team created projects from ground up with state-of-the-art 3D software e.g. Autodesk 3ds max, Adobe, Unity and proprietary software as the delivery platform. Successfully executed and coordinated projects with multiple teams working across multiple time zones. Responsibilities included managing timelines, deliverables, quality and communication. Achieved organization's ambitious growth forecast for online research projects.

    Identify and successfully link customer's creative animation, videos and virtual reality needs to overall client's strategy by working in conjunction with outside creative agencies and partners, resulting in 100% success rate and return clients. Manage multiple projects running in parallel with accountability of work prioritization for the creative team and resource allocation. Recognize and address areas of improvement and operational growth, in line with business needs. Successful implementation of recommendations which resulted in strengthening regional and international virtual creative teams in US, UK and India.

- The Engineering Institute                                              2005 – 2014
  - Sr. Visualization Specialist/Forensic Animator
    Developed animation and video editing pipelines by introducing new and refining old tools, resulting in superior deliveries. Created scaled and accurate 3D environments and models under tight deadlines. Introduced FARO scanner which replaced hand drawings, reducing margin of error. Executed more than 200 forensic visualization projects and testified as a 3D expert.



FORENSIC ENGINEERS AND CONSULTANTS

- Brockman Productions                                                                    2002
  - Animator
    3D Engineering / Forensic Animator. Awarded Outstanding Service Award for work excellence.

## Education and Certifications
- **Computer Animation, B.A.:** Collins College (2005)
- **Computer Animation, A.A.:** Collins College (2002)
- **Political Science & Public Administration, B.A.:** Panjab University (2001)
- **Autodesk Maya Certified Professional (2013)**



FORENSIC ENGINEERS AND CONSULTANTS

# Chris Cuellar, A.A.S.

Graphic Artist
Visual Media and Technology



## Background

Mr. Cuellar received an Associate of Applied Science Degree in Computer Animation. He excels in many aspects of 3D computer animation such as, modeling, character rigging/animation, particle effects and advanced lighting. He is proficient in compositing, 2D motion graphics, video editing, as well as illustration in various media and design layouts.

Contact Information
(713) 621-3550
cacueller@rimkus.com

Eight Greenway Plaza,
Suite 500
Houston, TX 77046

Mr. Cuellar has experience in creating animations for events such as vehicle accident reconstruction, personal injury, fire, weather,

equipment failure, construction, and refinery accidents. He has created trial graphics such as large format posters, illustrations for reports and power point presentations. He has also videotaped or photographed live events, tests and site inspections.

Mr. Cuellar is certified in the use of the FARO 3D Laser Scanner and processing of scan data. He has experience in scanning large outdoor areas, interior of buildings, vehicles and small objects. He has produced animations that combine 3D computer animation and laser scan data



FORENSIC ENGINEERS AND CONSULTANTS

## Professional Engagements

- Animations
  - Baylor Neurological Center – Houston, TX (2002), Produced an educational animation for children.
  - Corpus Christi Water Department – Corpus Christi, TX (2002), designed and animated a 3D logo for a TV commercial.
  - Baseball Sports Medical Institute – Houston, TX (2001), created animation and visual effects for a TV commercial.
  - The News of Texas – San Antonio, TX (2000), created graphics for news broadcast.
  - Visual Candy, Houston, TX (1999), Provided post-production and animation assistance on a live production for Compaq computers.

## Forensic Engagements

- Animations (2005 – Present)
  - Accident Reconstruction – Low speed vehicle occupant animations to show injury causation, commercial and consumer multi vehicle accidents, show perception reaction times of drivers.
  - Criminal Cases – Police shootings, manslaughter, blunt injury, child abuse cases, show consistency of injuries with depositions and physical evidence.
  - Oil and Gas – Model machinery, oil rigs, drilling equipment, show mechanics of use or failure of system or parts.
  - Environmental – Wind versus hail damage, flood damages, fire spread, fire cause and origin, plant explosions.
  - Construction – Show as built versus as designed plans, animate roof failures, retaining wall collapse, show worker injury accidents on site during construction.
  - Personal Injury – Slip and fall animations, forklift accidents, fall protection equipment failure or improper use, electrocution accidents involving, power lines, transformers, and electrical facilities.

## Professional Experience

- Rimkus Consulting Group, Inc.                                                                              2005 – Present
  - Graphic Artist – Visual Media and Technology
    Create 3D animations and video graphics for litigation support encompassing a multitude of fields from accident reconstruction, personal injury, product failure, fire, etc. Composite and edit both 3D animations and video. 3D camera matching and tracking to incorporate 3D animations into live video or photos. Responsibilities also include creating multimedia presentations for investigations and expert reports, creating trial graphics such as scale drawings, diagrams and charts.  Other responsibilities include the use of the FARO Laser Scanner and Scene software. Scan accident sites and vehicles.  Process scans for site preservation, analysis, and visualization.  Create animations based on 3D scan data. Added and animated bi-peds, humanoids, and vehicles to 3D scan data to show how accident or incident occurred. Video analysis and enhancement. Vehicle and pedestrian speed analysis from security video or dash cam videos utilizing photogrammetry and reverse projection techniques.



FORENSIC ENGINEERS AND CONSULTANTS

- RGB Solutions                                                                 2002 – 2005
  - Contractor/Animator

- Baylor College of Medicine                                                          2002
  - Contractor, Animator/Graphic Artist

- The Corpus Christi Water Department                                                 2002
  - Contractor, Animator/Graphic Artist

- Visual Candy                                                                        2001
  - Contractor, Animator/Graphic Artist/VFX

- Crush Interactive                                                                   2001
  - Contractor/Modeler

- The News of Texas                                                                   2000
  - Graphic Artist

- Visual Candy                                                                        1999
  - Contractor/Animator/Graphic Artist/VFX

- Kno-It Inc.                                                                         1999
  - Internship/Animator

## Education and Certifications
- **Computer Animation, A.A.S.:** The Art Institute of Houston (2000)

## Continuing Education
- **FXPHD:** Production Rendering with Mental Ray; Digital Color Theory; After Effects Motion Graphics II, 2010; Advanced Environmental Modelling; Visual Effects Techniques with 3DSMax; Premiere Pro for the Filmmaker, 2011
- **Other:** FARO Laser Scanner, FARO Technologies, 2013

February 9, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

PATRICIA SLACK, INDIVIDUALLY )
AND AS THE SURVIVING MOTHER )
OF CHARLES ROUNDTREE, JR.,   )
BERNICE ROUNDTREE AS THE     )
REPRESENTATIVE OF THE ESTATE )
OF CHARLES ROUNDTREE, JR. AND)
ALL STATUTORY BENEFICIARIES, )
TAYLOR SINGLETON, AND        )
DAVANTE SNOWDEN              )
     PLAINTIFFS,            )
                            )
VS.                         )CIVIL ACTION NO.5:18-CV-1117
                            )
THE CITY OF SAN ANTONIO,     )
TEXAS AND STEVE CASANOVA     )
     DEFENDANTS             )
************************************************************

ORAL AND VIDEOCONFERENCE DEPOSITION OF
TAYLOR SINGLETON
FEBRUARY 9, 2021
(REPORTED REMOTELY)
************************************************************

          TAYLOR SINGLETON, produced as a witness at the
instance of the Defendants, and duly sworn, was taken in the
above-styled and numbered cause on the 9th of February,
2021, from 10:17 a.m. to 2:20 p.m., by Christine M. Sitzes,
CSR, reported by machine stenography, in the City of San
Antonio, County of Bexar, State of Texas, pursuant to the
pursuant to FRCP 30, the First Emergency Order Regarding the
COVID-19 State of Disaster, and/or the provisions stated on
the record or attached therein.

**Exhibit E**

February 9, 2021

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFFS, WASHINGTON LAW FIRM, PC:
     MR. DARYL K. WASHINGTON(VIA VIDEOCONFERENCE)
 3   325 North St. Paul, Suite 3950
     Dallas, Texas 75201
 4
     FOR DEFENDANT STEVE CASANOVA, DENTON NAVARRO ROCHA BERNAL &
 5   ZECH:
     MR. PATRICK C. BERNAL(VIA VIDEOCONFERENCE)
 6   2517 North Main Avenue
     San Antonio, Texas 78212
 7
     FOR DEFENDANT STEVE CASANOVA, DENTON NAVARRO ROCHA BERNAL &
 8   ZECH:
     MR. ADOLFO RUIZ(VIA VIDEOCONFERENCE)
 9   2517 North Main Avenue
     San Antonio, Texas 78212
10
     FOR DEFENDANT CITY OF SAN ANTONIO, OFFICE OF CITY OF SAN
11   ANTONIO:
     MR. LOGAN LEWIS(VIA VIDEOCONFERENCE)
12   100 West Houston Street, 18th Floor
     San Antonio, Texas 78205
13
14   ALSO IN ATTENDANCE:

15   MS. BERNICE ROUNDTREE(VIA VIDEOCONFERENCE)

16   MS. PATRICIA SLACK(VIA VIDEOCONFERENCE)

17   MS. SHERYL WOOD(VIA VIDEOCONFERENCE)

18   ALEJANDRA CASAS, VIDEOGRAPHER/TECH(VIA VIDEOCONFERENCE)

19   CHRISTINE M. SITZES, COURT REPORTER(VIA VIDEOCONFERENCE)

20

21

22

23                     * * * * * *

24

25
```

February 9, 2021

Page 3

1                    I N D E X

2                                                    Page

3   Appearances.............................................2

4   TAYLOR SINGLETON

5           Examination by Mr. Bernal.......................5

6   Examination by Mr. Lewis..............................111

7   Signature Waived Pursuant to Rule 30(e)(1.............132

8   Reporter's Certificate................................133

9                   E X H I B I T S

10  No./Description:

11   1      Deposition Notice..............................14

12   2      Ms. Singleton's Statement......................29

13   3      Omitted........................................

14   4      Panah Still(Casanova)(TS 6.12.04)..............48

15   5      Panah Still(Casanova SAPD Logo)(TS 06.07.29)...48

16   6      Still Photo 187(Singleton).....................54

17   7      Photo of Gun...................................68

18   8      Photo of Magazine..............................68

19   9      Panah Still(Cotton)(TS 6.22.03)................39

20  10      Plaintiff's Responses to Interrogatories.......70

21  11      Dartson Report.................................99

22  12      Photo of Mr. Snowden...........................84

23  13      Photo of Drugs in Mr. Roundtree's Waistband....97

24                  **********

25

February 9, 2021

Page 20

1      A.   No.  It's -- the name of it is -- I think it's --
2  I don't want to give you the wrong name.  It's
3  Dr. Bocanegra's office.  He's the main doctor in there.
4      Q.   And Dr. Clarissa is also a doctor in
5  Dr. Bocanegra's office?
6      A.   Yes, a PCA, whatever that is.
7      Q.   Oh, I see, a physician's assistant?
8      A.   Yeah.
9      Q.   Can you tell me your relationship to Mr. Snowden
10 or, as you called him, Snow at the time of this incident?
11     A.   That was a friend.
12     Q.   So he's not related to you in any way?
13     A.   No.  No.
14     Q.   Okay.  How about with Mr. Roundtree?
15     A.   We were friends.
16     Q.   Were you related?  I'm sorry.  I think I talked
17 over you.  I apologize.  I asked if you were related?
18     A.   He's a friend as well.
19     Q.   So there's no family relationship with
20 Mr. Roundtree?
21     A.   No.
22     Q.   Okay.  That evening on October 17 of 2018, you
23 traveled to a house at -- located at 217 Roberts Street in
24 San Antonio.  Is that right?
25     A.   Yes.

February 9, 2021

Page 31

1       Q.   Other than at the very top where it has an SAPD
2   case number?  Do you see that at the top right-hand corner?
3       A.   Yes.
4       Q.   That's not your handwriting; is it?
5       A.   No.
6       Q.   Okay.  But the rest of it is?
7       A.   Yes.
8       Q.   Okay.  Can we go to the bottom of the page,
9   please.  And you see there's some information that is
10  redacted again, your phone number, you see that, place of
11  employment.  Apparently it says N/A.  Do you know why -- why
12  did you write N/A there?
13      A.   At that moment, I probably wasn't employed.  I was
14  going to school.
15      Q.   Okay.  And so let's go to page two of Exhibit
16  Number 2.  And the date and time at the top of this page
17  says October 17, 2018, 0400 hours.  Do you know if that's
18  the date and time you gave this statement?
19      A.   That date is correct.  I'm not sure this -- the
20  time.  Because I was in handcuffs the whole time.  I was in
21  handcuffs from the time the officers took me out the house
22  to the homicide unit.  I was in handcuffs.
23      Q.   Do you have any other basis to believe that this
24  statement was given at any other time?
25      A.   I'm not sure.  I don't recall.

February 9, 2021

Page 35

1        A.    Yes.

2        Q.    Then a couple of sentences later, you state at

3   some point I saw a cop stop in front of the house.  Then the

4   cop drove off.

5        A.    Yes.

6        Q.    Explain the background to that statement.

7        A.    Well, that's a area that's always profiled.  So

8   police officer stopped in front of the house, shined a light

9   through that front window and he drove off.  Then we

10  finished socializing.

11       Q.    And were you inside the house when that happened?

12       A.    Yes.

13       Q.    And were you in that living room?  In the front

14  living room?

15       A.    Yes.  Yes.

16       Q.    Could you see out the window when the police

17  officer drove by?

18       A.    Barely.  He -- the only reason I knew he was

19  outside 'cause he shined a light into the house into that

20  front window.

21       Q.    But how would you know it was a cop?

22       A.    Who else has a light like that to shine through

23  somebody's living room window and a police car?

24       Q.    Did you see the police car?

25       A.    Yes.

February 9, 2021

1      Q.   And you could see the police car through the

2   window?

3      A.   Yes.

4      Q.   And were you sitting or standing when you saw

5   that?

6      A.   I got up to look out the window.  We all looked

7   out the window.

8      Q.   And who is all of us?  Are you talking about you

9   and who else?

10     A.   Me, Devante and Chop.

11     Q.   All three of you went to the window, looked out

12   the window and you saw a police car?

13     A.   Yes.

14     Q.   And a police officer shining a light through your

15   window?

16     A.   Yes.

17     Q.   And did you all talk about that?  What did you say

18   to Devante and Mr. Roundtree?

19     A.   We closed the blinds back and we sat down and we

20   finished talking.

21     Q.   Well, what I'm interested in knowing is was there

22   any discussion by any of the three of you as to why a cop

23   car was passing by?

24     A.   That's an area that's profiled.  The week before

25   that, I was profiled again and pulled over and just

Page 46

1          MR. BERNAL:  Let me just finish this --
2    these last couple of questions and then we can take a
3    break.
4          MR. WASHINGTON:  Patrick --
5    Q.    (MR. BERNAL) You didn't know whether the
6    officer was white or Hispanic.  Correct?
7    A.    He could have been purple.  I don't know what
8    color he was.  I assumed he was Hispanic.
9          That's what I got -- I got harassed by the
10   day before the last week was Hispanic.  That doesn't even
11   -- that's irrelevant.  I still got shot at.
12   Q.    (MR. BERNAL) And so what about the beanie part?
13   How -- how did you know at the time you signed this
14   statement that he was wearing a beanie?
15   A.    Because after he shot, the gun moved, the
16   flashlight, everything moved out the way, you see a beanie
17   sitting on top of his head.  You can't see him.  You can't
18   see nothing.
19   Q.    So at one point you did -- were you able to see
20   that he was wearing a beanie?
21   A.    Yes.  The first shot that he fired went past my
22   head.  It hit Devante in the back and it went past my head.
23   It went through the wall.  That's -- after that, that's when
24   I ducked.
25          MR. BERNAL:  Okay.  Let's go ahead and take

February 9, 2021

Page 62

1        Q.    Okay.  So when the shots were fired, how many did

2    you hear?

3        A.    I heard a couple of them.

4        Q.    And what did you hear the person at the door say

5    before the shots were fired, if anything?

6        A.    He said don't move, don't move.  Then he started

7    shooting through the living room.

8        Q.    And could you tell who he was shooting at?

9        A.    I thought he was shooting at all of us.  If I

10   would have moved I probably would be dead too right now.

11       Q.    So you thought that person was shooting at you for

12   any particular reason?

13       A.    He was shooting at me.  It doesn't matter where he

14   shot, he was shooting at me.  I had a bullet hole next to my

15   head.

16       Q.    Did you give that person any reason to pull a gun

17   and shoot towards you?

18       A.    I didn't give him a reason to open that door.

19       Q.    Object to nonresponsiveness.  Can you answer the

20   question.  Did you give that person a reason to pull a gun

21   --

22       A.    No.

23       Q.    -- to shoot at you?

24       A.    None of us gave him a reason to just open the door

25   and shoot at us.  There could have been kids in that living

February 9, 2021

Page 85

1      A.    Yes.

2      Q.    And it looks like he's changed clothes.  Do you

3  see that?

4                MR. WASHINGTON:  Objection, form.

5      A.    He changed his jacket.  He took the jacket off to

6  put over Chop's bullet hole.

7      Q.    (MR. BERNAL) Okay.  And when did that happen?

8      A.    When we realized Chop was shot, we needed towels

9  and stuff.  So we couldn't find no towels.  Because I asked

10 Michelle for some towels, Devante took his jacket off to put

11 it onto Chop.

12     Q.    Okay.  Thank you.  You can take that photograph

13 off now.

14                Ms. Singleton, in your interrogatories, if

15 we can bring those up again, Exhibit Number 10.  If you

16 can go to Interrogatory Number 21.

17                So we had asked in that interrogatory

18 whether you had been treated by any physician for any

19 condition, illness or injury caused by this incident.  And

20 in your answer, you can see it below, under the answer,

21 the last line, it says plaintiff has been treated by

22 Dr. Uche, and I don't know how to pronounce his last name,

23 due to the incident in question.  Do you see that?

24     A.    Yes.

25     Q.    Is that the doctor you had testified and

February 9, 2021

Page 86

1    identified earlier?

2          A.   Yes.

3          Q.   Okay.  Let's call him Dr. Uche 'cause that's

4    easier to pronounce.  I think that's what you called him.

5    Correct?

6          A.   Yes.  That's who -- that was my -- the person that

7    I seeked out counseling to.  But my doctor is the one that

8    treated -- that prescribed me the medicine.

9          Q.   Sure.  So Dr. Uche was a counselor?

10         A.   Yes.

11         Q.   And did he office with Dr. Bocanegra?

12         A.   No.

13         Q.   Where is his office?

14         A.   It's off of I-10 and Huebner.

15         Q.   In San Antonio?

16         A.   Yes.

17         Q.   And did you see him for any of the mental anguish

18    or conditions that you were experiencing after this

19    incident?

20         A.   Yes.

21         Q.   And what did he treat you for?

22         A.   He's somebody that I go and talk to about my --

23    about my condition and how I can -- basically, how he can

24    help me with my feelings and with my anger and depression.

25         Q.   And do you know what kind of doctor he is?

February 9, 2021

Page 87

1        A.    He's a counselor.  He's mental health.  He's a --

2   well, I don't -- I don't want to give the wrong name.  He's

3   -- I know he's a counselor, though.

4        Q.    Do you know if he's a medical doctor?

5        A.    I believe so.  His thing say Dr. Uche.

6        Q.    Okay.  How many times did you see him?

7        A.    I seen him quite a few times.  I used to see him

8   once a week.

9        Q.    How many weeks did you see him?

10       A.    I don't recall.

11       Q.    Did you see him for over a year?

12       A.    No, I didn't have.

13       Q.    Do you remember when you started to treat with

14  Dr. Uche?

15       A.    No, I don't recall.  I didn't see him that many

16  times.  Like I said before, I had to go to work and I had to

17  deal with my son and everything like that.  I'm a single

18  mom.

19       Q.    Sure.  I understand.  Let's go to Interrogatory

20  Number 17.  That's where you identified medication?

21       A.    Uh-huh.

22       Q.    And you listed Dr. Bocanegra and Clarissa Cuellar?

23       A.    Uh-huh.

24       Q.    And I think you testified earlier that she was a

25  physician's assistant?

February 9, 2021

Page 88

1        A.    Yes.

2        Q.    And was Dr. Bocanegra your regular physician?

3        A.    Clarissa is -- Clarissa is.  She works within

4   Dr. Bocanegra's office.

5        Q.    But you would only see the physician's assistant,

6   Ms. Cuellar?

7        A.    Yes.  'Cause that's who prescribed the medicine.

8   She's on my medicine bottles.

9        Q.    Okay.  Now, you mentioned in your interrogatory

10  responses that you had a car accident in June of 2018

11  involving an uninsured motorist?

12       A.    Yes.

13       Q.    And were you injured in that accident?

14       A.    Yes.

15       Q.    Did you claim any mental anguish associated with

16  the injuries that you sustained in that accident?

17       A.    No.

18       Q.    Can you tell me what -- how bad was that accident.

19  I'm sorry.  Are you talking?  I don't mean to interrupt you.

20  I can't hear at all.

21       A.    I got hit by a 18-wheeler.

22       Q.    I see.  So it says here -- let's go to

23  Interrogatory Number 11, please.

24             THE VIDEOGRAPHER:  I'm sorry, what number?

25             MR. BERNAL:  11.

February 9, 2021

1          A.    Yes.

2          Q.    Okay.  I got you.  Okay.  When is the last time

3    that you had a counseling session with Dr. Uche?

4          A.    It's been a while due to COVID.  I had got COVID

5    as well so I hadn't been nowhere.

6          Q.    Do you remember when your last appointment with

7    him would have been?

8          A.    Probably in the summer, 2020.  I'm not -- it was

9    before I got COVID though.  So it probably had to have been

10   in June maybe.  I'm not sure.  I see another -- I talk to

11   another psychologist or psychiatrist, whatever they're

12   called.

13         Q.    And who is that?

14         A.    I believe her name is Myra Brown.

15         Q.    Okay.  Is it Myrna Dartson?

16         A.    Oh, okay.  Yeah, that's her name.

17         Q.    Okay.  We'll get to her in a minute.  When is the

18   last time that you saw the physician's assistant at

19   Dr. Bocanegra's office for medication?

20         A.    I was seeing her before I moved to Dallas because

21   I needed more blood pressure pills.

22         Q.    And so you -- you list two medications in your

23   interrogatory answers, Escitalopram.

24         A.    Uh-huh.  That's for anxiety and depression.

25         Q.    And Travadone(verbatim).

February 9, 2021

Page 91

1      A.    That's for depression.  To sleep, I had insomnia

2   after.  I couldn't sleep for weeks.  I couldn't sleep.  I

3   was having nightmares and stuff.

4      Q.    Tell me how this incident -- you can take the

5   interrogatory responses down, I believe.  I don't need that.

6   Tell me how this incident has affected you personally.

7      A.    I'm a very paranoid person now.  I'm still

8   depressed.  My -- I have bad anxiety.  I have nightmares.  I

9   can see -- like I can see -- I can still see Chop in my head

10  from that night.

11             I still -- like I'm terrified of guns and

12  stuff like that, loud noises.  And it makes me think about

13  my son.  My son's five years old right now and I don't

14  ever want this to happen to him.

15             I wouldn't wish this on nobody.  I don't

16  want this to happen to anybody.  And that's something that

17  I'll have to live with.  And I try to prepare my son for

18  things like this so it doesn't happen to him.  I'm not the

19  same -- the same mother I used to be before.

20     Q.    How -- how have you changed as a mom?

21     A.    I'm depressed.  So if you're depressed, you can't

22  go out and do things.  You can't go do activities you want

23  to go do 'cause you're depressed.

24     Q.    Activities such as what?

25     A.    Going and being a mom.  Going to take my son to go

February 9, 2021

Page 92

1    do things.  Being that joyful person I used to be.

2                   You can't be joyful if you're sitting here

3    thinking about something that happened in 2018.  You're

4    just not -- you're living in a nightmare.  You still live

5    with it because it can happen again.

6                   It still happens today.  It didn't just

7    happen to me.  It's happened to a lot of people in this

8    world.  And it's just -- it's not -- it's not fair.

9                   Like I live -- I live, I feel bad because

10   that day I didn't -- I almost died but I didn't die.  But

11   somebody else lost their son.  You get what I'm saying?

12                   And I got to go home to my son but their

13   son couldn't go to home to them.  That's not -- that's not

14   fair.  And then he dies and there's nothing I could do to

15   even save him or help him.

16        Q.    And when you would counsel with Dr. Uche, would he

17   help you through these issues that you're talking about?

18        A.    I mean, you can try to help somebody by talking to

19   them but I feel like just talking to somebody to tell them

20   how to get around something, that's something that -- that's

21   gonna take years to accomplish.  You can say oh, well, you

22   know, you can try to do this to not think about it and just

23   use -- that's hard not to think about 'cause I almost died.

24                   I almost died that night.  The same bullet

25   that hit Devante went past me.  It went past me.  It went

February 9, 2021

Page 93

1   through the wall to the neighbor's house.  Like that

2   bullet kept going.

3                    Or what if my son was in that living room

4   that morning?  I mean, that -- yeah, that morning with me

5   to go pick up somebody and my son got shot just because

6   the officer just was over jealous(verbatim), just reckless

7   shooting.  That's wrong.  That's not right.

8                    So it's hard to just live and not think

9   about that.  'Cause I live with guilt.  Devante lives with

10  guilt.  I live with guilt every day and I didn't even do

11  anything.  None of us did anything.

12      Q.   Have you stayed in touch with Mr. Snowden since

13  this incident?

14      A.   I was in touch with him but I haven't talked to

15  him lately, though.  No.

16      Q.   When's the last time you talked to him?

17      A.   In October 2020.

18      Q.   Okay.  Do you know that he's there in Dallas?

19      A.   No, I'm not sure where he is, where his

20  whereabouts are.  He has --

21      Q.   You haven't visited him in Dallas?

22      A.   He has psychological issues he's going through

23  right now 'cause he lives like -- like this is his fault.

24  So, I mean, you walk around with a body on you, you would

25  kinda understand that too.  It's not fair.

February 9, 2021

Page 107

1    that.  It'll make us comfortable but the end of day, we

2    still need justice.

3                   Y'all -- I mean, police officers go around

4    here killing people and then they don't -- they just don't

5    go to jail.  If I did that, if I came to your house,

6    opened your door and said what's up and then shot at

7    y'all, I would be in jail right now.

8        Q.   No, I understand your position in this case and

9    I'm sorry I have to object to responsiveness of the

10   question.

11       A.   I'm asking the jury to determine what -- what's

12   considered for me or for us.

13       Q.   I understand.  Are there any other ways this

14   incident has affected you that we haven't talked about

15   already?

16       A.   Just, I mean, I didn't die that day but y'all took

17   somebody else's life and I felt like I died with him that

18   day.

19       Q.   Is that part of your depression?

20       A.   Yes.  Watching somebody die that you can't save.

21   Watching somebody die, sitting there -- you sitting there

22   talking to them and then five seconds later, they're dead.

23   Yes.

24       Q.   And has that caused you any nightmares or

25   hallucinations?

February 9, 2021

Page 125

1   training requirements for a city to be -- and an officer to

2   be licensed as a peace officer in the state of Texas?

3              MR. WASHINGTON:   Objection, form.

4       A.   No, I'm not a police officer.   I didn't go to law

5   school.   I just know that when a police officer comes

6   through a door, a police officer is supposed to knock on the

7   door, not open the door or kick the door open.   And they're

8   not supposed to be sicking their gun through no -- no

9   burglar bar doors to shoots inside nobody's house.

10             And they're -- number one, they're supposed

11  to be identifying themselves, not saying what's up.   How

12  do I know who you are if you say "what's up"?

13      Q.   (MR. LEWIS) Okay.   And is that just based your

14  research, you know, anything you can tell me about?

15      A.   That's based -- that's based on what happened to

16  us today.   Basically, when a police officer has ever knocked

17  on anybody's door, and your door, too or wherever, they say

18  knock, knock, knock, hey, this is SAPD or this is, you know,

19  detectives or whatever.   They say that they're the police.

20             They don't just push the door open and be

21  like what's up.   He did -- he failed to identify himself.

22  The City did not discipline Casanova for -- for anything

23  that he did, none of his wrong.

24             Like it's been video.   There's footage

25  across the United States and YouTube showing this man

February 9, 2021

Page 127

1                    MR. WASHINGTON:  That's why I just said

2      that.

3                    MR. LEWIS:  Okay.  All right.  Can you guys

4      hear me?

5                    THE WITNESS:  Yes.

6      Q.    (MR. LEWIS) Okay.  Did -- at what point did you

7      see the door open?  Did you -- did you see it first or did

8      you hear a knock?

9      A.    It was no knock.  Even in y'all's video footage

10     from the body cams, there was no knock.

11                   When he -- when he tried to open the first

12     door, he didn't knock.  When he opened the second door, he

13     kicked it open with his shoe and that showed on the

14     second -- on the -- on the second body cam footage.  He

15     pushed the door open.  And there was nobody behind the

16     door.

17                   There was three individuals in the house.

18     You guys took two individuals to homicide and y'all

19     dropped the other Hispanic lady off and y'all took -- go

20     to jail -- I mean, y'all took him to the hospital and

21     y'all -- and De -- I mean, and Chop was dead.

22     Q.    Okay.  My question -- and I object to

23     nonresponsive.  Did you hear the knock or did you first see

24     the door open?

25     A.    He did not knock.  And he didn't knock on that

Page 133

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3   PATRICIA SLACK, INDIVIDUALLY )
    AND AS THE SURVIVING MOTHER  )
4   OF CHARLES ROUNDTREE, JR.,   )
    BERNICE ROUNDTREE AS THE     )
5   REPRESENTATIVE OF THE ESTATE )
    OF CHARLES ROUNDTREE, JR. AND)
6   ALL STATUTORY BENEFICIARIES, )
    TAYLOR SINGLETON, AND        )
7   DAVANTE SNOWDEN              )
        PLAINTIFFS,              )
8                                )
    VS.                          )CIVIL ACTION NO.5:18-CV-1117
9                                )
    THE CITY OF SAN ANTONIO,     )
10  TEXAS AND STEVE CASANOVA     )
        DEFENDANTS               )
11  * * * * * * * * * * * * * * * * * * * * * * * * * *
                  REPORTER'S CERTIFICATE
12        ORAL AND VIDEOTAPED DEPOSITION OF
                    TAYLOR SINGLETON
13                FEBRUARY 9, 2021
                  (REPORTED REMOTELY)
14  * * * * * * * * * * * * * * * * * * * * * * * * * *
15  I, Christine M. Sitzes, Certified Shorthand Reporter, hereby
16  certify to the following:
17          That the witness,TAYLOR SINGLETON, was duly sworn
18  by the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by the
20  witness;
21          That examination and signature of the witness to
22  the deposition transcript was waived pursuant to Federal
23  Rule 30(e)1;
24          That the amount of time used by each party at the
25  Deposition is as follows:
```

1          Mr. Bernal - 2 hours 34 minutes  and

2          Mr. Lewis - 0 hours 31 minutes and

3          Mr. Washington - 0 hours 0 minutes;

4               That pursuant to information given to the

5     deposition officer at the time said testimony was taken, the

6     following includes counsel for all parties of record:

7     FOR THE PLAINTIFFS:
            MR. DARYL K. WASHINGTON(VIA VIDEOCONFERENCE)
8     WASHINGTON LAW FIRM, PC
            325 North St. Paul, Suite 3950
9     Dallas, Texas 75201

10    FOR DEFENDANT STEVE CASANOVA:
            MR. PATRICK C. BERNAL(VIA VIDEOCONFERENCE)
11    DENTON NAVARRO ROCHA BERNAL & ZECH
            2517 North Main Avenue
12    San Antonio, Texas 78212

13    FOR DEFENDANT STEVE CASANOVA:
            MR. ADOLFO RUIZ(VIA VIDEOCONFERENCE)
14    DENTON NAVARRO ROCHA BERNAL & ZECH
            2517 North Main Avenue
15    San Antonio, Texas 78212

16    FOR DEFENDANT CITY OF SAN ANTONIO:
            MR. LOGAN LEWIS(VIA VIDEOCONFERENCE)
17    OFFICE OF CITY OF SAN ANTONIO, LITIGATION DIVISION
            100 West Houston Street, 18th Floor
18    San Antonio, Texas 78205

19               I further certify that I am neither counsel for,

20    related to, nor employed by any of the parties to the

21    action in which this proceeding was taken, and further

22    that I am not financially or otherwise interested in the

23    outcome of this action.

