UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**BERNICE ROUNDTREE, Individually**
**and on behalf of the Estate of CHARLES**
**ROUNDTREE, JR. and the Statutory**
**Beneficiaries, TAYLOR SINGLETON**
**and DAVANTE SNOWDEN,**

      **Plaintiffs,**

**v.**                                                                 **No. SA-18-CV-01117-JKP-ESC**

**CITY OF SAN ANTONIO, TEXAS;**
**STEVE CASANOVA,**

      **Defendants.**

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is *Defendant Steve Casanova's Motion for Summary Judgment* (ECF No. 143). The motion is fully briefed and ripe for ruling. The Court heard the arguments of the parties at a hearing convened March 24, 2022. For the reasons set forth below, the Court denies the motion.

**I. BACKGROUND**

This case arises out of the death of Charles Roundtree, Jr. (Roundtree) and the injuries sustained by Taylor Singleton (Singleton) and Devante Snowden (Snowden) when San Antonio Police Officer Steve Casanova (Casanova) fired his service weapon into the living room of 217 Roberts Street. *See* ECF No. 173. Plaintiffs bring this action against Casanova for violations of their civil rights pursuant to 42 U.S.C. § 1983, seeking wrongful death and survival damages as to Roundtree and damages for the injuries sustained by Singleton and Snowden.

While on patrol in the early hours of October 17, 2018, Casanova received a report that an individual had been assaulted outside of 218 Roberts and the alleged assailant had fled into a house across the street. Casanova Axon 02:30-02:40. The complainant described the assailant as a Black male wearing a grey sweater and blue jeans, between twenty and twenty-five years old, skinny, tall, and "he didn't have any [hair]." *Id.* 00:50-03:10.[1] Casanova decided to go to 217 Roberts to see if he could locate the alleged assailant. He knew the house, and its owner, Hence Williams, because he had been watching it and suspected it was "a dope house." *Id.* 05:20-05:35.

Casanova and his patrol partner, Officer James Panah ("Panah"), waited for fellow Officers "Garza, Frank, Brian, and Jason" to join them before proceeding to the house. *Id.* 08:57-09:00, 14:22-15:15. When they arrived at 217 Roberts, it was dark outside and Casanova lit the way with his flashlight. *Id.* 15:28. Casanova and Panah walked up to the front of the house where Casanova briefly spoke to John Cotton, who was sitting on the porch. *Id.* 15:31-15:55; Panah Axon[2] 14:46-15:29. Casanova stepped onto the porch and approached the two front doors of the house—the door on the left was a screen door over a solid door with a curved window at the top; the door on the right was a slatted metal or wrought iron door over a wood door with no window—Casanova first pulled on the screen door on the left side, then turned to the door on the right.

It is undisputed that Casanova knocked twice and that he did not verbally identify himself as a police officer. Otherwise, the parties dispute the events that took place after Casanova's second knock. Casanova contends that after he knocked, the door simply fell open. He and Snowden exchanged friendly greetings and then Casanova

> very suddenly confronted an exigent circumstance that posed an immediate threat risk to his life and that of his fellow officers when he saw Snowden brandish a nine-millimeter handgun near his waist as he became confrontative and belligerent

---

[1] Def. Ex. A1.

[2] Def. Ex. B1.

toward the officer. Snowden quickly escalated the investigation from a "knock and talk" to a verbal warning to show his hands to a sudden need for self-preservation. Snowden stepped toward the officer and did not obey Casanova's command. Only then did Casanova pull his service revolver from his holster and fire two shots at Snowden.

ECF No. 143 at 9-10.

Plaintiffs contend that Snowden, Singleton, and Roundtree were "chilling" and "listening to music" and Hence Williams and Michelle Martinez were resting in a back bedroom at 217 Roberts Street when the front door opened suddenly and a flashlight shined in. Snowden Dep. 137:1-25; Perez Dep. 54:13-22. The flashlight made it impossible to see who was at the door. Snowden Dep. 42:19-23, 75:22-23, 77:16-18, 79:7-12, 20-21, 80:3-4, 81:2-3; Singleton Dep. 49:17-19, 50:5-14; Casanova Axon 15:55-16:06; Panah Axon 15:25-15:40. The person at the door said, "what's up man?" Casanova Axon 15:55-16:01; Panah Axon 15:20-15:32. Snowden asked, "who the fuck is that?" and got up to see who was at the door. As Snowden neared the door, he saw that the person was holding a gun, so he turned away. Before he could retreat, the person at the door fired into the house twice, hitting Snowden and Roundtree and narrowly missing Singleton. The person then ran away. Casanova Axon 16:02-07.

