### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

**BERNICE ROUNDTREE, Individually
and on behalf of the Estate of
CHARLES ROUNDTREE, JR. and the
Statutory Beneficiaries, TAYLOR SIN-
GLETON and DAVANTE SNOWDEN,**

     **Plaintiffs,**

**v.**                                                    **No. SA-18-CV-01117-JKP-ESC**

**CITY OF SAN ANTONIO, TEXAS;
STEVE CASANOVA,**

     **Defendants.**

### <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is *Defendant City of San Antonio's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) and/or Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56* (ECF No. 151). The motion is fully briefed and ripe for ruling. For the reasons set forth below, the Court partially grants the motion.

### I. BACKGROUND

This case arises out of the death of Charles Roundtree, Jr. and the injuries sustained by Taylor Singleton and Devante Snowden when San Antonio Police Officer Steve Casanova fired his service weapon on October 17, 2018. *See* ECF No. 173. Plaintiffs Bernice Roundtree, Taylor Singleton (Singleton), and Devante Snowden (Snowden) bring this action against the City of San Antonio (the City) and Officer Steve Casanova (Casanova) for violations of their civil rights pursuant to 42 U.S.C. § 1983, seeking wrongful death and survival damages as to Charles Roundtree (Roundtree) and for the injuries sustained by Singleton and Snowden.

According to Plaintiffs' Fourth Amended Complaint, which is the live pleading in this case, on October 17, 2018, Roundtree, Singleton, and Snowden gathered at the residence located at 217 Roberts Street, San Antonio, Texas 78207. ECF No. 173 ¶ 11. Plaintiffs allege that Officer Casanova (Casanova) and two other San Antonio Police Department (SAPD) officers were purportedly investigating a misdemeanor assault that allegedly occurred on Roberts Street, when Casanova entered the residence via the front door without any verbal warning and shone a bright light at Roundtree, Singleton, and Snowden, who were sitting inside. *Id.* ¶¶ 11–13. Casanova's entry startled the three individuals, and Snowden walked towards the front door to see who was there. *Id.* ¶ 13. Plaintiffs allege that Snowden saw Casanova pointing a gun at him and attempted to turn and walk away when Casanova opened fire, striking Snowden in the back and buttocks, striking Roundtree in the chest, and narrowly missing Singleton. *Id.* Roundtree died from his wounds. *Id.* Singleton alleges she witnessed the events and has suffered severe mental and emotional distress as a result. *Id.*

Plaintiffs dispute the official police report stemming from the incident, which states that Snowden was reaching for a gun in his waistband at the time Casanova opened fire, and maintain that Roundtree, Singleton, and Snowden were unarmed and did not make any threatening gestures toward Casanova or any other person that would have justified the use of deadly force. *Id.* ¶¶ 14-15. Plaintiffs further allege that Snowden, despite not being in possession of any weapon, was arrested and charged with unlawful possession of a firearm. *Id.* ¶ 14. Plaintiffs claim that Snowden remained in jail for ten months for a crime he did not commit and that there was no probable cause or reasonable suspicion to ever believe that Roundtree, Singleton, or Snowden had committed or were attempting to commit a crime. *Id.* ¶¶ 14-15.

Plaintiffs filed this lawsuit October 23, 2018. ECF No. 1. The case was reassigned to the undersigned on August 27, 2019. ECF No. 39. The City filed the instant motion on June 11, 2021.

ECF No. 151. In light of the filing of the Fourth Amended Complaint on July 16, 2021, ECF No. 173, the Court ordered the parties to confer and file an advisory addressing whether the motion should be dismissed without prejudice to refiling, or whether the dispositive motion could be addressed against the newly filed Fourth Amended Complaint. ECF No. 177. The parties advised the Court that the instant motion could be assessed against the live pleading and requested leave to file supplemental briefing. ECF Nos. 181, 183. The briefing now before the Court includes Plaintiffs' response to the motion for summary judgment, ECF No. 188, filed September 24, 2021, and appendix, ECF No. 194, filed September 28, 2021, and the City's reply, ECF No. 201, filed October 29, 2021. The motion is fully briefed and ready for ruling.

