# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3    BERNICE ROUNDTREE,              )
      Individually and on behalf of  )
 4    the Estate of CHARLES          )
      ROUNDTREE, JR. And the         )
 5    Statutory Beneficiaries,       )
      TAYLOR SINGLETON and DAVANTE   )
 6    SNOWDEN,                       )
                      Plaintiffs,    )
 7                                   )
      VS.                            ) CIVIL ACTION NO.
 8                                   ) SA-18-CV-1117-JKP-ESC
      CITY OF SAN ANTONIO, TEXAS;    )
 9    and STEVE CASANOVA             )
                      Defendants.    )
10

11   ****************************************************

12                   ORAL DEPOSITION OF

13             JOHN G. PETERS, JR., Ph.D.

14                    March 13, 2025

15   ****************************************************

16        ORAL DEPOSITION OF JOHN G. PETERS, JR., Ph.D.,

17   produced as a witness at the instance of the Defendant,

18   and duly sworn, was taken in the above-styled and

19   -numbered cause on the 13th day of March, 2025, from

20   10:01 a.m. to 4:57 a.m., before Quinlyn Jones, CSR in

21   and for the State of Texas, reported by machine

22   shorthand, pursuant to the Texas Rules of Civil

23   Procedure and the provisions stated on the record or

24   attached hereto.

25
```



```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   BERNICE ROUNDTREE,                )
     Individually and on behalf of     )
 4   the Estate of CHARLES             )
     ROUNDTREE, JR. And the            )
 5   Statutory Beneficiaries,          )
     TAYLOR SINGLETON and DAVANTE      )
 6   SNOWDEN,                          )
                    Plaintiffs,        )
 7                                     )
     VS.                               ) CIVIL ACTION NO.
 8                                     ) SA-18-CV-1117-JKP-ESC
     CITY OF SAN ANTONIO, TEXAS;       )
 9   and STEVE CASANOVA                )
                    Defendants.        )
10

11   **********************************************************

12                   ORAL DEPOSITION OF

13              JOHN G. PETERS, JR., Ph.D.

14                    March 13, 2025

15   **********************************************************
                  REPORTER'S CERTIFICATION
16           DEPOSITION OF JOHN G. PETERS, JR., Ph.D.
                      March 13, 2025
17

18       I, Quinlyn Busby, Certified Shorthand Reporter in

19   and for the State of Texas, hereby certify to the

20   following:

21       That the witness, JOHN G. PETERS, JR., Ph.D., was

22   duly sworn by the officer and that the transcript of the

23   oral deposition is a true record of the testimony given

24   by the witness;

25       That the witness was located in Dallas, Texas;
```



1         That the amount of time used by each party at the

2    deposition is as follows:

3         Mr. Lowell Denton        .....02 HOURS:29 MINUTES
          Mr. Daryl Washington     .....00 HOURS:25 MINUTES
4         Mr. Mark Kosanovich      .....02 HOURS:33 MINUTES

5         That pursuant to information given to the

6    deposition officer at the time said testimony was taken,

7    the following includes counsel for all parties of

8    record:

9         Mr. Daryl Washington, Attorney for Plaintiffs;
          Mr. Lowell Denton, Attorney for Defendant;
10        Mr. Mark Kosanovich, Attorney for Defendant;
          Mr. Mark Ralls, Attorney Defendant.

11

12        I further certify that I am neither counsel for,

13   related to, nor employed by any of the parties or

14   attorneys in the action in which this proceeding was

15   taken, and further that I am not financially or

16   otherwise interested in the outcome of the action.

17        Further certification requirements pursuant to Rule

18   203 of TRCP will be certified to after they have

19   occurred.

20

21

22

23

24

25



1  developed since your report as a result of the Tanwar

2  material, correct?

3        A.  Correct.

4        Q.  Anything else as a result of having that

5  material that you didn't have before?

6        A.  No, I think I think we've covered it.

7        Q.  All right.  So in your analysis in this case,

8  as in many of your prior cases, you're not bringing to

9  this jury any determinations or opinions on credibility,

10 correct?

11       A.  Correct.

12       Q.  Do you have opinions on which facts are true or

13 false?

14       A.  Not in a sense of true or false, I think some

15 of the objective evidence or potential evidence

16 depending if the court allows it is the video.  But the

17 video becomes subjective once you view it.  So you and I

18 can look at a video and come away with different

19 opinions about the video.  That's the subjectivity of

20 analysis.

21       Q.  Very good.  And that's the reason that that's

22 up to the jury?

23       A.  Correct.

24       Q.  And you're going to leave that up to the jury?

25       A.  Correct.



1        Q.   And you're not telling the jury who's telling

2   the truth, correct?

3        A.   Correct.

4        Q.   And it's up to them to look at that video and

5   to draw their own conclusions listening to you and all

6   the other witnesses?

7        A.   Correct.

8        Q.   All right.  You're not going to be offering any

9   opinions on the law and legal standards because that's

10  the judge's job?

11       A.   That's right.

12       Q.   Now, we will be talking about Graham versus

13  Connor and some of the other cases that are in your

14  report, but you don't intend to offer opinions on what

15  the law is in those cases?

16       A.   Correct.  The reference is more for training

17  purposes than for any legal opinion.

18       Q.   All right.  Now, clarify for me, you refer to

19  national standards more than once in your report, I'm

20  confused because I've seen your prior testimony where

21  you say there is no national standard for the use of

22  force or for deadly force, is that true?

23       A.   No, there is a national standard for the use of

24  force and deadly force.

25       Q.   Is it the 4th Amendment definition under Graham



```
 1   versus Connor?

 2        A.   Correct.

 3        Q.   And the subsequent case law?

 4        A.   Correct.

 5        Q.   All right.  And the national standard is not

 6   from some policy from a particular agency or like the

 7   IACP?

 8        A.   No, IACP is an advocacy group, an organization.

 9        Q.   As is CALEA, the organization that accredits

10   police departments?

11        A.   Correct.

12        Q.   As would be PERF, the other organization?

13        A.   Correct.

14        Q.   The Police Executive Research Forum?

15        A.   Correct.

16        Q.   Okay.  And you will not be, I don't believe

17   you'll be expressing any opinions on qualified immunity?

18        A.   No, certainly not.

19        Q.   Okay.  Because again, that's a legal question

20   for the court and the jury to determine?

21        A.   Correct.

22        Q.   No opinions on what law was clearly established

23   for purposes of that analysis?

