# Exhibit 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| PATRICIA SLACK, Individually and as the surviving mother of CHARLES ROUNDTREE, JR., BERNICE ROUNDTREE as the representative of the estate of CHARLES ROUNDTREE, JR. and the Statutory Beneficiaries, TAYLOR SINGLETON and DAVANTE SNOWDEN, *Plaintiffs,* | § | |
| VS. | § | CIVIL ACTION NO. 5:18-CV-1117-FB |
| THE CITY OF SAN ANTONIO, TEXAS AND STEVE CASANOVA, *Defendants.* | § | |

**Preliminary Opinion Report: John G. Peters, Jr., Ph.D.**

209 South Stephanie Street ◆ Suite B249 ◆ Henderson, Nevada 89012
Telephone: 717.538.5940

Pursuant to Fed. R. Civ. P. 26(1)(2), I, John G. Peters, Jr., Ph.D., hereby submit my preliminary report that contains a complete statement of opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the opinions the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for information review, report preparation, and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

*John G. Peters, Jr., Ph.D.*

John G. Peters, Jr., Ph.D.
January 14, 2021


©2021. A.R.R.

## I. CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED: See APPENDIX A.

## II. FOCUS OF ANALYSIS

Through counsel for the Plaintiffs Patricia Slack (Ms. Slack), Bernice Roundtree (Ms. Roundtree), Taylor Singleton (Mr. Singleton), and Davante Snowden (Mr. Snowden), I was asked to review documents produced in discovery, certain pleadings, deposition testimony and other documents and then to analyze the City of San Antonio, Texas policies and procedures, training, as well as use of force by Officer Steve Casanova (Officer Casanova) on decedent Charles Roundtree, Jr., (Mr. Roundtree), Mr. Singleton, and Mr. Snowden and on related issues, and then to offer opinions about same. My analyses and preliminary opinions are within this report.

This report provides foundational expert opinions in the stated areas of law enforcement policies, conduct and practices. I am not a party to this litigation and am over the age of twenty-one. Submitted with this report is a copy of my *Curriculum Vitae*, which identifies my education, professional experience, over 250 publications, and other training and experience. There are areas of my education, training, and experience that are relevant to issues identified and opinions developed in this matter.

My education includes being a *Certified Litigation Specialist®: Police* and *Corrections* by the Americans for Effective Law Enforcement (AELE), in addition to related certifications in corrections and campus law enforcement. I am also an experienced instructional designer and have developed and taught law enforcement programs across the United States. In addition to my extensive experience as an instructional designer and trainer, I also hold a CLEAR California Teaching Credential (Public Safety), and a *post-doctoral* Master of Arts degree in Education (Career and Technical).

Vocationally, I serve as president of the Henderson, Nevada-based Institute for the Prevention of In-custody Deaths, Inc., (IPICD), and am its senior instructional designer. The IPICD provides a variety of Train-the-Trainer programs to law enforcement agencies across the globe. These training programs include but are not limited to: “Prevention and Management of Suicide,” “Excited Delirium and Agitated Chaotic Events™ Instructor: Recognizing, Responding, Preventing, and Investigating Arrest-Related and Sudden, In-Custody Deaths Version 5.1”; “Use-of-Force Train-the-Trainer”; and “Arrest-Related and In-Custody Death Investigative Specialist™.” Agitated Chaotic Events is a term developed by the IPICD to encompass a constellation of delirium-like, agitated behaviors where the underlying cause is unknown to first responders. Sub-topics include science-based instruction regarding encounters with persons suffering from topics include epilepsy, Hyponatremia, alcohol withdrawal, synthetic drugs, energy drinks, diabetes, autism, and other conditions. I have taught one or more of the above program to law enforcement officers across the Commonwealth of Pennsylvania.

Annually, the IPICD hosts an international conference (2020 is the 15th one) that presents the latest scientific, legal, medical, and psychological research, in addition to street-proven tactics and programs used by law enforcement agencies to avoid, especially Fourth Amendment violations of citizen’s Constitutional rights and, to identify, prevent, and/or manage excessive


©2021. A.R.R.

use of force including especially that which could lead to sudden in-custody and/or arrest-related deaths. In 2016, presentations included the latest information about Fentanyl and other widely used drugs and how fast they are spreading and killing individuals. The IPICD has also awarded unrestricted grants for the funding of scientific research (e.g., UCSD School of Medicine; University of Miami, Miller School of Medicine), including the conducting of in-house primary research on in-custody and arrest-related deaths topics.

In 2014, the Singapore Prison Service had engaged my services to conduct training in Singapore and to evaluate several of its training programs. I also teach in the "Jail: Legal Issues" programs held in Las Vegas, Nevada, hosted by the AELE. Several correctional facilities have engaged me to review policies, procedures, and training, including, but not limited to jails in Texas, New Mexico, Idaho, Massachusetts, Pennsylvania, and California.

I have taught defensive tactics, tactical handcuffing, impact tools (e.g., batons), and arrest techniques instructor- and user-level programs to thousands of law enforcement officers across the globe during the past 30 years. The author of more than 250 publications, my publications include **Realistic Defensive Tactics** and **Tactical Handcuffing for Chain- and Hinged-Style Handcuffs**. I have taught several law enforcement programs in the Commonwealth of Pennsylvania when I was a Pennsylvania police officer, deputy sheriff, and as a civilian. I have taught several law enforcement programs across the State of Texas, including but not limited to Lubbock, Austin, and the Harris County Sheriff's Office, and I am familiar with the use of force policies implemented by law enforcement agencies throughout the country.

On February 1, 2020, the Americans for Effective Law Enforcement (AELE) Board of Directors appointed me Executive Director of AELE. In addition to my supervision of a part-time staff of three people, I manage the scheduling and presenters of AELE seminars. I also serve as instructional designer of AELE seminars, webinars, and online programs. These seminars have been approved in many states as certified training for police and other law enforcement personnel, as well as qualifying as Continued Legal Education credits for licensed attorneys.

In addition to writing about and lecturing on law enforcement policy and procedures, use-of-force, force options, force training, force policies, force warnings, excited delirium, sudden in-custody death, investigations, and related topics, I am an AELE Certified Litigation Specialist in Police liability, and a faculty member teaching in its "Discipline and Internal Investigations for Law Enforcement, Public Safety and Corrections" and "Biometric, Psychological and Legal Aspects of Lethal and Less Lethal Force and the Management, Oversight, Monitoring, Investigation and Adjudication of the Use of Force" programs.

I have been a consultant to several correctional facilities, including, but not limited to the Harris County Jail, Houston, Texas (3rd largest jail in the United States). Additionally, I am an AELE Certified Litigation Specialist in Corrections Liability, and a faculty member teaching in its "Jail Legal Issues," "Internal Affairs," and "Managing Force" seminars. I spoke on two occasions at the American Jail Association International Training Conferences and have been a contracted trainer for the American Jail Association. I have also consulted with the American


©2021. A.R.R.

Correctional Association, and taught workshops on several occasions throughout California for the California Sheriff's Association and at the Los Angeles County Sheriff's Department.

As a former law enforcement patrol officer, deputy sheriff, and law enforcement administrator, I am familiar with the need for written policies, rules, and procedures, and the need to adequately train and test officers regarding them. I was also President of a municipal Civil Service Commission, where I oversaw testing requirements for law enforcement officers and was involved with disciplinary actions involving law enforcement officers. Supervisory training is also a key ingredient to organizational effectiveness, as is having contemporary policies and procedures. I have written about these issues, conducted organizational and departmental diagnoses and evaluations concerning management, training, policies and procedures, etc. in law enforcement and correctional organizations, and hold graduate degrees (Ph.D. and M.B.A.) in management.