24               Further certification requirements pursuant to

25    Rules of Civil Procedure will be certified to after they

February 9, 2021

Page 135

1   have occurred.

2           Certified to by me this 26th of February, 2021.

3                               /s/Christine M. Sitzes
                                Christine M. Sitzes
4                               TX CSR#8756, Expires 2/28/22
                                Firm Registration No. 79
5                               Federal Court Reporters of
                                San Antonio
6                               10100 Reunion Place, Suite 660
                                San Antonio, Texas 78216-4119

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1        FURTHER CERTIFICATION UNDER RULE 30 FRCP:

2            The original deposition was delivered to Mr.

3  Bernal in accordance with Rule 30(e) of the FRCP on

4  MARCH  01, 2021

5            That $ 1743.00    is the deposition officer's

6  charges to Mr. Bernal for preparing the original deposition

7  transcript and any copies of exhibits;

8            That the deposition transcript was delivered in

9  accordance with Rule 30(e) and (f)(1) of the FRCP, and that

10  a copy of this certificate was served on all parties shown

11  herein and filed with the Clerk.

12            Certified to by me on this  1st  day of

13  MARCH       , 2021.

14                       /s/Christine M. Sitzes
                                 Christine M. Sitzes,

15                       TX CSR#8756
                                 Expiration: 2/28/22

16                       Firm Registration No. 79
                                 Federal Court Reporters of

17                       San Antonio
                                 10100 Reunion Place

18                       Suite 660
                               San Antonio, Texas 78216-4119

19

20

21

22

23

24

25

San Antonio Police Department
**STATEMENT INFORMATION SUPPLEMENT**
NOTE: This information is strictly confidential and only for police and District Attorney's office files/records

Case Number: _SAPD18220885_

Under the Texas Penal Code, a person commits **Aggravated Perjury, a Third Degree Felony,** if, with intent to deceive and with knowledge of the statements meaning: (1) he makes a false statement under oath, or swears to the truth of a false statement previously made.  (2) If the statement is required or authorized by law to be made under oath, and the statement is made during, or in connection with an official proceeding, and is material.

Name
Nombre: _Taylor Singleton_

Home Address
Direccion de Residencia: ████████████████ 78218

Business Address
Direccion de Empleo: _____

Place of Employment
Lugar de Empleo: _N/A_                     Titulo de Empleo: _____

Home Phone Number
Telefono de Residencia: ████████        Business Phone Number
                                        Telefono de Empleo: _____

Race  _BLK_      Sex  _F_    Age  ████
Raza             Sexo       Ededad

Date of Birth
Fecha de Nacimiento: ████████

Driver's License
Numero de Licensia: ████████

Social Security Number
Numero de Seguro Social: _____

Job Title
Married  Yes                    No                    Name of Spouse
Casado:  Si  ☐    No  ☒         Nombre de Esposo O Esposa: _____

Nearest Relative other than Spouse:
Pariente Mas Cercano (Exclusivo de Esposo O Esposa):

Name
Nombre: _Denitra Singleton (mom)_

Home Address
Direccion de Residencia: _same_

Home Phone Number
Telefono de Residencia: ████████        Business Phone Number
                                        Telefono de Empleo: _____

Place of Employment
Lugar de Empleo: _N/A_

Comments (Any remarks observations which are pertinent to the case):
_____
_____
_____
_____
_____

(352)

SAPD Form 66 8L Rev (04 04)

COSA002132

**STATE OF TEXAS §**
**COUNTY OF BEXAR §**

**Case Number: SAPD18220885**
**Date and Time: 10/17/2018 0400**
**Taken by : DET. R. Hines #2358**

Page 1 of 1

**BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Taylor Singleton, who being by me duly sworn upon his/her oath deposes and says:

My name is Taylor Singleton. I am currently a student at Central Texas College online. I graduated from Ace Academy in San Antonio. I can read, write, speak, and understand the English language.

Earlier in the day I had been with "Snow". I think his name is Deante or DeVante. He is a Black male. He wears his hear in a fade and he has a dark complexion. When I had last talked to him he asked to come by Hence's house to pick him up. I went to Hence's house to pick up "Snow". I know Hence through his granddaughter Rochelle. When I got to Hence's house I was there with Snow. I believe that Hence and the Hispanic lady were in the bedroom sleeping. About 10 minutes after I got there "Chop" got to the house. "Chop" is a mixed male. He is Black and Hispanic. He has a medium complexion. He is about 5'4" tall. At some point I saw a cop stop in front of the house then the cop drove off. I saw the front door of the house start to open and I saw a flashlight shining in the door. "Snow" got up and asked who was at the door. Snow walked towards the door. The person at the door started saying in a strong voice "don't move, don't move". I assumed that it was a police officer but I could not see him. The person at the door never identified themselves as police. Chop was sitting to the right of me while this was going on. The police officer pushed the door open and "Snow" turned away from him. The officer started shooting. When the officer was shooting I just curled up and put my head down.  "Chop" was still sitting to the right of me and he was shot in the chest. "Chop" got up from the chair and he collapsed. "Snow" went to "Chop" and I could see a hole in "Chop" in the middle of his chest. "Chop" was trying to breath. After the cop stopped shooting he ran away from the house. The officer I saw shooting looked Hispanic and he was wearing a beanie. Detective Hines asked me if anyone in the house had any guns. I didn't see anyone with any guns and I don't know why the officer started shooting.

Everything I have told Detective Hines is true. I have not been promised anything for giving this statement. This is the end of my statement.

Signature _T. Sglet_

**Sworn to and subscribed before me, Randal Hines, TCLEOSE#111099, a peace officer in the State of Texas and pursuant to No. 602.002, Texas Government Code, on this _17ᵗʰ_ day of __October, A.D., 2018.**

_Ral An_ - 23SP

Peace Officer
(353)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

PATRICIA SLACK, Individually and as the §
surviving mother of CHARLES §
ROUNDTREE, JR., BERNICE §
ROUNDTREE as the representative of the §
estate of CHARLES ROUNDTREE, JR. and §
all Statutory Beneficiaries, TAYLOR §
SINGLETON, and DAVANTE SNOWDEN §
    *Plaintiffs*, §
     §   CIVIL ACTION NO.
VS. §   5:18-CV-1117-JKP-ESC
     §
THE CITY OF SAN ANTONIO, TEXAS §
AND STEVE CASANOVA §
    *Defendants*. §

---

## DECLARATION OF ALBERT A. ORTIZ

---

STATE OF TEXAS    §
               §
COUNTY OF BEXAR   §

    Before me, the undersigned notary, on this day personally appeared Albert Ortiz, a person whose identity is known to me.  After being by me duly cautioned to tell the truth, subject to the penalties for perjury, he did affirm and testify as follows:

    "My name is Albert Ortiz.  I am over the age of eighteen (18) years, am of sound mind, and am fully capable of making this affidavit.  I am personally familiar with facts recited below, which are true and correct.

    I have been retained as an expert witness in the above referenced lawsuit. I served as a police officer in the San Antonio Police Department (SAPD) for over 33 years.  I held every rank in the Department before retiring as the Chief of Police in April of 2006. During my tenure, I was assigned to the Homicide Unit as a first line supervisor (sergeant) and later as the commander (lieutenant) of the unit for five years. I hold a bachelor's degree in Applied Arts and Sciences from Southwest Texas State University and a master's degree in Criminal Justice from now Texas State University. I previously taught Criminal Justice at San Antonio College. Throughout my career I received continuing education and training at the San Antonio Police Academy. I also attended a substantial number of additional



training classes and conferences related to criminal justice and police administration outside the department.

My experience, education, and training in the law enforcement field; and specifically my experience, education and training related to police procedures are set forth in my CV, attached hereto as **Exhibit F-1**.  I base my opinions expressed in this affidavit on review of the materials, documents and information enumerated in **Exhibit F-2** herein.

According to the written statement and body worn camera (BWC) recording of SAPD Officer Steve Casanova, while on patrol, Officer Casanova was approached by a citizen, Maria Herrera, who reported that a few minutes earlier she and her husband, Esteban Preciado, had parked in front of 218 Roberts to deliver some food to a resident. She said she was approached by a tall, skinny, black male, 20 to 25 years of age, wearing a grey sweater. She was unsure of his hair length but after conferring with her husband, she said he had no hair. She said the man was very upset because they had parked in front of his house. The male walked to the driver's side door and punched Mr. Preciado in the face. Officer Casanova's BWC recording shows Mr. Preciado's injury. Ms. Herrera identified the house into which the assailant fled after the assault as 217 Roberts Street.[1]

SAPD Policies and Procedures dictate how a SAPD investigating officer should attempt to ascertain whether an alleged assault incident reported is actually a violation of the law.  It is the duty of the reporting officer to obtain both sides of the story and gather facts and identifying information of participants, suspects and/or witnesses to the alleged assault.  A police officer for SAPD, while on duty and acting in the course and scope of his employment, is engaged in the discharge of discretionary duties as a licensed and certified peace officer for the State of Texas. Part and parcel of the officer's discretionary duties is to determine how best to investigate allegations of possible crimes.  It was Officer Casanova's sworn duty to investigate the alleged assault of the victim in order to establish whether probable cause existed to believe a penal code violation occurred and who committed it. **[Exhibit F-3, SAPD Procedure 701.06 (A.) Officers/UEDI's General Crime Scene Duties and the Exhibit F-4, Texas Code of Criminal Procedure Chapter 2, Article 2.13 Duties and Powers (of peace officers).**

For this investigation and within his discretionary authority, Officer Casanova decided to comply with the aforementioned procedure **[701.06 (A.)]** by approaching the residence and talking to the occupants in an effort to gather facts and identify witnesses, suspects, and anyone else who might have information about the alleged assault.[2]  In the law enforcement profession this information gathering strategy is commonly referred to as a "knock and talk".  Police officers have the same right as any citizen to open an unlocked gate, walk down a pathway

---

[1] See Officer Casanova's BWC, attached hereto as **Exhibit F-6** (T06:06:43 – T06:12:19Z).

[2] Officers Casanova and Panah referenced the "knock and talk" investigation in their BWCs, [F-6, Casanova (T06:19:35Z – T06:20:28Z); and F-7, Panah (T06:08:42Z-T06:09:21Z).

up to the front door, knock, and attempt to talk to the occupants of the house. A "knock and talk" is a consensual encounter between police officers and citizens, as opposed to serving an arrest or search warrant that does not require the consent of the occupant.  There is no announcement requirement for a "knock and talk". Service of a warrant, on the other hand, requires an announcement **[SAPD Procedure 504.09 (B.) (1.) Execution of Search Warrants]**.

Prior to going to 217 Roberts Street, Officer Casanova assigned two officers to watch the rear of the house in case the suspect was indeed present and attempted escape. Officer Casanova and two back-up officers went to the front of the residence. Multiple officers can be utilized in a "walk and talk" investigation. These are reasonable and proper discretionary decisions by an investigating officer.  At no time did Officer Casanova tell any of his back-up officers that his goal or intentions were to enter the residence, nor did he direct them to do so.

In my opinion, any prudent officer in the same or similar circumstances as Officer Casanova could believe his discretionary duties included to determine how best to investigate allegations of an assault.  It is also my opinion that any prudent officer in the same or similar circumstances could reasonably believe that a "knock and talk" strategy was a proper option and could have acted in the same or similar manner. **[Exhibit F-3, SAPD Procedure 701.06 (A.); and Exhibit F-4, Texas Code of Criminal Procedure, Chapter 2, Article 2.13 Duties and Powers (of peace officers]**.

SAPD officers, including Officer Casanova, receive training on use of force in various forms including classroom (academic) instruction, practical application (hands-on), practical problems, and on-the-job training. Procedure 501.05 (C)-Use of Force, contains a matrix which provides officers with guidelines to help them decide the amount and level of force appropriate to accomplish a legitimate police objective in different situations they may encounter.  The goal is to use the lowest level of force necessary to overcome the resistance or force offered by a person being detained by the officer.  The matrix, sometimes referred to as a use of force continuum, is taught in the same basic manner to police officers throughout the nation.

It would be impossible for any police department manual to address every situation an officer may encounter. Although each situation is different and an officer may have to immediately resort to a higher level of force without first employing lower levels, generally speaking, the matrix consists of:

a) Officer's Presence;
b) Verbal Communications/Instructions;
c) Open/Empty Handed Control Techniques;
d) Physical Force;
e) Intermediate Weapons; and
f) Deadly Force.

As stated in Officer Casanova's written statement, **[Exhibit F-5, [Casanova's written statement, Bate Stamp Nos. COSA 002126 - 002128],** and my observation of Officer Casanova's BWC video, Officer Casanova's flashlight was pointed downward when the door opened. As seen and heard on Casanova's BWC video, he received a routine greeting, "What's up", from Snowden and Officer Casanova   returned the greeting in a similar casual manner by stating, "What's up, man?" **[Exhibit F-6, Casanova's BWC (T06:22:16Z – T06:2218Z)].** Through the open door, the living room light can be seen casting the shadows of Casanova and the outer iron door onto the floor of the porch. **[Exhibit F-7, Panah's BWC (T06:22:15Z-T06:22:20Z).** Officer Casanova was wearing his full regulation SAPD uniform, with badge, name plate, and SAPD patch on his arm and on the front of his beanie. A reasonable assumption by the officer is that his presence and uniform paraphernalia is visible to occupants inside the residence. Plaintiff Singleton noted in her written statement and in her deposition testimony that the officer she saw shooting looked Hispanic, and she could see the beanie he was wearing. **[Exhibit F-8, Singleton 10/17/18 written statement, COSA 002132 - 002133[3];   Exhibit F-9, Singleton's Deposition page 41, lines 10-14; page 50, lines 2 - 15].** Singleton testified in her deposition that before the shots were fired, she heard the person at the door say, "don't move" twice. [**Exhibit F-9, pg. 62, lines 1-7]**   Moreover, Singleton testified in her deposition, that she and Snowden could see police vehicles outside the house before Officer Casanova knocked on the door. [**Exhibit F-9,  page 35, lines 2-25; page 36, lines 1-16**]. Further, given the facts that Snowden admitted he had an altercation when he pushed a Mexican man prior to the shooting incident **[Exhibit 10, Snowden's recorded statement (15:34:58 -15:37:54); Exhibit 11, Detective Perez's documented recorded statement,  COSA 001788-001710 ],** and according to Ms. Herrera, her husband was assaulted by an assailant that ran into 217 Roberts Street **[Exhibit F-6, Casanova's BWC (T06:06:43 – T06:12:19Z)],** it is likely Snowden and others knew there was police presence on Roberts Street just before Officer Casanova knocked on the door.

The initial contact with Mr. Snowden and the other occupants of the house was non-confrontational. The overhead light inside the living room of the residence lit up the position in which Casanova was standing. It would have been logical to believe he was visible to the occupants inside. His presence in full uniform additionally served to instruct others of his presence as a law enforcement officer. Based on the lighting and his uniformed presence, it is my opinion any prudent officer in the same or similar circumstances as Officer Casanova could believe his identity and authority as a peace officer should be readily apparent and could have acted in the same or similar manner.  As previously discussed in this report, Officer Casanova's decision to employ a "knock and talk" strategy was part of his discretionary duties. In my opinion, any officer in the same or similar circumstances as Officer Casanova could believe a requirement or duty to make a verbal announcement of his presence prior to or

---

[3] Included as Exhibit No. 2 in Singleton's Deposition.

after knocking on the door did not exist and could have acted in the same or similar manner.

As Officer Casanova's written report indicates, he properly assessed the three individuals in the room once the door opened, and as shown in his BWC video, and concluded one of the males sitting on the sofa in front of him, later determined to be Davante Snowden, matched the complainant's general description of the assailant. **[Exhibit F-5, COSA (001785-001787 @ 001786); Exhibit F-6 Casanova's BWC  (T06:22:18Z - T06:22:20Z)]**.

The room in which Mr. Snowden was sitting was very small and put him and Officer Casanova in close proximity to each other.  According to Casanova's statement and BWC video, when Snowden suddenly stood up in an aggressive manner stepping toward Officer Casanova saying: "Who the fuck is this", he reached for a gun in his waistband **[Exhibit F-5, COSA (001785-001787 @ 001786); Exhibit F-6 Casanova's BWC (T06:22:18Z - T06:22:20Z)]**. Snowden's actions escalated the level of force toward Officer Casanova. Until this point, Officer Casanova had not removed his holstered weapon. **[Exhibit F-7, (T06:21:42Z - T06:22:12Z - T06:22:14Z)]** Officer Casanova then properly proceeded with the use of force matrix's second level of force, namely, a verbal command to Snowden to show his hands. **[Exhibit F-6, Casanova's BWC ( T06:20:20Z - T06:22:22Z)]**. Snowden's immediate close-range threat presented a clear and present danger of serious bodily injury, including death, to Officer Casanova as well as to his fellow officer located behind him. Because of these quickly changing, life-threatening developments, Casanova could not progress through the intermediate steps in the use of force matrix.  He had to make a split-second decision.  It is my opinion that any officer in the same or similar circumstances as Officer Casanova could believe the use of deadly force was immediately necessary and could have acted in the same or similar manner.  In such a situation, only Snowden was the intended target as he solely presented the risk of serious bodily injury toward Officer Casanova and his fellow officers.

The following documents and videos referenced in this affidavit are included in the totality of documents I reviewed as listed in **Exhibit F-2** to formulate my opinions.

**F-1:**    Ortiz CV

**F-2:**    List of materials, documents and information reviewed

**F-3:**    San Antonio Police Department Procedures;
         **701.06 (A.) - Crime Scene Duties;**
         **504.09 (B.)(1.) – Execution of Search Warrants;**
         **501.05 (C) – Use of Force**

**F-4:**    Texas Code of Criminal Procedure, Chapter 2, Article 2.13.

**F-5:**    Steve Casanova's statement [COSA 002126-002128]

**F-6:**    Video recording entitled,
         SAPD18220885_00132324_CASANOVA__STEVE-
         (bodycam) taken on October 17, 2018

**F-7:**    Video recording entitled,
         "SAPD18220885_00137518_PANAH__JAMES_A-file 1 (bodycam)
         taken on October 17, 2018

**F-8:**    Taylor Singleton's 10/17/18 Statement [COSA 002132 – 002133]

**F-9:**    Singleton's deposition testimony excerpts, Page 35, 41, 62 and 50.

**F-10:**   Video recording of Davante Snowden's statement, Parts 1 and 2

**F-11:**   Written recorded statement by Detective Ruben Perez
         [COSA 001788-001710]


The aforementioned opinions and observation are true and correct to a reasonable degree of professional certainty.


I declare under penalty of perjury that the foregoing is true and correct.


Executed in Bexar County, Texas, on this the 27th day of May 2021.



_____
ALBERT A. ORTIZ

# Albert Ortiz Consulting, LLC

3926 River Falls
San Antonio, Texas 78259
C (210) 380-7839
e-mail  dcao2000@yahoo.com

**EMPLOYMENT:**

*2006-Present*   **Albert Ortiz Consulting, LLC**
Consulting and Expert Witness Services in Premise Liability and Police Liability/Employment Issues

*2002-2006*   **Chief of Police, San Antonio Police Department**
- Responsible for the administration of  250+ million dollar budget and management of 2700 employees

*2000-2002*   **Assistant Chief of Police, Administration Bureau Commander**
- Supervise two deputy chiefs and two captains
- Responsible for a 237 million dollar budget
- Direct the Resource Management Division which includes:  Accounting and Personnel Unit; Research and Planning Unit; Crime Analysis Unit Management Accountability Program (MAP); Training Academy; and Recruiting Detail
- Manage the Professional Standards Section which includes:  Internal Affairs Unit; Accreditation Detail; and Staff Inspection Detail
- Oversee the Support Services Division which includes:  Community Services Section; Communications Unit; Records Unit; Victims Advocacy Section; Psychological Services; Vehicle Storage Unit; and Property and Evidence Room Detail

*1999-2000*   **Deputy Chief, Chief of Staff**
- Managed the day-to-day operations of the department
- Coordinated all police operations
- Supervised all personnel reporting to the Chief of Police

*1994-1999*   **Deputy Chief, Criminal Investigations Division Commander**
- Supervised three captains
- Directed all Major Crime Investigations including:  Homicide; Sex Crimes; Robbery; Forgery; Narcotics; Vice; Traffic Investigations; Night Criminal Investigations Unit; Vehicle Crimes; Repeat Offenders Program; Evidence Unit; and Youth Crimes
- Administered a 30.9 million dollar budget

*1994-1994*   **Captain, Property Crimes Commander**
- Supervised three Lieutenants
- Directed the Burglary Unit; Theft Unit; Forgery Detail; and Auto Theft Unit

*1992-1994*   **Lieutenant, Intelligence Unit Commander**
- Supervised one sergeant
- Planned and directed Organized Crime Investigations
- Directed Criminal investigations of Public Officials and Police Officers
- Coordinated dignitary protection plans with various federal agencies for visiting heads of state

*1987-1992*   **Lieutenant, Homicide Unit Commander**
- Supervised three sergeants
- Directed the investigations of the Homicide Detail; the Sex Crimes Detail; Aggravated Assaults and Assaults Detail
- Created and Commanded the Officer Involved Shooting Team which investigated all shootings involving SAPD officers
- Prepared and administered a 5 million dollar budget

*1985-1987*   **Lieutenant, Special Operations (Gang/Directed Patrol)Unit Commander**
- Supervised two sergeants and a uniformed complement of sixteen officers who engaged in directed and saturation patrol
- Created and commanded the unit for the purpose of addressing gang and drug-related activity, as well as unique crime problems that were beyond the capabilities of the regular patrol officers
- Planned, coordinated, and directed the operations of the unit

*1984-1985*   **Sergeant, Sex Crimes Detail**
- Supervised 12 detectives

**Exhibit
F-1**

- Identified training needs for the detail
- Trained incoming personnel
- Coordinated investigation with outside agencies
- Handled complaints against officers and recommended disciplinary actions

*1983-1984*   **Sergeant, Night Vice Unit**
- Supervised 15 detectives
- Planned and executed covert operations
- Identified training needs for the detail
- Trained incoming personnel
- Coordinated investigations with outside agencies
- Handled complaints against officers and recommended disciplinary actions

*1983-1983*   **Sergeant, Patrol Supervisor**
- Supervised 15 Patrolmen
- Handled complaints against officers and recommended disciplinary actions

*1980-1983*   **Detective, Vice Unit (Undercover Operative)**
- Investigated prostitution, gambling, pornography, and liquor law violations
- Provided direct support for other operational units

*1972-1980*   **Patrolman**
- Field Training Officer
- Special Weapons and Tactics (SWAT) Team

**OTHER EMPLOYMENT:**
*2000-2002*   **Professor, Criminal Justice Department, San Antonio College**
*1972-1980*   **United States Army Reserves (Staff Sergeant)**

**EDUCATION:**
Texas State University, Master's in Criminal Justice
Southwest Texas State University, Bachelor of Applied Arts and Sciences (Major: Criminal Justice)
San Antonio College, Associates in Public Administration
South San Antonio High School

**AWARDS/HONORS/CERTIFICATES:**
Master Peace Officer Certification
Crime Prevention Specialist
B'Nai B'Rith- "Officer of the Year" Award
Alamo Area Rape Crisis Center- "Distinguished Community Service" Award
Texas Department of Human Services-"Contributions to Child Abuse Issues" Award
Alamo Area Rape Crisis Center- "Outstanding Voluntary Service" Award
Texas Department of Regulatory and Protective Services-Served on the original Child Death Review Panel
 for Bexar County
Created & Commanded the Officer Involved Shooting Team
Created & Commanded the Special Operations (Gang/Directed Patrol) Unit
Served on the Board of Directors and Instrumental in the Planning and Development of the Alamo
Children's Advocacy Center
Pinnacle of Achievement Award – Bexar Family Support Conference (Mental Health Issues)
Crisis Intervention Program Award – Center for Health Care Services
Leadership Award – San Antonio Hispanic Police Officers Organization
Equality in Law Enforcement Award – League of United Latin American Cities (LULAC)

**MEMBERSHIPS:**
FBI NA- Federal Bureau of Investigation National Academy Associates
HAPCOA- Hispanic American Police Command Officers Association
 The One Hundred Club of San Antonio

**SKILLS:**
Read, Write, and Speak Spanish Fluently
Computer Literate in Microsoft Applications and Web Navigation
Recognized as an Expert at the State and Federal Court Level in the Field of Criminal Investigations and
Police Procedures; Recognized as a Security Expert in State Court

**PERSONAL:** Married to Elizabeth Ortiz; One son, Daniel; Step-daughters Stacy and Lesley

Page 2 - Slack

My opinions on this case are based on my education, knowledge, training, and experience, as well as a review of the following:

1) Plaintiffs' First Amended Original Complaint;
2) Plaintiff's Third Amended Complaint;
3) Body Worn Camera (BWC) of Steve Casanova & J. Panah;
4) Crime Scene Photographs;
5) SAPD General Manual (COSA000001-000723);
6) Officer S. Casanova's Academy File (COSA000724-001348);
7) Casanova's Personnel Files (COSA001349-COSA001746);
   a) Field File (COSA001349-COSA001374),
   b) Internal Affairs 201 File (COSA001375-COSA001451),
   c) Use of Force Reports (COSA001452-COSA001488),
   d) Division File (COSA 001489-COSA001505),
   e) Applicant Processing File (COSA001506-COSA1738), and,
   f) Work Permits COSA001739-COSA001746);
8) Internal Affairs File (Right Side) (COSA001747-COSA002188);
9) Internal Affairs File (Left Side) (COSA002189-COSA002192);
10) Radio Transmissions # 1 COSA002193);
11) Radio Transmissions # 2 (COSA002194);
12) 9 1 1 Calls (COSA002195-COSA2198);
13) Crime Scene Video by Crime Scene Investigator (CSI) C. Crain (COSA002199);
14) Body Worn Cameras of Officers S. Casanova, J. Panah & A. Garza (COSA003000-COSA00302);
15) Crime Scene Photos by CSI A. Salvatierra (COSA003003-COSA003435);
16) Photos by CSI M. Machado (COSA003436-COSA003451);
17) BWC of J. Carmona (COSA003452);
18) BWC of J. Lopez (COSA003453);
19) BWC of J. Quintanilla (COSA003454);
20) BWC of E. Holguin (COSA003455);
21) BWC of Converse Police Officers (COSA003456-COSA3459);
22) Revised Radio Transmissions (COSA003460);
23) BWC of M. Schanlaub (COSA003461);
24) BWC of E. Holland (COSA003462):
25) BWC of A. Dominguez (COSA003463);
26) M. Winn Interview at Bexar County Detention Center (COSA003464);
27) Photographs of D. Snowden by CSI Sweeney (COSA3465-COSA003496);
28) Photographs by CSI C. Boone (COSA003497-COSA003571);
29) Interview of D. Snowden (COSA003572);
30) Criminal Charge and Disposition Report (COSA003573-COSA003979);
31) 9 1 1 Calls (COSA003980-COSA003983);
32) Radio Transmissions Revised (COSA003984);
33) Radio Transmission # 1 (Unrevised) (COSA003985);
34) Radio Transmission # 2 (COSA003986);

**Exhibit F-2**

Page 3 – Slack

35) Interview of D. Snowden (COSA003987);
36) BWC of Officer E. Holguin (COSA003988);
37) BWC of Officer J. Lopez (COSA3989);
38) BWC of BWC of J. Quintanilla (COSA3990);
39) BWC of Sgt. M. Schanlaub (COSA003991);
40) BWC of J. Carmona (COSA003992);
41) BWC of E. Holland (COSA 003993);
42) BWC of A. Dominguez (COSA003994);
43) Interview of M. Winn at Bexar County Detention Center (COSA003995);
44) Photographs of D. Snowden (COSA003996-COSA004027);
45) Photographs of Officers at 315 South Santa Rosa Street (COSA004028-COSA004102);
46) Photographs of Found Bullet at 215 Roberts Street (COSA004103-COSA4148);
47) BWC of Converse Police Officers (COSA004119-COSA004122);
48) Crime Scene Video dated October 22, 2018 (COSA004123);
49) Crime Scene Photographs (COSA 004124-COSA004456);
50) Standard Operating Procedures:
   a) Homicide Unit 2018 (COSA004457-COSA004604),
   b) Internal Affairs (COSA 004605-004685)), and,
   c) Integrity Detail (COSA004686-COSA004702);
51) BWC of Officers S. Casanova, J. Panah and A. Garza (COSA004703-COSA004705);
52) D. Snowden's Criminal Trial Transcript;
53) Bexar County Medical Examiner's Autopsy and Ballistics Report;
54) Crime Scene Search Report (CSSR) by J. Rodriguez;
55) CSSR by N. Berrios;
56) CSSR by P. Sweeney;
57) CSSR by A. Salvatierra;
58) CSSR by M. Machado;
59) CSSR by S. Boone;
60) CSSR by T. Lozano;
61) CSSR by C. L. Crain;
62) Deposition Transcripts of: W. McManus, S. Casanova, R. Perez, A. Garza, R. Hines, K. Landrum and R. Luza; and,
63) Expert Report of J. Peters;

The aforementioned are the types of documents, recordings, data and facts upon which experts in law enforcement practices and procedures rely to form opinions on the subject matter of this lawsuit.

The incident made the basis of this lawsuit occurred on October 17, 2018, at about 1:00 o'clock in the morning, at 217 Roberts Street, in San Antonio, Texas. SAPD officers investigating a report of an assault with bodily injury were directed to this residence by the victim's wife, who was also a witness to the assault. She reported to the



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 501 – Use of Force*



| Office with Primary Responsibility: | CTA | Effective Date:<br>Prior Revision Date: | March 11, 2017<br>January 31, 2017 |
|---|---|---|---|
| Office(s) with Secondary Responsibilities: | PSC, PNC, TSC, SSD, MCC | Number of Pages: | 11 |
| Forms Referenced in Procedure: | SAPD Form #62-UOF<br>SAPD Form #62 | Related Procedures: | 303, 309, 408, 512, 601, 605, 908 |

### .01 INTRODUCTION

This procedure provides officers with guidelines on the use of non-deadly and deadly force.  This procedure also explains the process officers shall follow for reporting use of force incidents.

### .02 POLICY

A.  The San Antonio Police Department requires its officers to exhibit a sense of prudent judgment derived from departmental training, acquired knowledge, skills, and ability in the exercise or application of any level of force.

B.  Officers shall use only the level of force necessary to accomplish a lawful police objective.  Any time force is used, the officer shall apply a level of force reasonable for the situation.

C.  The San Antonio Police Department requires all officers to document use of force incidents on SAPD Form #62-UOF, *Use of Force Report*, in accordance with this procedure.  The Department also requires supervisors to respond to the scene of use of force incidents and to review all *Use of Force Reports,* to ensure the application of force conforms to established guidelines and departmental policy and procedures.

### .03 DISCUSSION

A.  The sanctity of human life and individual liberties are immeasurable elements of modern society which vests police officers with the responsibility for the preservation and protection of its paramount values.  In the pursuit of this responsibility, officers maintain the understanding that protection of property and apprehension of criminal offenders is subservient to the protection of life, including their own.

B.  In the course of discharging their duty, police officers are often confronted with situations requiring some degree of force to be exercised in order to effectively maintain public order and safety.  This may be achieved on an ascending scale of the officer's presence, verbal communications, open/empty hands control, physical force, intermediate weapon and deadly force, according to and proportional with the circumstances of the situation.  The application of force must be conducted in a manner reasonable and commensurate to achieving a level of control that cannot otherwise be obtained through the use of other alternatives.

C.  Although the use of a reasonable amount of force is authorized in appropriate circumstances, such as those involving the protection of the officer or others from bodily harm, officers must be aware unnecessary or excessive force violates Federal Statues, the Texas Penal Code and departmental policy.

### .04 TERMINOLOGY *(For specific use within this procedure, see Glossary)*

| | | |
|---|---|---|
| Active Resistance | Anti Felon Identification (AFID) | Approved Weapon |
| Brandishing/Displaying Firearm | Deadly Force | Drive Stun Mode |
| Electronic Control Devices (ECD) | Force | Injury |
| Intermediate Weapon | Lateral Vascular Neck Restraint | Non-deadly Force |
| Officer's Presence | Oleoresin Capsicum (OC) | Open/Empty Hands Control |
| Passive Resistance | Physical Force | Probe Mode |
| Reasonable Force | Takedowns | Verbal Communications |
| Weapon | Use of Force Review Board (New) | |

**Exhibit F-3**

COSA 000302



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 501 – Use of Force*



**Lateral Vascular Neck Restraint (LVNR) -** The lateral vascular neck restraint (LVNR), commonly known as a sleeper hold, or carotid chokehold, is a general term for a grappling hold that critically reduces or prevents either air (choking) or blood (strangling) from passing through the neck of an opponent. The restriction may be of one or both and depends on the hold used and the reaction of the victim.

**.05** *APPLICATION OF FORCE*

    A.  With the exception of an officer's presence or verbal communications, the use of any type of force is not justified in response to verbal provocation alone.

    B.  Police officers finding it necessary to use force to achieve a lawful police objective shall use a reasonable amount of force to affect the objective. However, nothing in this procedure is interpreted to mean an officer must prolong any combat or struggle in order to satisfy any element of escalation rather than resort to a reasonable method that resolves the situation in the safest and most expedient fashion.

    C.  The use of force by an officer can be viewed as a matrix of force options used in response to a subject's actions and behavior. The force matrix illustrates the relationship between a subject's actions and the officer's response. As force options move from lesser to greater levels, the risk of injury to the suspects and/or officers increase. The matrix is designed to assist officers in understanding how force can escalate.

| OFFICER'S PERCEPTION OF SUSPECT'S ACTIONS | | | | | |
|---|---|---|---|---|---|
| | Compliant (Cooperative) | Passive Resistant | Active Resistant | Imminent Assault (Bodily Injury) | Imminent Serious Bodily Injury/Death |
| *Officer's Presence* | ✔ | ✔ | ✔ | ✔ | ✔ |
| *Verbal Communications* | ✔ | ✔ | ✔ | ✔ | ✔ |
| *Open/Empty Hands Control* | | ✔ | ✔ | ✔ | ✔ |
| *Physical Force* | | | ✔ | ✔ | ✔ |
| *Intermediate Weapon* | | | ✔ | ✔ | ✔ |
| *Deadly Force* | | | | | ✔ |

    D.  An officer should consider the following factors when assessing the need to use force:

        1.  Is the suspect submitting peacefully or resisting?

        2.  Is the suspect armed?

        3.  What is the nature of the crime?

        4.  Does the suspect have a previous arrest record or history showing violence?

        5.  Number of suspects involved?

        6.  How much support from other officers is available?

COSA 000303



# SAN ANTONIO POLICE DEPARTMENT
### GENERAL MANUAL
*Procedure 501 – Use of Force*



E.  A weapon is not displayed or brandished as a threat unless its potential use in the situation would be reasonable, or if the circumstances clearly call for the use of a weapon to control a dangerous situation, or in accordance with Chapter 9 of the Texas Penal Code.

F.  De-escalation of force:

   1.  When employing necessary force, which is greater than an officer's presence, and this level of force is being employed to achieve a lawful police objective, officers <u>shall de-escalate their use of force options</u> when a subject's actions indicate that the initial use of force has achieved an acceptable level of compliance by a subject.

      a.  If circumstances allow, Officers should attempt to de-escalate tense situations through "advisements, warnings, verbal persuasion, and other tactics" to reduce the need for force.

   2.  The de-escalation of force principle requires an officer to decrease the scope, or intensity of physical force being employed against a subject only when the resisting or non-compliant subject clearly demonstrates that he or she has decreased the level of resistance against an officer who is attempting to achieve a lawful police objective.

   3.  The de-escalation of force can be viewed as a direct relationship between a subject's resistance level to an officer's use of force level. As a subject decreases his or her level of resistance, the responding officer also decreases the level of force required to gain compliance.

G.  Any officer present and observing another officer using force that is clearly beyond that which is reasonable under the circumstances shall, when in a position to do so, safely intercede to prevent the use of such excessive force. Officers shall immediately report these observations to a supervisor.

## .06  USE OF NON-DEADLY FORCE

A.  When attempting to affect an arrest, officers should use verbal communications prior to the use of non-deadly force, if possible.

B.  If verbal communication has been exhausted or proven ineffective, officers are authorized to use open/empty hands control.

C.  If an open/empty hands control has been exhausted or proven ineffective, officers are authorized to use physical force.

D.  If physical force has proven ineffective or is not a reasonable option based upon the circumstances, officers are authorized to use an intermediate weapon to affect an arrest.  Officers using intermediate weapons must be authorized to carry such weapons in accordance with GM Procedure 309, *Weapons*.

E.  Officers may resort to the use of an approved intermediate weapon when:

   1.  Lesser methods have failed;

   2.  In self-defense or defense of a third person;

   3.  Subduing or controlling a violent subject;

   4.  Subduing an actively resisting actor; or

   5.  Physical force has proven ineffective or is not a reasonable option based upon the circumstances.

COSA 000304



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 501 – Use of Force*



F.  Oleoresin Capsicum (OC) Spray/Gel and/or Electronic Control Device (ECD)

1.  Only officers who have successfully completed a training course and are certified in the use of OC spray/gel and/or an ECD are authorized to carry and use OC spray/gel and/or ECD as an intermediate weapon. Additionally, only officers who have also successfully completed a 40 hour Crisis Intervention Training course are authorized to carry an ECD.

2.  Officers shall only carry and use department-issued OC spray/gel and/or ECDs.

3.  Officers shall carry the OC spray/gel and /or ECD in an authorized carrier.

4.  OC spray/gel and/or ECD shall not be brandished, displayed, or pointed at a subject in an intimidating manner unless an officer is attempting to prevent further escalation of force.

5.  Officers using OC Spray/Gel and/or ECD:

    a.  Oleoresin Capsicum Spray/Gel

        (1)  As with any other type of force, officers will end application of OC Spray/Gel when the subject discontinues resistance or aggression.  OC Spray Spray/Gel is irritating to the eyes, nose, and skin. Any time OC Spray/Gel is used to control or subdue an actively resisting or violent subject, the officer will ensure the subject is decontaminated as soon as possible, to reduce the discomfort caused by the OC Spray/Gel.  Decontamination consists of the application of water to the subject's eyes and face.

        (2)  Decontaminate prisoners exposed to OC Spray/Gel before being transported to the Detention Center. Prisoners exposed to OC spray/gel, will be observed by an officer for 45 minutes to ensure the prisoner does not require medical attention.  If, in the officer's opinion, the prisoner appears to be in severe pain, discomfort, or exhibits unusual symptoms such as unconsciousness, profuse sweating, chest pain or slow, shallow breathing, the officer shall immediately request EMS to the scene.

        (3)  The decontamination process and amount of time the prisoner was observed will be documented in the officer's report and on the SAPD Form #62-UOF, *Use of Force Report*.

    b.  Electronic Control Devices (ECD) will be used in accordance with GM Procedure 512, *Electronic Control Devices*.

## .07  *USE OF DEADLY FORCE*

A.  This section applies to all forms of deadly force, regardless of the type of instrument or weapon used.

B.  The use of deadly force is authorized only to protect an officer or another person from what is reasonably believed to be an immediate threat of death or serious bodily injury.

1.  An officer with an honest and sincere personal belief his life or the life of another person is in imminent danger is justified in using deadly force to preserve that life.

2.  Justification for the use of deadly force is determined by the facts known or perceived by the officer at the time the deadly force is employed.

C.  The use of deadly force against one who is fleeing from custody, or who is fleeing immediately after committing an offense, is prohibited unless the officer has probable cause to believe the suspect poses an imminent threat of death or serious bodily injury to the officer or a third party.

D.  A lateral vascular neck restraint (LVNR) shall not be used unless deadly force is authorized.

COSA 000305



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL

*Procedure 501 – Use of Force*



E.  Approved firearms are intended to be used as defensive instruments to prevent an assailant from completing a potentially deadly act.  A firearm is discharged with the intent to stop a course of conduct.

F.  Firearms are not discharged under the following circumstances:

  1.  As a warning shot;

  2.  When it appears likely a non-participant may be injured; or

  3.  At or from a moving vehicle, except as the ultimate measure of self-defense or defense of another.  Officers should employ all reasonable means available to move to an area of safety if the vehicle becomes a threat, including retreating from the threat, if practical.

**.08**  *SHOULDER WEAPON DEPLOYMENT*

A.  If physical force and the use of intermediate weapons have proven ineffective or are not reasonable options based upon the circumstances, officers authorized to deploy and use a department-approved shoulder weapon may do so to neutralize a threat that poses an imminent danger of serious bodily injury or death to any person.

B.  Officers shall only utilize a shoulder weapon consistent with the training received and in accordance with all GM Procedures and Standard Operating Procedures (SOPs).

C.  A shoulder weapon is intended to augment primary and approved handguns under circumstances where a hand held weapon is not sufficient to neutralize a perceived threat that may result in serious bodily injury or death.

  1.  A shoulder weapon may be used or deployed at a scene where it is requested by an officer or supervisor who is in a position to articulate the need for such support; and

  2.  Supervisors will ensure compliance with section .12 of this procedure.

D.  The decision to deploy or use a shoulder weapon will be dependent upon the actions of the subject, the threat facing the officer, and the totality of circumstances surrounding an incident.

E.  As with any other type of force, officers will end the use of a shoulder weapon when the subject discontinues resistance, aggression, or when the threat has been sufficiently neutralized and a shoulder weapon is no longer necessary to affect a police response.

F.  Shoulder weapons should not be brandished, displayed, or pointed at a subject in an intimidating manner unless an officer is attempting to prevent further escalation of force or finds it necessary to discharge the weapon to neutralize a threat of serious bodily injury or death to any person.

G.  More than one officer may deploy a shoulder weapon at a scene as dictated by the circumstances, keeping in mind the location of other officers, other persons, and other variables involved in the situation.

H.  As soon as practical, an officer will immediately notify the Communications Unit of a shoulder weapon discharge and advise on whether there are any hits or injuries.

I.  Improper handling or inappropriate uses of a shoulder weapon may result in disciplinary action.

**.09**  *MEDICAL TREATMENT*

A.  Prisoners, who are injured as a result of an officer's use of force, either physical, non-deadly, or deadly force, are provided immediate medical treatment in accordance with GM Procedure 601, *Prisoner*s.

COSA 000306



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 501 – Use of Force*



B.  Officers having prisoners who have been exposed to oleoresin capsicum (OC) Spray/Gel and/or ECD utilization, shall comply with Subsection .06 F of this procedure.

### .10  *USE OF FORCE REPORT RESPONSIBILITIES*

A.  Officers shall complete SAPD Form #62-UOF, *Use of Force Report,* under the following circumstances:

1.  Any force used by an officer greater than an open/empty hands control technique, as listed in Subsection .05C of this procedure;

2.  Any force used by an officer that causes injury to an individual, which requires medical treatment;

3.  Any force used by an officer that causes death to an individual;

4.  Discharging a firearm at an individual to accomplish a lawful police objective;

5.  The use of an intermediate weapon by an officer; and

6.  When a police canine bites an individual.

B.  When a prisoner offers resistance during an arrest and the officer does not use more than an open/empty hands control, the officer will check the appropriate box on the booking slip.  The information gathered on the suspect's resistance will be used for statistical purposes.

C.  The discharging of a firearm in order to destroy an animal, in accordance with GM Procedure 605, Subsection .02F, does not require the completion of SAPD Form #62-UOF.

### .11  *OFFICER RESPONSIBILITIES*

A.  Although an officer's presence, verbal communication, open/empty hands control techniques, or the brandishing or displaying of a weapon does not require the completion of SAPD Form #62-UOF, *Use of Force Report*, the details must be documented in the officer's report.

B.  Each officer using force during an incident which requires them to complete SAPD Form #62-UOF, *Use of Force Report*, in accordance with Section .09 of this procedure shall:

1.  Notify the supervisor of the type of force used and whether the prisoner received any type of injury as a result of the use of force.

2.  Request the supervisor to respond to the scene.

    a.  An officer may relocate the prisoner prior to the arrival of a supervisor due to a threat of violence or exigent circumstances.

    b.  If an officer does relocate from the scene, he shall notify the dispatcher and the responding supervisor.

3.  Complete SAPD Form #62-UOF, *Use of Force Report*, documenting the specific type of force the officer used.

4.  Complete a detailed, accurate offense/incident report describing the force used and the circumstances and facts surrounding the use of force.

5.  Complete SAPD Form #62, *Injured Prisoners Report*, for those injured prisoners who receive medical treatment at a hospital.

**COSA 000307**



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL

*Procedure 501 – Use of Force*



6. Attach a copy of the offense/incident report to the completed SAPD Form #62-UOF, *Use of Force Report* as well as SAPD Form #62, *Injured Prisoners Report* and give it to the supervisory officer who was notified of the use of force incident.

C. SAPD Form #62-UOF, *Use of Force Report* shall be completed before the officer ends their tour of duty, or as otherwise outlined in this procedure.

**.12 SUPERVISORS' RESPONSIBILITIES**

A. Supervisory officers who are assigned to handle a use of force incident, which requires SAPD Form #62-UOF, *Use of Force Report* in accordance with Section .09 of this procedure shall:

1. Respond to the scene;

2. Contact the officer(s) involved in the use of force; and

3. Request a UEDI to photograph the person who had the force used against them. If a UEDI is unavailable a Crime Scene Unit Investigator shall be requested. In their absence, the responding supervisor will take the photos.

   a. The photographs shall include photos of any documented, visible or alleged injuries.

   b. The photographs shall take place as soon as practical after the incident.

   c. The photographs will be handled in accordance with GM Procedure 408, *Digital Photography.*

B. If a supervisor from the section is not available to respond to the scene of a use of force incident the dispatcher will send any available supervisor.

C. The supervisor shall evaluate the circumstances surrounding the use of force incident and:

1. Interview the prisoner, when available;

2. Determine and ensure the use of force incident meets the criteria, which requires completion of the *Use of Force Report*;

3. Determine if departmental policies and procedures were followed;

4. Ensure proper medical treatment has been offered to the prisoner and, if oleoresin capsicum (OC) spray/gel was used, the decontamination process is conducted;

5. When an ECD has been utilized and the subject received an electrical charge, the supervisor relieves the officer of his ECD. The sergeant downloads the ECD's internal information onto the ECD computer tracking system. Afterward, the supervisor returns the ECD to the officer as soon as possible. The sergeant also issues the officer replacement cartridges when applicable;

6. Ensure all officers who used force, in accordance with Subsection .09A of this procedure during the incident, complete SAPD Form #62-UOF, *Use of Force Report.*

7. Ensure the officer documents the incident on *SAPD Form #62-UOF, Use of Force Report*, completely and accurately, before being submitted for review and entry into Blue Team, in accordance with Section .12 (I).

8. Write a report detailing the incident and findings, which is to be included in the reports which are scanned and attached in the *Blue Team* entry.

COSA 000308



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 501 – Use of Force*



D.   Procedural violations identified by the supervisor will be handled in accordance with GM Procedure 303, *Disciplinary Procedures*.  Supervisors shall route line complaint disposition reports or formal preliminary complaint investigation reports utilizing Blue Team through the chain of command.

E.   If the officer(s) is unable to complete the SAPD Form #62-UOF, *Use of Force Report*, the supervisor shall prepare the report based on available information.

F.   The supervisory officer receiving SAPD Form #62-UOF, *Use of Force Report,* shall complete the appropriate section of the report and route the original report to the unit/shift director for completion.

G.   Supervisors responding to incidents where officers are working out of their regular assignment will perform the initial review/approval of the officer's SAPD Form 62-UOF, *Use of Force Report*.  The supervisor will then forward the original SAPD Form 62-UOF, *Use of Force Report* to the officer's chain of command. The officer's chain of command will be responsible for completing the Director's section of the report and entry into Blue Team.

H.   Supervisors not responding to a use of force incident, as outlined in Subsection .11A of this procedure, shall document in a report the reason they did not respond.  This report will be scanned and attached to the use of force Blue Team entry.

I.     The unit/shift director receiving SAPD Form #62-UOF, *Use of Force Report,* shall review all reports pertaining to the incident to ensure completeness and accuracy, that all department policies and procedures were followed based on information available and shall;

   1.   Enter all related information on the use of force incident into the online Use of Force Database (known as *Blue Team)* in a timely manner and electronically add copies of all pertinent documentation, to include, but not limited to, copies of all Offense reports/Supplement reports, Use of Force Reports, and Taser downloads.  Each report shall be scanned and attached to the *Blue Team* entry as individual reports and not as one continuous report, regardless of the type.

   2.   Complete and sign the appropriate section of the report and place the original SAPD Form #62-UOF, *Use of Force Report* in the officer's  Field File.

   3.   Utilizing Blue Team, the supervisor shall then route the incident through the chain of command. Reference Section .15 (A) Flow Charts.

J.   The station/section commander receiving an electronic *Use of Force Report* entry in *Blue Team,* shall review it and all reports pertaining to the incident to ensure all department policies and procedures were followed based on information available. The station/section commander shall then complete the appropriate section and electronically forward the Blue Team entry to Internal Affairs. (Taser Use of Force incidents are forwarded to the appropriate Division Commander as per GM Procedure 512, *Electronic Control Devices*).

K.   As a result of a use of force incident in which multiple officers from different patrol shifts/units are required to fill out SAPD Form #62-UOF, *Use of Force Report*, and only one supervisor is required to enter the incident into Blue Team. Reference Section .15 (B) Flow Charts.

   1.   The involved officer(s) shall, immediately following the incident, fill out SAPD Form #62-UOF, *Use of Force Report,* and leave the original with the assigned supervisor who made the scene.

   2.   The assigned supervisor who made the scene, and his Unit Director, will fill out the appropriate sections of the SAPD Form #62-UOF, *Use of Force Reports* of <u>all</u> officers involved in the use of force incident, regardless of unit assignment, prior to being scanned and attached in Blue Team. It is the responsibility of the assigned supervisor to ensure all signed original SAPD Form 62-UOF, *Use of Force Reports*, are delivered to the supervisor of the officer who has report responsibility.

COSA 000309



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL

*Procedure 501 – Use of Force*



3. The use of force entry into *Blue Team* shall be generated by the supervisor of the officer who is assigned report responsibility for the incident.  The SAPD Form #62-UOF, *Use of Force Report(s)* from the other officer(s) shall be scanned, attached and included in the entry. The supervisor will then route the incident in *Blue Team* through his chain of command and carbon copy the station/section commander(s) of the officer's from the different units/shifts.

4. After the entry into *Blue Team* is completed, all original use of force report(s) will be routed to the respective officer's unit of assignment for placement into the officer's Field File, in accordance with this section.

L. The Use of Force Review Board will include a Deputy Chief as a chairperson and two members from the rank of Captain. The members will be empanelled for six months (January - June and July – December), following the same schedule as the Complaint and Administrative Review Board.

**.13** *USE OF FORCE ANALYSIS*

A. The *Use of Force Reports* will be analyzed annually by the Internal Affairs Unit and the data will be used to prepare the *Formal Cases and Line Complaints Report* for the Chief of Police.

B. The *Chief's Use of Force Review Board* will meet monthly and review the monthly reports generated by Blue Team. The board will provide oversight for policy and procedural deficiencies, as well as for training and tactical anomalies. The board chairperson will update the Chief of Police on a monthly basis.

**.14** *POST EVENT PROCEDURES*

A. The Internal Affairs Unit will review the *Blue Team Use of Force* entry to ensure:

1. The type of force documented meets the criteria required for the completion of SAPD Form #62-UOF, *Use of Force Report*;

2. Whether departmental policies and procedures were followed; and

3. The SAPD Form #62-UOF, *Use of Force Report,* was properly entered into the Use of Force database (*Blue Team*).

A. All corrections and/or clarifications will be handled through the *Blue Team* Program.

B. The supervisory officer receiving a notification/request for clarification of details or corrections shall ensure the corrections/clarifications are completed within five calendar days and resubmitted via *Blue Team* to the Internal Affairs Unit.

C. Officers involved in the use of deadly force shall be placed on administrative duty or administrative leave in accordance with GM Procedure 908, *Mandatory Reassignment*.

COSA 000310



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 501 – Use of Force*



**.15  *FLOW CHARTS***

A.



COSA 000311



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 501 – Use of Force*



B.

# Use of Force
## w/Officer(s) from Multiple Units/Shifts

Officer(s) submits hardcopy of
SAPD Form 62-UOF,
**Immediately following the incident,**
with Incident/Supplement reports
to assigned Supervisor

*Needs additional Information and/or corrections*

**Assigned Supervisor**

Review and sign SAPD Form 62-UOF, *Use of Force
Report.*
Forward to Unit Director.

If policy violation found, enter LC or Formal in Blue
Team
(refer to Proc 303)

*Forward for signature.*

**Unit/Shift Director of
Assigned Supervisor**

Review and sign SAPD Form 62-UOF, *Use of Force
Report(s).*
If policy violation found, route back to Assigned
Supervisor for investigation.
Return signed report(s) to Assigned Supervisor.

*Return signed report(s) to Assigned
Supervisor.*

**Assigned Supervisor**

Route signed originals to supervisor of officer
with report responsibility for entry into Blue
Team.