Plaintiffs filed this lawsuit October 23, 2018. ECF No. 1. The case was reassigned to the undersigned on August 27, 2019. ECF No. 39. Defendant Casanova filed the instant motion for summary judgment on June 1, 2021. ECF No. 143. In light of the filing of the Fourth Amended Complaint on July 16, 2021, ECF No. 173, the Court ordered the parties to confer and file an advisory addressing whether the motion should be dismissed without prejudice to refiling in light of the amended pleading or whether it could be addressed against the newly filed Fourth Amended Complaint. ECF No. 177. The parties advised the Court that the motion could be addressed against the live pleading and requested leave to file supplemental briefing. ECF Nos. 182, 183. The

3

briefing before the Court now includes Plaintiffs' response to the motion for summary judgment, ECF No. 189, filed September 24, 2021, corrected and amended by ECF No. 193, filed September 28, 2021; Defendant Casanova's reply, ECF No. 199, filed October 18, 2021; Plaintiffs' sur-reply, ECF No. 204, filed November 9, 2021; and Defendant Casanova's sur-sur-reply, ECF No. 205, filed November 19, 2021. The Court heard the arguments of the parties on March 24, 2022. The motion is ready for ruling.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When seeking summary judgment on an affirmative defense, the movant "must establish beyond peradventure" each essential element of the defense. *Access Mediquip L.L.C. v. UnitedHealthcare*

*Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011), *adhered to on reh'g en banc*, 698 F.3d 229 (5th Cir. 2012); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

"Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). And at summary judgment, a court may assign greater weight to "facts evident from the video recordings taken at the scene." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).

### III. APPLICABLE LAW

**42 U.S.C. § 1983**

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (citation and internal quotation marks omitted). "[T]here can be no § 1983 liability unless the plaintiff has "suffered a constitutional violation . . . at the hands of . . . a state actor." *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012) (en banc).

5

**Qualified Immunity**

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam) (quoting *Mullenix* v. *Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson* v. *Callahan*, 555 U.S. 223, 231 (2009))). When qualified immunity is asserted by a law enforcement officer, the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)).

When determining whether an official can claim qualified immunity, courts typically engage in a two-step analysis. *Griggs*, 841 F.3d at 312. "First, they assess whether a statutory or constitutional right would have been violated on the facts alleged." *Id.* (citing *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)). "Second, they determine whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* However, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

In considering these questions, this Court must: (1) "frame the constitutional question with specificity and granularity"; (2) rely on "clearly established law [which, necessarily] comes from holdings, not dicta"; (3) be mindful that excessive force cases are an area of the law in which results "depend[] very much on the facts of each case" and where the burden on plaintiffs is high; and (4) "think twice before denying qualified immunity." *Morrow v. Meachum*, 917 F.3d 870, 875-76 (5th Cir. 2019).

In sum, the Fifth Circuit requires that the law "so clearly and unambiguously prohibited the violative conduct that '*every* reasonable official would understand that what he is doing violates the law.'" *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (emphasis in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *accord Estate of Bonilla v. Orange Cty.*, 982 F.3d 298 (5th Cir. 2020). The Supreme Court "does not require a case directly on point . . . but existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix*, 577 U.S. at 12) (quoting *al-Kidd*, 563 U.S. at 741).

## IV. DISCUSSION

### A. Objections

### 1. Expert Testimony

Plaintiffs object to Digvijay Tanwar's testimony to the extent he purports to testify as to what the officers' bodycam video depicts. ECF No. 193 at 13. This issue has been previously considered by the Court. Specifically, the Honorable Elizabeth S. Chestney considered whether Tanwar, an expert retained by Defendants to provide forensic analysis and enhancement of officer bodycam recordings of the incident underlying this suit, should be permitted to testify as to what the recordings depict. Judge Chestney concluded that "Tanwar's proposed testimony on the contents of the video recordings from Casanova's body camera will not assist the jury; rather, the testimony is likely to confuse or invade the province of the jury." ECF No. 123 at 7-8. Observing that "jurors can interpret the video and audio evidence for themselves," Judge Chestney limited Tanwar's testimony to "the process he used to enhance the audio and video evidence in this case." *Id.*; *see also* Mag. J. H'rg (Apr. 6, 2021) (ECF No. 121). This Court agrees with Judge Chestney's analysis and conclusion. Accordingly, the objection to Tanwar's testimony is sustained.