The City moves for summary judgment on all of Plaintiffs' claims against it. It argues that: (1) Bernice Roundtree lacks capacity to bring survival claims and Patricia Slack lacks standing to assert any claim; (2) SAPD's written policies on the use of force are not facially unconstitutional and were not the moving force behind the alleged violation of Plaintiffs' constitutional rights; (3) Casanova was properly trained, supervised, and disciplined; (4) the City did not ratify his conduct; (5) Snowden was lawfully arrested and there is no evidence that Singleton was arrested.

## II. LEGAL STANDARD

In light of the evidence attached to the motion and the briefing, which the Court has considered, the Court analyses the instant motion under Fed. R. Civ. P. 56.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. When considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832 F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### III. APPLICABLE LAW

#### 42 U.S.C. § 1983

"Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (citation and internal quotation marks

omitted). "[T]here can be no § 1983 liability unless the plaintiff has "suffered a constitutional violation . . . at the hands of . . . a state actor." *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 867 (5th Cir. 2012) (en banc).

**Municipal Liability Under § 1983**

A local government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("local governments are responsible only for their own illegal acts"). "[A] final decisionmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations may, in some circumstances, give rise to municipal liability under § 1983." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 406 (1997) (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 481 (1986)).

## IV. DISCUSSION

### A. Abandoned Claims and Claims Subject to Dismissal

The live pleading in this case asserts the following theories of municipal liability under *Monell*: (1) SAPD's excessive force policy is unconstitutional on its face and is the moving force behind the alleged Fourth Amendment violations; (2) failure to train, supervise, and discipline; and (3) ratification. ECF No. 173 at 18, 20, 23. *See Monell,* 436 U.S. at 694 (municipality may be held liable under § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."); *City of Canton v. Harris,* 489 U.S. 378, 385-87 (1989); *Deville v. Marcantel*, 567 F.3d 156, 171 (5th Cir. 2009) (inadequacy of training or failing to supervise or discipline may

serve as basis for liability where the failure or inadequacy amounts to deliberate indifference to rights of persons); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir. 1985) (finding municipal liability based on city's failure to reprimand or discharge officers after their egregious conduct). Plaintiffs Snowden and Singleton also bring claims against the City for false arrest.

The City argues that the SAPD use-of-deadly-force policy was constitutionally sound and not the moving force behind the violation of Plaintiffs' constitutional rights, SAPD officer training was proper and City officials were not deliberately indifferent to any obvious inadequacy, the City properly supervised and disciplined its officers, the City did not ratify Casanova's conduct, Snowden was lawfully arrested, and there is no evidence that Singleton was arrested. ECF No. 151 at 8, 16, 23, 26-27.

Plaintiffs' response argues its failure to train, supervise, and discipline claims solely under a ratification theory. Plaintiffs therefore appear to abandon their failure to train, supervise, and discipline claims to the extent they are based on deliberate indifference. Accordingly, to the extent these claims are based on deliberate indifference, they are waived. *See Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971, 977 (E.D. Tex. 2004) (recognizing that claims alleged in the complaint but not defended in summary judgment are deemed abandoned); *Fischer v. Fed. Bureau of Prisons*, 349 F. App'x 372, 375 n.2 (11th Cir. 2009) (explaining that the plaintiff waived a claim by not addressing that issue in response to a summary judgment motion). As to their false arrest claims, Plaintiffs argue in their response only that Taylor Singleton was wrongfully arrested. ECF No. 188 at 11 n.3 & 30. Because Plaintiff Snowden appears to have abandoned his false arrest claim, it is waived. The Court grants the City's motion with regard to the waived claims.

As to Plaintiff Singleton, central to a claim for false arrest is an arrest or a seizure. At summary judgment, the nonmovant must point to evidence that supports their claim. *See Matsushita*, 475 U.S. at 586; *Heinsohn*, 832 F.3d at 234. Plaintiff Singleton's response to the City's

motion alleges she was arrested but points to no evidence that shows she was arrested. Because she has not shown that she was arrested, or seized in a circumstance that rose to the level of an arrest,[1] the Court grants summary judgment as to her claim for false arrest.

## B. Estate Claims

The City moves to dismiss Bernice Roundtree and Patricia Slack from the case based upon lack of capacity (Ms. Roundtree) and standing (Ms. Slack). The Court previously ruled on these issues. *See Roundtree v. City of San Antonio*, No. SA-18-CV-01117-JKP-ESC, 2022 U.S. Dist. LEXIS 29375, 2022 WL 508343 (W.D. Tex. Feb. 17, 2022). Accordingly, the Court denies as moot the City's motion to dismiss Ms. Roundtree and Ms. Slack.