24        A.   Not for qualified immunity, no.

25        Q.   Okay.  All right.  Your report doesn't say
```



1      Q.   Now, there's nothing in policy 501 about cover

2  and concealment, correct?

3      A.   I don't recall any.

4      Q.   Right.  So are you talking about a failure to

5  respond to Mr. Snowden's conduct by covering and

6  concealing?

7      A.   No.  What I'm referring to here, there's

8  nothing in the record that I reviewed from the original

9  complainant that pointed out that that was the house she

10 was referring to.  Then Officer Casanova went to that

11 house and I think the man's name was John, who was

12 sitting on the front step, and as I recall, Officer

13 Casanova shined a flashlight on him, asked him who are

14 you and at some point said, oh, I recognize you.  Never

15 asked who was in the house, never asked did you see

16 anything, never asked the fundamental questions that I

17 think an officer would ask under those circumstances,

18 because given the information that was provided by the

19 complainant, we have a person who is allegedly battering

20 other people.  So you know you've got an aggressive

21 violent person or potentially violent person up front

22 and then you go and you know, just simply knock on the

23 door by yourself.  I think there's other ways, better

24 ways and more efficient ways to handle that from a

25 safety perspective.  Both for the officer and for the



John Peters                                    March 13, 2025
                                               Page 40