I have conducted primary research on the management of criminal investigations, restraint devices, and competency testing, and have taught how to conduct criminal and internal investigations and have been an investigator.

## III. RIGHT TO AMEND

I reserve the right to amend and/or supplement these opinions after receiving the deposition transcripts for Chief William McManus and Officer James Panah and if additional information becomes available, or in response to expert disclosures of the defendants or plaintiffs, or if questions are asked of me that do not relate to information contained in this disclosure.

## IV. OPINION STANDARDS

Expressed opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## V. OPINION METHODOLOGY

The basis of my opinions includes one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study.

The social sciences classify the documents reviewed as *archival records*. Graziano and Raulin (1997) define archival records as "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, and making observations are methodologies regularly utilized in the social sciences.


©2021. A.R.R.

## VI. EXECUTIVE SUMMARY

**1. A content analysis[1] of The City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police command staff issued a "Procedure 501--Use of Force" policy that is substantially deficient, misleading, inaccurate, and does not meet national standards, recommendations, and/or guidelines for the development of "Use of Force" policy and procedures for their officers.**

**2. A content analysis of the documents reviewed from the Internal Investigation and the civil lawsuit into the fatal shooting of Mr. Roundtree, the shooting of Mr. Snowden, and the arrest of Mr. Snowden and Taylor Singleton (Ms. Singleton) support the City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police management having created an organizational atmosphere that demonstrates bias toward protecting their officers and ratifying their errant behavior.**

**3. The City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police management have created and have applied two investigation standards, one for civilians and another for their police officers that falls below generally accepted police investigation practices and shows favorable bias toward their police officers.**

**4. The force used by Officer Casanova on Mr. Roundtree and Mr. Snowden was inconsistent with national use-of-force standards, recommendations, and guidelines.**

**5. Given the totality of the circumstances, Officer Casanova failed to use generally accepted officer safety tactics, including cover and concealment, when he contacted the residence and the occupants, which is a material cause in the fatal shooting of Mr. Roundtree and the shooting of Mr. Snowden.**

**6. Officer Casanova mislead other officers and dispatch when he reported "shots fired" but never told anyone that the shots were from him and not another person, and further reinforced this inaccuracy when he grabbed his long rifle and put on his ballistic vest, which placed the occupants of the residence in a hostile environment.**

**7. The City of San Antonio, its leadership, and/or police leadership failed to conduct a thorough and objective Internal Affairs investigation into the fatal**

---

[1] "A detailed and systematic examination of the contents of a particular body of material . . . for the purpose of identifying patterns, themes, or biases within the material" (Leedy and Ormond, 2001, p. 114).


©2021. A.R.R.

**shooting of Mr. Roundtree, the shooting of Mr. Snowden, and the seizure of Ms. Singleton that appears will result in the ratification of Officer Casanova's outrageous conduct and which falls below internal investigative standards, recommendations, and guidelines.**

## VII. DISCUSSION of PRELIMINARY OPINIONS

[**NOTE**: It is my understanding Discovery remains open. The following opinions are predicated upon information provided to me to date and therefore may be supplemented.]

**1. A content analysis[2] of The City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police command staff issued a "Procedure 501--Use of Force" policy that is substantially deficient, misleading, inaccurate, and does not meet national standards, recommendations, and/or guidelines for the development of a "Use of Force" policy and procedures for their officers.**

A foundational requirement of any police department, such as the City of San Antonio and its police department, is a set of well and clearly written rules, regulations, and procedures that guides the department's officers in the lawful performance of their specific duties – especially in those areas in which it is foreseeable that they will likely be called upon to properly balance the Constitutional rights of citizens whom they encounter, with their proper performance of assigned duties. It is equally important that these rules, regulations, and procedures prescribe a process for handling issues which arise when confronting certain situations. It is also of equal importance that these rules, regulations and procedures set forth in stark terms the discipline which will be promptly imposed for infractions of same – including progressively more severe discipline if there is an effort to conceal rather than to disclose such violations.

I conducted a content analysis of the "Use of Force" policy issued and adopted by the City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police command staff and found it deficient, misleading, inaccurate, and is not consistent with contemporary law enforcement written policies, rules, and regulations.

### Missing Definitions

Readers of "Procedure 501—Use of Force" are directed to see the "Glossary" in the rear of the more than 700-page policy and procedures manual for "Terminology" that is "For specific use within this procedure" (Bates Stamp, COSA 000302). Several terms are listed under "Procedure 501—Use of Force" section ".04 Terminology," however several key terms missing from either this policy and/or the "Glossary" to which the reader is referred. These terms include *objectively reasonable force*, *excessive force*, *probable cause*, and *reasonable suspicion* (COSA 000302). Based upon my education, training, and experience as a former law enforcement

[2] "A detailed and systematic examination of the contents of a particular body of material . . . for the purpose of identifying patterns, themes, or biases within the material" (Leedy and Ormond, 2001, p. 114).


©2021. A.R.R.

administrator and use-of-force trainer, these missing terms are important for City of San Antonio police officers to know and to understand the policy and be able to appropriately apply it.

For example, "Procedure 501.04—Use of Force Terminology" directs the reader to look in the "Glossary" for the definition of "Reasonable Force," but the term has not been included in the "Index" so the reader is unable to quickly locate the definition in the "Glossary" (Bates Stamp, COSA 000719). When a reader does locate the term "Reasonable force" in the "Glossary," the definition provides little direction (COSA 000701). The definition, as written say, "Means the necessary degree of force sufficient to achieve a lawful police objective" (COSA 000701), which is vague and potentially misleading.

In contrast, the law enforcement policy organization LEXIPOL, in its sample "Use of Force" policy, notes, "[Officers/Deputies] shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the [officer/deputy] at the time of the event to accomplish a legitimate law enforcement purpose" (Lexipol, Use of Force, 7/7/2016, p. 1).

Missing from the City of San Antonio Police Department force policy and "Glossary" is the key definition of *objectively reasonable*, the foundation for determining whether force used by an officer was reasonable. The term *Objectively reasonable* and its definition are missing in the "Glossary" and therefore cannot be reviewed by officers (Bates Stamp, COSA 000697). As noted in the Lexipol force policy, "[Officers/Deputies] must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties (Lexipol, Use of Force, 7/7/2016, p. 1).

The National Consensus Documents on the Use of Force (2020, 2017) also includes and defines the term *objectively reasonable* in its recommendations for law enforcement agencies. Under its "Definitions" section, "OBJECTIVELY REASONABLE: The determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation in light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar situations" (p. 2).

Nationally, police officers are taught that the national standard regarding the use of deadly and non-deadly force that amounts to a 4th Amendment seizure is one of objectively reasonable force, under the United States Constitution's Fourth Amendment, based upon the totality of the circumstances known to the officer at the moment the force was used. Officers are taught, among other things, "reasonableness contemplates careful consideration of the facts and circumstances of the incident including: (1) the severity of the crime at issue, (2) whether the person poses an immediate threat to the safety of officers or others, and (3) whether the person is actively resisting arrest or attempting to evade arrest by flight" (Graham v. Connor).

The term and definition of *excessive force* are missing from the City of San Antonio Police Department force policy, and therefore the reader will not know of such a term and/or how it is defined.