*Forward for entry into
Blue Team.*

**Unit/Shift Director of
Officer w/Report Responsibility**
Enter into Blue Team. Review report(s) for
completeness & accuracy.
Follow Procedure 501 for routing through
chain of command.
Carbon copy station/section commander of
the officer(s) from the different unit/shift.

COSA 000312



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 504 – Execution of Search Warrants*



| Office with Primary Responsibility: | CTA | Effective Date: Prior Revision Date: | November 01, 2012 July 31, 2010 |
|---|---|---|---|
| Office(s) with Secondary Responsibilities: | PSC, PNC, TSC, FTC, IDC, SSO | Number of Pages: | 7 |
| Forms Referenced in Procedure: | SAPD Form #OP-2003 SAPD Form #8-PWC SAPD Form #8-WIC | Related Procedures: | 601, 606 |

## .01  INTRODUCTION

A.  The purpose of this procedure is to establish departmental guidelines under which officers of the San Antonio Police Department follow in the delivery and execution of search warrants.

B.  The duties to search, definitions, requisites, issuance, scope, authority, and execution of search warrants are outlined in Chapter 18 of the Texas Code of Criminal Procedure.

C.  An officer to whom a valid search warrant has been issued executes that warrant in the manner provided by law, by guidelines established in this procedure, and by adhering to each respective unit's standard operating procedures (SOP).

## .02  GENERAL PROCEDURES

A.  Any search warrant that appears to be in proper form is presumed to be valid.  Any warrant which does not appear to be in proper form is not executed and is returned to the magistrate who issued it.  This includes any warrant containing significant errors in identifying the place to be searched or the property to be seized.

B.  A warrant is never altered in any manner.

C.  An officer never represents to any person that a search warrant has been issued in a particular case, knowing such is not true, in order to obtain consent to search.

D.  During normal duty hours, the Officer-in-Charge or Warrant Execution Supervisor assigned to units that do not routinely execute search warrants (i.e., Patrol and Traffic) must notify the Investigations Division Unit which has investigative responsibility for the offense listed in the search warrant, so any active investigations are not compromised.

E.  When executing search warrants after normal business hours, the Officer-in-Charge or Warrant Execution Supervisor assigned to units that do not routinely execute search warrants (i.e., Patrol and Traffic) must contact a Supervisor from the Tactical Response Unit, Repeat Offenders Program, Narcotics Unit, or Night Detectives for guidance and assistance.

F.  The Officer-in-Charge or Warrant Execution Supervisor must notify the Deconfliction Unit (207-2495) prior to execution of the search warrant.  If a location of interest is listed with the Deconfliction Unit, the Officer-in-Charge or Warrant Execution Supervisor shall contact the officer who placed the location into deconfliction for resolution.  Any conflicts not resolved shall be elevated to the Supervisor in charge of the unit who placed the location into deconfliction and the Warrant Execution Supervisor for resolution.

G.  When planning to execute a high risk search warrant, or where there is a probability forced entry will be needed to gain entry, each member involved in the execution of a search warrant wears body armor.

H.  Prior to the execution of any search warrant:

   1.  Officers will check the Arrest Warrant Database on SAMWEB, http://samweb/warrantForm.asp prior to execution of the warrant for updated notes on the suspect.

COSA 000326



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 504 – Execution of Search Warrants*



2. Officers will utilize SAPD Form #8-PWC, *Police Arrest/Search Warrant Checklist*, for Felony Search Warrants or any crimes of violence.

3. The Arrest/Warrant Checklist will determine whether the warrant should be executed by the officer or if a specialized unit or units should be called.

I. After executing any warrants:

1. Officers will UPDATE the Arrest Warrant Database on SAMWEB http://samweb/warrantForm.asp adding any pertinent information available.

## .03 *DECONFLICTION*

A. The South Texas HIDTA Investigative Support Center (managed by SAPD) has been designated as the hub for de-confliction services by the South Texas HIDTA Executive Board. As such, it is the single point of contact for the entire South Texas Region.

B. Plainclothes officers will deconflict through HIDTA on Arrest and Search Warrants.

1. Prior to executing a planned felony arrest or search warrant, the Officer-In-Charge will contact the South Texas HIDTA Investigative Support Center at 207-2495 and provide all necessary information for the de-confliction process to take place.

a. Information to be provided will include:

(1) a physical address,

(2) block number or intersection.

b. Information on the suspect named in the arrest warrant will include:

(1) first and last name,

(2) DOB,

(3) race/sex,

(4) and when available, secondary identifiers such as a social security number, driver's license number, FBI number, etc.

2. This information shall be provided as soon as available, practical, and possible, with as much forewarning as possible.

3. A minimum two (2) hour advanced notice to the Deconfliction Center is required for optimum conflict resolution.

## .04 *TERMINOLOGY* (For specific use within this procedure, see Glossary)

| | | |
|---|---|---|
| Curtilage | Entry Team | Evidence Officer (fix to GM in glossary) |
| Exigent Circumstances | Officer-In-Charge | Search Team |
| Security Team | Verification Officer | Warrant Execution Supervisor |

## .05 *TIME OF SEARCH*

COSA 000327



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### Procedure 504 – Execution of Search Warrants



A. A search warrant is executed in accordance with Code of Criminal Procedure Article 18.07. This article defines the time allowed for the execution of a search warrant , exclusive of the day of its issuance and the day of its execution, is:

    1. Fifteen (15) whole days if the warrant is issued solely to search for and seize specimens from a specific person for DNA analysis and comparison, including blood and saliva samples; or

    2. Three (3) whole days if the warrant is issued for a purpose other than described by Subdivision (1).

B. Within the above period allowed for execution, the time of the actual execution is determined based on the following considerations:

    1. The execution should occur when the property to be seized is believed to be present;

    2. The execution should occur when the least resistance is expected, or when resistance can best be controlled;

    3. Other such considerations of safety, success, and convenience as may be applicable; and

    4. There are no time limits on the continuous search of a location once actual entry has been made.

## .06  SCOPE OF SEARCH

A. A search warrant is executed at, and the search made of, only the place or places described in the warrant.

    1. The search may extend to all buildings or structures within the curtilage of the described place where the items sought may be kept.

    2. A warrant describing the place to be searched as a limited portion of larger premises may not be extended to other, unnamed portions.

    3. Vehicles located upon multi-unit dwelling premises (i.e., apartment complexes) are not searched unless specifically named in the warrant.

B. The search is limited to discovering those items named in the warrant, and examining those places or things, which could contain or conceal the items described in the warrant.

C. Items discovered during a lawful search, but not named in the search warrant may be seized if:

    1. They were found in a place reasonably within the scope of the search; and

    2. There is probable cause to believe they are stolen, or are evidence or instruments of a crime.

D. Persons named in the search warrant are searched and any person(s) the officer(s) develop reasonable suspicion to believe is armed are frisked. The officer(s) may search persons found on the premises to prevent the disposal or concealment of any instruments, articles, or things particularly described in the warrant, if there is probable cause the person(s) may have such items upon his person. In determining whether probable cause exists officer(s) consider:

    1. The nature and physical characteristics of the item sought;

    2. The ease with which the item may be disposed of, if so concealed;

    3. The fact, if true, the item has not been located upon the premises; and

COSA 000328



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL
*Procedure 504 – Execution of Search Warrants*



    4.   The relationship of the person to the premises, including ownership, residence, frequenter, and to those in control of the premises.

**.07  *RESPONSIBILITIES***

A.  Warrant Execution Supervisors:

    1.   Assigns a "Verification Officer" when applicable in accordance with this procedure;

    2.   Reviews and approves all search warrants, SAPD Form #OP-2003, *Operational Plan*, SAPD Form #8-PWC, and SAPD Form #8-WIC, *Warrant Intel Checklist*, prior to execution of the search warrant;

    3.   Ensures location has been properly identified, adequate manpower and equipment are available, and all provisions of this procedure are being followed for the proper and safe execution of the warrant;

    4.   Ensures adequate steps are taken to provide for the safety and security of the officers involved, items being sought, and any persons who may be at the scene of the execution of the warrant;

    5.   Ensures uniformed officer(s) are present at the location named in the search warrant;

    6.   Except during periods of extenuating circumstances, accompanies officers in the execution of the warrant; and

    7.   Ensures the dispatcher is notified before and after the execution of the warrant.

B.  Officer-in-Charge:

    1.   Conducts warrant research in accordance with SAPD Form #8-WIC;

    2.   Physically views the location to be searched in order that a precise address and description can be obtained, or ensures the warrant verification officer involved with the warrant physically views the location;

    3.   Completes SAPD Form #8-PWC and submits it and all documentation to the Warrant Execution Supervisor for evaluation prior to execution of the search warrant;

    4.   If the Warrant Execution Supervisor will not be present when the warrant is executed, he ensures adequate steps are taken to provide for the safety and security of the officers involved, items being sought, and any persons who may be at the scene of the execution of the warrant;

    5.   If the Warrant Execution Supervisor will not be present when the warrant is executed, he develops a written plan for execution of the search warrant to ensure the location has been properly identified, adequate manpower and equipment is available, and all provisions of this procedure are being followed;

    6.   Assigns officers to the "Entry Team," "Security Team," and "Search Team";

    7.   Ensures all officers involved are aware of their assigned duties and responsibilities;

    8.   Ensures the warrant is carried to the scene and is exhibited to the person, if any, in charge of the premises;

    9.   If the Warrant Execution Supervisor will not be present when the search warrant is executed, he notifies the supervisor before and after executing the warrant; and

    10. The duties of the Officer-in-Charge do not supersede those of the Warrant Execution Supervisor, when that Supervisor is present.

C.  Verification Officer

COSA 000329



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### Procedure 504 – Execution of Search Warrants



1. When planning to execute a search warrant, a single officer (other than the Officer-in-Charge) will be assigned by the Warrant Execution Supervisor as the Verification Officer.

2. The Verification Officer is responsible for positively identifying the correct location where the warrant will be executed and for directing the entry team to the correct location. The Verification Officer will confirm the address or warrant location description named in the warrant and warrant affidavit is the same as the address or location description where the warrant will be executed.

3. The name of the Verification Officer will be listed on the SAPD Form #OP-2003 and on SAPD Form #8-PWC.

4. The Verification Officer will accompany the entry team or an officer assigned to the entry team to positively identify and point out the correct location described in the search warrant. It is not necessary for the Verification Officer to accompany the entry team into the warrant location when the entry is made.

### .08 PLANNED FORCED ENTRY

A. In planning a forced entry, the supervisor of the unit executing the warrant reviews SAPD Form #8-PWC. This form is designed to determine the degree of probability of death or serious bodily injury.

B. When the Warrant Execution Supervisor determines a high probability of death or serious bodily injury exists, the Supervisor or his designee shall contact a Special Weapons and Tactics Unit Supervisor to determine the necessity for inclusion of Special Weapons and Tactics Unit members in the execution of the warrant.

C. In all planned forced entries, the Warrant Execution Supervisor ensures enough officers are present to adequately protect the safety and security of all persons involved.

1. This includes the presence of uniform officers to identify the group as members of the Department.

2. In normal circumstances, uniformed officers enter the premises with nonuniformed officers.

### .09 SEARCH PROCEDURE

A. Persons other than peace officers, police legal advisors, and members of the District Attorney's Office are not allowed to accompany officers in the execution of a search warrant, unless approved in advance through the Office of the Chief of Police.

B. Entry into the premises is accomplished by the least forceful means possible under the circumstances.

1. When entering private premises, officers knock, announce their identity, and demand admittance. They then wait to be admitted and explain their purpose if so requested.

   a. This announcement and demand are not required when the officer in charge can articulate particular exigent circumstances that exist that create a reasonable suspicion that to announce and demand would be futile or would jeopardize:

      (1) The safety and security of the officers or nearby citizens; or

      (2) The items sought.

   b. The officer in charge should articulate in the affidavit these specific exigent circumstances if they exist at the time the affidavit is prepared, requesting specific authorization in the warrant for a no-knock entry.

   c. In such cases, officers enter the premises by the most efficient means possible, while inflicting as little damage as possible to the premises. This may include breaking any door or window, but only if such is necessary.

COSA 000330



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 504 – Execution of Search Warrants*



C. Whenever possible, upon entering a building or other premises, uniformed officers are on site and in plain view to assist in locating and controlling the movements of all persons.

    1. Necessary force may be used to secure the premises.

    2. An officer explains fully the reason for the officers' presence, the nature of the items sought, and displays the warrant.

    3. As soon as the building has been secured, any officers who are no longer needed leave the area.

D. When the premises have been secured, a searching team conducts the search.  The searching team is composed of as few officers as is practical and may include members of the security team.

    1. Damage to the premises is minimized.  Any structural damage or modification is carefully considered before being inflicted.

    2. The search is confined to places where the items sought could be concealed.

    3. Two (2) officers should be assigned to search a single room or area, if possible.

    4. A record is kept during the course of the search as to which areas have been examined, by whom, the nature of any item seized, and where it was found.

    5. All items seized are turned over to the evidence officer, along with the record of the search.  That officer makes a property receipt for all items seized for the person from whose possession or control they were taken and completes the return of the warrant by attaching an inventory of the items seized and delivering it to the magistrate.  The inventory list may be used in lieu of the property receipt.

    6. All items seized are handled in accordance with GM Procedure 606.

    7. The officer in charge submits a written report following the execution of the warrant regardless of whether or not the search proved fruitful.  The original is routed to the Records Section and a copy is routed to the unit commander.  This report includes:

        a. Damage to premise in gaining entry, if any;

        b. Use of force in overcoming resistance, if any;

        c. Articles seized (including, those not described in the warrant);

        d. How the damaged premise was secured upon departure; and

        e. A list of all officers executing the search warrant.

E. Before leaving the scene after executing a search warrant, a designated officer ensures the premises are adequately secure as well as possible, either by leaving them in the hands of a responsible person or by locking all doors, windows, etc.

F. A second search is not permitted under the same warrant once officers have left the premises.

COSA 000331



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 504 – Execution of Search Warrants*



**.10  ARRESTS DURING SEARCH**

A. In cases of combined warrants commanding both arrest and search or where officers suspect there may be arrest warrants outstanding, they may require persons on the premises to identify themselves in order to determine whether any of those persons are named in the arrest warrant.  Persons on the premises may be required to identify themselves if they are witnesses to the search or arrest.

B. Should any contraband or other item be found during the search, the presence of which yields probable cause to believe an offense has been committed, the officers may arrest any or all of those persons on the premises for whom probable cause to arrest exists.

C. Should any person resist or interfere with the lawful actions of the officers during the execution of the search warrant, that person may be arrested and charged with the offense committed.

D. There is no requirement in the law that persons on the premises at the time of the search identify themselves unless there is reasonable suspicion of some involvement in criminal activity or the person is a witness.

E. Arrests are made in accordance with GM Procedure 601, *Prisoners*.

**.11  TRAINING**

A. When executing a planned "high risk" forced entry, prior to assignment as an entry team, security team or search team member, the officer, detective and supervisor will be provided training for the specific duties assigned while executing the search warrant. The training will be documented and will include, at a minimum, the following courses of instruction:

1. Intelligence gathering;

2. Building entries;

3. Room clearing;

4. Weapons handling;

5. Breaching techniques;

6. Shield handling techniques; and

7. Evidence handling procedures.

B. At a minimum, training shall be conducted on a quarterly basis to maintain proficiency in the above listed skills.

C. The Unit Director will be responsible for maintaining a record of all training.

COSA 000332



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



| Office with Primary Responsibility: | IDC | Effective Date: Prior Revision Date: | July 18, 2014 May 04, 2012 |
|---|---|---|---|
| Office(s) with Secondary Responsibilities: | PSC, PNC, TSC, FTC | Number of Pages: | 12 |
| Forms Referenced in Procedure: | SAPD Form #45-F9 SAPD Form #2010 SAPD Form #4130 | Related Procedures: | 307, 606, 708 |

## .01  INTRODUCTION

A. This procedure outlines the duties of members who respond to the scene of a crime or assist in the initial investigation of a crime.

B. This procedure is intended to provide guidelines to help preserve the integrity of the crime scene itself and all physical evidence at or near the scene.

C. This procedure does not prescribe the procedures or methods to be used in the highly specialized area of collection of physical evidence by UEDIs/Crime Scene Unit Investigators, nor does it prescribe follow-up investigation procedures.

## .02  TERMINOLOGY *(For specific use within this procedure, see Glossary)*

| | | | |
|---|---|---|---|
| Digital Evidence | Digital Storage Device | Handheld Digital Device | Life Threatening Incident |
| Major Crime | Master Video Recording | Physical Evidence | Video Recording Origin |

## .03  PHYSICAL EVIDENCE

A. The scene of any crime is physical evidence in itself.  However, the best physical evidence is normally found at or near the site of the most critical action taken by the criminal against the property or victim.

B. In order for physical evidence to be effectively used by the Investigator and the prosecutor, its presence must be recognized by the officers at or near the crime scene.

C. Physical evidence must be properly preserved, recorded, and collected for it to be of use in discovering the facts of a crime.

D. The first officer to arrive at the scene of a crime automatically assumes the responsibility of securing the crime scene area from unauthorized intrusions to protect any physical evidence.

## .04  DIMENSIONS OF A CRIME SCENE

A. No set of definite rules can be applied to defining the dimensions of the scene of a crime.

B. While it is entirely possible the dimensions of a crime scene will be large, there are usually priority areas readily apparent to the trained officer/UEDI or Crime Scene Unit Investigator which should be given immediate protection.

## .05  COMMAND / SUPERVISORY OFFICERS' CRIME SCENE RESPONSIBILITIES

A. Command Officers

1. While the ranking command officer at the scene of any call is in overall charge, he may delegate supervision to the assigned sergeant and acts as an overseer. He intervenes only when he observes serious breaches of established procedure.

2. Make periodic checks of major crime scenes to ensure proper procedures are being followed.

COSA 000515



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



3. Exceptions are calls which involve an officer of this department in any major incident. Under such circumstances the ranking command officer shall be in charge of the scene.

B. Supervisory Officers

1. Patrol Division supervisory officers are in charge of supervising all lower ranking officers at any major crime scene, including follow-up detectives and Crime Scene Unit Investigators in the absence of an Investigations Division supervisory officer. If the scene involves a major crime, evidence processing shall be handled in accordance with section .06, B., 1., c.

2. When an Investigations Division supervisory officer is present at a crime scene, he supervises the activities of the follow-up detectives, UEDIs, and Crime Scene Unit Investigators assigned to the case.

3. In the absence of an Investigations Division supervisory officer, the Crime Scene Unit Supervisor is in charge of the UEDI/Crime Scene Unit Investigators.

4. Patrol Division supervisory officers proceed to any major crime scene or any crime scene where supervisory presence is requested and assess the crime scene to determine:

   a. Whether there are sufficient officers at the scene. Request additional officers, if necessary;

   b. The dimensions of the crime scene and the best method of protecting the scene;

   c. Whether the proper quadrant has been established and the officers assigned are working it properly;

   d. Whether the proper information regarding the actor has been broadcast to officers working the quadrant;

   e. Whether the dispatcher has notified the Bexar County Medical Examiner's Office in cases involving deaths; and

   f. Whether the Investigations Division detectives are needed at the scene, and if so, ensures proper adherence to GM Procedure 708, *Follow-Up Units*, is followed.

5. Assign officers to specific duties required to correctly protect and process the crime scene.

6. Provide for the transportation of complainants and witnesses, if necessary.

7. Determine when and/or if the news media may be briefed and admitted to the scene in accordance with GM Procedure 307, *Public and Media Information.*

8. Remain at the scene as long as necessary to ensure proper protection of the scene and supervises subordinates in the performance of their assigned functions.

9. Ensure all officers prepare the necessary reports.

10. Prepare a supplemental report describing any actions taken and the names and assigned duties of officers present at the crime scene.

## .06 *OFFICERS/ UEDIs' GENERAL CRIME SCENE DUTIES*

A. Officer(s) Assigned to Crime Scene

1. Proceed to the crime scene and observe all conditions and events on the way to and on arrival at the crime scene.

COSA 000516



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



2. Note any remarks made by the complainant, witness, or actor upon arrival at the crime scene.

3. Pursue and apprehend the actor if the actor is still at the scene, visibly fleeing the scene, or in the general area of the scene.

   a. Interview and/or interrogate the actor or suspect; or

   b. If the crime will be investigated by a follow-up unit, the follow-up unit personnel will interview and/or interrogate the actor or suspect.

4. Use caution when entering the crime scene so as not to destroy physical evidence.

5. Request EMS for any injured or sick persons.

6. Ascertain the actual type of crime committed.

   a. If an emergency exists, the amount of time lapse involved and whether additional officers are needed to aid the injured and secure the scene; or

   b. If an emergency does not exist, advise responding officers to slow down in responding to the scene of the crime.

7. If possible, obtain a description of the actor, the means, and direction of flight, and whether or not the actor is armed.  This information is relayed to the dispatcher.

8. Secure and protect the crime scene and any physical evidence by preventing unauthorized persons from entering the crime scene area.  Officers should pay particular attention to items which may contain DNA evidence.

9. Request a UEDI/Crime Scene Unit Investigator to process the crime scene for physical evidence.

10. Locate, identify, and interview the complainant and witnesses:

    a. Officers should utilize SAPD Form #2010, *Neighborhood Canvas Form*, on any preliminary criminal investigation where witnesses are likely to be present, or at the direction of a supervisor or follow-up unit personnel.

    b. All SAPD Forms #2010 are forwarded to the appropriate follow-up unit.

    c. If the crime will be investigated by a follow-up unit, contact the follow-up unit personnel to see if they need to also interview the complainant and witnesses.

11. Prepare the proper reports which describe the offense, including:

    a. Any vehicles, persons, or suspicious activities possibly related to the offense which was observed on the way to the scene;

    b. Time of arrival at the scene of the crime;

    c. The name of all officers present, should supervisory officers not make the scene; and

    d. Initial observations by the officer, including any res gestae statements made by the actor or dying declarations made by the complainant.

12. Continue protection of the crime scene and all physical evidence to maintain its integrity.  Avoid handling items of physical evidence unless it is absolutely necessary to prevent its loss, destruction, or contamination.

COSA 000517



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL

*Procedure 701 – Crime Scene Duties*



13. When an officer must handle evidence to protect it from loss, destruction, contamination, or for the victim to receive proper medical treatment, the officer takes custody of the evidence, and:

    a. Handles the item in the least intrusive manner to avoid destroying the item, fingerprints, or other trace evidence that may be on the item;

    b. Marks the exact location where the evidence was found and points this out to the UEDI/Crime Scene Unit Investigator;

    c. Protects the item from loss or unnecessary handling; and

    d. Marks the item for later identification and turns it over to the UEDI/Crime Scene Unit Investigator, if one is assigned to the call, or places the item in the Property Room as evidence. Care must be exercised to avoid destruction of latent fingerprints or trace evidence on the item when marking it.

14. When an officer must handle a firearm as evidence at a crime scene either prior to the arrival of UEDI/Crime Scene Unit Investigators or because they are not available, the officer:

    a. Assumes custody of the firearm when it is obvious the firearm must be removed to protect it from loss, destruction, or contamination;

    b. Handles the firearm in the least intrusive manner to avoid destroying the item, fingerprints, or other trace evidence that may be on the firearm (i.e., does not rotate the cylinder, does not unload firearm);

    c. As soon as practical, secures the firearm by placing it in the locked trunk of the officer's police vehicle;

    d. Records the exact location of recovery, condition of the firearm, and marks it with his initials;

    e. Places the firearm in the Property Room in accordance with GM Procedure 606, *Impounding Property*, or turns the firearm over to UEDIs/Crime Scene Unit Investigators upon their arrival and relates the location where it was found; and

    f. Details his possession of the evidence in a written report.

15. All officers assigned to, dispatched to, or assisting at or near any crime scene where a felony apprehension has been made will prepare the necessary supplemental reports documenting the reason for responding and actions taken in regard to the call. A copy of the report will be forwarded to the respective follow-up unit.

B. UEDI/Crime Scene Unit Investigator Assigned to Crime Scene:

1. Upon arrival, immediately surveys the crime scene to determine:

    a. The type of crime committed;

    b. Whether additional equipment or personnel are needed to assist in processing the crime scene and request same from the dispatcher; and

    c. At a major crime scene, UEDIs must receive approval and direction from the Crime Scene Unit Supervisor or the follow up unit investigator assigned to the crime scene prior to processing the scene.

2. Establishes the perimeter of the crime using crime scene barrier tape, if necessary;

3. Processes the crime scene for evidence (i.e., collects latent fingerprints, photographs, sketches, DNA evidence, etc.);

COSA 000518



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL
*Procedure 701 – Crime Scene Duties*



4. Collects and preserves all physical evidence at the crime scene and places the physical evidence in the Property Room;

5. Prepares the necessary supplemental reports of all actions taken, including the names of any officers who assisted.

C. Follow-Up Unit Detective Assigned to Crime Scene:

1. Proceeds to the crime scene when notified to do so;

2. Obtains initial information from the officer responsible for preparing the offense report;

3. Assesses the crime scene to determine if their presence in the crime scene area is necessary and:

   a. When it is necessary to enter, uses caution to avoid contamination of the crime scene area; and

   b. Avoids handling, contaminating, or altering the crime scene. When it becomes necessary to move any objects before the UEDI/Crime Scene Unit Investigator arrives, the follow-up unit detective records the exact location and condition in the detective's report, properly marks the item, and turns it over to the UEDI/Crime Scene Unit Investigator for processing upon arrival.

4. Identifies and interviews witnesses outside the immediate crime scene area;

5. Makes arrangements for witnesses to give their statements and advises a Patrol Division Sergeant when transportation is necessary.

6. Prepares the proper supplemental report describing the detective's actions.

**.07  *OFFICERS/UEDIs SPECIFIC CRIME SCENE RESPONSIBILITIES***

A. Homicide and/or violent crime scenes

1. In every instance, officers/UEDIs call for emergency medical assistance.

2. Personnel authorized to enter a homicide or violent crime scene includes:

   a. First officer/UEDI to arrive;

   b. Emergency medical personnel;

   c. Assigned Patrol Division Sergeant;

   d. Additional officers/UEDIs necessary to secure and protect the crime scene;

   e. Assigned Crime Scene Unit Investigator(s), including the Crime Scene Unit supervisor;

   f. Assigned follow-up unit personnel; and

   g. Investigators from the Bexar County Medical Examiner's Office.

3. A Patrol Division Supervisor will assign a Patrol Officer to complete SAPD Form 4130, "Crime Scene Personnel Log," to document all personnel entering the crime scene. SAPD Form 4130 will be forwarded to the Homicide Unit prior to the end of the assigned Patrol Officer's tour of duty. Upon receiving SAPD Form 4130, Homicide Unit personnel will ensure that it is included in the investigative file.

COSA 000519



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



4. Once the crime scene has been deemed secure:

   a. Any personnel entering an indoor crime scene will wear protective shoe coverings and gloves;

   b. Any personnel entering an outdoor crime scene will wear gloves. The use of any additional equipment, such as shoe covers, will be determined by an Investigations Division Supervisor.

5. The Follow-Up Unit Supervisor or his designee, will be responsible for the direction and coordination of the investigation.

6. When the victim is obviously dead, the body may not be moved without authorization from the Bexar County Medical Examiner or a Medical Examiner Investigator, except:

   a. In emergency circumstances; or

   b. In cases of unreasonable delay after repeated attempts to contact Medical Examiner's Office personnel have failed.

7. Before moving the victim's body, the officers/UEDIs shall:

   a. Make note of the original position of the victim; and

   b. Request the Crime Scene Unit Investigator photograph and take necessary measurements of the crime scene.

8. Upon discovery of a "mysterious" homicide or one in which no witnesses or suspects are apparent, or where it appears a solution to the crime may rest heavily on the development of physical evidence to identify a criminal actor or actors, the only officers authorized to enter a crime scene are those specifically charged with processing the area for physical evidence. After the scene has been processed, other officers may be allowed to enter.

9. Officers make note of any physical evidence–which may be accidentally moved by medical personnel and ensure medical personnel do not contaminate the crime scene by discarding any of their supplies or equipment in the area.

10. Officers/UEDIs relate to the Crime Scene Unit Investigator, the follow-up unit detective, and any supervisory personnel, the following:

    a. Any changes in the victim's position; and

    b. Any physical evidence the officer found necessary to pick up, the location where it was found, and any other alterations of the crime scene area.