**2. Mobile Phone Communications**

During the pendency of this litigation Casanova changed carriers and destroyed or disposed of his personal mobile phone. The record evidence shows calls and texts to and from this phone shortly before and after the incident that formed the basis of the litigation. ECF Nos. 188-1 at 29-36 (Pl. Ex. 14, Sprint Spectrum L.P.-00019-26); 193-1 at 126, 135-36 (Casanova Dep. 38:5-7, 65:20-66:5). Plaintiffs request that the Court make an adverse inference that Casanova's personal mobile phone records, "had they been preserved and produced, would have shown that (1) Casanova had no basis for approaching and entering the front door at 217 Roberts, and (2) Casanova never saw a gun when he opened that door" and that the Court deny summary judgment on that basis. ECF No. 193 at 16-17.

An adverse inference is permitted against a spoliator upon a showing of "bad faith" or "bad conduct." *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005); *accord Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 F. App'x 565, 572 (5th Cir. 2020) (per curiam). It appears that Casanova destroyed or disposed of his mobile phone at a time when he knew or should have known the contents may be discoverable. Because the evidence does not show the specific date or the circumstances, such as whether Casanova physically destroyed his phone or traded it in as a routine upgrade, the Court finds the requested inference an inappropriate sanction at this time. However, the Court will consider a motion for a spoliation jury instruction prior to trial. *See Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008); *Russell v. Univ. of Tex.*, 234 Fed. App'x. 195, 207 (5th Cir. 2007).

**B. Motion**

Casanova's basis for summary judgment is that he acted appropriately when he fired his service weapon. Casanova contends that the recordings from his and Panah's bodycams "provide

undisputed evidence of what took place the night of October 16, and the early morning of October 17, 2018. The recordings are consistent with, and do not controvert, Casanova's version of the facts." ECF No. 143 ¶ 4. Casanova asks the Court to "view the facts in the light depicted by the videotape." *Id.* ¶ 6 (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)). He argues that the recordings show that he "very suddenly confronted an exigent circumstance that posed an immediate threat risk to his life and that of his fellow officers when he saw Snowden brandish a nine-millimeter handgun near his waist as [Snowden] became confrontative and belligerent toward the officer." *Id.* ¶ 17.

**1. Constitutional Violation**

"To prevail on a Fourth Amendment excessive force claim, a plaintiff must show '(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Craig v. Martin*, 26 F.4th 699, 704-05 (5th Cir. 2022). "Excessive force claims are necessarily fact intensive; whether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Id.* (internal quotation marks omitted). In making this determination, courts consider the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

**a. Injury**

An injury in the context of an excessive force claim "must be more than a *de minimis* injury and must be evaluated in the context in which the force was deployed." *Lincoln v. Turner*, 874 F.3d 833, 846 (5th Cir. 2017) (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001)). "[P]sychological injuries may sustain a Fourth Amendment claim." *Id.* (citing *Dunn v. Denk*, 79 F.3d 401,

402 (5th Cir. 1996) (*en banc*)).

It is undisputed that Casanova shot Roundtree and Snowden and that their injuries were more than *de minimis*. Singleton contends she has suffered psychological injuries as a result of being shot at and a bullet lodging in the wall above her head. ECF No. 193-1 (Singleton Dep. 46:21-24). She testifies that she has received treatment and counseling for anger, depression, insomnia, nightmares, paranoia, and survivor's guilt, which onset after the incident. *Id.* 85:17-93:11.

The injury alleged in an excessive force claim, whether physical or psychological, need not be significant but it "must be more than *de minimis*" and the injury "must be evaluated in the context in which the force was deployed." *Lincoln*, 874 F.3d at 846. Roundtree was shot in the chest and died. The bullet that hit Snowden entered and exited his left buttock, grazed his right, and then lodged in the wall above Singleton's head. Since then Singleton has suffered anger, depression, insomnia, nightmares, paranoia, and survivors guilt. Accepting Plaintiffs' recitation of the facts, as the Court must at this stage of the proceedings,[3] they have demonstrated injuries sufficient to support their excessive force claims. *See Durant v. Brooks*, 826 F. App'x 331, 336 (5th Cir. 2020).

**b. Use of Force**

Relevant to the use of force inquiry are the *Graham* factors: (1) the severity of the crime at issue, (2) whether the suspect[4] posed an immediate threat to the safety of the officers or others,

---

[3] As explained in more detail below, the Court finds that Plaintiffs' version of the facts is not contradicted by the audio and video evidence presented by Defendant such that a reasonable jury would be unable to render a verdict in Plaintiffs' favor. *Scott v. Harris*, 550 U.S. 372, 378, 380-81 (2007).