## C. *Monell* Claims

"Municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). In other words, "[t]here must be (1) a policy (2) of the city's policymaker (3) that caused (4) the plaintiff to be subjected to a deprivation of constitutional right." *Grandstaff*, 767 F.2d at 169 (citations omitted).

## 1. Constitutional Violation

"To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff [first] must establish that he possessed a constitutional right of which he was deprived." *City of Canton,* 489 U.S. at 389. "Where there is no underlying constitutional violation, there can be no municipal liability." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Whether Casanova violated Plaintiffs' constitutional rights has yet to be

---

[1] "A prolonged investigative detention may be tantamount to a *de facto* arrest, a more intrusive custodial state which must be based upon probable cause rather than mere reasonable suspicion." *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). "A seizure rises to the level of an arrest only if 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Carroll v. Ellington*, 800 F.3d 154, 171 (5th Cir. 2015).

determined. In its Memorandum Opinion and Order denying Defendant Casanova's motion for summary judgment, entered contemporaneously herewith, this Court found that genuine disputes of material fact regarding Casanova's use of deadly force preclude summary judgment as to Plaintiffs' claims against Officer Casanova. Consequently, here too, there are genuine disputes of material fact that must be resolved before determining whether there is an underlying constitutional violation in this case. Because genuine disputes impact Plaintiffs' *Monell* claims, the Court could hold the City's motion in abeyance pending resolution of the disputed facts. However, to narrow the issues for trial, the Court will assume a Fourth Amendment violation for the instant motion only.

**2. Policymaker**

A policymaker is "one who takes the place of the governing body in a designated area of city administration." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010). When determining whether an official is the relevant policymaker, courts must ascertain whether the official "possesses final authority to establish municipal authority with respect to the action ordered." *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595, 602 (5th Cir. 2001) (quoting *Brady v. Fort Bend Cty.*, 145 F.3d 691, 698 (5th Cir. 1998)). "[T]he identity of the policymaker is a question of law, not of fact—specifically, a question of state law." *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 284 (5th Cir. 2016).

Although the Fifth Circuit has not held that Texas police chiefs are final policymakers for their municipalities as matter of law, it has "previously found that Texas police chiefs are final policymakers for their municipalities, and it has often not been a disputed issue in the cases." *Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) (citing *Zarnow*, 614 F.3d at 168; *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847-48 (5th Cir. 2009); *Lewis v. Pugh*, 289 F. App'x 767, 776 (5th Cir. 2008); *cf. Kelley v. City of Cedar Park*, No. 1:20-CV-481-RP, 2022 U.S.

Dist. LEXIS 19462, at *49-50, 2022 WL 329342, at *19 (W.D. Tex. Feb. 3, 2022) (where the plaintiff identified the Chief of Police as the City's policymaker and cited *Garza* in support, plaintiff "met the first element of *Monell*" because "the Fifth Circuit has found repeatedly that 'Texas police chiefs are final policymakers for their municipalities'").

The parties do not dispute that the San Antonio City Manager and Police Chief are policymakers who can be charged with actual or constructive knowledge of official policies, practices, or customs within the SAPD. *See* ECF Nos. 173 at 2[2]; 151 at 15. At issue in this case is SAPD's use of deadly force policy, codified in its Policy and Procedures Manual and SAPD's alleged ratification of Casanova's actions. The briefing and Fifth Circuit caselaw therefore support a finding that the SAPD Police Chief is the appropriately identified policymaker in this case.

### 3. Municipal Liability Based on a Facially Unconstitutional Policy

Courts must determine whether an identified policy "is facially constitutional or unconstitutional." *Piotrowski v. City of Houston*, 237 F.3d 567, 580 (5th Cir. 2001). An "unconstitutional official policy renders a municipality culpable under § 1983," without any need to consider deliberate indifference. *Id.* at 579 & n.22. When the policy itself compels a constitutional violation, the "potential for municipal liability . . . is well established, because a

---

[2] The live pleading in this case specifically alleges:

> Plaintiffs allege that the City of San Antonio and its policy makers, City Manager, Sheryl Sculley ("Sculley"), Chief of Police, William McManus ("McManus"), the San Antonio City Council, and Mayor of San Antonio, Ron Nirenberg ("Nirenberg") (collectively referred herein as the "Policy-makers") implemented a use of force policy that is facially unconstitutional and failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise control officers who are known, or who should have been known, to engage in the use of excessive force, including those officers repeatedly accused of such acts. The Policymakers, specifically City Manager Sculley, along with Chief of Police McManus had a duty, but failed to implement and/or enforce policies, practices, and procedures for the SPD that respected Roundtree, Singleton and Snowden's constitutional rights. This duty was delegated to the San Antonio City Council who hired City Manager Sculley to carry out the actions and policies of the council by overseeing the day-to-day operation of The City of San Antonio.