```
 1                MR. DENTON:  I understand.
 2                MR. WASHINGTON:  It's just -- that's all.
 3                MR. DENTON:  I'm being courteous and I
 4   think the record shows my courtesy.
 5        Q.  (By Mr. Denton) Do you remember where you were,
 6   Dr. Peters?
 7        A.  No, I don't.
 8        Q.  Okay.
 9                MR. DENTON:  Can you read back the last
10   part of that answer so that he can pick up --
11                DR. PETERS:  It was the last sentence or
12   two.
13                MR. DENTON:  That courteous enough?
14                (Requested portion read.)
15        A.  All I was going to add to that was one of the
16   first rules in officer safety training is time is on
17   your side in almost every instance.  You have time to
18   set it up properly, you have time to keep the pacing of
19   the event at your pace not necessarily at the target's
20   pace, whatever the target is, could be a homeless
21   person, could be anybody.  That's all I was going to
22   add.
23        Q.  (By Mr. Denton) Okay.  Thank you.  So, you're
24   not telling this jury that it is inappropriate or
25   improper police behavior to lawfully go up to a door and
```



John Peters                                             March 13, 2025
                                                              Page 41

1  knock on the door to have a conversation?

2       A.  If you have a reason to do that, certainly not.

3       Q.  All right.  And doing so to see whether or not

4  an assault assailant is in that house is a totally

5  legitimate police tactic?

6       A.  It can be if that house was identified as where

7  the person is.

8       Q.  Okay.  And do you agree that Ms. Preciado

9  agreed with Officer Casanova's question about whether or

10  not the house was the one that the lady went into?

11              MR. WASHINGTON:  Objection, form.

12       A.  I don't recall seeing that.

13       Q.  (By Mr. Denton) Okay.  All right.  In any

14  event, now that he's on the porch for a knock and

15  talk --

16              MR. WASHINGTON:  Objection, form.

17       Q.  (By Mr. Denton) -- how can he do a knock and

18  talk and be covered and concealed?

19       A.  Well, again, we go back, I think this started

20  wrong from the beginning in my analysis.  As I said

21  earlier, they could've made other ways to announce who

22  they were and had people come out if they really thought

23  this was a problem.  What I got from reading the report

24  is, Casanova wanted to get into that house because he

25  thought it was a drug house.



1    Q.  Is that your answer?  All right.  I'm just
2  trying to make sure I'm listening to what you're saying.
3  Are you not finished?
4    A.  No.  I just think from reading the reports and
5  based on what he said in those reports and other
6  testimony he wanted to get into that house.
7    Q.  And in his reports and his testimony, it was
8  clear that he knew where the lines were, right?
9    A.  Which lines?
10          MR. WASHINGTON:  Objection, form.
11   Q.  (By Mr. Denton) The 4th Amendment line?
12          MR. WASHINGTON:  Objection, form.
13   A.  Well, he didn't establish probable cause.
14   Q.  (By Mr. Denton) He said that if I can't, he
15 said in his deposition testimony that he knew that once
16 he talked to the people there if he couldn't find
17 probable cause he had to go back to the office and write
18 it up?
19   A.  Right.
20   Q.  He knew he couldn't get into the house unless
21 he had consent, right?
22   A.  Right.
23   Q.  Okay.  So do I have the full understanding of
24 what your opinion is about failure to use cover and
25 concealment at this location?



 1        A.   I think we've covered it.

 2        Q.   And I want to make sure that I have an answer

 3   and I'm not trying, this is a real world problem you

 4   know, if an officer goes up there, he had not been told

 5   if there are any weapons in that house, right?

 6                 MR. WASHINGTON:   Objection, form.

 7        A.   I don't think he knew what was in the house.

 8        Q.   (By Mr. Denton) Right.   Nobody had told him

 9   that there were weapons?

10                 MR. WASHINGTON:   Objection, form, calls

11   for speculation.

12        A.   Right.

13        Q.   (By Mr. Denton) Okay.   Nobody had told him that

14   they had seen a weapon on the people that were involved

15   in the assault?

16        A.   The only weapon would've been fists.

17        Q.   Okay.   No guns or knives mentioned by anybody?

18        A.   Not in the report I saw.

19        Q.   Well, you haven't seen any facts that suggested

20   there was any history of weapons at that location?

21        A.   I don't recall saying that.

22        Q.   So, Officer Casanova believed that that was a

23   drug house, but he didn't have any information that the

24   people were violent or had weapons, correct?

25        A.   I don't recall him saying that he did.



1      Q.  All right.  Certainly no violent context for

2   his interaction with Mr. Cotton on the front porch?

3      A.  No, he approached Cotton.

4      Q.  Okay.  So, if a police officer goes up to a

5   door and wants to have a conversation with the people

6   and when the door comes open somebody pulls out a gun,

7   now your opinion is that didn't happen, right?

8                MR. WASHINGTON:  Objection, form.

9   Objection to the side bar.

10     A.  Correct.

11     Q.  (By Mr. Denton) Right.  But if that happens, if

12  that happens and somebody pulls out a gun, that officer

13  has a right to defend himself?

14     A.  If he or she is placed in imminent jeopardy.

15     Q.  Correct.  If the officer reasonably believes

16  that there is an immediate risk of deadly force or

17  serious bodily injury?

18     A.  I think imminent is the word.

19     Q.  Okay.  Immediate, imminent, the same principal

20  right?

21     A.  No, they're very different terms.

22     Q.  Okay.  So, immediate is different than

23  imminent?

24     A.  Correct.

25     Q.  All right.  But imminent danger of serious



1  bodily injury or death, correct?

2      A.  That's the standard.

3      Q.  All right.  And if somebody in the house pulls

4  out a gun and begins to bear down on the officer, it

5  meets that standard, right?

6              MR. WASHINGTON:  Objection, form.

7      A.  If that were to happen and the officer had to

8  respond right away, yes.

9      Q.  (By Mr. Denton) Okay.  So I'm moving on past

10 number five on your executive summary.  Number six,

11 we've already covered, that was the after the fact shots

12 fired.  Number seven, then I believe that's another

13 opinion that you have against the city and not my

14 officer, Officer Casanova?

15     A.  That's the IAP, so right.

16     Q.  Is that correct?

17     A.  Yes, that was it.

18     Q.  That's against the city and not my client?

19     A.  Number seven?

20     Q.  Yes.

21     A.  Correct.

22     Q.  So you understand that my client's conduct is

23 based on what he's testified that he saw with his own

24 eyes, right?

25     A.  That's what he testified to, yes.



 1  question after --
 2      Q.  I think you'd already answered that one.
 3      A.  All right.  I think so, too.
 4              MR. WASHINGTON:  Dr. Peters, it's a
 5  strategy that's played.  If you have an answer, please
 6  give your complete answer, all right.
 7              MR. DENTON:  And please do.
 8              MR. WASHINGTON:  Don't let counsel stop
 9  you or prevent you from giving your full answer.  We
10  could be here --
11      Q.  (By Mr. Denton) And I'll reiterate, that I want
12  to hear your full answer.  I just want you to answer my
13  question.
14      A.  All right.  Fair.
15      Q.  So you agree that you're, first of all, your
16  report doesn't say that my client went to the wrong
17  house or didn't have a reason to go there, is that your
18  opinion?  It's not in your report.
19      A.  I just, I didn't say it was the wrong house, he
20  just didn't have information that I saw that that was
21  the house.
22      Q.  All right.  But there's no reason he that can't
23  go knock and talk under those circumstances?
24      A.  No, he can go and make inquiry.
25      Q.  All right.  Your issues in the report about the



1      Q.   All right.

2      A.   I mean, I've read the forensic reports and all

3  of those things so, yeah, but we also have Mr. Roundtree

4  in the equation.  We kind of keep sidestepping

5  Roundtree.

6      Q.   Let me go directly --

7            MR. WASHINGTON:  Hold on, Lowell just let

8  him finish, please.  I know you want to get to your next

9  question, just let him finish.

10     A.   So we keep focusing on Snowden getting up and

11 moving and we have the officer who said I knew there

12 were people in there and he shot.  So, I just want to

13 keep Roundtree in the picture here.

14     Q.   So, you finish?

15     A.   Yes.

16     Q.   So my questions were focussed on who the

17 officer was shooting at and that was Mr. Snowden,

18 correct?

19     A.   No, I think he was shooting into the house.

20     Q.   How do you reach the conclusion that my officer

21 intended to shoot anybody other than Mr. Snowden?

22     A.   Well, we have a dead guy.  And I don't think

23 that was a mistake.

24     Q.   Okay.  Thought it was on purpose?

25     A.   He intended, based on the video evidence, and



1  his own testimony to shoot into a building that he knew

2  was occupied.

3      Q.  All right.  Any fact that suggest that he was

4  shooting in response to anything that Charles Roundtree

5  did?

6      A.  No.

7      Q.  Any fact that suggests that he thought Charles

8  Roundtree deserved to be shot?

9              MR. WASHINGTON:  Objection, form.

10     A.  I didn't see anything.

11     Q.  (By Mr. Denton) Okay.  There was a reflection

12  off of Ms. Singleton's cell phone right in front of him

13  on that video, you saw it?