©2021. A.R.R.

Two other important and key terms missing from the force policy terminology are *probable cause* and *reasonable suspicion* (Bates Stamp, COSA 000302). Officers need to be reminded these two terms play important roles when deciding to use force. *Reasonable suspicion* is not listed in the "Index" of the policy manual (COSA 000719) so an officer could not easily locate it through the "Index". Should an officer decide to look up *Reasonable suspicion* in the manual's "Glossary" section, two definitions are offered for this term, which can confuse officers when trying to understand how *reasonable suspicion* is used in conjunction with force decision-making (COSA 000701).

**Force Continuum Standard of Care**

Adding more confusion to "Procedure 501—Use of Force" is the inclusion of "Officer's Perception Of Suspect's Actions" contained within section .05 C (Bates Stamp, COSA 000303). Following the levels of resistance is the equivalent of a force continuum that identifies various *force options* available to SAPD officers (COSA 000303). *Force options* are tools available to officers but are not *force standards,* the latter established by the U.S. Constitution and/or state statutes.

"Force continuums may create, directly or indirectly, what is known as the **continuum standard of care**" (Peters & Brave, 2006, p. 3), and only show relationships between the actor's behavior and available force options. Chief Ken Wallentine who is also a lawyer, wrote that force continuums often create a "One-plus-one" force theory fallacy, meaning that officers must use one higher level force option against the actor (Wallentine, 2009).

The "examples" of what *force options* are associated with various levels of resistance per Procedure 501—Use of Force" are insufficient, misleading, and not inclusive. For example, there is no mention of defensive tactics or baton force options. Contemporary and knowledgeable members of City Council, a Mayor, a Police Chief, and/or police command staff know to not include *force options* within policy because officers easily confuse *force options* with force *standards*.

Based upon my education, training, and experience as a police officer, administrator, and use-of-force trainer, the City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police command staff issued a "Use of Force" policy that is substantially deficient, misleading, inaccurate, and does not meet national standards, recommendations, and/or guidelines for the development of "Use of Force" policy and procedures for their officers. Such a poorly written, inaccurate, misleading, and/or deficient policy falls far below generally accepted policy practices in law enforcement and led to the fatal shooting of Charles Roundtree, Jr., and the shooting of Davante Snowden (Mr. Snowden).

The City of San Antonio, its City Council, its Mayor, and/or its Police Chief approved the SAPD policy that permitted officers to use deadly force when they "reasonably believe" a threat of death or serious bodily injury exists. However, contemporary municipal and law enforcement administrators know or should know that in the Fifth Circuit an officer is not justified in using deadly force "[w]here the suspect *poses no immediate threat* to the officer and no threat to others" (*Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. Aug. 20, 2019)). This holding is consistent with the Supreme Court of the United States' holding in *Tennessee v. Garner*, 471 U.S. 1 (1985).


©2021. A.R.R.

**2. A content analysis of the documents reviewed from the Internal Investigation and the civil lawsuit into the fatal shooting of Mr. Roundtree, the shooting of Mr. Snowden, and the arrest of Mr. Snowden and Taylor Singleton (Ms. Singleton) support the City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police management having created an organizational atmosphere that demonstrates bias toward protecting their officers and ratifying their errant behavior.**

A content analysis of documents produced from the SAPD Internal Affairs Investigation and the civil lawsuit into the fatal shooting of Mr. Roundtree have identified several policy violations that support SAPD officers and supervisors, along with serious misrepresentations about the shooting that were known by management, investigators, and supervisors to be inaccurate because of an inadequate investigation.

"Admit nothing. Deny everything. Demand proof," is a historical mantra that has been used in American law enforcement for decades. This mantra appears to have been adopted by the City of San Antonio, its police leadership, supervisors, and select officers who were involved in the fatal shooting investigation of Mr. Roundtree.

**Policy violation: Failure to Isolate Involved Officers**

Per the "Glossary" of the SAPD policy manual, the fatal shooting of Mr. Roundtree and the wounding of Mr. Snowden are defined as an "Officer Involved Shooting" (Bates Stamp, COSA 000697, 000547). Also, per the SAPD policy manual, Mr. Roundtree's death was defined as a "Custodial Death," meaning "the death of an individual who is in the custody of a peace officer or who dies as a result of a peace officer's use of force" (COSA 000689). SAPD "Procedure 705—Officer Involved Shootings and Custodial Deaths" direct officers, supervisors, and other about this policy, their responsibilities, and investigative procedures (COSA 000547).

Officer Casanova testified that following the shootings of Mr. Roundtree and Mr. Snowden, he and other officers on the scene "discussed" what had happened (Casanova deposition, 217:24), which violated SPD "Procedure 705—Officer Involved Shootings and Custodial Deaths" section 705.04.6, ". . . Witnesses and suspects are cared for and kept separated" (Bates Stamp, COSA 000549). The officers involved in the incident are considered "witnesses" to the event.

Further, section 705.05 E.2 directed, "Officers shall refrain from discussing the facts of the incident . . ." (Bates Stamp, COSA 000549). Officer Casanova testified that he should not have been discussing the incident with other officers, and that he should have been separated from the other officers (Casanova deposition, 218:3,6).

Section 705.05 F and F.1 directs, "When two (2) or more officers are involved in a shooting or a custodial death incident, they are: (1) Isolated from one another at the scene by a supervisory officer . . ." (Bates Stamp, COSA 000550).


©2021. A.R.R.

In surprising contrast, there is no requirement for supervisors to separate witnesses and/or officers when evaluating the circumstances surrounding a use-of-force incident per "Procedure 501.12 C 1-8—Use of Force," which appears to contradict the "Officer Involved" policy and procedure (Bates Stamp, COSA 000308).

Based upon my education, training, and experience as a prior law enforcement administrator and a lecturer on law enforcement policy and internal investigations, the City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police management failed to appropriately discipline the officers who shared and listened to information about the event, and/or failed to appropriately discipline supervisors who failed to tell the officers not to share information, and/or internal investigators who failed to report the sharing of information that violated policy.

**Perpetuation of a False Shooting Narrative**

Internal investigators knew or should have known from their interviews with officers and civilian witnesses that Mr. Roundtree was not in possession of a handgun and did not attempt to shoot Officer Casanova, but instead perpetuated inaccurate information about the shooting events to put Mr. Roundtree in a dark light, and Officer Casanova in a favorable light. Detective Perez wrote in his "Felon in Poss of Firearm" report that, "I was told that Charles [Mr. Roundtree] was the person who had the gun" (Bates Stamp, COSA001812). "At that point I had not had the chance to view body cams and statements" (COSA001812).

In another report, Evidence Submission Form," it is noted the investigating officer is Detective Perez and that the request was for testing of trace evidence in an officer-involved shooting where, ". . . Snowden was believed to have had a gun (E5) in his waistband causing Officer Casanova to shoot. Snowden (then threw the gun out a window before he was taken into custody. The gun was later recovered") (COSA002003). There was no supporting evidence that Mr. Snowden had thrown anything out a residence window, including the found handgun, even though he had interviewed Mr. Snowden at 1:06 a.m. on the same morning as making the trace evidence testing request where Mr. Snowden told him "no one in the house had a gun and that the only guns in the house, was a BB rifle" (BOCA001842).