B. Crime Scenes Where Video Recordings Are Made:

   1. VHS Recording Devices and Digital Recording Devices

      a. Officers(s) Assigned

         (1) Locate the video recording origin and take custody of the VHS tape and pull the tab on the side of the VHS tape so the tape cannot be recorded over. If the origin is a digital recording device officers should have some form of digital video copy (CD, DVD, Floppy Disk, Flash drive, etc.) made by the employees, manager, or owner. This digital video copy becomes the master video recording.

         (2) If the video recording origin is locked, or a digital video copy cannot be made, contact the person in charge of the location.

COSA 000520



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



    (i)      If entry into the video recording origin is refused, a supervisor is notified.

    (ii)     If a digital video copy cannot be made, the officer will have the person in charge of the location contact the company where the digital video equipment was purchased or whoever they have the service/security contract with and have them respond to make a copy.

    (iii)    A reasonable amount of time should be allowed as long as the investigation is not prolonged or hindered.

    (iv)    If the officer is refused custody of the VHS tape a supervisor is notified.

    (v)     If a digital video copy cannot be made, the officer will document the name and phone numbers of the company and/or the name and phone numbers of the company that services the DVR equipment.  A supervisor then is notified.

    (vi)    The officers shall document in their report all supervisors and follow-up unit detective's names contacted and the decisions made.

(3)    Officers/UEDIs should not view or make copies of the master video recording without approval from the follow-up unit investigator or supervisor.  Viewing of a master video recording should only be conducted by the follow-up unit personnel assigned to the crime or personnel from the Technical Investigations Detail unless viewing of the master video recording is needed for immediate information on the crime and can be done in a manner which does not present a risk to the master video recording value as evidence, with approval from the follow-up unit.

(4)    Maintains custody and control of the master video recording, unless the master video recording is released to a Crime Scene Unit Investigator or Technical Investigations Detail detective at a life-threatening incident or is requested by a member of the follow-up unit.  Officers will document in their report the disposition of the video evidence.

(5)    Upon completion of his crime scene duties, the officer delivers the master video recording and a copy of his report to the video tape receptacle located in the Headquarters Building Central Mail Room.  If the master video recording was released to a Crime Scene Investigator or a member of the follow-up unit, the officer shall attach a copy of his report to the master video recording before releasing the master video recording.

b.    Crime Scene Unit Investigator Assigned

    (1)    Takes custody of the master video recording if the crime is a life-threatening incident;

    (2)    Releases the master video recording to a member of the follow-up unit, if requested; or

    (3)    Returns the master video recording along with a copy of his report and the officer's report to the video tape receptacle located in the Headquarters Building Central Mail Room.

    (4)    If the digital video copy cannot be made, the Crime Scene Unit Investigator shall take custody of all digital video equipment including the monitor when requested by a supervisor and place it in the Property Room. They shall also route a copy of their report to the follow-up unit and Technical Investigations Detail supervisors.

c.    Follow-Up Unit Detective(s) Assigned

    (1)    Views or takes custody of a master video recording of a crime involving a life threatening incident.

COSA 000521



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL
*Procedure 701 – Crime Scene Duties*



(2) The follow-up unit detective should view the master video recording to verify the incident was properly recorded. If the master video recording is made from a digital recording device the video should be viewed on another computer if available to verify the incident was properly recorded and downloaded. If the follow-up unit detective views the master video recording, he should document the camera number(s) and six (6) digit time (hours: minutes: seconds) of the incident.

(3) If the follow-up unit detective takes custody of a master video recording, he delivers the master video recording, with copies of reports from the assigned officer/UEDI and Crime Scene Unit Investigator, along with a copy of his report, to the video tape receptacle located in the Headquarters Building Central Mail Room

(4) If a digital video copy cannot be made by those at the location, the detective assigned will obtain and document the name and phone numbers of the company where the equipment was purchased along with the company which services the equipment and contact them for assistance in downloading the video evidence.

(5) If a copy of the digital video evidence cannot be made **after** the detective assigned has contacted the company where the equipment was purchased along with the company which services the equipment, the detective assigned will contact the Technical Investigations Detail during normal business hours with the names and phone numbers of those individuals the detective has contacted along with the results of their efforts. If a copy of the digital video evidence cannot be made regarding a high profile or life threatening incident or where there is a risk the video evidence will be lost the detective assigned will obtain and document the name and phone numbers of the company where the equipment was purchased and the company which services the equipment and contact them to have them **come out and download the video evidence**. If these efforts fail then the detective assigned shall contact a supervisor.

    d. Supervisory Officer Assigned

(1) Some video recording origins are locked to prevent suspects and employees from tampering with the video recording.  When requested, the supervisor determines whether forced entry into the video recording origin is necessary to recover a master video recording.

(2) When custody of the video evidence is refused, the supervisor will notify the follow-up unit to let them determine if they want to do an immediate search warrant or wait to obtain the video evidence at a later date.

(3) When advised a master video recording cannot be made the supervisor determines if the offense is severe enough to notify the Technical Investigations Detail Detectives, after business hours, to respond to the scene and make a digital video. Examples of this would be a Police involved shooting or Capital Murder investigation where video holds a key role in the investigation. The supervisor will have the Communication Unit call the Technical Investigations Detail Detectives so they can respond and attempt to make a digital video copy of the incident.

C. Robbery of Business Crime Scenes:

    1. Officers/UEDI dispatched on robbery calls approach the location of the call as if the suspect is still at the scene. In the event the actor has fled, obtain and provide the dispatcher a description of the suspect, means and direction of flight, weapon used, time lapse, and any other pertinent information.

    2. Protect the crime scene by:

        a. Safeguarding all entrances and exits possibly used by the actor and allow no unauthorized person near areas where the robbery may have been; and

COSA 000522



**SAN ANTONIO POLICE DEPARTMENT**
GENERAL MANUAL

*Procedure 701 – Crime Scene Duties*



    b.   Isolating the areas where the actual robbery took place (i.e., teller's window in a bank or a check-out counter in a convenience store.)

    3.   Show the UEDI/Crime Scene Unit Investigator areas on the premises where the actor was observed and may have touched something.

D.   Burglary Crime Scenes:

    1.   A UEDI/Crime Scene Unit Investigator is dispatched on all confirmed burglary calls.

    2.   It is the responsibility of the investigating officer to request a UEDI/Crime Scene Unit Investigator or if a call turns out to be a burglary after being dispatched as some other offense.

    3.   The owner or authorized representative should be present and give effective consent for the processing of the burglary scene.

        a.   In the event the owner or authorized representative is not available to give consent, the UEDI/Crime Scene Unit Investigator should conduct a latent print investigation following these guidelines:

            (1)   Point of entry; and

            (2)   Point of exit.

        b.   When the owner or authorized representative cannot be located, a supervisory officer may authorize the processing of the burglary scene when the need exists.

    4.   A UEDI/Crime Scene Unit Investigator is canceled under the following circumstances:

        a.   The investigating officer at the scene determines the offense of burglary has not been committed and a UEDI/Crime Scene Unit Investigator is not required for any other purpose;

        b.   A supervisor at the scene determines it is impossible to lift prints or obtain other evidence; or

        c.   The owner, after being told of the purpose of the UEDI/Crime Scene Unit Investigator, advises the investigating officer he does not wish for the premises to be printed.

    5.   All instances in which a UEDI/Crime Scene Unit Investigator is canceled are documented by the investigating officer in the text of his report.

    6.   When the UEDI/Crime Scene Unit Investigator is needed and requested, the assigned officer sees the scene is safeguarded by:

        a.   Informing the complainant he should not handle any object or printable surface the perpetrator may have touched until such time as the UEDI/Crime Scene Unit Investigator can examine it; and

        b.   Protecting objects or surfaces which may contain fingerprints from the weather or conditions which may destroy the fingerprints before the UEDI/Crime Scene Unit Investigator arrives.

    7.   When a safe has been entered, the officer secures the immediate area surrounding the safe, the entry, and the exit point of the perpetrator, and notifies the appropriate follow-up investigators, as they may need to come to the scene.

E.   Burglary of Vehicle Crime Scenes:

    1.   Burglarized vehicles are processed for latent fingerprints when:

COSA 000523



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



    a.   An arrest has been made;

    b.   There is a suspect in the case and a possibility exists for developing latent prints in the interior of the vehicle;

    c.   The theft involves the loss of objects of great monetary value; or

    d.   The complainant requests the vehicle to be printed.

2.   The owner or authorized representative should be present to give effective consent for the processing of the vehicle.

    a.   The owner or authorized representative may refuse to allow the vehicle to be fingerprinted.

    b.   When the owner or authorized representative cannot be located, a supervisory officer may authorize the processing of the vehicle when the need exists.

3.   A UEDI/Crime Scene Unit Investigator is not sent on cases reported to an expediter unless the owner of the vehicle requests fingerprints to be taken.

F.   Recovered Stolen Vehicle Scenes:

1.   A UEDI/Crime Scene Unit Investigator is dispatched to print recovered stolen vehicles at the scene, unless the owner of the vehicle specifically requests the vehicle not be printed.

2.   If a UEDI/Crime Scene Unit Investigator is unavailable to be dispatched prior to the vehicle being impounded, a UEDI/Crime Scene Unit Investigator, when available, is dispatched to the Vehicle Storage Unit to print the vehicle.

3.   The UEDI/Crime Scene Unit Investigator makes every effort to conduct the processing of the vehicle at the scene of recovery, unless the following prohibitive circumstances exist:

    a.   Inclement weather;

    b.   Inadequate lighting; or

    c.   The seriousness of the offense requires the Crime Scene Unit Investigator to move the vehicle to the evidence stall for a thorough processing of the vehicle.

G.   Forged Check Scenes:

1.   Officers are dispatched and shall handle forgeries in progress (i.e., actor at scene, possibility of apprehension, or in custody, etc.) as follows:

    a.   Officer makes the scene and takes appropriate action;

    b.   Notifies the Forgery Detail;

    c.   Handles the report; and

    d.   If the Forgery Detail is closed or the Night CID Unit is not available, the officer handles the arrest and any necessary reports.

COSA 000524



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



2.  When a call for service is received by the Communications Unit for a forgery not in progress, the Communications Unit personnel shall inform the complainant of the following:

    a.  Obtain SAPD Form #45-F9, *Forged Check*, at the Headquarters Building, any police substation, or at www.sanantonio.gov/sapd ;

    b.  A separate SAPD Form #45-F9 must be completed and attached to each check submitted; and

    c.  Either mail in or return the forged check and attached SAPD Form #45-F9 to the Forgery Detail.

3.  This subsection only pertains to forged checks and not credit card abuse, counterfeits, money orders, hot checks, etc.

H.  Preservation of Firearms Evidence/Reporting Stolen Firearms:

1.  When a firearm is recovered, found, or confiscated as evidence, the proper handling of the weapon is a priority to preserve any evidentiary value.  This type of recovery, finding, or confiscation would include, but not be limited to, the following examples:

    a.  A firearm is used or suspected of being used in any assault type of offense and is found at or near the scene of the offense or found on a suspect;

    b.  A firearm is found hidden in a vehicle, not in the possession of an individual, during a legal search of the vehicle; and

    c.  A firearm is found in a location which would tend to indicate it has been dumped, discarded, or lost by a suspect involved in any assault offense.

2.  When a firearm comes into the custody and control of an officer and the possibility exists the weapon has been used in any type of violent offense or criminal activity, the officer immediately notifies his supervisor of the circumstances of the recovery.

    a.  If the supervisor determines the firearm is to be processed as evidence, a UEDI/Crime Scene Unit Investigator is to respond to the scene to take immediate charge of the evidence.

    b.  If the supervisor determines the firearm is of no evidentiary value or the evidentiary value has been lost, for whatever reason, this decision shall be included in the text of the officer's report of the incident.

3.  Whenever an officer recovers, finds, or confiscates a firearm as evidence, the firearm will be processed in accordance with Subsection .06A14 of this procedure.

4.  Whenever a firearm is reported stolen, an officer, in addition to completing the required report, shall immediately report the stolen firearm(s) to the appropriate service area Service Agent by telephone for entry into NCIC/TCIC.  The report is submitted at the end of the tour of duty with the words "CALLED-IN" written at the top of the report.

I.  Preservation of Digital Evidence

1.  If it is anticipated digital evidence will be present at a crime scene and time permits (i.e. search warrant), a Technical Investigations Detail Detective should be contacted prior to entry.  A Technical Investigations Detail Detective should be present during the execution of search warrants where digital storage devices are anticipated (with prior approval from the Technical Investigations Detail Supervisor).

2.  Officers encountering digital storage devices should use caution so as not to damage or destroy the digital evidence.  Officers should not manipulate switches, buttons, keyboards or any other input devices on digital

COSA 000525



# SAN ANTONIO POLICE DEPARTMENT
## GENERAL MANUAL
### *Procedure 701 – Crime Scene Duties*



storage devices unless instructed to do so by a computer forensic detective.  If switches, buttons, keyboards or other input devices are manipulated, this shall be documented in a written report.  A copy of this report should accompany the computer to the property room or computer forensic lab.

3.  If a digital storage device is located and it is determined to be related to a criminal offense, the Technical Investigations Detail should be contacted.  The Technical Investigations Detail Supervisor will determine if a Detective should respond to the scene.

4.  If a Technical Investigations Detail Detective does not respond, a Crime Scene Investigator will collect the digital storage device(s).  A Technical Investigations Detail Detective may direct an officer or follow-up detective to collect the digital storage device.  The digital storage device(s) may be placed in the property room or taken to the computer forensic lab for forensic analysis.

COSA 000526

Art. 2.13. DUTIES AND POWERS.  (a)  It is the duty of every peace officer to preserve the peace within the officer's jurisdiction.  To effect this purpose, the officer shall use all lawful means.

(b) The officer shall:

(1) in every case authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime;

(2) execute all lawful process issued to the officer by any magistrate or court;

(3) give notice to some magistrate of all offenses committed within the officer's jurisdiction, where the officer has good reason to believe there has been a violation of the penal law;  and

(4) arrest offenders without warrant in every case where the officer is authorized by law, in order that they may be taken before the proper magistrate or court and be tried.

(c) It is the duty of every officer to take possession of a child under Article 63.009(g).

(d)  Subject to Subsection (e), in the course of investigating an alleged criminal offense, a peace officer may inquire as to the nationality or immigration status of a victim of or witness to the offense only if the officer determines that the inquiry is necessary to:

(1)  investigate the offense; or

(2)  provide the victim or witness with information about federal visas designed to protect individuals providing assistance to law enforcement.

(e)  Subsection (d) does not prevent a peace officer from:

(1)  conducting a separate investigation of any other alleged criminal offense; or

(2)  inquiring as to the nationality or immigration status of a victim of or witness to a criminal offense if the officer has probable cause to believe that the victim or witness has engaged in specific conduct constituting a separate criminal offense.

**Exhibit F-4**

(f)  On a request made by that office, a peace officer
shall execute an emergency detention order issued by the Texas
Civil Commitment Office under Section 841.0837, Health and
Safety Code.

Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.


Amended by Acts 1999, 76th Leg., ch. 685, Sec. 1, eff. Sept. 1,
1999;  Subsec. (c) amended by Acts 2003, 78th Leg., ch. 1276,
Sec. 5.0005, eff. Sept. 1, 2003.
Added by Acts 2017, 85th Leg., R.S., Ch. 4, Sec. 6.01, eff.
September 1, 2017.
Amended by:
     Acts 2017, 85th Leg., R.S., Ch. 4 (S.B. 4), Sec. 6.01, eff.
September 1, 2017.
     Acts 2017, 85th Leg., R.S., Ch. 34 (S.B. 1576), Sec. 3,
eff. September 1, 2017.
     Acts 2019, 86th Leg., R.S., Ch. 467 (H.B. 4170), Sec.
21.001(2), eff. September 1, 2019.

**STATE OF TEXAS §**
**COUNTY OF BEXAR §**

**Case Number: SAPD18220885**
**Date and Time: 10/17/2018 0530 hrs**
**Taken by : <u>DET. R. Perez, #2298</u>**

Page 1 of 3

              **BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Steve Casanova who being by me duly sworn upon his/her oath deposes and says:

My name is Steve Casanova and I am a patrol officer with the San Antonio Police Department.  My badge number is #0099.  I have not been given or promised anything in return for my statement.  I have been with the San Antonio Police Department for approximately 5 years.  I have worked the streets the entire time.  I am currently assigned to Central Dogwatch.

I am here today to talk about what happened earlier this morning.  I came to work last night for my shift at 2230 hours.  My shift was from 2230 to 0630 hours.  I work in full SAPD uniform and was a one man unit.  From the time I came to work at 2230 hours to the time of this incident, I was answering calls for service as I would do on any other day.  At approximately 2330 hours, Officer J. Panah #0907 and I decided to go patrol the projects looking for activity.

I had seen a dark colored car with unknown people on Roberts Street.  I know Roberts Street as a street known for drug activity.  I then saw a female with pink pants crossing Roberts and head towards the house where this incident occurred.  She was lit up by the headlights of this dark colored car.  I then drove the block to see what they were doing down there.  I let Officer Panah know what I had just seen.

I then parked at Hamilton and Albert streets.  As I was parked a vehicle pulled up and parked next to me.  A female exited the vehicle and approached me.  The female stated she was the wife of the victim of an assault.  At this time I realized that this vehicle was the same vehicle I'd just seen parked on Roberts Street.  The female told me that a male had just assaulted her husband.  Her husband was driving their vehicle and was sitting in it as she was the only person that had gotten out.  She explained that while she was making a sale of soup on Roberts Street a black male had came out from across the street and had began cussing at them.  The black male then approached the driver's side of the car and opened the door and punched her husband in the face three or four times.  The husband had a busted lip.  The black male had been yelling at her 'why are you parked in front of my aunt's house and don't ever park here again'.  The wife of the victim explained to him that she was just making a sale and that she was sorry.  She was telling them that she wasn't from there and that they were going to be leaving.  The wife told me the husband did not want to file a report because he was nervous because he didn't have his papers.  (I took this to mean he was an illegal immigrant).  Basically she was telling me that he didn't want anything to do with the Police but she was the one who'd initiated contact with me because she didn't feel it was right what had happened and she wanted to press charges.

At that point I gathered both their information and I explained that I would try and make contact with someone at the house.  I told her that if I didn't make contact with them I would still come back to her and file a report for her.  Officer Panah and I assigned ourselves.  Officer Panah I believe then sent out messages on the computer to other officers letting them know what we'd be doing.  I believe that the reason he did this was because of our knowledge of past drug activity at that particular house.

Once all the officers arrived, I gave them a rundown of what had occurred.  I then coordinated where everyone should position themselves in case somebody tried to run.  Officer Panah Officer Garza and I then approached 217 Roberts in our vehicles.  We parked one property down.  We all walked up to the house and I opened up the gate on the chain link fence.  I saw an unknown black male eating food on the porch.  I asked him if he lived there and he told me no.  I asked him who lived there and he said he didn't know.  In my opinion, he was being cooperative and I recognized him once he lifted up his hat.  I recognized him as a

**Signature** _(signature)_ #99

**Sworn to and subscribed before me, R. Perez, #2298, a Peace Officer in the State of Texas and pursuant to Chapter 602.002 of the Texas Government Code on  this the 17th day of October, A.D., 2018.**

_(346)_ _(signature)_ # 2298

R. Perez, #2298
**Detective, San Antonio Police Department**

<u>"EXHIBIT F-5"</u>

COSA002126

**STATE OF TEXAS §**
**COUNTY OF BEXAR §**

**Case Number: SAPD18220885**
**Date and Time: 10/17/2018 0530 hrs**
**Taken by : <u>DET. R. Perez, #2298</u>**

Page 2 of 3

      **BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Steve Casanova who being by me duly sworn upon his/her oath deposes and says:

male I know as "John"; a male that frequents drug houses in the area. I went to knock on the door. When I walked up to the porch, I approached the door on the left; I initially tried to open the screen door but it was tied shut so I moved on to the door on the right. I see a steel security door; I knocked on the interior wooden door and it just swung open. I did not forcefully knock; it was light tap. I was surprised the door opened as easily as it did. I see a black male sitting directly in front of me; a female in pink pants to his right, they were both sitting on the couch. To her right there was another black male. I did not recognize either of the black males however I did recognize the female in the pink pants as the female I had seen crossing the street a short time earlier.

The male sitting directly in front of me matched the description of the individual that assaulted the ladies husband. I was focused on him. As the door had swung open, this male had jumped up and had started walking towards me when I immediately noticed his right hand holding something in his waistband. He's saying who the fuck are you; I'm thinking at this time he knows it's the cops.

As he's noticing me he's simultaneously moving to his right and I noticed it was a gun in his waistband and as I start to yell show me your hands, he was starting to pull the gun out of his waistband. Beliving that the suspect was pulling his gun to try and shoot and kill me, I drew my weapon and fired two rounds. I yelled to the guys shots fired as I'm falling back to a position of cover back into the street. At that moment, both my partners had moved to cover. As I was falling back to the vehicles I got on the police radio and said shots fired. I also noticed the pit bull come out of nowhere and was being very aggressive towards us.

By this time Officer Macias was moving through the empty lot. He noticed the black male known as John standing by the side of the house; this would be the empty lot side. Officer Macias told John to crawl towards us. As he's crawling towards us, we were trying to get him to safety and in doing so, the pit bull actually attacked John. Officer Panah, in protecting all of us, fired one shot killing the pit bull. At that point, they took John off to safety. I fall back from the front of the house to my patrol vehicle to get better cover. Officer Garza deployed his AR rifle and provided cover for me. I then deployed my AR rifle and we set up a perimeter at the location. I did this because there were still subjects located inside the residence. At this point we didn't know the status of the suspect that I had seen with a gun.

I got on the radio and gave a description of the people I had seen inside of the house; I also made it clear who had the firearm on them. We sat and waited. Street crimes officers arrived to provide additional cover. One of the Officers got on the PA and started giving commands to the people inside the location. He was letting them know to come out of the house with their hands up. I could hear the people inside the house saying I'm coming out but call EMS. I called for EMS; shortly after that I saw shadows of people coming out of the house. I believe four people came out. I could hear them being detained and being secured in patrol vehicles. As soon as we thought everyone was safely out of the house, street crimes got a group of officers together and they made entry. They went inside to clear the house.

Sgt. Limon then told me to stay back because I had been involved in the shooting. Besides Officer Panah and I, no other Officers fired their weapons. I stood by until I was transported to the Public Safety Headquarters to provide my statement.

         Signature

**Sworn to and subscribed before me, R. Perez, #2298, a Peace Officer in the State of Texas and pursuant to Chapter 602.002 of the Texas Government Code on  this the 17th day of October, A.D., 2018.**

         # 2298

      R. Perez, #2298
      **Detective, San Antonio Police Department**

**STATE OF TEXAS §**
**COUNTY OF BEXAR §**

**Case Number: SAPD18220885**
**Date and Time: 10/17/2018 0530 hrs**
**Taken by : <u>DET. R. Perez, #2298</u>**

Page 3 of 3

        **BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Steve Casanova who being by me duly sworn upon his/her oath deposes and says:

I have read this statement and everything is true and correct to the best of my knowledge.

Signature _____

**Sworn to and subscribed before me, R. Perez, #2298, a Peace Officer in the State of Texas and pursuant to Chapter 602.002 of the Texas Government Code on  this the 17th day of October, A.D., 2018.**

_____
R. Perez, #2298
Detective, San Antonio Police Department

COSA002128

San Antonio Police Department
**STATEMENT INFORMATION SUPPLEMENT**
NOTE: This information is strictly confidential and only for police and District Attorney's office files/records.

Case Number: _SAPD 18 220885_

Under the Texas Penal Code, a person commits **Aggravated Perjury, a Third Degree Felony,** if, with intent to deceive and with knowledge of the statements meaning: (1) he makes a false statement under oath, or swears to the truth of a false statement previously made.  (2) If the statement is required or authorized by law to be made under oath, and the statement is made during, or in connection with an official proceeding, and is material.

Name
Nombre: _Taylor Singleton_

Home Address
Direccion de Residencia: ▉▉▉▉▉▉▉▉▉▉ 78218

Business Address
Direccion de Empleo:

Place of Employment
Lugar de Empleo: N/A

Título de Empleo:

Business Phone Number
Telefono de Empleo:

Home Phone Number
Telefono de Residencia: ▉▉▉▉▉▉▉

Race
Raza: BlK

Sex
Sexo: F

Age
Ededad: ▉▉

Date of Birth
Fecha de Nacimiento: ▉▉▉▉▉▉

Driver's License
Numero de Licensia: ▉▉▉▉▉▉

Social Security Number
Numero de Seguro Social:

Job Title
Married Yes
Casado: Si ☐   No ☐

Name of Spouse
Nombre de Esposo O Esposa:

Nearest Relative other than Spouse:
Pariente Mas Cercano (Exclusivo de Esposo O Esposa):

Name
Nombre: _Denitra Singleton (mom)_

Home Address
Direccion de Residencia: _came_

Home Phone Number
Telefono de Residencia: ▉▉▉▉▉▉▉

Business Phone Number
Telefono de Empleo:

Place of Employment
Lugar de Empleo: N/A

Comments (Any remarks observations which are pertinent to the case):

(352)

SAPD Form 66 8L Rev (04 04)

"EXHIBIT F-8"

COSA002132

**STATE OF TEXAS** §
**COUNTY OF BEXAR** §

**Case Number:  SAPD18220885**
**Date and Time:  10/17/2018 0400**
**Taken by :  DET. R. Hines #2358**

Page  1  of  1

**BEFORE ME**, the undersigned authority in and for the State and County aforesaid, on this day personally appeared Taylor Singleton, who being by me duly sworn upon his/her oath deposes and says:

My name is Taylor Singleton. I am currently a student at Central Texas College online. I graduated from Ace Academy in San Antonio. I can read, write, speak, and understand the English language.

Earlier in the day I had been with "Snow". I think his name is Deante or DeVante. He is a Black male. He wears his hear in a fade and he has a dark complexion. When I had last talked to him he asked to come by Hence's house to pick him up. I went to Hence's house to pick up "Snow". I know Hence through his granddaughter Rochelle. When I got to Hence's house I was there with Snow. I believe that Hence and the Hispanic lady were in the bedroom sleeping. About 10 minutes after I got there "Chop" got to the house. "Chop" is a mixed male. He is Black and Hispanic. He has a medium complexion. He is about 5'4" tall. At some point I saw a cop stop in front of the house then the cop drove off. I saw the front door of the house start to open and I saw a flashlight shining in the door. "Snow" got up and asked who was at the door. Snow walked towards the door. The person at the door started saying in a strong voice "don't move, don't move". I assumed that it was a police officer but I could not see him. The person at the door never identified themselves as police. Chop was sitting to the right of me while this was going on. The police officer pushed the door open and "Snow" turned away from him. The officer started shooting. When the officer was shooting I just curled up and put my head down.  "Chop" was still sitting to the right of me and he was shot in the chest. "Chop" got up from the chair and he collapsed. "Snow" went to "Chop" and I could see a hole in "Chop" in the middle of his chest. "Chop" was trying to breath. After the cop stopped shooting he ran away from the house. The officer I saw shooting looked Hispanic and he was wearing a beanie. Detective Hines asked me if anyone in the house had any guns. I didn't see anyone with any guns and I don't know why the officer started shooting.

Everything I have told Detective Hines is true. I have not been promised anything for giving this statement. This is the end of my statement.

Signature   _T. Sglet_

**Sworn to and subscribed before me, Randal Hines, TCLEOSE#111099, a peace officer in the State of Texas and pursuant to No. 602.002, Texas Government Code, on this _17th_  day of __October, A.D., 2018.**

_Ra// /  2350_

**Peace Officer**

February 9, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

PATRICIA SLACK, INDIVIDUALLY )
AND AS THE SURVIVING MOTHER )
OF CHARLES ROUNDTREE, JR., )
BERNICE ROUNDTREE AS THE )
REPRESENTATIVE OF THE ESTATE )
OF CHARLES ROUNDTREE, JR. AND)
ALL STATUTORY BENEFICIARIES, )
TAYLOR SINGLETON, AND )
DAVANTE SNOWDEN )
    PLAINTIFFS, )
  )
VS. )CIVIL ACTION NO.5:18-CV-1117
  )
THE CITY OF SAN ANTONIO, )
TEXAS AND STEVE CASANOVA )
    DEFENDANTS )
*************************************************************

ORAL AND VIDEOCONFERENCE DEPOSITION OF
TAYLOR SINGLETON
FEBRUARY 9, 2021
(REPORTED REMOTELY)
*************************************************************

      TAYLOR SINGLETON, produced as a witness at the
instance of the Defendants, and duly sworn, was taken in the
above-styled and numbered cause on the 9th of February,
2021, from 10:17 a.m. to 2:20 p.m., by Christine M. Sitzes,
CSR, reported by machine stenography, in the City of San
Antonio, County of Bexar, State of Texas, pursuant to the
pursuant to FRCP 30, the First Emergency Order Regarding the
COVID-19 State of Disaster, and/or the provisions stated on
the record or attached therein.