[4] The Court acknowledges that the word "suspect" may unfairly describe Snowden who did not match the description of the alleged assailant. Moreover, Casanova did not go to 217 Roberts looking for a specific person but to investigate the alleged assault and to see if anyone at that location fit the description of the alleged assailant. Whether Snowden later became an aggressor, as Casanova contends, or a victim, as Plaintiffs contend, is discussed in more detail below.

and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

### i. First *Graham* Factor

Under the first *Graham* factor, the Court analyses the severity of the crime at issue. The court notes that the crime at issue is not the crime Snowden was ultimately arrested for, which was felon in possession of a firearm. ECF No. 143 at 41-42. Snowden was acquitted of that crime. ECF No. 193 at 8, 12-13. The relevant inquiry under *Graham*, "is what a reasonable officer on the scene would have believed the crime at issue to be." *Chacon v. City of Austin*, No. A-12-CV-226-SS, 2013 WL 2245139, at *10 (W.D. Tex. May 21, 2013), *aff'd sub nom. Chacon v. Copeland*, 577 F. App'x 355 (5th Cir. 2014). Here, the evidence supports a finding that the crime at issue for the purpose of the *Graham* analysis was an assault.

Casanova testifies that he was investigating an alleged assault. ECF No. 143 at 27 (Casanova Aff. at 2.). Based on the complainant's description, Casanova had reason to suspect that a tall, skinny, twenty to twenty-five year old Black man wearing a grey sweater and blue jeans had punched Esteban Preciado and might be in a house across from 218 Roberts Street. Casanova Axon 02:45-03:10. In Texas, a person commits an assault "if the person: (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse." Tex. Penal Code § 22.01(a)(1). With exceptions not knowable at the time of the alleged offense, this crime is "a Class A misdemeanor" punishable by up to a $4000 fine, a year in jail, or both. *Id.*, § 22.01(b).[5]

---

[5] The Court reads Plaintiffs' briefing as attempting to minimize the severity of the crime at issue by characterizing all misdemeanors as minor. But the severity of the crime at issue here should be viewed in context of classes of misdemeanors under Texas law. A Class A misdemeanor is more severe than a Class B misdemeanor (punishable by up to six months in jail and a $2,000 fine) or a Class C misdemeanor (punishable by a fine not to exceed $500). Thus, misdemeanor assault is classified with the misdemeanors deemed most severe.

Importantly, although the crime at issue is a misdemeanor, assaults can be extremely violent and cause serious injuries. However, the evidence in this case does not establish that Casanova was in pursuit of an assailant that had inflicted serious injuries or that the assailant was armed with any weapon. *See* Casanova Axon 00:50-03:10 (the complainant did not indicate that any weapon was used during the alleged assault and neither the complainant nor the victim requested medical attention; the victim was sitting in a vehicle and able to contribute to the description of his attacker).

That the officers decided to conduct a "knock and talk" is also evidence that they did not consider the crime at issue to be severe. And the evidence does not conclusively establish that the alleged assailant had retreated into 217 Roberts. *See id.* Additionally, in light of his not matching the description given by the complainant,[6] it does not appear that Snowden could have been a suspect in the assault. Thus, the first *Graham* factor—the severity of the crime—militates against concluding that Casanova's use of force was objectively reasonable.

**ii. Second *Graham* Factor**

Under the second *Graham* factor, courts consider whether the suspect posed an immediate threat to the safety of the officer or others. It is undisputed that Casanova used deadly force during his encounter with the occupants of 217 Roberts. *See Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004) (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) (holding that "deadly force" is force "carrying with it a substantial risk of causing death or serious bodily harm")). "An officer's use of deadly force is not excessive, and thus no constitutional violation

---

[6] Mrs. Herrera stated to Casanova that the man who assaulted her husband was Black, wearing a grey sweater and blue jeans, in his twenties (between twenty and twenty-five), skinny, tall, and did not have any hair. Casanova Axon 00:50-01:00, 02:45-03:10. When Casanova encountered him, Snowden was wearing a white t-shirt, a black jacket, and khaki-color pants with zippered pockets. Snowden Dep. 66:18-68:20. *See also* Casanova Dep. 240:25-241:3 ("Q. So when you said that Snowden matched the description of the suspect, actually he had on totally different clothing than what she told you; correct? A. Correct.").

12

occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011). "Use of deadly force is not unreasonable when an officer would have reason to believe the individual poses a threat of serious harm to the officer or others." *Carnaby*, 636 F.3d at 188 (quoting *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)). "When an officer uses deadly force, its reasonableness turns primarily on whether the officer had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others." *Wilson v. City of Bastrop*, 26 F.4th 709, 713 (5th Cir. 2022) (citations omitted).