ECF No. 173 at 2.

constitutional violation flows directly from a policymaker's deliberate choice reflected in an official policy or action." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 389 (8th Cir. 2007) (citing various Supreme Court cases). "Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bryan Cty.*, 520 U.S. at 404; *see also Jauch v. Choctaw Cty.*, 874 F.3d 425, 435–36 (5th Cir. 2017) (where the challenged policy could not "be separated from the procedure [the court] found constitutionally deficient"—i.e. they were "one and the same"—"fault and causation" were "obvious").

Plaintiffs assert that SAPD's use-of-deadly-force policy is facially unconstitutional because, at the time of the incident, it contained language that does not comport with the objective reasonableness standard in *Graham*. The challenged policy reads:

.07 USE OF DEADLY FORCE

A. This section applies to all forms of deadly force, regardless of the type of instrument or weapon used.

B. The use of deadly force is authorized only to protect an officer or another person from what is reasonably believed to be an immediate threat of death or serious bodily injury.

> 1. An officer with an honest and sincere personal belief his life or the life of another person is in imminent danger is justified in using deadly force to preserve that life.

> 2. Justification for the use of deadly force is determined by the facts known or perceived by the officer at the time the deadly force is employed.

C. The use of deadly force against one who is fleeing from custody, or who is fleeing immediately after committing an offense, is prohibited unless the officer has probable cause to believe the suspect poses an imminent threat of death or serious bodily injury to the officer or a third party.

D. A lateral vascular neck restraint (LVNR) shall not be used unless deadly force is authorized.

E. Approved firearms are intended to be used as defensive instruments to prevent an assailant from completing a potentially deadly act. A firearm is discharged with the intent to stop a course of conduct.

F. Firearms are not discharged under the following circumstances:

    1. As a warning shot;

    2. When it appears likely a non-participant may be injured; or

    3. At or from a moving vehicle, except as the ultimate measure of self-defense or defense of another. Officers should employ all reasonable means available to move to an area of safety if the vehicle becomes a threat, including retreating from the threat, if practical.

ECF No. 151-6 at 9-10. The language in subsections B-1 and B-2 does not accurately reflect *Graham v. Connor*, which sets the standard for reviewing excessive force claims, 490 U.S. 386, 396 (1989).

The standard set forth in *Graham* is that of "a reasonable officer on the scene." *Id.* Even though the Fifth Circuit has used varying language to express reasonableness in the deadly force context,[3] this Court is not aware of Fifth Circuit precedent that rejects *Graham's* objective standard. As *Tolan* explained, when analyzing excessive force claims courts must not view the facts from the subjective perspective of the officer who was at the scene but rather from the perspective of "an objectively-reasonable officer" in the on-scene officer's position. *Tolan v. Cotton*, 713 F.3d 299, 307 (5th Cir. 2013) *rev'd on other grounds* 572 U.S. 650, 657 (2014).[4] In

---

[3] Compare pre-*Graham* language, "[i]f Young's movements gave Olson cause to believe that there was a threat of serious physical harm, Olson's use of deadly force was not a constitutional violation," *Young v. Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985), with post-*Graham* language, "[u]se of deadly force is not unreasonable when an officer would have reason to believe the individual poses a threat of serious harm to the officer or others," *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003), "[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others," *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011), and recent Fifth Circuit language regarding reasonableness in the context of deadly force, "[w]hen an officer uses deadly force, its reasonableness turns primarily on whether the officer had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others," *Wilson v. City of Bastrop*, 26 F.4th 709, 713 (5th Cir. 2022).

[4] The Supreme Court returned the case to the Fifth Circuit because the lower court had "failed to view the evidence at summary judgment in the light most favorable to [the nonmovant] with respect to the central facts of [the] case." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

other words, would "an objectively-reasonable officer" placed in the shoes of the allegedly offending officer take the same action.