14             MR. WASHINGTON:  Objection, form.

15     A.  I'd have to go back and look at it.

16     Q.  (By Mr. Denton) My client testified that he saw

17  the glare off of the slide of a 9mm handgun, didn't he?

18     A.  Yes.

19     Q.  Okay.  He didn't shoot Ms. Singleton, did he?

20     A.  No.

21     Q.  Do you agree with her testimony about the

22  timing of the shots that the first shot hit Mr. Snowden

23  in the buttocks and then hit the wall?

24             MR. WASHINGTON:  Objection, misstates the

25  testimony.



1  thought was a weapon, correct?

2              MR. WASHINGTON:  Objection, form.

3      A.  He did, I think he testified that he thought he

4  could hit Mr. Snowden.

5      Q.  (By Mr. Denton) And your report goes through

6  how the, my client was mistaken about believing that he

7  had accuracy, right?

8      A.  Yeah, statically, it doesn't hold true.

9      Q.  So statistics in your report don't have any

10  correlation to the distances of the shots fired, do

11  they?

12     A.  No, the, the correlation to the distance, we

13  only have one distance basically.

14     Q.  So on, we've just talked on page ten about the

15  perpetuation of a false shooting narrative?

16     A.  Yes.

17     Q.  I want to call your attention to 16, I believe

18  I was just asking you about page 16.

19     A.  Page 16, thank you.

20     Q.  And this is where you have some discussion in

21  several paragraphs about the fact that police officers

22  can't hit their targets?

23     A.  Correct.

24     Q.  You agree actually that officers are taught

25  that they should shoot twice if they have to use deadly



1  force because they usually miss with their first round?

2       A.   Depends on your firearms training program.

3       Q.   You know my client testified he was taught

4  exactly that, right?

5       A.   Called a double tap.

6       Q.   No reason not to believe he was taught that

7  way?

8       A.   No, if he said he was taught way.

9       Q.   And what I was asking you, it appears to me

10 that in the three paragraphs discussing the statistics

11 there, LAPD's report, the Donner and Popovich study and

12 the Dallas Police Department study, none of those are

13 correlated to the distance fired versus the percentage

14 of accuracy.

15      A.   Yeah, no, I put all those on the jump drives.

16      Q.   Okay.

17      A.   So you have all --

18      Q.   I can take a look at those.

19      A.   Yeah, you have all the data, there is some, as

20 you see in the third paragraph, the last sentence it

21 said 37 percent of the time the distance is seven yards

22 or less, so that's less than 21 feet.  So, there are,

23 some of these studies actually do correlate to that.

24      Q.   Okay.  Very good.  And seven yards or less is a

25 lot farther than we had at issue here.  Here we have



 1  that as a possibility here.

 2      Q.  All right.  And you're not saying that if in

 3  fact there was a gun and the gun was pointed at him that

 4  he should've tried to move out of the way?

 5      A.  If there was a gun and it was directly pointed

 6  at him, which doesn't show in the video --

 7      Q.  I understand.

 8      A.  There's no (unintelligible).

 9      Q.  All right.  That's never --

10          THE REPORTER:  I'm sorry, there's no?

11      A.  If the gun were pointed at Officer Casanova,

12  which my understanding doesn't show in the video at all,

13  so if that's a hypothetical there may not have been time

14  to move out of the way.

15      Q.  Thank you.  And that's not a defensive tactic

16  that any agency teaches?

17      A.  No, people are taught that if you can move out

18  of the way, if you can, and it doesn't jeopardize

19  anybody, sure, move out of the way.

20      Q.  But it's a question of sufficient time?

21      A.  Time is a variable, yes.

22      Q.  Taking into account that reactionary gap

23  formula?

24      A.  Well, the reactionary gap can apply to many

25  different things, so time is a variable.



 1        A.   No, I would still move.

 2        Q.   Okay.

 3        A.   Because if my partner's paying attention, he

 4   should be -- it's kind of interesting that nobody else

 5   shot.  If the partner's that close and he sees it, why

 6   didn't he also shoot?

 7        Q.   So, in your opinions about the recklessness of

 8   shooting into this house, I want to try to get a clear

 9   answer about whether or not it is your analysis that if

10   a police officer is in fact facing the imminent gunfire

11   from an assailant with a weapon, that that police

12   officer has to hold their fire, maybe at the loss of

13   their life because somebody in the background might get

14   hit, is that your opinion about what the standard is

15   about policing in the United States?

16        A.   No.  If you're staring down the barrel and you

17   think you're going to be shot and it's imminent, you

18   have to do what you have to do.

19        Q.   Okay.  Any other reasons other than the

20   forensics that make you believe that Mr. Snowden did not

21   have a firearm in his hand or pants or on his person?

22        A.   There's, the video doesn't indicate there's a

23   specific view of a handgun and all the hypotheticals

24   that you gave me in the last, say hour, aren't supported

25   by the video.



1    Q.  In what way are they not supported by the

2  video?

3    A.  There's no video that shows a gun barrel being

4  pointed at Casanova.

5    Q.  And so you agree that at the time the shots

6  were fired Mr. Snowden is essentially out of the frame

7  of the body worn camera video?

8    A.  He's moving out of the frame and he's moving

9  away from that window, if you will.

10   Q.  And so I couldn't, I think that you weren't

11  sure about whether or not the shot that grazed both his

12  left and right buttock meant that he was at an angle

13  sideways to the officer, do you agree or disagree with

14  that?

15   A.  From the video, it would show that he was

16  turning to move, so he would be more sideways.

17   Q.  Okay.

18   A.  More of his back turned.

19   Q.  All right.  And you agree that the bullet did

20  not enter him from the back and exit from the front?

21   A.  I don't recall the bullet exiting.  If you can

22  point me to a document.

23   Q.  If you'll look at tab number nine.

24   A.  Okay.

25   Q.  I'll mark this as deposition Exhibit Number 4.



1  This is a photograph of Davante Snowden's buttocks and

2  the bullet graze that goes across from one side to the

3  other.

4       A.   Right.

5       Q.   Had you seen that before?

6       A.   Yes.

7       Q.   Okay.  Do you agree that that indicates that at

8  the time of the bullet strike that he was sideways to

9  the approaching bullet?

10      A.   It would indicate that.

11      Q.   Just as a matter of physics?

12      A.   It would indicate that.

13      Q.   And from what you've seen on the video, and you

14 talked about him turning earlier, was he turning to his

15 right or his left?  Davante Snowden's right or left?

16      A.   He was turning to his right.

17      Q.   Okay.

18                MR. KOSANOVICH:  When you said his, did

19 you mean Davante Snowden?

20                MR. DENTON:  Yes.

21                MR. KOSANOVICH:  I'm sorry.

22                MR. DENTON:  No, that's fine.  Thank you

23 for the clarification.

24                MR. KOSANOVICH:  The readback's going to

25 be a little easier.



 1  on that.

 2      Q.  Thank you for clarifying that, I appreciate

 3  that.  And also, so the jury understands the opinions

 4  that you're giving, the standard is whether or not a

 5  police officer believes that there's an imminent danger

 6  of being shot and not whether or not a shots being

 7  fired?

 8      A.  That would be part of the calculus.

 9              MR. WASHINGTON:  Objection, form.

10      Q.  (By Mr. Denton) Is that correct?

11      A.  That would be part of it, yes.

12      Q.  So, when questions were asked in a lot of the

13  depositions here, nobody ever shot at you right, you

14  read all that?

15      A.  Right.

16      Q.  And that's not the legal standard, is it?

17      A.  No, you don't have to be shot at to use deadly

18  force.

19      Q.  Okay.  So and I think I understand that it's

20  clear that a large basis for your opinion is, is that

21  this jury should evaluate my client's conduct with the

22  understanding that there was no gun at all, right?

23      A.  That's a large piece of it, yes.

24      Q.  Right.  And you disregard the fact that the

25  magazine of a 9mm handgun was found in that house?



1      A.  No, I didn't disregard it.

2      Q.  Okay.

3      A.  I didn't disregard it.  Nobody's put anything,

4  the forensics doesn't put Snowden's DNA or fingerprints

5  or anything else on the weapon.

6      Q.  All right.  Is that your answer, I'm sorry?

7      A.  And the second part of that is, if you watch

8  the video and you mentioned earlier that frame-by-frame

9  break down, we have, I'll try to explain it so we get it

10  on the record, we have the, I'll call it the window area

11  that the video shows --

12      Q.  Just to clarify, not to interrupt your --

13          MR. WASHINGTON:  No, no, let him finish.

14  No, no, let him finish his question.  Just let him

15  finish, Lowell.

16          MR. DENTON:  Just trying to get it clear?

17          MR. WASHINGTON:  I understand.

18      A.  Door, thank you.  We have that door and we have

19  Officer Casanova on the outside, we had Mr. Snowden on

20  the inside and based on the video and your description

21  and in a movement in a previous question, we have

22  Snowden going from the viewpoint of Officer Casanova to

23  Officer Casanova's left moving out of the door opening

24  area that appears to be moving into or out of frame

25  where the wall begins.  We have the door and then we