It was also reported by investigators that Mr. Roundtree was the "suspect" who had the handgun and ". . . reached for the handgun" (Bates Stamp, COSA001751). Mr. Roundtree, described as suspect #1 (SP1) in the internal affairs report, was reportedly shot by Officer Casanova by ". . . two rounds striking the SP1 in the chest. When the suspect went down a SP1 (believed to be Davonte Snowden B/M 01-18-95) grabbed the handgun and retreated to a backroom" (COSA001751).

**Violation of Mobile Video Recording Policy**

Officer Casanova testified, "It's not a policy that we have to mute our cameras while we're discussing tactics. It's on the officer's discretion . . ." (Casanova deposition, 25:18-20). SAPD "Procedure 409.06 E 2.a—Mobile Video Recording" permits "Officers to momentarily mute only "a. Conversations that involve case tactics or strategy . . ." (Bates Stamp, COSA 000283), but also requires under section F, "All stoppage and/or muting, other than


©2021. A.R.R.

administrative functions testing or accidental activation, of the mobile video must be verbally documented—stating a specific reason—in the Officer's video, and report or CFS comment entry field" (COSA 000284). I did not find where Officer Casanova complied with this section of the policy.

**Shooting Policy Violation**

Officer Casanova knew Mr. Roundtree was "standing near [Mr. Snowden's] location where I fired my weapon" (Casanova deposition, 132:16-17), and also knew that it was a difficult shot because Mr. Snowden was moving away from him as he [Officer Casanova] "took a step off to the side when I fired my round" (132:19-20; 133:3-4; 136: 6-8). Denying that he violated SAPD shooting policy, Officer Casanova testified he knew there was a risk of someone else in the room or the residence getting shot by him (133:23; 134:11, 22).

Based upon my education, training, and experience as a former law enforcement administrator and internal affairs investigator, Officer Casanova failed to follow SAPD "Procedure 501—Use of Force" policy because "Firearms are not discharged under the following circumstances: . . . 2. When it appears likely a non-participant may be injured . . ." (Bates Stamp, COSA 000306).

**Multiple and Misleading Versions about the Shooting Event**

Officer Casanova described several different and conflicting versions of the suspect he was seeking, the shooting of Mr. Snowden, and the fatal shooting of Mr. Roundtree. Officer Casanova knew the suspect he was seeking was bald based upon the description given to him by Maria Herrera (Ms. Herrera) (Casanova deposition, 66:19, 24; 67:21). However, he provided a statement to investigators that Mr. Snowden had "short hair" that matched the description of the suspect (67:4). In fact, Officer Casanova said he did not know if Mr. Snowden had a bald head (72:25; 88:19).

At the time Officer Casanova shot at Mr. Snowden, "his [Mr. Snowden's] back was not turned. He was off to the side of me" (Casanova deposition, 123:15-16). Officer Casanova also said that Mr. Snowden was moving fast as he went toward the back of the residence (136:17), and said Mr. Snowden was "running" in the opposite direction of him when he fired his handgun (160:5). Confusingly, Officer Casanova also testified that Mr. Snowden was "walking, not running" toward the back of the residence (215: 7).

Officer Casanova had also said Mr. Snowden had taken "two steps toward me, and then he kind of went to the side and then he was like lifting his shirt up" (Casanova deposition, 245:9-11; video audio). Another version from Officer Casanova had Mr. Snowden holding a handgun "inside his hand" (246: 21-22), yet in another version, "I saw Mr. Snowden pulling a weapon from his waistband, which is why I fired my weapon" (276:9-10).

Surprisingly, when asked about a report that claimed Officer Casanova had shot Mr. Roundtree in the chest and then Mr. Snowden went over and grabbed the handgun and went into


©2021. A.R.R.

another part of the residence, Officer Casanova testified, "I couldn't agree or disagree with the version because this is this officer's version of the story, not mine" (252:21-22).

Based upon my education, training, and experience, Officer Casanova provided many different and conflicting versions about the fatal shooting of Mr. Roundtree and why he shot Mr. Snowden. These various versions of the event must raise "red flags" to investigators and SAPD leadership about the accuracy of the descriptions, and at the very least, involve more investigation into the facts. [NOTE: Veracity and credibility issues are not for me to determine. These issues are determined by the trier of fact.]

**Failure to Discipline for Policy Violations**

Officer Casanova testified that SAPD individuals told him that what he did during the incident was "proper" and that he was not reprimanded because of the incident that involved the fatal shooting of Mr. Roundtree and the shooting of Mr. Snowden (Casanova deposition, 279:17, 20). Based upon my education, training, and experience, Officer Casanova committed several policy violations, and when coupled with his many versions of the events, there are several bases for disciplining him, unless the leadership of the City of San Antonio and its police department are looking for ways to develop an organizational culture that supports their police officers. However, "no allegations of misconduct were brought against Officer Casanova (Administrative Review only)" (Bates Stamp, COSA001747).

**Organizational Culture and Unwritten Ground Rules**

Organizational culture refers to what makes an employee's experience of working at one law enforcement agency different than working for another similarly situated agency. Wheelen and Hunger (2006) defined organizational culture as 'the collection of beliefs, expectations and values learned and shared by the [organization's] members and transmitted from one generation of employees to another . . . and generally reflects the [leaders] and the mission of the [organization].'

Law enforcement administrators know that "not only does the organizational culture need to be reinforced, but also the *subculture* of the units where officers work every day. Officer subculture is defined as the set attitudes and values that shape Peace Officer behavior. The police subculture commands our attention because it is generally seen as a major obstacle to reform and, thus, a powerful force working to erode any reforms which are in fact achieved (Peters, Wilhite, LaRochelle, 2015).

Unwritten Ground Rules (UGR), according to Dourado, often produce the "actual" culture of the organizational unit and/or the organization (Peters, Wilhite, LaRochelle, 2015). Lawrence Sherman (1974) was one of the first researchers in the criminal justice area to link organizational culture to deviant police behavior. In his seminal text, **Police Corruption: A Sociological Perspective**, he introduced the terms *peer group secrecy*.

Based upon my education, training, and experience, the City of San Antonio, its Council, its mayor, its Police Chief and/or its police command staff actions and inactions show an organizational culture that clearly is biased toward protecting SAPD police officers and


©2021. A.R.R.

confirming that the City and the police department administration have your back and will protect you—even if police officers and supervisors demonstrated outrageous behavior as discussed. In short, this culture ratified the misconduct of officers and supervisors. Such a policy contradicts generally accepted police practices regarding policy and procedures.

**3. The City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police management have created and have applied two investigation standards, one for civilians and another for their police officers that falls below generally accepted police investigation practices and shows favorable bias toward their police officers.**

Two reasons for investigating a fatal shooting are to identify the facts and to identify if a crime has occurred. The investigator will not know if the elements of a crime have occurred until the investigation is completed. Therefore, everyone involved in the shooting is a criminal "suspect" until proven otherwise except for San Antonio police officers.

After fatally shooting Mr. Roundtree, shooting Mr. Snowden, and nearly shooting Ms. Singleton, SAPD investigators treated Officer Casanova very differently than Mr. Snowden and Ms. Singleton. The latter were viewed and investigated as "criminal suspects" whereas Officer Casanova was not viewed or investigated as a criminal suspect. Ms. Singleton was detained, handcuffed, and then driven to the police station to be interviewed.