**Exhibit**
**F-9**

February 9, 2021

Page 2

1                 A P P E A R A N C E S

2  FOR THE PLAINTIFFS, WASHINGTON LAW FIRM, PC:
   MR. DARYL K. WASHINGTON(VIA VIDEOCONFERENCE)
3  325 North St. Paul, Suite 3950
   Dallas, Texas 75201
4
   FOR DEFENDANT STEVE CASANOVA, DENTON NAVARRO ROCHA BERNAL &
5  ZECH:
   MR. PATRICK C. BERNAL(VIA VIDEOCONFERENCE)
6  2517 North Main Avenue
   San Antonio, Texas 78212
7
   FOR DEFENDANT STEVE CASANOVA, DENTON NAVARRO ROCHA BERNAL &
8  ZECH:
   MR. ADOLFO RUIZ(VIA VIDEOCONFERENCE)
9  2517 North Main Avenue
   San Antonio, Texas 78212
10
   FOR DEFENDANT CITY OF SAN ANTONIO, OFFICE OF CITY OF SAN
11 ANTONIO:
   MR. LOGAN LEWIS(VIA VIDEOCONFERENCE)
12 100 West Houston Street, 18th Floor
   San Antonio, Texas 78205
13

14 ALSO IN ATTENDANCE:

15 MS. BERNICE ROUNDTREE(VIA VIDEOCONFERENCE)

16 MS. PATRICIA SLACK(VIA VIDEOCONFERENCE)

17 MS. SHERYL WOOD(VIA VIDEOCONFERENCE)

18 ALEJANDRA CASAS, VIDEOGRAPHER/TECH(VIA VIDEOCONFERENCE)

19 CHRISTINE M. SITZES, COURT REPORTER(VIA VIDEOCONFERENCE)

20

21

22

23                      * * * * * *

24

25

February 9, 2021

Page 3

1                          I N D E X

2                                                       Page

3   Appearances..............................................2

4   TAYLOR SINGLETON

5           Examination by Mr. Bernal.......................5

6   Examination by Mr. Lewis..............................111

7   Signature Waived Pursuant to Rule 30(e)(1..............132

8   Reporter's Certificate................................133

9                        E X H I B I T S

10  No./Description:

11    1     Deposition Notice...............................14

12    2     Ms. Singleton's Statement.......................29

13    3     Omitted.........................................

14    4     Panah Still(Casanova)(TS 6.12.04)...............48

15    5     Panah Still(Casanova SAPD Logo)(TS 06.07.29)....48

16    6     Still Photo 187(Singleton)......................54

17    7     Photo of Gun....................................68

18    8     Photo of Magazine...............................68

19    9     Panah Still(Cotton)(TS 6.22.03).................39

20    10    Plaintiff's Responses to Interrogatories........70

21    11    Dartson Report..................................99

22    12    Photo of Mr. Snowden............................84

23    13    Photo of Drugs in Mr. Roundtree's Waistband.....97

24                        * * * * * * * * * *

25

February 9, 2021

Page 35

1      A.   Yes.

2      Q.   Then a couple of sentences later, you state at
3  some point I saw a cop stop in front of the house.  Then the
4  cop drove off.

5      A.   Yes.

6      Q.   Explain the background to that statement.

7      A.   Well, that's a area that's always profiled.  So
8  police officer stopped in front of the house, shined a light
9  through that front window and he drove off.  Then we
10  finished socializing.

11      Q.   And were you inside the house when that happened?

12      A.   Yes.

13      Q.   And were you in that living room?  In the front
14  living room?

15      A.   Yes.  Yes.

16      Q.   Could you see out the window when the police
17  officer drove by?

18      A.   Barely.  He -- the only reason I knew he was
19  outside 'cause he shined a light into the house into that
20  front window.

21      Q.   But how would you know it was a cop?

22      A.   Who else has a light like that to shine through
23  somebody's living room window and a police car?

24      Q.   Did you see the police car?

25      A.   Yes.

February 9, 2021

Page 36

1       Q.   And you could see the police car through the
2   window?
3       A.   Yes.
4       Q.   And were you sitting or standing when you saw
5   that?
6       A.   I got up to look out the window.  We all looked
7   out the window.
8       Q.   And who is all of us?  Are you talking about you
9   and who else?
10      A.   Me, Devante and Chop.
11      Q.   All three of you went to the window, looked out
12  the window and you saw a police car?
13      A.   Yes.
14      Q.   And a police officer shining a light through your
15  window?
16      A.   Yes.
17      Q.   And did you all talk about that?  What did you say
18  to Devante and Mr. Roundtree?
19      A.   We closed the blinds back and we sat down and we
20  finished talking.
21      Q.   Well, what I'm interested in knowing is was there
22  any discussion by any of the three of you as to why a cop
23  car was passing by?
24      A.   That's an area that's profiled.  The week before
25  that, I was profiled again and pulled over and just

February 9, 2021

Page 41

1   not?

2         A.   Yes.

3         Q.   Do you remember -- I know that was a, you know, a,

4   you know, a tragic evening and a lot happened.

5         A.   Yes.

6         Q.   But do you remember being able to read the

7   statement before you signed it that night?

8         A.   I don't recall.

9         Q.   Okay.

10        A.   This is my first time seeing the statement.

11        Q.   Okay.  And so at the bottom of the paragraph,

12   there's a sentence that says the officer I saw shooting

13   looked Hispanic and he was wearing a beanie?

14        A.   Yes.

15        Q.   So when the door opened, is that what you saw?

16   Describe to me what you saw.

17        A.   When the door came open, all I seen was a bright

18   light, just a bright flashlight.  We couldn't see what was

19   behind the flashlight.  We couldn't see nothing.

20             So Devante got up off the couch.  And his

21   eye -- one of his eyes is messed up.  He asked the person

22   at the door who the fuck are you.  And the officer said --

23   at that time, I'm not knowing it's a officer.  The officer

24   said don't move, don't move.

25             And I guess that's when he finally got a

February 9, 2021

Page 50

1  but that last answer was a little faint.

2       Q.    (MR. BERNAL) Yeah, Ms, Singleton, can you speak

3  up a little so we can hear you better.

4       A.    I don't know him.

5       Q.    No, I understand you don't know him.  What I'm

6  asking is, is that the officer that you described as

7  Hispanic wearing a beanie that was at the door at the time

8  of the shooting?

9       A.    I saw him briefly.

10      Q.    No, I understand that.  But is that what you saw?

11 Did you see that beanie?

12      A.    Yes.

13      Q.    Yes?

14      A.    Yes.  That's the only thing I seen was a beanie.

15      Q.    Okay.

16      A.    That's why Devante went to the door to ask who the

17 fuck are you 'cause nobody could see who it was.

18      Q.    Okay.  Let me ask the next question.  So you can

19 remove those exhibits from the screen.  So when the officer

20 went to the door and you saw the door open, did you hear him

21 knock on the door?

22      A.    He didn't knock on the door.  He pushed the door

23 open.

24      Q.    Okay.  And how do you know that?

25      A.    Because nobody else was in the living room but me,

February 9, 2021

Page 62

1      Q.   Okay.  So when the shots were fired, how many did
2  you hear?

3      A.   I heard a couple of them.

4      Q.   And what did you hear the person at the door say
5  before the shots were fired, if anything?

6      A.   He said don't move, don't move.  Then he started
7  shooting through the living room.

8      Q.   And could you tell who he was shooting at?

9      A.   I thought he was shooting at all of us.  If I
10  would have moved I probably would be dead too right now.

11      Q.   So you thought that person was shooting at you for
12  any particular reason?

13      A.   He was shooting at me.  It doesn't matter where he
14  shot, he was shooting at me.  I had a bullet hole next to my
15  head.

16      Q.   Did you give that person any reason to pull a gun
17  and shoot towards you?

18      A.   I didn't give him a reason to open that door.

19      Q.   Object to nonresponsiveness.  Can you answer the
20  question.  Did you give that person a reason to pull a gun
21  --

22      A.   No.

23      Q.   -- to shoot at you?

24      A.   None of us gave him a reason to just open the door
25  and shoot at us.  There could have been kids in that living

Page 133

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3    PATRICIA SLACK, INDIVIDUALLY )
      AND AS THE SURVIVING MOTHER  )
 4    OF CHARLES ROUNDTREE, JR.,   )
      BERNICE ROUNDTREE AS THE     )
 5    REPRESENTATIVE OF THE ESTATE )
      OF CHARLES ROUNDTREE, JR. AND)
 6    ALL STATUTORY BENEFICIARIES, )
      TAYLOR SINGLETON, AND        )
 7    DAVANTE SNOWDEN              )
          PLAINTIFFS,             )
 8                                )
      VS.                         )CIVIL ACTION NO.5:18-CV-1117
 9                                )
      THE CITY OF SAN ANTONIO,     )
10    TEXAS AND STEVE CASANOVA     )
          DEFENDANTS             )
11    * * * * * * * * * * * * * * * * * * * * * * * * *
                    REPORTER'S CERTIFICATE
12            ORAL AND VIDEOTAPED DEPOSITION OF
                      TAYLOR SINGLETON
13                  FEBRUARY 9, 2021
                  (REPORTED REMOTELY)
14    * * * * * * * * * * * * * * * * * * * * * * * * *

15    I, Christine M. Sitzes, Certified Shorthand Reporter, hereby

16    certify to the following:

17            That the witness,TAYLOR SINGLETON, was duly sworn

18    by the officer and that the transcript of the oral

19    deposition is a true record of the testimony given by the

20    witness;

21            That examination and signature of the witness to

22    the deposition transcript was waived pursuant to Federal

23    Rule 30(e)1;

24            That the amount of time used by each party at the

25    Deposition is as follows:
```

Federal Court Reporters of San Antonio, Inc.
210-340-6464

1      Mr. Bernal - 2 hours 34 minutes  and

2      Mr. Lewis - 0 hours 31 minutes and

3      Mr. Washington - 0 hours 0 minutes;

4           That pursuant to information given to the

5   deposition officer at the time said testimony was taken, the

6   following includes counsel for all parties of record:

7   FOR THE PLAINTIFFS:
       MR. DARYL K. WASHINGTON(VIA VIDEOCONFERENCE)
8   WASHINGTON LAW FIRM, PC
    325 North St. Paul, Suite 3950
9   Dallas, Texas 75201

10  FOR DEFENDANT STEVE CASANOVA:
       MR. PATRICK C. BERNAL(VIA VIDEOCONFERENCE)
11  DENTON NAVARRO ROCHA BERNAL & ZECH
    2517 North Main Avenue
12  San Antonio, Texas 78212

13  FOR DEFENDANT STEVE CASANOVA:
       MR. ADOLFO RUIZ(VIA VIDEOCONFERENCE)
14  DENTON NAVARRO ROCHA BERNAL & ZECH
    2517 North Main Avenue
15  San Antonio, Texas 78212

16  FOR DEFENDANT CITY OF SAN ANTONIO:
       MR. LOGAN LEWIS(VIA VIDEOCONFERENCE)
17  OFFICE OF CITY OF SAN ANTONIO, LITIGATION DIVISION
    100 West Houston Street, 18th Floor
18  San Antonio, Texas 78205

19           I further certify that I am neither counsel for,

20  related to, nor employed by any of the parties to the

21  action in which this proceeding was taken, and further

22  that I am not financially or otherwise interested in the

23  outcome of this action.

24           Further certification requirements pursuant to

25  Rules of Civil Procedure will be certified to after they

February 9, 2021

Page 135

1    have occurred.

2              Certified to by me this 26th of February, 2021.

3                                   /s/Christine M. Sitzes
                                    Christine M. Sitzes
4                                   TX CSR#8756, Expires 2/28/22
                                    Firm Registration No. 79
5                                   Federal Court Reporters of
                                    San Antonio
6                                   10100 Reunion Place, Suite 660
                                    San Antonio, Texas 78216-4119

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 136

1              FURTHER CERTIFICATION UNDER RULE 30 FRCP:

2              The original deposition was delivered to Mr.

3    Bernal in accordance with Rule 30(e) of the FRCP on

4    MARCH 01, 2021

5              That $1242.00 _____ is the deposition officer's

6    charges to Mr. Bernal for preparing the original deposition

7    transcript and any copies of exhibits;

8              That the deposition transcript was delivered in

9    accordance with Rule 30(e) and (f)(1) of the FRCP, and that

10   a copy of this certificate was served on all parties shown

11   herein and filed with the Clerk.

12             Certified to by me on this ___1st___ day of

13   ___MARCH___, 2021.

14                                  /s/Christine M. Sitzes
                                    Christine M. Sitzes,
15                                  TX CSR#8756
                                    Expiration: 2/28/22
16                                  Firm Registration No. 79
                                    Federal Court Reporters of
17                                  San Antonio
                                    10100 Reunion Place
18                                  Suite 660
                                    San Antonio, Texas 78216-4119

19

20

21

22

23

24

25

| PROSECUTION GUIDE | 3. OFFENSE CLASSIFICATION | | | |
|---|---|---|---|---|
| | | 4. ASSIGNMENT NO: | 18220885 | |
| PAGE 5 OF 50 | **Felon in Poss of firearm** | 5. OFFENSE NO: | 520303 | |
| | | 6. DATE REPORTED: | 10/17/18 | |

ROUTING: <u>Homicide</u>

### SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | Phone Number |
|---|---|---|
| **Casanova, Steve #0099** | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report |
|---|---|---|---|
| **217 Roberts S.A., TX** | **2360** | **10/17/2018 0106 hrs** | **12/26/2018 1700 hrs** |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

Patricia Slack (NOK) was notified of Charles Roundtree's (O1)'s death by Det. L. Saiz #2474.

**<u>ARRESTED PERSON:</u>**  **Snowden, Davante M.**          ***O1's friend***
**(AP)**                          B/M

                                                      *Recorded DVD statement obtained



On Wednesday, October 24th 2018, Davante Snowden (AP) was arrested on a felon in possession of firearm warrant and was transported to the Homicide office for a formal statement; a summary of his interview:

1503 hours-Davante was put in room #3329.  For his comfort, Officer Hebert put his handcuffs in front.

I walked in to the room and offered him water.  He accepted the water.  I exited the room and returned with a bottle of water.

I introduced myself and then I then read Davante his Miranda warning using SAPD form 66-E and he said he understood his rights.  I filled out the SAPD form 66-8L form for him.

1515 hours-Davante said that Hence was not blood related; he calls Hence his "grandfather."  Went on to say that he breeds dogs and keeps them at Hence's and goes by every day.  He said they were "chillin'; he said Charles shut the door and they were chillin' some more then the door swung open and he heard the gunshots.  He tried to go for the hallway and into Hence's room.  He closed the front door.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ( XX) ARREST | CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OF OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report  (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| **Detective R. Perez # 2298** | **Sergeant W. McCourt # 3266** | | **Homicide** |

| **SAN ANTONIO POLICE DEPARTMENT** | **TYPE ONLY** | **PROSECUTION GUIDE** SAPD Form 3-L Rev. (9-90) |
|---|---|---|



Exhibit
**F-11**

⑦

COSA001788

| PROSECUTION GUIDE | 3. OFFENSE CLASSIFICATION | | 4. ASSIGNMENT NO: | 18220885 |
|---|---|---|---|---|
| PAGE 6 OF 50 | **Felon in Poss of firearm** | | 5. OFFENSE NO: | 520303 |
| | | | 6. DATE REPORTED: | 10/17/18 |

**ROUTING: Homicide**

**SAN ANTONIO POLICE DEPARTMENT**

| Last name of Complainant,First,Middle Initial | Address of Complainant | | Phone Number |
|---|---|---|---|
| Casanova, Steve #0099 | | | |
| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report |
| 217 Roberts S.A., TX | 2360 | 10/17/2018 0106 hrs | 12/26/2018 1700 hrs |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

He said they tried to say we had "something."  (Referring to Officer's saying he had a gun).

He said his girlfriend had dropped him off at Hence's house at approximately 5:00 p.m. on Tuesday, October 16th 2018.

The night of the incident he was wearing black and white Nikes, a black jacket and khaki pants

1521 hours-Davante said that he and Charles are "blood cousins" through their fathers.  He talked about Taylor arriving and how he was going to sell a dog but the buyer never arrived.

Davante and Taylor are not related by blood; he said his mother helped raise her.

1525 hours-I asked him if he did anything significant that night and he said no.

1530-Davante talked about himself getting shot and then how Charles got shot as he was behind him.  I asked him about how long they'd been inside the house after the shooting; he said he felt it was about a minute, no more than a minute and thirty seconds before they came back out.

1533 hours-Det. Saiz knocked on the door and gave me the copy of the firearms trace report.  I asked him about an assault that had occurred outside.  He said a "Mexican" had gone into the yard and that he, Davante had pushed him.  He said the Mexican came into the yard and he pushed him.  He said that was the only altercation that happened.

1539 hours-"I did not have a gun that night."

1550 hours-I stepped out of the room.

1554 hours-I walked back in the room.  I asked Davante if he would give me a buccal swab.  He said he would not do it without his lawyer.  I then asked him if he was willing to take a polygraph exam and he said he needed to contact his lawyer.  I walked out of the room.

1559 hours-Det. Espinosa and I walked into the room and Det. Espinosa and Espinosa tried to explain to Davante what he had told him.  Davante

1605 hours-Davante was led out of the room.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ARREST | (XX) CLEARED BY JUVENILE ARREST | ( ) | CLEARED BY EXCEPTION OF OTHER MEANS | ( ) | CHANGE OF OFFENSE | ( ) | PROGRESS OF INVESTIGATION | ( ) |
|---|---|---|---|---|---|---|---|---|---|---|

| Officer Making Report  (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| Detective R. Perez # 2298 | Sergeant W. McCourt # 3266 | | Homicide |

| SAN ANTONIO POLICE DEPARTMENT | TYPE ONLY | PROSECUTION GUIDE SAPD Form 3-L  Rev. (9-90) |
|---|---|---|

**PROSECUTION GUIDE**

3. OFFENSE CLASSIFICATION

**PAGE 7 OF 50**

**Felon in Poss of firearm**

| 4. ASSIGNMENT NO: | 18220885 |
|---|---|
| 5. OFFENSE NO: | 520303 |
| 6. DATE REPORTED: | 10/17/18 |

ROUTING: Homicide

## SAN ANTONIO POLICE DEPARTMENT

| Last name of Complainant,First,Middle Initial | Address of Complainant | Phone Number |
|---|---|---|
| Casanova, Steve #0099 | | |

| Place of Occurrence-Street on- at or Number | Dist. Occurrence | Date & Time of Occurrence | Date & Time of this Report |
|---|---|---|---|
| 217 Roberts S.A., TX | 2360 | 10/17/2018 0106 hrs | 12/26/2018 1700 hrs |

Additional Detail of Offense-Progress of Investigation-Disposition of Evidence, Property, Etc..

1607 hours-video ends.

Davante never admitted to having a gun on him; also said he never went into the back room.

| UCR STATUS | UNFOUNDED ( ) REPORT | CLEARED BY ARREST | (XX) CLEARED BY ( ) JUVENILE ARREST | CLEARED BY EXCEPTION ( ) OF OTHER MEANS | CHANGE OF ( ) OFFENSE | PROGRESS OF ( ) INVESTIGATION |
|---|---|---|---|---|---|---|

| Officer Making Report (Badge No.) | Approving Authority | Unit Case No. | Unit Assigned to Follow -up |
|---|---|---|---|
| Detective R. Perez # 2298 | Sergeant W. McCourt # 3266 | | Homicide |

**SAN ANTONIO**
**POLICE DEPARTMENT**

**TYPE ONLY**

**PROSECUTION GUIDE**
SAPD Form 3-L Rev. (9-90)



March 22, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

PATRICIA SLACK, INDIVIDUALLY )
AND AS THE SURVIVING MOTHER  )
OF CHARLES ROUNDTREE, JR.,   )
BERNICE ROUNDTREE AS THE     )
REPRESENTATIVE OF THE ESTATE )
OF CHARLES ROUNDTREE, JR. AND)
ALL STATUTORY BENEFICIARIES, )
TAYLOR SINGLETON, AND        )
DAVANTE SNOWDEN              )
    PLAINTIFFS,              )
                       )
VS.                          )CIVIL ACTION NO.5:18-CV-1117
                       )
THE CITY OF SAN ANTONIO,     )
TEXAS AND STEVE CASANOVA     )
    DEFENDANTS               )
************************************************************

ORAL AND VIDEOCONFERENCE DEPOSITION OF
DAVANTE SNOWDEN
MARCH 16, 2021
(REPORTED REMOTELY)
************************************************************

      DAVANTE SNOWDEN, produced as a witness at the
instance of the Defendants, and duly sworn, was taken in the
above-styled and numbered cause on the 16th of March, 2021,
from 9:05 a.m. to 12:43 p.m., by Christine M. Sitzes, CSR,
reported by machine stenography, in the City of San Antonio,
County of Bexar, State of Texas, pursuant to the pursuant to
FRCP 30, the First Emergency Order Regarding the COVID-19
State of Disaster, and/or the provisions stated on the
record or attached therein.

**Exhibit
G**

March 22, 2021

```
 1               A P P E A R A N C E S

 2   FOR THE PLAINTIFFS, WASHINGTON LAW FIRM, PC:
     MR. DARYL K. WASHINGTON(VIA VIDEOCONFERENCE)
 3   325 North St. Paul, Suite 3950
     Dallas, Texas 75201
 4
     FOR DEFENDANT STEVE CASANOVA, DENTON NAVARRO ROCHA BERNAL &
 5   ZECH:
     MR. PATRICK C. BERNAL(VIA VIDEOCONFERENCE)
 6   2517 North Main Avenue
     San Antonio, Texas 78212
 7
     FOR DEFENDANT STEVE CASANOVA, DENTON NAVARRO ROCHA BERNAL &
 8   ZECH:
     MR. ADOLFO RUIZ(VIA VIDEOCONFERENCE)
 9   2517 North Main Avenue
     San Antonio, Texas 78212
10
     FOR DEFENDANT CITY OF SAN ANTONIO, OFFICE OF CITY OF SAN
11   ANTONIO:
     MR. LOGAN LEWIS(VIA VIDEOCONFERENCE)
12   100 West Houston Street, 18th Floor
     San Antonio, Texas 78205
13
14   ALSO IN ATTENDANCE:

15   ALEJANDRA CASAS, VIDEOGRAPHER/TECH(VIA VIDEOCONFERENCE)

16   CHRISTINE M. SITZES, COURT REPORTER(VIA VIDEOCONFERENCE)

17

18

19

20                    * * * * * *

21

22

23

24

25
```

March 22, 2021

Page 3

1                    I N D E X

2                                              Page

3  Appearances..............................................2

4  Stipulations...........................................145

5  DAVANTE SNOWDEN

6            Examination by Mr. Bernal.......................6

7  Examination by Mr. Lewis...............................108

8  Examination by Mr. Washington..........................134

9  Witness's Signature Page/Corrections...................146

10 Reporter's Certificate.................................147

11                  E X H I B I T S

12 No./Description:

13  1     Deposition Notice................................25

14  2     San Antonio PD Investigative Report..............50

15  3     Omitted..........................................

16  4     Plaintiff's Responses to Interrogatories.........45

17  5     Dartson Report...................................93

18  6     Casanova Still Photo(Herrera)....................58

19  7     Casanova Still Photo(Preciado)...................59

20  8     Panah Still(Casanova SAPD logo)(TS 06.07.29).....76

21  9     Omitted..........................................

22  10    Photo of Mr. Snowden.............................66

23  11    Photo of Mr. Snowden's wound.....................69

24  12    Still 187(Singleton w phone).....................71

25  13    Panah Still(Cotton)(TS 6.22.03)..................66

March 22, 2021

```
                                                      Page 4
 1   No./Description:

 2   14      Photo of Gun......................................86

 3   15      Photo of Magazine.................................86

 4   16      Photo of Drugs in Mr. Roundtree's Waistband........92

 5            P L A I N T I F F   E X H I B I T S

 6   No./Description:

 7   28      Case#2019CR0596 Case Search Results...............143

 8

 9

10

11

12

13

14                     ***********

15

16

17

18

19

20

21

22

23

24

25
```

March 22, 2021

Page 66

1      A.    Yes, sir.

2      Q.    Let's show Exhibit Number 13, please.  When

3 Officer Casanova arrived at the house, there was a gentleman

4 sitting on the porch and this is his picture.  Can you see

5 it?

6      A.    Yes, sir.

7      Q.    Do you know who that is?

8      A.    No, I don't know who that is.

9      Q.    So when you arrived that night, this gentleman was

10 not sitting on the porch?

11     A.    No, sir.

12     Q.    Was he inside the house?

13     A.    No, sir.

14     Q.    Did you ever see him that night?

15     A.    No, sir.

16     Q.    Okay.  You can take that down now.  Let's put up

17 Exhibit 10, please.

18           Mr. Snowden, I'm gonna represent to you

19 this is a photograph of you the night of the incident

20 after the shooting occurred and you were arrested.  Do you

21 see that?

22     A.    Yes, sir.

23     Q.    You recognize that those were the clothes that you

24 were wearing that night?

25     A.    Yes, sir, they was.

March 22, 2021

Page 67

1        Q.    And do you see that these two guys that are
2    looking at you are EMS people?
3        A.    Yes, sir.
4        Q.    Okay.  So it looks like you're wearing a white
5    T-shirt.  Right?
6        A.    Yes, sir.
7        Q.    And did you change clothes before then?
8        A.    No, sir.
9        Q.    Weren't you wearing some -- a dark colored?
10       A.    I was wearing a jacket.  I was wearing a jacket.
11   I took my jacket off to stop Charles -- try to stop Charles
12   Roundtree from bleeding to death.
13       Q.    Right.  So you had a dark jacket on?
14       A.    A black jacket.
15       Q.    I'm sorry.  What did you say?
16       A.    A black jacket.
17       Q.    Yes, a black jacket.  So you took that off before
18   they arrested you at the scene?
19       A.    No, I took it off -- I took it off to stop him
20   from bleeding.  That's the only reason I took it off.
21       Q.    I understand.  But you were wearing a black jacket
22   and underneath was a white T-shirt.  Right?
23       A.    Yes, sir.
24       Q.    And then you have these pants.  Is that khaki
25   colored or yellow pants?

March 22, 2021

Page 68

1       A.    Khaki.

2       Q.    Khaki colored?  Okay.  And you can see there's no

3    belt.  Right?  You don't have a belt?

4       A.    No, sir.

5       Q.    And this black line on your right pocket, that's a

6    zippered pocket.  Is it not?

7       A.    Yes, sir.

8       Q.    And it looks like it's open.  Is it zipped up or

9    is it open?

10      A.    Open.

11      Q.    Okay.  And those are the pants that you were

12   wearing at the time of the shooting.  Correct?

13      A.    Yes, sir.

14      Q.    And if we go down a little bit, we could see your

15   shoes and socks.  Is that what you were wearing at the time

16   of the shooting?

17      A.    Yes, sir.

18      Q.    Was there anything else that you took off other

19   than the black jacket when they arrested you at that time?

20      A.    No, that's the only thing I took off.

21      Q.    Okay.  And so at that time, did you realize that

22   you had been shot?

23      A.    Yes.  At this time of this picture, yes, sir.

24      Q.    And tell me again when did you first figure out

25   that you had been shot?

March 22, 2021

Page 147

```
 1                    SAN ANTONIO DIVISION
 2    PATRICIA SLACK, INDIVIDUALLY )
      AND AS THE SURVIVING MOTHER  )
 3    OF CHARLES ROUNDTREE, JR.,   )
      BERNICE ROUNDTREE AS THE     )
 4    REPRESENTATIVE OF THE ESTATE )
      OF CHARLES ROUNDTREE, JR. AND)
 5    ALL STATUTORY BENEFICIARIES, )
      TAYLOR SINGLETON, AND        )
 6    DAVANTE SNOWDEN              )
          PLAINTIFFS,              )
 7                                 )
      VS.                          )CIVIL ACTION NO.5:18-CV-1117
 8                                 )
      THE CITY OF SAN ANTONIO,     )
 9    TEXAS AND STEVE CASANOVA     )
          DEFENDANTS               )
10    * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                      REPORTER'S CERTIFICATE
11          ORAL AND VIDEOTAPED DEPOSITION OF
                          DAVANTE SNOWDEN
12                      MARCH 16, 2019
                     (REPORTED REMOTELY)
13    * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

14    I, Christine M. Sitzes, Certified Shorthand Reporter, hereby

15    certify to the following:

16          That the witness, DAVANTE SNOWDEN, was duly sworn

17    by the officer and that the transcript of the oral

18    deposition is a true record of the testimony given by the

19    witness;

20          That the deposition transcript was submitted on

21    _MARCH  22, 2021_ to the witness or to the attorney for the

22    witness for examination, signature, and return to FEDERAL

23    COURT REPORTERS OF SAN ANTONIO by_ Apra  21, 2021  ;

24          That the amount of time used by each party at the

25    Deposition is as follows:

March 22, 2021

Page 148

1       Mr. Bernal - 2 hours 32 minutes  and

2       Mr. Lewis - 0 hours 34 minutes and

3       Mr. Washington - 0 hours 15 minutes;

4            That pursuant to information given to the

5  deposition officer at the time said testimony was taken, the

6  following includes counsel for all parties of record:

7  FOR THE PLAINTIFFS:
        MR. DARYL K. WASHINGTON(VIA VIDEOCONFERENCE)
8       WASHINGTON LAW FIRM, PC
        325 North St. Paul, Suite 3950
9       Dallas, Texas 75201

10 FOR DEFENDANT STEVE CASANOVA:
        MR. PATRICK C. BERNAL(VIA VIDEOCONFERENCE)
11      DENTON NAVARRO ROCHA BERNAL & ZECH
        2517 North Main Avenue
12      San Antonio, Texas 78212

13 FOR DEFENDANT STEVE CASANOVA:
        MR. ADOLFO RUIZ(VIA VIDEOCONFERENCE)
14      DENTON NAVARRO ROCHA BERNAL & ZECH
        2517 North Main Avenue
15      San Antonio, Texas 78212

16 FOR DEFENDANT CITY OF SAN ANTONIO:
        MR. LOGAN LEWIS(VIA VIDEOCONFERENCE)
17      OFFICE OF CITY OF SAN ANTONIO, LITIGATION DIVISION
        100 West Houston Street, 18th Floor
18      San Antonio, Texas 78205

19           I further certify that I am neither counsel for,

20 related to, nor employed by any of the parties to the

21 action in which this proceeding was taken, and further

22 that I am not financially or otherwise interested in the

23 outcome of this action.