Thus, the inquiry here is whether the evidence shows that when Casanova fired his weapon, a reasonable officer could have reasonably believed he faced a threat that posed an immediate risk of serious harm to himself or others. "[T]he focus of the inquiry is 'the act that led [the officer] to discharge his weapon.'" *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). The "inquiry is confined to whether [Casanova] was in danger *at the moment of the threat* that resulted in [the shooting]." *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 493 (5th Cir. 2001) (emphasis in original). The perspective courts apply is that of "a reasonable officer on the scene," and in applying this perspective, courts "allow[] for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

Casanova contends firing his weapon was reasonable because Snowden brandished a nine-millimeter handgun, became confrontative and belligerent, and escalated the investigation from a knock and talk to a verbal warning to show his hands to a sudden need for self-preservation as he stepped toward the officer and did not obey his command. ECF No. 143 at 9-10. Snowden denies being in possession of a handgun the night of the shooting, denies being aggressive, confrontative,

13

or belligerent, and argues that he never heard a command to show his hands—all he heard was the sound of gunfire. ECF No. 193 at 7-8, 12-13.

When versions of events differ, the Court is "required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion. In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378 (internal citations and quotation marks omitted). The Court is not required to credit the plaintiff's version when that version is contradicted by unambiguous video evidence; instead, it should view the facts "in the light depicted by the videotape." *Id.* at 380-81. And while a court may not ordinarily weigh credibility at summary judgment, it may assign greater weight to "facts evident from the video recordings taken at the scene." *Griggs*, 841 F.3d at 312 (quoting *Carnaby*, 636 F.3d at 187). Casanova's motion relies exclusively on the audio and video recordings taken at the scene; he argues that the recordings wholly support his version of the events that gave rise to this lawsuit. ECF No. 143 at 4, 9-13.

Having viewed the audio and video recordings submitted with Casanova's motion, the Court finds that the video evidence does not so blatantly contradict Plaintiffs' version of events "so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. In some places the video evidence supports Casanova's version of events, in some places it is ambiguous, and in some places the video supports Plaintiffs' version of events. Critically, the video evidence from the time Casanova entered the property at 217 Roberts through the time he retreated after firing his weapon does not undeniably contradict Plaintiffs' version of events. The video evidence is "too uncertain" to discount Plaintiffs' version. *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013). Accordingly, the *Scott* rule is inapplicable and the Court must apply the ordinary summary judgment standard, viewing the facts "in the light most favorable to the non-moving party" and

drawing "all justifiable inferences in their favor." *Estate of Aguirre v. City of San Antonio*, 995

F.3d 395, 406, 410-11 (5th Cir. 2021) *accord Amador v. Vasquez*, 961 F.3d 721, 725 (5th Cir.

2020).

Plaintiffs contend that in the early hours of October 17, 2018, Snowden, Singleton, and

Roundtree were "chilling" and "listening to music" in the living room and Hence Williams and

Michelle Martinez were resting in a back bedroom at 217 Roberts Street when the front door

suddenly opened.[7] A flashlight held by the person at the door made it impossible to see who was

there.[8] The person at the door said, "what's up man?" And did not respond when Snowden asked,

"who the fuck is that?"[9] Because he was blinded by the flashlight and because he has trouble

seeing, Snowden approached the front door to see who was there.[10] As he approached the door,

---

[7] Casanova testified that he knocked on the wood door "about three times" and his "last knock caused the inside door to swing open." ECF No. 143 at 27 (Casanova Affidavit at 2). Snowden and Singleton testified that Casanova pushed the wood door open. ECF No. 193-1 (Snowden Dep. 54:13, 78:13-19, 80:22-81:3, 139:20-140:13); (Singleton Dep. 43:5-10, 50:20-51:3). *See also* Casanova Axon 15:55-15:59; Panah Axon 15:20-15:32; Snowden Dep. 137:1-25; Perez Dep. 54:13-22. It is undisputed that Casanova did not verbally identify himself as a police officer.

[8] Snowden Dep. 42:19-23, 75:22-23, 77:16-18, 79:7-12, 20-21, 80:3-4, 81:2-3; Singleton Dep. 49:17-19, 50:5-14; Casanova Axon 15:55-16:06; Panah Axon 15:25-15:40.

[9] Casanova Axon 15:55-16:05; Panah Axon 15:20-15:37.