Courts must "engage in an objective analysis;" and are not to "cast[ ] understanding of the events as they unfolded in a subjective light." *Poole v. City of Shreveport*, 691 F.3d 624, 630 (5th Cir. 2012). This analysis "cuts both ways," because courts may apply neither their own subjective interpretation of the events nor the officer's subjective interpretation of the events. *See, e.g., Chacon v. City of Austin*, No. A-12-CA-226-SS, 2013 U.S. Dist. LEXIS 71967, at *32, 2013 WL 2245139, at *11 (W.D. Tex. May 21, 2013) (being "mindful [of] its obligation to view the situation reasonably, without the benefit of hindsight," the court found that the officer's justification for his use of force was "an obvious post-hoc explanation for his behavior," as the officer's explanation was "completely discredited by his actions as captured by his own dashboard camera").

With respect to determining whether a city's policy is facially unconstitutional, a sister court recently observed:

> The Fifth Circuit has held that in analyzing the written policy of a city, the court must do so in the context of the whole. Accordingly, to confine the court's consideration to a subsection that the plaintiff finds particularly troublesome, narrowly examining in a vacuum, a single sentence of a section, would be inconsistent with generally applicable principles of interpretation regularly employed by this Court in the construction of a controlling writing.

*Sanchez v. Gomez*, No. EP-17-CV-133-PRM, 2020 U.S. Dist. LEXIS 36199, at *24, 2020 WL 1036046, at *9 (W.D. Tex. Mar. 3, 2020) (alterations omitted) (quoting *Maddux v. Officer One*, 90 F. App'x 754, 771 (5th Cir. 2004)). This Court is not aware of another case that cited *Maddux* as a guide for analyzing a city's written policy nor is the Court aware of additional Fifth Circuit caselaw that provides a roadmap for such analysis. In *Sanchez*, the court applied *Maddux* by "considering the totality of the section for its broader context when analyzing each of [the plaintiffs'] textual claims," in that case, "whether [the policy] authorized detention without probable cause or a threat of serious harm." *Id.*

12

Here, the challenged policy permits an officer to use deadly force when the officer possesses an "honest and sincere personal belief his life or the life of another person is in imminent danger" and that the "justification for the use of deadly force" can be determined by the facts "perceived by the officer at the time the deadly force is employed." Thus, the policy itself does not compel a constitutional violation, even if it may make a constitutional violation more likely. That is, an officer applying this policy may be in greater peril of facing (and losing) an excessive force claim because an officer with "an honest and sincere personal belief his life or the life of another person is in imminent danger" may still be found to have acted objectively unreasonably in the circumstances he faced. Even though it may provide poor guidance to an officer making a decision to use deadly force, the policy does not direct an officer to violate federal law. Therefore the Court cannot find that the policy, even if poorly written, is facially unconstitutional. The Court grants the City's motion for summary judgment to the extent Plaintiffs' claims are brought pursuant to a facially unconstitutional policy.

### 4. Municipal Liability Based on Ratification

A municipality may be liable under § 1983 for failure to train its municipal employees. *City of Canton*, 489 U.S. at 388. The same is true for a claim based upon a municipality's failure to supervise or discipline its police officers. *Deville*, 567 F.3d at 171 (citing *City of Canton*, 489 U.S. 378; *Piotrowski*, 237 F.3d at 581). Such claims "must identify the policy, connect the policy to the city itself[,] and show that the particular injury was incurred because of the execution of that policy." *Vega v. Cameron Cty., Texas*, 856 F. App'x 532, 533 (5th Cir. 2021) (quoting *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984) (en banc)).

Under the ratification theory of municipal liability, the Fifth Circuit has held that, "if the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Peterson*, 588 F.3d at 849

(quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "[A] policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Id.* at 849 (citing *Coon v. Ledbetter*, 780 F.2d 1158, 1161-62 (5th Cir. 1986)). And "good faith statements made while defending complaints of constitutional violations by municipal employees do not demonstrate ratification." *Id.* (citing *Zarnow*, 614 F.3d at 169).

Plaintiffs' response to the City's motion argues that their "failure to train claim is supported by the City's conduct after the fact—its failure to discipline or otherwise reprimand Casanova for his obvious violations and reckless behavior. In short, the City approved and ratified Casanova's conduct, let the entire [police] force know that it supported what he did, in spite of its own policies." ECF No. 188 at 26. Plaintiffs further contend that because "Casanova received no discipline, reprimand, or order for further training from McManus and/or the City, despite glaring violations of policy and conduct that his fellow officers described as 'reckless' . . . [the policymakers] have ratified and approved of Casanova's conduct, which itself establishes a custom and policy supporting the use of unjustified, and unconstitutional, deadly force." *Id.* at 29.