```
 1                    MR. WASHINGTON:  Objection, form.
 2         A.  I read that report to mean they attempted to do
 3    the DNA test and they didn't have enough material.
 4         Q.  (By Mr. Denton) Okay.  You agree that the gun
 5    was found right outside the window?
 6                    MR. WASHINGTON:  Objection, form.
 7         A.  There was a gun found outside the window.
 8         Q.  (By Mr. Denton) You agree that the magazine of
 9    that gun was in the house?
10         A.  There was --
11                    MR. WASHINGTON:  Hold on Dr. Peters.
12                    Objection, form.
13         Q.  (By Mr. Denton) And let me just adjust my
14    question in case counsel is suggesting, you read a
15    report that says that the magazine of the gun was found
16    in the house?
17         A.  Yes.
18                    MR. WASHINGTON:  That's better, Lowell.
19         Q.  (By Mr. Denton) You read a report that said
20    that the gun was found outside under conditions that
21    suggested that it was recently placed there?
22         A.  Correct.
23         Q.  And you're disregarding that as any fact to
24    confirm that Mr. Snowden might in fact have had a gun?
25         A.  I'm not disregarding it, but I didn't read
```



 1  anything that tied him to it.

 2      Q.  Right.  It doesn't put it in his hand and

 3  therefore you're going to go with what he says?

 4                  MR. WASHINGTON:  Objection, form.

 5      A.  No, I'm going with what the reports have said.

 6      Q.  (By Mr. Denton) The report doesn't say

 7  Mr. Snowden never had this gun, does it?

 8      A.  No, it doesn't.

 9      Q.  All right.

10                  MR. DENTON:  I think this is actually a

11  good break.

12                  MR. WASHINGTON:  Okay.  How long you guys

13  want to say?

14                  MR. KOSANOVICH:  Thirty minutes.

15                  MR. WASHINGTON:  That's fine.

16                  THE VIDEOGRAPHER:  All right.  We're now

17  off the record at 11:50 a.m.

18                  (Lunch break taken.)

19                  THE VIDEOGRAPHER:  And we are now back on

20  the record at 12:39 p.m.

21      Q.  (By Mr. Denton) So Dr. Peters, I'll return your

22  attention back to, let's look at page 12 on your report,

23  I think that's where I had left off.

24      A.  Page 12, okay.

25      Q.  And then you have the failure to discipline for



1  policy violations, this is apart of your analysis

2  against the City of San Antonio; is that correct?

3      A.  Correct.

4      Q.  In the middle of that paragraph, thought you

5  say that Officer Casanova, my client, committed several

6  policy violations when coupled with his many versions of

7  the events are bases for disciplining him.  Would you

8  just list for me, so that I know what those several

9  policy violations are?  I want to know specifically what

10 my client did that was a policy violation?

11     A.  First of all, he met to discuss the incident

12 with the other officers.  That was a specific policy

13 violation per the use of force policy.

14     Q.  Okay.

15     A.  He gave false information to someone and I

16 don't know who because the chief of police came out and

17 said, as I recall, in a news conference that Roundtree

18 had a gun and the officer shot because Mr. Roundtree had

19 a gun.  That was totally false.  The chief actually

20 walked that back at one point, as I recall.  So again,

21 that was misinformation.  And the only person logically

22 who could say that would be Officer Casanova.

23     Q.  That's an assumption?

24     A.  Well, it's an assumption only as far as he

25 didn't come out and say he said that, but he's the only



1  one who reportedly saw the gun.  So if I'm the only
2  person in the area who said Roundtree had a gun and
3  nobody else saw that, I think everything's pointing
4  toward Casanova pretty clearly.
5      Q.  That's a conclusion that it had to come from
6  him?
7      A.  He was the shooter and more than likely it came
8  from him and if he told the detectives or he told IA or
9  he told anybody, somebody needed to verify that.  And
10  obviously that wasn't done initially.  So that was
11  another violation.  I believe based on my analysis that
12  he used excessive force, which is in violation of
13  policy.  Now, I understand that the trier of fact
14  determines whether it was excessive or not, so I don't
15  say that as a legal conclusion but based on the policy,
16  the policy explains when that can, when deadly force can
17  be used and given my analysis of all the testimony and
18  all the statements and all the reports, I didn't find
19  that there was sufficiency for him to use deadly force
20  aside from our hypothetical discussion this morning.
21      Q.  All right.  Okay.  So that's the ones you were
22  talking about in this paragraph?
23      A.  Right, because we had, we had the young lady
24  who was in the house, and we had Mr. Roundtree who was
25  in the house and we had Snowden who was in the house and



1   conduct identifying yourself as a police officer?

2        A.  I can't say for sure it requires it, I think

3   there's another policy that says you should identify

4   yourself.

5        Q.  Now, your materials attached to your report and

6   I'll broaden that question to anything that's on the

7   flash drives that you brought here today, you didn't

8   review any training materials from the San Antonio

9   Police Academy?

10       A.  No.

11       Q.  You didn't review any curriculum work plans and

12  so forth for the academy?

13       A.  Correct.

14       Q.  And I'll ask the same question with inservice

15  training programs from the San Antonio Police

16  Department?

17       A.  I didn't see lesson plans, I did see Officer

18  Casanova's training record.  I believe there were a

19  couple sheets that depicted the courses he took at the

20  academy as well as inservice.

21       Q.  Okay.  And you agree that he had taken far in

22  excess of the required state mandated training programs

23  for a police officer?

24              MR. WASHINGTON:  Objection, form.

25       A.  The basic academy he completed, that's a



1  requirement in Texas and the inservice would've met the

2  inservice requirements.

3      Q.  (By Mr. Denton) Okay.

4      A.  Now, whether there was specific inservice

5  course requirements over that period of time, I'm not

6  sure what they were.

7      Q.  You didn't look into that?

8      A.  No, but I know, used to be TCLEOSE, I think

9  it's now TCOLE.

10     Q.  Correct.

11     A.  Requires inservice training, so.

12     Q.  On page 12, we're still on 12?

13     A.  Yes.

14     Q.  Continuing that, the organizational culture and

15 unwritten ground rules, those are issues against the

16 City of San Antonio in your analysis and not my client,

17 right?

18     A.  Yes.

19     Q.  And the same thing on page 13, City of San

20 Antonio, it's mayor, police chief and so forth, those

21 are your, that's your analysis against the city's

22 failure and not my client on the date of this incident?

23     A.  That would, that would be true from the

24 investigation viewpoint, yes.

25     Q.  All right.  And we've talked about these issues