In contrast and as previously discussed, Officer Casanova testified that following the shootings of Mr. Roundtree and Mr. Snowden, he and other officers on the scene "discussed" what had happened (Casanova deposition, 217:24), which violated SPD "Procedure 705—Officer Involved Shootings and Custodial Deaths" section 705.04.6, ". . . Witnesses and suspects are cared for and kept separated" (Bates Stamp, COSA 000549). The officers involved in the incident are considered "witnesses" to the event. Detective Kevin Landrum (Detective Landrum) testified that witnesses must be kept separated and not allowed to talk between and among themselves because it is possible to taint the investigation (Landrum deposition, 9:14, 21-22).

Detective Hines testified that civilians are not allowed to walk around the crime scene, and that "somebody would detain them or arrest them until we investigated exactly what happened" (Hines deposition, 11:25; 12:1-3). In contrast, Detective Hines said that generally officers who are involved in officer-involved shootings are neither arrested nor detained like civilians (12:10).

Officer Casanova testified that he was not asked to return to the crime scene, was not asked for his personal cellular telephone, was not asked for his cellular and texting records, and was not asked detailed questions about what happened (Casanova deposition, 57:4-5; 50:7, 9; 53:13-14). Shockingly, Officer Casanova was only asked to give one statement to investigators (55: 23).

In contrast, Officer Casanova testified that civilians who are involved in a possible murder are, "asked several questions and they're asked to provide a statement in their own wording on what they saw that occurred . . ." (Casanova deposition, 53:23-25).


©2021. A.R.R.

The International Association of Chiefs of Police (IACP) notes, "few things cause more confusion within police agencies than the difference between administrative and criminal procedures involving a complaint (Thurnauer, *Internal Affairs*, November 2004, p. 249).

Based upon my education, training, and experience, the City of San Antonio, its City Council, its Mayor, its Police Chief, and/or its police management have created and have applied two investigation standards and methodologies, one for civilians and another for their police officers that is based upon documentation and testimony. Per Detective Hines, treating police officers who are involved in officer-involved shooting differently should not be classified as treating them more "favorable . . . [just] differently" (Hines deposition, 13:19-20).

**4. The force used by Officer Casanova on Mr. Roundtree and Mr. Snowden was inconsistent with national use-of-force standards, recommendations, and guidelines.**

The force used by Officer Casanova was inconsistent with and violated national use-of-force standards, recommendations, and guidelines. Law enforcement officers, like Officer Casanova, are taught about use of force in the law enforcement academy, and then usually during in-service, as well as other training programs authorized by their agency and the state. Officers are taught that the national standard regarding the use of deadly and non-deadly force that amounts to a 4th Amendment seizure is one of objectively reasonable force, under the United States Constitution's Fourth Amendment, based upon the totality of the circumstances known to the officer at the moment the force was used (Plitt, 2005, section 62).

Officers are taught, among other things, "reasonableness contemplates careful consideration of the facts and circumstances of the incident including: (1) the severity of the crime at issue, (2) whether the person poses an immediate threat to the safety of officers or others, and (3) whether the person is actively resisting arrest or attempting to evade arrest by flight" (Graham v. Connor). Based upon my education, training, and experience, Officer Casanova knew from his Academy training that the elements were not present for him to use deadly force on Mr. Snowden and/or on Mr. Roundtree and knew that any deadly force used by him violated national use-of-force standards, training, and recommendations based upon the totality of the circumstances known to him at the time.

**Analysis of the Fatal Shooting of Mr. Roundtree by Officer Casanova**

**Factor #1: Was Mr. Roundtree an immediate threat to Officer Casanova, to others, or to himself?**

No, because Mr. Roundtree was not doing anything wrong, not committing a crime, and was only sitting on the sofa (Casanova deposition, 130:13,16, 20). In short, Mr. Roundtree was not an immediate threat, or any threat to Officer Casanova at the time Officer Casanova fatally shot him.


©2021. A.R.R.

**Factor #2: Did Mr. Roundtree actively resist arrest?**

No, because Mr. Roundtree was not under arrest.

**Factor #3: What was the crime that had been committed by Mr. Roundtree at the time Officer Casanova seized him?**

None.

**Officer Casanova Intended to Use Deadly Force**

Officer Casanova testified that he made a conscious decision to use deadly force (i.e., discharging his handgun) against Mr. Snowden even though he knew Mr. Roundtree was unarmed (Casanova deposition, 144:4-5), was not doing anything to harm him (144:9), was an innocent third party (144:13), and was behind Mr. Snowden (145:24) when Officer Casanova fired his weapon. Given the totality of circumstances, Officer Casanova was without a basis for intentionally discharging his handgun in a manner where he knew it was likely to cause harm to Mr. Roundtree and/or other occupants of the residence. In short, Officer Casanova seized Mr. Roundtree's movement at the time he shot and killed him through means intentionally applied.

**Mr. Roundtree was in Officer Casanova's Line of Fire**

Officer Casanova testified that Mr. Roundtree was behind Mr. Snowden when he fired his weapon (Casanova deposition, 145:24). Detective Ruben Perez (Detective Perez) confirmed that Mr. Roundtree was sitting in the exact line of Officer Casanova's area where he fired his handgun (Perez deposition, 36:13). Officer Casanova shot and fatally wounded Mr. Roundtree (Luza deposition, 18:24), even though Officer Casanova admitted that he knew his handgun discharge could have struck Mr. Roundtree (Casanova deposition, 131:4).

**Every Trigger Pull is A Separate Use of Force**

Each pull of the handgun trigger by Officer Casanova was <u>a separate use of force</u>. Each shot must be based upon a threat of imminent harm. There must also be a threat assessment made between each shot that must justify the next shot(s) based upon the perceived threat for another use of force. Recall that Officer Casanova testified that Mr. Roundtree was not doing anything wrong, not committing a crime, and was only sitting on the sofa (Casanova deposition, 130:13,16, 20). Based upon my education, training, and experience as a Use of Force instructor, Mr. Roundtree was not an immediate threat, or any threat to Officer Casanova at the time Officer Casanova fatally shot him.

**Officer Casanova believed Target Closeness Guaranteed Accuracy**

Officer Casanova testified, "I felt like with the distance that we were both standing in, which was less than 10 feet and him [Mr. Snowden] coming into my direction off to the side, we were, like, at arm's length away from each other . . . I could fire off an accurate shot . . ."


©2021. A.R.R.

In contrast to his own belief, Officer Casanova testified the shooting at Mr. Snowden, "was difficult because he's moving" (Casanova deposition, 132:19-20). Mr. Snowden was moving in the opposite direction from Officer Casanova (132:12), backing up (130:23).

Officer Casanova's belief that targets closeness guarantees accuracy is nothing more than a fallacy. Statistically, officer accuracy percentages with their handguns are considered very low. For example, New York City Police Department statistics shows its police officers fired 170 shots and hit their targets 75 times, for a hit ratio of 44 percent for the year, as of Dec. 21, 2017. In 2016, police landed 107 of a total 304 shots fired, a hit ratio of roughly 35 percent. Again,

According to the LAPD's 2016 report, the average annual hit ratio from 2012 through 2016 was 33.4 percent. Rostker, Hanser, Hix, Jensen, Morral, Ridgeway, and Schell (2008) found in their study of New York City Police Department police officer firearms accuracy rates that, "Accuracy improves at close range, with officers hitting their targets 37 percent of the time at distances of seven yards or less" (p. 15).

Donner and Popovich (2018) examined data from the Dallas (TX) Police Department (N = 149) and found that "officers struck the suspect with at least one round 54 percent of the time." Narrowing their findings to "bullet-level accuracy," the researchers' found approximately 35% of all officers' rounds struck the target. One officer reportedly had 23 misses.