24           Further certification requirements pursuant to

25 Rules of Civil Procedure will be certified to after they

Federal Court Reporters of San Antonio, Inc.
210-340-6464

March 22, 2021

Page 149

1    have occurred.

2              Certified to by me this 22nd of March, 2021.

3                                      /s/Christine M. Sitzes
                                       Christine M. Sitzes
4                                      TX CSR#8756, Expires 2/28/22
                                       Firm Registration No. 79
5                                      Federal Court Reporters of
                                       San Antonio
6                                      10100 Reunion Place, Suite 660
                                       San Antonio, Texas 78216-4119
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              FURTHER CERTIFICATION UNDER RULE 30 FRCP:

Federal Court Reporters of San Antonio, Inc.
210-340-6464

March 22, 2021

Page 150

1            The original deposition was/was not returned to

2    the deposition officer in accordance with Rule 30(e) of the

3    FRCP on _April 21, 2021_;

4            If returned, the attached Changes and Signature

5    page contains any changes and the reasons therefore;

6            If returned, the original deposition was delivered

7    to:Mr. Bernal;

8            That $ _1641.75_ is the deposition officer's

9    charges to Mr. Bernal for preparing the original deposition

10   transcript and any copies of exhibits;

11           That the deposition transcript was delivered in

12   accordance with Rule 30(e) and (f)(1) of the FRCP, and that

13   a copy of this certificate was served on all parties shown

14   herein and filed with the Clerk.

15           Certified to by me on this _22nd_ day of

16   _April_, 2021.

17

18                          Christine M. Sitzes,
                            TX CSR#8756
19                          Expiration: 2/28/22
                            Firm Registration No. 79
20                          Federal Court Reporters of
                            San Antonio
21                          10100 Reunion Place
                            Suite 660
22                          San Antonio, Texas 78216-4119

23

24

25

Federal Court Reporters of San Antonio, Inc.
210-340-6464



2-10-21 1st wit
February 10, 2021

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION DIVISION

PATRICIA SLACK, Individually and as   )
the surviving mother of CHARLES       )
ROUNDTREE, JR., BERNICE ROUNDTREE     )
as the representative of the estate   )
of CHARLES ROUNDTREE, JR. and all     )
Statutory beneficiaries, TAYLOR       )
SINGLETON, and DAVANTE SNOWDEN        )
    Plaintiffs,                      )
                                     )CIVIL ACTION NO.
VS.                                   )5:18-CV-1117-JKP
                                     )
THE CITY OF SAN ANTONIO, TEXAS        )
AND STEVE CASANOVA                    )
    Defendants.                      )

ORAL AND VIDEOTAPED DEPOSITION OF
PATRICIA CASTILLO SLACK
FEBRUARY 10, 2021

    ORAL DEPOSITION OF PATRICIA CASTILLO SLACK, produced

as a witness at the instance of the Defendant, The City

of San Antonio, and duly sworn, was taken in the

above-styled and numbered cause on FEBRUARY 10, 2021,

from 9:05 a.m. to 1:10 p.m., before VANESSA P. POMPA,

CSR in and for the State of Texas, reported by

stenographic method, Via Zoom video conference, San

Antonio, Bexar County, Texas pursuant to the Federal

Rules of Civil Procedure, and the provisions stated on

the record or attached hereto, and pursuant to Texas

Governor's Orders regarding the COVID-19 State of

Disaster, Section 22.0035(b) of the Texas Government

Code.

Exhibit
H

2-10-21 1st wit
February 10, 2021

Page 2

```
 1                       APPEARANCES

 2
     FOR PLAINTIFF:
 3
         Mr. Daryl K. Washington        (Via Zoom)
 4       Washington Law Firm, PC
         345 N. St. Paul Street, Suite 950
 5       Dallas, Texas  75201

 6   FOR DEFENDANT THE CITY OF SAN ANTONIO:

 7       Mr. Logan Lewis               (Via Zoom)
         Office of City of San Antonio
 8       Assistant City Attorney
         Litigation Division
 9       100 W. Houston St., 18th Floor
         San Antonio, Texas  78205
10
     FOR DEFENDANT STEVE CASANOVA:
11
         Mr. Adolfo Ruiz               (Via Zoom)
12       Denton Navarro Rocha Bernal & Zech
         2517 N. Main Avenue
13       San Antonio, Texas  78212

14   ALSO PRESENT:

15       Bernice Roundtree,            (Via Zoom)

16       Alejandra Casas,              (Via Zoom)
         Video Technician;
17
         Patricia Castillo Slack       (Via Zoom)
18       the Witness; and

19       Vanessa P. Pompa, CSR         (Via Zoom)

20

21

22

23

24

25
```

2-10-21 1st wit
February 10, 2021

Page 3

1                        INDEX

2                                           PAGE

4  Appearances                               2

5  PATRICIA CASTILLO SLACK

6      Examination by Mr. Ruiz               4

7      Examination by Mr. Lewis            115

8      Re-Examination by Mr. Ruiz          121

9  Signature and Changes                   123

10 Reporter's Certification                125

11                   EXHIBIT INDEX

12 1   Patricia Slack's Responses          77

13 2   Certificate of Death               105

14 3   Certificate of Birth               106

15                REQUESTED DOCUMENTS

16 NONE

17                CERTIFIED QUESTIONS

18 NONE

19

20

21

22

23

24

25

2-10-21 1st wit
February 10, 2021

Page 50

1   know, he -- he always had us.  He had uncles, he had

2   aunts, he had -- he had all of us, he had grandparents.

3   You know, he didn't have to do anything to -- all he had

4   to do was ask.

5        Q.   And what relation is Bernice Roundtree to

6   Charles?

7        A.   She is his -- she's his aunt/paternal -- well,

8   she's his adopted mother/paternal aunt.

9        Q.   Okay.  And can you -- can you describe that --

10  that relationship, adopted mother or paternal aunt.  Did

11  he -- did Bernice Roundtree adopt Charles?

12       A.   Yes, she did.

13       Q.   Okay.  When did she adopt Charles?

14       A.   When he was young.  I mean, I can't exactly

15  remember the age.

16       Q.   Okay.  So was it -- was it -- was he ten, was

17  he five?

18       A.   He was younger than that.

19       Q.   Was he five -- was he younger than five?

20       A.   I think he was, like, three or four.

21       Q.   Okay.  And did she legally adopt Charles?

22       A.   Yes, she did.

23       Q.   Okay.  And why did she adopt Charles?

24       A.   I was young, I was -- I had issues.  I was

25  younger, you know, she was mature and I trusted her with

2-10-21 1st wit
February 10, 2021

Page 51

1   my children.

2       Q.   So what issues did you have?

3       A.   I mean, some issues that I really don't want to

4   re-live, you know.  I was young, I made mistakes.  I

5   didn't want my kids in the system.

6       Q.   What system are you talking about?

7       A.   I didn't want my kids in CPS.

8       Q.   Was there a time where -- where CPS had to take

9   Charles away from you?

10      A.   I don't recall.

11      Q.   Was there a time where CPS had to take any of

12  your other children away from you?

13      A.   I don't recall.

14          MR. WASHINGTON:  Adolfo, we've been going

15  about an hour-and-a-half now.  Can we take a break?

16          MR. RUIZ:  Absolutely.  How long of a

17  break would you like, Daryl?

18          MR. WASHINGTON:  Five minutes.  How long

19  -- how much longer you think you're gonna be going with

20  Patricia?

21          MR. RUIZ:  Well, I -- probably a while

22  still.  So if you wanna take a break we can take a ten

23  minute break.

24          MR. WASHINGTON:  Okay.

25          (Recess from 10:27 to 10:38)

2-10-21 1st wit
February 10, 2021

Page 56

1    A.    Correct.

2    Q.    So did you claim any of your children as

3 deductions?

4    A.    I'm not understanding you.

5    Q.    As a dependent when -- where you do your --

6    A.    I've claimed my son yes, when he was living

7 with me.  Yes.

8    Q.    Okay.  Before he was adopted, is that correct?

9    A.    No.

10    Q.    So -- So when Charles turned 18 did he live --

11 start living with you?

12    A.    He was living with me at 15.

13    Q.    Fifteen, okay.  But you didn't go through a

14 legal -- from what I understand, correct me if I'm

15 wrong, go through a legal process to regain custody

16 of -- of Charles when he went back to living with you?

17    A.    Are you asking me did I go to court?

18    Q.    Or -- Yes, or a legal process.

19    A.    No.  I mean, I got power of attorney of -- from

20 Bernice.

21    Q.    Okay.  And what was that power of attorney,

22 what did it -- what did it allow you to do?

23    A.    Everything.

24    Q.    Okay.  Which is?

25    A.    Put him in school, medical and whatever, you

2-10-21 1st wit
February 10, 2021

Page 57

1    know, he needed as a child.

2        Q.    Okay.  And that -- okay.  So did the -- that

3    power of attorney did it -- was Bernice Roundtree still

4    the -- the legal parent of Charles?

5        A.    We both were.

6        Q.    Okay.  But that's your understanding, is that

7    correct?

8        A.    That's both of our understanding.

9        Q.    Now, when you said that you were young and you

10   had issues and you weren't financially well off, did you

11   have any drug problem?

12       A.    No.  I've never had a drug problem.  I don't

13   even do drugs.

14       Q.    How about an alcohol problem?

15       A.    No.  I'm not a drinker.

16       Q.    How about -- besides your -- your financial

17   problems that you indicated did you have a -- I guess a

18   -- since you were -- How old were you when you gave

19   Charles up for adoption?

20       A.    About 15, 16.

21       Q.    How old were you when Charles was born?

22       A.    Charles was born when I was 15 in 2000.  I

23   can't remember the exact age when I gave Bernice

24   Charles.

25       Q.    Well, how long did Charles live with Bernice?

2-10-21 1st wit
February 10, 2021

Page 59

1              MR. RUIZ:  Oh, I'm sorry, I did take it
2      off.  I'm sorry. There you go.
3         Q.   (BY MR. RUIZ)  So would it be fair to say that
4      at the time of Charles' death on October 17th of 2018
5      that -- well, let me rephrase that question.  When was
6      -- is Charles' birthday?
7         A.    September 5th, 2000.
8         Q.   So at the time of his death on October 17th,
9      2018 Charles had just turned 18?
10        A.    Yes.
11        Q.   So right before Charles' 18th birthday was --
12     was Bernice Roundtree still Charles' legal guardian?
13        A.    She's always been his legal guardian.  Like I
14     said, we've both been his legal guardians.
15        Q.   And that's your understanding?
16        A.    That's both of our understanding.
17        Q.   And although you have this understanding, what
18     is your legal -- I know you're not a lawyer but what is
19     your understanding that the power of attorney provided
20     to you?
21        A.    We both have rights to him.
22        Q.   So when Charles went to live with you when he
23     was -- went to live with you when he was 15 did he stay
24     for any long periods at Bernice's house?
25        A.    Yeah, that's his mom too.

2-10-21 1ST WIT CERT

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   PATRICIA SLACK, Individually and as  )
     the surviving mother of CHARLES       )
 4   ROUNDTREE, JR., BERNICE ROUNDTREE     )
     as the representative of the estate   )
 5   of CHARLES ROUNDTREE, JR. and all     )
     Statutory beneficiaries, TAYLOR       )
 6   SINGLETON, and DAVANTE SNOWDEN        )
          Plaintiffs,                      )
 7                                         )CIVIL ACTION NO.
     VS.                                   )5:18-CV-1117-JKP
 8                                         )
     THE CITY OF SAN ANTONIO, TEXAS        )
 9   AND STEVE CASANOVA                    )
          Defendants.                      )

10

11

12            CERTIFICATE OF PATRICIA CASTILLO SLACK

13                   FEBRUARY 10, 2021

14

15                    THE ORIGINAL IS

16                    IN THE CUSTODY OF

17

18                    Mr. Adolfo Ruiz
               Denton Navarro Rocha Bernal & Zech
19                   2517 N. Main Avenue
               San Antonio, Texas  78212
20

21

22

23   Taxable Court Costs: $ 867.85

24   Due From:  Denton Navarro Rocha Bernal & Zech

25
```

Federal Court Reporters of S.A.
(210) 340-6464

Page 1

2-10-21 1st wit
February 10, 2021

Page 125

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3  PATRICIA SLACK, Individually and as  )
   the surviving mother of CHARLES      )
4  ROUNDTREE, JR., BERNICE ROUNDTREE    )
   as the representative of the estate  )
5  of CHARLES ROUNDTREE, JR. and all    )
   Statutory beneficiaries, TAYLOR      )
6  SINGLETON, and DAVANTE SNOWDEN       )
        Plaintiffs,                     )
7                                       )CIVIL ACTION NO.
   VS.                                  )5:18-CV-1117-JKP
8                                       )
   THE CITY OF SAN ANTONIO, TEXAS       )
9  AND STEVE CASANOVA                   )
        Defendants.                     )

10

11              REPORTER'S CERTIFICATE

12     ORAL DEPOSITION OF PATRICIA CASTILLO SLACK

13              FEBRUARY 10, 2021

14

15      I, Vanessa P. Pompa, Certified Shorthand Reporter in

16  and for the State of Texas, hereby certify to the

17  following:

18      That the witness, PATRICIA CASTILLO SLACK, was duly

19  sworn and that the transcript of the deposition is a

20  true record of the testimony given by the witness;

21      That the deposition transcript was duly submitted on

22  March 08, 2021   to the witness or to the attorney for

23  the witness for examination, signature, and return to me

24  by  April 07, 2021     .

25      That pursuant to information given to the deposition

2-10-21 1st wit
February 10, 2021

Page 126

1    officer at the time said testimony was taken, the

2    following includes all parties of record and the amount

3    of time used by each party at the time of the

4    deposition:

5         MR. DARYL K. WASHINGTON (0 Hours, 0 Minutes)
               Attorney for Plaintiffs
6
          MR. LOGAN LEWIS (0 Hours, 7 Minutes)
7              Attorney for City of San Antonio

8         MR. ADOLFO RUIZ (2 Hours, 59 Minutes)
               Attorney for Steve Casanova
9         That a copy of this certificate was served on all

10   parties shown herein on ___April 12, 2021___ and filed

11   with the Clerk.

12        I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties in the

14   action in which this proceeding was taken, and further

15   that I am not financially or otherwise interested in the

16   outcome of this action.

17        Further certification requirements pursuant to

18   Rule 30 of FRCP will be complied with after they have

19   occurred.

20        Certified to by me on this __12th__ day of

21   __April_____, __2021__ .

22

23                        /S/ Vanessa P. Pompa
                          Vanessa P. Pompa, CSR
24                        Texas CSR 2670
                          Expiration:  01/31/22
25                        Firm Registration No. 79

2-10-21 1st wit
February 10, 2021

Page 127

1        FURTHER CERTIFICATION UNDER FRCP RULE 30

2        The original deposition was/was not returned to the

3    deposition officer on ___April 07, 2021___.

4        If returned, the attached Changes and Signature

5    page(s) contain(s) any changes and the reasons therefor.

6        If returned, the original deposition was delivered

7    to Mr. Adolfo Ruiz, Custodial Attorney.

8        $_1150.35_ is the deposition officer's charges to the

9    Defendant Steve Casanova for preparing the original

10   deposition and any copies of exhibits;

11       The deposition was delivered in accordance with Rule

12   30, and a copy of this certificate, served on all

13   parties shown herein, was filed with the Clerk.

14       Certified to by me on this __12th__ day of

15   __April_____, _2021_.

16

17

18                        /S/ Vanessa P. Pompa
                          Vanessa P. Pompa, CSR
19                        Texas CSR 2670
                          Expiration:  01/31/22
20                        Firm Registration No. 79

21

22

23

24

25

Federal Court Reporters of San Antonio, Inc.
(210) 340-6464210-340-6464

## STATE OF TEXAS
### CERTIFICATION OF VITAL RECORD

# DEPARTMENT OF STATE HEALTH SERVICES
## VITAL STATISTICS UNIT

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS
OCT 30 2018
**STATE OF TEXAS** — **CERTIFICATE OF DEATH** — **STATE FILE NUMBER** 142-18-163797

| 1. LEGAL NAME OF DECEASED (Include AKA's, if any) (First, Middle, Last) | 2. DATE OF DEATH - ACTUAL OR PRESUMED (mm-dd-yyyy) |
|---|---|
| CHARLES D. ROUNDTREE JR AKA CHARLES D ROUNDTREE | OCTOBER 17, 2018 |

| 3. SEX | 4. DATE OF BIRTH (mm-dd-yyyy) | 5. AGE-Last Birthday (Years) | IF UNDER 1 YR Mo/Days | IF UNDER 1 DAY Hours/Min | 6. BIRTHPLACE (City & State or Foreign Country) |
|---|---|---|---|---|---|
| MALE | SEPTEMBER 5, 2000 | 18 | | | SAN ANTONIO, TX |

| 7. SOCIAL SECURITY NUMBER | 8. MARITAL STATUS AT TIME OF DEATH | 9. SURVIVING SPOUSE'S NAME (if wife, give name prior to first marriage) |
|---|---|---|
| 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 | ☐ Married ☐ Widowed ☐ Divorced ☒ Never Married ☐ Unknown | |

| 10a. RESIDENCE STREET ADDRESS | 10b. APT. NO. | 10c. CITY OR TOWN |
|---|---|---|
| 2017 GUADALUPE ST. | | SAN ANTONIO |

| 10d. COUNTY | 10e. STATE | 10f. ZIP CODE | 10g. INSIDE CITY LIMITS? |
|---|---|---|---|
| BEXAR | TEXAS | 78207 | ☒ Yes ☐ No |

| 11. FATHER'S NAME PRIOR TO FIRST MARRIAGE | 12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE |
|---|---|
| CHARLES ROUNDTREE Sr. | BERNICE T. ROUNDTREE |

| 13. PLACE OF DEATH (CHECK ONLY ONE) |
|---|
| IF DEATH OCCURRED IN A HOSPITAL: ☐ Inpatient ☐ ER/Outpatient ☐ DOA  IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☒ Other (Specify) PRIVATE RESIDENCE |

| 14. COUNTY OF DEATH | 15. CITY/TOWN, ZIP  IF OUTSIDE CITY LIMITS, GIVE PRECINCT NO.) | 16. FACILITY NAME (If not institution, give street address) |
|---|---|---|
| BEXAR | SAN ANTONIO, 78207 | 217 ROBERTS ST. |

| 17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED | 18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code) |
|---|---|
| BERNICE T. ROUNDTREE - MOTHER | 10305 IVY JADE, SCHERTZ, TX 78154 |

| 19. METHOD OF DISPOSITION | 20. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH | 21. ☐ Unknown |
|---|---|---|
| ☒ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Removal from state ☐ Other (Specify) | EUSEBIO BETANCOURT ,BY ELECTRONIC SIGNATURE - 113730 | Section PROMISE  Block ___  Lot 60  Space 8 |

| 22. PLACE OF DISPOSITION (Name of cemetery, crematory, other place) | 23. LOCATION (City/Town, and State) |
|---|---|
| MEADOWLAWN MEMORIAL PARK | SAN ANTONIO, TX |

| 24. NAME OF FUNERAL FACILITY | 25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code) |
|---|---|
| MEADOWLAWN FUNERAL HOME & CREMATORY | 5611 E. HOUSTON, SAN ANTONIO, TX 78220-0606 |

| 26. CERTIFIER (Check only one) |
|---|
| ☐ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated. ☒ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date and place, and due to the cause(s) and manner stated. |

| 27. SIGNATURE OF CERTIFIER | 28. DATE CERTIFIED (mm-dd-yyyy) | 29. LICENSE NUMBER | 30. TIME OF DEATH (Actual or presumed) |
|---|---|---|---|
| WILLIAM D MCCLAIN , BY ELECTRONIC SIGNATURE | OCTOBER 24, 2018 | N9600 | 01:51 AM |

| 31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City,State,Zip Code) | 32. TITLE OF CERTIFIER |
|---|---|
| WILLIAM D MCCLAIN  7337 LOUIS PASTEUR DRIVE, SAN ANTONIO, TX 78229-4565 | MD |

33. PART I. ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH LINE.

Approximate interval Onset to death

IMMEDIATE CAUSE (Final disease or condition resulting in death) —→
a. GUNSHOT WOUND OF THE CHEST
Due to (or as a consequence of):

Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST
b. ____ Due to (or as a consequence of):
c. ____ Due to (or as a consequence of):
d. ____

| PART 2. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH - BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I. | 34. WAS AN AUTOPSY PERFORMED? ☒ Yes ☐ No |
|---|---|
| | 35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☒ Yes ☐ No |

| 36. MANNER OF DEATH | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? | 38. IF FEMALE: | 39. IF TRANSPORTATION INJURY, SPECIFY: |
|---|---|---|---|
| ☐ Natural ☐ Accident ☐ Suicide ☒ Homicide ☐ Pending Investigation ☐ Could not be determined | ☐ Yes ☒ No ☐ Probably ☐ Unknown | ☐ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to one year before death ☐ Unknown if pregnant within the past year | ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify) |

| 40a. DATE OF INJURY (mm-dd-yyyy) | 40b. TIME OF INJURY | 40c. INJURY AT WORK? | 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) |
|---|---|---|---|
| OCTOBER 17, 2018 | 01:06 AM | ☐ Yes ☒ No | PRIVATE RESIDENCE |

| 40e. LOCATION (Street and Number, City,State,Zip Code) | 40f. COUNTY OF INJURY |
|---|---|
| 217 ROBERTS ST, SAN ANTONIO, TX 78207 | BEXAR |

| 41. DESCRIBE HOW INJURY OCCURRED |
|---|
| SHOT |

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. REGISTRAR | |
|---|---|---|---|
| 0213120 | OCTOBER 31, 2018 | REGISTRAR - SAN ANTONIO CITY CLERK, ELECTRONICALLY FILED | BRO |

EDR NUMBER  000002305500



This is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Section 191.051, Health and Safety Code.

**ISSUED**   NOV 01 2018

TARA DAS
STATE REGISTRAR

WARNING: THIS DOCUMENT HAS A DARK BLUE BORDER AND A COLORED BACKGROUND

CR000004

**EXHIBIT**
2 Slack
2-10-21  2p


QA135364336

# STATE OF TEXAS
## CERTIFICATION OF VITAL RECORD

## DEPARTMENT OF STATE HEALTH SERVICES
## VITAL STATISTICS UNIT

**STATE OF TEXAS**     **CERTIFICATE OF BIRTH**     BIRTH NUMBER 142-00-264358

| 1 Child's Name | First | Middle | | Last | Suffix | 2 Date of Birth (mm/dd/yyyy) | 3. Sex |
|---|---|---|---|---|---|---|---|
| CHARLES | | D | | ROUNDTREE | JR | 09/05/2000 | MALE |

| 4a Place of Birth - County | 4b. City or Town (if outside city limits, give precinct no ) | 5 Time of Birth | 6a Plurality - Single, Twin, Triplet, etc | 6b If Plural Birth, Born 1st, 2nd,3rd, etc. |
|---|---|---|---|---|
| BEXAR | SAN ANTONIO | 10.03 AM | SINGLE | |

| 7a Place of birth ☐ Clinic / Doctor's Office ☐ Licensed Birthing Center ☒ Hospital<br>☐ Home Birth<br>☐ Other (Specify): | 7b. Name of Hospital or Birthing Center    (If Not Institution, Give Street Address)<br><br>CHRISTUS SANTA ROSA HOSPITAL |
|---|---|

| 8 Informant's Name and Mailing Address<br><br>BERNICE ROUNDTREE<br><br>623 BLAINE SAN ANTONIO, TEXAS 78202 | 9 Certifier - I certify that this child was born alive on the date as stated above<br><br>*Geraldine R. Harris*<br>Signature of State Registrar |
|---|---|

| 10 Mother's Name Prior to First Marriage | First | Middle | Last | 11 Date of Birth (mm/dd/yyyy) | 12 Birthplace (State, Territory or Foreign Country) |
|---|---|---|---|---|---|
| BERNICE | | | ROUNDTREE | 12/26/1979 | TEXAS |

| 13a. Residence - State | 13b. County | 13c. City, Town or Location | 13d Street Address or Rural Location |
|---|---|---|---|
| TEXAS | BEXAR | SAN ANTONIO | 623 BLAINE |

| 13e Zip Code | 13f Inside City Limits | 14. Mailing Address: | ☒ Same As Residence, or: |
|---|---|---|---|
| 78202 | ☒ Yes  ☐ No | | |

| 15 Father's Name | First | Middle | Last | Suffix | 16 Date of Birth (mm/dd/yyyy) | 17. Birthplace (State, Territory or Foreign Country) |
|---|---|---|---|---|---|---|
| | | | | | | |

| 18a. Registrar's File Number | 18b. File Date | 18c. Name of State Registrar |
|---|---|---|
| 0218162 | 11/7/2000 | GERALDINE R. HARRIS |

VS-161 Rev. 01/05 Texas Department of State Health Services - Vital Statistics

K441382

EXHIBIT
3 Slack
2-10-21

This is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Section 191.051, Health and Safety Code.

ISSUED JUL 1 5 2005

*Geraldine R. Harris*
GERALDINE R. HARRIS
STATE REGISTRAR



CR000006

STATE OF TEXAS
COUNTY OF BEXAR

That MEADOWLAWN MEMORIAL PARK, INC., a private corporation
duly incorporated under the laws of the State of Texas, for and in consideration of the sum of
**Two Thousand Nine Hundred Ninety and 00/100 Dollars**
($2,990.00) to it paid by Grantee herein named, has granted, sold
and conveyed and by these presents do grant, sell and convey unto
**Bernice Roundtree**
and their heirs and assigns forever, subject to conditions, limitations, provisions
and restrictions hereinafter provided, the following described lot or parcel
of land, to-wit:

**Garden of Promise, Lot 60, Space 9**
**Deceased: Charles D. Roundtree**
of Meadowlawn Memorial Park, Inc., in Bexar County, Texas

TO HAVE AND TO HOLD the above described premises unto the said
Bernice Roundtree and their heirs
and assigns forever, for burial purposes only. This deed is made subject
to all of the laws of the State of Texas applicable to cemeteries, and subject
to conditions, limitations, restrictions and provisions specified in
the rules, regulations and by laws, of Meadowlawn Memorial Park.
Cemetery may amend, add to, revise, change or modify such rules and
regulations as it may deem fit.

This Cemetery is operated as a Perpetual Care Cemetery, which
means that a Perpetual Care Fund for its maintenance has been established
in conformity with the laws of the State of Texas. Perpetual Care
means to maintain, repair, and care for the Cemetery, including the roads on cemetery property.
Section 712.007 of Texas Health and Safety Code.

The above described lot or parcel shall be entitled to receive care
and maintenance out of the income of the perpetual care and maintenance
fund as provided by Trust Agreement dated July 19, 1963, between
Meadowlawn Memorial Park, Inc. and Live Oak Banking Company,
Wilmington, North Carolina.

IN TESTIMONY WHEREOF, the said Meadowlawn Memorial Park, Inc.
has caused these presents to be duly executed by its President and
countersigned by its Secretary, thereunto duly authorized and empowered,
and its seal hereunto affixed, this day.
October 28, 2018
MEADOWLAWN MEMORIAL PARK, INC.

ATTEST:

_____
Secretary

By _____
President

CR000005

February 10, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| PATRICIA SLACK, Individually and as the surviving mother of CHARLES ROUNDTREE, JR., BERNICE ROUNDTREE as the representative of the estate of CHARLES ROUNDTREE, JR. and all Statutory beneficiaries, TAYLOR SINGLETON, and DAVANTE SNOWDEN<br>　　　Plaintiffs,<br><br>VS.<br><br>THE CITY OF SAN ANTONIO, TEXAS AND STEVE CASANOVA<br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)CIVIL ACTION NO.<br>)5:18-CV-1117-JKP<br>)<br>)<br>)<br>)<br>) |

ORAL AND VIDEOTAPED DEPOSITION OF
BERNICE ROUNDTREE
FEBRUARY 10, 2021

　　　ORAL DEPOSITION OF BERNICE ROUNDTREE, produced as a witness at the instance of the Defendant, The City of San Antonio, and duly sworn, was taken in the above-styled and numbered cause on FEBRUARY 10, 2021, from 1:15 p.m. to 3:36 p.m., before VANESSA P. POMPA, CSR in and for the State of Texas, reported by stenographic method, Via Zoom video conference, San Antonio, Bexar County, Texas pursuant to the Federal Rules of Civil Procedure, and the provisions stated on the record or attached hereto, and pursuant to Texas Governor's Orders regarding the COVID-19 State of Disaster, Section 22.0035(b) of the Texas Government Code.

Federal Court Reporters of San Antonio, Inc.
(210) 340-6464210-340-6464

**Exhibit I**

February 10, 2021

Page 2