[10] Casanova testified he shined his flashlight into 217 Roberts "in a downward direction." Casanova Affidavit at 2. He further testified that the "living room had a ceiling light fixture that I knew was shining a bright light on me as I was standing at the door behind the iron outer door." Casanova Affidavit at 2. Snowden testified that Casanova shined his flashlight into the house, blinding him from seeing who was at the door. Snowden Dep. 42:19-23. *See also* Casanova Axon 15:55-16:06; Panah Axon 15:25-15:40; Casanova Enhanced Frames at 112-219 (Def. Ex. D4, D8); Panah Enhanced frames at 1067-1186 (Def. Ex. D2). Singleton testified that she did not know who was at the door and all she could see of the person was "a beanie." Singleton Dep. 50:5-14. She also testified that when the door opened, all she saw "was a bright light, just a bright flashlight. We couldn't see what was behind the flashlight. We couldn't see nothing." Singleton Dep. 49:17-19. Snowden testified that he saw a flashlight and a gun but he could not see Casanova's "beanie, the logo, the badge, his uniform . . . because the flashlight was blinding [him]." Snowden Dep. 75:22-23, 77:16-18, 79:7-12, 20-21, 80:3-4, 81:2-3. Snowden testified that he closed the door after the shooting because he did not know who was shooting at them. Snowden Dep. 84:5-8. Singleton testified that Snowden has a bad eye, making it difficult for him to see and which requires him to wear eyeglasses. Singleton Dep. 41:17-21; *see also* Def. Ex. 4 184-190 (showing Snowden wearing glasses); Def. Ex. 12 (same); Snowden Dep 138:6-8 ("I can't really see that good.").

Snowden saw what he believed was a handgun and turned to retreat to safety.[11] The person shining the flashlight into the house fired two shots at Snowden, Roundtree, and Singleton and then "ran off."[12] Roundtree and Snowden were hit and a bullet narrowly missed Singleton. The occupants of the home still did not know who shot at them, so Snowden closed the door.[13] No one in the house had a gun and no one made any threatening gestures. Snowden was not holding or reaching for a gun. His hand was at his waist because he was pulling his pants up.[14] Additionally, Snowden, Singleton, and Roundtree did not match the description of the individual Casanova said he was searching for.[15]

The Court makes no findings or determination as to the credibility of Plaintiffs' contentions. But viewing the evidence in the light most favorable to Plaintiffs and drawing all justifiable

---

[11] After the door opened, Snowden got off the couch and moved toward the door. Snowden Dep. 79:9-12; Casanova Axon 15:55-16:05. Before he reached the front door, Snowden turned to his right. Casanova Dep. 132:9-12, 136:3-17, 159:16-160:5. After Snowden turned away, Casanova yelled "let me see your fucking hands" and fired his service revolver. Casanova Axon 16:05-07. Snowden testified he was moving to his right because he saw the person at the door had a gun and he was trying to get away from the bullets. Snowden Dep. 82:12-18, 138:1-20.

[12] Snowden Dep. 83:3-84:3 ("Q. . . . you remember Casanova telling you show me your fucking hands? A. No, sir. . . . He already started shooting, then he said that and ran off. . . . if he did say that, we couldn't hear him 'cause the shots were already fired.").

[13] Snowden Dep. 55:1-6 ("We closed the door because we didn't know who was shooting inside at first."); 84:4-8 ("we was all trying to run to Hence's room, run inside the hallway area to get away from the bullets. And then that's when I got up and I closed the front door 'cause we didn't -- I didn't know who it was.").

[14] Casanova testified he saw Snowden drawing a weapon, so he "immediately drew [his] holstered weapon and shouted, 'Let me see your fucking hands!'" Casanova Aff. at 3; Casanova Dep. 136:20-22. Casanova testified that as Snowden "moved to his right [Snowden] drew his gun" and so Casanova "fired two successive rounds aiming at Mr. Snowden." Casanova Aff. at 3. Snowden testified that he did not have a gun, did not reach for a gun, did not make any gestures to indicate that he was trying to reach for a gun, that he had a phone in his pocket, and his hand was at his waistband only to pull his pants up. Snowden Dep. 76:5-18, 139:1-25. Snowden and Singleton testified that no one in the house had a gun. Snowden Dep. 76:5-18, 135:17-136:8, 138:24-139:17; Singleton Dep. 60:5-14. Snowden testified that after Casanova shot them, he stayed with Charles Roundtree, holding his jacket against his chest, trying to save his life until he was ordered out of the house. Snowden Dep. 140:14-141:15. Singleton testified that she called 911 for assistance. Singleton Dep. 63:22-64:21; Snowden Dep. 84:9-14; 85:20-23.