Viewing the facts in the light most favorable to Plaintiffs, Casanova pushed open the front door of the home at 217 Roberts, did not verbally identify himself as a police officer, gave a command to Snowden to show his hands, and then, without giving Snowden time to comply, fired two shots, killing Roundtree, hitting Snowden, and narrowly missing Singleton. Accepting Plaintiffs' version of the facts (which the Court has found are not blatantly or undeniably contradicted by the audio and video evidence) no one in the house had a gun and no one made any threatening gestures. Plaintiff Snowden was not holding or reaching for a gun, he was merely pulling his pants up. Snowden Dep. 76:5-18. Additionally, no one in the living room matched the description of the individual Casanova said he was searching for. Snowden Dep. 66:18-68:20; Casanova Axon 16:00-16:05; Pl. Ex. 17 (showing the pants Snowden was wearing when he

encountered Casanova); Pl. Ex. 18 (showing Roundtree, whose hair is very different from that described by the assault victim); Taylor Singleton is female and the person Casanova sought was male.

Plaintiffs contend that after the shooting, "Chief McManus, before any investigation could be conducted, immediately adopted Casanova's version of the events, which erroneously included Charles Roundtree, Jr. being in possession of a handgun, claiming that Casanova's conduct was justified because one of the occupants had a gun." *Id.* at 11. In support of this contention, Plaintiffs offer Chief McManus's deposition testimony in which he testifies that he recalled giving a public statement that Roundtree was armed with a gun. McManus Dep. 21:16-19. And that he could not recall if he retracted that statement. *Id.* 24:13-18. It is undisputed that Roundtree did not possess a gun during the incident that formed the basis of this lawsuit. *Id.* 21:20-22.

Next, the "investigating officers made sure their investigation was merely a means to reach this same conclusion, simply taking Casanova's word for it that Snowden had a gun when Casanova shot, never bothering to consider the fact that no one—other than Casanova—could see a gun on his body-cam video, the fact that no other officer saw a gun in the house or on Casanova's body-cam video, and the fact that none of the occupants of 217 Roberts said there was a gun anywhere in the house." ECF No. 188 at 12. In support, Plaintiffs offer the deposition testimony of Snowden and Singleton who testify that no one in the house had a gun. Snowden Dep. 76:5-18, 135:17-136:8, 138:24-139:17; Singleton Dep. 60:5-14. Plaintiffs also offer the depositions of Officers[5] Garza, Hines, Perez, and Luza. Officer Garza testified that he did not see a gun on the Axon video and that at the moment Casanova said, "let me see your fucking hands," he started shooting. Officers Garza and Hines testified that they did not have any personal knowledge of

---

[5] It is clear that these witnesses are police officers. Because the rank of each of these witnesses is not clear, the Court uses the general designation "Officer."

anyone in the house having a gun. Garza Dep. 44:10-22; Hines Dep. 86:10-13. Upon watching the Axon, Officer Perez stated that he did not see a gun but he saw something shiny on the video that could have been anything. Perez Dep. 98:13-25. Officer Luza testified that based on the Axon video it was not clear to him whether or not there was a gun but that he saw a photo of a gun outside the house. Luza Dep. 16:13-17:10. Plaintiffs also offer the deposition testimony of Chief McManus who, in viewing the Axon video taken at the scene during his deposition, was unable to categorically state that Snowden had a gun. McManus Dep. 76:12-77:7, 78:2-7, 81:3-15.

Then, the City stated that Casanova acted in accordance with his training "even though a number of the investigating officers agreed that Casanova's conduct was 'reckless' and that his conduct violated the City's own use of force policy." ECF No. 188 at 12. In support, Plaintiffs offer Chief McManus's and Officers Hines, Perez, and Luza's depositions. Chief McManus testified that Casanova's actions were justified and in accordance with SAPD training. McManus Dep. 72:14-74:14. When asked, "is it your opinion that firing into an occupied home, not knowing where everyone is located in the home, is reckless," Officer Hines testified, "yes, I would consider that reckless, yes, sir." Hines Dep. 71:16-72:1. Officer Perez testified that firing into an occupied home while backing up could possibly be reckless. Perez Dep. 98:9-12. And Officer Luza testified firing into an occupied house could be dangerous and could possibly lead to the death of innocent third parties. Luza Dep. 18:7-18, 65:2-16, 67:20-71:19.