1  here before, the second paragraph under your number four

2  about my client's conduct the one, two, three factors

3  that you have down there, those are just straight out of

4  the Graham versus Connor analysis, correct?

5      A.  Correct.

6      Q.  Now, you say that he knew from his academy

7  training that the elements were not present for him to

8  use deadly force on Mr. Snowden and/or Mr. Roundtree and

9  knew that any deadly force violated, and I'm going to

10 read, national use of force standards as Graham versus

11 Connor, right?

12     A.  Correct.

13     Q.  Okay.  And what you're talking about there,

14 once again, is your conclusion's that there was no

15 weapon that justified his use of deadly force?

16     A.  Right.

17     Q.  All right.  You agree that if there is a weapon

18 and someone is committing an assault on a police officer

19 by deploying a weapon against a policeman that that

20 relevant crime for Graham analysis is a felony?

21          MR. WASHINGTON:  Objection, form.

22     A.  In most states it would be.

23     Q.  (By Mr. Denton) Okay.  So a few more questions,

24 just trying to pick out the details on Mr. Snowden's

25 movements as reflected in the body camera when he went



John Peters                                            March 13, 2025
                                                            Page 91

 1  across the room.  Do you see in the video that he had

 2  his right hand down in the area of his waist throughout

 3  that period as he went across the room?

 4                  MR. WASHINGTON:  Objection, form.

 5       A.  I'd have to look at the video again.  As I

 6  recall there wasn't much to view there.

 7       Q.  (By Mr. Denton) Okay.

 8       A.  And I think as he was getting up, his hand was

 9  in that general vicinity, but I'd have to look at the

10  video again.

11       Q.  All right.  Let's just take a quick look at it

12  again.  This won't take but a moment.

13                  (Video being played.)

14       Q.  (By Mr. Denton) So, from the live realtime

15  continuance play video, can you tell whether or not he

16  has his right hand down toward the front of his body, as

17  far as you can see?

18       A.  Well, mostly Officer Snowden's[sic] left arm

19  blocks the view, but if you look at the elbow height,

20  the elbow's pretty much like this.  I couldn't really

21  tell where the hand was because the arm blocked the

22  view.

23       Q.  Okay.  And you have received and have had an

24  opportunity to look through the hundreds of stills

25  broken down the decompression of that video, right?



 1        A.   Right.

 2        Q.   And do you agree that those stills, to the

 3   extent that they capture that portion of Mr. Snowden's

 4   movement, show that his right hand remains in that

 5   general area?

 6                  MR. WASHINGTON:   Objection, form.

 7        A.   Geographically, yes, I would agree with that

 8   yes.

 9        Q.   (By Mr. Denton) Do you agree that prior to his,

10   show me your fucking hands statement by my client, that

11   he did nothing aggressive or hostile toward any of the

12   individuals in the room?

13        A.   No, I wouldn't agree with that.

14        Q.   Okay.  What did he do?

15        A.   Well, first of all he made the door open and

16   contrary to his report that he lightly tapped it and it

17   opened, it's clear on video it didn't just open.  I mean

18   he hit that door a couple times, three times, I think,

19   so he had no reason to open that door because there's no

20   evidence of a crime being committed anywhere.

21        Q.   So, is it your conclusion that he opened the

22   door on purpose?

23        A.   It appears to be that way, yes.

24        Q.   So, you're telling the jury that he busted the

25   door open?



1  different basis, if you will or at least an explanation

2  on why he or she did what they did, versus a very

3  experienced officer with more training and more

4  specialized training and experience and what have you,

5  so it's really kind of a two-part analysis there, not

6  just objective reasonableness, but also the objective

7  reasonableness from the perspective of a similarly

8  trained officer.

9      Q.  Okay.  And I'll revisit that briefly after I

10 get to Appendix, was it D?

11     A.  I think it was D.

12     Q.  Okay.

13     A.  Thank you.

14     Q.  I think you've already told me that section 6

15 covered, which is after the fact and has to do with the

16 City of San Antonio and the same thing with seven out of

17 your report.

18     A.  Well, six, opinion six on page 19, is focused

19 on Officer Casanova's --

20     Q.  Shot fired.

21     A.  -- shots fired statement.

22     Q.  Yeah, and I apologize, I'm not trying to cut

23 you off.

24     A.  No, I understand.  I just wanted to make sure

25 that -- you had mentioned that was to the city, it's



 1  really for Casanova.

 2       Q.  I'm sorry, I misspoke if I said that.  I was

 3  saying we had covered that before, shots fired was after

 4  the fact, not a cause of what happened in terms of

 5  anybody's death and so forth.

 6       A.  Right.

 7       Q.  Has to do with policy issues and so forth even

 8  though what you're saying is Officer Casanova acted

 9  improperly?

10       A.  Right.

11       Q.  And then on number seven, once again, that's

12  your analysis of the city's shortcomings in this case?

13       A.  Correct.

14       Q.  You don't have any opinions about whether or

15  not my client has any responsibility or violated any

16  applicable standards in connection with the prosecution

17  of Mr. Snowden?

18                 MR. WASHINGTON:  Can you repeat that

19  question?

20       A.  Not quite sure I understood that.

21       Q.  (By Mr. Denton) Do you have any opinions that

22  my client did anything legally or constitutionally wrong

23  that resulted in the prosecution of Mr. Snowden for a

24  felon in possession of a firearm?

25       A.  The hurdle I'm having on that is the word



1  calling for back-up he, just to be clear, he used his

2  cell phone to call for particular individuals to come

3  out?

4        A.   That's my understanding, yes.

5        Q.   And would that have been a reason why you would

6  have wanted to review his phone records?

7        A.   That would've been one reason, but I think the

8  bigger question is when you're doing an investigation,

9  you want to make sure that you have all the potential

10  evidence.  So you understand all that took place and

11  it's just customary to do that, but that information,

12  once you get it, that may be very beneficial to your

13  investigation and the questions you ask.

14        Q.   And you were also asked about what evidence

15  that you have that would have shown that Snowden did not

16  have a gun.  Did Snowden in fact give a statement?

17        A.   Yes.

18        Q.   That he did not have a gun?

19        A.   Yes.  He gave a statement and the lady, I think

20  her name's Singleton.

21        Q.   Taylor Singleton.

22        A.   Yeah, she also said that.

23        Q.   And did Taylor Singleton actually state that

24  Charles Roundtree was shot as he was getting up?

25        A.   Yes.