Officer Casanova's belief that targets closeness improves bullet-level accuracy is mostly a fallacy, possibly based upon poor training given him by the City of San Antonio. RAND Corporation researchers did find that as a target was more distant from the officer, bullet-level accuracy decreases at longer ranges, hit rates fell off sharply, to 23 percent (p. 15).

Based upon my education, training, and experience, Officer Casanova made a poor decision when he fired his handgun at Mr. Snowden among the several decisions he could have made (i.e., disengage Mr. Snowden and/or move away from the building).

**Analysis of the Shooting of Mr. Snowden by Officer Casanova**

**Factor #1: Was Mr. Snowden an immediate threat to Officer Casanova, to others, or to himself?**

No, because it is unlikely Mr. Snowden knew the person on the outside of the residence was a police officer who pushed open the door and was then asking him. Body-worn camera video showed Officer Casanova shooting as Mr. Snowden walked away from the officer and not toward him (see body-worn camera video; Casanova deposition, 121:20, 23).

**Factor #2: Did Mr. Snowden actively resist arrest?**

No, because Mr. Snowden was not under arrest.

**Factor #3: What was the crime that had been committed by Mr. Snowden at the time Officer Casanova seized him?**


©2021. A.R.R.

None, based upon the evidence and the totality of the circumstances. Mr. Snowden was never charged with assault, which was used by Officer Casanova as a pretext for contacting the occupants of the residence.

Law enforcement officers, like Officer Casanova, know from their training that each pull of the handgun trigger is a separate use of force. Each shot must be based upon a threat of imminent harm. There must also be a threat assessment made between each shot that must justify the next shot(s) based upon the perceived threat for another use of force. Based upon my education, training, and experience, there was no imminent threat made against Officer Casanova by Mr. Snowden that justified his using deadly force two times. Recall, body-worn camera video showed Officer Casanova shooting as Mr. Snowden walked away from the officer and not toward him (see body-worn camera video; Casanova deposition, 121:20, 23).

Officer Casanova has given various versions of the events that he claims supports his shooting of Mr. Snowden. These various versions have been previously discussed. Regardless of the version provided by Officer Casanova, the physical evidence fails to support his decision to use deadly force against Mr. Snowden. In contrast, what can be shown is that Officer Casanova selected and used poor tactics and ignored alternative actions other than using deadly force.

**5. Given the totality of the circumstances, Officer Casanova failed to use generally accepted officer safety tactics, including cover and concealment, when he contacted the residence and the occupants, which is a material cause in the fatal shooting of Mr. Roundtree and the shooting of Mr. Snowden.**

Officer Casanova did not appear concerned about his safety as he approached the residence that presumably had occupants. In fact, Officer Casanova failed to question the unknown Black male who was sitting outside the residence "eating food on the porch" about the alleged assault therefore suggesting his primary goal was to enter the home (Bates Stamp, COSA001786).

Although Officer Casanova appears to use the pretext of searching for a person who matched the description of someone who allegedly committed an assault, Officer Casanova testified the residence where Messrs. Snowden, Roundtree, and Ms. Singleton were occupying was ". . . the house that we were trying to go to" because it was a drug house officers had under surveillance (Casanova deposition, 84:14). Although he never asked the complainant if the suspect had any weapons (110:5), he did have a description of the individual.

Failed to identify himself as a police officer: After approaching the residence, Officer Casanova "looked into the home from outside of the location" (Casanova deposition, 111:13-14), and then knocked on the door (111:17-18). His third knock on the door ". . . is what pushed the door open or it swung open" (114:19-21). He then asked one of the occupants, "What's up man?" (115:17). Officer Casanova never announced that he was a San Antonio police officer, which violated not only training, but also officer safety standards. Officer Casanova believed because he was in a police uniform, "I would think that they would know that I'm a police officer" (116:2-3), and


©2021. A.R.R.

further believed, "I felt my presence alone would indicate that I was a San Antonio police officer" (116:17-18; 126:1-3).

It is obvious from Officer Casanova's testimony that he viewed his contact with the occupants of the residence through only his viewpoint, discounting or not considering their viewpoints. For example, if renters or owners were occupying the residence, they can use force to defend their property and/or themselves.

Flashlight beam could obscure vision: Although Officer Casanova testified that he was holding a flashlight that he pointed "towards the ground," he never reported how he had it pointed on his report or to investigators (Casanova deposition, 116:21). Ms. Singleton reported that, "The person at the door never identified themselves as police" and that she, "saw a flashlight shining in the door" (Bates Stamp, COSA002133).

As the author of the widely adopted text, **Defensive Tactics With Flashlights**, and instructional designer of training programs about law enforcement defensive use of flashlights, officers are not taught to shine a flashlight toward the ground unless they are looking for something on the ground, or for a non-enforcement reason. They are taught to temporarily blind a person by shining the flashlight beam into a person's eyes, which can be a good officer safety tactic. However, if the flashlight light beam is aimed in the direction of the person and the officer is standing is a dark area, when a person looks in the direction of the flashlight beam it may still be hard to see the person who is holding the flashlight.

Failure to use cover and concealment to avoid shooting: At the time Officer Casanova shot at Mr. Snowden, "his [Mr. Snowden's] back was not turned. He was off to the side of me" (Casanova deposition, 123:15-16). Officer Casanova also said that Mr. Snowden was moving fast as he went toward the back of the residence (136:17), and said Mr. Snowden was "running" in the opposite direction of him when he fired his handgun (160:5). Confusingly, Officer Casanova also testified that Mr. Snowden was "walking, not running" toward the back of the residence (215: 7).

Officer Casanova also claimed Mr. Snowden had taken "two steps toward me, and then he kind of went to the side and then he was like lifting his shirt up" (Casanova deposition, 245:9-11; video audio). Another version from Officer Casanova had Mr. Snowden holding a handgun "inside his hand" (246: 21-22), yet in another version, "I saw Mr. Snowden pulling a weapon from his waistband, which is why I fired my weapon" (276:9-10).

Officer Casanova also testified that when he shot at Mr. Snowden it, "was difficult because he's moving" (Casanova deposition, 132:19-20). Mr. Snowden was moving in the opposite direction from Officer Casanova (132:12), backing up (130:23).

If Mr. Snowden were moving toward the rear of the residence per Officer Casanova's one version of the events, officer safety tactics promote that Officer Casanova quickly move away from the outside of the residence and take *cover* and/or *concealment* and announce that Mr. Snowden had a gun. These are practical and available alternatives to shooting into a residence


©2021. A.R.R.

that is occupied by others, some of whom may be seen and some of whom may not be seen (e.g., sleeping in bed) by the shooting officer.

The officer safety concepts of *cover* and *concealment* have been taught to law enforcement officers for more than 30 years. In their leading text, **Street Survival: Tactics for Armed Encounters**, Adams, McTernan, and Remsberg (1980) defined *concealment* as pertaining, "to protection from being *seen* by a suspect. It may be provided by natural man-made objects—bushes, brush, small trees, tall grass . . . that will *hide* your presence or movements from your adversary" (p. 158). This officer safety tactics continues to be taught today (Remsberg, Marcou, & Glennon, 2018).

In contrast, *cover*, "will—or at least deflect them or slow them down [referring to bullets]. Usually cover incorporates concealment, but its salient feature is its capacity for protecting you from hostile fire" (Adams, McTernan, & Remsberg, 1980, p. 158; see also Remsberg, Marcou, & Glennon, 2018).