```
 1                      APPEARANCES

 2

    FOR PLAINTIFF:
 3
            Mr. Daryl K. Washington        (Via Zoom)
 4          Washington Law Firm, PC
            345 N. St. Paul Street, Suite 950
 5          Dallas, Texas  75201

 6  FOR DEFENDANT THE CITY OF SAN ANTONIO:

 7          Mr. Logan Lewis                (Via Zoom)
            Office of City of San Antonio
 8          Assistant City Attorney
            Litigation Division
 9          100 W. Houston St., 18th Floor
            San Antonio, Texas  78205
10
    FOR DEFENDANT STEVE CASANOVA:
11
            Mr. Adolfo Ruiz                (Via Zoom)
12          Denton Navarro Rocha Bernal & Zech
            2517 N. Main Avenue
13          San Antonio, Texas  78212

14  ALSO PRESENT:

15          Alejandra Casas,               (Via Zoom)
            Video Technician;
16
            Bernice Roundtree              (Via Zoom)
17          the Witness; and

18          Vanessa P. Pompa, CSR          (Via Zoom)

19

20

21

22

23

24

25
```

February 10, 2021

Page 3

1                         INDEX

2                                         PAGE

4   Appearances                           2

5   BERNICE ROUNDTREE

6        Examination by Mr. Ruiz           4

7        Examination by Mr. Washington    65

8        Re-Examination by Ruiz           67

9        Re-Examination by Mr. Washington 68

10       Re-Examination by Mr. Ruiz       68

11  Signature and Changes                 71

12  Reporter's Certification              73

13                    EXHIBIT INDEX

14  1  Bernice Roundtree's Interrogatory answers 10

15                REQUESTED DOCUMENTS

16  NONE

17                CERTIFIED QUESTIONS

18  NONE

19

20

21

22

23

24

25

February 10, 2021

Page 30

1  was living with his mother.  He was living with

2  Patricia.

3      Q.   Okay.  And so what was the -- the reason why

4  Charles went to go live with Patricia when he was -- he

5  turned 15?

6      A.   He just wanted to be with his -- his mother.

7      Q.   Okay.

8      A.   And so many -- it was a lot of us.  He just

9  wanted to be with his mother.

10     Q.   And -- and so he stopped living with you and

11  started living with Patricia Slack?

12     A.   Yes.

13     Q.   Now, Patricia said she has a power of attorney.

14  Can you elaborate on that, what -- what she was talking

15  about.

16     A.   Yes.  I gave her the power of attorney to be

17  able to put him in school and if he needed to go to

18  doctors' appointments and whatnot she was able to do

19  that with the power of attorney.

20     Q.   Okay.  Well, with that power of attorney it

21  didn't give up any of your parental rights, did it?

22           MR. WASHINGTON:  Objection, form.

23     Q.   (BY MR. RUIZ)  Let me ask this another way.

24  Did that power of attorney -- did the power of attorney

25  give up any of your parental rights?

February 10, 2021

Page 31

1           MR. WASHINGTON:   Objection, form.

2       A.   No.

3       Q.   Now, when Charles was growing up did -- was

4   there a particular person who was, I guess, a father

5   figure to him?

6       A.   His older brothers.

7       Q.   And who are -- what are their names?

8       A.   Alvin and Rayshon.

9       Q.   And where does Alvin live right now today, is

10  Alvin in San Antonio?

11      A.   He's in Dominguez State Jail.

12      Q.   Okay.  And -- Now, what is he in Dominguez

13  State Jail for?

14      A.   I'm not sure.

15      Q.   So that's the same jail that Charles is in,

16  Roundtree, Senior?

17      A.   Yes.

18      Q.   Okay.  So you -- you don't recall the criminal

19  charge or the conviction why he is in -- why Alvin is in

20  Dominguez State Jail?

21      A.   No.

22      Q.   How about Rayshon, where is he currently?

23      A.   He just moved into an apartment with a

24  roommate.  I'm not sure that -- exactly where but it's

25  here in San Antonio.

February 10, 2021

Page 51

1   be a fair statement?

2        A.   Yes.

3        Q.   Have you ever known of Charles owning a gun?

4        A.   No.

5        Q.   Or -- having possession -- or having a gun?

6        A.   No.

7        Q.   The power of attorney that you entered into

8   with Patricia Slack, do you have a copy of that power of

9   attorney?

10       A.   I don't recall.  I'm not sure.

11       Q.   Okay.  I guess does -- does -- do you think

12   Patricia has a copy of that power of attorney?

13       A.   I can't say.

14       Q.   Okay.  Did you have a lawyer draw that up for

15   you?

16       A.   I'm sorry?

17       Q.   Did you have a lawyer prepare the power of

18   attorney for you?

19       A.   No, I did not.  I got it from the library and

20   just had it -- we got it notarized.

21       Q.   Okay.  What library did you get it from?

22       A.   It was one of the San Antonio libraries.  I

23   can't remember which branch.

24       Q.   Okay.  And so it was -- was there a term limi

25   -- was there a -- I guess a term period where the power

February 10, 2021

Page 52

1  of attorney is going to be valid or a time limitation?

2      A.   I don't -- I don't recall.  I can't -- I can't

3  recall.

4      Q.   Okay.  And in that power of attorney was there

5  a power to revoke that power of attorney at any time by

6  you, do you recall that type of clause in the power of

7  attorney?

8      A.   I'm not positive if it -- if that was included.

9  I can't say.

10      Q.   Okay.  When -- When Charles went back to his

11  mother was there any benefits that you were receiving

12  for Charles that kind of transferred over to Patricia

13  Slack?

14      A.   No.

15      Q.   But did Charles still have his Medicaid

16  insurance?

17      A.   Yes.  Yes.

18      Q.   When Charles went to go live with -- with

19  Patricia Slack was it a, I guess, a mutual agreement,

20  everybody agreed that -- Well, let me ask -- let me --

21  let me rephrase.  Was it Charles' decision to go live

22  with Patricia Slack?

23      A.   Yes.

24      Q.   And is there any particular reason why he

25  wanted to live with Patricia Slack or to move from your

February 10, 2021

Page 53

 1    house?

 2         A.    Not that I can recall.

 3         Q.    And you were okay with that agreement, with

 4    that arrangement?

 5         A.    Yes.

 6         Q.    Tell me the loss that you feel because of the

 7    death of Charles.

 8         A.    The loss I feel -- I feel empty.  I mean, he --

 9    he took away any -- my joy.  He took away a big brother,

10    a mentor.  He took away my spirit.

11         Q.    And have you -- Have you sought any treatment

12    for, I guess, for grieving?  Any counseling or -- or

13    therapy since the death of Charles?

14         A.    I received counseling from Dr. Uche.

15         Q.    So how many times have you seen Dr. Uche?

16         A.    Several times.  I was seeing him frequently.

17    In the beginning it was like every week.  Then it went

18    to every other week up until Covid.

19         Q.    Okay.  And would your insurance cover Dr.

20    Uche's visits?

21         A.    Yes -- Wait.  No -- yes and no.  I have

22    insurance but --

23         Q.    Okay.  Did you see -- there's another doctor,

24    Dr. Dartson, a psychologist out of Dallas.  Did you

25    have -- ever been seen by her?

February 10, 2021

Page 54

1      A.    No.

2      Q.    Besides Uche any other doctors that you've seen

3   because of the incident -- the shooting incident with

4   Charles?

5      A.    No.

6      Q.    So what has Dr. Uche done for you, what -- what

7   is his -- did he diagnose you or --

8      A.    Well, he -- he didn't diagnose me.  I just

9   mainly went for counseling.  I talked to him.  He

10  started me on a treatment where -- helping me to be able

11  to talk to and deal with the situation without breaking

12  down or, you know, falling apart.  He just talked, we

13  did different exercises, you know, as far as, you know,

14  what -- what I need to do to deal with some of my

15  depression and anxiety.  So pretty much that's what I --

16  he helped me with.

17     Q.    Is he -- is he a psychiatrist or a

18  psychologist, do you know?

19     A.    I just know he's -- it says he's a counselor.

20     Q.    Okay.  Has he -- has he prescribed any

21  medication to you?

22     A.    No, sir.

23     Q.    Okay.  Did he recommend that you go to a

24  psychiatrist or recommend that certain medication may

25  help you?

2-10-21 2nd wit cert

1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3    PATRICIA SLACK, Individually and as  )
      the surviving mother of CHARLES      )
 4    ROUNDTREE, JR., BERNICE ROUNDTREE    )
      as the representative of the estate  )
 5    of CHARLES ROUNDTREE, JR. and all    )
      Statutory beneficiaries, TAYLOR      )
 6    SINGLETON, and DAVANTE SNOWDEN       )
           Plaintiffs,                     )
 7                                         )CIVIL ACTION NO.
      VS.                                  )5:18-CV-1117-JKP
 8                                         )
      THE CITY OF SAN ANTONIO, TEXAS       )
 9    AND STEVE CASANOVA                   )
           Defendants.                     )
10

11

12              CERTIFICATE OF BERNICE ROUNDTREE

13                    FEBRUARY 10, 2021

14

15                    THE ORIGINAL IS

16                   IN THE CUSTODY OF

17

18                    Mr. Adolfo Ruiz
             Denton Navarro Rocha Bernal & Zech
19                 2517 N. Main Avenue
                 San Antonio, Texas  78212
20

21

22

23    Taxable Court Costs: $522.50

24    Due From:  Denton Navarro Rocha Bernal & Zech

25
```

Federal Court Reporters of S.A.
(210) 340-6464

Page 73

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3  PATRICIA SLACK, Individually and as    )
   the surviving mother of CHARLES        )
4  ROUNDTREE, JR., BERNICE ROUNDTREE      )
   as the representative of the estate    )
5  of CHARLES ROUNDTREE, JR. and all      )
   Statutory beneficiaries, TAYLOR        )
6  SINGLETON, and DAVANTE SNOWDEN         )
        Plaintiffs,                       )
7                                         )CIVIL ACTION NO.
   VS.                                    )5:18-CV-1117-JKP
8                                         )
   THE CITY OF SAN ANTONIO, TEXAS         )
9  AND STEVE CASANOVA                     )
        Defendants.                       )

10

11                REPORTER'S CERTIFICATE

12          ORAL DEPOSITION OF BERNICE ROUNDTREE

13                 FEBRUARY 10, 2021

14

15      I, Vanessa P. Pompa, Certified Shorthand Reporter in

16  and for the State of Texas, hereby certify to the

17  following:

18      That the witness, BERNICE ROUNDTREE, was duly sworn

19  and that the transcript of the deposition is a true

20  record of the testimony given by the witness;

21      That the deposition transcript was duly submitted on

22  March 08, 2021 to the witness or to the attorney for

23  the witness for examination, signature, and return to me

24  by April 07, 2021        .

25      That pursuant to information given to the deposition
```

February 10, 2021

Page 74

1   officer at the time said testimony was taken, the

2   following includes all parties of record and the amount

3   of time used by each party at the time of the

4   deposition:

5       MR. DARYL K. WASHINGTON (0 Hours, 2 Minutes)
            Attorney for Plaintiffs

6

7       MR. LOGAN LEWIS (0 Hours, 0 Minutes)
            Attorney for City of San Antonio

8       MR. ADOLFO RUIZ (2 Hours, 14 Minutes)
            Attorney for Steve Casanova

9       That a copy of this certificate was served on all

10  parties shown herein on _____ April 12, 2021 _____ and filed

11  with the Clerk.

12      I further certify that I am neither counsel for,

13  related to, nor employed by any of the parties in the

14  action in which this proceeding was taken, and further

15  that I am not financially or otherwise interested in the

16  outcome of this action.

17      Further certification requirements pursuant to

18  Rule 30 of FRCP will be complied with after they have

19  occurred.

20      Certified to by me on this __12__ day of

21  _____ April _____ , 2021 .

22

23                          /S/ Vanessa P. Pompa
                            Vanessa P. Pompa, CSR

24                          Texas CSR 2670
                            Expiration:  01/31/22

25                          Firm Registration No. 79

Page 75

1                FURTHER CERTIFICATION UNDER FRCP RULE 30

2          The original deposition was/was not returned to the

3     deposition officer on _Apau 07 2021_ .

4          If returned, the attached Changes and Signature

5     page(s) contain(s) any changes and the reasons therefor.

6          If returned, the original deposition was delivered

7     to Mr. Adolfo Ruiz, Custodial Attorney.

8          $ _267.60_ is the deposition officer's charges to the

9     Defendant Steve Casanova for preparing the original

10    deposition and any copies of exhibits;

11         The deposition was delivered in accordance with Rule

12    30, and a copy of this certificate, served on all

13    parties shown herein, was filed with the Clerk.

14         Certified to by me on this _17th_ day of

15    _Apau_ , _2021_ .

16

17

18                        /S/ Vanessa P. Pompa
                          Vanessa P. Pompa, CSR
19                        Texas CSR 2670
                          Expiration:  01/31/22
20                        Firm Registration No. 79

21

22

23

24

25

NO.  2005-PA-00719

| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| CHARLES D. ROUNDTREE JR., ET AL | § | 166TH  JUDICIAL DISTRICT |
| | § | |
| CHILDREN | § | BEXAR COUNTY, TEXAS |

## ORDER GRANTING ADOPTION

1. **Date of Hearing**

   On ____APR 1 4 2005____ the Court heard this case.

2. **Appearances**

   Petitioner, BERNICE ROUNDTREE, appeared in person and through attorney of record, Arabia Vargas, and announced ready for trial.

   Other party appearing was TEXAS DEPARTMENT PROTECTIVE & REGULATORY SERVICES.

   Also appearing was IRENE CADENA, appointed by the Court as guardian ad litem of the children the subject of this suit.

3. **Jurisdiction**

   The Court, after examining the record and hearing the evidence and argument of counsel, finds that it has jurisdiction of this case and of all the parties and that no other court has continuing, exclusive jurisdiction of this case. All questions of fact and of law were submitted to the Court. All persons entitled to citation were properly cited.

4. **Record**

   The making of a record of testimony was waived by the parties with the consent of the Court.

5. **Children**

   The Court finds that the children sought to be adopted in this suit and now residing with Petitioners are:

   Name:           **CHARLES D. ROUNDTREE JR.**
   Sex:            Male
   Birth date:     September 5, 2000
   Birth place:    San Antonio, Texas
   Social Security #:  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



Exhibit
J

CR000104

| | |
|---|---|
| Name: | **INFANT ROUNDTREE AKA CARMELITA MARIAH ROUNDTREE** |
| Sex: | Female |
| Birth date: | June 21, 2001 |
| Birth place: | San Antonio, Texas |
| Social Security #: | 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 |

| | |
|---|---|
| Name: | **ALIYHA MARIE CASTILLO** |
| Sex: | Female |
| Birth date: | May 24, 2003 |
| Birth place: | San Antonio, Texas |
| Social Security #: | 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 |

**6.     Eligibility for Adoption**

The Court finds that the children have no living parents, and no living alleged or probable father whose parental rights have not been terminated by final judicial order.

**7.     Residence with Petitioners**

The Court finds that the children have lived in the home of Petitioners for at least six months.

**8.     Home Screening Post-Placement Report**

The Court finds that the required preadoptive home screening and post-placement report have been made and are on file.

**9.     Health, Social, Educational, and Genetic History Report**

The Court finds that the preparation and filing of the health, social, educational, and genetic history report concerning the children is not required by section 162.005 of the Texas Family Code.

**10.    Criminal History Record Information**

The Court finds that the criminal history record information required for BERNICE ROUNDTREE is on file in the record of this case.

**11.    Interstate Compact**

The Court finds that Petitioners have filed a verified allegation or statement regarding compliance with the Interstate Compact on the Placement of Children as required by section 162.002 of the Texas Family Code.

**12.    Consent**

The Court finds that the managing conservator has consented to this adoption by written

CR000105

consent on file in this case.

13.   **Adoption Granted**

The Court finds that all prerequisites and requirements for adoption have been met and that the adoption is in the best interests of the children. IT IS ORDERED that the adoption of the children the subject of this suit by Petitioners is GRANTED and that the parent-child relationship is created between the children and Petitioners for all purposes.

IT IS FURTHER ORDERED that the name of **CHARLES D. ROUNDTREE JR.**, the child the subject of this suit, a male who was born on September 5, 2000, shall remain **CHARLES D. ROUNDTREE JR.**

IT IS FURTHER ORDERED that the name of **INFANT ROUNDTREE AKA CARMELITA MARIAH ROUNDTREE,** the child the subject of this suit, a female who was born on June 21, 2001, shall changed to **CARMELITA MARIAH ROUNDTREE.**

IT IS FURTHER ORDERED that the name of **ALIYAHA MARIE CASTILLO,** the child the subject of this suit, a female who was born on May 24, 2003, shall remain **ALIYAH MARIE CASTILLO.**

14.   **Citizenship**

The Court finds that the children adopted are citizens by birth of the United States of America.

15.   **Transmitting Report; Sealing Files**

IT IS FURTHER ORDERED that the clerk of this Court shall, after entry of final orders in this case, transmit to the Bureau of Vital Statistics at Austin, Texas, a certified report of adoption in accordance with section 108.003 of the Texas Family Code. All papers and records in this case, including the minutes of the Court, are ordered sealed.

16.   **Relief Not Granted**

IT IS ORDERED that all relief requested in this case and not expressly granted is denied.

04/12/2005  10:16    210-735-2417              LAW OFFICE                    PAGE  02

17.    **Date of Order**       APR 1 4 2005

       SIGNED on _____

_____

JUDGE PRESIDING      PETER SAKAI
                     **ASSOCIATE JUDGE**

APPROVED AND CONSENTED TO AS TO BOTH FORM AND SUBSTANCE

_____
BERNICE ROUNDTREE, Petitioner

APPROVED AS TO FORM ONLY.


Law Offices of Arabia Vargas & Lori Bindseil
214 Dwyer, Suite 206
San Antonio, Texas 78204
Tel:(210) 222-9954
Fax: (210) 222-9956


By: _____
    Arabia Vargas
    State Bar No. 00789767
    Attorney for Petitioners

_____
Irene Cadena, Guardian Ad Litem

CR000107

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## POWER OF ATTORNEY:
## CARE AND CUSTODY OF CHILD OR CHILDREN

KNOW ALL MEN BY THESE PRESENTS: That the undersigned, Bernice Roundtree, parent(s) of the child(ren) identified below, residing at 10715 Archer Point, hereby make, constitute and appoint Patricia Castillo *(if more than one attorney-in-fact is appointed, add 'Jointly," "either of them" or "any one of them" to indicate how they must act)* as the true and lawful Attorney(s)-in-Fact of the undersigned, to act in name, place and stead of the undersigned, to do and execute all or any of the following acts, deeds and things with respect to the care and custody of the following child(ren):

Charles Roundtree

Aliyah Castillo

_____

_____

(a) To participate in decisions regarding the child(ren)'s education including attending conferences with the child(ren)'s teachers or any other educational authorities, granting permission for the child(ren)'s participation in school trips and other activities, and making any other decisions and executing any documents pertinent to their education.

(b) To grant permission and consent to the child(ren) participating in any activity sponsored by any group, association or organization which activity the Attorney(s)-in-Fact may deem appropriate.

(c) To make health care decisions on behalf of the child(ren), including making decisions regarding the child(ren)'s medical or dental care, whether routine or emergency in nature,

- 1 -

CR000108

e. EXCLUDED SPECIFICALLY FROM THE AUTHORITY AND POWERS GRANTED TO THE ATTORNEY-IN-FACT:

- Power or authority to consent to the marriage or adoption of the chid(ren).

_____

_____

_____

4. The powers granted to the attorney-in-fact shall be in effect until February 27 , 20 19 (not to exceed six months) or until such time as the undersigned revokes this document and the powers of the attorney-in-fact in writing.

_____

Dated this 27 day of August , 20 18 .

_____ (sign here)

Bernice Roundtree (type or print name)

12142 Harris Hawk (address)

San Antonio, TX 78253 (city, state, zip code)

(210) 393-9224 (telephone number)

Signed and sworn to before me this 27 day of August , 20 18
In San Antonio (city), Bexar (county) Texas (state).

_____

Notary Public

H. C. CAVAZOS
Notary Public
State of Texas
My Comm. Exp. 06-17-2019

CR000109

unless such particular party shall have received prior notice in writing of the revocation of this Power of Attorney.

Signed this _21_ day of _February_ , 20 _17_ .

_R_
Signature
_San Antonio, TX_ _Bexar_
City, County, and State of Residence

_Patricia Castillo_
Signature
_209 Clutter  San Antonio TX_ _78214_
City, County, and State of Residence

STATE OF TEXAS
COUNTY OF _Bexar_

This document was acknowledged before me on _February 21, 2017_ (date) by

_Bernice Roundtree_ _____ (name of principal(s))

_Atkinson_
(signature of notarial officer)

_Anita Atkinson_
(printed name)

ANITA ATKINSON
My Commission Expires
May 28, 2017

My commission expires:
_May 28, 2017_

THE ATTORNEY IN FACT OR AGENT, BY ACCEPTING OR ACTING UNDER THE APPOINTMENT, ASSUMES THE FIDUCIARY AND OTHER LEGAL RESPONSIBILITIES OF AN AGENT.

- 4 -

CR000110

# POWER OF ATTORNEY DELEGATING PARENTAL POWERS

Principal, the parent or guardian of the children listed below, hereby appoints the below-named Agent/Attorney-in-Fact to act in name and place of Principal parent, or guardian to have parental authority and to perform general responsibilities of a parent and execute any of the below-listed specific acts. EXCEPT for authorizing the marriage or adoption of the minor children.

1. **INFORMATION NEEDED:**
   - Current full legal name of the parent or guardian who is giving the temporary authority over the child(ren)?

   Bernice T. Roundtree

   - The full legal name of each child          – and –          Date of birth for each child

   1. Charles D. Roundtree          9-5-2000
   2.
   3.
   4.
   5.

   - The full legal name of the person who agrees to and accepts the delegation of Parental Authority. (This is the same as the Attorney-in-Fact mentioned above)

   Arlene Frances Castelle Patricia Slack

   - The full physical address of the person who agrees to and accepts the delegation of Parental Authority:          206 Clutter

2. **RESPONSIBILITIES DELEGATED:** Check ONE if you, as a parent or guardian agree to give the following powers to the Attorney-in-Fact:

   ☑ I delegate all parental responsibilities I might perform myself
   ☐ I delegate only the specific parental responsibilities named as follows:

   _____
   _____

3. **DURATION:** This delegation of Parental Powers lasts up to six (6) months unless I, as Principal, Parent or Guardian, revoke it earlier, or unless I am a member of the military on active duty. Check only one:

   ☑ This Parental Power of Attorney begins on  Nov. 25, 2015  and expires not more than six (6) months later on  May 25, 2015 , unless I revoke it earlier or unless I am a member of the military on active duty.

   ☐ I am an active duty Military Member who is a parent or guardian of a minor child or ward. I delegate Parental Powers to my Attorney-in-Fact for a period not to exceed one year beginning on _____, and expiring not more than twelve (12) months later on _____, unless I revoke it earlier.

CR000111

4. **MANNER OF REVOCATION:** The Principal may revoke this document in writing at any time before the expiration date, if the specific tasks have been accomplished by the Attorney-in-Fact, for no reason, for cause, or if the Attorney-in-Fact exceeds or violates the scope and authority granted by this document.

5. **COMPENSATION** of Attorney-in-Fact: None.

6. **SIGNATURES:**

**For Principal:**

I, _Bernice Roundtree_ , the principal, sign my name to this power of attorney this _25_ day of _November_ and, being first duly sworn, do declare to the undersigned authority that I sign and execute this instrument as my power of attorney and that I sign it willingly, or willingly direct another to sign for me, that I execute it as my free and voluntary act for the purposes expressed in the power of attorney that I am eighteen years of age or older, of sound mind, and under no constraint or undue influence.

_____
Principal Signature

**For Witness:**

I, _arlene Castill Patricia Slack_ the witness, sign my name to the foregoing power of attorney being first duly sworn, and do declare to the undersigned authority the principal signs and executes this instrument as the principal's power of attorney and that the principal signs it willingly, or willingly directs another to sign for the principal, and that I, in the presence and hearing of the principal sign this power of attorney as witness to the principal's signing, and to the best of my knowledge the principal is eighteen years of age or older, of sound mind, and under no constraint or undue influence.

_arlene Castill Patricia Slack_
Witness Signature

**7. NOTARIZATION:**

**For Notary:**

The State of _Texas_

County of _Bexar_

Subscribed, sworn to and acknowledged before me by _TX ID_ , the principal, and subscribed and sworn _____ witness, this _25_ day of _November_ _2015_ .

(Seal)

VALERIE HERNANDEZ
Notary Public
State of Texas
My Comm. Exp. 01-23-2019

(Signed) _Valerie Hernandez_

_Valerie Hernandez_
(Notary Public)

CR000112

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **PATRICIA SLACK, Individually and as the** § | |
| **surviving mother of CHARLES** § | |
| **ROUNDTREE, JR., BERNICE** § | |
| **ROUNDTREE as the representative of the** § | |
| **estate of CHARLES ROUNDTREE, JR. and** § | |
| **all Statutory Beneficiaries, TAYLOR** § | |
| **SINGLETON, and DAVANTE SNOWDEN** § | |
| *Plaintiffs,* § | |
| § | **CIVIL ACTION NO.** |
| **VS.** § | **5:18-CV-1117-JKP-ESC** |
| § | |
| **THE CITY OF SAN ANTONIO, TEXAS** § | |
| **AND STEVE CASANOVA** § | |
| *Defendants.* § | |

**ORDER ON DEFENDANT CASANOVA'S**
**MOTION FOR SUMMARY JUDGMENT**

On this day the Court considered Defendant Steve Casanova's Motion for Summary Judgment.  The Court, having considered the pleadings, finds that Defendant Casanova is entitled to qualified immunity from all claims asserted by Plaintiffs and Defendant's Motion should therefore be granted.

IT IS THEREFORE ORDERED that Defendant Casanova's Motion for Summary Judgment is GRANTED.  All of Plaintiffs' claims against Defendant Casanova are dismissed with prejudice.

SIGNED on this ___ day of _____, 2021.

_____
ELIZABETH S. CHESTNEY
UNITED STATES MAGISTRATE JUDGE