[15] Snowden Dep. 66:18-68:20; Pl. Ex. 17 (showing the pants Snowden was wearing when he encountered Casanova); Pl. Ex. 18 (showing Roundtree, whose hair is very different from that described by the assault victim); Taylor Singleton is female and the person Casanova sought was male.

inferences in their favor, the Court finds material disputes that must be submitted to the jury. Weighing the evidence and gaging the credibility of the witnesses is the province of the jury. And, as the Magistrate Judge and the undersigned have ruled, what is depicted on the videotape is not for an expert to interpret but for a jury to decide.

Casanova's argument that a reasonable officer standing in his shoes would have taken the same action is premised on his disputed construction of facts and his reliance on the video evidence—as interpreted by his expert.[16] To agree with his argument would require a finding that Snowden brandished a weapon, moved toward Casanova in a sudden and aggressive manner, and did not follow Casanova's commands. But these facts are in dispute and are material to determining whether Casanova "had probable cause to believe that [ Snowden] posed a threat of serious physical harm, either to the officer or to others." *Wilson,* 224 F.4th at 713.

At summary judgment, the Court may not simply accept the officer's subjective version of events, but must reconstruct the events in the light most favorable to the non-moving party, and determine whether the officer's use of force was excessive under those circumstances. *See Reese v. Anderson*, 926 F.2d 494, 510 (5th Cir. 1991); *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011). The second *Graham* factor involves genuine disputes of material fact, namely: how Snowden approached the front door, whether he possessed a gun, whether he reached for anything, whether he grasped something in his waistband, and whether he turned to walk away from Casanova. This factor is therefore inconclusive as to whether Casanova's belief that Snowden posed an immediate threat to himself or others was reasonable.

---

[16] The vast majority of Casanova's motion for summary judgment relies on Digvijay Tanwar's testimony, which had been excluded before Defendant filed the motion. *See* ECF Nos. 123, 143 (Judge Chestney's order, entered April 13, 2021, and the instant motion, filed June 1, 2021). The Court granted Casanova an opportunity to present evidence in support of his motion that did not rely on the excluded testimony by convening a hearing on the motion. *See* ECF Nos. 212-216.

### iii. Third *Graham* Factor

The third *Graham* factor requires courts to consider whether the suspect is actively resisting arrest or attempting to evade arrest by flight. As with the second *Graham* factor, the accounts differ. If Snowden was brandishing a weapon, that could be interpreted as actively resisting arrest. There is testimony that Snowden did not have a weapon; that other officers did not see a weapon; there is evidence that the weapon found on the scene was inconclusive as to DNA and fingerprints (and Snowden was acquitted of illegally possessing a firearm); and there is evidence that there were police officers in the yard when a gun was allegedly thrown out of a window of 217 Roberts and into that yard. Therefore, the third *Graham* factor is also inconclusive.

### c. Material Facts in Dispute

Applying the *Graham* factors, the Court finds that material factual disputes exist as to whether the force used by Casanova was objectively reasonable. The first *Graham* factor, conducting a knock in talk in search of an individual suspected of punching someone in the face, could not signal to an officer that an occupant of 217 Roberts could, potentially, be armed and dangerous. As to the second and third *Graham* factors, viewing the evidence in the light most favorable to Plaintiffs, there are material fact disputes as to how Snowden approached the front door, whether he possessed a gun, whether he reached for anything, whether he grasped something in his waistband, and whether he turned to walk away from Casanova. If, as Snowden and Singleton testified, he walked toward the door calmly, did not possess a gun, did not grasp or reach for anything, and was turning to walk away from Casanova, Casanova's belief that his life was in danger, and his action in shooting into 217 Roberts, may not have been objectively reasonable.

Accordingly, viewing the evidence in the light most favorable to the Plaintiffs, this Court cannot say, as a matter of law, that Casanova acted reasonably because genuine disputes of material

fact preclude such a determination. "The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Tolan v. Cotton*, 572 U.S. 650, 659 (2014). The question of whether a constitutional violation occurred is therefore a matter for the finder of fact to determine. *See e.g., Morris v. Leblanc*, 674 Fed. App'x 374 (5th Cir. 2016) (dismissing an appeal of denial of qualified immunity for lack of jurisdiction where the appeal was grounded on an argument that there was no factual dispute at all, rather than an argument that the factual dispute was immaterial); *Chacon v. Copeland*, 577 F. App'x 355, 363 (5th Cir. 2014) (affirming lower court where disputes of material fact precluded summary judgment); *Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986) ("[I]t is up to the finder of fact to determine a witness's credibility in light of conflicting evidence.")