Finally, Plaintiffs argue that "the City went so far as to arrest Snowden and charge him with unlawful possession of a firearm where he remained in jail for [ten] months before being released. That strategy backfired when the City could not find Snowden's DNA or fingerprints on the gun they claim to have found outside of 217 Roberts, and when the jury eventually found Snowden to be not guilty of having a firearm." ECF No. 188 at 12. Plaintiffs' Exhibit 10, a Bexar County Forensic DNA Report, states in pertinent parts that (1) an insufficient quantity/quality of

human DNA was identified on the swabs from the handgun, the magazine, and the live rounds, to develop a genetic profile suitable for forensic DNA comparisons; (2) human DNA consistent with originating from at least two contributors was identified on the swab tips; and (3) due to the limited quantity/quality of DNA present, the complexity of the observed genetic mixture, and the possible sharing of genetic material among the contributors, a genetic profile suitable for a forensic DNA comparison could not be developed. Officer Perez testified that both Snowden and Singleton told him, during the course of his investigation into the events at 217 Roberts, that no one in the living room had a gun that night. Perez Dep. 31:4-9. Perez further testified that he made the decision that Casanova did "nothing wrong" that night based solely on Casanova's account, the finding of a 9mm handgun outside of the home, and a magazine under a bed in the back bedroom. *Id.* 31:10-20. He further testified that the evidence he reviewed did not prove that Devante Snowden had a gun. *Id.* 31:21-23.

The Fifth Circuit has recognized that ratification of an officer's actions or conduct by a municipality may establish the policy element of a *Monell* claim. *Grandstaff*, 767 F.2d at 169 ("There must be (1) *a policy* (2) of the city's policymaker (3) that caused (4) the plaintiff to be subjected to a deprivation of constitutional right.") (emphasis added). In that deadly force case, the evidence showed that "the officers knew that third parties lived in the home from which the Grandstaff pickup came"; the officers were "aware of the possibility that an innocent resident of the house could have been in the pickup"; and "from their protected position in the path of the Grandstaff pickup, with five patrol units and six officers between the slow moving pickup and the exit, without awaiting any hostile act or sound, they poured their gunfire at the truck and into the person of James Grandstaff"; the officers "showed no inclination to avoid inflicting unnecessary harm upon innocent people"; "they simply saw a target and fired." *Grandstaff*, 767 F.2d at 167-68.

In this case, viewing the evidence in the light most favorable to Plaintiffs, on October 17, 2018, Davante Snowden, Taylor Singleton, and Charles Roundtree were "chilling" and "listening to music" and Hence Williams and Michelle Martinez were resting in a back bedroom at 217 Roberts Street. Snowden Dep. 137:1-25; Perez Dep. 54:13-22. Casanova was patrolling the area that night and received a report that a man had been assaulted outside of 218 Roberts Street and the alleged assailant had retreated into a house across the street. The complainant did not report that any weapon was used or present during the assault. Casanova decided the assailant must have gone into 217 Roberts and that he would "wait for [his] other partner to get [there]" and then they would "try to go make contact at that house." Casanova Axon 03:20-05:01.

Casanova appeared giddy at the prospect of being able to get inside 217 Roberts (which he believed was a "dope house") when, after he gained an excuse to conduct a knock and talk, said to Officer Panah, "what are the odds of that shit," Casanova Axon 07:35-07:40; Officer Panah commented, "you know they're not gonna answer the door," Panah Axon 10:48-10:52; and Casanova replied, "I know but it's worth a fucking shot," *id.* Casanova knew that third parties could be present in the house at 217 Roberts. After all, he had been watching the house and he knew its owner, Hence Williams. Casanova Axon 05:20-05:35, 12:06-12:32; Panah Axon 11:37-11:56. It was well-past midnight, making it likely that Hence—who requires assistive devices to ambulate—would be home. Panah Axon 07:12-08:36; Snowden Dep. 66:7-12; Casanova Dep. 107:23-108:11, 135:1-9.