```
 1   a drug house.
 2          Q.   Anything else you base that on, sir?
 3          A.   Not that I can recall.
 4          Q.   Okay.  Let's go back in time a little bit?
 5          A.   Okay.
 6          Q.   Are you a licensed peace officer in the state
 7   of Texas?
 8          A.   No.
 9          Q.   Have you ever been?
10          A.   No.
11          Q.   Okay.  Are you a licensed peace officer any
12   place in the United States?
13          A.   No.
14          Q.   Okay.  Have you ever been a licensed peace
15   officer in any state in the United States?
16          A.   I've been a peace officer in both Massachusetts
17   and Pennsylvania, but we didn't have anything called
18   licensure.
19          Q.   Okay.  So when was the last time you were
20   actually employed as a police officer or a peace officer
21   depending on what jurisdiction and how they determine or
22   they use the terminology?
23          A.   Just for clarification we use police officer.
24          Q.   That's fine, we can use police officer.
25          A.   1978.
```



1    Q.  Okay.  That was the last time you were actually
2  a police officer?
3    A.  Right.
4    Q.  And what department were you working for at
5  that time?
6    A.  I was with the York County Sheriff's Department
7  in York, Pennsylvania and then later in the year, I was
8  with the Braintree, Massachusetts Police Department.
9  Braintree, B-r-a-i-n-t-r-e-e.
10   Q.  And what was your rank there?
11   A.  In the sheriff's department it was deputy
12 sheriff.  You were either the sheriff or deputy sheriff
13 and in Braintree, I was staff executive and I held a
14 special Massachusetts state police certification where I
15 could make arrest, carry a gun, do investigations, that
16 type of thing.
17   Q.  That was in 1978?
18   A.  Correct.
19   Q.  You were at both of those departments in 1978?
20   A.  I left one to go to the other.
21   Q.  Okay.  So, before 1978, you were with what
22 department?
23   A.  York, or I'm sorry, Northern York County
24 Regional Police Department.
25   Q.  How long were you with them, sir?