If Officer Casanova had removed himself from the side of the residence and sought *cover or concealment*, not only would this have de-escalated the situation, but also it would have given Officer Casanova and other officers time to select other tactical and/or force options such as ordering the occupants from the home, effective deploying back-up officers who were on the scene, and/or calling specialized units such as S.W.A.T. (specialized weapons and tactics) to the scene. Officer Casanova did not choose these available alternatives even though time was on his side. He was the fuel propelling (pacing) the event that could have slowed down by him.

**6. Officer Casanova mislead other officers and dispatch when he reported "shots fired" but never told anyone that the shots were from him and not another person, and further reinforced this inaccuracy when he grabbed his long rifle and put on his ballistic vest, which placed the occupants of the residence in a hostile environment.**

Officer Casanova testified that he fired the two shots heard by other officers (Casanova deposition, 156:16), but failed to tell the other officers that it was him who had fired the shots and not someone inside the residence (156:18; 161:20-21). In short, Officer Casanova created a mindset in other officers that someone inside the residence fired the shots.

To further this inaccuracy and further reinforce the mindset that the occupants of the residence were dangerous people, Officer Casanova is shown on video obtaining his long rifle and putting on a ballistic vest (see body-worn camera video; Casanova deposition, 1616:5; 169:10, 14).

While Officer Casanova was perpetuating these fallacies, Mr. Roundtree, who had been shot in the chest by Officer Casanova, failed to receive timely medical intervention per policy (Bates Stamp, 000306). Officer Casanova attempts to justify his failure to provide Mr. Roundtree with timely medical intervention by saying, "No one was screaming for help inside the home . . .


©2021. A.R.R.

we couldn't safety retrieve anyone form the home to seek any type of medical attention" (Casanova deposition, 162:19-21).

Law Enforcement Code of Ethics: Officer Casanova's behaviors, described above, also violated the SAPDs "Law Enforcement Code of Ethics" that was adopted by the Chief of Police and incorporated into the policy manual (Bates Stamp, COSA 000007). Officer Casanova was a sworn law enforcement officer when he interacted with the occupants of the residence and is bound by the "Law Enforcement Code of Ethics" published by the International Association of Chiefs of Police (IACP) and adopted by the City of San Antonio in its SAPD policy manual.

Based upon my education, training, and experience as a former professor who taught "ethics," Officer Casanova violated the following provisions of the Code of Ethics based on his behaviors when he was misleading his fellow officers at the scene:

"***As a Law Enforcement Officer****, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception . . . and to respect the Constitutional rights of all persons to liberty, equality, and justice.*

*"Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my Department.*

*"I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence . . . "* (Bates Stamp, COSA 000007).

A content analysis of the body-worn camera and audio, coupled with Officer Casanova's testimony clear show he failed to "safeguard lives and property; failed to protect the innocent against deception"; failed to obey the regulations of the SAPD; and failed to enforce the law courteously when he used profanity throughout the evening (Casanova deposition, 175:11-12).

**7. The City of San Antonio, its leadership, and/or police leadership failed to conduct a thorough and objective Internal Affairs investigation into the fatal shooting of Mr. Roundtree, the shooting of Mr. Snowden, and the seizure of Ms. Singleton that appears will result in the ratification of Officer Casanova's outrageous conduct and which falls below internal investigative standards, recommendations, and guidelines.**

[NOTE: It is my understanding that SAPD Chief William McManus' deposition was taken but the transcript was unavailable in time for review and incorporation into my opinions. Therefore, I reserve the right to submit a Supplemental Report.]

On the surface it appears the City of San Antonio, its leadership, and/or SAPD leadership conducted a thorough investigation into the events that took place at 217 Roberts Street, which involved the uses of deadly force by Officer Casanova (Bates Stamp, COSA 001747-2188). A content analysis of the several hundred-page report identified misinformation, lack of follow-up


©2021. A.R.R.

interviews of Officer Casanova, inherent bias toward non-police officers, and a general failure to conduct a through and impartial investigation where policy violations were identified.

One synopsis contained within the Internal Affairs report said, "EMS made the location and treated the injured" that implied the treatment was timely (Bates Stamp, COSA001747). It also states that "No allegations of misconduct were brought against Officer Casanova (Administrative Review only)" (COSA001747), even though Detective Hines testified that Officer Casanova's shooting into an occupied house when not knowing where anyone is located was reckless (Hines deposition, 71:25). He also testified that if Officer Casanova had not seen a handgun and fired, that this, too, was reckless (85:8-9). Detective Luza agreed that firing in a house that is occupied could be reckless (Luza deposition, 18:10; 68:8). Detective Perez agreed with his investigative colleagues. "It possibly could" have been reckless for Officer Casanova to fire his handgun into an occupied home as he was backing up at the time, he fired two rounds (Perez deposition, 98:12).

Regarding complaint processing, the CALEA standard manual notes "a written directive requires the agency to investigate all complaints against the agency or employees of the agency" (CALEA, Standard 52.2.1, p. 52-2). The CALEA standards manual notes "the integrity of the agency depends on the personal integrity and discipline of each employee" (p. 52-1).

The International Association of Chiefs of Police (IACP) has issued guidelines for the investigation of employee misconduct and has also authored a model policy regarding such investigations (IACP, "Investigation of Employee Misconduct: Model Policy", July 2001). Regarding the disposition of a citizen complaint, the IACP recommends that: "The primary investigative authority for the investigation (i.e., subject employee's supervisor and commander or OPS) shall review the complaint report and investigate findings once deemed complete. This authority will compile a report of findings and provide a disposition recommendation for each charge as follows:

a. *Sustained*: Evidence sufficient to prove allegations.
b. *Not sustained*: Insufficient evidence to either prove or disprove allegations.
c. *Exonerated*: Incident occurred but was lawful.
d. *Unfounded*: Allegation is false or not factual or the employee was not involved (p. 3).

While the SAPD has similar dispositions in its policy manual, it is only "lip service" to conduct an Internal Affairs investigation and then conclude the police officer, in this case Officer Casanova and/or the supervisors at the scene, were exonerated because a complaint was lacking. Based upon my education, training, and experience, the vacuousness of Chief McManus and/or the City of San Antonio and police leadership teams makes him and/or them unfit to evaluate the Internal Affairs investigative report and/or to administer fair discipline or remedial training to Officer Casanova or officers in general. If the Chief decided not to take any significant corrective action to alter Officer Casanova's outrageous behavior, such behavior would have been ratified by the Chief thereby creating or reinforcing an organizational atmosphere that intentionally protected his law enforcement officers and/or ratified law enforcement officer misconduct.


©2021. A.R.R.

This opinion is based on a content analysis of produced documents, not that I did not like the disciplinary outcome. As a former law enforcement administrator, I know how difficult it is on occasion to discipline an officer, but in this case the information is overwhelming that Officer Casanova violated policy, training, and mislead his fellow officers.

## XI. DEMONSTRATIVE EVIDENCE

I reserve the right to use demonstrative evidence at trial to illustrate the facts and my opinions expressed above.

**XII. COMPENSATION:** See APPENDIX B.

**XIII: TESTIMONY for the PAST FOUR YEARS:** See Appendix C.


©2021. A.R.R.

## REFERENCES

Adams, R. J., McTernan, T. M., & Remsberg, C. (1980). **Street survival: Tactics for armed encounters**. IL: Evanston. Calibre Press.

Attard, B., & Olson, K. (2021). **Police misconduct complaint investigations manual** (2nd ed.). New York: Routledge.