## 2. Clearly Established

At summary judgment, courts may not resolve fact disputes pertaining to either prong of qualified immunity in favor of the moving party. *Cotton*, 572 U.S. at 656. The question this Court must resolve under the clearly established prong of qualified immunity is whether Casanova would have had "fair notice" that his actions were unreasonable, based on the evidence viewed in the light most favorable to Plaintiffs. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009) (the focus of the inquiry "should be on 'fair warning'").

In 1985, the Supreme Court concluded that deadly force may not be used by a police officer unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *accord Tolan v. Cotton*, 713 F.3d 299, 307 (5th Cir. 2013), *rev'd on other grounds* 572 U.S. 650,

657 (2014).[17] In *Garner*, police deployed deadly force "to prevent the escape of an apparently unarmed suspected felon." *Id.*[18] Following *Garner*, every reasonable police officer would know that law enforcement "may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 7-8.

Upon the facts this Court must accept as true for the purpose of the instant motion, it would have been sufficiently clear to Casanova that if he or others in his vicinity did not face "a significant threat of death or serious physical injury"[19] at the moment he fired his weapon, shooting at Snowden or into 217 Roberts would violate the occupants' Fourth Amendment rights. In 2017, the Fifth Circuit held that the law in January 2013, "clearly established that it was objectively unreasonable for several officers to tackle an individual who was not fleeing, not violent, not aggressive, and only resisted by pulling his arm away from an officer's grasp." *Trammell v. Fruge*, 868 F.3d 332, 343 (5th Cir. 2017). With knowledge of *Garner* and *Trammel*, every reasonable Texas police officer would know that it is objectively unreasonable to shoot someone who was not fleeing, not violent, not aggressive, and only resisted by turning away from the officer. *Malley v.*

---

[17] The Supreme Court returned the case to the Fifth Circuit because the lower court had "failed to view the evidence at summary judgment in the light most favorable to [the nonmovant] with respect to the central facts of [the] case." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

[18] Memphis police officers had been "dispatched to answer a 'prowler inside call.'" When they arrived at the scene, the next-door neighbor told them she "had heard glass breaking and that 'they' or 'someone' was breaking in next door." One of the officers went to the back of the house, heard a door slam, and saw someone run across the backyard. The "fleeing suspect," stopped at a 6-feet-high chain link fence at the edge of the yard. Believing that the suspect would escape, but seeing "no sign of a weapon," the officer shot him. The suspect "was taken by ambulance to a hospital, where he died on the operating table." *Tennessee v. Garner*, 471 U.S. 1, 3-4 (1985).

[19] Or "has reason to believe the individual poses a threat of serious harm to the officer or others," *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003); or "unless it is necessary to prevent a suspect's escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others," *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004); or "reasonably believes that the suspect poses a threat of serious harm to the officer or to others," *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011); or "had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others," *Wilson*, 224 F.4th at 713.

*Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law").

Also, the unresolved material facts in this case prevent resolution of the clearly established prong. For example, Casanova argues that Snowden made a movement, from which a reasonable officer could believe he was under threat of serious physical harm. But the video evidence is inconclusive and there is conflicting testimony on this point. Casanova also argues that Snowden did not comply with his commands but the video evidence shows that Snowden had no time to comply between Casanova shouting, "let me see your fucking hands" and firing his weapon. *Cf. Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009) (finding use of deadly force reasonable where the plaintiff had "reached under the seat of his vehicle and then moved as if he had obtained the object he sought" and had done so "in defiance of the officers' commands").

## V. CONCLUSION

At summary judgment the Court must assume the validity of a plaintiff's version of facts except where "video evidence undeniably contradicts the plaintiff's version of the facts such that no reasonable jury could believe it." *Chacon*, 577 F. App'x 359; *Scott*, 550 U.S. 380. The video evidence in this case does not contradict Plaintiffs' version of the facts such that no reasonable jury could believe it. How Snowden approached the front door, whether he possessed a gun, whether he reached for anything, whether he grasped something in his waistband, and whether he turned to walk away from Casanova are facts that are material to an excessive force determination. The Court is unable to determine whether Office Casanova acted in an objectively reasonable manner without resolving these factual disputes. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 739 (5th Cir. 2000) (recognizing the principal that a "district court cannot draw conclusions of law

from disputed facts at the summary judgment phase"). Accordingly, the Court **DENIES** *Defendant Steve Casanova's Motion for Summary Judgment* (ECF No. 143).

     It is so **ORDERED** this **28th day of March 2022.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**