Once his crew arrived to back him up, Casanova walked up to the front door of 217 Roberts and knocked twice. Then, he pushed the front door open. Snowden Dep. 54:13, 78:13-19, 80:22-81:3, 139:20-140:13; Singleton Dep. 43:5-10; 50:20-51:3; Panah Axon 15:25-15:31. He did not announce himself as a police officer, but simply said, "what's up man?" Casanova Axon 15:55-16:01; Panah Axon 15:20-15:32. And even though he said the overhead light in the living room

was so bright anyone would be able to see him, and his uniform, and his badge, and his SAPD-emblazoned beanie, he shined his flashlight at the occupants sitting in the living room. Snowden Dep. 42:19-23, 75:22-23, 77:16-18, 79:7-12, 20-21, 80:3-4, 81:2-3; Singleton Dep. 49:17-19, 50:5-14; Casanova Axon 15:55-16:06; Panah Axon 15:25-15:40. None of the persons in the living room matched the description of the alleged assailant Casanova sought.

As Devante Snowden got up to see who was at the door, without observing any hostile act, Casanova yelled, "let me see your fucking hands" and without giving any time to comply with this order, he fired his service revolver into the home. Casanova Axon 16:05-07. Casanova and the other officers retreated while the occupants of the home—not knowing who had shot at them—called 911 for help and tried to save Charles who had been shot in the chest. Snowden Dep. 85:4-23; Singleton Dep. 65:18-66:17, 67:14-18. More than fifteen minutes passed before anyone who could render professional aid entered the home. Casanova Axon 16:06-38:00. By that time, Charles Roundtree had died.

In *Grandstaff*, upon finding that the "officers and a city police force failed, at great cost," and that "those officers and their supervisors thereafter denied their failures and concerned themselves only with unworthy, if not despicable, means to avoid legal liability," the Fifth Circuit imposed municipal liability for a policy of "prevalent recklessness," *id.* 767 F.2d at 166.

Plaintiffs argue that the City charged Snowden with felon in possession of a firearm and pursued the case against him as one element of its efforts to cast a negative light on the occupants of 217 Roberts in order to protect Casanova and justify his conduct. If true, the City's actions go beyond good faith statements, generally defending conduct that is later shown to be unlawful, or making an internal administrative decision that an officer's conduct does not warrant discipline. *See Peterson*, 588 F.3d at 852; *Zarnow*, 614 F.3d at 169; *Medina v. Ortiz*, 623 F. App'x 695, 701 (5th Cir. 2015); *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017). Such a finding

would support a jury's conclusion that the City engaged in "unworthy, if not despicable, means to avoid legal liability." *Grandstaff*, 767 F.2d at 166. This should be decided upon weighing the evidence and testing the credibility of the witnesses. There is evidence in the record that contradicts the City's version of the events as they unfolded October 17, 2018, and on that evidence a reasonable juror could find that Snowden merely got up to see who was at the door and Casanova shot him, killed Charles Roundtree, and narrowly missed Taylor Singleton.

Should the jury reach the conclusion that the City then took extreme measures to defend Casanova and to shield itself from liability, the jury would be entitled to infer that Casanova's conduct on October 17, 2018 demonstrated the policy of the San Antonio Police Department as approved by its policymaker. Moreover, should the jury find that Casanova "seize[d] an unarmed, nondangerous suspect by shooting him dead" in the absence of "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," *Garner*, 471 U.S. at 11, this finding would likely meet the "sufficiently extreme" requirement set by the Fifth Circuit. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (the officer's conduct must be "sufficiently extreme--for instance, an obvious violation of clearly established law").

Upon hearing the testimony, viewing the evidence, and resolving the disputed facts, the jury can decide if Casanova's conduct was extreme and whether the City ratified Casanova's conduct by engaging in a campaign to tarnish the reputations of the people inside 217 Roberts as a means to avoid legal liability. Accordingly, the Court denies summary judgment on Plaintiffs' municipal liability claim for failure to train, supervise, and discipline brought under a ratification theory.

## V. CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART**

*Defendant City of San Antonio's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(c) and/or*

*Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56* (ECF No. 151).

The Court **denies as moot** the City of San Antonio's motion to dismiss Bernice Roundtree

and Patricia Slack. **Plaintiffs' claims against the City for failure to train, supervise, and**

**discipline based upon a ratification theory shall proceed**. All other claims against the City of

San Antonio are **dismissed with prejudice**.

**It is so ORDERED this 28th day of March 2022.**

_____
**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**