```
 1         A.   One year.

 2         Q.   And before that where were you employed?

 3         A.   Federal Bureau of Investigation, but as a

 4    clerical employee.

 5         Q.   So, you are a police officer for one year like

 6    in 1977 time period?

 7         A.   1972, one year in patrol and then from '73 to

 8    '77, the sheriff's department, I was a deputy.

 9         Q.   So you were always a deputy, there was just the

10    deputies and then the sheriff's in that structure?

11         A.   Correct.  We had a chief deputy who was under

12    the sheriff, but I'm not really quite sure what he did.

13         Q.   Well, I guess what I'm trying to figure out

14    here just for purposes of my knowledge here, did you

15    only work, I thought I saw some place in your resume

16    that you worked for one entity that sounded like it was

17    a county's sheriff department then there was another

18    entity that was a county sheriff's department or one was

19    a regional task force type, explain that to me, sir?

20         A.   Okay.  As a York County sheriff's deputy, I did

21    a multitude of things.  I did courtroom security, I did

22    jury background investigations, I served civil papers, I

23    did prisoner transports, and I served warrants.

24         Q.   Okay.

25         A.   That's all under the sheriff's department.
```



1    Q.  What years would that have been, sir?

2    A.  '73 to '77.  I think I resigned my commission

3  in '77 or '78.  It's in my CV.  Then I also worked

4  part-time as a police officer for the borough of Mount

5  Wolf, Pennsylvania, which was a small borough.  In

6  Pennsylvania you had villages, and then you had

7  boroughs, and then you had cities and then you had

8  counties.  So I worked for a borough.  A borough form of

9  government is a mayoral form of government, so I did

10 that.  It was a part-time weekend position, they

11 couldn't afford a full-time police department.  So

12 because I was a sheriff's deputy, it gave me

13 jurisdiction up there as well.  So, I worked there in

14 uniform on weekends.  I did that probably for a year.

15    Q.  And so you were doing this type of work with

16 the sheriff's department that you described, courthouse

17 staffing, background investigations for jurors, et

18 cetera, I'm not going to repeat it?

19    A.  Right.

20    Q.  But that's what you were doing and then you

21 went to the Braintree Police Department?

22    A.  Correct.

23    Q.  And were your ever a supervisor in the

24 sheriff's department?

25    A.  No.



1       Q.  As deputy?

2       A.  No.

3       Q.  Okay.  Did you ever meed out discipline against

4   anybody in the, as a sheriff's deputy?

5       A.  No.

6       Q.  Okay.  Did you ever conduct criminal

7   investigations as a deputy?

8       A.  Trying to think.  No, I only did civil stuff.

9       Q.  Okay.  And so, did you ever, just to be real

10  clear, did you ever conduct a felony investigation as a

11  sheriff's deputy?

12      A.  I don't believe so, no.

13      Q.  And just to kind of cut to the chase a little

14  bit, you know, in a lot of police departments you have

15  investigation divisions, you have patrol officers, you

16  have other divisions that might be in the traffic

17  division, you also have homicide investigations,

18  criminal, CID, criminal in-force investigation division,

19  and then a lot of times in some of these investigation

20  divisions you'll have somebody, what's known as a lead

21  investigator, have you ever heard of that in

22  terminology?

23      A.  Oh, yes.

24      Q.  Okay.  So were you ever a lead investigator in

25  any way for a felony at the sheriff's department?



 1        A.   Correct.

 2        Q.   And as a matter of fact it was Casanova's

 3   contention that he saw Snowden with the gun, correct?

 4        A.   That's what he reported, yes.

 5        Q.   Okay.  And so you have Snowden, or excuse me,

 6   Casanova, who says I saw him drawing a gun or pulling a

 7   gun, correct?

 8        A.   Right.

 9        Q.   Later on you have Snowden who says some point

10   in time, I didn't have a gun, correct?

11        A.   Snowden, right.  Snowden said he didn't have a

12   gun.

13        Q.   How long after this incident did that interview

14   occur?

15        A.   I don't remember the date.

16        Q.   So, you had two conflicting stories, one says I

17   do have a gun, I saw a gun that Snowden had a gun.

18   Snowden says, I didn't have a gun, correct?

19        A.   Right.

20        Q.   And you had another witness, her name,

21   Ms. Singleton?

22        A.   Singleton, correct.

23        Q.   She says Snowden didn't have a gun, correct?

24        A.   Right.

25        Q.   So those are material facts that are in dispute



1  want to misstate this so correct me if I'm wrong that

2  Mr. Denton or when you were talking to Mr. Denton you

3  said about the, Officer Casanova shot an unarmed person

4  that would have been Mr. Round, correct?

5       A.  Right.

6       Q.  I need you to identify for me all the facts

7  that you have that Officer Casanova intended to shoot,

8  not Mr. Snowden, not Ms. Singleton, that he intended to

9  shoot Mr. Roundtree?

10       A.  Give me one second.  Officer Casanova in his

11  deposition testified he made a conscious decision to use

12  deadly force against Snowden even though he knew

13  Roundtree was unarmed and was not doing anything to harm

14  him and was an innocent third party and was behind

15  Snowden.  He also said that on page 145, line 24, that

16  Roundtree was behind Mr. Snowden when he fired his

17  weapon and that Roundtree was sitting in the exact line

18  of Officer Casanova's area where he fired the handgun.

19  Detective Perez testified to that.  And Officer Casanova

20  admitted that he knew his handgun discharge could've

21  struck Mr. Roundtree, he testified to that in his

22  deposition page 139, line four.  He also testified that

23  the shooting at Mr. Snowden was difficult because he was

24  moving.  And that's at page 132, 19 and 20.  I think

25  that's the main ones that I cited in my report.



1    Q.  Okay.  Well, Doctor, you know there's a

2  difference between an intentional act and something that

3  might be extremely dangerous or reckless, isn't that

4  fair to say?

5    A.  Yes.

6    Q.  Okay.  My question was very direct about do you

7  hold the contention that Officer Casanova saw Charles

8  Roundtree and intended to shoot and kill him or hit him

9  with the bullet?

10    A.  He intended to shoot in that direction.

11          MR. KOSANOVICH:  Objection,

12  nonresponsive.

13    Q.  (By Mr. Kosanovich) He saw Mr. Roundtree and he

14  intended to shoot Mr. Roundtree, not that he shot in the

15  direction of him, that he intended to strike him with a

16  bullet?

17    A.  I don't know what was in Casanova's mind at

18  that moment, but the detective said the shooting was

19  reckless.

20    Q.  Well, let's be really clear, that was part of a

21  hypothetical about shooting into a house where

22  individuals are seated, correct, when that was asked?

23          MR. WASHINGTON:  Objection.

24    Q.  (By Mr. Kosanovich) Is that correct?

25          MR. WASHINGTON:  Objection, form.



 1  Objection to the side bar.

 2         A.  I don't recall.

 3         Q.  (By Mr. Kosanovich) My question is very direct,

 4  are you testifying you'd agree with me that Officer

 5  Casanova never testified or said in any shape form or

 6  fashion either the night of or after that Charles

 7  Roundtree had a gun?

 8              MR. WASHINGTON:  Objection, form.

 9         Q.  (By Mr. Kosanovich) Is that fair to say?

10         A.  I don't recall him saying that or being asked

11  that.

12         Q.  Okay.  Well, but his contention or his

13  statement was that Mr. Snowden had the gun, that's

14  clear, correct?

15         A.  He testified to that.

16         Q.  And that's who he shot at because he's the one

17  who had the gun is that fair to say?

18              MR. WASHINGTON:  Objection, form.

19         A.  I think that was his primary target.

20         Q.  (By Mr. Kosanovich) Okay.  So do you hold the

21  contention in any way that Steve Casanova, Officer

22  Casanova processed that Charles Roundtree didn't have a

23  gun and still shot and intended to hit him with the

24  bullet?

25              MR. WASHINGTON:  Mark, don't point like



```
 1              MR. KOSANOVICH:  Objection, form.
 2         Q.  (By Mr. Washington) Would you consider that to
 3    be a proper investigation of a incident that resulted in
 4    one unarmed person being shot in the buttocks and
 5    another unarmed individual being shot in the chest?
 6              MR. KOSANOVICH:  Objection, form.
 7         A.  No, it wouldn't be.
 8         Q.  (By Mr. Washington) What would you have
 9    expected to have been done in a situation like this?
10         A.  As I previously testified today, I would've
11    gotten all of that evidence, cellular, text, whatever it
12    was and then asked very detailed questions about the
13    incident and what the officer saw, didn't see, reacted,
14    so on and so forth.  I would ask why he went to the
15    house.  So on and so forth.  And then I would have
16    looked, I would have compared at some point his answers
17    to the video see if there were any inconsistencies and
18    then maybe brought him back for more detailed
19    questioning.
20         Q.  Now did you, there's been some questions asked
21    of you about Chief McManus' statement that Charles
22    Roundtree had a gun and that's basically why he was
23    shot, do you recall that?
24         A.  Yes.
25         Q.  Do you recall in your review of the documents
```



```
 1  that Chief McManus indicated who told him that?
 2       A.  I don't recall that he said anybody told him
 3  that, other than somebody told him that.  I don't recall
 4  a name.
 5       Q.  And you're aware that the body cam footage came
 6  out shortly there after?
 7       A.  Right I -- and if I were the chief, I would've
 8  corrected my statement right after that because the body
 9  worn camera doesn't support the original statement made
10  by the chief.
11       Q.  So, and let me get this correct, if Officer
12  Casanova did not tell that to Chief McManus, is it fair
13  to say either that Chief McManus told the public a tale?
14            MR. KOSANOVICH:  Objection, form.
15       Q.  (By Mr. Washington) Or he was just covering for
16  officers?
17            MR. KOSANOVICH:  Objection, form.
18       A.  If no one told the chief, then it would
19  certainly appear that he was offering an explanation
20  more than likely to suppress any civil unrest that the
21  city might experience.  I guess it could be that you
22  know, he said that.  He had some information obviously I
23  mean he knew the person's name Roundtree, so he had
24  something but I think retracting it was certainly
25  important after the video got published.
```