Commission on Accreditation for Law Enforcement Agencies. (2001, November). **Standards for law enforcement agencies** (4th ed.). Fairfax, VA: Author.

Donner, C. M., & Popovich, N. (2018, October). Hitting (or missing) the mark: An examination of police shooting accuracy in officer-involved shooting incidents. *Policing An International Journal of Police Strategies and Management*, *42*, (8).

Graziano, A. M., & Raulin, M. L. (2000). **Research methods: A process of inquiry** (4th ed.). Boston: Allyn and Bacon.

International Association of Chiefs of Police. (2002, July). *Investigation of Employee Misconduct: Model Policy*. Alexandria, VA: Author.

Orrick, W. D. (2004, November). Developing a Police Department Policy-Procedure Manual. In **Police chiefs desk reference: A guide for newly appointed police leaders** (pp. 138-155). Alexandria, VA: International Association of Chiefs of Police.

Peters, Jr., J. G., & Brave, M. (2006). Force continuums: Are they still needed. *Police and Security News*, *(22)*, 1.

Peters, Jr., J. G., Wilhite, C., LaRochelle, J. (2015). Body-worn Cameras: Rebuilding public trust through organizational culture. *Police and Security News.*

Police1. (2018, December 3). New study on shooting accuracy: How does your agency stack up? Retrieved from www.police1.com

Reiter, L. (2006). **Law enforcement administrative investigations: A manual guide** (3rd ed.). Indianapolis, IN: Public Agency Training Council.

Remsberg, C., Marcou, D., & Glennon, J. (2018). **Street survival II: Tactics for deadly force encounters**. IL: Glen Ellyn. Calibre Press, Inc.

Rostker, B. D., Hanser, L. M., Hix, W.M., Jensen, C., Morral, A. R., Ridgeway, G., & Schell, T. L. (2008). Evaluation of the New York City Police Department Firearm Training and Firearm-Discharge Review Process. CA: Santa Monica. RAND Corporation.

Sherman, L. W. (1974). **Police corruption: A sociological perspective**. Garden City, NY: Anchor Books.


©2021. A.R.R.

Wallentine, K. (2009, Summer). The Risky Continuum: Abandoning the Use of Force Continuum. *International Municipal Lawyers Association Journal.*

Wheelen, T. L., & Hunger, J. D. (2006). **Strategic management and business policy** (10th ed.). Upper Saddle River, NJ: Pearson, Prentice Hall.


©2021. A.R.R.

# APPENDIX A

## CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED

Slack, et al. v. City of San Antonio, et al.

(Doc. 9) Plaintiffs' First Amended Complaint
(Doc. 12 ) Defendant Casanova's Answer
(Plaintiffs' Third Amended Complaint
Alexander Garza - Non Respondent Officer's Report
Alexander Garza sworn statement by R. Hines
All UOF Reports COSA001452-COSA001488
Angela Salvatierra
Applicant Processing COSA001506-COSA001738
Bernice Roundtree's Responses and Objections to Defendant Casanova's First Request for Production
Bernice Roundtree's Responses and Objections to Defendant Casanova's First Set of Interrogatories
Bexar County Medical Examiner's Investigative Report
Cara Crain
Casanova - Respondent Officer's Report
Casanova by Detective Perez
Casanova Field File COSA001349-COSA001374
Casanova TCOLE Report
casanova
Casanova's Training Academy Class Transcripts
Cause and Manner of Death (Randall E. Frost, M.D.)
Custodial Death Report by Rubenm Perez
Defendant Casanova's Answer to Plaintiffs' Third Amended Complaint
Defendant Casanova's Responses to Plaintiffs' ROGS and RFP
Defendant City of San Antonio's Responses to Slack's RFP
Defendant City of San Antonio's Responses to Slack's ROGS
Defendant city ofSan Antonio's Answer to Plaintiffs' Third Amended Complaint
Details of Investigation by R. Perez
Detective K. Landrum
Division File COSA001489-COSA001505
dna
Etebon Preciado sworn statement by Detective Mark Garza
Evidence Submission Form
Firearms Report
Forensic Serology Report
Garrity Warning Sheet - Casanova


©2021. A.R.R.

garza
Hence Williams sworn statemet by Det. Hines
IA 201 Casanova COSA001375-COSA001451
IA2018-0972 Investigative Report Redacted COSA001747-COSA002188
Incident Detail Report - Fire
Incident Detail Report - Police
Incident Detail Report prepared by Steve Casanova
Internal Affairs Report Prepared by Ryan Luza and Tim Vaughn
Interoffice Correpondence by Efrain Gonzalez
James Panah - Non-Respondent Officer's Report
James Panah by Detective T. Angell
James Panah Sworn Statement by Tim Angell
Jason Macias - Non-Respondent Officer's Report
Joe Rodriguez
Left Side COSA002189-COSA002192
Letter from Timothy Vaughan to Steve Casanova re. Investigation
Local News and video--11-11-2020
Marc Machado
Maria Herrera sworn statements by Sgt. D. Evans
Melina Moncivais sworn statement by Detective Tim Angell
Michelle Martinez sworn statement by Det. Hines
panah 2
panah
Patricia Slack's Responses to Def Casanova's First Set of Interrogatories
Peter Sweeney
Photos of Devante Snowden CSI Photos by Sweeney COSA003465-COSA003496
Photos of inside of home
Plaintiff Davante Snowden's Responses and Objections to Defendant Casanova's First Request for Production
Plaintiff Davante Snowden's Responses and Objections to Defendant Casanova's First Set of Interrogatories
Plaintiff's Slack's Responses to Defendant Casanova's RFP
Prosecution Guide - R. Perez
Report by Thomas Maurice indicating Charles Roundtree shot first
Review of Documents Viewed - Ryan Luza
Roundtree Prelim Report--Dr. Peters--DRAFT
Ryan Luza Internal Correspondence re. review of bodycam videos
Second Amended Complaint
Sketch of Scene
Snowden by Perez
Supplementary Reports
Sworn Statement by Casanova (R. Perez)
Taylor Singleton sworn statement by Det. Hines
Taylor Singleton's Responses and Objections to Defendant Casanova's First Request for Production


©2021. A.R.R.

Taylor Singleton's Responses to Defendant Casanova's First Set of Interrogatories (1)

Taylor Singleton's Responses to Defendant Casanova's First Set of Interrogatories

Tiffany Lozano (no prints found)

Trace Evidence Report

Work Permits COSA001739-COSA001746

9-1-1 Calls
Body-worn Camera digital footage
Deposition transcript: Ruben Perez
Deposition transcript: Ryan Luza
Deposition transcript: Kevin Landrum
Deposition transcript: Randal Hines
Deposition transcript: Steve Casanova


©2021. A.R.R.

## APPENDIX B

## COMPENSATION

Slack, et al. v. City of San Antonio, et al.

**Compensation**

I will invoice at my published flat rate of $7500.00. Deposition testimony is invoiced at a flat daily rate of $2000.00 per day, if the deposition is taken at my location and pre-paid, or $3000.00 if taken other than at my location, or not pre-paid, plus direct expenses. ZOOM or similar style depositions are invoiced and must be pre-paid at $3000.00 per day. On-site visits are invoiced at $3000.00 per day, plus direct expenses. Time for trial testimony is invoiced at $2000.00 per day at my location, or $3000.00 per day other than at my location, plus direct expenses.


©2021. A.R.R.