# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

BERNICE ROUNDTREE, Individually and on behalf of the Estate of CHARLES ROUNDTREE, JR. And the Statutory Beneficiaries, TAYLOR SINGLETON and DAVANTE SNOWDEN,
Plaintiffs,

VS.

CITY OF SAN ANTONIO, TEXAS; and STEVE CASANOVA
Defendants.

CIVIL ACTION NO. SA-18-CV-1117-JKP-ESC

**********************************************************

ORAL DEPOSITION OF

JOHN G. PETERS, JR., Ph.D.

March 13, 2025

**********************************************************

ORAL DEPOSITION OF JOHN G. PETERS, JR., Ph.D., produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and -numbered cause on the 13th day of March, 2025, from 10:01 a.m. to 4:57 a.m., before Quinlyn Jones, CSR in and for the State of Texas, reported by machine shorthand, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

MAGNA LEGAL SERVICES
(866) 624-6221
Www.MagnaLS.com

A P P E A R A N C E S

FOR THE PLAINTIFFS:
Mr. Daryl Washington
SBOT: 24013714
WASHINGTON LAW FIRM, PC
325 North Saint Paul Street
Suite 3950
Dallas. Texas 75201

FOR THE DEFENDANTS:
Mr. Lowell Denton
SBOT: 05764700
DENTON NAVARRO RODRIGUEZ BERNAL SANTEE & ZECH, P.C.
2517 North Main Avenue
San Antonio, Texas 77450

Mr. Mark Kosanovich
SBOT: 00788754
FITZPATRICK & KOSANOVICH, PC
P.O. Box 831121
San Antonio, Texas 78283

Mr. Nathan Mark Ralls
SBOT: 16489200
HOBLIT DARLING RALLS HERNANDEZ & HURDLOW, LLP
2806 West Bitters Road
Suite 114
San Antonio, Texas 78248

# INDEX


| | PAGE |
|---|---|
| Appearances . . . . . . . . . . . . . . . . . | 2 |
| JOHN G. PETERS, JR., Ph.D. | |
| Examination by Mr. Denton . . . . . . . . | 6 |
| Examination by Mr. Washington . . . . . | 106 |
| Examination by Mr. Kosanovich . . . . . | 114 |
| Examination by Mr. Denton . . . . . . . . | 220 |
| Examination by Mr. Washington . . . . . | 227 |
| Examination by Mr. Kosanovich . . . . . | 236 |
| Examination by Mr. Washington . . . . . | 240 |
| Reporter's Certificate . . . . . . . . . . . | 247 |


EXHIBITS


| NO. | DESCRIPTION | |
|---|---|---|
| 1 | Preliminary Opinion Report . . . . | 10 |
| 2 | 2 Flash Drives . . . . . . . . . . . | 7 |
| 3 | Rimkus Report. . . . . . . . . . . . | 12 |
| 4-7 | Photographs. . . . . . . . . . . . . | 74 |
| 8 | Photograph . . . . . . . . . . . . . | 94 |

P R O C E E D I N G S:

THE VIDEOGRAPHER: Good morning, we are now on the record. This begins videotape number one in the deposition of John G. Peters, Jr., in the matter of Bernice Roundtree versus City of San Antonio, Texas in the United States District Court for the Western District of Texas, San Antonio division. Today is Thursday, March 13th, 2025 and the time is 10:01 a.m.. This deposition is being taken at the Washington Law Firm, located in Dallas, Texas, at the request of counsel for defense. The videographer is Erica Taylor, the court reporter is Quinlyn Jones, both of Magna Legal Services. Will counsel please state their appearances for the record?

MR. WASHINGTON: Darryl Washington for the plaintiffs.

MR. DENTON: Lowell Denton for Officer Steve Casanova.

MR. KOSANOVICH: Mark Kosanovich and Mark Ralls for City of San Antonio.

MR. RALLS: You need to hear from me, too? Mark Ralls for the City of San Antonio.

THE VIDEOGRAPHER: All right. Our court reporter will now swear in the witness.

THE REPORTER: Can I get you to please

raise your right hand?

(Witness duly sworn.)

THE REPORTER: Thank you.

JOHN G. PETERS, JR., Ph.D.

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. DENTON:

Q. Good morning Dr. Peters, I'm Lowell Denton, as you heard, I represent Officer Steven Casanova in this case. I'll be asking you some questions. I'm going to skip all of the usual lawyer instructions about how to do this because I believe you've probably done it more than I have, would you agree?

A. I would agree.

Q. What are you up to, 200 depositions at this point in your career or more?

A. I don't really keep track, but it's probably pretty close to that.

Q. You testified back in 2016 that it was 150 and you've been doing it since then, right?

A. Been doing it since then, yes.

Q. All right. So the only thing I will ask, is there anything in terms of recent events, health, stress or anything else that prevents you from being able to give me a full set of analysis and answers about your

opinions in this case today?
A. No, nothing.
Q. All right.
MR. DENTON: And I apologize to you about the speed of my speech and I will try to slow down as I begin.
Q. (By Mr. Denton) So, first of all, we had served an amended notice for this deposition with a duces tecum, have you brought anything with you today?
A. Yes.
Q. All right. What do you have with you?
A. Two flash drives.
Q. Okay.
A. Has my current CV on it.
Q. All right.
A. Has my entire file on it. The only thing that's not on the flash drive is the video.
Q. Correct.
A. It was too large to --
Q. Certainly.
A. -- squeeze on the flash drive.
Q. So, and then let me, I'll have the reporter mark these flash drives and I appreciate you bringing those. You have referred to the video, tell me this precise video recordings that you're talking about. Are

they ones listed on your report?
A. Yes.
Q. Any others that aren't listed on your report?
A. No.
Q. All right. So let me just page over to that and I'll hand you this notebook, if you will look at tab number three, that should be your report, am I correct?
A. Yes, that's correct.
Q. And if you'll look over to page 25, 26, 27, I believe, is that the right page?
A. Yes.
Q. All right. Twenty-seven is where it lists generically the body worn camera digital footage?
A. Correct.
MR. WASHINGTON: Which page you looking at?
MR. DENTON: Twenty-seven.
MR. WASHINGTON: Of three?
MR. DENTON: Twenty-seven of three.
DR. PETERS: Of the report, not the CV.
MR. WASHINGTON: Okay.
DR. PETERS: The reports in front of the CV.
MR. DENTON: It's Appendix A, third page. You have it there, counsel?

MR. WASHINGTON: I'm trying to find it.
MR. DENTON: Are we there?
MR. WASHINGTON: Yeah.
MR. DENTON: Thank you.
Q. (By Mr. Denton) So, it just generically says body worn digital camera -- body worn camera digital footage, so that's going to be the body worn camera for my client Steve Casanova?
A. Correct.
Q. For Officer Panah, who else?
A. I'd have to go back and actually look. Those are the primary two that I relied on. Casanova's primarily.
Q. All right. Very good, that was going to be my next question. So on the, on the flash drives that we have here, you do not have the enhanced video work from doctor, Mr. Tanwar, correct?
A. No, I don't.
Q. All right. So, let's go through the list that we were just looking at, page back two pages to the beginning in that Appendix A because I want to have a good understanding of what you had when you were working in this case. Have you received anything else since you provided your preliminary report to us with your opinions and the basis for it in this case?

A. Yes, I received deposition transcript of the chief of police and there was some also, I believe other pleadings, court order and they were on the flash drive.
Q. Okay. Let me then ask you to turn in your notebook and for the record, I will mark the exhibit that we've just looked at which is it, tab three in your book, that's a correct copy of the report that you provided in this case; is that correct?
A. Yes.
Q. I'll mark that as exhibit number one to this deposition and then I want to ask you about tab number five. I referred to this a moment ago, do you recognize that supplemental report of findings?
A. Yes.
Q. All right. Is that something you've been provided as well?
A. Yes, that's on the flash drive as well.
Q. Okay. All right. But you did not have that at the time that you did your original report, correct? It's not listed --
A. If it's not listed, then I didn't.
Q. All right. Very good. Now we know where we are on that. Anything else other than the deposition of McManus, the pleadings, the court order and the report of the Rimkus report from Tanwar, Digvijay Tanwar

Consultants?
A. Let me just check one thing. I also had received the defendant's police practices expert report, I don't think it's listed on my original documents.
Q. When you say defendant's are you talking about my expert on behalf of Officer Casanova, Albert Ortiz?
A. Yes.
Q. Okay.
A. And that's on this jump drive as well.
Q. Very good, and so I'll take the two flash drives and at the break we will mark those as Exhibit 2 to this deposition. So as you know, I'm looking today to find out everything about the scope of your opinions that you're going to offer at trial. You've not provided any preliminary supplemental report, correct?
A. No.
Q. All right. So I would like you to start by telling me what has changed and what have you added to the analysis that I have in the report that we're going to go through?
A. Probably starting with the two expert reports, I read the report you referenced and under tab five, Tanwar's report and I didn't find that helpful at all. And it didn't change any of my opinions. Mr. Ortiz's report in my opinion was just the summary of the facts

and it really wasn't an opinion report as such, I found that he ignored most of what I found as policy violations and other things. And that didn't change my opinions at all either.

Q. All right. When you looked at the report for Rimkus at Exhibit 5, and I will mark that as Exhibit 3 to this deposition when we break, you said that that didn't change your opinions, didn't find it helpful, did you look at all of the hundreds and hundreds of single frame breakdowns of that video?

A. I did.

Q. Okay. And you've previously been involved in looking at enhanced or decompressed video that has been able to help you make determinations in the cases you've studied, correct?

A. In some cases, yes.

Q. All right. You previously testified that decompressing the video is essential to find out what the video actually shows?

A. Correct.

Q. You agree with me that body camera video, digital video is usually less accurate than the human eye during an event?

MR. WASHINGTON: Objection, form.

A. That's a hard question to answer because the

video will pick up things the human eye doesn't.
Q. (By Mr. Denton) And the human eye will pick up things the video doesn't?
A. Correct. Same with audio.
Q. Very good. And so the video is a supplemental tool, correct?
A. Can be, depending on the department's protocol. Sometimes they, I consider it a supplemental to a report.
Q. Okay.
A. But some departments will allow the officer to review the video first, then write the report, so there it's more of a primary tool.
Q. And I'm talking about in the context of our jury in this case, the digital video is one source of information about what happened, right?
A. Yes.
Q. But it can't substitute for what my client Officer Casanova actually saw?
MR. WASHINGTON: Objection, form.
A. In some cases, that's correct.
Q. (By Mr. Denton) All right. And you know that during this video, have you looked at it recently? Steve Casanova's body worn camera?
A. A couple weeks ago.

Q. All right. So you have a fairly recent memory of what's there?
A. Uh-huh.
Q. You agree that during that video at the point where Mr. Snowden is going across the field of view, that the camera angle or direction changes?
A. Yes.
Q. You would agree with me it changes as a result of my client reaching for his weapon?
MR. WASHINGTON: Objection, form, calls for speculation.
A. I don't recall exactly when your client reached for his weapon.
Q. (Mr. Denton) Okay. All right. So what did you see, if anything, in the Tanwar report in the images that you reviewed that added to the facts you had before?
MR. WASHINGTON: Objection, form.
A. Probably the most, well let me back up. Frame-by-frame analysis is helpful, but usually static. So I did the frame-by-frame review, but then I went back and played the video, as well. I think the frame-by-frame review mostly showed Mr. Snowden turning and going toward the rear of the residence. 'Cause we have so many conflicting versions of what took place in

the residence and I think the video helped solidify some of that.
Q. (By Mr. Denton) All right. And I was going to ask you about that at a later point and I will follow up on that. You agree with me that at that point in the video you just referenced about when Mr. Snowden turns, that shortly there after he leaves the field of view?
MR. WASHINGTON: Objection, form.
A. As I recall it, yes.
Q. (By Mr. Denton) Okay. And can you tell me, your report doesn't specifically say or place in point of time when the first and second shots were fired in that sequence, can you tell the jury when you think the first shot was fired in that sequence? And I could show it to you again if you want to look at it?
A. That would probably be helpful.
Q. All right.
A. If you wouldn't mind.
MR. DENTON: Counsel, you want to do this on the record or just take a short break?
MR. WASHINGTON: We can do it on the record.
MR. DENTON: This will take me just a moment.
MR. WASHINGTON: Do you have a way to do

the video where we can all see it?

MR. DENTON: I'm just going to play it on here, that's all I can do. I don't know how I can play it in this conference room so everybody can see it. Do you?

MR. WASHINGTON: I mean, you can maybe put it here and we can all come around if that's, if need be. Or just turn it this way and we all look at it at the same time.

MR. DENTON: Yeah, it's no problem. I'm going to put this here and this is a clip from the video from my client's body worn camera.

(Video being played.)

Q. (By Mr. Denton) So, the question I had asked you is, can, do you have an opinion about when, during the course of that video, and I mean when in the context of where Mr. Snowden was passing by, that the first and second shots were fired?

A. It was as he was turning and one of the shots hit him in buttocks area, so it would've been after he had turned his body toward that window.

Q. All right. So that's helpful and I thank you for that answer. What I want to do, I'm going to come back to that later in my inquiry. Let me go through some of the generics. I think we've covered what's

developed since your report as a result of the Tanwar material, correct?
A. Correct.
Q. Anything else as a result of having that material that you didn't have before?
A. No, I think I think we've covered it.
Q. All right. So in your analysis in this case, as in many of your prior cases, you're not bringing to this jury any determinations or opinions on credibility, correct?
A. Correct.
Q. Do you have opinions on which facts are true or false?
A. Not in a sense of true or false, I think some of the objective evidence or potential evidence depending if the court allows it is the video. But the video becomes subjective once you view it. So you and I can look at a video and come away with different opinions about the video. That's the subjectivity of analysis.
Q. Very good. And that's the reason that that's up to the jury?
A. Correct.
Q. And you're going to leave that up to the jury?
A. Correct.

Q. And you're not telling the jury who's telling the truth, correct?
A. Correct.
Q. And it's up to them to look at that video and to draw their own conclusions listening to you and all the other witnesses?
A. Correct.
Q. All right. You're not going to be offering any opinions on the law and legal standards because that's the judge's job?
A. That's right.
Q. Now, we will be talking about Graham versus Connor and some of the other cases that are in your report, but you don't intend to offer opinions on what the law is in those cases?
A. Correct. The reference is more for training purposes than for any legal opinion.
Q. All right. Now, clarify for me, you refer to national standards more than once in your report, I'm confused because I've seen your prior testimony where you say there is no national standard for the use of force or for deadly force, is that true?
A. No, there is a national standard for the use of force and deadly force.
Q. Is it the 4th Amendment definition under Graham

versus Connor?
A. Correct.
Q. And the subsequent case law?
A. Correct.
Q. All right. And the national standard is not from some policy from a particular agency or like the IACP?
A. No, IACP is an advocacy group, an organization.
Q. As is CALEA, the organization that accredits police departments?
A. Correct.
Q. As would be PERF, the other organization?
A. Correct.
Q. The Police Executive Research Forum?
A. Correct.
Q. Okay. And you will not be, I don't believe you'll be expressing any opinions on qualified immunity?
A. No, certainly not.
Q. Okay. Because again, that's a legal question for the court and the jury to determine?
A. Correct.
Q. No opinions on what law was clearly established for purposes of that analysis?
A. Not for qualified immunity, no.
Q. Okay. All right. Your report doesn't say

anything about Officer Casanova calling for other officers for back up and the contention by counsel for the plaintiff that they were his buddies, you don't think that has any bearing on the outcome in this case, do you?

MR. WASHINGTON: Objection to the side bar.

A. Well, I think calling for back up certainly important.

Q. (By Mr. Denton) Inappropriate?

A. Yes --

MR. WASHINGTON: Just for one second, Lowell, can you let him just, 'cause you're going really fast.

MR. DENTON: I did not mean to cut you off.

MR. WASHINGTON: Yeah, I wanted to make sure he's finished.

Q. (By Mr. Denton) And Dr. Peters, let me tell you, because I certainly intend to respect you and hear your full opinion. Okay. I'm not here to cut your opinions off because I'm going to hear them sooner or late, anyway.

A. That's true.

Q. So, if I cut you off at any point, I'd like you

to tell me you want to finish your answer?
A. All right. That's fair.
Q. All right. And would you proceed with that answer?
A. Yeah, I think it's certainly appropriate to call for back up. I think one of the things Casanova did on the radio at one point when he said shots fired, he never said who fired. He fired and I think as a responding officer if you hear something on the radio that says hey, shots fired, I think most officers think somebody's shooting at the officer, not the other way around. But I don't have a problem with getting back up.
Q. All right. And just, I'm a little bit curious about that, are you familiar with the opinion in the, I probably can't say this correctly, the Batyukova case, deputy sheriff in Bexar County?
A. I don't believe I am.
Q. It's one of the opinions. Are you familiar with the Fifth Circuit's opinion in this case?
A. Only what I read from the court order.
Q. Okay.
A. I haven't read the appellate. I didn't know there was an appellate.
Q. All right. No problem at all. So, Officer

Casanova for calling for back up is appropriate?
MR. WASHINGTON: Objection, form.
A. I think it's appropriate, particularly if you have an officer involved shooting.
Q. (By Mr. Denton) Very good. And there's no opinion in your report on what was in Casanova's mind?
A. I don't know what would've been in his mind.
Q. And you're not going to tell the jury or have any opinions about what his intent was?
A. No, I wouldn't know what his intent was.
Q. Very good. And you agree that under the Graham versus Connor standard, the subjective motivations or intents of the officer are irrelevant?
A. There's language to that effect, yes.
Q. Okay. What we're looking for is objective facts that would justify what the officer did?
A. Certainly to support what the officer did.
Q. Okay. To support what the officer did?
A. Right.
Q. Objective facts that were appropriate for the officer to base their decisions on?
A. I think you can have facts that are objective and you can have an officer who doesn't respond to those facts. In other words, maybe the officer did something different in light of those facts.

Q. Very good. I'm just looking for an agreement that the standard is objective reasonableness and not his, not subjective intent?

A. Correct.

Q. All right. You agree that the motivation of the officer is not an element of any constitutional violation?

MR. WASHINGTON: Objection, form.

A. That's a hard question to answer in today's environment because when you have officers who intentionally beat up people that result in their death, obviously their motivation will play a factor to the jury. I don't necessarily know what their motivation was at that moment in time.

Q. (By Mr. Denton) And you don't have any opinion --

MR. WASHINGTON: Hold on one second, Lowell. Just pause one second before. Okay?

MR. DENTON: I'm waiting.

MR. WASHINGTON: All right.

A. I don't know what's in an officer's head, obviously, because I'm not the officer, I have no way of knowing that. But I think the jury has the opportunity to look back at the outcome sometimes and they may come to their own conclusion on that.

Q. (By Mr. Denton) In this case, you don't have any opinions that Officer Casanova's motivations were apart of the outcome?
MR. WASHINGTON: Objection, form.
A. Well, I think what he expressed in his report and testimony impact the outcome. But as far as his clear motivation at that point in time, I can only go by what he testified to.
Q. (By Mr. Denton) Okay. So as we, as I have referred to or marked or will mark your report as Exhibit Number 1 in the deposition and so I'd like to go through that and get your opinions and understand them in some detail?
A. And that's tab's three, right?
Q. That's correct.
A. All right. Thank you.
Q. So, you discuss on the first page here, it's marked page number two, it's the first substantive discussion, number of sub specialties, excited delirium, agitated chaotic events, those are not present here, right?
A. Not to my knowledge, no.
Q. And this is not a case involving mental health issues, substance abuse, epilepsy, alcohol withdrawal and so forth, right?

A. To the best of my knowledge, that's correct.
Q. Doesn't involve handcuffing, impact tools, batons and the devices and so forth that you've previously been involved with?
A. No, I don't recall any of those being used.
Q. And you've written extensively about flash lights and their use, but your opinion really doesn't deal with any tactical use of flashlights here, other than whether it was pointed in somebody's eyes, right?
A. Correct.
Q. So what percentage, if you can, and I know this would only just be a rough estimate, what percentage of the cases that you have analyzed and provided expert opinions in involved what I'll refer to as a gun on gun or firearm versus firearm scenario? Because a lot of your work has been electrical conductive weapons, and Tasers, and batons and those other kinds of thing, can you break that down for me?
A. Well, that would be hard. I would estimate 15 to 20 percent, maybe.
Q. Okay.
A. That would be an estimate.
Q. All right. That's helpful. So, as I go through the, obviously this is not a case that involves the jail expertise and so forth?

A. Correct.
Q. I'd like you to give me some examples of cases that involve the scenario where an officer either says he sees a gun and somebody's going for it or says that the subject reached for their waist and he thought it was a weapon, that collection of categories. It's really two categories, but for, I think you'd agree with me that under the Graham versus Connor analysis, those two types of cases are highly similar, would you agree?
MR. WASHINGTON: Objection, form.
A. I think they're pretty similar.
Q. (By Mr. Denton) All right. Give me some examples of cases that you've been involved in that involved those scenarios?
A. There was one in Chicago where I recall a, the police came upon a, I think it was a juvenile who was running and the officer said he thought the person had a gun and fired, and as I recall it was no gun found. That would've been one of the earliest cases I handled.
Q. All right. You testify in trial in that?
A. No, that case, as I recall, I think that case never went to trial.
Q. All right. Others come to mind?
A. Let me just look here for one second.
Q. Certainly.

A. Appendix D is missing from my report copy here. 'Cause that lists all my recent cases in the last four years, I was going to look at that and see if I can.
Q. I will make a note of that and we will see if we can let you look at the break and I'll come back.
A. Yeah, that'll be fine.
Q. Nothing else comes to mind right now?
A. There's others that I was involved in, but some of those involve people that actually had weapons. I mean, clearly had weapons for sure.
Q. Weapon was found, identified?
A. Yes.
Q. All right. All right. Let me proceed on your report.
MR. WASHINGTON: Hold on. Were you finished, Dr. Peters?
THE WITNESS: Yes, I was.
Q. (By Mr. Denton) So page five in your report in the executive summary.
A. Okay.
Q. And I'm just going to try to make haste here when we can, I don't want to skip things, but it looks like to me that points one, two and three are opinions and criticisms that apply to the city and the standard for city liability and they don't focus upon my client,

Officer Casanova, until we get to point four; is that correct?

A. That would be a fair statement.

Q. All right. So, I just want to deal with the things that relate to Steve Casanova so, on number four you're focused on him. Your opinion of his use of force was inconsistent with national use of force standards recommendations and guideline, you're talking about Graham versus Connor as we discussed earlier?

A. Primarily, yes.

Q. Any other recommendations or guidelines that you are finding my client fell short of?

A. We discussed this briefly earlier, but I think modern policies from the IACP, those are recommendations and guidelines, particularly if a department relies on the developed policy and then the department's own policy, as well.

Q. All right. And the department's policy here you have cited it in your report, the use of force Section 501, correct?

A. Correct.

Q. All right. Any specific aspects of 501 that you contend that my client violated?

A. I'd have to go and look at each section of that policy again, but generally after the shooting, getting

together and discussing the case, which is a violation of the policy, not discussing the case, discussing the event, which was a violation of the policy.
Q. But that didn't cause the shooting or the death, right?
A. No, no, it didn't.
Q. That didn't cause the injury to Mr. Snowden?
A. No, but I think your question was anything in that policy.
Q. It was.
A. I'm just --
Q. It was. Thank you.
A. -- trying to highlight that.
Q. So then we segue in to from number four, which I would characterize as a little bit more general into number five where you specifically articulate cover and concealment totality of circumstances failed to use generally accepted officer safety tactics including --
THE REPORTER: Counsel, counsel. You're reading too fast.
Q. (By Mr. Denton) Given the totality of the circumstances, Officer Casanova failed to use generally accepted officer safety tactics including cover and concealment, correct?
A. Right.

Q. Now, there's nothing in policy 501 about cover and concealment, correct?
A. I don't recall any.
Q. Right. So are you talking about a failure to respond to Mr. Snowden's conduct by covering and concealing?
A. No. What I'm referring to here, there's nothing in the record that I reviewed from the original complainant that pointed out that that was the house she was referring to. Then Officer Casanova went to that house and I think the man's name was John, who was sitting on the front step, and as I recall, Officer Casanova shined a flashlight on him, asked him who are you and at some point said, oh, I recognize you. Never asked who was in the house, never asked did you see anything, never asked the fundamental questions that I think an officer would ask under those circumstances, because given the information that was provided by the complainant, we have a person who is allegedly battering other people. So you know you've got an aggressive violent person or potentially violent person up front and then you go and you know, just simply knock on the door by yourself. I think there's other ways, better ways and more efficient ways to handle that from a safety perspective. Both for the officer and for the

occupants.
Q. Okay. And what would that be? What are you saying that he should have done other than casual conversation with John Cotton on the porch?
A. I think find out some information from John who was on the porch. Get back-up earlier and maybe try to gather information who's in that house because the description that the lady provided didn't match the description of anybody in the house once they saw or he saw what was in --
Q. Right.
A. Or he saw who was in the house. So, I think taking more time, taking cover, that type of thing, not rushing in, the door opened, I understand that, there's a question as to whether or not he, people knew he was a police officer at that point?
Q. Right. Well, how is he going to interact with the people in the house to find out who they are and whether they're the assailant if he is hiding himself?
A. He's not necessarily hiding is an appropriate term, but I'm sure they had loud speakers, they had other methods to contact those people in the house and ask them to come out.
Q. All right.
A. Identify who they are, say we're the police, so

on so forth.
Q. All right. You knew that he had Officer Panah basically right behind him?
A. Right.
Q. So he already had that backup?
A. Right.
Q. He had Officer Garza on the side of the house, right?
A. Yes.
Q. So he did take those steps that you mentioned?
A. Yes. He had some people.
Q. And he had a pleasant casual conversation with Mr. Cotton?
A. Correct.
Q. Who didn't know anything?
MR. WASHINGTON: Objection, form.
A. Said he didn't know anything.
Q. (By Mr. Denton) He was asked who was in the house?
A. He didn't know.
Q. Okay.
MR. WASHINGTON: Lowell, before you get to your next question, do you mind if we take a quick three minute break?
MR. DENTON: I have no problem with that.

THE VIDEOGRAPHER: We are now --
Q. (By Mr. Denton) Let me just say on the record real quick that if you need a break at any point as long as it's not in the middle of a question, that's fine.
A. Understood.
THE VIDEOGRAPHER: Okay. We're now off the record at 10:39 a.m.
(Break in the proceedings.)
THE VIDEOGRAPHER: We're now back on the record at 10:47 a.m.
MR. DENTON: Thank you, ma'am.
Q. (By Mr. Denton) Before we resume on the cover and concealment questions I was asking you, I'm going to clean up the record. While you were gone and I apologize for moving your glasses --
A. Not a problem.
Q. -- without your permission. I put your report here and had it marked as I've said I would, we've also marked the two flash drives that you brought as deposition Exhibit Number 2, one of those, I'll take possession of and share with co-counsel and that other one, I will leave in this envelope in the possession of the court reporter. Number 3 is the exhibit that we looked at from Rimkus by Mr. Tanwar and it's been marked as Exhibit 3?

A. Just one point counsel, if I may, these are not identical. I filled one --

Q. Very good.

A. -- and this is almost filled.

Q. Thank you for that clarification.

A. So, I don't want you to give only half of it to your co-counsel.

Q. Thank you. And I'll work with court reporter to get a copy and we will leave the original with her. All right. Resuming on the cover and concealment question, anything else that you, in your opinion, believe that Officer Casanova failed to do in accordance with police policy regulations and so forth in the course of this event? And I'm distinguishing that from the Graham versus Connor dynamic itself.

A. I think tying into the cover and concealment issue standing in front of that window that we saw just a while ago, that you showed where you have multiple occupants of the house. And it was illuminated on the inside or certainly appeared that way from the video and Snowden, as you had asked earlier, had moved. He was moving across the window or across the frame of the video, if you might. Again, I think the officer put himself into a dangerous position by talking to people through that window, if you will. Where I think time

was on his side, that's a fundamental rule in officer safety, usually time is on your side, so when Snowden turned and moved, I think the continuation of the lack of cover and concealment certainly contributed to the shooting into the, into an occupied building. Where had there been cover and concealment and a different approach, to me it started bad and ended bad. It ended worse actually because we had Mr. Roundtree who got killed and shooting into a building like that, I think even Officer Casanova said, I knew there were other people in there. To me it was just a disregard of officer safety principals for the cover and concealment and also reckless to shoot into the place and hitting Roundtree and Snowden.
Q. All right. Whether it's reckless after you don't cover and conceal is a different issue, correct? I'm just trying to break this down into your logic.
A. I think it's, to me it's like a Venn diagram, the circles overlap. You can't take one circle out completely because if I disregard my safety and didn't use officer safety principals and I put myself in a dangerous situation and that resulted in shooting, I don't think you can artificially separate those two and make them totally independent.
Q. All right. Let me try to unpack that a little

bit. You're not telling this jury that if an officer uses a tactic that's a bad choice that they forfeit the right to defend their life against deadly force?

A. When you say forfeit, obviously at the end of the day, everybody wants to go home on both sides of the law, but if you jump in and create your own situational problem and then you shoot your way out of it, I don't think that's a very reasonable approach.

Q. So, you're not telling this jury that Mr. Snowden had a right to pull a gun on my client on the porch are you?

MR. WASHINGTON: Objection, form.

A. Well, let me qualify that. If Mr. Snowden didn't know who was out there and thought burglars were coming in or somebody to create harm to them, I think he has a right of self-defense.

Q. (By Mr. Denton) Does he have a right to shoot somebody on his porch, you know he doesn't?

MR. WASHINGTON: Objection, form argumentative.

A. Well, if somebody's on my porch and was pointing a gun at me, I'd shoot them.

Q. (By Mr. Denton) Was he pointing a gun, was my client pointing a gun?

A. No, your question was broad, it wasn't

specific.

Q. Very good. Let me make it specific. If there's a police officer with no gun on the front porch and the person in the house knows it, they don't have any legal right to shoot them, do they?

MR. WASHINGTON: Objection, hypothetical.

A. If the person on the inside knows that it's an officer --

Q. Yes.

A. I would agree with you given that hypothetical, which that hypothetical includes facts that I don't think are in this case.

Q. Understand. You think that they didn't know at that time that he was a police officer?

A. I think that's pretty reasonable, given the situation because they didn't announce who they were.

Q. All right. If somebody saw them and saw their uniform and saw their insignia, then the announcement doesn't matter, does it?

MR. WASHINGTON: Objection, form.

A. No, I think it still matters because there are people whose impersonate officers all the time.

Q. (By Mr. Denton) So, telling them I'm a police officer overcomes the fact that I have stolen a uniform and I'm masquerading as an officer?

A. No, but I think you -- he had the time to announce who he was. He should've known from his training that if I'm shining a flashlight at people, maybe they can't see who I am.

Q. So, is it your opinion --

MR. WASHINGTON: Hold on Lowell, just please.

MR. DENTON: He finished his answer --

MR. WASHINGTON: No, he didn't.

MR. DENTON: -- Mr. Washington.

MR. WASHINGTON: He was not finished. I promise you.

MR. DENTON: I have an agreement with the witness that if he didn't finish he will tell me.

MR. WASHINGTON: But Lowell, just do me a favor and I, honestly, I'm not trying to argue with --

MR. DENTON: I have sat here patiently.

MR. WASHINGTON: Lowell, just let me -- you're doing what you --

MR. DENTON: No, I am not.

MR. WASHINGTON: You're not letting me finish what I was saying to you. I'm just asking out of professional courtesy, so that we can have a clean record, not arguing in here, just pause just one second because he was still talking just so he doesn't have to

tell you that I'm still talking. I'm just asking you just to pause one second because you're talking very fast and you're coming quick with your questions, so that's all I'm asking.

MR. DENTON: Is the speech over now?

MR. WASHINGTON: Man, if you want to be rude --

MR. DENTON: I'm not being rude, I did what you said over --

MR. WASHINGTON: You can lower your voice. You can lower your voice.

MR. DENTON: I did what you said.

MR. WASHINGTON: Thank you.

MR. DENTON: Over and over.

MR. WASHINGTON: Thank you.

MR. DENTON: And over and I'm being respectful of the witness --

MR. WASHINGTON: You're not being respectful right now because you're being condescending.

MR. DENTON: No, I'm not. You told me to lower my voice and --

MR. WASHINGTON: We can move on --

MR. DENTON: Exactly what you said.

MR. WASHINGTON: Let's just, let's just move on. It's just a courtesy.

MR. DENTON: I understand.
MR. WASHINGTON: It's just -- that's all.
MR. DENTON: I'm being courteous and I think the record shows my courtesy.
Q. (By Mr. Denton) Do you remember where you were, Dr. Peters?
A. No, I don't.
Q. Okay.
MR. DENTON: Can you read back the last part of that answer so that he can pick up --
DR. PETERS: It was the last sentence or two.
MR. DENTON: That courteous enough?
(Requested portion read.)
A. All I was going to add to that was one of the first rules in officer safety training is time is on your side in almost every instance. You have time to set it up properly, you have time to keep the pacing of the event at your pace not necessarily at the target's pace, whatever the target is, could be a homeless person, could be anybody. That's all I was going to add.
Q. (By Mr. Denton) Okay. Thank you. So, you're not telling this jury that it is inappropriate or improper police behavior to lawfully go up to a door and

knock on the door to have a conversation?

A. If you have a reason to do that, certainly not.

Q. All right. And doing so to see whether or not an assault assailant is in that house is a totally legitimate police tactic?

A. It can be if that house was identified as where the person is.

Q. Okay. And do you agree that Ms. Preciado agreed with Officer Casanova's question about whether or not the house was the one that the lady went into?

MR. WASHINGTON: Objection, form.

A. I don't recall seeing that.

Q. (By Mr. Denton) Okay. All right. In any event, now that he's on the porch for a knock and talk --

MR. WASHINGTON: Objection, form.

Q. (By Mr. Denton) -- how can he do a knock and talk and be covered and concealed?

A. Well, again, we go back, I think this started wrong from the beginning in my analysis. As I said earlier, they could've made other ways to announce who they were and had people come out if they really thought this was a problem. What I got from reading the report is, Casanova wanted to get into that house because he thought it was a drug house.

Q. Is that your answer? All right. I'm just trying to make sure I'm listening to what you're saying. Are you not finished?
A. No. I just think from reading the reports and based on what he said in those reports and other testimony he wanted to get into that house.
Q. And in his reports and his testimony, it was clear that he knew where the lines were, right?
A. Which lines?
MR. WASHINGTON: Objection, form.
Q. (By Mr. Denton) The 4th Amendment line?
MR. WASHINGTON: Objection, form.
A. Well, he didn't establish probable cause.
Q. (By Mr. Denton) He said that if I can't, he said in his deposition testimony that he knew that once he talked to the people there if he couldn't find probable cause he had to go back to the office and write it up?
A. Right.
Q. He knew he couldn't get into the house unless he had consent, right?
A. Right.
Q. Okay. So do I have the full understanding of what your opinion is about failure to use cover and concealment at this location?

A. I think we've covered it.
Q. And I want to make sure that I have an answer and I'm not trying, this is a real world problem you know, if an officer goes up there, he had not been told if there are any weapons in that house, right?
MR. WASHINGTON: Objection, form.
A. I don't think he knew what was in the house.
Q. (By Mr. Denton) Right. Nobody had told him that there were weapons?
MR. WASHINGTON: Objection, form, calls for speculation.
A. Right.
Q. (By Mr. Denton) Okay. Nobody had told him that they had seen a weapon on the people that were involved in the assault?
A. The only weapon would've been fists.
Q. Okay. No guns or knives mentioned by anybody?
A. Not in the report I saw.
Q. Well, you haven't seen any facts that suggested there was any history of weapons at that location?
A. I don't recall saying that.
Q. So, Officer Casanova believed that that was a drug house, but he didn't have any information that the people were violent or had weapons, correct?
A. I don't recall him saying that he did.

Q. All right. Certainly no violent context for his interaction with Mr. Cotton on the front porch?
A. No, he approached Cotton.
Q. Okay. So, if a police officer goes up to a door and wants to have a conversation with the people and when the door comes open somebody pulls out a gun, now your opinion is that didn't happen, right?
MR. WASHINGTON: Objection, form. Objection to the side bar.
A. Correct.
Q. (By Mr. Denton) Right. But if that happens, if that happens and somebody pulls out a gun, that officer has a right to defend himself?
A. If he or she is placed in imminent jeopardy.
Q. Correct. If the officer reasonably believes that there is an immediate risk of deadly force or serious bodily injury?
A. I think imminent is the word.
Q. Okay. Immediate, imminent, the same principal right?
A. No, they're very different terms.
Q. Okay. So, immediate is different than imminent?
A. Correct.
Q. All right. But imminent danger of serious

bodily injury or death, correct?
A. That's the standard.
Q. All right. And if somebody in the house pulls out a gun and begins to bear down on the officer, it meets that standard, right?
MR. WASHINGTON: Objection, form.
A. If that were to happen and the officer had to respond right away, yes.
Q. (By Mr. Denton) Okay. So I'm moving on past number five on your executive summary. Number six, we've already covered, that was the after the fact shots fired. Number seven, then I believe that's another opinion that you have against the city and not my officer, Officer Casanova?
A. That's the IAP, so right.
Q. Is that correct?
A. Yes, that was it.
Q. That's against the city and not my client?
A. Number seven?
Q. Yes.
A. Correct.
Q. So you understand that my client's conduct is based on what he's testified that he saw with his own eyes, right?
A. That's what he testified to, yes.

Q. And so if he in fact saw an object in Mr. Snowden's hand or waistband, that's subjective information?
A. If it's true, yes.
Q. That's all I'm asking. If he objectively saw, which I believe you agree with this part of it, he saw someone whose appearance and behavior changed very quickly, didn't he?
MR. WASHINGTON: Objection, form.
A. I would agree the behavior changed, yes.
Q. (By Mr. Denton) Do you agree Mr. Snowden is the one who spoke first and said what's up?
MR. WASHINGTON: Objection, form.
A. No.
Q. (By Mr. Denton) You think the officer spoke first?
A. Yes.
Q. Okay. In any, event both of them said what's up to each other?
MR. WASHINGTON: Objection, form.
A. I think the, I think Casanova said something to the effect, what's going on or what's up and then I think Snowden said something to the effect, who's out there or who the F is out there.
Q. (By Mr. Denton) All right. So, if the sequence

is that both of them first say what's up man and then Mr. Snowden says, while standing up quickly, who the fuck is this?

A. Right.

Q. That's a quick change in his appearance and behavior, isn't it?

A. I think that's an expected change. The fact that he said who is this indicates to me he doesn't know who's --

Q. Okay.

A. -- at the door or who said that.

Q. All right. It may indicate that he just realized that it's a policeman standing there?

MR. WASHINGTON: Objection, form.

A. Well, I don't think you would ask who is it if you know it's a police officer.

Q. (By Mr. Denton) Are you speculating on that or is that your analysis as a police professional?

A. It would be my analysis going on the words.

Q. Okay. I'm just looking for why you reject my client's statement that Mr. Snowden, at that point realized he was a cop. You think my client's wrong, right?

MR. WASHINGTON: Objection, form.

A. I'm going by what Snowden said.

Q. (By Mr. Denton) You're buying Snowden's version, not my client, Officer Casanova?
A. I'm just saying that version indicates to me that he didn't know who was at the door.
Q. Right. So you agree that whatever my client heard Mr. Snowden say was also objective information?
MR. WASHINGTON: Objection, form.
A. If he heard it, yes.
Q. (By Mr. Denton) Just the words that he heard, correct?
A. If he heard them.
Q. I understand. And that is a premise that I'm asking every question on, okay. If I hear Mr. Snowden say what my officer says he said, that's objective?
MR. WASHINGTON: Objection, asked and answered.
Q. (By Mr. Denton) It's not subjective?
MR. WASHINGTON: Asked and answered.
A. It would be -- I agree.
Q. (By Mr. Denton) All right. So, the next thing that you believe happened from the testimony and the video is that Mr. Snowden was standing up, right?
A. Yes.
Q. And he closed a part of the distance between him and my client, Officer Casanova?

A. What do you mean by closed the distance?
Q. He got closer to my client.
A. Well, when he got up and turned, proxemically that would be true, except we have one person outside and one person inside.
Q. I'm talking about the distance between Officer Casanova on the porch and Mr. Snowden who was first sitting on the couch, agreed?
A. Right.
Q. When he stands up, he moves closer to my client?
A. Yeah, he would've moved. I don't know the exact distance.
Q. He had to move forward some to go past Ms. Singleton, right?
A. That's my understanding.
Q. Okay. And he went to my client's left?
A. That would be correct.
Q. All right.
A. Based on the video.
Q. Okay. Do you have an opinion about how much of the original distance between my client and Mr. Snowden he closed before he turned to the left?
A. No, because I don't know the distances they were separated.

Q. You agree that Mr. Snowden, when he first stood up, wasn't going anywhere?
MR. WASHINGTON: Objection, form.
A. Well, he had to be going somewhere because he stood. He went from seated to a standing position.
Q. That's all I'm saying.
A. That's a movement.
Q. Right?
A. Right.
Q. And then he began to move?
A. It was kind of all together, but yes.
Q. And my point is merely that he went from a stationary position to in transit?
A. That's fair.
Q. Okay. And so he was going faster as he proceeded?
MR. WASHINGTON: Objection, form.
A. I don't know if you could say it's faster. Getting up pretty quick, if you're distinguishing between getting up and moving.
Q. (By Mr. Denton) That's what I'm talking about.
A. I -- maybe getting up was actually faster.
Q. Okay. So, if either you or I get up and walk down the hall, we are almost stationary when we start and then we're moving quicker?

A. I would agree.
Q. All right. And that's consistent with what my client testified, that at some point, he was walking and at some point he was running?
MR. WASHINGTON: Objection, form. Who was running?
A. Yeah, who?
Q. (By Mr. Denton) Mr. Snowden.
A. Mr. Snowden was running. I think toward the back of the house.
Q. Did you ever see him go toward the back of the house?
A. If I recall it correctly, there was testimony or a report and one of the problems here we've got so many different versions of what took place, that it's, that it's hard to pinpoint exactly which version we're talking about all the time.
MR. DENTON: Okay. I'll object to nonresponsive.
Q. (By Mr. Denton) I asked whether or not you ever saw Mr. Snowden go to the back of the house. I'm talking about the video, if I wasn't clear.
A. Okay. On the video, no.
Q. Okay. And the only thing you see is him going to the left?

A. It would be Snowden's right, but the officer's left.
Q. Correct?
A. Correct.
Q. So, that's what we see?
A. Right.
Q. All right. And you know that, because you talked about it earlier in the deposition, that he was shot across his left and right buttock?
A. Correct.
Q. The bullet grazed both?
A. Right.
Q. So, his body position at the time the bullet hit him was sideways to the officer?
MR. WASHINGTON: Objection, form.
A. Could've been I didn't really analyze the angle of the bullet.
Q. (By Mr. Denton) Well, you see my client in the video turning slightly to his left when he fires?
MR. WASHINGTON: Objection, form.
A. He does very slightly.
Q. (By Mr. Denton) Okay. Now again, backing up before this started, when my client came to the door, you've already agreed that he didn't have his gun out?
A. Correct.

Q. He didn't have his hand on his gun?
A. I didn't see if he did or not.
Q. Okay. But if the video shows that he didn't move toward his gun at all until the point in time that he sees that, that the video show that reflection, in the center of Mr. Snowden's body then --
MR. WASHINGTON: Objection.
Q. -- he didn't walk up there and start shooting people, did he?
MR. WASHINGTON: Objection, form.
A. Well, he did shoot at people, otherwise Roundtree wouldn't be dead.
Q. (By Mr. Denton) He didn't walk up there with his gun out and start shooting at people?
A. No, he didn't do that, but he eventually pulled it out and in my opinion was reckless because he killed Roundtree.
Q. But my question is --
MR. WASHINGTON: Let him finish, please. Let him finish. Thank you.
A. He did kill Roundtree and I understand that Officer Casanova is your client, I understand that and we're focusing on Casanova and Snowden, but we have a dead guy here that was killed by Casanova. So it's not just about Snowden. Yeah, Snowden got up and Snowden

moved.
Q. (By Mr. Denton) Do you remember my question?
MR. WASHINGTON: No.
MR. DENTON: No, I'm not.
MR. WASHINGTON: No, you are going to let him finish.
MR. DENTON: Well, it's my question.
MR. WASHINGTON: You're going to let him finish.
MR. DENTON: Okay. Very good. Just keep talking, go ahead.
MR. WASHINGTON: No, let him finish.
MR. DENTON: It's nonresponsive, but I'll let him finish.
MR. WASHINGTON: You can lodge your objection, but let him finish.
MR. DENTON: I will.
MR. WASHINGTON: You wouldn't do it at trial. Let him finish.
A. All I'm saying is, as I testified earlier, I thought Casanova was reckless in a shooting. He said that he knew other people were in that house.
Q. (By Mr. Denton) You remember my question?
MR. WASHINGTON: Could you please let him finish?

MR. DENTON: No, I'm not going to let him talk all day.

MR. WASHINGTON: You're going to let him finish his question, his answer.

MR. DENTON: It's not an answer to my question.

MR. WASHINGTON: Object to it, follow the rules, but you're going to let him finish.

A. Why don't you re-ask your question, counsel.

Q. (By Mr. Denton) My question was, did my client go up to the door with his gun out and start shooting people?

A. And I answered that.

Q. But then you have been telling me your perspective on the case, that's not an answer to that question.

A. But I believe you had a follow-up question to that.

Q. Okay. Can we move on?

MR. WASHINGTON: Can you finish?

Q. (By Mr. Denton) Do you have something else to say in response to the question you don't remember?

A. No, the question was about him shooting. Your follow-up question, I believe was, he took his gun out and aimed slightly to the left. I think that was your

question after --
Q. I think you'd already answered that one.
A. All right. I think so, too.
MR. WASHINGTON: Dr. Peters, it's a strategy that's played. If you have an answer, please give your complete answer, all right.
MR. DENTON: And please do.
MR. WASHINGTON: Don't let counsel stop you or prevent you from giving your full answer. We could be here --
Q. (By Mr. Denton) And I'll reiterate, that I want to hear your full answer. I just want you to answer my question.
A. All right. Fair.
Q. So you agree that you're, first of all, your report doesn't say that my client went to the wrong house or didn't have a reason to go there, is that your opinion? It's not in your report.
A. I just, I didn't say it was the wrong house, he just didn't have information that I saw that that was the house.
Q. All right. But there's no reason he that can't go knock and talk under those circumstances?
A. No, he can go and make inquiry.
Q. All right. Your issues in the report about the

lack of better definitions in the city policy, that doesn't mean that my client, Officer Casanova, didn't understand what the legal principals were, correct?
A. I don't know what he understood.
Q. Okay. Now you make a reference to national consensus documents on the use of force and I think we have an agreement that your use of force standard is the Graham versus Connor standard?
A. Right.
Q. I don't see anything attached to your report that fit into the national consensus documents on the use of force. Is that something other than Graham versus Connor and the case law that goes with it?
A. There's more explanation in those documents.
Q. And what are they?
A. Elaboration on Graham versus Connor, elaboration on points of Graham -- I think they're on that jump drive, so I copied everything that's in there.
Q. Well, let's take a quick look at page 25, Appendix A and tell me whether or not that's anything that's listed here because I couldn't find it.
A. Well, it wouldn't be listed there.
Q. Okay.
A. It would be listed under references. Those are documents reviewed that I got from counsel.

Q. Understand.
A. References is what I reviewed.
Q. All right. All right.
A. And all these are on the jump drive.
Q. Very good. So, for instance, the articles that you refer to about tactics and street survival would be in that editorial?
A. Correct.
Q. Okay. Now we're on the same page. Now, officers are taught that action beats reaction?
A. True.
Q. Officers are taught about the reactionary gap?
A. Correct.
Q. Now, for our jurors and that's something that you have taught yourself?
A. Correct.
Q. Officers are taught that they are in a position of extreme risk if somebody begins to engage them with a weapon and they get behind that curve, correct?
A. Correct.
Q. Because an officer first of all has to go through the mental process of recognizing whether or not there's a weapon there?
MR. WASHINGTON: And I'm going to object to this line of questioning because it exceeds the scope

of his report.
Q. (By Mr. Denton) Can you answer the question?
A. Yes, they would. It takes a bit to analyze.
Q. Okay. And once they analyze that, once they decide that there's a weapon and the imminent risk of serious bodily or death is present, then they have to put themselves into motion?
MR. WASHINGTON: Objection, form.
A. They have to react, yes.
Q. (By Mr. Denton) Okay. Now, from watching the video, do you see a reaction from my client to what he has been seeing?
A. He pulled a gun and shot.
Q. Okay. That's the reaction, right?
A. That's what it appears to be in the video.
Q. All right. What is his first reaction?
MR. WASHINGTON: Objection, form.
A. He said something. I don't, I don't recall exactly what it was.
Q. (By Mr. Denton) All right.
A. But we saw it on the video or heard it on the video.
Q. I think earlier you said you believe that that was correct, that the body camera angle changes as he reaches for his weapon.

A. Correct.
Q. The next thing that you see is, you actually see his arms come together with his firearm in a shooting stance?
A. Correct.
Q. In some time, juxtaposition with that and I'm not trying to mislead you about that, he says show me your fucking hands, correct?
A. Right.
Q. Almost simultaneously with that the shots are fired, correct?
A. Yes.
Q. Now, don't you agree that the video shows a complete change in his attitude and actions?
A. Well, it certainly shows his actions.
Q. Right. Do you agree that show me your hands or show me your fucking hands is a muscle memory response by a police officer?
MR. WASHINGTON: Objection, form.
A. I wouldn't agree that that's a muscle memory. First of all, muscles don't have memories, number one, and number two, verbally saying something isn't muscle memory, that would be possibly result of your training.
Q. (By Mr. Denton) So, you've never heard that term used to describe a trained response?

A. I've heard it misused to describe that trained response.
Q. Very good. So how would you articulate that if an officer had been trained and they've been on the force for 20 years and they've had multiple armed interactions and they say show me your hands as a automatic response that they didn't even know they were doing?
MR. WASHINGTON: Objection, form.
A. Well, let me qualify that. Verbally saying something isn't muscle memory.
Q. I agree with you.
A. Okay.
Q. I was just using that phrase.
MR. WASHINGTON: Lowell, can you please let him finish.
MR. DENTON: I thought he had.
MR. WASHINGTON: No, he hadn't.
A. So, there's no muscle memory involved in that. It would be possibly from training, be possibly from whatever the officer was used to saying. I don't think there's a police academy anywhere that says show me your fucking hands as the response so it's probably a combination of officer safety training and street experience, that's probably what it is.

Q. Absolutely.
A. Combination of --
Q. That was my point and thank you. And so that was a reaction that my client had to something he saw?
A. Correct.
Q. All right.
A. Now, with that comes when you say show me your hands, you have to have some, give the person a little opportunity to show the hands.
Q. And do you have to wait to see if you get compliance if you're looking down the barrel of the gun?
A. If you're looking down the barrel of the gun then the hands are shown.
Q. It's too late, right?
A. Well, no, the questions answered, the hands are shown. But we don't have that in this case.
Q. And how do you know you don't have that in this case?
A. Well, first of all, there's nothing even the forensic analysis didn't put Snowden's fingerprints or anything else on that weapon, on any weapon.
Q. Okay. That's not my question?
A. Well, you asked how I knew.
Q. Okay. I apologize. Go ahead.
A. So that's how I know.

Q. All right.
A. I mean, I've read the forensic reports and all of those things so, yeah, but we also have Mr. Roundtree in the equation. We kind of keep sidestepping Roundtree.
Q. Let me go directly --
MR. WASHINGTON: Hold on, Lowell just let him finish, please. I know you want to get to your next question, just let him finish.
A. So we keep focusing on Snowden getting up and moving and we have the officer who said I knew there were people in there and he shot. So, I just want to keep Roundtree in the picture here.
Q. So, you finish?
A. Yes.
Q. So my questions were focussed on who the officer was shooting at and that was Mr. Snowden, correct?
A. No, I think he was shooting into the house.
Q. How do you reach the conclusion that my officer intended to shoot anybody other than Mr. Snowden?
A. Well, we have a dead guy. And I don't think that was a mistake.
Q. Okay. Thought it was on purpose?
A. He intended, based on the video evidence, and

his own testimony to shoot into a building that he knew was occupied.

Q. All right. Any fact that suggest that he was shooting in response to anything that Charles Roundtree did?

A. No.

Q. Any fact that suggests that he thought Charles Roundtree deserved to be shot?

MR. WASHINGTON: Objection, form.

A. I didn't see anything.

Q. (By Mr. Denton) Okay. There was a reflection off of Ms. Singleton's cell phone right in front of him on that video, you saw it?

MR. WASHINGTON: Objection, form.

A. I'd have to go back and look at it.

Q. (By Mr. Denton) My client testified that he saw the glare off of the slide of a 9mm handgun, didn't he?

A. Yes.

Q. Okay. He didn't shoot Ms. Singleton, did he?

A. No.

Q. Do you agree with her testimony about the timing of the shots that the first shot hit Mr. Snowden in the buttocks and then hit the wall?

MR. WASHINGTON: Objection, misstates the testimony.

A. I don't recall that --
Q. (By Mr. Denton) Actually she said in the back and hit the wall, you don't remember that?
A. I don't recall that.
Q. Okay. And do you agree with her testimony that the second shot was the one that hit Mr. Roundtree?
MR. WASHINGTON: Objection, form.
A. I would have to go back and look. I don't recall that offhand.
Q. (By Mr. Denton) You agree that my client never described any conduct by Charles Roundtree that was a threat to him?
A. I don't recall any.
Q. Never said that he saw any threatening movement by Charles Roundtree?
A. I think he said something about Roundtree was in there, in the room and I'd have to go back and review.
Q. Your report does go through the fact that multiple sources in the course of this investigation identified Charles Roundtree either as the shooter or a person in the possession of the gun, you remember that?
A. Yes.
Q. And my client never said anything to that effect?

MR. WASHINGTON: Objection, form, calls for speculation.
A. Was it Detective Perez who said he was told --
Q. (By Mr. Denton) Believe that's correct.
A. -- that Roundtree had the gun?
Q. Right. And you don't have any facts that suggest that my client said anything about Charles Roundtree ever having a gun?
MR. WASHINGTON: Objection, form.
A. I don't recall seeing anything.
Q. (By Mr. Denton) That's crime scene gossip, right?
A. I don't know if it's crime scene gossip or it's intentionally misleading.
Q. But there's no statement by anybody in Officer Pettis's investigation where somebody gives a statement under oath that says Charles Roundtree had a gun?
A. This was such a poor investigation, it wouldn't surprise me.
Q. Will you answer my question?
A. There's nothing, it was a bad investigation.
Q. But there's nothing that says that?
A. There's nothing that I found that said that.
Q. All right. You agree that my client believed that he could hit his mark on Davante Snowden, that he

thought was a weapon, correct?
MR. WASHINGTON: Objection, form.
A. He did, I think he testified that he thought he could hit Mr. Snowden.
Q. (By Mr. Denton) And your report goes through how the, my client was mistaken about believing that he had accuracy, right?
A. Yeah, statically, it doesn't hold true.
Q. So statistics in your report don't have any correlation to the distances of the shots fired, do they?
A. No, the, the correlation to the distance, we only have one distance basically.
Q. So on, we've just talked on page ten about the perpetuation of a false shooting narrative?
A. Yes.
Q. I want to call your attention to 16, I believe I was just asking you about page 16.
A. Page 16, thank you.
Q. And this is where you have some discussion in several paragraphs about the fact that police officers can't hit their targets?
A. Correct.
Q. You agree actually that officers are taught that they should shoot twice if they have to use deadly

force because they usually miss with their first round?
A. Depends on your firearms training program.
Q. You know my client testified he was taught exactly that, right?
A. Called a double tap.
Q. No reason not to believe he was taught that way?
A. No, if he said he was taught way.
Q. And what I was asking you, it appears to me that in the three paragraphs discussing the statistics there, LAPD's report, the Donner and Popovich study and the Dallas Police Department study, none of those are correlated to the distance fired versus the percentage of accuracy.
A. Yeah, no, I put all those on the jump drives.
Q. Okay.
A. So you have all --
Q. I can take a look at those.
A. Yeah, you have all the data, there is some, as you see in the third paragraph, the last sentence it said 37 percent of the time the distance is seven yards or less, so that's less than 21 feet. So, there are, some of these studies actually do correlate to that.
Q. Okay. Very good. And seven yards or less is a lot farther than we had at issue here. Here we have

three yards, right, maybe two?
A. Yeah, somewhere around that.
Q. Okay. And then last comment, there appears to actually support my clients perspective that he had confidence that he could hit his target and not hit the other two people in the room because it said accuracy is better, I'm sorry, accuracy is worst if the target is more distant just like we would assume, correct?
A. I'm sorry, where are you reading that?
Q. The RAND corporation, in that last paragraph there?
A. RAND, thank you. That's true, it dropped to 23 percent where before it was 37 percent, seven yards or less.
Q. Okay.
A. So, that's true.
Q. All right. The last paragraph in that discussion kind of shifts back to the cover and concealment and this one appears to be different than what you explained to me before. It appears to be after the interaction with Mr. Snowden that it's your opinion that my client should've disengaged with Mr. Snowden and taken cover?
A. It's like being on a train track to avoid being hit by a train, take a step to the right. And he had

that as a possibility here.
Q. All right. And you're not saying that if in fact there was a gun and the gun was pointed at him that he should've tried to move out of the way?
A. If there was a gun and it was directly pointed at him, which doesn't show in the video --
Q. I understand.
A. There's no (unintelligible).
Q. All right. That's never --
THE REPORTER: I'm sorry, there's no?
A. If the gun were pointed at Officer Casanova, which my understanding doesn't show in the video at all, so if that's a hypothetical there may not have been time to move out of the way.
Q. Thank you. And that's not a defensive tactic that any agency teaches?
A. No, people are taught that if you can move out of the way, if you can, and it doesn't jeopardize anybody, sure, move out of the way.
Q. But it's a question of sufficient time?
A. Time is a variable, yes.
Q. Taking into account that reactionary gap formula?
A. Well, the reactionary gap can apply to many different things, so time is a variable.

Q. All right. And you know officers have successfully gone home at the end of the day having stared down the barrel of a gun?
A. Some have.
Q. But some haven't?
A. Some haven't.
Q. And you also know that in terms of moving out of the way, right behind my client was Officer Panah?
A. See again, we're back to cover and concealment. Why are we standing out in the middle of dodge talking to people?
Q. So, in the framework of my client is there, he believes that a gun is pointed at him and that a shot may be imminent, you don't recommend that he move and let his partner get killed, do you?
MR. WASHINGTON: Objection to the hypothetical.
A. If he knew where his partner was, I've read nothing in the reports that suggested that he was concerned about his partner.
Q. (By Mr. Denton) Okay. And my question, do you recommend that he move if he knows he's behind him?
A. You'd have to know exactly where he was. I mean, there's a lot of variables there.
Q. So, no answer?

A. No, I would still move.
Q. Okay.
A. Because if my partner's paying attention, he should be -- it's kind of interesting that nobody else shot. If the partner's that close and he sees it, why didn't he also shoot?
Q. So, in your opinions about the recklessness of shooting into this house, I want to try to get a clear answer about whether or not it is your analysis that if a police officer is in fact facing the imminent gunfire from an assailant with a weapon, that that police officer has to hold their fire, maybe at the loss of their life because somebody in the background might get hit, is that your opinion about what the standard is about policing in the United States?
A. No. If you're staring down the barrel and you think you're going to be shot and it's imminent, you have to do what you have to do.
Q. Okay. Any other reasons other than the forensics that make you believe that Mr. Snowden did not have a firearm in his hand or pants or on his person?
A. There's, the video doesn't indicate there's a specific view of a handgun and all the hypotheticals that you gave me in the last, say hour, aren't supported by the video.

Q. In what way are they not supported by the video?
A. There's no video that shows a gun barrel being pointed at Casanova.
Q. And so you agree that at the time the shots were fired Mr. Snowden is essentially out of the frame of the body worn camera video?
A. He's moving out of the frame and he's moving away from that window, if you will.
Q. And so I couldn't, I think that you weren't sure about whether or not the shot that grazed both his left and right buttock meant that he was at an angle sideways to the officer, do you agree or disagree with that?
A. From the video, it would show that he was turning to move, so he would be more sideways.
Q. Okay.
A. More of his back turned.
Q. All right. And you agree that the bullet did not enter him from the back and exit from the front?
A. I don't recall the bullet exiting. If you can point me to a document.
Q. If you'll look at tab number nine.
A. Okay.
Q. I'll mark this as deposition Exhibit Number 4.

This is a photograph of Davante Snowden's buttocks and the bullet graze that goes across from one side to the other.
A. Right.
Q. Had you seen that before?
A. Yes.
Q. Okay. Do you agree that that indicates that at the time of the bullet strike that he was sideways to the approaching bullet?
A. It would indicate that.
Q. Just as a matter of physics?
A. It would indicate that.
Q. And from what you've seen on the video, and you talked about him turning earlier, was he turning to his right or his left? Davante Snowden's right or left?
A. He was turning to his right.
Q. Okay.
MR. KOSANOVICH: When you said his, did you mean Davante Snowden?
MR. DENTON: Yes.
MR. KOSANOVICH: I'm sorry.
MR. DENTON: No, that's fine. Thank you for the clarification.
MR. KOSANOVICH: The readback's going to be a little easier.

A. Now, your question was did the bullet exit the front.
Q. (By Mr. Denton) And it did not?
A. Right.
Q. It just grazed both sides of his buttocks?
A. Right.
Q. And according to Ms. Singleton, it hit the wall?
A. Yes.
Q. So, you don't know whether or not Mr. Snowden --
MR. WASHINGTON: And just before you move on, I'm going object to that last question you asked.
MR. DENTON: Okay.
MR. WASHINGTON: Object to the form of that.
Q. (By Mr. Denton) Okay. You don't know whether Mr. Snowden had bladed his body away from the officer defensively?
MR. WASHINGTON: Objection, form.
A. Well, no, I wouldn't know because I don't think he would know what blading defensively means.
Q. (By Mr. Denton) And I'm not asking whether Mr. Snowden knew what blading means --
A. Right.

Q. In terms of tactics, correct?
A. I think he was just moving away.
Q. So that our jury understands the terms you and I are using, blading your body means to turn your body sideways, correct?
A. Correct.
Q. To make a smaller target, correct?
A. If the intent is to make a smaller target or it could be that you're blading to leave the area?
Q. Okay. And it's entirely possible the only, well let me back up, I'll re-ask that question, holding your gun out in front of yourself and shooting in that stance like my client did is not the only way to shoot somebody?
A. Correct.
Q. I can blade my body and shoot from in front of my body to the side, can't I?
A. Can.
Q. Okay. But you can't tell from the video whether any of that happened?
A. Well, we know it didn't happen because Casanova didn't report being shot at.
Q. You're just saying that there was no round fire?
A. Right. I'm just trying to answer your question

on that.
Q. Thank you for clarifying that, I appreciate that. And also, so the jury understands the opinions that you're giving, the standard is whether or not a police officer believes that there's an imminent danger of being shot and not whether or not a shots being fired?
A. That would be part of the calculus.
MR. WASHINGTON: Objection, form.
Q. (By Mr. Denton) Is that correct?
A. That would be part of it, yes.
Q. So, when questions were asked in a lot of the depositions here, nobody ever shot at you right, you read all that?
A. Right.
Q. And that's not the legal standard, is it?
A. No, you don't have to be shot at to use deadly force.
Q. Okay. So and I think I understand that it's clear that a large basis for your opinion is, is that this jury should evaluate my client's conduct with the understanding that there was no gun at all, right?
A. That's a large piece of it, yes.
Q. Right. And you disregard the fact that the magazine of a 9mm handgun was found in that house?

A. No, I didn't disregard it.
Q. Okay.
A. I didn't disregard it. Nobody's put anything, the forensics doesn't put Snowden's DNA or fingerprints or anything else on the weapon.
Q. All right. Is that your answer, I'm sorry?
A. And the second part of that is, if you watch the video and you mentioned earlier that frame-by-frame break down, we have, I'll try to explain it so we get it on the record, we have the, I'll call it the window area that the video shows --
Q. Just to clarify, not to interrupt your --
MR. WASHINGTON: No, no, let him finish. No, no, let him finish his question. Just let him finish, Lowell.
MR. DENTON: Just trying to get it clear?
MR. WASHINGTON: I understand.
A. Door, thank you. We have that door and we have Officer Casanova on the outside, we had Mr. Snowden on the inside and based on the video and your description and in a movement in a previous question, we have Snowden going from the viewpoint of Officer Casanova to Officer Casanova's left moving out of the door opening area that appears to be moving into or out of frame where the wall begins. We have the door and then we

have a wall area. To answer the second part of my answer is to your question is, I didn't find once he moved out and got that house wall between them that the threat was still imminent.

Q. (By Mr. Denton) Okay. All right. Thank you for that clarification, as well. Let's look, see if I can find this, let's look in tab number 10 and I'll number these three photographs, I believe this would be five, six and seven? Number four was the picture of the bullet wound?

A. Right.

Q. So we have five, six and seven. Are these photographs that you recognize?

A. Yes.

Q. And the last one there shows the bullet going through a portion of the door frame, you see that?

A. Yes.

Q. Did you ever go to the scene and do any scene evaluation or inspection?

A. No.

Q. And do you have any opinions about what this bullet strike through the door frame means, if anything, in the proper analysis in this case?

A. I didn't see any analysis on it, so no.

Q. Okay. It does confirm I think part of what you

were just explaining which is, is that at the time the first or second shot was fired, Mr. Snowden was passing this area and the bullet that my client fired actually went through part of the door frame?

MR. WASHINGTON: Objection, form.

A. It could. I didn't see a forensic analysis on the door frame.

Q. (By Mr. Denton) Okay. But you agree that's a bullet strike?

MR. WASHINGTON: Objection, form.

A. I -- it appears to be, but I'm not a ballistics expert.

Q. (By Mr. Denton) Okay.

MR. WASHINGTON: Lowell, quick question, do you know how much longer you have?

MR. DENTON: I have a little less than an hour and so, however you want us to structure our schedule, that's fine.

MR. WASHINGTON: We could probably go through, but would a break be appropriate right now?

MR. DENTON: It suits me and I think we could work with one.

MR. KOSANOVICH: Whatever you guys want to do.

MR. DENTON: It's really up to y'all

because I'm going to turn over to y'all and then he's got to leave at 4:45, so.

MR. KOSANOVICH: Okay. We should have time.

MR. DENTON: Y'all good with that?

MR. WASHINGTON: As far as a lunch a quick lunch.

MR. KOSANOVICH: I don't usually eat lunch so that's cool with me, whatever you guys --

MR. DENTON: I think that's a good plan. If you want to do that.

MR. WASHINGTON: Do you want to do it now or I want you to finish your question.

MR. DENTON: Thank you kindly.

MR. WASHINGTON: Let's maybe go to 12:00.

MR. DENTON: Let's go to 12:00 and then we'll break.

MR. WASHINGTON: Yeah.

MR. DENTON: Or just shortly thereafter based on --

MR. WASHINGTON: That's fine.

Q. (By Mr. Denton) So let me ask about the forensics. You've looked at the material in the forensics report and you know that there was insufficient DNA on the gun to do a test that would

attach it to anybody, right?
A. According to the report.
Q. And so we don't have a situation where DNA was checked and it wasn't Mr. Snowden, we have a situation where they couldn't check the DNA?
A. They ran their analysis and came up with nothing, so.
Q. Right. Insufficient bodily material in order to tell anything from it. So it could have been a gun in his hand or not, nobody knows, right?
A. I can just go with what the report said.
Q. Right, it doesn't tie the gun to him, but it doesn't tie the gun to anybody else?
MR. WASHINGTON: Objection, form.
Q. (By Mr. Denton) It doesn't eliminate him, it doesn't mean anything, right?
MR. WASHINGTON: Objection, form, asked and answered.
A. Well, I don't know if they tested anybody else for DNA.
Q. (By Mr. Denton) Okay. Just so we're clear, because I'm trying to find out what you think the report means, do you agree with me that the report says they were unable to do a DNA test because they didn't have enough material?

MR. WASHINGTON: Objection, form.
A. I read that report to mean they attempted to do the DNA test and they didn't have enough material.
Q. (By Mr. Denton) Okay. You agree that the gun was found right outside the window?
MR. WASHINGTON: Objection, form.
A. There was a gun found outside the window.
Q. (By Mr. Denton) You agree that the magazine of that gun was in the house?
A. There was --
MR. WASHINGTON: Hold on Dr. Peters. Objection, form.
Q. (By Mr. Denton) And let me just adjust my question in case counsel is suggesting, you read a report that says that the magazine of the gun was found in the house?
A. Yes.
MR. WASHINGTON: That's better, Lowell.
Q. (By Mr. Denton) You read a report that said that the gun was found outside under conditions that suggested that it was recently placed there?
A. Correct.
Q. And you're disregarding that as any fact to confirm that Mr. Snowden might in fact have had a gun?
A. I'm not disregarding it, but I didn't read

anything that tied him to it.
Q. Right. It doesn't put it in his hand and therefore you're going to go with what he says?
MR. WASHINGTON: Objection, form.
A. No, I'm going with what the reports have said.
Q. (By Mr. Denton) The report doesn't say Mr. Snowden never had this gun, does it?
A. No, it doesn't.
Q. All right.
MR. DENTON: I think this is actually a good break.
MR. WASHINGTON: Okay. How long you guys want to say?
MR. KOSANOVICH: Thirty minutes.
MR. WASHINGTON: That's fine.
THE VIDEOGRAPHER: All right. We're now off the record at 11:50 a.m.
(Lunch break taken.)
THE VIDEOGRAPHER: And we are now back on the record at 12:39 p.m.
Q. (By Mr. Denton) So Dr. Peters, I'll return your attention back to, let's look at page 12 on your report, I think that's where I had left off.
A. Page 12, okay.
Q. And then you have the failure to discipline for

policy violations, this is apart of your analysis against the City of San Antonio; is that correct?

A. Correct.

Q. In the middle of that paragraph, thought you say that Officer Casanova, my client, committed several policy violations when coupled with his many versions of the events are bases for disciplining him. Would you just list for me, so that I know what those several policy violations are? I want to know specifically what my client did that was a policy violation?

A. First of all, he met to discuss the incident with the other officers. That was a specific policy violation per the use of force policy.

Q. Okay.

A. He gave false information to someone and I don't know who because the chief of police came out and said, as I recall, in a news conference that Roundtree had a gun and the officer shot because Mr. Roundtree had a gun. That was totally false. The chief actually walked that back at one point, as I recall. So again, that was misinformation. And the only person logically who could say that would be Officer Casanova.

Q. That's an assumption?

A. Well, it's an assumption only as far as he didn't come out and say he said that, but he's the only

one who reportedly saw the gun. So if I'm the only person in the area who said Roundtree had a gun and nobody else saw that, I think everything's pointing toward Casanova pretty clearly.

Q. That's a conclusion that it had to come from him?

A. He was the shooter and more than likely it came from him and if he told the detectives or he told IA or he told anybody, somebody needed to verify that. And obviously that wasn't done initially. So that was another violation. I believe based on my analysis that he used excessive force, which is in violation of policy. Now, I understand that the trier of fact determines whether it was excessive or not, so I don't say that as a legal conclusion but based on the policy, the policy explains when that can, when deadly force can be used and given my analysis of all the testimony and all the statements and all the reports, I didn't find that there was sufficiency for him to use deadly force aside from our hypothetical discussion this morning.

Q. All right. Okay. So that's the ones you were talking about in this paragraph?

A. Right, because we had, we had the young lady who was in the house, and we had Mr. Roundtree who was in the house and we had Snowden who was in the house and

my recollection was from the reports and testimony that after Mr. Snowden was shot, he went on the ground, the young lady thought she might have been shot too, or not shot too, but had the potential of being shot. She was afraid and I believe there was, if I recall correctly, Snowden didn't move from that area because he was, if I remember correctly, he had a shirt or a jacket or something that he had taken off to stop the blood and then of course we had Mr. Roundtree who was shot in the chest and died.

Q. So the things you've just said, are any of those policy violations against my client?

A. Yes, I think they are. I think your client, based on that policy, was reckless and certainly incompetent at that point, because he fired into the building. He hit a totally innocent person, who, by all accounts, wasn't armed or threatening. So, I think it was a policy violation. Now, if you have the policy, the use of force policy, I'll be glad to look at it and be more specific because I didn't memorize it obviously.

Q. Okay.

A. We had the failure of him identifying himself as a police officer, which I think is apart of that as well.

Q. And your recollection is that 501 requires that

conduct identifying yourself as a police officer?
A. I can't say for sure it requires it, I think there's another policy that says you should identify yourself.
Q. Now, your materials attached to your report and I'll broaden that question to anything that's on the flash drives that you brought here today, you didn't review any training materials from the San Antonio Police Academy?
A. No.
Q. You didn't review any curriculum work plans and so forth for the academy?
A. Correct.
Q. And I'll ask the same question with inservice training programs from the San Antonio Police Department?
A. I didn't see lesson plans, I did see Officer Casanova's training record. I believe there were a couple sheets that depicted the courses he took at the academy as well as inservice.
Q. Okay. And you agree that he had taken far in excess of the required state mandated training programs for a police officer?
MR. WASHINGTON: Objection, form.
A. The basic academy he completed, that's a

requirement in Texas and the inservice would've met the inservice requirements.
Q. (By Mr. Denton) Okay.
A. Now, whether there was specific inservice course requirements over that period of time, I'm not sure what they were.
Q. You didn't look into that?
A. No, but I know, used to be TCLEOSE, I think it's now TCOLE.
Q. Correct.
A. Requires inservice training, so.
Q. On page 12, we're still on 12?
A. Yes.
Q. Continuing that, the organizational culture and unwritten ground rules, those are issues against the City of San Antonio in your analysis and not my client, right?
A. Yes.
Q. And the same thing on page 13, City of San Antonio, it's mayor, police chief and so forth, those are your, that's your analysis against the city's failure and not my client on the date of this incident?
A. That would, that would be true from the investigation viewpoint, yes.
Q. All right. And we've talked about these issues

here before, the second paragraph under your number four about my client's conduct the one, two, three factors that you have down there, those are just straight out of the Graham versus Connor analysis, correct?
A. Correct.
Q. Now, you say that he knew from his academy training that the elements were not present for him to use deadly force on Mr. Snowden and/or Mr. Roundtree and knew that any deadly force violated, and I'm going to read, national use of force standards as Graham versus Connor, right?
A. Correct.
Q. Okay. And what you're talking about there, once again, is your conclusion's that there was no weapon that justified his use of deadly force?
A. Right.
Q. All right. You agree that if there is a weapon and someone is committing an assault on a police officer by deploying a weapon against a policeman that that relevant crime for Graham analysis is a felony?
MR. WASHINGTON: Objection, form.
A. In most states it would be.
Q. (By Mr. Denton) Okay. So a few more questions, just trying to pick out the details on Mr. Snowden's movements as reflected in the body camera when he went

across the room. Do you see in the video that he had his right hand down in the area of his waist throughout that period as he went across the room?

MR. WASHINGTON: Objection, form.

A. I'd have to look at the video again. As I recall there wasn't much to view there.

Q. (By Mr. Denton) Okay.

A. And I think as he was getting up, his hand was in that general vicinity, but I'd have to look at the video again.

Q. All right. Let's just take a quick look at it again. This won't take but a moment.

(Video being played.)

Q. (By Mr. Denton) So, from the live realtime continuance play video, can you tell whether or not he has his right hand down toward the front of his body, as far as you can see?

A. Well, mostly Officer Snowden's[sic] left arm blocks the view, but if you look at the elbow height, the elbow's pretty much like this. I couldn't really tell where the hand was because the arm blocked the view.

Q. Okay. And you have received and have had an opportunity to look through the hundreds of stills broken down the decompression of that video, right?

A. Right.
Q. And do you agree that those stills, to the extent that they capture that portion of Mr. Snowden's movement, show that his right hand remains in that general area?
MR. WASHINGTON: Objection, form.
A. Geographically, yes, I would agree with that yes.
Q. (By Mr. Denton) Do you agree that prior to his, show me your fucking hands statement by my client, that he did nothing aggressive or hostile toward any of the individuals in the room?
A. No, I wouldn't agree with that.
Q. Okay. What did he do?
A. Well, first of all he made the door open and contrary to his report that he lightly tapped it and it opened, it's clear on video it didn't just open. I mean he hit that door a couple times, three times, I think, so he had no reason to open that door because there's no evidence of a crime being committed anywhere.
Q. So, is it your conclusion that he opened the door on purpose?
A. It appears to be that way, yes.
Q. So, you're telling the jury that he busted the door open?

MR. WASHINGTON: Objection, form.
A. I think when you hit it three times and it opens, I think it's reasonable that you wanted that door open.
Q. (By Mr. Denton) If you knock three times hard on a door that's latched, it stills just stays there, right?
A. Generally.
Q. Okay. Nothing else that my client did that was aggressive or confrontational?
A. He didn't identify himself as a San Antonio police officer.
Q. And that's aggressive and confrontational by not saying that?
A. Yes, I think it is. Look, if you're an officer and there's no crime being committed and I walk up and knock on your door, one of the first things I would say to you is, I'm Officer Peters with the San Antonio Police Department. I'd tell you who I am. I wouldn't just push the door open and then go, hey man, what's up. I don't think police officers, at least at the academy's that I've been to, teach that. They teach you to identify yourself and he didn't.
Q. So, the question I was trying to ask you was whether or not he did things that were aggressive or

hostile, and as I understand your testimony, the fact that he said what's up man casually and conversationally instead of San Antonio police fits into that definition from you?

A. Well, we have to bring it into context. This is 1 o'clock in the morning, this isn't some daylight operation here. This is 1 o'clock in the morning and if I'm sitting in my house and somebody pushes the door open, I'm going to get a little excited about that. I don't care who it is and to me that's aggressive behavior.

Q. I'll show you if you look at tab number eight, and we'll mark this --

A. Tab eight.

Q. Yes. We'll mark this as deposition Exhibit 8?

MR. WASHINGTON: Is that from Tanwar?

MR. DENTON: I believe this is a still from him, but it may not be.

MR. WASHINGTON: That's one of the exhibits that was excluded, you know that, right?

MR. DENTON: No, I don't know that.

MR. WASHINGTON: Yeah.

Q. (By Mr. Denton) So look at this picture, have you seen that picture before?

A. I've seen the video, I don't think I've seen

this picture.
Q. Okay.
A. Although, I may have. I've seen so many.
MR. DENTON: Do I have Exhibit 8, correct?
THE REPORTER: I think so.
Q. (By Mr. Denton) So, I'm just showing you this so you can see this picture and you've seen pictures of my client, Officer Casanova, right?
A. Yes.
Q. And you agree that he's wearing this black distinctive uniform with a badge and insignia and so forth?
A. Right.
Q. So, I guess the only question in this case is whether or not he is plainly visible at that door or not, right?
A. Well, the question can't be answered as asked because he was holding a flashlight and he was shining a flashlight inside. And you don't have to shine the flashlight in people's eyes to cause a blur where they can't see you. If the flashlight's in front of you and people look in that direction, you may be obscured based on the light beam. So, I agree that he's in a dark uniform with a badge and has a name tag, but whether he

could be seen.

Q. So, my question is, if they can see him, they know he's a police officer?

MR. WASHINGTON: Objection, form.

A. I mean, that's an assumption.

Q. (By Mr. Denton) How do they not know he's a police officer if he has a uniform and they can see him?

A. Well, that badge looks like a security guard badge at a distance.

Q. Okay.

A. And if he's standing directly in front of the door, they won't see the addition on his sleeves.

Q. So, you've given me some answers earlier about my client's intention to enter that home there, if my client intended to gain entry lawfully into that home, there's certainly nothing wrong with that?

MR. WASHINGTON: Objection, form.

A. Certainly nothing wrong with knocking on the door and asking to come in.

Q. (By Mr. Denton) Okay. And the knock and talk scenario is a very, very, very common police tactic?

A. I think knocking on a door and identifying yourself and asking to speak to somebody is.

Q. Okay.

A. The knock and talk, what comes to mind when you

say knock and talk is the no-knock rule which has gotten a lot of people into trouble. Plus, there's one thing we haven't talked about that I think's important to this going up and knocking and that is, Casanova said to his buddy's at one point, can't believe how lucky we are to get in this place or something to the effect, we have a reason to go knock on the door. He's wanted to get into that house for some time, so knocking on the door is fine, announcing yourself's fine and asking if you can talk to people.

Q. Just so it's clear --

MR. WASHINGTON: Hold on a second.

Q. (By Mr. Denton) Are you finished?

A. Yeah, I was.

Q. Just so it's clear, you're not saying that there's anything wrong with him being excited, if he was, that he had an opportunity to get into that house as long as he does it properly, as you described?

MR. WASHINGTON: Objection, form.

A. If he can do it properly and had the reason like I said told him who he was, ask, not just push the door open and start talking to people.

Q. (By Mr. Denton) And you don't know whether or not he intended to push that door open?

A. Well, he intended to knock on it. I mean,

that's obvious from the video. It's also obvious that when the door opened he could've said, hey, San Antonio Police sorry, I didn't mean the door to go open. I mean, you could've just answered very quickly and said hey, I'm sorry the door opened, but he didn't do that.

Q. So, I'd asked you earlier about whether or not an officer's subjective motivation is relevant to objective reasonableness under Graham, you seem to be relying very very much on his motivation or subjective intent here, you are, aren't you?

MR. WASHINGTON: Objection, form.

A. I think first of all, the first question you asked regarding that was on force. Here we're talking about making an approach and the door opening and not identifying yourself and all this, as I recall, kind of related back to some of the policy violations. So there's going to be, based on his testimony, I mean, he testified and whether this is subjective or objective will probably be a jury determination, but he testified look I made the decision to use deadly force and I knew there were people in there and I knew it was hard when Snowden moved. Now, is that subjective or objective because he testified to it. To me, as an expert, that's objective because he said here's what I did. So I think sometimes it's, you know, how the jury's going to

receive that information.

Q. (By Mr. Denton) And so let me frame my question a little more narrowly, I was asking about when he did the knock on the door and the door came open, it seems to me from your answers that you're relying strongly on what you see as his motivation to get that door open?

A. I'm relying on what the statements were that he got an opportunity to finally go get a reason to check the house. Now, the door opening, like I said, if it was intentional or unintentional he should've said, look, I'm sorry, the door opened, this is the San Antonio Police, we want to talk to you.

Q. Are you telling our jury that you believe that if in fact when the door had come open, he had done as you suggested that Mr. Snowden would've reacted any differently?

A. I don't know how Mr. Snowden would've reacted, but I think every juror would appreciate the fact that at 1 o'clock in the morning when a door suddenly comes open after pounding on it by an unknown person being told hey this is the police department, I'm sorry your door opened, I think every juror can relate to that. I could.

Q. Now, let me flip that around from the perception of my client. Your conclusion is that the

glare from the flashlight and the lack of his announcement meant that they didn't know that he was a police officer, am I correctly stating what you're explaining?

A. I think I said they may not have known he was a police officer.

Q. Yes, sir. Thank you. Fair enough. From my client's perspective, wearing the uniform that he had, pointing his flashlight down at the ground, was it a reasonable belief that he thought they could see that he was a police officer?

MR. WASHINGTON: Objection, calls for speculation.

A. I don't think it was reasonable because historically, cops think because they're in uniform everybody knows who they are. I see this over and over and over. I knocked on the door, I was in a uniform, they should've known who I was. Well, maybe they didn't.

Q. (By Mr. Denton) And that's very common for police officers to believe that?

A. Yeah. Because it's probably a failure, in some cases, in training that they don't point out repeatedly, look, just because you're in uniform don't assume people know who you are. Don't assume people have vision,

don't assume they can see, you know, maybe they have eye disease, maybe they're blind, I mean, there could be all sorts of reasons that you cannot take for granted that just because I'm 10 feet away from somebody that they know who I am, particularly at 1 o'clock in the morning.

Q. Have you ever done an expert analysis in a case where your opinion supported the conduct of an officer who saw somebody reach for what they thought was a weapon, but it turned out that they were unarmed?

A. I'm sure I have. Oh, and you were going to get me that list to review this afternoon, too. Not that I think that there may be something on there, but it would refresh my memory. Yeah, I've done cases where it was really either based on video or descriptions from witnesses, I mean, I would've thought the guy had a knife or a gun or what have you.

Q. So you have done opinions in support of an officer who reasonably believed that there was imminent deadly force, but it turned out that they were unarmed?

A. Yes, but, I need to qualify that answer. It's not enough to reasonably believe because Graham says that that objective reasonableness is viewed from the perspective of a similar officer with similar training. So, you might have a rookie officer with no background gets confronted with something like that that may have a

different basis, if you will or at least an explanation on why he or she did what they did, versus a very experienced officer with more training and more specialized training and experience and what have you, so it's really kind of a two-part analysis there, not just objective reasonableness, but also the objective reasonableness from the perspective of a similarly trained officer.

Q. Okay. And I'll revisit that briefly after I get to Appendix, was it D?

A. I think it was D.

Q. Okay.

A. Thank you.

Q. I think you've already told me that section 6 covered, which is after the fact and has to do with the City of San Antonio and the same thing with seven out of your report.

A. Well, six, opinion six on page 19, is focused on Officer Casanova's --

Q. Shot fired.

A. -- shots fired statement.

Q. Yeah, and I apologize, I'm not trying to cut you off.

A. No, I understand. I just wanted to make sure that -- you had mentioned that was to the city, it's

really for Casanova.
Q. I'm sorry, I misspoke if I said that. I was saying we had covered that before, shots fired was after the fact, not a cause of what happened in terms of anybody's death and so forth.
A. Right.
Q. Has to do with policy issues and so forth even though what you're saying is Officer Casanova acted improperly?
A. Right.
Q. And then on number seven, once again, that's your analysis of the city's shortcomings in this case?
A. Correct.
Q. You don't have any opinions about whether or not my client has any responsibility or violated any applicable standards in connection with the prosecution of Mr. Snowden?
MR. WASHINGTON: Can you repeat that question?
A. Not quite sure I understood that.
Q. (By Mr. Denton) Do you have any opinions that my client did anything legally or constitutionally wrong that resulted in the prosecution of Mr. Snowden for a felon in possession of a firearm?
A. The hurdle I'm having on that is the word

prosecution. The DA prosecutes, not the officer. Now, supporting the prosecution, it is certainly in Officer Snowden's[sic] best interest to charge or Officer Casanova's, it's in his best interest to charge Mr. Snowden. Because from my perspective, we have a dead man, Mr. Roundtree who was not armed, was not involved, not threatening, not anything. So if I convince a DA to prosecute Mr. Snowden, maybe that'll get me off a manslaughter charge.

Q. You don't have any factual information that suggest that my client had anything to do with the criminal investigation of the felon in possession of a firearm?

A. The only thing he had to do would be to tell his story.

Q. Okay. And you know that he was not the investigator on that charge?

A. Correct.

Q. Don't have any information that he had any influence or even communication with the prosecutors about whether to accept it?

A. I don't.

Q. Okay. Your report doesn't criticize my client or call attention to the fact that on many occasions throughout the recorded records he uses profanity, does

that have anything to do with your opinion or analysis?
A. No.
Q. You agree that other than the command, show me your fucking hands, he didn't do that with these subjects at any time?
A. I don't recall.
Q. You don't remember him using any profanity with subjects that reported the assault to him?
A. I don't recall him saying anything.
MR. DENTON: Appreciate your patience Dr. Peters. I'll pass the witness.
MR. KOSANOVICH: Dr. Peters, correct?
THE WITNESS: Yes.
MR. WASHINGTON: Let me just ask you this, are you going to get into the city's information because I would like to, if you're not going to get into excessive force, I'd like to ask follow-up questions to the excessive force before we get into a new claim with the city just to keep it clean.
MR. KOSANOVICH: I probably will, just a few. If you want me to I can stop. Well, you know what, go ahead Daryl, that's fine.
MR. WASHINGTON: Yeah, I just, I'm not going to be very long.
MR. KOSANOVICH: Go ahead.

EXAMINATION

BY MR. WASHINGTON:

Q. Dr. Peters, just very briefly and I know you were asked a number of questions about everything that's a policy violations, just can you explain, or can you tell the jury if you received any information that was contained on Casanova's cell phone?

A. No, I didn't receive any information on that.

Q. Would that have been something you would have wanted to receive and why?

A. Yes, it's part of the investigation package. So, yeah, you'd want to know what was said, what wasn't said. It could reveal any number of things not related to this case, but in sexual misconduct cases or racial discrimination case getting the text messages back and forth or phone messages back and forth back become very important as part of a complete investigation, so it would've been very helpful.

Q. And I just want to clarify something that counsel asked you about, Casanova calling for back up, now when he radioed for backup to have Garza and Panah and those guys come out, did he actually use his in-car radio or did he use his cell phone?

A. Cell phone.

Q. And so, when you were asked a question about

calling for back-up he, just to be clear, he used his cell phone to call for particular individuals to come out?
A. That's my understanding, yes.
Q. And would that have been a reason why you would have wanted to review his phone records?
A. That would've been one reason, but I think the bigger question is when you're doing an investigation, you want to make sure that you have all the potential evidence. So you understand all that took place and it's just customary to do that, but that information, once you get it, that may be very beneficial to your investigation and the questions you ask.
Q. And you were also asked about what evidence that you have that would have shown that Snowden did not have a gun. Did Snowden in fact give a statement?
A. Yes.
Q. That he did not have a gun?
A. Yes. He gave a statement and the lady, I think her name's Singleton.
Q. Taylor Singleton.
A. Yeah, she also said that.
Q. And did Taylor Singleton actually state that Charles Roundtree was shot as he was getting up?
A. Yes.

Q. So you clarified questions that were being asked of you, but based on your review of the evidence, did it appear that defendant Casanova was shooting at multiple individuals in that house?
MR. KOSANOVICH: Objection, form.
MR. DENTON: Objection, form.
A. Yes.
Q. (By Mr. Washington) For example, I think counsel asked you a question about Mr. Snowden getting out of the view of the body cam, do you recall that?
A. Yes.
Q. Once, was there a shot, a second shot that was fired after Mr. Snowden was no longer in the view of that body cam?
MR. KOSANOVICH: Objection, form.
MR. DENTON: Objection, form.
A. The shots are very rapid, but yes, based on the video we watched this morning the second shot did appear to take place after he moved to the right.
Q. And based on your experience Dr. Peters and your review of documents in this case, would defendant Casanova have a particular motivation for saying that he did not intend to shoot Charles Roundtree?
MR. KOSANOVICH: Objection, form.
MR. DENTON: Objection, form.

A. Certainly he would have. As I mentioned to one of the questions counsel asked me a few minutes ago, it would get you off any potential criminal charges that the DA listened and said look, I didn't mean to do X, Y or Z, so yeah, there would be motivation there to say that. Particularly in today's climate of prosecutors prosecuting police officers.
Q. (By Mr. Washington) I think you also asked a question about what crime Davante Snowden had committed, do you recall that?
A. Yes.
Q. And I think counsel said a, he had committed a felony, do you recall that?
MR. DENTON: Objection, form.
A. I don't recall him saying that Snowden committed a felony, I believe it was more of a hypothetical that if a person pointed at an officer, pointed a firearm at a officer that would be a felony so I think I answered it based on that.
Q. (By Mr. Washington) Do you recall in your review of the documents whether Davante Snowden was acquitted of the charges against him?
A. The --
MR. DENTON: Objection form.
A. -- criminal charges, yes. I did read that.

Q. (By Mr. Washington) Now, I know we looked at multiple still shots, as well as the video, at any time did you see Davante Snowden point a weapon at defendant Casanova?
A. No.
Q. At any time did you hear Davante Snowden issue any threats towards defendant Casanova that he was going to shoot him?
A. No.
Q. And I think you were shown the video and you were asked a question about his right hand, in reviewing this video, did you notice that Mr. Snowden's pants were actually falling off as he got up?
MR. KOSANOVICH: Objection, form.
Q. (By Mr. Washington) And we can look at the video --
A. I don't have an independent recollection of that.
MR. WASHINGTON: Do you mind if we pull that up?
MR. DENTON: Not at all.
Q. (By Mr. Washington) And let me just ask you this also while he's pulling this up, did you review any of the garments, any of the clothing that Davante Snowden was wearing on the morning of that incident that

would've shown that a bullet went through his pants?
A. I didn't physically look at any garments. I think there were some photographs, but I don't recall seeing anything through an outer trouser.
(Video being played.)
Q. (By Mr. Washington) Can you stop that? Can you back up just a little bit? I'm have him back up and when he gets up, I want you to tell the ladies and gentlemen of the jury whether you can see his trousers?
A. Right about there.
MR. WASHINGTON: You can stop there.
Q. (By Mr. Washington) In this video Dr. Peters, do you in fact see that defendants Snowden's trousers are showing?
A. I can't really tell what that, it almost looks like underwear.
Q. Right.
A. I mean, that's what it looks like.
Q. Keep on playing and I want you to continue watching.
(Video being played.)
MR. WASHINGTON: Stop.
Q. (By Mr. Washington) The point that defendant Casanova was saying let me see your hands, did he simultaneously shoot his gun?

A. Very, very soon afterwards. I mean, it was almost simultaneously.
Q. And based on your review of the evidence, do you think the City of San Antonio should've considered the information that was contained in defendant Casanova's phone as well as the other officers that he called out to the scene?
MR. KOSANOVICH: Objection, form.
MR. DENTON: Objection, form.
A. Sure.
Q. (By Mr. Washington) And I know you mentioned that, just briefly, obviously you know what a detailed report is?
A. Oh, yes.
Q. And what is that?
A. A detailed incident report is a written report that basically explains everything that happened in the incident.
Q. And you also have reports that shows the communication that's gone on amongst officers?
A. Usually have the communications who, in many cases, file a supplemental report because you may not have that right away. It may be mentioned in the incident report, but you have a supplemental report that maybe show what that was.

Q. And you know what the call log is?
A. Right.
Q. So if all the communication would've been made on via cell phone, would that information have been available on the call logs or the detailed incident report?
MR. KOSANOVICH: Objection, form.
A. The call log wouldn't have it because it didn't go through dispatch, it would just be telephone to telephone so it wouldn't have gone through dispatch. There wouldn't have been a call log like a computer aided dispatch system or anything like that. There would be a log that could be produced by the phone company or the phone provider.
Q. (By Mr. Washington) And the fact that the City of San Antonio did not preserve that information, would that be concerning to you?
MR. KOSANOVICH: Objection, form.
A. Well, it would be, it's concerning from a couple of perspectives. One, that's part and parcel to complete an investigation where you have a crime scene that involves a shooting of individuals, one fatally. So, you'd want all the information so that your investigators have every possible piece of evidence to analyze, evaluate for criminal prosecution whether

there's anything criminal and for IA for internal affairs or administrative investigation, you would have that to compare against policies, procedure, training and so on. Yeah, you would want to preserve that. I can't imagine hypothetically two bank robbers communicating like that and the city just overlooking their cell phones. I mean, you just don't do that.

Q. (By Mr. Washington) And finally, we talked about the evidence that you received, did you receive any evidence from the lady who allegedly called defendant Casanova stating that her boyfriend or husband had been assaulted, did you receive any evidence where she actually identified Davante Snowden, Charles Roundtree or Taylor Singleton as the individuals involved in that assault?

A. No. My recollection is she said it was a black male who was bald.

MR. WASHINGTON: I pass the witness. No further questions.

EXAMINATION

BY MR. KOSANOVICH:

Q. Touch on one thing real quick here Dr. Peters, when you were talking to Mr. Denton you said something, you said that Casanova wanted to get into the house for some time, you remember saying that?

A. Yes.
Q. I didn't misstate your testimony, correct?
A. Correct.
Q. Okay. Identify for me all the facts that you base that on?
A. It's in some of the information, let me see if I can find it. I believe it was, I'm relying on memory here so could be a bit off, but I think it was when he was outside talking to the other officers or he was -- said something about can you believe how lucky we are or something like that that we're going to get to go in there or go to that house. I'm just looking to see if I have it in here. On page 17 of my report in opinion five, the second paragraph under five, let me know when you're there. About the fourth line down, it says the house we were trying to go to because it was a drug house that officers had under surveillance. That came from Casanova's deposition on page 84, line 14.
Q. Okay. But that's in the deposition that was taken well after this event, correct?
A. Well, I assume he's under oath and told the truth.
Q. Correct. Okay. But that's after this event occurred while he's under oath, correct?
A. Yes.

Q. But my question is, your testimony was that he wanted to get into that house for some time, where's that, what facts do you have that support that?
A. Probably his deposition testimony and I think discussions he had with other officers I saw that in a report somewhere, I'm sure I did, but I don't have that specifically right in front of me. I'll be glad to look it up and get back to you on that.
Q. Well, I'm asking you right now, sir, this is really the only time I have to question you about that so my question is, what facts do you have to support that statement that you made?
A. Casanova's deposition and I recall that there was something in a report that said they were looking to go into that house because it was under drug surveillance.
Q. That wasn't from Steve Casanova, correct?
MR. WASHINGTON: Objection, form.
A. I don't recall.
Q. (By Mr. Kosanovich) Okay. Well, you said they were looking to go into that house. Who's they?
A. I think it was they had a surveillance team from what I understand, I don't know who the surveillance team was, but I believe Casanova said they wanted to go into that house because they thought it was

a drug house.
Q. Anything else you base that on, sir?
A. Not that I can recall.
Q. Okay. Let's go back in time a little bit?
A. Okay.
Q. Are you a licensed peace officer in the state of Texas?
A. No.
Q. Have you ever been?
A. No.
Q. Okay. Are you a licensed peace officer any place in the United States?
A. No.
Q. Okay. Have you ever been a licensed peace officer in any state in the United States?
A. I've been a peace officer in both Massachusetts and Pennsylvania, but we didn't have anything called licensure.
Q. Okay. So when was the last time you were actually employed as a police officer or a peace officer depending on what jurisdiction and how they determine or they use the terminology?
A. Just for clarification we use police officer.
Q. That's fine, we can use police officer.
A. 1978.

Q. Okay. That was the last time you were actually a police officer?
A. Right.
Q. And what department were you working for at that time?
A. I was with the York County Sheriff's Department in York, Pennsylvania and then later in the year, I was with the Braintree, Massachusetts Police Department. Braintree, B-r-a-i-n-t-r-e-e.
Q. And what was your rank there?
A. In the sheriff's department it was deputy sheriff. You were either the sheriff or deputy sheriff and in Braintree, I was staff executive and I held a special Massachusetts state police certification where I could make arrest, carry a gun, do investigations, that type of thing.
Q. That was in 1978?
A. Correct.
Q. You were at both of those departments in 1978?
A. I left one to go to the other.
Q. Okay. So, before 1978, you were with what department?
A. York, or I'm sorry, Northern York County Regional Police Department.
Q. How long were you with them, sir?

A. One year.
Q. And before that where were you employed?
A. Federal Bureau of Investigation, but as a clerical employee.
Q. So, you are a police officer for one year like in 1977 time period?
A. 1972, one year in patrol and then from '73 to '77, the sheriff's department, I was a deputy.
Q. So you were always a deputy, there was just the deputies and then the sheriff's in that structure?
A. Correct. We had a chief deputy who was under the sheriff, but I'm not really quite sure what he did.
Q. Well, I guess what I'm trying to figure out here just for purposes of my knowledge here, did you only work, I thought I saw some place in your resume that you worked for one entity that sounded like it was a county's sheriff department then there was another entity that was a county sheriff's department or one was a regional task force type, explain that to me, sir?
A. Okay. As a York County sheriff's deputy, I did a multitude of things. I did courtroom security, I did jury background investigations, I served civil papers, I did prisoner transports, and I served warrants.
Q. Okay.
A. That's all under the sheriff's department.

Q. What years would that have been, sir?
A. '73 to '77. I think I resigned my commission in '77 or '78. It's in my CV. Then I also worked part-time as a police officer for the borough of Mount Wolf, Pennsylvania, which was a small borough. In Pennsylvania you had villages, and then you had boroughs, and then you had cities and then you had counties. So I worked for a borough. A borough form of government is a mayoral form of government, so I did that. It was a part-time weekend position, they couldn't afford a full-time police department. So because I was a sheriff's deputy, it gave me jurisdiction up there as well. So, I worked there in uniform on weekends. I did that probably for a year.
Q. And so you were doing this type of work with the sheriff's department that you described, courthouse staffing, background investigations for jurors, et cetera, I'm not going to repeat it?
A. Right.
Q. But that's what you were doing and then you went to the Braintree Police Department?
A. Correct.
Q. And were your ever a supervisor in the sheriff's department?
A. No.

Q. As deputy?
A. No.
Q. Okay. Did you ever meed out discipline against anybody in the, as a sheriff's deputy?
A. No.
Q. Okay. Did you ever conduct criminal investigations as a deputy?
A. Trying to think. No, I only did civil stuff.
Q. Okay. And so, did you ever, just to be real clear, did you ever conduct a felony investigation as a sheriff's deputy?
A. I don't believe so, no.
Q. And just to kind of cut to the chase a little bit, you know, in a lot of police departments you have investigation divisions, you have patrol officers, you have other divisions that might be in the traffic division, you also have homicide investigations, criminal, CID, criminal in-force investigation division, and then a lot of times in some of these investigation divisions you'll have somebody, what's known as a lead investigator, have you ever heard of that in terminology?
A. Oh, yes.
Q. Okay. So were you ever a lead investigator in any way for a felony at the sheriff's department?

A. Not at the sheriff's department, no.
Q. Let's go over to the Braintree Police Department?
A. Braintree I handled all the internal affairs investigations that were assigned to me by the chief.
Q. Okay. How long were you actually, and I, you mentioned something about your commission with the Braintree Police Department, were you actually a police officer? Were you employed? I thought I read some place that you were the staff executive?
A. Right. Let me explain that to you 'cause it's confusing and probably only unique to Massachusetts. I was a civilian employee. I was staff executive, I ran the administrative bureau, I did internal investigations at the request of the chief of police. Sometimes I borderlined[sic] on some criminal, but we had our own criminal investigators so I let them worry about that. I was liaison to the auxiliary police. We had 115 auxiliary police officers. In order for me to do some of those investigations I had to have police powers so the commonwealth of Massachusetts has a, at that time had a statutory provision called special police officer where you got sworn in, you got ID, a badge and I could conduct any arrest and investigations that a state police officer could do anywhere across the

commonwealth, but that was not my primary job. I had that commission so I could do internal investigations. So if I had to write an affidavit or I had to get information or whatever I had to do, phone records for example in one case, I could do that.

Q. Okay.

A. I had the authority.

Q. So you were basically a civilian employee at the Braintree Police Department, but you had the special police power that allowed you to do investigations, internal affairs investigations, is that fair to say?

A. It allowed me to enhance the internal affairs investigation.

Q. And how long were you at the Braintree Police Department?

A. A little over a year.

Q. And how many officers did they have there?

A. Forty, I think it was 42 or '3 sworn, about ten civilians and 115 auxiliary police.

Q. Go back over those numbers one more time for me. I'm sorry, one more time.

A. Believe it was 42 or 43 sworn, about 10 civilians and 115 axillary police and the chief of police.

Q. And you said you were employed there for about

a year?
A. Correct.
Q. Okay. How many internal investigations did you conduct?
A. Probably about 10.
Q. And what were those violations?
A. One was a allegation that one of our officers beat up a DEA agent in the city of Boston. Another allegation was that a female college intern was engaged in theft of services through her actions in the police department. Another one involved a captain who, we need to put this into perspective, in 1978 ordered $80 worth of Chinese food at a restaurant, badged his way out and never paid for it. There were several internal investigations on employees who were out on injury but were working other jobs while they were out on injury.
Q. Okay.
A. And there was another investigation where a civilian employee allegedly was masturbating and got caught in the men's locker room.
Q. Okay.
A. And then another investigation was overtime assignments being improperly administered.
Q. Okay. Anything else you can remember?
A. Those are the ones that come to mind.

Q. Just want to be real clear, so when you leave the Braintree Police Department you said you were there about a year?
A. Correct.
Q. I don't want to hold you to it, could've been 11 months or 13 months, somewhere in there?
A. Somewhere in there.
Q. It's not that relevant, but I just want to make sure, it was about a year?
A. Right.
Q. Okay. Did you ever hold a police position a sworn police officer position after that?
A. I was a badge carrying, ID card deputy sheriff in Pulaski County, Arkansas for training purposes only. In other words they made me a training advisor and I would go there and conduct training and the sheriff gave me a badge and ID card. I didn't work uniform, I didn't work for the department, I just had that credential.
Q. Okay. What year was that?
A. I think it was around 1981 or '2.
Q. Well --
A. I still have the credentials so I could verify it for you.
Q. '81 or '82, you said?
A. Yeah.

Q. And you no longer hold that position?
A. No.
Q. And was just for the limited purpose of engaging in training?
A. Right.
Q. Okay. Have you ever been, have you ever conducted an investigation into a felony as a police officer?
A. Well, the beating up of the DEA agent would've been a felony.
Q. Okay. I'm sorry, sir, as a non-internal affairs investigation. Let's take it out of the internal affairs investigation arena.
A. No, I haven't.
Q. Okay. Worked in criminal investigation division, put together a case and sent it to the district attorney's office?
A. No, I assisted in some of those as an officer, but I never packaged the whole thing and signed, no.
Q. Where did you assist in those?
A. In Northern York County Regional Police, we were involved in, we had a homicide investigation, I was the first officer on the scene so I put my information together passed it on to the detective, got additional information and he presented to the district attorney.

Q. Okay. But you weren't the lead investigator?
A. No, no.
Q. Okay. Were you the person who got called to testify as the lead investigator in the case?
A. No.
Q. Okay. Did you get called in front of the grand jury?
A. No.
Q. So just to be really clear I want to just, so we're all on the same page here and I understand your testimony clearly is you've never actually conducted a felony investigation yourself as a lead investigator and presented it to a district attorney's office?
A. Correct.
Q. Have you ever presented a case to the district attorney's office as a felony not just being a lead investigator, as a felony to a district attorney's office?
A. Maybe, I think one time on a child abuse case I did.
Q. When would that have been, sir?
A. And that would have been same timeframe with Northern York County Regional Police.
Q. Have you ever conducted a homicide investigation in parallel that would've involved an

officer involved shooting incident?
A. No.
Q. Okay. As a internal affairs investigator, have you ever conducted an officer -- not homicide or a homicide was involved or a death was involved, an internal affairs investigation for a shooting incident where it's an officer involved shooting, an officer shot at a suspect or another individual rightly, wrongly?
A. No.
Q. Have you ever in your career, in relation to an aggravated assault conducted an internal affairs investigation?
A. No. I've been the victim of an aggravated assault and I helped with the investigation giving information, but no I never was a lead or anything like that.
Q. Okay. Have you in any way ever liaisoned[sic] with the district attorney's office besides this one case I think you mentioned relating to --
A. Child abuse.
Q. -- child abuse? That would be a serious misdemeanor like in Texas a class A misdemeanor or a felony?
A. I don't think so.
Q. Okay. So in relation to any department, have

you ever imposed discipline on a police officer?
A. Yes. Well, I recommended discipline and the department Braintree chief administered discipline, I didn't.
Q. Well, that's my question, I'll be really clear on this, you recommended discipline?
A. Yes.
Q. Okay. And the chief could either accept or reject that discipline, correct?
A. Correct.
Q. Okay. And how many times did you actually recommend discipline?
A. Probably, of the cases I identified probably about five times.
Q. Okay. And what was the most serious discipline you recommended?
A. Termination.
Q. Okay. Was the individual terminated?
A. Yes.
Q. Okay. And who was that?
A. That was the college intern, my investigation, we pulled the phone records from the phone company and found that number one she lied in the investigation when I interviewed her, she lied. We had evidence to show that she was not doing the job she was supposed to be

doing and doing other things and we terminated her for dishonesty, basically.

Q. In relation to and I apologize to the -- in relation to the San Antonio Police Department, do you know what the standards are for imposing discipline?

A. Only from what the policy manual states.

Q. Okay. What did the policy manual state?

A. That discipline can be administered depending on the findings. I think there's a separate policy on discipline. I'd have to go back an reread that policy, but I remember seeing things in there.

Q. Okay. Well, do you have any opinions on the imposition of discipline in this case?

A. Only that, in my opinion, Officer Casanova violated several policies and it didn't appear that there was any discipline administered.

Q. Okay. Well, we know from what you just told me that you thought there were policy violations and you felt that there should've been discipline imposed, right?

A. Correct.

Q. My question though is a little bit more detailed than that, do you know what the procedures are and what an officer is afforded to as far as the disciplinary process goes within the SAPD?

A. Well, I know that he's afforded Garrity rulings when he's brought in to make compelled statements. He has an opportunity for legal representation. I don't know what the collective bargaining agreement or association agreement might say. I haven't seen that.
Q. Okay. Well, you'd agree with me that across the entire country every officer's afforded his or her rights under a Garrity, correct?
A. Supposed to be that way, yes.
Q. That's not unique to the San Antonio Police Department?
A. No.
Q. And do you know of any police department where they're not entitled to legal representation?
MR. WASHINGTON: Objection, form.
A. At what point in time?
Q. (By Mr. Kosanovich) Well, we're talking about in internal investigation.
A. There are some departments where the rules are an attorney can be present, but can't say anything and there are other departments where the attorney can say things, again depending on whatever that circuit holds on discipline whatever the collective bargaining agreement might be and whatever's negotiated.
Q. Okay. So getting back to the disciplinary

process for the San Antonio Police Department, are you making any type of an opinion here that he was, the department should've imposed discipline, but they did not impose discipline against him. Are you making any type of an analysis as an expert in this case that he should've been disciplined by the police department?

A. I haven't, I don't think I have an opinion to that effect, but I do believe that the internal affairs investigation was short and he should've been disciplined for policy violations.

Q. We're going to get to that in a second, but my question is, are you going to offer any opinion in this case that the City of San Antonio should've imposed discipline on Officer Casanova, but they failed to do that?

A. If I'm asked that yeah I would testify to that.

Q. Okay. Well, have you been asked to do that as apart of this report?

A. I don't believe it's apart of this.

MR. WASHINGTON: It is.

MR. KOSANOVICH: Object to side bar and the coaching of the witness.

MR. WASHINGTON: I'm telling you that it is, Mark. I'm not coaching.

MR. KOSANOVICH: I'm not questioning you,

I'm questioning the witness.
A. On page 20 and 21.
MR. WASHINGTON: I take offense to you saying I'm coaching the witness, just like you asked a question during the time that Mr. Denton was asking questions for clarification and I did the same thing.
MR. KOSANOVICH: Objection to the side bar.
A. I mean throughout the, throughout my report I talk about double standards for investigations and the policy violations and the fact in opinion number seven that there was no discipline, but rather as I put it here not a legal definition, but administrative definition, ratification of conduct.
Q. (By Mr. Kosanovich) Okay.
A. I mean, to me it's pretty clear the policy violations.
Q. We're going to get to the policy violations but, I'm looking at number seven here and I'm just skimming quickly, tell me if I'm wrong, sir, I want you to point this out in paragraph seven on page 20, is that the one you're looking at?
A. Right.
Q. And I apologize, what exhibit do we have this marked as?

MR. DENTON: Three.
A. I'll tell you in one second, Exhibit 1.
Q. (By Mr. Kosanovich) As Exhibit 1.
MR. DENTON: Sorry.
Q. (By Mr. Kosanovich) Okay. I want to make sure we're on the same exhibit, okay?
A. Yeah, we're good.
Q. And if I misspeak let me know, okay?
A. Okay.
Q. So in paragraph seven here, do you mention discipline?
A. On the bottom paragraph on page 21, third sentence says Casanova was exonerated because a complaint was lacking, two lines down Chief McManus and or the City of San Antonio and police leadership teams make him and/or them unfit to evaluate the internal affairs investigative report and or to administer failed fair discipline or remedial training to Officer Casanova or officers in general. So, I do mention discipline.
Q. Okay.
A. And a failure of applying it.
Q. Well, but, it says based upon, I just want to read this sentence and I'll go over it, based upon my education training and experience and I'll slow down, the vacuousness, if I pronounced that correctly, of

Chief McManus and or the City of San Antonio and police leadership teams makes him and/or them unfit to evaluate internal affairs investigative report and or to administer fair discipline or remedial training to Casanova or officers in general. You see that?

A. Right.

Q. So you're saying that Chief McManus or somebody in the administration can't impose discipline because of the investigation that was done?

A. Correct.

Q. Okay. So you're not saying that there was a failure to discipline in this case, you're saying that it couldn't be because of the investigation; is that correct? I don't want to misstate this.

MR. WASHINGTON: Objection, form.

A. No, you're right on that part, if we go to the bottom part of that it talks about basically because discipline couldn't be invoked it was, the actions are ratified by the chief and city leadership from an administrative viewpoint.

Q. Okay. But my question, getting back to my original question to you, do you know the procedures that have to be taken before discipline can be imposed on a San Antonio police department officer? Do you know them?

MR. WASHINGTON: Objection, form.
A. Not offhand, no.
Q. (By Mr. Kosanovich) Well, not off hand. Did you ever review them?
A. I think there's a policy that talks about discipline.
Q. Okay. What policy is that?
A. I, counsel this is not a final exam. Out of 700 policies, I don't remember each number, I'm sorry.
MR. WASHINGTON: Do you want to show it to him, Mark?
A. If you have a copy of it, I'll be glad to tell you if I reviewed it.
Q. (By Mr. Kosanovich) You don't know it off the top of your head, I understand that.
A. Yeah.
Q. So my question though is, what procedures is an officer entitled to after he or she is disciplined by the chief?
A. I don't know that offhand.
MR. WASHINGTON: Okay. Hold on. Mark, just to be, and I'm looking through my documents that I received, have y'all resent us discipline procedures because I'm looking through my documents, have you sent that?

MR. KOSANOVICH: I don't know.

MR. WASHINGTON: No, I'm asking because I want to make sure that I gave Dr. Peters everything that you sent. So these policies that you're referring to, can you go to the base label and show me this because, no I just want to make sure that you're not asking him about something that you never produced.

MR. KOSANOVICH: I'm just asking him questions about what he knows about our policy. I'm not getting into what I produced.

MR. WASHINGTON: No, but I wouldn't expect him to know that if you didn't produce it.

MR. KOSANOVICH: I'm asking the questions and whether or not anybody made a request for that before hand --

MR. WASHINGTON: We did.

MR. KOSANOVICH: I wasn't the lawyer on the case.

Q. (By Mr. Kosanovich) So, my question is getting back to you, sir, off the top of your head, you don't know that procedure?

A. Other than what I testified to, I thought I saw it in a policy?

MR. WASHINGTON: And just for a clear record, we never received those documents from the City

of San Antonio.
Q. (By Mr. Kosanovich) So in relation to, you said something about a collective bargain agreement, do you know what that is?
A. Yes.
Q. You ever review that?
A. I don't believe it was given to me.
Q. Okay. Then how did you know, out of, trying to figure this out, how did you know about the collective bargaining agreement?
A. I've taught in Texas. I've taught officers and most of them say they have a collective bargaining agreement --
Q. Okay.
A. From state or an association agreement. Depending on what they call it in their jurisdiction.
Q. Okay. So, do you know, do you have an opinion here as to what level of discipline Officer Casanova should have been meeded out against him?
A. No, because I don't know the categories.
Q. Okay. Well, I think it's some place in your report you talked about and I don't want to confuse you, I'm not trying to, you talked about there were different levels sustained, not sustained, exonerated, unfounded?
A. Right. Right.

Q. Okay. Do you know the review process that occurs because of that, sir?
A. Not within San Antonio.
Q. Okay. Now, let's go back to the front of your report.
A. Okay.
Q. And let's look at your second opinion.
MR. WASHINGTON: What page are you on?
MR. KOSANOVICH: Page nine, Exhibit 1.
A. Right. I'm with you.
Q. (By Mr. Kosanovich) It says in here and I'm going off when I say number two, just for purposes of reference, that coincides with your, I think you called it the executive summary.
A. Correct.
Q. We're skipping one and going to two.
A. Okay.
Q. Did you read the opinion in relation to your opinion in relation -- did you read the court opinion in relation to your opinions for executive summary number one?
A. I just got that and I read it and I think the court dismissed that, I believe.
Q. So, that's why we're skipping that. I'm not trying to hide anything from you.

A. Right.
Q. We're going to go to number two.
A. Fair.
Q. We're not coming back to number one.
A. Got it. I appreciate that, thanks.
Q. So, in relation to number two, I'm not going to read it word for word, you mentioned mayor, chief of police and/or its police management who created an organizational atmosphere that demonstrates bias toward protecting their officers and ratifying their current behavior.
A. Correct.
Q. See that?
A. Yes.
Q. You then have in here a statement and it's quotation a couple of paragraphs down, it says admit nothing, deny everything, demand proof is a historical mantra that has been used in American law enforcement for decades.
A. Correct.
Q. Do you see that? Then you say this mantra appears to have been adopted by the City of San Antonio, its police leadership, supervisors and select officers who were involved in the fatal shooting investigation of Mr. Roundtree?

A. Correct.
Q. Can you point to me where, 'cause you mentioned the City of San Antonio here, one of its officials ever said admit nothing, deny everything and demand proof?
A. No.
Q. Okay. Do you know, do you have any facts to support that anything in police leadership ever said admit nothing, deny everything and demand proof?
A. I don't have anything that would say they said exactly that.
Q. Okay. Well, do you have any facts to support that Chief McManus said admit nothing, deny everything, and demand proof?
A. Never heard him say that.
Q. Okay. What about any supervisor?
A. Same.
Q. Okay. Well, in relation to the criminal investigation detectives who worked on this case, did you ever come across any evidence that they ever said anything like that or similar to that?
A. On the criminal side?
Q. Yes.
A. Or the internal affairs, this opinion deals with the internal affairs side.
Q. Okay. So I want to be real clear on this,

everything under number two here and I don't want to misstate this only relates to the internal affairs investigation?

A. The first sentence of this opinion says the content analysis of the documents reviewed from the internal investigation, yes.

Q. So you're not saying that under number two and I'm being inclusive because this goes on for a few pages.

A. Right.

Q. This does not relate to the criminal investigation, correct?

A. Right. This is the internal affairs investigation.

Q. Okay. And I appreciate that, it might cut a little time off of our deposition here today. So in relation to this statement here, did you ever hear anybody who was involved in the fact internal affairs investigation say anything like that?

A. I haven't heard anybody verbally say it, but their action certainly supports some of it.

Q. Okay. We'll get to that in a second, but do you have any facts to support that any internal affairs investigator ever coached or told Officer Casanova or anybody who was a subject to that investigation to admit

nothing, deny everything and demand proof?
A. I don't have a verbatim transcript of what investigators may or may not have told Officer Casanova.
Q. So, you said in here and I don't want to misstate this so, please let me know, a second ago, you said well maybe their actions or something indicated that they meant that?
A. Right.
Q. For the internal affairs investigators?
A. Right.
Q. Okay. Which internal affairs investigator are you saying engaged in any conduct that remotely touched on admit nothing, deny everything and demand proof?
A. Well, let me find it for you here. It's sort of in the inverse relationship where admit nothing, deny everything, and demand proof doesn't necessarily have to be spoken. Doesn't have to, in other words, people don't have to say that, it's just a historical umbrella if you will over some situations in the past. So when you allow officers to get together and chat about the event, that's a violation of policy. So someone, a supervisor at the scene should've separated them out right away. To demand proof based on their statements to internal affairs separately, not collectively that's what a lot of this goes to looking at it from the other

side of that lens. So, when you treat police officers differently than you treat suspects, you have a double standard, and the standard is you wouldn't treat a suspect the way you treated the officers or vice versa. You assume everything's going to be good right from the beginning. You let them collaborate, you let them talk, you don't demand proof because you don't confiscate the telephones. You basically destroy evidence or allow the evidence to get spoiled. So the demanding proof is, we let the proof go away, we don't enforce anything. So now if I have to demand proof, I don't have it. That's what a lot of this is really talking about. When you have the chief of police get up in front of the world in a press conference and say Roundtree had a gun and that's why we had to shoot him, that's patently false. Somebody didn't demand proof. Somebody denied the truth. That's what this is all going toward that umbrella. So when you look at it separately in isolation, it doesn't necessarily appear to raise a big flag, but when you look at it collectively, there's a lot here. I mean, those are the couple of things and if we go over on page ten, there's no requirement in the officer involved use of force policy on force for supervisors to separate witnesses. So again, if we get down to the bottom of that page, Casanova testified it's

not a policy we have to mute our cameras while we're discussing tactics. So you're letting your proof, if you will, evaporate. That's what all this is doing here.

Q. Anything else?

A. Just give me a second, please. On page 11, the policy says firearms won't be discharged when it appears likely a nonparticipant may be injured. Well, a nonparticipant was injured. Mr. Roundtree. And then we have several versions of the events that were reduced to writing. It's very clear these investigation tactics that were used were biased. Highly biased and people didn't get proof. They just went with what they were told originally and that's how I interpret it. Otherwise, the statements wouldn't have been made, the statements wouldn't have gone out to the public. I'm sure when the chief had to walk back that first statement, he was probably not a happy guy. And we've had it happen in other departments too I've seen it, but to have this many versions of what took place and they just seem to all be accepted.

MR. KOSANOVICH: Objection, nonresponsive.

Q. (By Mr. Kosanovich) My question was in the internal affairs investigation okay, do you know who the

internal affairs investigator was?

A. There were several of them.

Q. Who were the internal affairs investigators?

A. Let me find them for you here, Detective Hines, there were several different reports that had investigators names on them, I don't know if I've listed them all here. 'Cause some I listed by Bates stamp so I don't have the name. Hines, Detective Perez, and the investigative report Bates stamp COSA001747 through 2188 and then there was an internal affairs report produced, prepared by Ryan Luza and Tim Vaughn. Detective Angell, A-n-g-e-l-l. So there were several what I considered detectives working on it.

Q. Well, my question was, specifically do you know who the actual internal affairs investigators were?

A. Other than these people, probably not.

Q. Okay. Do you know if there's difference between internal affairs investigators and homicide investigators?

A. There should be, absolutely.

Q. Okay. So, I want to make sure I understand what your understanding is. Is it your understanding that internal affairs investigators were out at the scene that night?

A. I don't recall them being at the scene that

night.
Q. Okay. Well, you're talking about officers being separated, that are involved in a shooting incident, correct?
A. Right.
Q. Were you saying that the internal affairs investigator should've separated them?
A. No, it was too late. They had gotten together right away.
MR. WASHINGTON: Hold up, before you ask your next question, Mark, I just want to make sure we're not playing games, do you have an internal affairs report?
MR. KOSANOVICH: Yeah, I do.
MR. WASHINGTON: I just want to make sure you're not playing games.
MR. KOSANOVICH: I'm not playing games.
MR. WASHINGTON: What's the base number for it?
MR. KOSANOVICH: I don't have it off the top of my head.
MR. WASHINGTON: No, but you're asking the questions to this witness, I want to make sure we're not playing games.
MR. KOSANOVICH: I'm going to object to

the sidebar. I'm not going to sit here and get into --

MR. WASHINGTON: This is not a side bar to him, I'm asking you a question because if you're asking him --

MR. KOSANOVICH: I'm not here to be questioned.

MR. WASHINGTON: You are, as an attorney if there's something that you're asking and I'm asking you, I want to make sure I have this documented. Is there a separate internal affairs --

MR. KOSANOVICH: I'm not getting into this.

MR. WASHINGTON: You have to get it.

MR. KOSANOVICH: No, we don't.

MR. WASHINGTON: I'll file a motion with the court if you're holding documents that you didn't produce, that's unethical.

MR. KOSANOVICH: I'm not withholding anything.

MR. WASHINGTON: I'm asking, do you have an internal affairs report.

MR. KOSANOVICH: I'm not withholding anything and I'm not getting into this with you.

MR. WASHINGTON: Can you show me the document?

MR. KOSANOVICH: I'm not, no.
MR. WASHINGTON: Mark Ralls, do you have an internal affairs report? I'm asking, Mark, you play fair, do you have an internal affairs report?
MR. KOSANOVICH: I'm going to object to that saying I don't play fair. We're not getting into this --
MR. RALLS: Quite frankly --
MR. WASHINGTON: I'm just asking, if there's an internal, Mark, here's the reason I'm asking and this can stay on the record --
MR. KOSANOVICH: No, I'm not agreeing to this. No, we're done with this.
MR. WASHINGTON: Okay. Deposition is done if you're done. I'm saying if you're asking a witness something about --
MR. KOSANOVICH: I'm asking him questions about --
MR. WASHINGTON: Right. And I'm asking you is there an internal affairs report.
MR. KOSANOVICH: He's got internal affairs documents. I don't know --
MR. WASHINGTON: No, he doesn't. I'm asking you. I'm looking at my documents, do you have an internal affairs report?

MR. KOSANOVICH: I'm not getting into this with you about what's been produced.

MR. WASHINGTON: So I'm saying, play right.

MR. KOSANOVICH: I'm playing right. I'm not going through documentation with you, I'm asking your witness questions.

MR. WASHINGTON: I'm saying you're asking trick questions that you --

MR. KOSANOVICH: I'm not asking anybody, I'm not asking anybody a trick question.

MR. WASHINGTON: Do you have an internal affairs report?

MR. KOSANOVICH: There are internal affairs documents. I don't know what you're talking about Daryl and I'm not getting into this with you any further. I'm done.

MR. WASHINGTON: I'm asking do you have an internal affairs -

Q. (By Mr. Kosanovich) I'm asking you a question --

MR. WASHINGTON: Don't answer a question until he answer this, do you have an internal --

MR. KOSANOVICH: I'm not here to be questioned. I'm not here to be questioned by you.

MR. WASHINGTON: If you have an internal affairs report, I'm asking that you produce it.
MR. KOSANOVICH: I'm not producing documents today.
MR. WASHINGTON: You don't have to produce it today, but --
MR. KOSANOVICH: I'm not producing documents to you.
MR. WASHINGTON: Okay. This is on the record, we're going to take this up with the judge you're stating that you're not producing documents. If there is --
MR. KOSANOVICH: I'm not producing documents to you today.
MR. WASHINGTON: I didn't say you had to produce it today, I'm saying if there are internal affairs documents, we want them.
MR. KOSANOVICH: You can take that up with the court.
MR. WASHINGTON: I'm taking it up with you.
MR. KOSANOVICH: No, I'm not taking that up on the record with you. By the way, you're wasting our deposition time.
MR. WASHINGTON: I want it to be on the

record that you did not produce internal affairs documents.

MR. KOSANOVICH: I'm not getting into document production with you.

MR. WASHINGTON: Okay. You can move on.

MR. KOSANOVICH: I will.

MR. WASHINGTON: Because you ask --

Q. (By Mr. Kosanovich) I'm asking you a question, sir --

MR. WASHINGTON: Document that you didn't produce.

MR. KOSANOVICH: No, I'm not asking about that.

Q. (By Mr. Kosanovich) I'm asking do you know who the investigators were?

A. Other than the name I just shared, no.

Q. Okay. Do you know which ones were apart of internal affairs and which ones were apart of the homicide unit?

MR. WASHINGTON: Objection, form.

Q. (By Mr. Kosanovich) Do you know which ones were which?

A. According to the list of documents I listed in Appendix A of my report, I would have to pull up the investigative report to find out who wrote it and I

would have to look at the other report, as well.
Q. Okay.
A. To look at who they were.
Q. So were you, were you faulting the internal affairs investigators for not separating them that night?
MR. WASHINGTON: Objection, form.
A. No, I wasn't faulting the internal affairs investigators because it already happened.
Q. (By Mr. Kosanovich) Okay. Do you know of any policy that says after a critical incident an officer cannot talk to another officer to discuss what happened?
A. Oh, yeah.
Q. Okay.
A. Most OIS policies have that in it.
Q. Okay. No, no, no, after, immediately after an incident happens, are you saying that it's your testimony that an officer can't turn around and look at his partner and say did you see just what happened and I saw what happened and they have a conversation back and forth, are you saying that that can't occur?
A. Again, in most OIS policies, officers are not allowed to talk to one another.
Q. Have you ever investigated anybody for violating that policy? You personally?

A. I have not personally investigated anybody for that, I've looked at other cases where that --
Q. Okay. And in this particular case, you're making an issue of that in this report aren't you about what was discussed between the officers, correct?
A. Yes.
Q. Okay. And I want you to identify for me every fact that was discussed between the officers that wasn't correct?
A. I can't do that because nobody was there except the officers.
Q. Okay.
A. You're asking me to disprove a negative, you can't do that.
Q. No, I'm asking you to identify for me what facts were obscured because of a conversation between two officers?
A. Well, I can tell you that what's been obscured is what came out that Roundtree had a gun and was shot. That didn't just get invented by a detective.
Q. No, I'm asking you what specific facts were obscured because or somehow twisted because of a conversation between Steve Casanova and another police officer. Identify those facts for me?
A. I can't do that because they got together and

nobody else was there.

Q. Okay. Well, how do you know they got together and had a conversation that had anything that affected the facts for this case?

A. Because you've got five different versions of the facts.

Q. Okay. Does that indicate that they didn't get together and collude as to what happened if they have five different version?

MR. WASHINGTON: Objection, form.

A. It says that the internal affairs investigators didn't get to the bottom line here.

Q. Okay. What was the bottom line?

A. The truth.

Q. Okay. What was the truth? Did it come out?

A. Well, the truth that initially didn't come out was that Roundtree wasn't armed.

Q. Okay. And let me ask you this question because you've gone back to this numerous times in your deposition about Roundtree not being armed and that somebody initially saying he was, isn't that correct?

A. Correct.

Q. Okay. Do you have any evidence or facts to support a contention that any internal affairs investigator at the end of the investigation believed

that Roundtree was the individual with the gun?
MR. WASHINGTON: Objection, form.
A. Not at the end, at the beginning.
Q. (By Mr. Kosanovich) Okay. And if he had it at the end of the investigation it was ferreted out through the investigation that Roundtree did have the gun, isn't that fair to say?
A. Correct.
Q. And was that the information that was presented and reviewed to review Casanova's conduct by the police department? Do you know that?
A. I just saw the investigative report that was heavily redacted.
Q. So, my question is, going back to it, what facts were discussed between Panah and another officer that some fact was misstated or miscued or misrepresented to anybody? Do you know of any facts that support that?
A. Again, I don't have that communication and that could've happened verbally.
Q. Okay. And so how did that affect this investigation if you don't know what was said?
A. I'm going by the outcome and the documents of what took place during it.
Q. So at the end of the day, sir, you talked about

phone communications?
A. Right.
Q. Correct? What phone communications occurred between the officers?
A. Well, we don't know exactly, but we do know that from the video that Casanova was on his phone.
Q. Okay. And what did he say on his phone?
A. We don't have those conversations.
Q. Okay. Do you have any facts that support a theory that he said something that was contradictory to his statement?
A. No, because we don't have the transcripts.
Q. Okay. Well, you did an investigation about a woman back in the 1970's, correct?
A. Right.
Q. About a phone, some -- did you have the transcripts of her phone conversation?
A. I didn't have the transcripts, but I got the phone company records from the phone company and one of the issues in that case was the length of time that she was on the phone. And after we proved that she was on the phone for a couple hundred minutes at a time, I brought her back in and I confronted her with it and then she told the truth. Then we fired her.
Q. Okay. And so getting back to this case, it's

undisputed that he used his phone, correct?
A. Right.
Q. And I'm asking you what facts do you have not your speculation, what facts do you have that he said something that was contradictory to his statement?
A. I have none.
Q. Okay. So then, let's go and talk about what facts do you have that he said anything that would have been material to this investigation in a phone conference with somebody?
A. I don't.
Q. Okay. So we know that he did have a phone conversation at least one, correct?
A. Right.
Q. Okay. So, what is it that you're trying to tell me you needed to review, what record would that phone record have proven to you, that he made a phone call?
A. Getting the phone records would've revealed phone call, length of time, to whom and whether there are any text messages.
Q. Okay. And do you --
A. And we don't have that.
Q. Go ahead. Finish?
A. I'm sorry, we don't have that.

Q. Okay. And what evidence do you have that something was put into a text message that was actual recoverable at some point in time?

MR. WASHINGTON: Objection, form.

A. I don't.

Q. (By Mr. Kosanovich) Okay.

A. And neither do your investigators because they never got it.

Q. So if you don't know what it is, how do you know it's material?

A. This is a crime scene. This is a criminal crime scene and we're looking at internal policy violations and maybe a separate administration investigation. So all of that becomes part of the overall investigatory process.

Q. Okay.

A. And the questions you're asking me can be asked of your investigators. They don't have any information to prove otherwise.

Q. But my question is what evidence do you have that he said something that was contradictory to a statement that he gave?

MR. WASHINGTON: Objection, asked and answered.

A. I don't because we don't have any text

messages.

Q. (By Mr. Kosanovich) So, let's move on because you say in here --

MR. WASHINGTON: Mark can we take five, ten minute break? We've been going since 12:30.

MR. KOSANOVICH: Sure. Yeah, that's fine. Just got to move it along because we've got your 4:45 deadline.

MR. WASHINGTON: No, but I'm just saying.

MR. KOSANOVICH: That's fine.

THE VIDEOGRAPHER: We're off the record at 2:25 p.m.

(Break in the proceedings.)

THE VIDEOGRAPHER: We are now back on the record at 2:46 p.m.

Q. (By Mr. Kosanovich) If I look at page 10 of your report, sir, it says there perpetuation of false shooting narrative, you see that?

A. Yes.

Q. Did, how did that have an effect on the internal affairs investigation?

A. Had the effect of as part of the investigation you'd look at all the narratives that are presented and how they came about. And this perpetuation of the, how Roundtree allegedly had a gun got started, continued was

presented by the chief, obviously that's what the chief had at that time and then walked back. So, that all impacts the internal investigation when it comes to looking at all the people who were involved and comparing and contrasting information and it also gives you a basis for your questions during the internal investigation.

Q. Okay. Did, on the night of the incident, is that when Chief McManus said Roundtree had the gun?

A. Whenever he held the press conference. I don't think he held a press conference at 1:00 or 2:00 in the morning.

Q. Well, do you know when that was taken back or corrected by the department?

A. Let's see. Just give me a moment. I know I have it in here that McManus mentioned it, I'm trying to find the page where I put that information. I don't have it in my report when they took that back.

Q. Okay. So if they retracted it they weren't trying to perpetuate it then is that correct, if they went back and corrected their statement?

MR. WASHINGTON: Objection, form.

A. It would be a correction, correct.

Q. (By Mr. Kosanovich) Okay. Well, why would they issue a correction do you know?

MR. WASHINGTON: Objection, form, calls for speculation.
A. I don't know what, why they, I would assume the chief did it to correct the situation.
Q. (By Mr. Kosanovich) Okay. And do you know if Officer Casanova ever said in any way shape form or fashion that Roundtree had a gun?
A. I don't know if he said that directly to anyone but he would've been the only one to have known it in the beginning.
Q. Okay. Well, have you ever seen him make a statement or any indication that he ever said anything that Roundtree had a gun, that's Officer Casanova, that Roundtree had a gun?
MR. WASHINGTON: Objection, form.
A. No.
Q. (By Mr. Kosanovich) Okay. And what about Officer Panah, did you ever hear him say that or see any evidence that he said that?
A. I don't believe so.
Q. Okay. And Officer Casanova actually gave a statement that evening, correct?
A. Yes.
Q. Okay. And that's not contained anywhere in his report that Roundtree had a gun?

A. Correct.
Q. And as a matter of fact it was Casanova's contention that he saw Snowden with the gun, correct?
A. That's what he reported, yes.
Q. Okay. And so you have Snowden, or excuse me, Casanova, who says I saw him drawing a gun or pulling a gun, correct?
A. Right.
Q. Later on you have Snowden who says some point in time, I didn't have a gun, correct?
A. Snowden, right. Snowden said he didn't have a gun.
Q. How long after this incident did that interview occur?
A. I don't remember the date.
Q. So, you had two conflicting stories, one says I do have a gun, I saw a gun that Snowden had a gun. Snowden says, I didn't have a gun, correct?
A. Right.
Q. And you had another witness, her name, Ms. Singleton?
A. Singleton, correct.
Q. She says Snowden didn't have a gun, correct?
A. Right.
Q. So those are material facts that are in dispute

then as to one says they had a gun, Casanova says he did have a gun, correct?

A. Right.

Q. So you say here there's a perpetuation of a false shooting narrative, okay. At the end of the investigation when the review was done, the administrative review, the internal review of the shooting was done, do you know, do you have any facts to support that anybody believed that was reviewing the case that Roundtree had the gun or had that been corrected by that point in time?

A. It appears that it was corrected throughout that time.

Q. And when the case was sent over to the district attorney's office, do you know what actually happened with the criminal investigation?

A. I don't believe so.

Q. Okay. Do you know what the criminal investigators did with the investigation file and what they did with the district attorney's office?

A. I don't believe so.

Q. Okay. Do you know whether or not there was any representation made to the district attorney's office that Roundtree was the individual who possessed the gun from anybody from the SAPD?

A. I don't have any information.
Q. So in relation to this perpetuation of a false shooting narrative, do we know on the evening of the shooting that Casanova never said that or perpetuated that theory, correct?
A. I don't think we know that for a fact.
Q. Do you know where the concept came that Roundtree was the individual or whoever made that statement that Roundtree was the individual with the gun?
A. I don't.
Q. Do you know how long it took any of the investigators to determine that Roundtree did not have the gun?
MR. WASHINGTON: Objection, calls for speculation.
A. I don't know.
Q. (By Mr. Kosanovich) Okay. And do you know, do you have any facts to support that once they determine Detective Perez, Detective Hines, Sergeant Luza, anybody that when they found out it wasn't Roundtree with the gun that they went and made that statement anyway, they disregarded the truth and went out and made that a false statement?
MR. WASHINGTON: Objection, form.

A. No, I think in that case, I think it was Hines who put in the report sort of the opposite and said you know Casanova was reckless.
Q. (By Mr. Kosanovich) I'm sorry?
A. Reckless in the shooting. In other words, moving, trying to explain the situation with Roundtree.
Q. Is it your testimony that Detective Hines wrote in a SAPD report that Casanova acted recklessly?
A. I think that was in his deposition I believe.
Q. Okay. Well, do you know whether or not he said that as a conclusory statement or he said that as part of a hypothetical question?
A. I would have to go back and look at the deposition testimony.
Q. Well, do you know if all the facts were presented to Detective Hines when he made that statement about what occurred that night in that deposition? Do you know whether or not he had all those facts?
A. I don't.
Q. Okay. So you say here there's a violation of the mobile video recording policy?
A. Right.
Q. Okay. What information are you claiming was not captured because a body worn camera was muted, muted or turned off?

A. Well, I think Casanova said there's not a policy we have to mute our cameras or audio really and the video the body worn camera video shows they were talking, it shows that Casanova was texting, using his personal cell phone, so we don't know what was said. We have don't know if that was tactics, we don't know if that was personal communication, we don't know what it is.

Q. Okay. So I guess, similar question, I'm not trying to be argumentative but do you have any facts that you can sit here today and tell me that specific information was actually not recorded because it was muted and it contradicts something that Casanova said that was part of his statement?

A. That's an impossible question to answer. If it wasn't captured how would you know what was said, you wouldn't, so no, I don't know and your investigators never secured the phone so we don't know.

Q. Well, let me ask you this about the phone, we've gone over this, when you and I are talking on our cell phones, let's say I call you, you'd agree with me that that's not recorded, correct?

A. Correct.

Q. Okay. And do you know how long a text message can be retrieved?

A. Years later.
Q. Okay. When you say years later, how is that?
A. I just did a case where DEA went and got every text message for five years from a firefighter's cell phone. So it never goes away.
Q. Okay. And where would that have been stored?
A. Probably in the carriers data bank.
Q. Okay. So you're saying that that information would've been in the carriers data bank?
A. Right.
Q. Okay. So that'd still be available today?
A. Still be available today.
Q. Okay. So now you said that there was a shooting policy violation, correct?
A. Yes.
Q. What was the shooting policy violation?
A. Well, one is he shot an unarmed person. Two according to the policy he shot into an area where it was likely a nonparticipant may be injured, and according to the video, he shot without any, giving Mr. Snowden any time to react to his command to show the hands.
Q. Let's go back here, let's just kind of break this down a little bit. As far as and I think you made the statement or something like this and again I don't

want to misstate this so correct me if I'm wrong that Mr. Denton or when you were talking to Mr. Denton you said about the, Officer Casanova shot an unarmed person that would have been Mr. Round, correct?
A. Right.
Q. I need you to identify for me all the facts that you have that Officer Casanova intended to shoot, not Mr. Snowden, not Ms. Singleton, that he intended to shoot Mr. Roundtree?
A. Give me one second. Officer Casanova in his deposition testified he made a conscious decision to use deadly force against Snowden even though he knew Roundtree was unarmed and was not doing anything to harm him and was an innocent third party and was behind Snowden. He also said that on page 145, line 24, that Roundtree was behind Mr. Snowden when he fired his weapon and that Roundtree was sitting in the exact line of Officer Casanova's area where he fired the handgun. Detective Perez testified to that. And Officer Casanova admitted that he knew his handgun discharge could've struck Mr. Roundtree, he testified to that in his deposition page 139, line four. He also testified that the shooting at Mr. Snowden was difficult because he was moving. And that's at page 132, 19 and 20. I think that's the main ones that I cited in my report.

Q. Okay. Well, Doctor, you know there's a difference between an intentional act and something that might be extremely dangerous or reckless, isn't that fair to say?

A. Yes.

Q. Okay. My question was very direct about do you hold the contention that Officer Casanova saw Charles Roundtree and intended to shoot and kill him or hit him with the bullet?

A. He intended to shoot in that direction.

MR. KOSANOVICH: Objection, nonresponsive.

Q. (By Mr. Kosanovich) He saw Mr. Roundtree and he intended to shoot Mr. Roundtree, not that he shot in the direction of him, that he intended to strike him with a bullet?

A. I don't know what was in Casanova's mind at that moment, but the detective said the shooting was reckless.

Q. Well, let's be really clear, that was part of a hypothetical about shooting into a house where individuals are seated, correct, when that was asked?

MR. WASHINGTON: Objection.

Q. (By Mr. Kosanovich) Is that correct?

MR. WASHINGTON: Objection, form.

Objection to the side bar.
A. I don't recall.
Q. (By Mr. Kosanovich) My question is very direct, are you testifying you'd agree with me that Officer Casanova never testified or said in any shape form or fashion either the night of or after that Charles Roundtree had a gun?
MR. WASHINGTON: Objection, form.
Q. (By Mr. Kosanovich) Is that fair to say?
A. I don't recall him saying that or being asked that.
Q. Okay. Well, but his contention or his statement was that Mr. Snowden had the gun, that's clear, correct?
A. He testified to that.
Q. And that's who he shot at because he's the one who had the gun is that fair to say?
MR. WASHINGTON: Objection, form.
A. I think that was his primary target.
Q. (By Mr. Kosanovich) Okay. So do you hold the contention in any way that Steve Casanova, Officer Casanova processed that Charles Roundtree didn't have a gun and still shot and intended to hit him with the bullet?
MR. WASHINGTON: Mark, don't point like

that.
A. The only way Casanova would know for sure that Roundtree didn't have a gun is after the fact, because Roundtree was sitting down. And Roundtree stood up right about this same time.
Q. (By Mr. Kosanovich) Who stood up, Roundtree or Snowden?
A. Well, my understanding is Snowden stood and then Roundtree stood up.
Q. But the question is very direct, though. Do you have an opinion or contention in any way in this lawsuit because I need to know this, that Steve Casanova never saw a gun on Charles Roundtree, never believed he had a gun, but then intended to shoot him?
MR. WASHINGTON: Objection, form.
A. Again, I don't know what he saw with Roundtree when he was seated.
Q. (By Mr. Kosanovich) Okay. So you've talked about there being a shooting violation, does the SAPD policy, when is it prohibited, if it's likely somebody will be struck?
A. No, it's not that specific. Let me find it for you.
Q. Go to page 11, maybe this will expedite.
A. Okay. Thank you.

Q. Shooting policy violation.
A. There we go. The second paragraph on page 11, under shooting policy violation, firearms are not discharged under the following circumstances, number two, when it appears likely a nonparticipant may be injured.
Q. Okay.
A. That's, and I think already answered this question earlier, and again Snowden testified that he knew there was a risk of someone else in the room or residents getting shot by him, that's on the first paragraph under shooting policy violation.
Q. So my, so my question is, though, so I believe the language is when appears likely a nonparticipant may be injured, correct?
A. Right.
Q. But the policy also allows police officer to discharge his weapon and use deadly force and I believe your testimony was, and again I don't want to misstate this, if there's a threat of imminent bodily injury or death correct? And I'm summarizing that, is that fair to say?
A. If there's no other alternative, that's correct.
Q. And so if Officer Casanova believed based on

what he saw, that there was an imminent threat of bodily injury to himself or death to himself and he discharged his weapon there's no preclusion from him using that to protect himself even though somebody might be in that room is that fair to say?

MR. WASHINGTON: Objection, form.

Q. (By Mr. Kosanovich) Or does he have to wait to get shot and say I couldn't return fire because there was somebody else in that house?

MR. WASHINGTON: Objection, form.

A. I don't think he has to wait to get shot but he might be able to have an alternative action, such as stepping out of the way. See the, one of the difficulties in answering your direct question and I'm not trying to be evasive trust me I'm not, when you have Casanova testifying oh Snowden had the gun in his hand one time, and then oh, he's reaching for it in his waist another time and you have two eyewitnesses that says there was no gun, I mean, that's going to be a jury decision ultimately, because we know that on the criminal case, which has a higher standard, he was acquitted. Snowden was acquitted of having a gun.

Q. (By Mr. Kosanovich) Well, but you'd agree with me then Doctor, that that same tension exists for anybody else who reviews this case that you have the

faction that says, well he had a gun, that would be Casanova and you have the faction that says he didn't have a gun, there's tension there, isn't that correct? That you have two different stories, fair to say?
A. You may have more than two.
Q. Could have five, could have three, correct?
A. At least.
Q. Okay. So my question is for the policy violation you're saying that occurred, you would have to discount Casanova's contention that there was a gun and accept the fact that there was no gun, isn't that fair to say?
MR. WASHINGTON: Objection, form.
A. Well, which version of Casanova do you want me to use for that?
Q. (By Mr. Kosanovich) Well, sir, you'd agree with me that Steve Casanova is part of the investigation, part of the criminal investigation, gave a statement, correct?
A. Yes.
Q. And he wasn't even required to give that statement, correct?
MR. WASHINGTON: Objection, form.
A. He could've plead the fifth.
Q. (By Mr. Kosanovich) Okay. So when the

department has his version of events, that's his version of events, correct?
A. Right.
Q. Okay. So my question is you have another version of events that's in tension with that that's in conflict with that, that would be Mr. Snowden and Ms. Singleton, correct?
A. Correct.
Q. So and if Steve Casanova believed that there was a gun, and he was in fear of his life 'cause he sees this gun he says it's coming up being drawn whatever?
A. Well, no, we're not going to whitewash this whatever. I'm not going into that trap counsel, I'm sorry.
Q. That's fine.
A. 'Cause I know you're going to -- in a trial or in a motion. If I answered questions like whatever, you would strike as nonresponsive. I'm not trying to be difficult, I'm just putting on the record, I'm not wading into that trap.
Q. Understood. So I'll make it even cleaner for you, Steve Casanova says that he was reaching for the gun.
A. Okay.
Q. Okay. That is completely in conflict with what

Mr. Snowden said because he said he didn't even have a gun, right?
A. Correct.
Q. So based on Steve Casanova's viewing of what he saw and from his perspective and what his version of events were, okay, can you conclusively state that there would have been a policy violation per the SAPD?
A. I would say there's still a policy violation because if he's reaching for it, that means you have time to get out of the way. And if it was in his hand, instead of saying show me your hands, like he said, it would've been drop the gun. Why would you want to have somebody show you their hands if they're pointing a gun at you? That makes no sense. I mean, logically, that makes no sense.
Q. That's not in your report though is it about this whole logically?
A. I think I have something in my report about him saying it was pointed at him. Snowden testified or I'm sorry Casanova testified on page 245, lines 9 to 11, it's also on the video audio that Snowden had taken two steps toward me and then he kind of went to the side and he was like lifting his shirt. Another version from Officer Casanova had Mr. Snowden holding a handgun inside his hand, that's on page 246, 21 and 22, and then

a third version, I saw Mr. Snowden pulling a weapon from his waistband which is why I fired my weapon on page 276, nine to 10.

Q. So, you'd agree with me that that's deposition testimony, correct?

A. I assume Casanova told the truth.

Q. Okay. Well, but my question is was that deposition testimony given to the SAPD to make a determination about this shooting incident or that occurred one, two years afterwards, sir?

MR. WASHINGTON: Objection, form.

A. Well, it occurred afterwards but a good investigation would've surfaced that through a cognitive interview.

Q. (By Mr. Kosanovich) So are you claiming that the interview of Steve Casanova was defective?

A. I think the whole investigation was defective.

Q. Okay. Is that in your report that you claim that the entire investigation was defective?

A. Let me find it for you. On page 20 the very last sentence says the content analysis of this several hundred page report identified misinformation, lack of follow up interviews with Officer Casanova, inherent bias toward non-police officers, and a general failure to conduct a thorough and impartial investigation over

policy violations were identified. So yeah, I did say that.

Q. Okay. You say a content analysis of the several hundred page report identified misinformation, correct?

A. Right.

Q. Lack of follow up interviews of Officer Casanova, inherent bias towards non-police officers and general failure to conduct a thorough and impartial investigation where policy violations were identified?

A. Right.

Q. Well, what was the misinformation that officer Casanova gave?

A. Well, again I would have to go back and look at that report because it's a huge report but I think any time you have multiple versions of what took place, you need to pin those down.

Q. Well, I'm talking about Officer Casanova are you claiming he gave multiple versions of what occurred to the SAPD investigators?

A. No, what I'm saying is what he initially described, they have evidence or should've had evidence that didn't support that entirely. So you bring him back and you clarify and you get more interviews.

Q. Well, was he required to come back and give

that information?
A. If it's under Garrity, he would be compelled to make a statement.
Q. Well, but my question is, what misinformation did he give initially?
A. It's probably up front. Okay. One thing on page 11 under multiple misleading versions, Casanova was told by Ms. Herrera that the suspect was bald, but Casanova provided the statement to investigators that Snowden had short hair that matched the description of the suspect.
Q. Anything else?
A. At one point he said Snowden's back was turned, he was off to the side of me, another time Officer Casanova said Mr. Snowden was moving fast as he went toward the back of the residence and then he said Snowden was running in the opposite direction of him. And then another time he said Snowden was walking and not running toward the back of the residence. Snowden said, or I'm sorry Casanova said Snowden had taken two steps toward me and then he kind of went to the side like he was lifting his shirt and then in another version he said Snowden was holding a handgun inside his hand and another version I saw Mr. Snowden pulling a weapon from his waistband. I mean, that's enough to

bring in the shooter and say we got to pin this down. You know, which is correct here.

Q. All of this stuff that you just discussed with me sir was taken from his deposition, isn't that fair to say? I'm not trying to mislead you, but all this stuff you just quoted to me?

A. Right.

Q. Okay. But I asked you, what misinformation had he provided during the investigation?

A. And I said, I would have to go back and specifically reread that.

Q. Well, but what you're telling me and you're reciting to me, all that stuff you just told me, was taken out of his deposition testimony, correct?

A. Right.

Q. And that was parched out by you correct?

A. I didn't parch that out. I read the deposition and parched that out, I thought you meant did I take the deposition, no.

Q. Okay. So, but my point, my question was you said that there was misinformation provided to the SAPD 'cause you were critical of their entire investigation, I've asked you what misinformation did Officer Casanova provide in the investigation?

A. And I told you I'd have to go back and reread

that.

Q. What about any of the other officers out there that night who were with him, what misinformation did they provide in the investigation?

A. Again, I would have to go back and look at it.

Q. Well, I'm asking this question because I think you said it was on page, there was a lack of follow up interviews of Officer Casanova?

A. Right.

Q. Correct?

A. Right.

Q. Okay. Well, how many interviews do you subject a police officer to in an OIS shooting, officer involved shooting?

A. Until you get all the facts.

Q. Okay. Well, what facts did they not have?

A. Well, again, you're asking me to disprove a negative. I don't know what facts they don't have because they never got them. But I would go back and march him through it, look we've got Singleton who said after Snowden got shot, he stayed on the floor trying to stop the blood flow. We've got Casanova saying he's running to the back bedroom area. Well we need to get that reconciled.

Q. Okay. And but my question on that is, that all

occurred after the shooting, correct?
A. Everything on the internal investigation occurred after the shooting.
Q. But what I'm asking though sir is you said there was a lack of follow up?
A. Right.
Q. Okay. So what lack of follow up wasn't done for the interview with Steve Casanova? You're telling me and I'm not trying to be disrespectful and I'm going to summarize kind of what you told me is like I don't know because the questions weren't asked. I'm asking you as the expert, what was it that they should've gone back and asked him?
A. Well, as the investigation grew, in other words as you interview more people and you come up with conflicting information you go back and ask him to provide information regarding those inconsistencies.
Q. Okay, what inconsistencies were those?
A. I just went over some and you have a detective who says he was reckless so you go back and you would ask him, say tell me why, how this went down again.
Q. How many times have you ever gone back and re-interviewed an officer who has been involved in an officer involved shooting and ask them follow up questions?

A. I haven't, but I've read reports where they've done it several time.

Q. Well, and no disrespect to you then sir, how does that make you an expert in the field?

MR. WASHINGTON: Objection, form.

A. Well, if you look at my CV, I've taken numerous OIS investigation courses. I specialize in knowledge not in field. I've done internal investigations not necessarily on OIS. I've looked at a couple dozen OIS shooting cases and had to go back and reconstruct those, so I have specialized training, I have specialized knowledge in that area, and I've done IA's, so questions are questions.

Q. Well, okay, go ahead, I didn't mean to cut you off.

A. And investigations, I've had courses on criminal investigations, I've had it on specialized what I'll call noncriminal investigations and when you have conflicts, I don't care if you're in criminal or in civil, doesn't matter you have to go back and get those straightened out. You're always going to learn additional information in your investigation that you will probably have to go back and get clarification of or more information.

Q. But you've never done that so how can you say

that?
     A.  Investigations are investigations and if I'm an investigator and I have a hole in an investigation and I have a witness who I think can plug that hole, I'm going to go back and talk to that witness.
     Q.  You say I, I and you're referring to I'm going to go back and do that but you've never done that?
     A.  I haven't done it an OIS.  I've done it in other investigations.
     Q.  Okay.  But you --
               MR. WASHINGTON:  Mark, your questions are becoming repetitive and becoming a little argumentative. I mean you've asked him that, I mean, I'm just be honest, I'm trying to let you go with this, but you've asked him that multiple times and it's getting a little argumentative.  Well, quite frankly a little insulting to his, a professional like him and his background, so.
     A.  Maybe I can summarize it this way, any investigator who has a gap in an investigation wants to fill it.  The same as a lawyer, if you do a deposition like we're doing today and there's a gap, you want to try to fill it.  Well, when you have the witness at your disposal for the most part you would bring that witness back and try to fill that gap, try to get more clarification maybe.

Q. Okay. So and I understand this and I'm not trying to be insulting to you so I don't want you to take it that way, you're telling me about this investigative technique, and I'm asking you about this specific investigation, what question should Officer Casanova have been brought back in and asked?

A. To talk about the discrepancy of information that might have been learned through the investigation. To get more clarification on what Mr. Roundtree was or wasn't doing. I mean, basically we have a homicide. So you have a criminal investigation should be going over here on the homicide and this is only for policy here. So we want to get enough information so we can look and compare the actions of the officer against the policies then if we do an administrative investigation, which is slightly different, we're going to go back and compare that to the training and we're going to compare it to the field training officer program to see if there's any inconsistencies there.

Q. Okay. Sir, you've had a 700-plus page report or documentation, I think that was what was provided to you?

A. It was big.

Q. Right. Okay. So, and I want to drill down and I need specifics, you've talked and given me some

generalities, I'm asking you what discrepancy was the SAPD required, according to you should've been brought back in -- investigators brought back in -- the investigators brought Casanova back in and specifically questioned him about?

A. Well, one specific would be to take him to the crime scene. He said he never went to the crime scene. Take him to the crime scene, walk him through it, have him explain it.

Q. Okay. Anything else? I'm talking about, you said there was a discrepancy and I don't know if that was a discrepancy. Not trying to be argumentative. One, take him back to the crime scene?

A. Yeah, take him back to the crime scene and out of those 700 pages, I would have to go back and look for specific discrepancies that you'd want to reconcile or the lack of information that you didn't get the first time. It's not always about discrepancies, sometimes you don't think to ask the question because you didn't know that question should've been asked.

Q. So if I, again, if I'm understanding your testimony correctly you can just tell me that he should've been taken back, but you can't provide to me any specifics of questions that he should've inquired about and asked about as you sit here today?

A. Well, taking him back to the crime scene you would ask him questions about specifics.

Q. What discrepancy was there that needed to be gone over with Officer Casanova?

A. Again, I would have to go back and look at that big document.

Q. What about the witnesses? What witnesses should've been re-interviewed? That's not in your report 'cause you said re-interview or bring in Officer Casanova but I'm going to be fair here, I think I'm being fair, what witnesses should've been brought back in and re-questioned?

A. Well, you can't obviously re-question Mr. Roundtree, he would've been a witness to part of it. Singleton I thought they asked some fairly good questions and she said there was no gun and she was sitting there. Unless there's something that said she's changing her testimony on that, probably no reason to bring her back. And Snowden, he was in jail for nine months or thereabout and you had a criminal case where you know, I'm sure he was asked a bunch of questions on the stand.

Q. Okay. Anything else that should've been brought, asked about witnesses, I need you to identify for me witnesses that should've been brought back in and

re-questioned?
A. I think any of the police witnesses that were there and there weren't that many, but I would say any inconsistencies, you know, if I said the sky was blue and Mr. Denton said it was gray, well we both may be right 'cause we both may have been looking at the sky but different parts of it. That's an inconsistency, so you just bring it in, you ask the question. It doesn't mean that somebody's lying, doesn't mean that anything other than, here's what I saw, here's what he saw, and the investigator's got to try pull that together.
Q. What evidence do you have, facts do you have that any investigator wither the administrative review of the case or the criminal investigator skewed the investigation to assist Officer Casanova?
A. Well --
Q. Intended to do that?
MR. WASHINGTON: Objection, form.
A. I think I have that in my report. Well, I'll give you a couple examples, phone weren't secured, they weren't obtained, we've already talked about that, but in a criminal investigation that would've been done.
Q. (By Mr. Kosanovich) Anything else?
A. That's a big one right there. I think, I don't think Mr. Snowden or I'm sorry, Officer Casanova was

treated as if he were a criminal suspect.
Q. I'm sorry, can you please repeat that?
A. Yeah, I don't think Officer Casanova was treated as a criminal suspect during a criminal investigation.
Q. Okay. So, how should he have been treated?
A. Just like everybody else.
Q. So, go ahead.
A. Given Miranda rights, he has an opportunity to have a lawyer present, go through and ask him the questions and make it an investigatory type criminal investigation.
Q. Do you know whether or not he was given a Miranda warning?
A. I'm sure he was, he should've been.
Q. Okay.
A. But I don't know for a fact.
Q. Okay. Do you know whether or not he was afforded the right to have an attorney present?
A. I'm sure he was that, too.
Q. Do you know whether or not he was questioned that night?
A. I don't believe he was questioned that night.
Q. Well, he wrote a statement, correct?
A. Right.

Q. Do you know whether or not he was questioned that night by the detectives conducting the criminal investigation?
A. I would have to go back and look at the date.
Q. Are you saying in any way, I just need to understand that Officer Casanova should've been put in handcuffs and taken down to the substation or to the police station?
A. No, he shouldn't have been handcuffed.
Q. Okay.
A. But he should've been taken down to the substation, he should've had his firearm removed and given time to obtain counsel if he wanted it. Usually in these cases it's not recommended you interview the person right away because their memories not that clear. The science on interviewing is usually within 42 or 72 hours.
Q. You mean 48 or 72?
A. I'm sorry, 48 or 72 hours because the science shows that your memory is more clear, taking you back to crime scene also enhances the memory.
Q. Well, is it your, are you critical of the SAPD because they treated him differently than they treated the other, the two, Mr. Snowden?
A. Yes.

Q. Mr. Snowden was taken to the hospital, correct?
A. Right he was.
Q. Okay. Ms. Singleton was taken downtown, correct?
A. Right.
Q. And she was taken downtown in handcuffs, correct?
A. Right.
Q. Are you critical of that?
A. I don't know why she was put in handcuffs. It may be the policy that everybody gets in the car gets handcuffed. I don't really have a problem with that because I've done that, too.
Q. I need to understand because I'm trying to draw the distinctions here, are you saying that Officer Casanova should've been taken downtown in handcuffs?
A. No, I've already answered that.
Q. I thought that's what you testified to. And he should've had his gun taken away?
A. Right.
Q. Okay. And if he did would that have been okay for the police department to take his gun away that night?
A. Absolutely.
Q. Okay. And he could've refused to answer

questions, correct?
A. He could have.
Q. He was provided counsel?
A. On the criminal side he could have.
Q. Okay. He was provided counsel, correct?
A. Correct.
Q. So, how is that, how would that be showing bias if they did all that, how would that be showing bias to Officer Casanova?
A. The bias comes from leading questions, not considering him a criminal suspect.
Q. Okay.
A. I had something else in here about that. The officers were allowed to walk around the crime scene. You wouldn't do that in a criminal case. On page 13 of my report, it said that Officer Casanova was not viewed or investigated as a criminal suspect. That in and of itself is a pretty big deal. Witnesses and suspects are cared for and kept separated. And that's a procedure 705, officer involved shooting as custodial deaths. So I think we've covered most of it without going back and going through that big report?
Q. Sure.
A. And identifying specifics.
Q. You said he was not viewed as a criminal

suspect?
A. Right.
Q. What facts do you base that on?
A. Because of what, go back to page 13, well number one they were, the officers got together, they walked through the crime scene, he didn't have his phone taken which would have been something common in a criminal case, he was asked to give one statement to investigators.
Q. Okay. Sir, was that apart of the criminal investigation?
A. Yes, that was part of the criminal, I thought that's what we were talking about.
Q. Right. So and perhaps I'm confused you said that he should've been taken back to the scene and allowed to walk through it to ask him questions about it, correct?
A. Right.
Q. They did it that night, how does that differ?
A. Again following cognitive interviewing and following the science, you would take the person back two or three days later.
Q. Okay. Well, is there any mandated policy that the SAPD had to do that follow that timeline?
A. No, they didn't have to.

Q. Okay. Well, but he was not viewed as a criminal suspect, if he was read his Miranda rights okay, that indicates you're kind of under criminal investigation, right?
A. You're under criminal investigation.
Q. And you don't know what questions the investigators asked him do you?
A. I don't recall seeing those.
Q. Okay. Do you know whether or not the investigators who questioned him were conducting an administrative review or a criminal investigation that night?
A. They should've been conducting a criminal investigation.
Q. Okay. So, if he was questioned that night what else should he have had done to him that night and if he cooperated?
A. Well, he did cooperate.
Q. Okay. I just wane to get that out there. You're not saying he didn't cooperate in any way?
A. No, as far as I know he cooperated as Ms. Singleton cooperated.
Q. So, my question is, what else should they have asked Officer Casanova that night that they didn't?
A. Well, since I haven't seen the questions they

asked, I don't fully know. My reports focussing on the internal investigation. I'm just saying that based on what's in the reports, they treated differently. Normally police officers, unless it's something really really out of line, the investigators are biased toward the officer, they believe the officer. I was in class last month and two criminal investigators told the whole class, we don't believe suspects, but we believe our officers, we put precedence on them.

Q. Do you know whether or not on the night that Officer Casanova was interviewed that Detective Perez, Detective Hines held a belief, we're going to believe what Officer Casanova says and we're going to disbelieve or sway this one way or the other, do you have any facts to support that, sir?

A. No, in fact I have something a little opposite where Hines said Casanova was reckless.

Q. Okay so in relation to Sergeant Luza, did you have any facts that, hey I'm just going to believe what Casanova tells me and I'm just going to disregard what anybody else, do you have any facts to support that?

A. No.

Q. Okay. So you say in your report there's an organizational culture and unwritten ground rules, you see that on page 12?

A. Yeah, I'll get there. I know what I said but I'll get there. Okay. I'm there.
Q. What unwritten ground rules does the SAPD have, are you making that allegation in your report in any way?
A. Well, you have officers using a personal cell phones to text and make calls, and you have officers gather to discuss the event, you have officers walking through crime scenes. Most of that's against police department policy and that would be the unwritten ground rules. You have your formal policy that you want the public to believe you follow and then you have your unwritten ground rules of what actually takes place.
Q. Okay. Well, you said that they walked through the crime scene, correct?
A. Right.
Q. Which officers walked through the crime scene?
A. I think they all did at one point. The ones who were there.
Q. Okay. Well when can an officer not go back if you're at the scene and you're there, wouldn't you necessarily be part of the crime scene?
A. You are part of the crime scene.
Q. Okay. So what did they walk through that destroyed or altered evidence?

A. Well, we don't know that for a fact because the crime scene wasn't preserved so we don't know what was altered.

Q. Okay. Well, sir, I understand what you're telling me is that you don't know, are you in any way contending that anything was altered or destroyed because the officer walked through the crime scene or there was any evidence lost because somebody walked through the crime scene?

A. I don't know if there's any evidence lost, but Ms. Singleton described Mr. Snowden as trying to stop the bleeding which means he was in that room. As far as I know, he was in that room. So if he was trying to stop the bleeding and he was shot in the buttocks how could he have gotten up necessarily and tossed a gun out a window if he never left that place. But there's a gun found outside in the grass.

Q. So my question, go ahead.

A. So if you stop, if you don't let people go through the crime scene other than EMS to treat somebody because Casanova said I didn't go back in and help anybody because nobody was screaming, well if nobody went in there then you've got three people, one shot, one dead and one petrified probably from all this. How'd the gun get outside?

Q. Okay. The question is, somebody could've been lying, right?
A. Somebody could've been.
Q. And it could've been Ms. Singleton, correct?
A. Could've been.
Q. And it could've been Mr. Snowden?
A. Could've been.
Q. So let's get back to walking through the crime scene --
A. Or it could've been Officer Casanova.
Q. Okay.
A. Let's not rule out the other suspect.
Q. Well, let me ask you this, where did Officer Casanova walk through the crime scene and disturb any evidence?
A. I don't know where all he walked.
Q. Okay. What about Officer Panah, when did they walk through the crime scene? I just need you to identify for me anybody from the SAPD who you're claiming walked through crime scene inappropriately and disturbed evidence, who was that?
A. After the crime scene's pardoned off, criminal investigators can go through that. There forensics people can go through that. They're going to have to walk through it. They just are.

MR. WASHINGTON: Objection, nonresponsive.
A. That's responsive.
MR. WASHINGTON: He answered your question, Mark.
A. You said who could walk through and who couldn't.
Q. Okay. In this case, I think my question was, maybe I'll clarify it, who walked through the crime scene and disturbed evidence improperly? I'll make it more specific.
MR. WASHINGTON: Objection. Hold on, Dr. Peters.
MR. KOSANOVICH: Go ahead.
MR. WASHINGTON: Objection, form, calls for speculation.
A. I don't know.
Q. (By Mr. Kosanovich) Okay. So, you said that there's an unwritten ground rule about personal cell phones, what's that? Because I asked you about what were the unwritten ground rules and you mentioned something about personal cell phone use correct?
A. Yeah, you have on body work, you video of them of Snowden using a cell phone.
Q. Okay.

MR. WASHINGTON: Casanova.
A. I'm sorry. Casanova, I'm sorry.
Q. (By Mr. Kosanovich) Is there a policy that says that officers cannot use their cell phones?
A. I would have to go back and look at that whole policy manual.
Q. Well, you're saying there's an unwritten ground rule okay, and I'm asking you what's the ground rule, that the SAPD says that officers cannot use their personal cell phones but they in fact do use them?
A. They do use them and they're not collected as part of evidence.
Q. Okay. Well, is there a SAPD policy that says no matter what in a criminal investigation you have to collect everybody's cell phone?
A. I would have to go back and look at the policy.
Q. Well, you've indicated to me that you've worked with a bunch of different police departments and you've done a lot of OIS investigation reviews, correct?
A. Right.
Q. Okay. Do you of any police department in the United States that requires everybody who's been involved in an officer involved shooting that all of their, by policy every one of their cell phones is actually retained and taken into evidence by the police

department?

A. Only --

MR. WASHINGTON: Objection, form.

A. Only if the cell phone was used during the event.

Q. (By Mr. Kosanovich) Okay. Which department requires that?

A. I think LAPD requires it, I think Las Vegas metro requires it, I think North Las Vegas requires it, I know North Las Vegas requires it, fire department requires it, so there are policies out there to that effect.

Q. Okay. But is there any requirement that the police department hadn't placed a policy that said, no matter in a criminal investigation even if the phone's been used as part of the incident that it had to be collected? Is there any national standards that says that has to occur?

A. I don't believe there's a national standard no.

Q. Okay. Well you've referenced national standards in your report, correct?

A. In certain areas.

Q. Okay. So there's no national standard on that?

A. No, Mr. Denton and I talked about national standards regarding force.

Q. Okay. And is there, do you have any evidence or facts that support that officers are not allowed to talk to one another after a critical incident occurs?
A. It's in the policy.
Q. Okay. It says no matter what, they can't talk to one another afterwards?
A. I think I actually quote that in my report, give me a minute. On page nine of my report.
Q. What policy number is that, sir?
A. 705.05e, point two.
Q. Okay.
A. Officer shall refrain from discussing the facts of the incident. Okay.
Q. Do you know whether or not, sir, that policy is qualified that relates to the officer who is guarding or watching the officer who's been involved in the shooting incident?
MR. WASHINGTON: Objection, form.
A. I don't know.
Q. (By Mr. Kosanovich) Well, that would make a difference wouldn't it?
A. Not when the officers get together and talk.
Q. Okay. Well, you're talking about a violation of the policy because the officers talked to one another, do you know as you sit here today whether or

not that policy applies to all, all officers who are at the scene or that just applies to the officer who was assigned to guard the officer after the incident occurred? Just asking the question, do you know that one way or the other, sir?

A. I don't.

Q. Okay so let's move on. In relation to -- do you know what information was forwarded to the district attorneys office in relation to Officer Casanova?

MR. WASHINGTON: Objection, form.

A. I don't think I received anything on a criminal -- what was forwarded -- I have some statements. I have a prosecution guide that I reviewed from Perez, I don't know if that's what you're referring to.

Q. (By Mr. Kosanovich) I think my question was more general, do you know what information was forwarded to the district attorney's office?

A. No, I don't think I do.

Q. In regards to Officer Casanova?

A. I don't believe. I don't.

Q. Do you know whether or not there was ever a grand jury review of Officer Casanova?

A. No, not sitting here today.

Q. Okay. Do you know what information was

presented to the grand jury or if information was presented to a grand jury in relation to Mr. Snowden?
MR. WASHINGTON: Objection, form, calls for speculation.
A. I don't know.
Q. (By Mr. Kosanovich) Okay. Do you hold a contention in any way, do you have any facts or a contention that the SAPD detectives in any way who were involved in any aspect of this case forwarded false or misleading information to the district attorney's office?
A. I don't know what was forwarded.
Q. Okay. Well, do you have any facts or contentions as you sit here today that they provided false or misleading information to the grand jury if that in fact occurred?
MR. WASHINGTON: Objection, form.
A. I don't.
Q. (By Mr. Kosanovich) Okay. Same thing for Officer Casanova, do you know whether or not, do you hold a contention in any way that any information was falsely or improperly provided to a grand jury in relation to Officer Casanova?
A. I don't have any transcript of that.
Q. Okay. Well do you have it, do you have a

contention of that in any way?

A. Well, grand jury is generally one-sided. Only the prosecution presents in most jurisdictions so in that regard it's probably somewhat of a one-sided presentation.

Q. Okay. Well, but that's the district attorney's office, correct?

A. Yeah, the DA would be the one to do that.

Q. Well, do you have any facts or do you hold a contention, I need to know whether or not false information was provided to the district attorney's office for a review by a grand jury of Officer Casanova's conduct?

MR. WASHINGTON: Objection, form.

A. I don't have anything to point to.

Q. (By Mr. Kosanovich) Okay. So in relation to reviewing Officer Casanova's conduct, do you know whether or not he was ever criminally reviewed for his conduct?

A. Criminally reviewed by?

Q. Anybody.

A. Well, somebody had to review it they did a criminal investigation, so.

Q. Okay.

A. I would think somebody would look at it.

Q. Did you hold a contention or you hold any, have any facts, any beliefs, any expert opinions that any detective or investigator forwarded or intentionally mislead the district attorney's office in relation to either Mr. Snowden's investigation or in the investigation into Officer Casanova that was eventually sent over to the district attorney, if it was?

MR. WASHINGTON: Objection form.

A. I don't think I have that information.

Q. (By Mr. Kosanovich) Okay. Well, do you have an opinion one way or the other?

A. Not knowing what was sent over, I mean we certainly have a homicide of an unarmed person so I don't know what was sent over regarding that or what the district attorney's thought process was in declining to prosecute for say manslaughter.

Q. Have you seen Mr. Brattn's review of this case? The city's expert witness.

A. I saw Ortiz, I think his name was. But I don't think, I don't recall Brattn by name. I don't think it's on my list.

Q. Well, I have to ask the question for purposes of clarity, do you any criticism or opinions about his opinions?

A. Who, Brattn?

Q. Yes.
A. I don't think I saw that document.
Q. Okay. In your report on page 13, you say they've applied two investigation standards, one for civilians and another for police officers that falls below generally accepted police investigation practices and shows favorable bias towards police officers. You see that?
A. Right.
Q. Well, there are two investigation standards okay, what's the standard for civilians?
A. Standards for civilians be to separate them, not let them converse, you would have a standard of collecting all the potential evidence at the crime scene. That was used or thought to be used and the perpetration of possible crimes or criminal activity.
Q. Anything else?
A. That's pretty much it.
Q. Okay. So that's, so you're talking about two different standards are those criminal investigation standards?
A. That was your question.
Q. Right. Well, in your report are you saying there are two investigation standards, are those criminal investigation standards?

A. They can be criminal or they can be internal affairs.
Q. Okay. So for the criminal investigation are you saying there's a different standard for police officers then?
A. Usually the way police officers are treated in the beginning and oftentimes leading questions are asked to police officers such as, well you were in fear of your life weren't you. You never hear that with criminal suspects.
Q. Well, do you know if there were leading questions asked to Officer Casanova?
A. I haven't seen the questions that were asked of him.
Q. Okay. And you mentioned, you collect all the evidence being the cell phones, correct?
A. Cell phones, purses, if somebody was carrying a purse for example.
Q. What other evidence wasn't collected by the officers. The detectives that night besides the cell phones?
A. I don't think they took the rifle or the ballistic vest that Officer Casanova put on.
Q. Okay. How would that be relevant to the investigation?

A. Well, first of all to make sure it's department issued property and it's not personal property. Or if it was personal property that you had a waiver to use it.
Q. What else didn't they collect besides that?
A. And you would use that for a whole set of questions regarding that. You know, why'd you put it on why'd you think it was necessary.
Q. Anything else that they didn't collect?
A. No, I think we've covered that this afternoon.
Q. All right. And in your report you talk about, it says in here, again for purpose of brevity, the City of San Antonio, its leadership, police leadership failed to conduct a thorough and objective internal affairs investigation into the fatal shooting of Mr. Roundtree.
A. What page you on counsel?
Q. I apologize, page 20.
A. All right. Thank you. Did you say 10.
Q. Twenty.
A. Oh, 20, sorry, I misheard. Okay. I'm with you.
Q. It says result, the shooting of Mr. Roundtree, the shooting of Mr. Snowden and the seizure of Ms. Singleton, it appears will result in the ratification of Officer Casanova's outrageous conduct which falls below

internal investigative standards, recommendations and guidelines, correct?
A. Right.
Q. Okay. So what standards are you referring to?
A. Investigator should ask detailed questions, should try to get and collect all the evidence. Which would include the cell phones, text messages, video, audio, you know, anything that, that would be out there. And I'm just looking for the statement about that that Casanova made, to illustrate it. Now on page 13 in my report, the second to last paragraph at the bottom of the page, said Officer Casanova testified he was not asked to return to the crime scene was not asked for his personal cellular telephone, was not asked for his cellular and texting records, and was not asked detailed questions about what happened.
Q. Okay. Well, let's break that down. You said you, you don't -- he said he wasn't asked detailed questions about what happened?
A. That's right.
Q. Okay. Well, what would he considered to be a detailed question?
MR. WASHINGTON: Objection, form.
A. I don't know you would have to ask him.
Q. (By Mr. Kosanovich) Okay. And this was

provided, this information was provided at his deposition, correct?

A. Correct.

Q. Okay. So, I guess I'm going back to it, it says falls below internal investigative standards, recommendations and guidelines. What fell below an internal investigative standard and where's that standard located that I can go and look at?

A. I'll have to get you the text. I can get those for you and I'll be glad to provide those through counsel. You do ask detailed questions, you get all the information, you collect all the relevant evidence that was at the crime scene that you believe might have been used during the event. So those, I mean that's the standard evidence collection. Those are things that you would normally get.

Q. We've gone over this several times different ways so the thing that they didn't get was the cell phones?

A. Right.

Q. Okay.

A. Cell phones, texting, according to him they didn't ask detailed questions.

Q. Okay.

A. I mean that's a good.

Q. Okay. Well, and we don't know what was in any text message. You can't tell us one way, we've gone over that a couple different times, correct?
A. Right.
Q. So what else is there? Anything else?
A. Again, I think it's just the manner of a non-detailed thorough line of questioning.
Q. Okay. And so then you say, which falls below internal investigative standards, recommendations. What do you mean by recommendations?
A. The IACP, per a number of advocacy groups, put out recommendations on how to conduct internal affairs. Other organizations put out things on how to conduct internal affairs investigations. So there's several bodies and treatises out there providing guidance on how you do this. There's cognitive interviewing classes you can take, that talk about how to go about asking people questions to elicit more detailed -- I mean, there's a number of things out there so.
Q. Well, recommendations, that's what it is, a recommendation, correct?
A. Right.
Q. There's no requirement that the SAPD follow any of those recommendations from any of those think tank groups, correct or?

A. Correct.
Q. Okay. Trade groups, whatever you want to call them.
A. Right.
Q. I don't know how you describe them. How would you describe them? You tell me?
A. I call them advocacy groups for their own purpose.
Q. Okay. So, they're advocacy groups. So, and then you say guidelines, what guidelines has the SAPD not followed? That it was required to follow.
A. I don't, unless the state of Texas has something mandatory, there wouldn't be any guidelines that they must follow. But there are guidelines given in OIS courses on how to investigate, there's checklists, there's a number of things collecting evidence that have been publishes and are out there.
Q. Okay. Well, but his, do you know whether or not any SAPD investigation technique guideline has ever been deemed to be unconstitutional?
A. I'm not aware of any.
Q. Violated any law?
A. Not that I'm aware of.
MR. WASHINGTON: Mark, does any of these questions have anything to do with the claims that are,

that we have pending against the city of San Antonio?

MR. KOSANOVICH: Yeah, it's in his report, yeah.

MR. WASHINGTON: The questions you're asking, it's my opinion, it's my understanding we're dealing with ratification claim?

MR. KOSANOVICH: Correct.

MR. WASHINGTON: I mean, your questions are just so far off what's contained in that memorandum of what the issues are. I mean, we can go through them if you're just wanting to kill some time, but I'm just trying to figure out, because I'm sure counsel's going to have some follow up questions and I have. I mean, I was clear about the 4:45.

MR. KOSANOVICH: I'll object to the side bar. I'll move it along.

MR. WASHINGTON: Wasn't side bar I was just talking about the time.

MR. KOSANOVICH: Okay. Well, it's on the record, so I object.

Q. (By Mr. Kosanovich) But if I'm looking at this, sir, because it says in here, it says and the seizure of Ms. Singleton, and I'm paraphrasing so move it along, that appears will result in the ratification of Officer Casanova's outrageous conduct and which falls below

internal investigative standards, recommendations and guidelines?
A. Right.
Q. Now, you wrote that?
A. I did.
Q. So, I've been trying to determine with you what specific guidelines the SAPD falls below?
A. Well, we can start with their own guidelines, their own policies. We've identified policy violations.
Q. Okay.
A. And Casanova said he's never been disciplined.
Q. Okay. So are you claiming it's a policy violation because he wasn't disciplined?
MR. WASHINGTON: Objection, form.
A. No, it's a ratification issue. It deals with, we've accepted this behavior, even though we know there are policy violations, we're going to look the other way.
Q. So, it's your testimony that they are ratifying bad behavior?
A. Yes.
Q. Okay. And specifically who ratified bad behavior?
A. The city and the police leadership.
Q. Okay. Specific names, sir?

A. Well, start with the chief of police.
Q. Okay. Provide to me all the facts you have that he ratified bad behavior? Just need to know those.
A. Casanova said he wasn't disciplined.
Q. Okay. Anything else?
A. Well, not being disciplined for policy violations generally translates into a ratification of that behavior. That's okay.
Q. Anything else, sir? Any other facts?
A. I think also the ratification of the investigators didn't get all the potential evidence that was available to them and apparently there was no --
Q. So --
A. -- on that.
Q. What evidence besides the cell phones, are you going to tell me the cell phone wasn't obtained? What other evidence didn't they get?
A. Text messages.
Q. Okay. Anything else?
A. I think those are the two big ones.
Q. Okay. So for the ratification you're claiming people ratified bad conduct or bad behavior, you've identified Chief McManus, anybody else?
A. Possibly the mayor depending on how the disciplinary process works in San Antonio. Sometimes

the mayor has authority to reduce or enhance or play a role in the disciplinary process.

Q. Okay. Are you making a contention in this lawsuit that the mayor of San Antonio ratified Officer Casanova's conduct?

MR. WASHINGTON: Objection, form.

A. No, I didn't specifically say the mayor.

Q. (By Mr. Kosanovich) Do you have any facts that support that, that he ratified his bad conduct?

A. No.

Q. Okay. So let's get back to your ratification argument or your ratification statement here --

MR. WASHINGTON: And just for the record, I think the mayor was a lady at that time.

Q. (By Mr. Kosanovich) If we had -- do you know who the mayor was?

A. I don't.

Q. Okay.

A. I may have known at one time but the name skips me.

Q. Okay. So you talked about the chief, anybody else?

A. Well, I'm sure the chief was last or almost last in the chain of discipline. Someone more than likely made a recommendation so that person would also

be included in the disciplinary loop.

Q. Well, do you know that as a fact or you just speculating on that?

A. Again I would have to go back and look at the IA file to see if there was a recommendation. I think there was, let me just look. I don't know if Perez would've been involved in that, however details of the investigation authored by him, I would have to go back and look.

Q. Anybody else, sir?

A. Not that I recall sitting here.

Q. Okay. Do you have any contentions as to what should've occurred with Officer Casanova post incident as far as discipline or any other thing that should've been taken in regards to him action that should've been taken in relation to him by the police department? What's your opinion on that? Do you have one?

A. Well, I think remedial training at a minimum. I mean he entered a person's property without probable cause. The detective said that the shooting was reckless or Casanova's behavior was reckless so I think there's enough there to at least put him into remedial training.

Q. Anything else?

A. Maybe include use of force review.

Q. Anything else?
A. I think that would be the minimal process.
MR. KOSANOVICH: Just give me a few minutes, and take a quick break and probably going to finish up here pretty soon.
THE VIDEOGRAPHER: We're now off the record at 4:16.
(Break in the proceedings.)
THE VIDEOGRAPHER: We are now back on the record at 4:28 p.m.

EXAMINATION

BY MR. DENTON:
Q. Dr. Peters, I'm going ask you a few more things and try to wrap this up. Let me ask you about the fees that you charge in this case, I'm a little bit confused, your report shows a deposition fee of $3,000, we paid $5,000 for today, what have you charged in this case to date?
A. I just looked at that and that's on the jump drive too $7,500.
Q. Okay. And that was in your original number. Why was it 5,000 today instead of 3,000 like I thought it was going to be?
A. Expenses.
Q. Which are?

A. Airfare, Las Vegas to here, short notice, about $900.
Q. Just actual cost then?
A. Actual cost.
Q. You weren't punishing us in some way?
A. Oh no, no, no, no. In fact when I get back you'll get a copy of all the accurate expenses so you'll know exactly where it went and if it's under that amount I'll refund you and if it's over the amount.
Q. That's what I understood. Thank you very much. What was the last law enforcement agency that you did training on use of force or any of its sub parts?
A. Oh boy, well I taught in the use of force seminar in May of last year in Las Vegas. And we had about 40 people from all over the country so we had quite a few.
Q. Is that the institute for the avoidance of in-custody deaths?
A. No, that was the Americans for Effective Law Enforcement.
Q. Okay. AELE, all right. The institute that I just referred to, is that a organization that you created?
A. Yes.
Q. That's a vehicle that you use for your

consulting and training?

A. Training for sure, some consulting and I use John Peters & Associates for consulting, too.

Q. All right. And the institutes, are you the primary employee there?

A. Yes.

Q. Are you the sole owner of it?

A. Yes.

Q. Okay. What I would like to ask you to do since we're running out of time and since I can't find your extensive testimonial history, I have the short one that's just like four years.

A. Right.

Q. I would like to ask you with counsel's permission to just find the longer one and just put a checkmark and provide me a copy with the ones that were cases involving either somebody reaching for a weapon or somebody reaching for something that was an object or whatever that turned out not to be a weapon.

A. Okay. I will look for that.

Q. And you don't even have to go back 25 years, you know?

A. I probably don't have records that far back anyway, so.

MR. WASHINGTON: How many years does the

rule require?

MR. DENTON: I think it's four.

MR. WASHINGTON: Four years.

MR. DENTON: I think we probably had that from him. I know he has the longer testimonial history which I believe we were provided. I think I've seen it.

MR. WASHINGTON: I'm not sure.

Q. (By Mr. Denton) I think I asked you about this before, do you recall what was the basis for Officer Casanova from his explanation about why he went to 217 Roberts, do you remember?

A. He was talking to a lady whose husband had just been punched in the mouth by a black male who was bald and to the best of my recollection, she didn't give a specific location other than it was in, I think he was in a car or something, any way he, it was right near that house so he went to that house.

Q. So you've been involved in doing law enforcement audits or agency audits or incident audits, correct?

A. Yes.

Q. To determine both the constitutional compliance and policy level compliance for agencies?

A. Mostly policy compliance.

Q. Okay.

A. Some constitutional.

Q. And here's what I'm puzzled by in this case, the fact that there is a disparity between whether the gentlemen is bald, whether or not you can see his head, whether or not he's got blue jeans on and so forth, tell me what difference that makes in this case, because the incident that we're talking about only lasted six seconds and my client got no opportunity to determine anything about whether it was the right people?

A. Well I would respectfully disagree that he didn't have an opportunity to determine because he saw who they were. And no one even in the video fit the description of what that lady said was the assailant.

Q. Okay.

A. It did go down quickly, I will give you that but again I think at 1 o'clock in the morning, you know, entering a property kind of without explanation or notice, I think caused the pacing to go pretty rapidly.

Q. Is it only relevant because of your contention that he intentionally opened the door?

A. Well, I think the door was opened, again I think you can't isolate it into individual cubes. I think you have to look at the totality of the circumstances and it was 1:00 in the morning, he didn't have a really good description of who this person was,

knocked on the door, again if your intention was to find out who was in there instead of saying hey, how y'all doing, I'm Officer Casanova from the San Antonio Police Department, can you tell me who all's here or something.

Q. Right. So, but you would agree that he didn't take any policing action against anybody until the shooting incident occurred?

MR. WASHINGTON: Objection, form.

A. Well, I think causing the door to open and reaching inside that's policing action to some degree.

Q. (By Mr. Denton) Okay. That was my question. And I think you said at the very beginning of my questions that you were not making determinations of credibility in this case, right?

A. Correct.

Q. And on the other hand, I believe that you have either said or written before that when you are investigating criminal activity you tend to take the feedback that you get from potential suspects with a grain of salt; is that correct?

A. No, I never said grain of salt.

Q. Okay. That you, in your history or your experience that when you were investigating suspects that you frequently got unreliable or false information?

A. Sometimes you do and sometimes you get pretty

accurate, depends on what the investigation is.
Q. Depends on whether or not you know your subjects and your snitches too right?
A. Yeah, that's apart of it. Sometimes a snitch can be pretty reliable. Other times their they're not.
Q. And a lot of whether or not you get true facts is whether or not the person has some potential culpability or exposure, right?
A. Sometimes that plays into the situation. I'm sure that played into part of this.
Q. You wouldn't expect Davante Snowden to tell you, somebody the truth about whether or not they had a firearm, would you?
MR. WASHINGTON: Objection, form.
A. I don't know anything about Mr. Snowden.
Q. (By Mr. Denton) Okay. Well, if he had a prior conviction and it was a felony for him to be in possession of a firearm, you wouldn't expect him to tell a police department, yeah I had a firearm would you?
A. Again, I --
MR. WASHINGTON: Objection, calls for speculation.
A. Yeah, I --
Q. (By Mr. Denton) And I'm not asking you for speculation, I'm asking that you as an officer who's

done investigations and teaches people how to do investigations if you'd tell a bunch of cops sitting in a room, well you should go ask him and see if he had a gun or not and if he says he didn't have a gun and there's no forensics on the gun that was found right there in the same house, you just have to take his word for it?

A. Well, I would certainly point that out and I probably would also point out, even though he didn't have, we don't have evidence that he had a hold of the gun, if he did have that felony conviction, it's likely he would possibly say that. I mean, people say all kinds of things to stay out of trouble.

Q. I thank you again for your patience, sir. Hope I have respected you. I'm sorry for some of the misunderstandings we had in the course of sorting through this.

A. That's just the nature of the animal.

MR. DENTON: I'll pass the witness.

EXAMINATION

BY MR. WASHINGTON:

Q. Dr. Peters, since I have short time, I just need to ask you a couple clarifying questions. I think counsel for the city asked you whether you opined in your report whether the city of San Antonio failed to

discipline Casanova for violations, you recall that question?

A. Yes.

Q. And you were looking for it, right?

A. Yes.

Q. I'm going to ask you to go to page 12 of your report?

A. Okay.

Q. Are you there?

A. Yes.

Q. And I want you to read the title of that first section.

A. Failure to discipline for policy violations.

Q. Does that clarify whether you had an opinion as to whether the city of San Antonio failed to discipline Officer Casanova for policy violations?

A. Yeah, it's the last sentence. Says no allegations of misconduct were brought against Officer Casanova.

Q. And in fact, can you read that first sentence what Officer Casanova testified to?

A. Officer Casanova testified that SAPD individuals told him that what he did during the incident was, quote, proper, unquote. And he was not reprimanded because of the incident that involved the

fatal shooting of Mr. Roundtree and the shooting of Mr. Snowden, parenthesis Casanova deposition 279, line 17 and 20.
Q. So, in your review of deposition transcripts, this is sworn testimony that Officer Casanova said that someone told him, right?
A. Right.
Q. So would it appear that the investigation, whatever internal investigation that the city of San Antonio conducted basically relied upon what Casanova told him and no one else?
MR. KOSANOVICH: Objection, form.
A. I think the weight of the evaluation, that would be true.
Q. (By Mr. Washington) And I'm going to point you to page 13 of your report and starting with Detective Hines testifying, 'cause I think you were asked several questions about that, and can you read what Detective Hines testified to?
A. This would be the fourth paragraph under opinion three, Detective Hines testified that civilians are not allowed to walk around the crime scene and that, quote, somebody would detain them or arrest them until we investigated exactly what happened, end quote, Hines deposition, page 11, line 25, page 12, lines one to

three. In contrast, Detective Hines said that generally officers who are involved in officer involved shootings are neither arrest or detained like civilians, page 12, line 10.

Q. Now, I want you to read the next paragraph with Officer Casanova because there's been quite a bit testimony about the cell phone and I want you to read what Officer Casanova testified to in his deposition?

A. Again on page 13, under opinion number three, Officer Casanova testified he was not asked to return to the crime scene, was not asked for his personal cellular telephone, was not asked for his cellular and texting records and was not asked detailed questions about what happened, Casanova deposition page 57, lines four and five, page 50, lines seven and nine, and page 53, lines 13 and 14. Shockingly, Officer Casanova was only asked to give one statement to investigators, page 55, line 23.

Q. Now when was asked, I think you was asked by counsel for the city that Officer Casanova voluntarily gave this statement but then Officer Casanova's own deposition testimony, he said that they did not ask him detailed questions about the incident, did I read that correct?

A. Correct.

MR. KOSANOVICH: Objection, form.
Q. (By Mr. Washington) Would you consider that to be a proper investigation of a incident that resulted in one unarmed person being shot in the buttocks and another unarmed individual being shot in the chest?
MR. KOSANOVICH: Objection, form.
A. No, it wouldn't be.
Q. (By Mr. Washington) What would you have expected to have been done in a situation like this?
A. As I previously testified today, I would've gotten all of that evidence, cellular, text, whatever it was and then asked very detailed questions about the incident and what the officer saw, didn't see, reacted, so on and so forth. I would ask why he went to the house. So on and so forth. And then I would have looked, I would have compared at some point his answers to the video see if there were any inconsistencies and then maybe brought him back for more detailed questioning.
Q. Now did you, there's been some questions asked of you about Chief McManus' statement that Charles Roundtree had a gun and that's basically why he was shot, do you recall that?
A. Yes.
Q. Do you recall in your review of the documents

that Chief McManus indicated who told him that?
A. I don't recall that he said anybody told him that, other than somebody told him that. I don't recall a name.
Q. And you're aware that the body cam footage came out shortly there after?
A. Right I -- and if I were the chief, I would've corrected my statement right after that because the body worn camera doesn't support the original statement made by the chief.
Q. So, and let me get this correct, if Officer Casanova did not tell that to Chief McManus, is it fair to say either that Chief McManus told the public a tale?
MR. KOSANOVICH: Objection, form.
Q. (By Mr. Washington) Or he was just covering for officers?
MR. KOSANOVICH: Objection, form.
A. If no one told the chief, then it would certainly appear that he was offering an explanation more than likely to suppress any civil unrest that the city might experience. I guess it could be that you know, he said that. He had some information obviously I mean he knew the person's name Roundtree, so he had something but I think retracting it was certainly important after the video got published.

Q. (By Mr. Washington) And I think you indicated that you were able to observe in the video that Officer Casanova was talking to other officers?

A. Yes.

Q. After the shooting?

A. Right.

Q. Were you able to hear everything that Officer Casanova was saying during his conversations with these officers?

A. No, I didn't, no.

Q. So it's possible he could've told them at that point that Charles Roundtree had a gun?

MR. KOSANOVICH: Objection, form.

MR. DENTON: Objection, speculation.

A. It's a possibility I don't know for sure.

Q. (By Mr. Washington) And at any time during your review of that video, did Officer Casanova tell anyone who arrived at that scene that he was the one that actually shot two individuals in that home?

MR. KOSANOVICH: Objection, form.

A. Not that I'm aware. When he made the announcement shots fired, it made it seem like they were receiving fire, not the other way around.

Q. (By Mr. Washington) But at any time during the review of any video footage, did Officer Casanova say,

and I'm talking on the night of the shooting or the morning of the shooting, did Officer Casanova say I shot Charles, I'm sorry Davante Snowden?
A. I don't recall that. I know he shot, he said I shot somebody in there. But I'm not sure at that point he knew who was in there.
Q. But it would be important, would you agree it would be important for him to let the officers know that he just shot two individuals because these are two individuals who need medical assistance?
A. Oh, yeah.
MR. KOSANOVICH: Objection, form.
Q. (By Mr. Washington) Was that done?
MR. KOSANOVICH: Objection, form.
A. No, as I recall, Officer Snowden, or Officer Casanova said that he didn't go in because he didn't hear anybody screaming.
Q. (By Mr. Washington) Now, do you have any issues that an outside agency other than the city of San Antonio Police Department did not conduct investigation of this shooting?
A. In today's environment third parties usually conduct the criminal investigation, be it the Texas Rangers in this case or neighboring department or what have you. That's usually what's done today to eliminate

any claim of bias or cover up or what have you.
Q. Last question, I think counsel mentioned to you and I was trying to get my arms around this, he said that the three conflicting stories that Officer Casanova gave came in his deposition do you recall that?
A. Yes.
MR. KOSANOVICH: Objection, form.
Q. (By Mr. Washington) And do you also understand that the depositions took place shortly after the shooting incident?
MR. KOSANOVICH: Objection, form.
A. Yeah, the dates weren't that far apart.
Q. (By Mr. Washington) Well, and the reason for my questions is, if there were three conflicting statements that Officer Casanova gave during his sworn deposition under oath, is there anything that prevented the City of San Antonio Police Department from saying we need reopen this investigation based on these three statements that were given during his deposition?
A. No, in fact --
MR. KOSANOVICH: Objection, form.
A. -- it happens very often when cases get reopened based on new evidence or conflicting evidence. I mean, we see that almost weekly now with DNA pops up and some guy gets arrested for murdering a young girl

from 40 years ago or in some cases inmates get released because DNA showed they weren't there, so you can always reopen an investigation.

Q. (By Mr. Washington) And it's your understanding that Officer Casanova did not turn over his personal cell phone is because the City of San Antonio did not ask him for it?

MR. KOSANOVICH: Objection, form.

A. That's correct.

Q. (By Mr. Washington) And do you know whether anyone conducted an internal investigation as to who told Chief McManus that Charles Roundtree had a gun?

A. I didn't see anything focussed on that.

MR. WASHINGTON: I pass the witness.

MR. DENTON: Nothing further.

MR. KOSANOVICH: One second please.

EXAMINATION

BY MR. KOSANOVICH:

Q. Do you know how difficult it is to obtain DNA or fingerprint evidence from a gun?

A. Well, I'm somewhat familiar with the process. It's going to depend on how much was there. It could also depend on the surface area.

Q. To follow up, to follow up with a couple questions from Mr. Washington, do you hold the

contention as you sit here today that the SAPD or the city of Antonio should open or reopen an investigation into Officer Casanova following his deposition?

A. Yes. We have a dead person here who wasn't armed and we have another person who was seriously injured where two witnesses said he wasn't armed and they didn't find a gun on him at the time. So, yes, who's responsible for the death of Roundtree. That's the question that has to be answered. Who's responsible? It's not Roundtree, he's dead. So if I'm in a department and I hear about a deposition that has variations of what took place I'm going to reopen that and try to get clarity.

Q. Okay. And so that's not included in your report though that they should've reopened the investigation is that fair to say?

A. It's not. That came up today during your question.

Q. So is that a new opinion you have?

A. That would be a new opinion that that deposition or that investigation should've been reopened.

Q. So, I need to ask you because this is the first time I'm hearing this, I didn't see this in your report, was, is it your contention, what facts are you telling

me were there that required this investigation to be reopened?

A. I think the statements made by Casanova.

Q. Okay. And so anything else?

A. I think the statements made by Casanova and the fact that Snowden was acquitted in his criminal case. I think when you combine those, there's enough reason to reopen and conduct more investigative inquiry.

Q. Okay. Where's that written down that that's standard or requirement that that should've been done?

A. I think any ethical, concerned police chief who really cares about his community after you have a dead guy who was not armed, wasn't engaged in criminal activity, and another person shot, out of respect for the family and for transparency in today's world would do that.

Q. Okay. Anything else?

A. No.

Q. Okay. So we have that and then you said something about that this should've been investigated by another agency?

A. Many states today require that when there's an officer involved shooting the shooting officer's department is not permitted to do the investigation because of bias or potential bias or any other number of

things.
Q. Is that a requirement in the state of Texas?
A. I don't know if it's a requirement but I know the Texas Rangers often conduct OIS investigations.
Q. Okay. But my question was, is that a requirement that it had to be conducted by somebody else?
A. I'm not aware of a statutory requirement.
Q. Is there any national standard that you've referred to that says that should've been done?
A. Only the department of justice consent decrees.
Q. Okay. Was there any consent decree in place that required the City of San Antonio to have another agency investigate this case?
A. No, let me just, if I may explain that answer. I find progressive police chiefs go to the DOJ website and they look at consent decrees and they find out what the department of justice is requiring and when they can and if it's feasible they adopt that or those principals or guidelines to keep the department of justice out of their neighborhoods.
Q. Was there ever a complaint filed with the department of justice regarding this case?
A. I don't know.
Q. Okay. Well, getting back to my original

question though was any other standard that you can determine, point me to that said that somebody from the SAPD or the SAPD should've referred this to somebody else to investigate the either criminal or the internal investigation?
A. Not sitting here in the state of Texas, no.
MR. KOSANOVICH: Pass the witness.
MR. DENTON: Nothing further.
EXAMINATION
BY MR. WASHINGTON:
Q. Dr. Peters have you ever been qualified to testify as an expert in federal courts in Texas?
A. Yes.
Q. On multiple occasions?
A. Yes.
Q. And have you testified as an expert over 50 times?
A. Oh, yeah. Yes.
Q. And just looking at the report of Casanova's expert, how many times would he have testified in federal court on a use of force case?
A. I don't remember it. I think he had something attached but under the new rules I don't think his report would pass. Certainly under methodology.
Q. And just to be clear, you testify as an expert

on behalf of plaintiffs and defendants?

A. Right. Right now I'm doing about 70 percent defense work and 30 percent plaintiff.

Q. And you train police officers all throughout the country?

A. Yes.

Q. On what type of courses you train them on?

A. Over the years there's been officer safety, handcuffing, defensive tactics, baton. Today more along the lines of investigating in-custody deaths, investigating sexual harassment complaints, conducting internal affairs investigations, use of force and most recently artificial intelligence.

Q. And are your courses well attended?

A. We just did one two weeks ago, online we had 82 people. So, yeah, I think so.

Q. Has anybody ever said they don't want to take a course under you because you haven't been on the force since 1970?

A. No.

MR. WASHINGTON: I pass the witness.

MR. DENTON: Nothing further.

MR. KOSANOVICH: Nothing further.

THE VIDEOGRAPHER: Okay. We're now off the record at -- you want to get your order?

MR. WASHINGTON: We want to read and sign.

THE REPORTER: You want a copy?

MR. KOSANOVICH: Just one copy.

You going to order?

MR. DENTON: Yeah, I'll order.

THE REPORTER: Okay.

MR. WASHINGTON: Just send it to me.

THE REPORTER: Okay.

THE VIDEOGRAPHER: Okay. For video, anyone need a copy of the video?

MR. WASHINGTON: Make sure I have your card.

THE VIDEOGRAPHER: Okay. All right. We're now off the record at 4:57 p.m.

(End of proceedings.)

CHANGES AND SIGNATURE

WITNESS NAME: DATE:

PAGE LINE CHANGE REASON

I, JOHN G. PETERS, JR., Ph.D., have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_________________________________
JOHN G. PETERS, JR., Ph.D.

THE STATE OF __________)
COUNTY OF _____________)

Before me, ___________________________, on this day personally appeared JOHN G. PETERS, JR., Ph.D., known to me (or proved to me under oath or through ___________________________) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of ________________________, __________.

_________________________________

NOTARY PUBLIC IN AND FOR
THE STATE OF ______________________

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

BERNICE ROUNDTREE, )
Individually and on behalf of )
the Estate of CHARLES )
ROUNDTREE, JR. And the )
Statutory Beneficiaries, )
TAYLOR SINGLETON and DAVANTE )
SNOWDEN, )
Plaintiffs, )
)
VS. ) CIVIL ACTION NO.
) SA-18-CV-1117-JKP-ESC
CITY OF SAN ANTONIO, TEXAS; )
and STEVE CASANOVA )
Defendants. )

*********************************************************

ORAL DEPOSITION OF

JOHN G. PETERS, JR., Ph.D.

March 13, 2025

*********************************************************

REPORTER'S CERTIFICATION
DEPOSITION OF JOHN G. PETERS, JR., Ph.D.
March 13, 2025

I, Quinlyn Busby, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JOHN G. PETERS, JR., Ph.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the witness was located in Dallas, Texas;

That the amount of time used by each party at the deposition is as follows:

Mr. Lowell Denton .....02 HOURS:29 MINUTES
Mr. Daryl Washington .....00 HOURS:25 MINUTES
Mr. Mark Kosanovich .....02 HOURS:33 MINUTES

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Daryl Washington, Attorney for Plaintiffs;
Mr. Lowell Denton, Attorney for Defendant;
Mr. Mark Kosanovich, Attorney for Defendant;
Mr. Mark Ralls, Attorney Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 17th day of March, 2025.

Quinlyn Jones

Quinlyn Busby, Texas CSR 8187
Expiration Date: 02/28/26
MAGNA LEGAL SERVICES
Magna Registration No. 633
7 Penn Center
1635 Market Street
9th Floor
Philadelphia, Pennsylvania 19103
(877) 624-6221

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on ________________________;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to ________________________, Custodial Attorney;

That $__________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on ___________ and filed with the Clerk.

Certified to by me this _____ day of _______, 2025.

__________________________________

Quinlyn Busby, Texas CSR 8187
Expiration Date: 02/28/26
MAGNA LEGAL SERVICES
Magna Registration No. 633
7 Penn Center
1635 Market Street
9th Floor
Philadelphia, Pennsylvania 19103
(877) 624-6221



# Magna Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

MAGNA
LEGAL SERVICES

## $

**$3,000** 220:16

**$5,000** 220:17

**$7,500** 220:20

**$80** 124:12

**$900** 221:2

## -

**-numbered** 1:19

## 0

**00788754** 3:11

**05764700** 3:8

## 1

**1** 4:11 24:11 94:6,7 99:19 101:5 134:2,3 139:9 224:16

**10** 4:11 79:7 101:4 123:22 124:5 160:16 178:3 210:18 230:4

**106** 4:6

**10:01** 1:20 5:8

**10:39** 33:7

**10:47** 33:10

**11** 125:6 145:6 172:24 173:2 177:20 180:7 229:25

**114** 3:15 4:6

**115** 122:18 123:19,23

**11:50** 84:17

**12** 4:12 84:22,24 89:12 196:25 228:6 229:25 230:3

**12:00** 81:15,16

**12:30** 160:5

**12:39** 84:20

**13** 1:14 89:19 125:6 193:15 194:4 208:3 211:10 229:16 230:9,16

**132** 169:24

**139** 169:22

**13th** 1:19 5:8

**14** 115:18 230:16

**145** 169:15

**15** 25:19

**150** 6:19

**16** 67:17,18,19

**16489200** 3:14

**17** 115:13 229:3

**19** 102:18 169:24

**1970** 241:19

**1970's** 157:14

**1972** 119:7

**1977** 119:6

**1978** 117:25 118:17,19,21 124:12

**1981** 125:20

**1:00** 161:11 224:24

## 2

**2** 4:4,11 11:11 33:20 125:20

**20** 25:20 61:5 133:2,21 169:24 178:20 210:17,20 229:3

**200** 6:15

**2016** 6:19

**2025** 1:14,19 5:8

**21** 68:22 133:2 134:12 177:25

**217** 223:10

**2188** 146:9

**22** 177:25

**220** 4:7

**227** 4:7

**23** 69:13 230:18

**236** 4:8

**24** 169:15

**240** 4:8

**24013714** 3:4

**245** 177:20

**246** 177:25

**247** 4:9

**25** 8:9 57:19 222:21 229:25

**2517** 3:9

**26** 8:9

**27** 8:9

**276** 178:3

**279** 229:2

**2806** 3:15

**2:00** 161:11

**2:25** 160:12

**2:46** 160:15

## 3

**3** 4:12 12:6 33:23,25 123:18

**3,000** 220:22

**30** 241:3

**325** 3:5

**37** 68:21 69:13

**3950** 3:5

## 4

**4** 73:25

**40** 221:15 236:1

**42** 123:18,22 191:16

**43** 123:22

**48** 191:18,19

**4:16** 220:7

**4:28** 220:10

**4:45** 81:2 160:8 215:14

**4:57** 1:20 242:15

**4th** 18:25 42:11

## 5

**5** 12:6

**5,000** 220:22
**50** 230:15 240:16
**501** 28:20,22 30:1 87:25
**53** 230:15
**55** 230:17
**57** 230:14

**6**

**6** 4:5 102:14

**7**

**7** 4:11
**70** 241:2
**700** 136:9 187:15
**700-plus** 186:20
**705** 193:20
**705.05e** 203:10
**72** 191:16,18,19
**73** 119:7 120:2
**74** 4:12
**75201** 3:6
**77** 119:8 120:2,3
**77450** 3:9
**78** 120:3
**78248** 3:16
**78283** 3:12

**8**

**8** 4:13 94:15 95:4
**81** 125:24
**82** 125:24 241:15
**831121** 3:12
**84** 115:18
**866 624-6221** 2:1

**9**

**9** 177:20
**94** 4:13
**9mm** 64:17 77:25

**A**

**A-N-G-E-L-L** 146:12
**a.m** 5:8
**a.m.** 1:20 33:7,10 84:17
**above-styled** 1:18
**absolutely** 62:1 146:20 192:24
**abuse** 24:24 127:19 128:20,21
**academy** 61:22 88:9,12,20,25 90:6
**academy's** 93:21
**accept** 104:21 129:8 175:11
**accepted** 29:18,23 145:21 208:6 216:16
**accordance** 34:12
**account** 70:22
**accounts** 87:17
**accredits** 19:9
**accuracy** 67:7 68:14 69:6,7
**accurate** 12:22 221:7 226:1
**acquitted** 109:22 174:22 238:6
**act** 170:2
**acted** 103:8 166:8
**action** 1:7 58:10 142:21 174:12 219:15 225:6,10
**actions** 60:14,15 124:10 135:18 143:6 186:14
**activity** 208:16 225:18 238:14
**actual** 146:15 159:2 221:3,4
**add** 40:15,22
**added** 11:18 14:16
**addition** 96:12
**additional** 126:24 184:22
**adjust** 83:13
**administer** 134:17 135:4
**administered** 124:23 129:3 130:8, 16
**administration** 135:8 159:13
**administrative** 114:2 122:14 133:13 135:20 164:7 186:15 189:13 195:11
**admit** 140:16 141:4,8,12 142:25 143:13,15
**admitted** 169:20
**adopt** 239:19
**adopted** 140:22
**advisor** 125:15
**advocacy** 19:8 213:11 214:7,9
**AELE** 221:21
**affairs** 114:2 122:4 123:11,12 126:12,13 128:3,6,11 132:8 134:17 135:3 141:23,24 142:2,13,18,23 143:9,11,24 145:25 146:1,3,10,15, 18,23 147:6,12 148:10,21 149:3,4, 20,22,25 150:13,15,19 151:2,17 152:1,18 153:5,8 155:11,24 160:21 209:2 210:14 213:12,14 241:12
**affect** 156:21
**affected** 155:3
**affidavit** 123:3
**afford** 120:11
**afforded** 130:24 131:1,7 190:19
**afraid** 87:5
**afternoon** 101:11 210:10
**agencies** 223:23
**agency** 19:6 70:16 221:11 223:19 234:19 238:21 239:14
**agent** 124:8 126:9
**aggravated** 128:11,13
**aggressive** 30:20 92:11 93:10,13, 25 94:10
**agitated** 24:20

**agree** 6:13,14 12:21 14:4,8 15:5 22:11 23:5 26:7,9 37:10 41:8 46:6, 10,11 48:5,19 50:1 51:1 56:15 60:13,16,20 61:12 64:21 65:5,10 66:24 67:24 73:5,13,19 74:7 80:8 82:23 83:4,8 88:21 90:17 92:2,7,9, 13 95:11,24 105:3 131:6 167:21 171:4 174:23 175:16 178:4 225:5 234:7

**agreed** 41:9 49:8 52:24

**agreeing** 149:12

**agreement** 23:1 38:13 57:7 131:4, 5,24 138:3,10,13,15

**ahead** 54:11 62:24 105:22,25 158:24 184:14 190:8 198:18 200:14

**aided** 113:12

**aimed** 55:25

**Airfare** 221:1

**Albert** 11:6

**alcohol** 24:24

**all's** 225:4

**allegation** 124:7,9 197:4

**allegations** 228:18

**allegedly** 30:19 114:10 124:19 160:25

**allowed** 123:10,12 153:23 193:14 194:16 203:2 229:22

**altered** 197:25 198:3,6

**alternative** 173:23 174:12

**amended** 7:8

**Amendment** 18:25 42:11

**American** 140:18

**Americans** 221:19

**amount** 221:8,9

**analysis** 6:25 11:19 14:20 17:7,20 19:23 26:8 41:20 47:18,19 62:20 72:9 79:23,24 80:6 82:6 85:1 86:11,17 89:16,21 90:4,20 101:6 102:5 103:12 105:1 132:5 142:5 178:21 179:3

**analyze** 52:16 59:3,4 113:25

**analyzed** 25:13

**and/or** 90:8 134:16 135:2 140:8

**Angell** 146:11

**angle** 14:6 52:16 59:24 73:12

**animal** 227:18

**announce** 37:16 38:2 41:21

**announcement** 37:18 100:2 233:22

**announcing** 97:9

**answering** 174:14

**answers** 6:25 96:13 99:5 231:16

**Antonio** 1:2,8 3:9,12,16 5:5,7,20, 22 85:2 88:8,15 89:16,20 93:11,18 94:3 98:2 99:12 102:16 112:4 113:16 130:4 131:10 132:1,13 134:15 135:1,24 138:1 139:3 140:22 141:3 210:13 215:1 217:25 218:4 225:3 227:25 228:15 229:10 234:20 235:17 236:6 237:2 239:13

**anybody's** 103:5

**apologize** 7:4 33:15 62:24 102:22 130:3 133:24 210:17

**apparently** 217:12

**appearance** 46:7 47:5

**appearances** 4:4 5:13

**appeared** 34:20

**appears** 59:15 68:9 69:3,19,20 78:24 80:11 92:23 140:22 145:7 164:12 173:5,14 210:24 215:24

**appellate** 21:23,24

**Appendix** 8:24 9:21 27:1 57:20 102:10 152:24

**applicable** 103:16

**applied** 208:4

**applies** 204:1,2

**apply** 27:24 70:24

**applying** 134:21

**approach** 35:7 36:8 98:14

**approached** 44:3

**approaching** 74:9

**area** 16:20 76:9 78:10,24 79:1 80:3 86:2 87:6 91:2 92:5 168:18 169:18 182:23 184:12 236:23

**areas** 202:22

**arena** 126:13

**argue** 38:16

**arguing** 38:24

**argument** 218:12

**argumentative** 36:20 167:10 185:12,16 187:12

**Arkansas** 125:14

**arm** 91:18,21

**armed** 61:5 87:17 104:6 155:17,20 237:5,6 238:13

**arms** 60:3 235:3

**arrest** 118:15 122:24 229:23 230:3

**arrested** 235:25

**arrived** 233:18

**articles** 58:5

**articulate** 29:16 61:3

**artificial** 241:13

**artificially** 35:23

**aspect** 205:9

**aspects** 28:22

**assailant** 31:19 41:4 72:11 224:13

**assault** 41:4 43:15 90:18 105:8 114:15 128:11,14

**assaulted** 114:12

**assigned** 122:5 204:3

**assignments** 124:23

**assist** 126:20 189:15

**assistance** 234:10

**assisted** 126:18

**Associates** 222:3

**association** 131:5 138:15

**assume** 69:8 100:24,25 101:1 115:21 144:5 162:3 178:6

**assumption** 85:23,24 96:5

**atmosphere** 140:9

**attach** 82:1

**attached** 1:24 57:10 88:5 240:23

**attempted** 83:2

**attended** 241:14

**attention** 67:17 72:3 84:22 104:24

**attitude** 60:14

**attorney** 126:25 131:20,21 148:7 190:19 207:7

**attorney's** 126:17 127:13,16,17 128:18 164:15,20,23 204:18 205:10 206:6,11 207:4,15

**attorneys** 204:9

**audio** 13:4 167:2 177:21 211:8

**audits** 223:19

**authored** 219:8

**authority** 123:7 218:1

**automatic** 61:7

**auxiliary** 122:18,19 123:19

**Avenue** 3:9

**avoid** 69:24

**avoidance** 221:17

**aware** 214:21,23 232:5 233:21 239:8

**axillary** 123:23

**B**

**B-R-A-I-N-T-R-E-E** 118:9

**back** 6:19 9:11,20 14:19,21 16:24 20:2,8 21:6,12 22:1 23:24 27:5 33:9 40:9 41:19 42:17 51:10,11,21 64:15 65:2,8,17 69:18 71:9 73:18, 20 76:11 84:19,22 85:20 98:16 106:15,16,20 111:7 116:8 117:4 123:20 130:10 131:25 135:21 137:20 139:4 140:4 145:17 153:20 155:19 156:14 157:14,23,25 160:14 161:2,13,18,21 166:13 168:23 179:14,24,25 180:13,16,19 181:10,25 182:5,19,23 183:13,16, 20,22 184:10,20,23 185:5,7,24 186:6,16 187:3,4,13,14,15,23 188:1,5,11,19,25 191:4,20 193:21 194:4,15,21 197:20 198:21 199:8 201:5,16 212:4 218:11 219:4,8 220:9 221:6 222:21,23 231:18 239:25

**back-up** 31:6 107:1

**background** 72:13 101:24 119:22 120:17 185:17

**backing** 52:22

**backup** 32:5 106:21

**bad** 35:7 36:2 66:21 216:20,22 217:3,22 218:9

**badge** 95:12,25 96:8,9 122:23 125:13,17

**badged** 124:13

**bald** 114:17 180:8 223:13 224:4

**ballistic** 209:23

**ballistics** 80:11

**bank** 114:5 168:7,9

**bar** 20:7 44:9 132:21 133:8 148:2 171:1 215:16,17

**bargain** 138:3

**bargaining** 131:4,23 138:10,12

**barrel** 62:11,12 71:3 72:16 73:3

**base** 22:21 115:5 117:2 137:5 147:18 194:3

**based** 42:5 45:23 49:20 63:25 78:20 81:20 86:11,15 87:14 95:23 98:17 101:14 108:2,17,20 109:19 112:3 134:22,23 143:23 173:25 177:4 196:2 235:18,23

**bases** 85:7

**basic** 88:25

**basically** 32:3 67:13 112:17 123:8 130:2 135:17 144:8 186:10 229:10 231:22

**basis** 9:25 77:20 102:1 161:6 223:9

**Bates** 146:7,9

**baton** 241:9

**batons** 25:3,17

**battering** 30:19

**Batyukova** 21:16

**beam** 95:24

**bear** 45:4

**bearing** 20:4

**beat** 23:11 124:8

**beating** 126:9

**beats** 58:10

**bedroom** 182:23

**began** 50:10

**begin** 7:6

**beginning** 9:21 41:20 144:6 156:3 162:10 209:7 225:12

**begins** 5:3 45:4 58:18 78:25

**behalf** 1:3 11:6 241:1

**behavior** 40:25 46:7,10 47:6 94:11 140:11 216:16,20,23 217:3,8,22 219:21

**belief** 100:10 196:12

**beliefs** 207:2

**believed** 43:22 66:24 101:18 155:25 164:9 172:13 173:25 176:9

**believes** 44:15 71:13 77:5

**believing** 67:6

**beneficial** 107:12

**Beneficiaries** 1:5

**BERNAL** 3:8

**Bernice** 1:3 5:5

**Bexar** 21:17

**bias** 140:9 178:24 179:8 193:7,8, 10 208:7 235:1 238:25

**biased** 145:12 196:5

**big** 144:19 186:23 188:6 189:24 193:18,22 217:20

**bigger** 107:8

**bit** 21:14 29:15 36:1 59:3 111:7 115:8 117:4 121:14 130:22 168:24 220:15 230:6

**Bitters** 3:15

**black** 95:11 114:16 223:13

**blade** 76:16

**bladed** 75:18

**blading** 75:22,24 76:4,9

**bleeding** 198:12,14

**blind** 101:2

**blocked** 91:21

**blocks** 91:19

**blood** 87:8 182:22

**blue** 189:4 224:5

**blur** 95:21

**bodies** 213:15

**bodily** 44:17 45:1 59:6 82:8 173:20 174:1

**body** 8:13 9:6,7 12:21 13:24 16:12, 21 52:13 53:6 59:24 73:7 75:18 76:4,16,17 90:25 91:16 108:10,14 166:24 167:3 200:23 232:5,8

**book** 10:7

**borderlined[sic** 122:16

**borough** 120:4,5,8

**boroughs** 120:7

**Boston** 124:8

**bottom** 134:12 135:17 144:25 155:12,13 211:11

**Box** 3:12

**boy** 221:13

**boyfriend** 114:11

**Braintree** 118:8,9,13 120:21 122:2,4,8 123:9,14 125:2 129:3

**Brattn** 207:20,25

**Brattn's** 207:17

**break** 11:11 12:7 15:20 25:18 27:5 32:24 33:3,8 35:17 78:9 80:20 81:17 84:11,18 160:5,13 168:23 211:17 220:4,8

**breakdowns** 12:10

**brevity** 210:12

**briefly** 28:13 102:9 106:3 112:12

**bring** 94:5 179:23 181:1 185:23 188:9,19 189:8

**bringing** 7:23 17:8

**broad** 36:25

**broaden** 88:6

**broken** 91:25

**brought** 7:9 33:19 88:7 131:2 157:23 186:6 187:2,3,4 188:11,24, 25 228:18 231:18

**buddies** 20:3

**buddy's** 97:5

**building** 35:5,9 64:1 87:16

**bullet** 52:11,13,17 73:19,21 74:2,8, 9 75:1 79:10,15,22 80:3,9 111:1 170:9,16 171:24

**bunch** 188:21 201:18 227:2

**bureau** 119:3 122:14

**burglars** 36:14

**busted** 92:24

**buttock** 52:9 73:12

**buttocks** 16:20 64:23 74:1 75:5 198:14 231:4

**buying** 48:1

**C**

**calculus** 77:8

**CALEA** 19:9

**call** 21:6 67:17 78:10 104:24 107:2 113:1,5,8,11 138:16 158:18,20 167:21 184:18 214:2,7

**called** 68:5 112:7 114:10 117:17 122:22 127:3,6 139:13

**calling** 20:1,8 22:1 106:20 107:1

**calls** 14:10 43:10 66:1 100:12 162:1 165:15 197:7 200:15 205:3 226:21

**cam** 108:10,14 232:5

**camera** 8:13 9:6,7 12:21 13:24 14:6 16:12 59:24 73:7 90:25 166:24 167:3 232:9

**cameras** 145:1 167:2

**captain** 124:11

**capture** 92:3

**captured** 166:24 167:16

**car** 192:11 223:16

**card** 125:13,17 242:13

**care** 94:10 184:19

**cared** 193:19

**career** 6:16 128:10

**cares** 238:12

**carriers** 168:7,9

**carry** 118:15

**carrying** 125:13 209:17

**Casanova** 1:9 5:18 6:9 9:8 11:6 13:19 20:1 21:6 22:1 28:1,5 29:22 30:10,13 34:12 35:10 41:24 43:22 45:14 46:21 48:2,25 49:7 53:22,23, 24 54:21 57:2 70:11 73:4 76:21 78:19,22 85:5,22 86:4 95:9 97:4 103:1,8 106:20 108:3,22 110:4,7 111:24 114:11,24 116:17,24 130:14 132:14 134:13,18 135:5 138:18 142:24 143:3 144:25 154:23 157:6 162:6,13,21 163:6 164:1 165:4 166:3,8 167:1,4,13 169:3,7,10,19 170:7 171:5,21,22 172:2,12 173:25 174:16 175:2,14, 17 176:9,22 177:20,24 178:6,16,23 179:8,13,18 180:7,9,15,20 181:23 182:8,22 183:8 186:6 187:4 188:4, 10 189:15,25 190:3 191:6 192:16 193:9,16 195:24 196:11,13,17,20 198:21 199:10,14 201:1,2 204:9, 20,23 205:20,23 207:6 209:12,23 211:10,12 216:11 217:4 219:13 223:10 225:3 228:1,16,19,21,22 229:2,5,10 230:6,8,10,14,16,20 232:12 233:3,8,17,25 234:2,16 235:4,15 236:5 237:3 238:3,5

**Casanova's** 9:12 13:24 22:6 24:2 41:9 78:23 88:18 102:19 104:4 106:7 112:6 115:18 116:13 156:10 163:2 169:18 170:17 175:10 177:4 206:13,17 210:25 215:25 218:5 219:21 230:21 240:19

**case** 6:10 7:1 9:23,25 10:8 13:15 17:7 19:3 20:4 21:16,20 24:1,23

25:24 26:21 29:1,2 37:12 55:15 57:13 62:16,18 79:23 83:14 95:15 101:6 103:12 106:14,15 108:21 123:5 126:16 127:4,15,19 128:19 130:13 132:5,13 135:12 137:18 141:18 154:3 155:4 157:20,25 164:10,14 166:1 168:3 174:21,25 188:20 189:14 193:15 194:8 200:8 205:9 207:17 220:15,17 224:2,6 225:14 234:24 238:6 239:14,23 240:21

**cases** 12:14,16 13:21 17:8 18:13, 15 25:13 26:2,9,13,19 27:2 100:23 101:13 106:14 112:22 129:13 154:2 184:10 191:14 222:17 235:22 236:1

**casual** 31:3 32:12

**casually** 94:2

**categories** 26:6,7 138:20

**caught** 124:20

**caused** 224:18

**causing** 225:9

**cell** 64:12 106:7,23,24 107:2 113:4 114:7 167:5,21 168:4 197:6 200:19,22,24 201:4,10,15,24 202:4 209:16,17,20 211:7 212:18,22 217:15,16 230:7 236:6

**cellular** 211:14,15 230:11,12 231:11

**center** 53:6

**Certificate** 4:9

**certification** 118:14

**cetera** 120:18

**chain** 218:24

**change** 11:24 12:3,8 47:5,7 60:14

**changed** 11:18 46:7,10

**changing** 188:18

**chaotic** 24:20

**characterize** 29:15

**charge** 104:3,4,9,17 220:15

**charged** 220:17

**charges** 109:3,22,25

**Charles** 1:4 64:4,7 65:11,15,21 66:7,17 107:24 108:23 114:13 170:7 171:6,22 172:13 231:21 233:12 234:3 236:12

**chase** 121:13

**chat** 143:20

**check** 11:2 82:5 99:8

**checked** 82:4

**checklists** 214:16

**checkmark** 222:16

**chest** 87:10 231:5

**Chicago** 26:15

**chief** 10:2 85:16,19 89:20 119:11 122:5,15 123:23 129:3,8 134:14 135:1,7,19 136:19 140:7 141:12 144:13 145:17 161:1,9 162:4 217:1,23 218:21,23 231:21 232:1, 7,10,12,13,18 236:12 238:11

**chiefs** 239:16

**child** 127:19 128:20,21

**Chinese** 124:13

**choice** 36:2

**CID** 121:18

**circle** 35:19

**circles** 35:19

**circuit** 131:22

**Circuit's** 21:20

**circumstances** 29:17,22 30:17 56:23 173:4 224:24

**cited** 28:19 169:25

**cities** 120:7

**city** 1:8 5:5,20,22 27:24,25 45:13, 18 57:1 85:2 89:16,19 102:16,25 105:19 112:4 113:15 114:6 124:8 132:13 134:15 135:1,19 137:25 140:22 141:3 210:12 215:1 216:24 227:24,25 228:15 229:9 230:20 232:21 234:19 235:16 236:6 237:2 239:13

**city's** 89:21 103:12 105:15 207:18

**civil** 1:7,22 119:22 121:8 184:20 232:20

**civilian** 122:13 123:8 124:19

**civilians** 123:19,23 208:5,11,12 229:21 230:3

**claim** 105:18 178:18 215:6 235:1

**claiming** 166:23 178:15 179:19 199:20 216:12 217:21

**claims** 214:25

**clarification** 34:5 74:23 79:6 117:23 133:6 184:23 185:25 186:9

**clarified** 108:1

**clarify** 18:18 78:12 106:19 179:24 200:9 228:14

**clarifying** 77:2 227:23

**clarity** 207:23 237:13

**class** 128:22 196:6,8

**classes** 213:16

**clean** 33:14 38:23 105:19

**cleaner** 176:21

**clear** 24:7 42:8 51:22 72:8 77:20 78:16 82:21 92:17 97:11,15 107:1 121:10 125:1 127:9 129:5 133:16 137:24 141:25 145:11 170:20 171:14 191:15,20 215:14 240:25

**clerical** 119:4

**client** 9:8 13:18 14:9,12 27:25 28:12,23 36:10,24 45:18 48:2,5,25 49:2,11,22 51:3 52:18,23 53:22 55:10 56:16 57:2 59:11 62:4 64:16 65:10,24 66:7,24 67:6 68:3 69:22 71:8,12 76:13 80:3 85:5,10 87:12, 13 89:16,22 92:10 93:9 95:9 96:15 99:25 103:15,22 104:11,23 224:8

**client's** 16:12 45:22 47:21,22 49:17 77:21 90:2 96:14 100:8

**clients** 69:4

**climate** 109:6

**clip** 16:11

**close** 6:18 72:5

**closed** 48:24 49:1,23

**closer** 49:2,10

**clothing** 110:24

**co-counsel** 33:21 34:7

**coached** 142:24

**coaching** 132:22,24 133:4

**cognitive** 178:13 194:20 213:16

**coincides** 139:13

**collaborate** 144:6

**collect** 201:15 209:15 210:5,9 211:6 212:12

**collected** 201:11 202:17 209:19

**collecting** 208:14 214:16

**collection** 26:6 212:15

**collective** 131:4,23 138:3,9,12

**collectively** 143:24 144:20

**college** 124:9 129:21

**collude** 155:8

**combination** 61:24 62:2

**combine** 238:7

**command** 105:3 168:21

**comment** 69:3

**commission** 120:2 122:7 123:2

**committed** 85:5 92:20 93:16 109:9,12,16

**committing** 90:18

**common** 96:21 100:20 194:7

**commonwealth** 122:21 123:1

**communicating** 114:6

**communication** 104:20 112:20 113:3 156:19 167:7

**communications** 112:21 157:1,3

**community** 238:12

**company** 113:14 129:22 157:19

**compare** 114:3 186:14,16,17

**compared** 231:16

**comparing** 161:5

**compelled** 131:2 180:2

**complainant** 30:9,19

**complaint** 134:14 239:22

**complaints** 241:11

**complete** 56:6 60:14 106:17 113:21

**completed** 88:25

**completely** 35:20 176:25

**compliance** 62:11 223:22,23,24

**computer** 113:11

**conceal** 35:16

**concealed** 41:18

**concealing** 30:6

**concealment** 29:17,24 30:2 33:13 34:10,16 35:4,6,12 42:25 69:19 71:9

**concept** 165:7

**concerned** 71:20 238:11

**conclusion** 23:25 63:20 86:5,15 92:21 99:25

**conclusion's** 90:14

**conclusions** 18:5

**conclusively** 177:6

**conclusory** 166:11

**condescending** 39:19

**conditions** 83:20

**conduct** 30:5 45:22 65:11 77:21 88:1 90:2 101:7 121:6,10 122:24 124:4 125:16 133:14 143:12 156:10 178:25 179:9 206:13,17,19 210:14,25 213:12,13 215:25 217:22 218:5,9 234:20,23 238:8 239:4

**conducted** 126:7 127:11,24 128:4,11 229:10 236:11 239:6

**conducting** 191:2 195:10,13 241:11

**conductive** 25:16

**conference** 16:4 85:17 144:14 158:10 161:10,11

**confidence** 69:5

**confirm** 79:25 83:24

**confiscate** 144:7

**conflict** 176:6,25

**conflicting** 14:25 163:16 183:16 235:4,14,23

**conflicts** 184:19

**confrontational** 93:10,13

**confronted** 101:25 157:23

**confuse** 138:22

**confused** 18:20 194:14 220:15

**confusing** 122:12

**connection** 103:16

**Connor** 18:13 19:1 22:12 26:8 28:9 34:15 57:8,13,16 90:4,11

**conscious** 169:11

**consensus** 57:6,11

**consent** 42:21 239:11,12,17

**considered** 112:4 146:12 211:21

**consistent** 51:2

**constitutional** 23:6 223:22 224:1

**constitutionally** 103:22

**Consultants** 11:1

**consulting** 222:1,2,3

**contact** 31:22

**contained** 106:7 112:5 162:24 215:9

**contend** 28:23

**contending** 198:6

**content** 142:5 178:21 179:3

**contention** 20:2 155:24 163:3 170:7 171:12,21 172:11 175:10 205:7,8,21 206:1,10 207:1 218:3 224:19 237:1,25

**contentions** 205:14 219:12

**context** 13:14 16:16 44:1 94:5

**continuance** 91:15

**continuation** 35:3

**continue** 111:19

**continued** 160:25

**Continuing** 89:14

**contradictory** 157:10 158:5 159:21

**contradicts** 167:13

**contrary** 92:16

**contrast** 230:1

**contrasting** 161:5

**contributed** 35:4

**conversation** 31:4 32:12 41:1 44:5 153:20 154:16,23 155:3 157:17 158:13

**conversationally** 94:2

**conversations** 157:8 233:8

**converse** 208:13

**conviction** 226:17 227:11

**convince** 104:8

**cool** 81:9

**cooperate** 195:18,20

**cooperated** 195:17,21,22

**cop** 47:22

**copied** 57:18

**cops** 100:15 227:2

**copy** 10:7 27:1 34:9 136:12 221:7 222:16 242:3,4,11

**corporation** 69:10

**correct** 7:18 8:7,8,14 9:9,17 10:7, 8,19 11:15 12:15,20 13:4,6,21 17:2,3,10,11,23,25 18:2,3,7,16 19:2,4,11,13,15,21 23:4 24:15 25:1,10 26:1 28:2,20,21 29:24 30:2 32:14 35:16 43:24 44:10,15,24 45:1,16,21 48:10 49:18 52:3,4,10, 25 57:3 58:8,13,16,19,20 59:24 60:1,5,8,11 62:5 63:18 66:4 67:1, 23 69:8 76:1,5,6,7,15 77:10 83:22 85:2,3 88:13 89:10 90:4,5,12 95:5 103:13 104:18 105:12 115:2,3,20, 23,24 116:17 118:18 119:11 120:22 124:2 125:4 127:14 129:9, 10 130:21 131:8 135:10,14 139:15 140:12,20 141:1 142:12 147:4 154:5,9 155:21,22 156:8 157:3,14 158:1,13 161:20,23 162:4,22 163:1,3,7,10,18,22,23 164:2 165:5 167:22,23 168:14 169:1,4 170:22, 24 171:14 173:15,21,24 175:3,6, 19,22 176:2,7,8 177:3 178:5 179:5 181:2,14,16 182:10 183:1 190:24 192:1,4,7 193:1,5,6 194:17 197:15 199:4 200:22 201:19 202:21 206:7 209:16 211:2 212:2,3 213:3,21,25 214:1 215:7 223:20 225:15,20 230:24,25 232:11 236:9

**corrected** 161:14,21 164:11,12 232:8

**correction** 161:23,25

**correctly** 21:16 51:13 87:5,7 100:3 134:25 187:22

**correlate** 68:23

**correlated** 68:13

**correlation** 67:10,12

**COSA001747** 146:9

**cost** 221:3,4

**Cotton** 31:4 32:13 44:2,3

**couch** 49:8

**could've** 41:21 52:16 98:2,4 125:5 156:20 169:20 175:24 192:25 199:1,3,4,5,6,7,10 233:11

**counsel** 5:11,13 8:25 15:19 20:2 29:19 34:1 55:9 56:8 57:25 83:14 106:20 108:9 109:2,12 136:8 176:13 191:13 193:3,5 210:16 212:11 227:24 230:20 235:2

**counsel's** 215:12 222:14

**counties** 120:8

**country** 131:7 221:15 241:5

**county** 21:17 118:6,23 119:18,20 125:14 126:21 127:23

**county's** 119:17

**couple** 13:25 88:19 92:18 113:20 140:16 144:21 157:22 184:9 189:20 213:3 227:23 236:24

**coupled** 85:6

**courses** 88:19 184:7,16 214:15 241:7,14

**court** 1:1 5:6,12,23 10:3,24 17:16 19:20 21:21 33:23 34:8 139:19,23 148:16 151:19 240:21

**courteous** 40:3,13

**courtesy** 38:23 39:25 40:4

**courthouse** 120:16

**courtroom** 119:21

**courts** 240:12

**cover** 29:16,23 30:1 31:13 33:12 34:10,16 35:4,6,12,16 42:24 69:18, 23 71:9 235:1

**covered** 16:25 17:6 41:18 43:1 45:11 102:15 103:3 193:21 210:10

**covering** 30:5 232:15

**create** 36:6,15

**created** 140:8 221:23

**credential** 125:18

**credentials** 125:22

**credibility** 17:9 225:14

**crime** 66:11,13 90:20 92:20 93:16 109:9 113:21 159:11,12 187:7,8, 13,14 188:1 191:21 193:14 194:6 197:9,15,17,22,23 198:2,7,9,20 199:8,14,18,20,22 200:9 208:14 211:13 212:13 229:22 230:11

**crimes** 208:16

**criminal** 104:12 109:3,25 113:25 114:1 121:6,18 122:16,17 126:15 141:17,21 142:11 159:11 164:16, 18 174:21 175:18 184:17,19 186:11 188:20 189:14,22 190:1,4, 11 191:2 193:4,11,15,17,25 194:8, 10,12 195:2,3,5,11,13 196:7 199:22 201:14 202:15 204:12 206:23 208:16,20,25 209:1,3,10 225:18 234:23 238:6,13 240:4

**criminally** 206:18,20

**critical** 153:11 181:22 191:22 192:9 203:3

**criticism** 207:23

**criticisms** 27:24

**criticize** 104:23

**CSR** 1:20

**cubes** 224:22

**culpability** 226:8

**culture** 89:14 196:24

**curious** 21:14

**current** 7:14 140:10

**curriculum** 88:11

**curve** 58:19

**custodial** 193:20

**customary** 107:11

**cut** 20:15,21,25 102:22 121:13 142:15 184:14

**CV** 7:14 8:20,23 120:3 184:6

**D**

**DA** 104:1,8 109:4 206:8

**Dallas** 3:6 5:10 68:12

**danger** 44:25 77:5

**dangerous** 34:24 35:22 170:3

**dark** 95:24

**DARLING** 3:14

**Darryl** 5:15

**Daryl** 3:3 105:22 150:16

**data** 68:19 168:7,9

**date** 89:22 163:15 191:4 220:18

**dates** 235:12

**Davante** 1:5 66:25 74:1,15,19 109:9,21 110:3,6,24 114:13 226:11 234:3

**day** 1:19 36:5 55:2 71:2 156:25

**daylight** 94:6

**days** 194:22

**DEA** 124:8 126:9 168:3

**dead** 53:12,24 63:22 104:6 198:24 237:4,10 238:12

**deadline** 160:8

**deadly** 18:22,24 36:3 44:16 67:25 77:17 86:16,19 90:8,9,15 98:20 101:19 169:12 173:18

**deal** 25:8 28:4 193:18

**dealing** 215:6

**deals** 141:23 216:15

**death** 23:11 29:5 45:1 59:6 103:5 128:5 173:21 174:2 237:8

**deaths** 193:20 221:18 241:10

**decades** 140:19

**decide** 59:5

**decision** 98:20 169:11 174:20

**decisions** 22:21

**declining** 207:15

**decompressed** 12:13

**decompressing** 12:18

**decompression** 91:25

**decree** 239:12

**decrees** 239:11,17

**deemed** 214:20

**defective** 178:16,17,19

**defend** 36:3 44:13

**defendant** 1:17 108:3,21 110:3,7 111:23 112:5 114:11

**defendant's** 11:3,5

**defendants** 1:9 3:7 111:13 241:1

**defense** 5:11 241:3

**defensive** 70:15 241:9

**defensively** 75:19,22

**definition** 18:25 94:3 133:13,14

**definitions** 57:1

**degree** 225:10

**delirium** 24:19

**demand** 140:17 141:4,8,13 143:1, 13,16,23 144:7,11,16

**demanding** 144:9

**demonstrates** 140:9

**denied** 144:16

**Denton** 3:7,8 4:5,7 5:17 6:7,8 7:4,7 8:17,19,24 9:2,4,5 13:2,22 14:14 15:3,10,19,23 16:2,10,14 20:10,15, 19 22:5 23:15,19 24:1,9 26:12 27:18 29:21 32:18,25 33:2,11,12 36:17,23 37:23 38:8,10,13,17,20 39:5,8,12,14,16,20,23 40:1,3,5,9, 13,23 41:13,17 42:11,14 43:8,13 44:11 45:9 46:11,15,25 47:17 48:1, 9,17,20 50:21 51:8,18,20 52:18,22 53:13 54:2,4,7,10,13,17,23 55:1,5, 10,21 56:7,11 59:2,10,20 60:24 61:17 64:11,16 65:2,10 66:4,11 67:5 71:21 74:20,22 75:3,14,17,23 77:10 78:16 79:5 80:8,13,16,21,25 81:5,10,14,16,19,22 82:15,21 83:4, 8,13,19 84:6,10,21 89:3 90:23 91:7,14 92:9 93:5 94:17,21,23 95:4,7 96:6,20 97:13,23 99:2 100:20 103:21 105:10 108:6,16,25 109:14,24 110:21 112:9 114:23 133:5 134:1,4 169:2 189:5 202:24 220:12 223:2,4,8 225:11 226:16,24 227:19 233:14 236:15 240:8 241:22 242:6

**deny** 140:17 141:4,8,12 143:1,13, 15

**department** 28:15 68:12 88:16 93:19 99:21 118:4,6,8,11,22,24 119:8,17,18,25 120:11,16,21,24 121:25 122:1,3,8 123:9,15 124:11 125:2,18 128:25 129:3 130:4 131:11,13 132:1,3,6 135:24 156:11 161:14 176:1 192:22 197:10 201:21 202:1,6,10,14 210:1 219:16 225:4 226:19 234:20,24 235:17 237:11 238:24 239:11,18,20,23

**department's** 13:7 28:16,18

**departments** 13:11 19:10 118:19 121:14 131:19,21 145:19 201:18

**depend** 236:22,23

**depending** 13:7 17:16 117:21 130:8 131:22 138:16 217:24

**depends** 68:2 226:1,2

**depicted** 88:19

**deploying** 90:19

**deposition** 1:12,16 5:4,9 7:8 10:1, 11,23 11:12 12:7 24:11 33:20 42:15 52:8 73:25 94:15 115:18,19 116:4,13 142:16 149:14 151:24 155:20 166:9,14,17 169:11,22 178:4,8 181:4,14,17,19 185:20 212:2 220:16 229:2,4,25 230:8,14, 22 235:5,15,19 237:3,11,21

**depositions** 6:15 77:13 235:9

**deputies** 119:10

**deputy** 21:17 118:11,12 119:8,9, 11,20 120:12 121:1,4,7,11 125:13

**describe** 60:25 61:1 214:5,6

**description** 4:10 31:8,9 78:20 180:10 224:13,25

**descriptions** 101:14

**deserved** 64:8

**destroy** 144:8

**destroyed** 197:25 198:6

**detail** 24:13

**detailed** 112:12,16 113:5 130:23 211:5,15,18,22 212:11,23 213:18 230:13,23 231:12,18

**details** 90:24 219:7

**detain** 229:23

**detained** 230:3

**detective** 66:3 126:24 146:4,8,11 154:20 165:20 166:7,16 169:19 170:18 183:19 196:11,12 207:3 219:20 229:16,18,21 230:1

**detectives** 86:8 141:18 146:13 191:2 205:8 209:20

**determination** 98:19 178:9

**determinations** 12:14 17:9 225:13

**determine** 19:20 117:21 165:13, 19 216:6 223:22 224:8,11 240:2

**determines** 86:14

**developed** 17:1 28:16

**devices** 25:3

**diagram** 35:18

**died** 87:10

**differ** 194:19

**difference** 146:17 170:2 203:21 224:6

**differently** 99:16 144:2 191:23 196:3

**difficult** 169:23 176:19 236:19

**difficulties** 174:14

**digital** 8:13 9:6 12:22 13:15

**Digvijay** 10:25

**direct** 170:6 171:3 172:10 174:14

**direction** 14:6 95:23 170:10,15 180:17

**directly** 63:6 70:5 96:11 162:8

**disagree** 73:13 224:10

**disbelieve** 196:13

**discharge** 169:20 173:18

**discharged** 145:7 173:4 174:2

**disciplinary** 130:25 131:25 217:25 218:2 219:1

**discipline** 84:25 121:3 129:1,2,3, 6,9,12,15 130:5,8,10,13,16,19 131:23 132:3,4,14 133:12 134:11, 18,19 135:4,8,12,18,23 136:6,23 138:18 218:24 219:14 228:1,13,15

**disciplined** 132:6,10 136:18 216:11,13 217:4,6

**disciplining** 85:7

**discount** 175:10

**discrepancies** 187:16,18

**discrepancy** 186:7 187:1,11,12 188:3

**discrimination** 106:15

**discuss** 24:17 85:11 153:12 197:8

**discussed** 28:9,13 154:5,8 156:15 181:3

**discussing** 29:1,2 68:10 145:2 203:12

**discussion** 24:19 67:20 69:18 86:20

**discussions** 116:5

**disease** 101:2

**disengaged** 69:22

**dishonesty** 130:2

**dismissed** 139:23

**disparity** 224:3

**dispatch** 113:9,10,12

**disposal** 185:23

**disprove** 154:13 182:17

**dispute** 163:25

**disregard** 35:11,20 77:24 78:1,3 196:20

**disregarded** 165:23

**disregarding** 83:23,25

**disrespect** 184:3

**disrespectful** 183:9

**distance** 48:24 49:1,6,13,22 67:12,13 68:13,21 96:9

**distances** 49:24 67:10

**distant** 69:8

**distinctions** 192:15

**distinctive** 95:12

**distinguishing** 34:14 50:19

**district** 1:1 5:6,7 126:17,25 127:13,15,17 128:18 164:14,20,23 204:8,18 205:10 206:6,11 207:4,7, 15

**disturb** 199:14

**disturbed** 199:21 200:10

**division** 1:2 5:7 121:17,18 126:16

**divisions** 121:15,16,20

**DNA** 78:4 81:25 82:3,5,20,24 83:3 235:24 236:2,19

**doctor** 9:17 170:1 174:24

**document** 73:22 148:25 152:4,10 188:6 208:2

**documentation** 150:6 186:21

**documented** 148:9

**documents** 11:4 57:6,11,14,25 108:21 109:21 136:22,24 137:25 142:5 148:16 149:22,24 150:15 151:4,8,11,14,17 152:2,23 156:23 231:25

**dodge** 71:10

**DOJ** 239:16

**Donner** 68:11

**door** 30:23 31:14 40:25 41:1 44:5,6 47:11 48:4 52:23 55:11 78:18,23, 25 79:16,22 80:4,7 92:15,18,19,22,

25 93:3,6,17,20 94:8 95:16 96:12, 19,22 97:7,8,22,24 98:2,3,5,14 99:4,6,9,11,14,19,22 100:17 224:20,21 225:1,9

**double** 68:5 133:10 144:2

**downtown** 192:3,6,16

**dozen** 184:9

**draw** 18:5 192:14

**drawing** 163:6

**drawn** 176:11

**drill** 186:24

**drive** 7:17,21 10:3,17 11:9 57:18 58:4 220:20

**drives** 4:11 7:12,23 9:15 11:11 33:19 68:15 88:7

**drop** 177:12

**dropped** 69:12

**drug** 41:25 43:23 115:16 116:15 117:1

**duces** 7:8

**duly** 1:18 6:2,5

**dynamic** 34:15

**E**

**earlier** 28:9,13 31:6 34:21 41:21 52:8 54:20 59:23 74:14 78:8 96:13 98:6 173:9

**earliest** 26:19

**easier** 74:25

**eat** 81:8

**editorial** 58:7

**education** 134:24

**effect** 22:14 46:22,23 65:25 97:6 132:8 160:20,22 202:12

**Effective** 221:19

**efficient** 30:24

**elaboration** 57:16,17

**elbow** 91:19

**elbow's** 91:20

**electrical** 25:16

**element** 23:6

**elements** 90:7

**elicit** 213:18

**eliminate** 82:15 234:25

**employed** 117:20 119:2 122:9 123:25

**employee** 119:4 122:13 123:8 124:19 222:5

**employees** 124:15

**EMS** 198:20

**end** 36:4 71:2 155:25 156:3,5,25 164:5 229:24 242:16

**ended** 35:7

**enforce** 144:10

**enforcement** 140:18 221:11,20 223:19

**engage** 58:18

**engaged** 124:9 143:12 238:13

**engaging** 126:4

**enhance** 123:12 218:1

**enhanced** 9:16 12:13

**enhances** 191:21

**enter** 73:20 96:14

**entered** 219:19

**entering** 224:17

**entire** 7:16 131:7 178:19 181:22

**entitled** 131:14 136:18

**entity** 119:16,18

**entry** 96:15

**envelope** 33:22

**environment** 23:10 234:22

**epilepsy** 24:24

**equation** 63:4

**Erica** 5:11

**essential** 12:18

**essentially** 73:6

**establish** 42:13

**established** 19:22

**Estate** 1:4

**estimate** 25:12,19,22

**ethical** 238:11

**evaluate** 77:21 113:25 134:16 135:2

**evaluation** 79:19 229:13

**evaporate** 145:3

**evasive** 174:15

**evening** 162:22 165:3

**event** 12:23 29:3 34:14 40:19 41:14 46:18 115:20,23 143:21 197:8 202:5 212:14

**events** 6:23 24:20 85:7 145:10 176:1,2,5 177:6

**eventually** 53:15 207:6

**everybody's** 201:15

**everything's** 86:3 144:5

**evidence** 17:15 63:25 92:20 107:10,14 108:2 112:3 113:24 114:9,10,12 129:24 141:19 144:8,9 155:23 159:1,20 162:19 179:22 189:12 197:25 198:8,10 199:15,21 200:10 201:12,25 203:1 208:14 209:16,19 211:6 212:12,15 214:17 217:11,15,17 227:10 231:11 235:23 236:20

**exact** 49:13 169:17

**exam** 136:8

**Examination** 4:5,6,7,8 6:6 106:1 114:20 220:11 227:20 236:17 240:9

**examples** 26:2,13 189:20

**exceeds** 58:25

**excess** 88:22

**excessive** 86:12,14 105:17,18

**excited** 24:19 94:9 97:16

**excluded** 94:20

**excuse** 163:5

**executive** 19:14 27:19 45:10

118:13 122:10,13 139:14,20

**exhibit** 10:5,10 11:11 12:6 24:11 33:20,23,25 73:25 94:15 95:4 133:24 134:2,3,6 139:9

**exhibits** 4:10 94:20

**exists** 174:24

**exit** 73:20 75:1

**exiting** 73:21

**exonerated** 134:13 138:24

**expect** 137:12 226:11,18

**expected** 47:7 231:9

**expedite** 172:24

**expenses** 220:24 221:7

**experience** 61:25 102:4 108:20 134:24 225:23 232:21

**experienced** 102:3

**expert** 11:3,6,21 25:13 80:12 98:23 101:6 132:5 183:12 184:4 207:2,18 240:12,16,20,25

**expertise** 25:25

**explain** 78:9 106:5 119:19 122:11 166:6 187:9 239:15

**explained** 69:20

**explaining** 80:1 100:4

**explains** 86:16 112:17

**explanation** 57:14 102:1 223:10 224:17 232:19

**exposure** 226:8

**expressed** 24:5

**expressing** 19:17

**extensive** 222:11

**extensively** 25:6

**extent** 92:3

**extreme** 58:18

**extremely** 170:3

**eye** 12:23 13:1,2 101:1

**eyes** 25:9 45:24 95:21

**eyewitnesses** 174:18

## F

**facing** 72:10

**fact** 37:24 45:11 46:1 47:7 64:3,7 65:19 67:21 70:3 72:10 77:24 83:23,24 86:13 94:1 99:14,18 102:15 103:4 104:24 107:16 111:13 113:15 133:11 142:18 154:8 156:16 163:2 165:6 172:3 175:11 190:17 196:16 198:1 201:10 205:16 219:2 221:6 224:3 228:20 235:20 238:6

**faction** 175:1,2

**factor** 23:12

**factors** 90:2

**facts** 11:25 14:16 17:12 22:16,20, 22,24,25 37:11 43:19 66:6 115:4 116:3,11 141:6,11 142:23 154:16, 21,24 155:4,6,23 156:15,17 157:9 158:3,4,8 163:25 164:8 165:19 166:15,18 167:10 169:6 182:15,16, 18 189:12 194:3 196:14,19,21 203:2,12 205:7,13 206:9 207:2 217:2,9 218:8 226:6 237:25

**factual** 104:10

**failed** 29:17,22 34:12 132:14 134:17 210:13 227:25 228:15

**failure** 30:4 42:24 84:25 87:22 89:22 100:22 134:21 135:12 178:24 179:9 228:13

**fair** 21:2 28:3 50:14 56:14 100:7 123:11 134:18 135:4 140:3 149:4,6 156:7 170:4 171:9,17 173:21 174:5 175:4,11 181:4 188:10,11 232:12 237:16

**fairly** 14:1 188:15

**falling** 110:13

**falls** 208:5 210:25 212:5 213:8 215:25 216:7

**false** 17:13,14 67:15 85:15,19 144:15 160:17 164:5 165:2,23 205:9,15 206:10 225:24

**falsely** 205:22

**familiar** 21:15,19 236:21

**family** 238:15

**farther** 68:25

**fashion** 162:7 171:6

**fast** 20:14 29:20 39:3 180:15

**faster** 50:15,18,22

**fatal** 140:24 210:15 229:1

**fatally** 113:22

**faulting** 153:4,8

**favor** 38:16

**favorable** 208:7

**fear** 176:10 209:8

**feasible** 239:19

**federal** 119:3 240:12,21

**fee** 220:16

**feedback** 225:19

**fees** 220:14

**feet** 68:22 101:4

**fell** 28:12 212:6

**felon** 103:24 104:12

**felony** 90:20 109:13,16,18 121:10, 25 126:7,10 127:12,16,17 128:23 226:17 227:11

**felt** 130:19

**female** 124:9

**ferreted** 156:5

**field** 14:5 15:7 184:4,8 186:18

**figure** 119:13 138:9 215:12

**file** 7:16 112:22 148:15 164:19 219:5

**filed** 239:22

**fill** 185:20,22,24

**filled** 34:2,4

**final** 136:8

**finally** 99:8 114:8

**find** 9:1 11:13,23 12:8,18 31:5,18 42:16 57:21 79:2,7 82:22 86:18 115:7 143:14 146:4 152:25 161:17 172:22 178:20 222:10,15 225:1 237:7 239:16,17

**finding** 28:12

**findings** 10:13 130:9

**fine** 27:6 33:4 74:22 80:18 81:21 84:15 97:9 105:22 117:24 160:7,10 176:15

**fingerprint** 236:20

**fingerprints** 62:20 78:4

**finish** 21:1 38:14,22 53:19,20 54:6, 9,12,14,16,19,25 55:4,8,20 61:16 63:8,9,14 78:13,14,15 81:13 158:24 220:5

**finished** 20:18 27:16 38:8,11 42:3 97:13

**fire** 72:12 76:24 174:8 202:10 233:23

**firearm** 25:15 60:3 72:21 103:24 104:13 109:18 191:12 226:13,18, 19

**firearms** 68:2 145:7 173:3

**fired** 15:12,14 16:18 21:7,8,10 26:18 45:12 60:11 67:10 68:13 73:6 77:7 80:2,3 87:15 102:20,21 103:3 108:13 157:24 169:16,18 178:2 233:22

**firefighter's** 168:4

**fires** 52:19

**Firm** 3:4 5:10

**fists** 43:16

**fit** 57:11 224:12

**fits** 94:3

**FITZPATRICK** 3:11

**flag** 144:20

**flash** 4:11 7:12,17,21,23 9:15 10:3, 17 11:10 25:6 33:19 88:7

**flashlight** 30:13 38:3 95:19,20,21 100:1,9

**flashlight's** 95:22

**flashlights** 25:8

**flip** 99:24

**floor** 182:21

**flow** 182:22

**focus** 27:25

**focused** 28:6 102:18

**focusing** 53:23 63:10

**focussed** 63:16 236:13

**focussing** 196:1

**follow** 15:4 55:7 178:23 179:7 182:7 183:5,7,24 194:24 197:12 213:23 214:11,14 215:13 236:24

**follow-up** 55:17,24 105:17

**food** 124:13

**footage** 8:13 9:7 232:5 233:25

**force** 18:22,24 28:6,7,19 36:3 44:16 57:6,7,12 61:5 68:1 77:18 85:13 86:12,16,19 87:19 90:8,9,10, 15 98:13,20 101:19 105:17,18 119:19 144:23 169:12 173:18 202:25 219:25 221:12,13 240:21 241:12,18

**forensic** 62:20 63:2 80:6

**forensics** 72:20 78:4 81:23,24 199:23 227:5

**forfeit** 36:2,4

**form** 12:24 13:20 14:10,18 15:8 22:2 23:8 24:4 26:10 32:16 36:12, 19 37:20 41:11,16 42:10,12 43:6, 10 44:8 45:6 46:9,13,20 47:14,24 48:7 50:3,17 51:5 52:15,20 53:10 59:8,17 60:19 61:9 64:9,14 65:7 66:1,9 67:2 75:15,20 77:9 80:5,10 82:14,17 83:1,6,12 84:4 88:24 90:21 91:4 92:6 93:1 96:4,17 97:19 98:11 108:5,6,15,16,24,25 109:14, 24 110:14 112:8,9 113:7,18 116:18 120:8,9 131:15 135:15 136:1 152:20 153:7 155:10 156:2 159:4 161:22 162:1,6,15 165:25 170:25 171:5,8,18 172:15 174:6,10 175:13,23 178:11 184:5 189:18 200:15 202:3 203:18 204:10 205:3, 17 206:14 207:8 211:23 216:14 218:6 225:8 226:14 229:12 231:1,6 232:14,17 233:13,20 234:12,14 235:7,11,21 236:8

**formal** 197:11

**formula** 70:23

**Forty** 123:18

**Forum** 19:14

**forward** 49:14

**forwarded** 204:8,12,17 205:9,12 207:3

**found** 12:1,2 26:18 27:11 66:23 77:25 83:5,7,15,20 129:23 165:21 198:17 227:5

**fourth** 115:15 229:20

**frame** 12:10 34:22 73:6,8 78:24 79:16,22 80:4,7 99:2

**frame-by-frame** 14:20,21,23 78:8

**framework** 71:12

**frankly** 149:8 185:16

**frequently** 225:24

**front** 8:22 30:12,21 34:17 37:3 44:2 64:12 73:20 75:2 76:12,16 91:16 95:22 96:11 116:7 127:6 139:4 144:13 180:6

**fuck** 47:3

**fucking** 60:8,17 61:23 92:10 105:4

**full** 6:25 20:21 42:23 56:9,12

**full-time** 120:11

**fully** 196:1

**fundamental** 30:16 35:1

**G**

**gain** 96:15

**games** 147:12,16,17,24

**gap** 58:12 70:22,24 185:19,21,24

**garments** 110:24 111:2

**Garrity** 131:1,8 180:2

**Garza** 32:7 106:21

**gather** 31:7 197:8

**gave** 72:24 85:15 107:19 120:12 125:16 137:3 159:22 162:21 175:18 179:13,19 230:21 235:5,15

**general** 29:15 91:9 92:5 134:19 135:5 178:24 179:9 204:17

**generalities** 187:1

**generally** 28:25 29:18,22 93:8 206:2 208:6 217:7 230:1

**generically** 8:13 9:5

**generics** 16:25

**gentlemen** 111:9 224:4

**Geographically** 92:7

**get all** 182:15 212:11 217:11

**girl** 235:25

**give** 6:25 26:2,12 34:6 56:6 62:8 107:16 145:6 161:15 169:10 175:21 179:25 180:5 189:20 194:8 203:8 220:3 223:14 224:15 230:17

**giving** 56:9 77:4 128:14 168:20

**glad** 87:19 116:7 136:12 212:10

**glare** 64:17 100:1

**glasses** 33:15

**good** 5:2 6:8 9:14,22 10:22 11:10 13:5 17:21 22:5,11 23:1 34:3 37:2 54:10 58:5 61:3 68:24 81:5,10 84:11 134:7 144:5 178:12 188:15 212:25 224:25

**gossip** 66:11,13

**government** 120:9

**Graham** 18:12,25 22:11 26:8 28:9 34:15 57:8,12,16,17 90:4,10,20 98:8 101:21

**grain** 225:20,21

**grand** 127:6 204:23 205:1,2,15,22 206:2,12

**granted** 101:3

**grass** 198:17

**gray** 189:5

**graze** 74:2

**grazed** 52:11 73:11 75:5

**grew** 183:14

**ground** 87:2 89:15 100:9 196:24 197:3,10,13 200:19,21 201:7,8

**group** 19:8

**groups** 213:11,25 214:2,7,9

**guard** 96:8 204:3

**guarding** 203:15

**guess** 95:15 119:13 167:9 212:4 232:21

**guidance** 213:15

**guide** 204:13

**guideline** 28:8 214:19

**guidelines** 28:11,15 211:2 212:6 214:10,13,14 216:2,7,8 239:20

**gun** 25:14 26:4,18 36:10,22,23,24 37:3 44:6,12 45:4 52:24 53:1,4,14 55:11,24 59:13 62:11,12 65:22 66:5,8,17 70:3,5,11 71:3,13 73:3 76:12 77:22 81:25 82:9,12,13 83:4,7,9,15,20,24 84:7 85:18,19 86:1,2 101:16 107:16,18 111:25 118:15 144:14 154:19 156:1,6 160:25 161:9 162:7,13,14,25 163:3,6,7,10,12,17,18,23 164:1,2,10,24 165:10,14,22 171:7,13,17,23 172:3,13,14 174:16,19,22 175:1,3,10,11 176:10,11,23 177:2,12,13 188:16 192:19,22 198:15,16,25 227:4,5,11 231:22 233:12 236:12,20 237:7

**gunfire** 72:10

**guns** 43:17

**guy** 53:24 63:22 101:15 145:18 235:25 238:13

**guys** 80:23 81:9 84:12 106:22

**H**

**hair** 180:10

**half** 34:6

**hall** 50:24

**hand** 6:1 8:6 46:2 53:1 72:21 82:10 84:2 91:2,8,16,21 92:4 110:11 136:3 137:15 174:16 177:10,25 180:24 225:16

**handcuffed** 191:9 192:12

**handcuffing** 25:2 241:9

**handcuffs** 191:7 192:6,10,16

**handgun** 64:17 72:23 77:25 169:18,20 177:24 180:23

**handle** 30:24

**handled** 26:19 122:4

**hands** 60:8,16,17 61:6,23 62:8,9,13,15 92:10 105:4 111:24 168:22 177:11,13

**happen** 44:7 45:7 76:21 145:19

**happened** 13:16 48:21 76:20 103:4 112:17 153:9,12,19,20 155:8 156:20 164:15 211:16,19 229:24 230:14

**happy** 145:18

**harassment** 241:11

**hard** 12:25 23:9 25:19 51:16 93:5 98:21

**harm** 36:15 169:13

**haste** 27:21

**head** 23:21 136:15 137:20 147:21 224:4

**health** 6:23 24:23

**hear** 5:21 20:20,22 21:9 48:13 56:12 110:6 142:17 162:18 209:9 233:7 234:17 237:11

**heard** 6:9 48:6,8,9,11 59:21 60:24 61:1 121:21 141:14 142:20

**hearing** 237:24

**heavily** 156:13

**height** 91:19

**held** 118:13 161:10,11 196:12

**helped** 15:1 128:14

**helpful** 11:23 12:8 14:20 15:16 16:22 25:23 106:18

**hereto** 1:24

**HERNANDEZ** 3:14

**Herrera** 180:8

**hey** 21:10 93:20 98:2,5 99:21 196:19 225:2

**hide** 139:25

**hiding** 31:19,20

**higher** 174:21

**highlight** 29:13

**highly** 26:9 145:12

**Hines** 146:4,8 165:20 166:1,7,16 196:12,17 229:17,19,21,24 230:1

**historical** 140:17 143:18

**historically** 100:15

**history** 43:20 222:11 223:5 225:22

**hit** 16:20 52:14 64:22,23 65:3,6 66:25 67:4,22 69:5,25 72:14 75:7 87:16 92:18 93:2 170:8 171:23

**hitting** 35:13

**HOBLIT** 3:14

**hold** 23:17 27:15 38:6 63:7 67:8 72:12 83:11 97:12 125:5,11 126:1 136:21 147:10 170:7 171:20 200:12 205:6,21 206:9 207:1 227:10 236:25

**holding** 76:11 95:19 148:16 177:24 180:23

**holds** 131:22

**hole** 185:3,4

**home** 36:5 71:2 96:14,15 233:19

**homeless** 40:20

**homicide** 121:17 126:22 127:24 128:4,5 146:18 152:19 186:10,12 207:13

**honest** 185:14

**honestly** 38:16

**Hope** 227:14

**hospital** 192:1

**hostile** 92:11 94:1

**hour** 72:24 80:17

**hours** 191:17,19

**house** 30:9,11,15 31:7,9,12,18,22 32:7,19 34:19 37:4 41:4,6,10,24,25 42:6,20 43:5,7,23 45:3 51:10,12,21 54:22 56:17,19,21 63:19 72:8 77:25 79:3 83:9,16 86:24,25 94:8 97:8,17 99:9 108:4 114:24 115:12, 16,17 116:2,15,21,25 117:1 170:21 174:9 223:17 227:6 231:15

**How'd** 198:25

**huge** 179:15

**human** 12:22 13:1,2

**hundred** 157:22 178:22 179:4

**hundreds** 12:9 91:24

**hurdle** 103:25

**HURDLOW** 3:14

**husband** 114:11 223:12

**hypothetical** 37:6,10,11 70:13 71:17 86:20 109:17 166:12 170:21

**hypothetically** 114:5

**hypotheticals** 72:23

**I**

**IA** 86:8 114:1 219:5

**IA's** 184:12

**IACP** 19:7,8 28:14 213:11

**IAP** 45:15

**ID** 122:23 125:13,17

**identical** 34:2

**identified** 27:11 41:6 65:21 114:13 129:13 178:22 179:1,4,10 216:9 217:23

**identify** 31:25 88:3 93:11,23 115:4 154:7,15,24 169:6 188:24 199:19

**identifying** 87:22 88:1 96:22 98:15 193:24

**illuminated** 34:19

**illustrate** 211:10

**images** 14:15

**imagine** 114:5

**immediately** 153:16

**imminent** 44:14,18,19,23,25 59:5 71:14 72:10,17 77:5 79:4 101:18 173:20 174:1

**immunity** 19:17,24

**impact** 24:6 25:2

**impacts** 161:3

**impartial** 178:25 179:9

**impersonate** 37:22

**important** 20:9 97:3 106:17 232:25 234:7,8

**impose** 132:4 135:8

**imposed** 129:1 130:19 132:3,13 135:23

**imposing** 130:5

**imposition** 130:13

**impossible** 167:15

**improper** 40:25

**improperly** 103:9 124:23 200:10 205:22

**in-car** 106:22

**in-custody** 221:18 241:10

**in-force** 121:18

**inappropriate** 20:10 40:24

**inappropriately** 199:20

**incident** 85:11 89:22 110:25 112:16,18,24 113:5 128:1,6 147:4 153:11,17 161:8 163:13 178:9 202:16 203:3,13,17 204:3 219:13 223:19 224:7 225:7 228:24,25 230:23 231:3,13 235:10

**include** 211:7 219:25

**included** 219:1 237:14

**includes** 37:11

**including** 29:18,23

**inclusive** 142:8

**incompetent** 87:15

**inconsistencies** 183:17,18 186:19 189:4 231:17

**inconsistency** 189:7

**inconsistent** 28:7

**independent** 35:24 110:17

**INDEX** 4:1

**indication** 162:12

**individual** 128:8 129:18 156:1 164:24 165:8,9 224:22 231:5

**Individually** 1:3

**individuals** 92:12 107:2 108:4 113:22 114:14 170:22 228:23 233:19 234:9,10

**influence** 104:20

**information** 13:16 30:18 31:5,7 43:23 46:3 48:6 56:20 85:15 99:1 104:10,19 105:15 106:6,8 107:11 112:5 113:4,16,23 115:6 123:4 126:23,25 128:15 156:9 159:18 161:5,17 165:1 166:23 167:12 168:8 180:1 183:16,17 184:22,24 186:7,13 187:17 204:8,17,25 205:1,10,15,21 206:11 207:9 212:1,12 225:24 232:22

**inherent** 178:23 179:8

**initially** 86:10 155:16,21 179:21 180:5

**injured** 145:8,9 168:19 173:6,15 237:6

**injury** 29:7 44:17 45:1 124:15,16 173:20 174:2

**inmates** 236:1

**innocent** 87:16 169:14

**inquired** 187:24

**inquiry** 16:24 56:24 238:8

**inservice** 88:14,20 89:1,2,4,11

**inside** 34:20 37:7 49:5 78:20 95:20 177:25 180:23 225:10

**insignia** 37:18 95:12

**inspection** 79:19

**instance** 1:17 40:17 58:5

**institute** 221:17,21

**institutes** 222:4

**instructions** 6:11

**insufficient** 81:25 82:8

**insulting** 185:16 186:2

**intelligence** 241:13

**intend** 18:14 20:20 108:23

**intended** 63:21,25 96:15 97:24,25 169:7,8 170:8,10,14,15 171:23 172:14 189:17

**intent** 22:9,10 23:3 76:8 98:10

**intention** 96:14 225:1

**intentional** 99:10 170:2

**intentionally** 23:11 66:14 207:3 224:20

**intents** 22:13

**interact** 31:17

**interaction** 44:2 69:21

**interactions** 61:6

**interest** 104:3,4

**interesting** 72:4

**intern** 124:9 129:21

**internal** 114:1 122:4,14 123:2,11, 12 124:3,14 126:13 128:3,6,11 131:18 132:8 134:16 135:3 141:23, 24 142:2,6,13,18,23 143:9,11,24 145:25 146:1,3,10,15,18,23 147:6, 12 148:10,21 149:3,4,10,20,21,25 150:12,14,19,23 151:1,16 152:1,18 153:4,8 155:11,24 159:12 160:21 161:3,6 164:7 183:2 184:8 196:2 209:1 210:14 211:1 212:5,7 213:9, 12,14 216:1 229:9 236:11 240:4 241:12

**interpret** 145:14

**interrupt** 78:12

**interview** 163:13 178:14,16 183:8, 15 191:14

**interviewed** 129:24 196:11

**interviewing** 191:16 194:20 213:16

**interviews** 178:23 179:7,24 182:8, 12

**invented** 154:20

**inverse** 143:15

**investigate** 214:15 239:14 240:4

**investigated** 153:24 154:1 193:17 229:24 238:20

**investigating** 225:18,23 241:10, 11

**investigation** 65:20 66:16,18,21 89:24 104:12 106:11,17 107:8,13 113:21 114:2 119:3 121:10,15,18, 19 123:13 124:18,22 126:7,12,13, 15,22 127:12,25 128:6,12,14 129:21,23 131:18 132:9 135:9,13 140:24 141:18 142:3,6,12,14,19,25 145:11,25 155:25 156:5,6,22 157:13 158:9 159:14 160:21,22 161:3,7 164:6,16,19 175:17,18 178:13,17,19,25 179:10 181:9,22, 24 182:4 183:2,14 184:7,22 185:3, 19 186:5,8,11,15 189:15,22 190:5, 12 191:3 194:11 195:4,5,11,14 196:2 201:14,19 202:15 206:23 207:5,6 208:4,6,10,20,24,25 209:3, 25 210:15 214:19 219:8 226:1 229:8,9 231:3 234:20,23 235:18 236:3,11 237:2,16,21 238:1,24 240:5

**investigations** 118:15 119:22 120:17 121:7,17 122:5,14,20,24 123:2,10,11 124:3,15 133:10 184:8,16,17,18 185:2,9 213:14 227:1,2 239:4 241:12

**investigative** 134:17 135:3 146:9 152:25 156:12 186:4 211:1 212:5,7 213:9 216:1 238:8

**investigator** 104:17 121:21,24 127:1,4,12,17 128:3 142:24 143:11 146:1 147:7 155:25 185:3,19 189:13,14 207:3 211:5

**investigator's** 189:11

**investigators** 113:24 122:17 143:3,9 146:3,6,15,18,19,23 152:15 153:5,9 155:11 159:7,18 164:19 165:13 167:17 179:20 180:9 187:3,4 194:9 195:7,10 196:5,7 199:23 217:11 230:17

**investigatory** 159:15 190:11

**invoked** 135:18

**involve** 25:2 26:3 27:9

**involved** 12:12 22:4 25:4,14 26:13,14 27:8 43:14 61:19 104:7 114:15 124:11 126:22 127:25 128:1,5,7 140:24 142:18 144:23 147:3 161:4 182:13 183:23,24 193:20 201:23 203:16 205:9 219:7 223:18 228:25 230:2 238:23

**involves** 25:24 113:22

**involving** 24:23 222:17

**irrelevant** 22:13

**isolate** 224:22

**isolation** 144:19

**issue** 34:17 35:16 68:25 110:6 154:4 161:25 216:15

**issued** 210:2

**issues** 24:24 56:25 89:15,25 103:7 157:20 215:10 234:18

**J**

**jacket** 87:7

**jail** 25:25 188:19

**jeans** 224:5

**jeopardize** 70:18

**jeopardy** 44:14

**job** 18:10 123:1 129:25

**jobs** 124:16

**John** 1:13,16 4:5 5:4 6:4 30:11 31:4,5 222:3

**Jones** 1:20 5:12

**Jr** 1:4,13,16 4:5 5:4 6:4

**judge** 151:10

**judge's** 18:10

**jump** 11:9 36:6 57:18 58:4 68:15 220:19

**jurisdiction** 117:21 120:13 138:16

**jurisdictions** 206:3

**juror** 99:18,22

**jurors** 58:14 120:17

**jury** 13:15 15:13 17:9,22,24 18:1 19:20 22:8 23:13,23 36:1,9 40:24 76:3 77:3,21 92:24 98:19 99:13 106:6 111:9 119:22 127:7 174:19 204:23 205:1,2,15,22 206:2,12

**jury's** 98:25

**justice** 239:11,18,20,23

**justified** 90:15

**justify** 22:16

**juvenile** 26:16

**juxtaposition** 60:6

**K**

**kill** 53:21 170:8 215:11

**killed** 35:9 53:16,24 71:15

**kind** 50:11 63:4 69:18 72:4 98:15 102:5 121:13 168:23 177:22 180:21 183:10 195:3 224:17

**kindly** 81:14

**kinds** 25:17 227:13

**knew** 31:15 32:2 35:10 42:8,15,20 43:7 54:22 62:23 63:11 64:1 71:18 75:24 90:6,9 98:20,21 169:12,20 173:10 232:23 234:6

**knife** 101:16

**knives** 43:17

**knock** 30:22 41:1,14,17 56:23 93:5,17 96:20,25 97:1,7,25 99:4

**knocked** 100:17 225:1

**knocking** 96:18,22 97:4,8

**knowing** 23:23 207:12

**knowledge** 24:22 25:1 119:14 184:7,12

**Kosanovich** 3:10,11 4:6,8 5:19 74:18,21,24 80:23 81:3,8 84:14 105:12,20,25 108:5,15,24 110:14 112:8 113:7,18 114:21 116:20 131:17 132:21,25 133:7,15 134:3,5 136:3,14 137:1,8,13,17,19 138:2 139:9,11 145:22,24 147:14,17,20, 25 148:5,11,14,18,22 149:1,5,12, 17,21 150:1,5,10,14,20,24 151:3,7, 13,18,22 152:3,6,8,12,14,21 153:10 156:4 159:6 160:2,6,10,16 161:24 162:5,17 165:18 166:4 170:11,13,24 171:3,9,20 172:6,18 174:7,23 175:16,25 178:15 189:23 200:14,18 201:3 202:6 203:20 204:16 205:6,19 206:16 207:10 211:25 215:2,7,15,19,21 218:8,15 220:3 229:12 231:1,6 232:14,17 233:13,20 234:12,14 235:7,11,21 236:8,16,18 240:7 241:23 242:4

**L**

**label** 137:5

**lack** 35:3 57:1 100:1 178:22 179:7 182:7 183:5,7 187:17

**lacking** 134:14

**ladies** 111:8

**lady** 31:8 41:10 86:23 87:3 107:19 114:10 218:14 223:12 224:13

**language** 22:14 173:14

**LAPD** 202:8

**LAPD's** 68:11

**large** 7:19 77:20,23

**Las** 202:8,9,10 221:1,14

**lasted** 224:7

**latched** 93:6

**late** 20:23 62:14 147:8

**law** 3:4 5:9 18:9,15 19:3,22 36:6 57:13 140:18 214:22 221:11,19 223:18

**lawfully** 40:25 96:15

**lawsuit** 172:12 218:4

**lawyer** 6:11 137:17 185:20 190:10

**lead** 121:20,24 127:1,4,12,16 128:15

**leadership** 134:15 135:2,19 140:23 141:7 210:13 216:24

**leading** 193:10 209:7,11

**learn** 184:21

**learned** 186:8

**leave** 17:24 33:22 34:9 76:9 81:2 125:1

**leaves** 15:7

**left** 49:17,23 51:25 52:2,9,19 55:25 73:12 74:15 78:23 84:23 91:18 118:20 198:16

**legal** 2:1 5:12 18:9,17 19:19 37:5 57:3 77:16 86:15 131:3,14 133:13

**legally** 103:22

**legitimate** 41:5

**length** 157:20 158:20

**lens** 144:1

**lesson** 88:17

**letting** 38:21 145:2

**level** 138:18 223:23

**levels** 138:24
**liability** 27:25
**liaison** 122:18
**liaisoned[sic** 128:17
**licensed** 117:6,11,14
**licensure** 117:18
**lied** 129:23,24
**life** 36:3 72:13 176:10 209:9
**lifting** 177:23 180:22
**light** 22:25 95:24
**lightly** 92:16
**lights** 25:7
**limited** 126:3
**lines** 42:8,9 134:14 177:20 229:25 230:14,15 241:10
**list** 9:19 85:8 101:11 152:23 207:21
**listed** 8:1,3 10:20,21 11:4 57:21, 22,24 146:6,7 152:23
**listened** 109:4
**listening** 18:5 42:2
**lists** 8:12 27:2
**live** 91:14
**LLP** 3:14
**located** 5:10 212:8
**location** 42:25 43:20 223:15
**locker** 124:20
**lodge** 54:15
**log** 113:1,8,11,13
**logic** 35:17
**logically** 85:21 177:14,17
**logs** 113:5
**long** 33:3 84:12 97:18 105:24 118:25 122:6 123:14 163:13 165:12 167:24
**longer** 80:15 108:13 126:1 222:15 223:5
**looked** 10:6 12:5 13:23 33:24 81:23 110:1 154:2 184:9 220:19 231:16
**loop** 219:1
**loss** 72:12
**lost** 198:8,10
**lot** 25:15 68:25 71:24 77:12 97:2 121:14,19 143:25 144:12,21 201:19 226:6
**loud** 31:21
**Lowell** 3:7 5:17 6:8 20:13 23:18 32:22 38:6,15,18 61:15 63:7 78:15 80:14 83:18
**lower** 39:10,11,21
**lucky** 97:5 115:10
**lunch** 81:6,7,9 84:18
**Luza** 146:11 165:20 196:18
**lying** 189:9 199:2

**M**

**machine** 1:21
**made** 41:21 92:15 98:20 113:3 116:12 125:15 137:14 145:15 158:17 164:23 165:8,22,23 166:16 168:24 169:11 211:10 218:25 232:9 233:21,22 238:3,5
**magazine** 77:25 83:8,15
**Magna** 2:1 5:12
**main** 3:9 169:25
**make** 12:14 20:17 27:4,21 35:24 37:2 42:2 43:2 56:24 57:5 72:20 76:7,8 102:24 107:9 118:15 125:8 131:2 134:5,16 137:3,6 146:21 147:11,15,23 148:9 162:11 176:21 178:8 180:3 184:4 190:11 197:7 200:10 203:20 210:1 242:12
**makes** 135:2 177:14,15 224:6
**making** 98:14 132:2,4 154:4 197:4 218:3 225:13
**male** 114:17 223:13
**man** 39:6 47:1 93:20 94:2 104:6
**man's** 30:11
**management** 140:8
**mandated** 88:22 194:23
**mandatory** 214:13
**manner** 213:6
**manslaughter** 104:9 207:16
**mantra** 140:18,21
**manual** 130:6,7 201:6
**march** 1:14,19 5:8 182:20
**mark** 3:10,13 5:19,22 7:23 10:5,10 11:11 12:6 24:10 66:25 73:25 94:13,15 132:24 136:11,21 147:11 149:2,3,10 160:4 171:25 185:11 200:5 214:24
**marked** 24:10,18 33:18,19,24 133:25
**masquerading** 37:25
**Massachusetts** 117:16 118:8,14 122:12,21
**masturbating** 124:19
**match** 31:8
**matched** 180:10
**material** 17:2,5 81:23 82:8,25 83:3 158:9 159:10 163:25
**materials** 88:5,8
**matter** 5:4 37:19 74:11 163:2 184:20 201:14 202:15 203:5
**matters** 37:21
**mayor** 89:20 140:7 217:24 218:1, 4,7,14,16
**mayoral** 120:9
**Mcmanus** 10:24 134:14 135:1,7 141:12 161:9,16 217:23 232:1,12, 13 236:12
**Mcmanus'** 231:21
**means** 75:22,24 76:4 79:22 82:23 177:9 198:12
**meant** 73:12 100:2 143:7 181:18
**medical** 234:10
**meed** 121:3
**meeded** 138:19
**meets** 45:5
**memorandum** 215:9

**memories** 60:21 191:15

**memorize** 87:20

**memory** 14:1 60:17,20,23 61:11, 19 101:13 115:7 191:20,21

**men's** 124:20

**mental** 24:23 58:22

**mention** 134:10,19

**mentioned** 32:10 43:17 78:8 102:25 109:1 112:11,23 122:7 128:19 140:7 141:2 161:16 200:21 209:15 235:2

**message** 159:2 167:24 168:4 213:2

**messages** 106:15,16 158:21 160:1 211:7 217:18

**met** 85:11 89:1

**methodology** 240:24

**methods** 31:22

**metro** 202:9

**middle** 33:4 71:10 85:4

**mind** 15:18 22:6,7 26:23 27:7 32:23 96:25 110:19 124:25 170:17

**minimal** 220:2

**minimum** 219:18

**minute** 32:24 160:5 203:8

**minutes** 84:14 109:2 157:22 220:4

**Miranda** 190:9,14 195:2

**misconduct** 106:14 228:18

**miscued** 156:16

**misdemeanor** 128:22

**misheard** 210:20

**misinformation** 85:21 178:22 179:4,12 180:4 181:8,21,23 182:3

**mislead** 60:7 181:5 207:4

**misleading** 66:14 180:7 205:10,15

**misrepresented** 156:17

**missing** 27:1

**misspeak** 134:8

**misspoke** 103:2

**misstate** 115:2 135:14 142:2 143:5 169:1 173:19

**misstated** 156:16

**misstates** 64:24

**mistake** 63:23

**mistaken** 67:6

**misunderstandings** 227:16

**misused** 61:1

**mobile** 166:21

**modern** 28:14

**moment** 10:12 15:24 23:14 91:12 161:15 170:18

**month** 196:7

**months** 125:6 188:20

**morning** 5:2 6:8 86:20 94:6,7 99:19 101:5 108:18 110:25 161:12 224:16,24 234:2

**motion** 59:7 148:15 176:17

**motivation** 23:5,12,13 24:7 98:7,9 99:6 108:22 109:5

**motivations** 22:12 24:2

**Mount** 120:4

**mouth** 223:13

**move** 39:22,25 49:14 50:10 53:4 55:19 70:4,14,17,19 71:14,22 72:1 73:16 75:12 87:6 152:5 160:2,7 204:7 215:16,23

**moved** 34:21 35:3 49:12 54:1 79:3 98:22 108:19

**movement** 50:7 65:14 78:21 92:4

**movements** 90:25

**moves** 49:10

**moving** 33:15 34:22 45:9 50:20,25 63:11 71:7 73:8 76:2 78:23,24 166:6 169:24 180:15

**multiple** 34:18 61:5 65:20 108:4 110:2 179:16,19 180:7 185:15 240:14

**multitude** 119:21

**murdering** 235:25

**muscle** 60:17,20,22 61:11,19

**muscles** 60:21

**mute** 145:1 167:2

**muted** 166:24 167:13

**N**

**name's** 107:20

**names** 146:6 216:25

**narrative** 67:15 160:18 164:5 165:3

**narratives** 160:23

**narrowly** 99:3

**Nathan** 3:13

**national** 18:19,21,23 19:5 28:7 57:5,11 90:10 202:17,19,20,23,24 239:9

**nature** 227:18

**NAVARRO** 3:8

**necessarily** 23:13 31:20 40:19 143:16 144:19 184:9 197:22 198:15

**needed** 86:9 158:16 188:3

**negative** 154:13 182:18

**negotiated** 131:24

**neighborhoods** 239:21

**neighboring** 234:24

**news** 85:17

**night** 146:24 147:1 153:6 161:8 166:17 171:6 182:3 190:22,23 191:2 192:23 194:19 195:12,15,16, 24 196:10 209:20 234:1

**no-knock** 97:1

**Nobody's** 78:3

**non-detailed** 213:7

**non-internal** 126:11

**non-police** 178:24 179:8

**noncriminal** 184:18

**nonparticipant** 145:8,9 168:19 173:5,14

**nonresponsive** 51:19 54:13 145:23 170:12 176:18 200:2

**North** 3:5,9 202:9,10

**Northern** 118:23 126:21 127:23

**note** 27:4

**notebook** 8:6 10:5

**notice** 7:8 110:12 221:1 224:18

**number** 5:3 8:7 10:10,11 24:11,18, 19 28:5 29:14,16 33:20,23 45:10, 12,19 60:21,22 73:23,25 79:7,8,9 90:1 94:12 103:11 106:4,13 129:23 133:11,19 136:9 139:12,20 140:2, 4,6 142:1,7 147:18 173:4 194:5 203:9 213:11,19 214:16 220:21 230:9 238:25

**numbers** 123:20

**numerous** 155:19 184:6

O

**oath** 66:17 115:21,24 235:16

**object** 46:1 51:18 55:7 58:24 75:13,15 132:21 147:25 149:5 215:15,20 222:18

**objection** 12:24 13:20 14:10,18 15:8 20:6 22:2 23:8 24:4 26:10 32:16 36:12,19 37:6,20 41:11,16 42:10,12 43:6,10 44:8,9 45:6 46:9, 13,20 47:14,24 48:7,15 50:3,17 51:5 52:15,20 53:7,10 54:16 59:8, 17 60:19 61:9 64:9,14,24 65:7 66:1,9 67:2 71:16 75:20 77:9 80:5, 10 82:14,17 83:1,6,12 84:4 88:24 90:21 91:4 92:6 93:1 96:4,17 97:19 98:11 100:12 108:5,6,15,16,24,25 109:14,24 110:14 112:8,9 113:7,18 116:18 131:15 133:7 135:15 136:1 145:22 152:20 153:7 155:10 156:2 159:4,23 161:22 162:1,15 165:15, 25 170:11,23,25 171:1,8,18 172:15 174:6,10 175:13,23 178:11 184:5 189:18 200:1,12,15 202:3 203:18 204:10 205:3,17 206:14 207:8 211:23 216:14 218:6 225:8 226:14, 21 229:12 231:1,6 232:14,17 233:13,14,20 234:12,14 235:7,11, 21 236:8

**objective** 17:15 22:15,20,22 23:2 48:6,14 98:8,18,22,24 101:22 102:6 210:14

**objectively** 46:5

**obscured** 95:23 154:16,18,22

**observe** 233:2

**obtain** 191:13 236:19

**obtained** 189:21 217:16

**obvious** 98:1

**occasions** 104:24 240:14

**occupants** 31:1 34:19

**occupied** 35:5 64:2

**occur** 153:21 163:14 202:18

**occurred** 115:24 157:3 166:17 175:9 178:10,12 179:19 183:1,3 204:4 205:16 219:13 225:7

**occurs** 139:2 203:3

**offense** 133:3

**offer** 11:14 18:14 132:12

**offering** 18:8 232:19

**offhand** 65:9 136:2,20

**office** 42:17 126:17 127:13,16,18 128:18 164:15,20,23 204:9,18 205:11 206:7,12 207:4

**officer** 5:17 6:9 9:10 11:6 13:11,19 20:1 21:9,11,25 22:4,13,16,17,18, 21,23,24 23:6,22 24:2 26:3,17 28:1 29:18,22,23 30:10,12,17,25 31:16 32:2,7 34:12,23 35:1,10,12,21 36:1 37:3,8,14,24,25 40:16 41:9 43:4,22 44:4,12,15 45:4,7,14 46:15 47:16 48:2,14,25 49:6 52:14 53:22 57:2 58:21 60:18 61:4,21,24 63:11,17, 20 66:15 70:11 71:8 72:10,12 73:13 75:18 77:5 78:19,22,23 85:5, 18,22 87:23 88:1,17,23 90:18 91:18 93:12,15,18 95:9 96:3,7 100:3,6,11 101:7,18,23,24 102:3,8, 19 103:8 104:1,2,3 109:17,18 117:6,11,15,16,20,23,24 118:2 119:5 120:4 122:9,22,25 125:12 126:8,18,23 128:1,4,7 129:1 130:14,24 132:14 134:18 135:24 136:18 138:18 142:24 143:3 144:23 153:11,12,18 154:24 156:15 162:6,13,18,21 169:3,7,10, 18,19 170:7 171:4,21 173:17,25 177:24 178:23 179:7,12,18 180:14 181:23 182:8,13 183:23,24 186:5, 14,18 188:4,9 189:15,25 190:3 191:6 192:15 193:9,16,20 195:24 196:6,11,13 197:20 198:7 199:10, 13,17 201:23 203:12,15,16 204:2, 3,9,20,23 205:20,23 206:12,17 207:6 209:12,23 210:25 211:12 215:24 218:4 219:13 223:9 225:3 226:25 228:16,18,21,22 229:5 230:2,6,8,10,16,20,21 231:13 232:11 233:2,7,17,25 234:2,15 235:4,15 236:5 237:3 238:23 241:8

**officer's** 23:21 52:1 98:7 131:7 238:23

**officers** 20:2 21:10 23:10 37:22 58:10,12,17 67:21,24 71:1 85:12 93:21 100:21 109:7 112:6,20 115:9,17 116:5 121:15 122:19 123:17 124:7 134:19 135:5 138:11 140:10,23 143:20 144:1,4 147:2 153:22 154:5,8,11,17 157:4 178:24 179:8 182:2 193:14 194:5 196:4,9 197:6,7,8,17 201:4,9 203:2,22,24 204:1 208:5,7 209:5,6,8,20 230:2 232:16 233:3,9 234:8 241:4

**officials** 141:3

**oftentimes** 209:7

**OIS** 153:15,22 182:13 184:7,9 185:8 201:19 214:15 239:4

**one-sided** 206:2,4

**online** 241:15

**open** 44:6 92:15,17,19,25 93:4,20 94:9 97:22,24 98:3 99:4,6,14,20 225:9 237:2

**opened** 31:14 92:17,21 98:2,5 99:11,22 224:20,21

**opening** 78:23 98:14 99:9

**opens** 93:3

**operation** 94:7

**opined** 227:24

**opinion** 4:11 11:25 12:1 16:15 18:17 20:21 21:15,20 22:6 23:16 25:7 28:6 34:11 38:5 42:24 44:7 45:13 49:21 53:16 56:18 69:21 72:14 77:20 101:7 102:18 105:1 115:13 130:14 132:2,7,12 133:11 138:17 139:7,18,19 141:23 142:4

172:11 207:11 215:5 219:17 228:14 229:21 230:9 237:19,20

**opinions** 7:1 9:25 11:13,24 12:4,8 17:9,12,19 18:9,14 19:17,22 20:22 21:19 22:9 24:2,12 25:14 27:23 72:7 77:3 79:21 101:17 103:14,21 130:12 139:20 207:2,23,24

**opportunity** 23:23 62:9 91:24 97:17 99:8 131:3 190:9 224:8,11

**opposite** 166:2 180:17 196:16

**ORAL** 1:12,16

**order** 10:3,24 21:21 82:8 122:19 241:25 242:5,6

**ordered** 124:12

**organization** 19:8,9,12 221:22

**organizational** 89:14 140:9 196:24

**organizations** 213:13

**original** 10:19 11:4 30:8 34:9 49:22 135:22 220:21 232:9 239:25

**originally** 145:14

**Ortiz** 11:6 207:19

**Ortiz's** 11:24

**outcome** 20:4 23:24 24:3,6 156:23

**outer** 111:4

**outrageous** 210:25 215:25

**overcomes** 37:24

**overlap** 35:19

**overlooking** 114:6

**overtime** 124:22

**owner** 222:7

**P**

**P.C.** 3:8

**p.m.** 84:20 160:12,15 220:10 242:15

**P.O.** 3:12

**pace** 40:19,20

**pacing** 40:18 224:18

**package** 106:11

**packaged** 126:19

**pages** 9:20 142:9 187:15

**paid** 124:14 220:16

**Panah** 9:10 32:2 71:8 106:21 156:15 162:18 199:17

**pants** 72:21 110:12 111:1

**papers** 119:22

**paragraph** 68:20 69:10,17 85:4 86:22 90:1 115:14 133:21 134:10, 12 173:2,12 211:11 229:20 230:5

**paragraphs** 67:21 68:10 140:16

**parallel** 127:25

**paraphrasing** 215:23

**parcel** 113:20

**parch** 181:17

**parched** 181:16,18

**pardoned** 199:22

**parenthesis** 229:2

**part** 40:10 46:6 48:24 77:8,11 78:7 79:1,25 80:4 106:11,17 113:20 135:16,17 159:14 160:22 166:11 167:14 170:20 175:17,18 185:23 188:14 194:12 197:22,23 201:12 202:16 226:10

**part-time** 120:4,10

**parties** 234:22

**partner** 71:15,18,20 153:19

**partner's** 72:3,5

**parts** 189:7 221:12

**party** 169:14

**pass** 105:11 114:18 227:19 236:14 240:7,24 241:21

**passed** 126:24

**passing** 16:17 80:2

**past** 45:9 49:14 143:19

**patently** 144:15

**patience** 105:10 227:14

**patiently** 38:17

**patrol** 119:7 121:15

**Paul** 3:5

**pause** 23:18 38:24 39:2

**paying** 72:3

**PC** 3:4,11

**peace** 117:6,11,14,16,20

**pending** 215:1

**Pennsylvania** 117:17 118:7 120:5,6

**people** 23:11 27:9 30:20 31:15,18, 22 32:11 34:24 35:11 37:22 38:3 41:22 42:16 43:14,24 44:5 53:9,11, 14 54:22 55:12 63:12 69:6 70:17 71:11 95:23 97:2,10,22 98:21 100:24,25 143:17 145:12 146:16 161:4 183:15 198:19,23 199:24 213:17 217:22 221:15 224:9 227:1, 12 241:16

**people's** 95:21

**percent** 25:20 68:21 69:13 241:2,3

**percentage** 25:11,12 68:13

**perception** 99:25

**Perez** 66:3 146:8 165:20 169:19 196:11 204:14 219:6

**PERF** 19:12

**period** 89:5 91:3 119:6

**permission** 33:17 222:15

**permitted** 238:24

**perpetration** 208:16

**perpetuate** 161:20

**perpetuated** 165:4

**perpetuation** 67:15 160:17,24 164:4 165:2

**person** 26:17 30:19,21 37:4,7 40:21 41:7 49:4,5 62:8 65:22 72:21 85:21 86:2 87:16 99:20 109:17 127:3 168:17 169:3 191:15 194:21 207:13 218:25 224:25 226:7 231:4 237:4,5 238:14

**person's** 219:19 232:23

**personal** 167:5,7 197:6 200:19,22 201:10 210:2,3 211:14 230:11

236:5

**personally** 153:25 154:1

**perspective** 30:25 55:15 69:4 100:8 101:23 102:7 104:5 124:12 177:5

**perspectives** 113:20

**Peters** 1:13,16 4:5 5:4 6:4,8 8:20, 22 20:19 27:16 40:6,11 56:4 83:11 84:21 93:18 105:11,12 106:3 108:20 111:12 114:22 137:3 200:13 220:13 222:3 227:22 240:11

**petrified** 198:24

**Pettis's** 66:16

**Ph.d.** 1:13,16 4:5 6:4

**phone** 64:12 106:7,16,23,24 107:2,6 112:6 113:4,13,14 123:4 129:22 157:1,3,6,7,16,17,19,21,22 158:1,9,12,17,19,20 167:5,18,19 168:5 189:20 194:6 200:22,24 201:15 202:4 217:16 230:7 236:6

**phone's** 202:15

**phones** 114:7 167:21 197:7 200:20 201:4,10,24 209:16,17,21 211:7 212:19,22 217:15

**photograph** 4:13 74:1

**photographs** 4:12 79:8,13 111:3

**phrase** 61:14

**physically** 111:2

**physics** 74:11

**pick** 13:1,2 40:10 90:24

**picture** 63:13 79:9 94:23,24 95:1,8

**pictures** 95:8

**piece** 77:23 113:24

**pin** 179:17 181:1

**pinpoint** 51:16

**place** 14:25 15:11 35:13 51:15 97:6 107:10 108:19 117:12 119:15 122:10 138:21 145:20 156:24 179:16 197:13 198:16 235:9 237:12 239:12

**plainly** 95:16

**plaintiff** 20:3 241:3

**plaintiffs** 1:6 3:3 5:16 241:1

**plan** 81:10

**plans** 88:11,17

**play** 16:2,3 23:12 91:15 149:3,6 150:3 218:1

**played** 14:22 16:13 56:5 91:13 111:5,21 226:10

**playing** 111:19 147:12,16,17,24 150:5

**plays** 226:9

**plead** 175:24

**pleadings** 10:3,24

**pleasant** 32:12

**plug** 185:4

**point** 6:16 14:4 15:4,5,11 20:25 21:7 24:7 28:1 30:14 31:16 33:3 34:1 47:21 50:12 51:3,4 53:4 62:3 73:22 85:20 87:15 97:5 100:23 110:3 111:23 131:16 133:21 141:2 159:3 163:9 164:11 171:25 180:13 181:20 197:18 203:10 206:15 227:8,9 229:15 231:16 233:12 234:5 240:2

**pointed** 25:9 30:9 70:3,5,11 71:13 73:4 109:17,18 177:19

**pointing** 36:22,23,24 86:3 100:9 177:13

**points** 27:23 57:17

**police** 10:2 11:3 19:10,14 26:16 31:16,25 34:13 37:3,14,23 40:25 41:5 44:4 47:16,18 60:18 61:22 67:21 68:12 72:10,11 77:5 85:16 87:23 88:1,9,15,23 89:20 90:18 93:12,19,21 94:3 96:3,7,21 98:3 99:12,21 100:3,6,11,21 109:7 117:20,23,24 118:2,8,14,24 119:5 120:4,11,21 121:14 122:2,8,15,18, 19,20,22,25 123:9,10,14,19,23,24 124:10 125:2,11,12 126:7,21 127:23 129:1 130:4 131:10,13 132:1,6 134:15 135:1,24 140:8,23 141:7 144:1,13 154:23 156:10 173:17 182:13 189:2 191:8 192:22 196:4 197:9 201:18,21,25 202:14 208:5,6,7 209:4,6,8 210:13 216:24 217:1 219:16 225:3 226:19 234:20 235:17 238:11 239:16 241:4

**policeman** 47:13 90:19

**policies** 28:14 114:3 130:15 136:9 137:4 153:15,22 186:14 202:11 216:9

**policing** 72:15 225:6,10

**policy** 12:2 19:6 28:16,17,18,25 29:2,3,9 30:1 34:13 57:1 85:1,6,9, 10,12,13 86:13,15,16 87:12,14,18, 19 88:3 98:16 103:7 106:5 130:6,7, 9,10,18 132:10 133:11,16,18 136:5,7 137:9,23 143:21 144:23 145:1,7 153:11,25 159:12 166:21 167:2 168:14,16,18 172:20 173:1, 3,12,17 175:8 177:7,8 179:1,10 186:12 192:11 194:23 197:10,11 201:3,6,13,16,24 202:14 203:4,9, 14,24 204:1 216:9,12,17 217:6 223:23,24 228:13,16

**poor** 66:18

**Popovich** 68:11

**pops** 235:24

**porch** 31:4,6 36:11,18,21 37:3 41:14 44:2 49:7

**portion** 40:14 79:16 92:3

**position** 34:24 50:5,13 52:13 58:17 120:10 125:11,12 126:1

**possessed** 164:24

**possession** 33:21,22 65:22 103:24 104:12 226:18

**possibility** 70:1 233:15

**possibly** 60:23 61:20 217:24 227:12

**post** 219:13

**potential** 17:15 87:4 107:9 109:3 208:14 217:11 225:19 226:7 238:25

**potentially** 30:21

**pounding** 99:20

**power** 123:10

**powers** 122:20

**practices** 11:3 208:6

**precedence** 196:9

**Preciado** 41:8

**precise** 7:25

**preclusion** 174:3

**preliminary** 4:11 9:24 11:15

**premise** 48:12

**prepared** 146:11

**present** 24:20 59:6 90:7 131:20 190:10,19

**presentation** 206:5

**presented** 126:25 127:13,15 156:9 160:23 161:1 166:16 205:1,2

**presents** 206:3

**preserve** 113:16 114:4

**preserved** 198:2

**press** 144:14 161:10,11

**pretty** 6:18 26:11 37:15 50:19 86:4 91:20 133:16 193:18 208:18 220:5 224:18 225:25 226:5

**prevent** 56:9

**prevented** 235:16

**prevents** 6:24

**previous** 78:21

**previously** 12:12,17 25:4 231:10

**primarily** 9:13 28:10

**primary** 9:12 13:13 123:1 171:19 222:5

**principal** 44:19

**principals** 35:12,21 57:3 239:19

**prior** 17:8 18:20 92:9 226:16

**prisoner** 119:23

**probable** 42:13,17 219:19

**problem** 16:10 21:12,25 32:25 33:16 36:7 41:23 43:3 192:12

**problems** 51:14

**procedure** 1:23 114:3 137:21 193:19

**procedures** 130:23 135:22 136:17,23

**proceed** 21:3 27:13

**proceeded** 50:16

**proceedings** 33:8 160:13 220:8 242:16

**process** 58:22 130:25 132:1 139:1 159:15 207:15 217:25 218:2 220:2 236:21

**processed** 171:22

**produce** 137:12 148:17 151:2,6,16 152:1,11

**produced** 1:17 113:13 137:7,10 146:10 150:2

**producing** 151:3,7,11,13

**production** 152:4

**profanity** 104:25 105:7

**professional** 38:23 47:18 185:17

**program** 68:2 186:18

**programs** 88:15,22

**progressive** 239:16

**prohibited** 172:20

**promise** 38:12

**pronounced** 134:25

**proof** 140:17 141:4,8,13 143:1,13, 16,23 144:7,9,10,11,16 145:2,13

**proper** 79:23 228:24 231:3

**properly** 40:18 97:18,20

**property** 210:2,3 219:19 224:17

**prosecute** 104:8 207:16

**prosecutes** 104:1

**prosecuting** 109:7

**prosecution** 103:16,23 104:1,2 113:25 204:13 206:3

**prosecutors** 104:20 109:6

**protect** 174:4

**protecting** 140:10

**protocol** 13:7

**prove** 159:19

**proved** 157:21

**proven** 158:17

**provide** 181:24 182:4 183:17 187:23 212:10 217:2 222:16

**provided** 9:24 10:8,16 11:15 25:13 30:18 31:8 180:9 181:9,21 186:21 193:3,5 205:14,22 206:11 212:1 223:6

**provider** 113:14

**providing** 213:15

**provision** 122:22

**provisions** 1:23

**proxemically** 49:3

**public** 145:16 197:12 232:13

**published** 232:25

**publishes** 214:17

**Pulaski** 125:14

**pull** 36:10 110:19 152:24 189:11

**pulled** 53:15 59:13 129:22

**pulling** 110:23 163:6 178:1 180:24

**pulls** 44:6,12 45:3

**punched** 223:13

**punishing** 221:5

**purpose** 63:24 92:22 126:3 210:12 214:8

**purposes** 18:17 19:23 119:14 125:14 139:12 207:22

**purse** 209:18

**purses** 209:17

**pursuant** 1:22

**push** 93:20 97:21,24

**pushes** 94:8

**put** 16:7,11 33:17 34:23 35:21 59:7 62:20 68:15 78:3,4 84:2 124:12 126:16,23 133:12 159:2 161:17 166:2 191:6 192:10 196:9 209:23 210:7 213:11,13 219:22 222:15

**putting** 176:19

**puzzled** 224:2

**Q**

**qualified** 19:17,24 203:15 240:11

**qualify** 36:13 61:10 101:20

**question** 9:15 12:25 16:14 19:19 23:9 29:8 31:15 32:23 33:4 34:11 36:25 41:9 48:13 53:18 54:2,7,23 55:4,6,9,10,16,17,22,23,24 56:1,13 59:2 62:22 63:9 66:20 70:20 71:21 75:1,13 76:11,25 78:14,21 79:2 80:14 81:13 83:14 88:6,14 93:24 95:15,18 96:2 98:12 99:2 103:19 106:25 107:8 108:9 109:9 110:11 116:1,10,11 129:5 130:22 132:12 133:5 135:21,22 136:17 137:19 145:24 146:14 147:11 148:3 150:11,21,22 152:8 155:18 156:14 159:20 166:12 167:9,15 170:6 171:3 172:10 173:9,13 174:14 175:8 176:4 178:7 180:4 181:20 182:6,25 186:5 187:19,20 189:8 195:23 198:18 199:1 200:5,8 204:4,16 207:22 208:22 211:22 225:11 228:2 235:2 237:9,18 239:5 240:1

**questioned** 148:6 150:25 187:5 190:21,23 191:1 195:10,15

**questioning** 58:25 132:25 133:1 213:7 231:19

**questions** 6:10 30:16 33:13 39:3 62:15 63:16 77:12 90:23 105:17 106:4 107:13 108:1 109:2 114:19 133:6 137:9,13 147:23 149:17 150:7,9 159:17 161:6 176:17 183:11,25 184:12,13 185:11 187:24 188:2,16,21 190:11 193:1, 10 194:16 195:6,25 209:7,12,13 210:7 211:5,16,19 212:11,23 213:18 214:25 215:4,8,13 225:13 227:23 229:18 230:13,23 231:12, 20 235:14 236:25

**quick** 32:23 33:3 39:3 47:5 50:19 57:19 80:14 81:7 91:11 114:22 220:4

**quicker** 50:25

**quickly** 46:8 47:2 98:4 133:20 224:15

**Quinlyn** 1:20 5:12

**quotation** 140:16

**quote** 203:7 228:24 229:23,24

**quoted** 181:6

**R**

**racial** 106:14

**radio** 21:7,9 106:23

**radioed** 106:21

**raise** 6:1 144:19

**Ralls** 3:13,14 5:20,21,22 149:2,8

**ran** 82:6 122:13

**RAND** 69:10,12

**Rangers** 234:24 239:4

**rank** 118:10

**rapid** 108:17

**rapidly** 224:18

**ratification** 133:14 210:24 215:6, 24 216:15 217:7,10,21 218:11,12

**ratified** 135:19 216:22 217:3,22 218:4,9

**ratifying** 140:10 216:19

**re-ask** 55:9 76:11

**re-interview** 188:9

**re-interviewed** 183:23 188:8

**re-question** 188:13

**re-questioned** 188:12 189:1

**reach** 63:20 101:8

**reached** 14:12 26:5

**reaches** 59:25

**reaching** 14:9 174:17 176:22 177:9 222:17,18 225:10

**react** 59:9 168:21

**reacted** 99:15,17 231:13

**reaction** 58:10 59:11,14,16 62:4

**reactionary** 58:12 70:22,24

**read** 11:22 21:21,23 40:9,14 63:2 71:18 77:14 83:2,14,19,25 90:10 109:25 122:9 134:23 139:18,19,22 140:7 181:17 184:1 195:2 228:11, 20 229:18 230:5,7,23 242:1

**readback's** 74:24

**reading** 29:20 41:23 42:4 69:9

**real** 33:3 43:3 114:22 121:9 125:1 141:25

**realized** 47:13,22

**realtime** 91:14

**rear** 14:24

**reason** 17:21 41:2 56:17,22 68:6 92:19 97:7,20 99:8 107:5,7 149:10 188:18 235:13 238:7

**reasonable** 36:8 37:15 93:3 100:10,14

**reasonableness** 23:2 98:8 101:22 102:6,7

**reasons** 72:19 101:3

**recall** 14:12 15:9 25:5 26:15,18,21 30:3,12 41:12 43:21,25 51:13 59:18 65:1,4,9,13 66:10 73:21 85:17,20 87:5 91:6 98:15 105:6,9 108:10 109:10,13,15,20 111:3 116:13,19 117:3 146:25 171:2,10 195:8 207:20 219:11 223:9 228:1 231:23,25 232:2,3 234:4,15 235:5

**receive** 99:1 106:8,10 114:9,12

**received** 9:23 10:1 11:3 91:23 106:6 114:9 136:23 137:25 204:11

**receiving** 233:23

**recent** 6:23 14:1 27:2

**recently** 13:23 83:21 241:13

**reciting** 181:13

**reckless** 35:13,15 53:16 54:21 87:14 166:3,5 170:3,19 183:20 196:17 219:21

**recklessly** 166:8

**recklessness** 72:7

**recognize** 10:12 30:14 79:13

**recognizing** 58:22

**recollection** 87:1,25 110:17 114:16 223:14

**recommend** 71:14,22 129:12

**recommendation** 213:21 218:25 219:5

**recommendations** 28:8,11,14

211:1 212:6 213:9,10,12,20,24 216:1

**recommended** 129:2,6,16 191:14

**reconcile** 187:16

**reconciled** 182:24

**reconstruct** 184:10

**record** 1:23 5:3,14 10:5 15:20,22 30:8 33:2,7,10,14 38:24 40:4 78:10 84:17,20 88:18 137:25 149:11 151:10,23 152:1 158:16,17 160:11, 15 176:19 215:20 218:13 220:7,10 241:25 242:15

**recorded** 104:25 167:12,22

**recording** 166:21

**recordings** 7:25

**records** 104:25 107:6 123:4 129:22 157:19 158:19 211:15 222:23 230:13

**recoverable** 159:3

**redacted** 156:13

**reduce** 218:1

**reduced** 145:10

**refer** 18:18 25:14 58:6

**reference** 18:16 57:5 139:13

**referenced** 11:22 15:6 202:20

**references** 57:24 58:2

**referred** 7:24 10:12 24:10 221:22 239:10 240:3

**referring** 30:7,10 137:4 185:6 204:14 211:4

**reflected** 90:25

**reflection** 53:5 64:11

**refrain** 203:12

**refresh** 101:13

**refund** 221:9

**refused** 192:25

**regard** 206:4

**regional** 118:24 119:19 126:21 127:23

**regulations** 34:13

**reiterate** 56:11

**reject** 47:20 129:9

**relate** 28:5 99:22 142:11

**related** 98:16 106:13

**relates** 142:2 203:15

**relating** 128:19

**relation** 128:10,25 130:3,4 138:2 139:18,19,20 140:6 141:17 142:17 165:2 196:18 204:7,9 205:2,23 206:16 207:4 219:16

**relationship** 143:15

**released** 236:1

**relevant** 90:20 98:7 125:8 209:24 212:12 224:19

**reliable** 226:5

**relied** 9:12 229:10

**relies** 28:15

**relying** 98:9 99:5,7 115:7

**remains** 92:4

**remedial** 134:18 135:4 219:18,22

**remember** 40:5 54:2,23 55:22 65:3,22 87:7 105:7 114:25 124:24 130:11 136:9 163:15 223:11 240:22

**remotely** 143:12

**removed** 191:12

**reopen** 235:17 236:3 237:2,12 238:8

**reopened** 235:23 237:15,22 238:2

**repeat** 103:18 120:18 190:2

**repeatedly** 100:23

**repetitive** 185:12

**report** 4:11,12 8:1,3,7,20 9:24 10:7,13,19,24,25 11:3,15,19,22,23, 25 12:1,5 13:9,12 14:15 15:11 17:1 18:14,19 19:25 22:6 24:5,10 27:1, 14,18 28:19 33:17 41:23 43:18 51:14 56:16,18,25 57:10 59:1 65:19 67:5,9 68:11 76:22 81:24 82:2,11,22,23 83:2,15,19 84:6,22 88:5 92:16 102:17 104:23 112:13, 16,22,24 113:6 115:13 116:6,14 132:18 133:9 134:17 135:3 138:22 139:5 146:9,10 147:13 148:21 149:3,4,20,25 150:13 151:2 152:24,25 153:1 154:4 156:12 160:17 161:18 162:25 166:2,8 169:25 177:16,18 178:18,22 179:4, 15 186:20 188:9 189:19 193:16,22 196:23 197:4 202:21 203:7,8 208:3,23 210:11 211:11 215:3 220:16 227:25 228:7 229:16 237:15,24 240:19,24

**reported** 1:21 105:8 163:4

**reportedly** 86:1

**reporter** 5:12,24,25 6:3 7:22 29:19 33:23 34:8 70:10 95:6 242:3,7,9

**Reporter's** 4:9

**reports** 8:22 11:21 42:4,5,7 63:2 71:19 84:5 86:18 87:1 112:19 146:5 184:1 196:1,3

**represent** 6:9

**representation** 131:3,14 164:23

**reprimanded** 228:25

**request** 5:10 122:15 137:14

**requested** 40:14

**require** 223:1 238:22

**required** 88:22 175:21 179:25 187:2 214:11 238:1 239:13

**requirement** 89:1 144:22 202:13 213:23 238:10 239:2,3,6,8

**requirements** 89:2,5

**requires** 87:25 88:2 89:11 201:22 202:7,8,9,10,11

**requiring** 239:18

**reread** 130:10 181:11,25

**Research** 19:14

**resent** 136:23

**residence** 14:24 15:1 180:16,19

**residents** 173:11

**resigned** 120:2

**respect** 20:20 238:14

**respected** 227:15

**respectful** 39:17,19

**respectfully** 224:10

**respond** 22:23 30:5 45:8

**responding** 21:9

**response** 55:22 60:17,25 61:2,7, 23 64:4

**responsibility** 103:15

**responsible** 237:8,10

**responsive** 200:3

**restaurant** 124:13

**result** 14:8 17:1,4 23:11 60:23 210:22,24 215:24

**resulted** 35:22 103:23 231:3

**resume** 33:12 119:15

**Resuming** 34:10

**retained** 201:25

**retracted** 161:19

**retracting** 232:24

**retrieved** 167:25

**return** 84:21 174:8 211:13 230:10

**reveal** 106:13

**revealed** 158:19

**review** 13:12 14:21,23 65:18 88:8, 11 101:11 107:6 108:2,21 109:21 110:23 112:3 136:4 138:6 139:1 156:10 158:16 164:6,7 189:13 195:11 204:23 206:12,22 207:17 219:25 229:4 231:25 233:17,25

**reviewed** 14:16 30:8 57:25 58:2 136:13 142:5 156:10 204:13 206:18,20

**reviewing** 110:11 164:9 206:17

**reviews** 174:25 201:19

**revisit** 102:9

**rifle** 209:22

**rightly** 128:8

**rights** 131:8 190:9 195:2

**Rimkus** 4:12 10:25 12:6 33:24

**risk** 44:16 58:18 59:5 173:10

**Road** 3:15

**robbers** 114:5

**Roberts** 223:11

**RODRIGUEZ** 3:8

**role** 218:2

**rookie** 101:24

**room** 16:4 65:17 69:6 91:1,3 92:12 124:20 173:10 174:5 198:12,13 227:3

**rough** 25:12

**round** 68:1 76:23 169:4

**Roundtree** 1:3,4 5:5 35:8,14 53:12,17,21 63:3,5,13 64:4,8 65:6, 11,15,16,21 66:5,8,17 85:17,18 86:2,24 87:9 90:8 104:6 107:24 108:23 114:14 140:25 144:14 145:9 154:19 155:17,20 156:1,6 160:25 161:9 162:7,13,14,25 164:10,24 165:8,9,13,21 166:6 169:9,13,16,17,21 170:8,13,14 171:7,22 172:3,4,6,9,13,16 186:9 188:14 210:15,22 229:1 231:22 232:23 233:12 236:12 237:8,10

**rude** 39:7,8

**rule** 35:1 97:1 199:12 200:19 201:8 223:1

**rules** 1:22 40:16 55:8 89:15 131:19 196:24 197:3,11,13 200:21 240:23

**rulings** 131:1

**running** 26:17 51:4,6,9 180:17,19 182:23 222:10

**rushing** 31:14

**Ryan** 146:11

**S**

**SA-18-CV-1117-JKP-ESC** 1:8

**safety** 29:18,23 30:25 35:2,12,20, 21 40:16 61:24 241:8

**Saint** 3:5

**salt** 225:20,21

**San** 1:2,8 3:9,12,16 5:5,7,20,22 85:2 88:8,15 89:16,19 93:11,18 94:3 98:2 99:11 102:16 112:4 113:16 130:4 131:10 132:1,13 134:15 135:1,24 138:1 139:3 140:22 141:3 210:13 215:1 217:25 218:4 225:3 227:25 228:15 229:9 234:19 235:17 236:6 239:13

**SANTEE** 3:8

**SAPD** 130:25 164:25 166:8 172:19 177:7 178:8 179:20 181:21 187:2 191:22 194:24 197:3 199:19 201:9, 13 205:8 213:23 214:10,19 216:7 228:22 237:1 240:3

**sat** 38:17

**SBOT** 3:4,8,11,14

**scenario** 25:15 26:3 96:21

**scenarios** 26:14

**scene** 66:11,13 79:18 112:7 113:21 126:23 143:22 146:24,25 159:11,12 187:7,8,13,14 188:1 191:21 193:14 194:6,15 197:15,17, 21,22,23 198:2,7,9,20 199:9,14,18, 20 200:10 204:2 208:15 211:13 212:13 229:22 230:11 233:18

**scene's** 199:22

**scenes** 197:9

**schedule** 80:18

**science** 191:16,19 194:21

**scope** 11:13 58:25

**screaming** 198:22 234:17

**seated** 50:5 170:22 172:17

**seconds** 224:8

**section** 28:20,24 102:14 228:12

**secured** 167:18 189:20

**security** 96:8 119:21

**sees** 26:4 53:5 72:5 176:10

**segue** 29:14

**seizure** 210:23 215:22

**select** 140:23

**self-defense** 36:16

**seminar** 221:14

**send** 242:8

**sense** 17:14 177:14,15

**sentence** 40:11 68:20 134:13,23 142:4 178:21 228:17,20

**separate** 35:23 130:9 144:24 148:10 159:13 208:12

**separated** 49:25 143:22 147:3,7 193:19

**separately** 143:24 144:18

**separating** 153:5

**sequence** 15:13,14 46:25

**Sergeant** 165:20 196:18

**served** 7:7 119:22,23

**services** 2:1 5:13 124:10

**set** 6:25 40:18 210:6

**sexual** 106:14 241:11

**shape** 162:6 171:5

**share** 33:21

**shared** 152:16

**sheets** 88:19

**sheriff** 21:17 118:12 119:12,17 125:13,16

**sheriff's** 118:6,11 119:8,10,18,20, 25 120:12,16,24 121:4,11,25 122:1

**shifts** 69:18

**shine** 95:20

**shined** 30:13

**shining** 38:3 95:19

**shirt** 87:7 177:23 180:22

**Shockingly** 230:16

**shoot** 35:13 36:7,17,22 37:5 53:11 63:21 64:1,19 67:25 72:6 76:13,16 108:23 110:8 111:25 144:15 169:7, 9 170:8,10,14 172:14

**shooter** 65:21 86:7 181:1

**shooting** 21:11 22:4 28:25 29:4 35:5,9,22 53:8,14 54:21 55:11,23 60:4 63:17,19 64:4 67:15 72:8 76:12 108:3 113:22 128:1,6,7 140:24 147:3 160:18 164:5,8 165:3,4 166:5 168:14,16 169:23 170:18,21 172:19 173:1,3,12 178:9 182:13,14 183:1,3,24 184:10 193:20 201:23 203:16 210:15,22, 23 219:20 225:7 229:1 233:5 234:1,2,21 235:10 238:23

**shootings** 230:2

**short** 15:20 28:12 132:9 180:10 221:1 222:11 227:22

**shortcomings** 103:12

**shorthand** 1:22

**shortly** 15:7 81:19 232:6 235:9

**shot** 15:14 52:9 59:13 63:12 64:8, 22 65:6 71:13 72:5,17 73:11 76:22 77:6,13,17 80:2 85:18 87:2,3,4,9 102:20 107:24 108:12,18 128:7 154:19 168:17,18,20 169:3 170:14 171:16,23 173:11 174:8,11 182:21 198:14,23 231:4,5,23 233:19 234:2,4,5,9 238:14

**shots** 15:12 16:18,19 21:7,10 45:11 60:10 64:22 67:10 73:5 77:6 102:21 103:3 108:17 110:2 233:22

**should've** 38:2 69:22 70:4 99:10 100:18 112:4 130:19 132:3,6,9,13 143:22 147:7 179:22 183:12 187:2, 20,23,24 188:8,11,23,25 190:15 191:6,11,12 192:16,19 194:15 195:13 219:13,14,15 237:15,21 238:10,20 239:10 240:3

**show** 15:14 53:5 60:7,16,17 61:6, 22 62:7,9 70:6,12 73:15 92:4,10 94:12 105:3 112:25 129:24 136:10 137:5 148:24 168:21 177:11,13

**showed** 14:23 34:18 236:2

**showing** 95:7 111:14 193:7,8

**shown** 62:13,16 107:15 110:10 111:1

**shows** 12:19 40:4 53:3 60:13,15 73:3 78:11 79:15 112:19 167:3,4 191:20 208:7 220:16

**side** 20:6 32:7 35:1,2 40:17 44:9 74:2 76:17 132:21 133:7 141:21,24 144:1 148:2 171:1 177:22 180:14, 21 193:4 215:15,17

**sidebar** 148:1

**sides** 36:5 75:5

**sidestepping** 63:4

**sideways** 52:14 73:13,16 74:8 76:5

**sign** 242:2

**signed** 126:19

**similar** 26:9,11 101:23 141:20 167:9

**similarly** 102:7

**simply** 30:22

**simultaneously** 60:10 111:25 112:2

**single** 12:9

**Singleton** 1:5 49:15 64:19 75:7 107:20,21,23 114:14 163:21,22 169:8 176:7 182:20 188:15 192:3 195:22 198:11 199:4 210:24 215:23

**Singleton's** 64:12

**sir** 100:7 116:9 117:2 118:25 119:19 120:1 126:11 127:21 133:20 137:20 139:2 152:9 156:25 160:17 175:16 178:10 181:4 183:4 184:3 186:20 194:10 196:15 198:4 203:9,14 204:5 215:22 216:25 217:9 219:10 227:14

**sit** 148:1 167:11 187:25 203:25 205:14 237:1

**sitting** 30:12 49:8 94:8 169:17 172:4 188:17 204:24 219:11 227:2 240:6

**situation** 35:22 37:16 82:3,4 162:4 166:6 226:9 231:9

**situational** 36:6

**situations** 143:19

**skewed** 189:14

**skimming** 133:20

**skip** 6:11 27:22

**skipping** 139:16,24

**skips** 218:19

**sky** 189:4,6

**sleeves** 96:12

**slide** 64:17

**slightly** 52:19,21 55:25 186:16

**slow** 7:5 134:24

**small** 120:5

**smaller** 76:7,8

**snitch** 226:4

**snitches** 226:3

**Snowden** 1:6 14:5,23 15:6 16:17 29:7 34:21 35:2,14 36:10,13 46:11, 23 47:2,21,25 48:6,13,22 49:7,22 50:1 51:8,9,21 53:23,25 63:10,17, 21 64:22 66:25 67:4 69:21,22 72:20 73:6 74:19 75:11,18,24 78:19,22 80:2 82:4 83:24 84:7 86:25 87:2,6 90:8 98:22 99:15,17 103:17,23 104:5,8 107:15,16 108:9,13 109:9,15,21 110:3,6,25 114:13 163:3,5,9,11,17,18,23 168:21 169:8,12,15,16,23 171:13 172:7,8 173:9 174:16,22 176:6 177:1,19,21,24 178:1 180:10,15, 17,18,19,20,23,24 182:21 188:19 189:25 191:24 192:1 198:11 199:6 200:24 205:2 210:23 226:11,15 229:2 234:3,15 238:6

**Snowden's** 30:5 46:2 48:1 52:1 53:6 62:20 74:1,15 78:4 90:24 92:3 110:12 111:13 180:13 207:5

**Snowden's[sic** 91:18 104:3

**sole** 222:7

**solidify** 15:1

**somebody's** 21:11 25:9 26:4 36:21 189:9

**sooner** 20:22

**sort** 143:14 166:2

**sorting** 227:16

**sorts** 101:3

**sounded** 119:16

**source** 13:15

**sources** 65:20

**speak** 96:23

**speakers** 31:21

**special** 118:14 122:22 123:9

**specialize** 184:7

**specialized** 102:4 184:11,17

**specialties** 24:19

**specific** 28:22 37:1,2 72:23 85:12 87:20 89:4 154:21 167:11 172:22 186:5 187:6,16 200:11 216:7,25 223:15

**specifically** 15:11 29:16 85:9 116:7 146:14 181:11 187:4 216:22 218:7

**specifics** 186:25 187:24 188:2 193:24

**speculating** 47:17 219:3

**speculation** 14:11 43:11 66:2 100:13 158:4 162:2 165:16 200:16 205:4 226:22,25 233:14

**speech** 7:5 39:5

**speed** 7:5

**spoiled** 144:9

**spoke** 46:12,15

**spoken** 143:17

**squeeze** 7:21

**staff** 118:13 122:10,13

**staffing** 120:17

**stamp** 146:7,9

**stance** 60:4 76:13

**stand** 188:22

**standard** 18:21,23 19:5 22:12 23:2 27:24 45:2,5 57:7,8 72:14 77:4,16 144:3 174:21 202:19,23 208:11,13 209:4 212:7,8,15 238:10 239:9 240:1

**standards** 18:9,19 28:7 90:10 103:16 130:5 133:10 202:17,21,25 208:4,10,12,20,21,24,25 211:1,4 212:5 213:9 216:1

**standing** 34:17 47:2,13 48:22 50:5 71:10 96:11

**stands** 49:10

**stared** 71:3

**staring** 72:16

**start** 11:17 50:24 53:8,14 55:11 97:22 216:8 217:1

**started** 35:7 41:19 52:23 160:25

**starting** 11:21 229:16

**state** 1:21 5:13 88:22 107:23 117:6,15 118:14 122:24 130:7 138:15 177:6 214:12 239:2 240:6

**stated** 1:23

**statement** 28:3 47:21 66:15,16 92:10 102:21 107:16,19 116:12 140:15 142:17 145:18 157:11 158:5 159:22 161:21 162:12,22 165:9,22,24 166:11,16 167:14 168:25 171:13 175:18,22 180:3,9 190:24 194:8 211:9 218:12 230:17, 21 231:21 232:8,9

**statements** 86:18 99:7 131:2 143:23 145:15,16 204:13 235:14, 18 238:3,5

**states** 1:1 5:6 72:15 90:22 117:12, 15 130:6 201:22 238:22

**static** 14:20

**statically** 67:8

**stating** 100:3 114:11 151:11

**station** 191:8

**stationary** 50:13,24

**statistics** 67:9 68:10

**statutory** 1:5 122:22 239:8

**stay** 149:11 227:13

**stayed** 182:21

**stays** 93:6

**step** 30:12 69:25

**stepping** 174:13

**steps** 32:10 177:22 180:21

**Steve** 1:9 5:18 9:8 13:24 28:5 116:17 154:23 171:21 172:12 175:17 176:9,22 177:4 178:16 183:8

**Steven** 6:9

**stills** 91:24 92:2 93:6

**stolen** 37:24

**stood** 50:1,5 172:4,6,8,9

**stop** 56:8 87:8 105:21 111:6,11,22 182:22 198:11,14,19

**stored** 168:6

**stories** 163:16 175:4 235:4

**story** 104:15

**straight** 90:3

**straightened** 184:21

**strategy** 56:5

**street** 3:5 58:6 61:24

**stress** 6:23

**strike** 74:8 79:22 80:9 170:15 176:18

**strongly** 99:5

**struck** 169:21 172:21

**structure** 80:17 119:10

**studied** 12:15

**studies** 68:23

**study** 68:11,12

**stuff** 121:8 181:3,5,13

**subject** 26:5 142:25 182:12

**subjective** 17:17 22:12 23:3 46:2 48:17 98:7,9,18,22

**subjectivity** 17:19

**subjects** 105:5,8 226:3

**subsequent** 19:3

**substance** 24:24

**substantive** 24:18

**substation** 191:7,12

**substitute** 13:18

**successfully** 71:2

**suddenly** 99:19

**sufficiency** 86:19

**sufficient** 70:20

**suggest** 64:3 66:7 104:11

**suggested** 43:19 71:19 83:21 99:15

**suggesting** 83:14

**suggests** 64:7

**Suite** 3:5,15

**suits** 80:21

**summarize** 183:10 185:18

**summarizing** 173:21

**summary** 11:25 27:19 45:10 139:14,20

**supervisor** 120:23 141:15 143:22

**supervisors** 140:23 144:24

**supplemental** 10:13 11:15 13:5,8 112:22,24

**support** 22:17,18 69:4 101:17 116:3,11 141:7,11 142:23 155:24 156:18 157:9 164:9 165:19 179:23 196:15,21 203:2 218:9 232:9

**supported** 72:24 73:1 101:7

**supporting** 104:2

**supports** 142:21

**supposed** 129:25 131:9

**suppress** 232:20

**surface** 236:23

**surfaced** 178:13

**surprise** 66:19

**surveillance** 115:17 116:16,22,24

**survival** 58:6

**suspect** 128:8 144:4 180:8,11 190:1,4 193:11,17 194:1 195:2 199:12

**suspects** 144:2 193:18 196:8 209:10 225:19,23

**sustained** 138:24

**sway** 196:14

**swear** 5:24

**sworn** 1:18 6:2,5 122:23 123:18,22 125:12 229:5 235:15

**system** 113:12

**T**

**tab** 8:6 10:6,11 11:22 73:23 79:7 94:12,14

**tab's** 24:14

**tactic** 36:2 41:5 70:15 96:21

**tactical** 25:8

**tactics** 29:18,23 58:6 76:1 145:2,11 167:6 241:9

**tag** 95:25

**takes** 59:3 197:13

**taking** 31:13 70:22 151:20,22 188:1 191:20

**tale** 232:13

**talk** 41:15,18 55:2 56:23 96:20,25 97:1,10 99:12 133:10 144:6 153:12,23 158:7 185:5 186:7 203:3,5,22 210:11 213:17

**talked** 42:16 52:8 67:14 74:14 89:25 97:3 114:8 138:22,23 156:25 172:18 186:25 189:21 202:24 203:24 218:21

**talking** 7:25 11:5 13:14 18:12 28:8 30:4 34:24 38:25 39:1,2 49:6 50:21 51:17,22 54:11 71:10 86:22 90:13 97:22 98:13 114:23 115:9 131:17 144:12 147:2 150:15 167:4,20 169:2 179:18 187:10 194:13 203:23 208:19 215:18 223:12 224:7 233:3 234:1

**talks** 135:17 136:5

**tank** 213:24

**Tanwar** 9:17 10:25 14:15 17:1 33:24 94:16

**Tanwar's** 11:23

**tap** 68:5

**tapped** 92:16

**target** 40:20 69:5,7 76:7,8 171:19

**target's** 40:19

**targets** 67:22

**Tasers** 25:17

**task** 119:19

**taught** 58:10,12,15,17 67:24 68:3,6,8 70:17 138:11 221:13

**Taylor** 1:5 5:11 107:21,23 114:14

**TCLEOSE** 89:8

**TCOLE** 89:9

**teach** 93:22

**teaches** 70:16 227:1

**team** 116:22,24

**teams** 134:15 135:2

**technique** 186:4 214:19

**tecum** 7:9

**telephone** 113:9,10 211:14 230:12

**telephones** 144:8

**telling** 11:18 18:1 36:1,9 37:23 40:24 55:14 92:24 99:13 132:23 181:12 183:8 186:3 198:5 237:25

**tells** 196:20

**ten** 67:14 123:18 144:22 160:5

**tend** 225:18

**tension** 174:24 175:3 176:5

**term** 31:21 60:25

**terminated** 129:18 130:1

**Termination** 129:17

**terminology** 117:22 121:22

**terms** 6:23 44:21 71:7 76:1,3 103:4

**test** 81:25 82:24 83:3

**tested** 82:19

**testified** 6:5,19 12:17 24:8 45:23, 25 51:3 54:20 64:16 67:3 68:3 98:18,19,23 137:22 144:25 169:11, 19,21,22 171:5,15 173:9 177:19,20 192:18 211:12 228:21,22 229:19, 21 230:8,10 231:10 240:16,20

**testify** 26:20 127:4 132:16 240:12, 25

**testifying** 171:4 174:16 229:17

**testimonial** 222:11 223:5

**testimony** 18:20 24:6 42:6,7,15 48:21 51:13 64:1,21,25 65:5 86:17 87:1 94:1 98:17 115:2 116:1,4 127:11 153:18 166:7,14 173:19 178:5,8 181:14 187:22 188:18 216:19 229:5 230:7,22

**Texas** 1:1,8,21,22 3:6,9,12,16 5:5, 7,10 89:1 117:7 128:22 138:11 214:12 234:23 239:2,4 240:6,12

**text** 106:15 158:21 159:2,25 167:24 168:4 197:7 211:7 212:9 213:2 217:18 231:11

**texting** 167:4 211:15 212:22 230:12

**that'd** 168:11

**that'll** 27:6 104:8

**theft** 124:10

**theory** 157:10 165:5

**thereabout** 188:20

**thing** 6:22 7:16 11:2 25:17 31:13 48:20 51:24 60:2 89:19 97:2 102:16 104:14 114:22 118:16 126:19 133:6 180:6 205:19 212:18 219:14

**things** 12:3 13:1,3 21:6 27:22 28:5 63:3 70:25 87:11 93:17,25 106:13 119:21 130:1,11 131:22 144:21 212:15 213:13,19 214:16 220:13 227:13 239:1

**think's** 97:3

**Thirty** 84:14

**thought** 26:5,17 36:14 41:22,25 54:21 61:17 63:24 64:7 67:1,3 85:4 87:3 100:10 101:8,15 116:25 119:15 122:9 130:18 137:22 181:18 188:15 192:18 194:12 207:15 208:15 220:22

**threat** 65:12 79:4 173:20 174:1

**threatening** 65:14 87:17 104:7

**threats** 110:7

**Thursday** 5:8

**tie** 82:12,13

**tied** 84:1

**Tim** 146:11

**time** 5:8 10:19 15:12 16:9 23:14 24:7 31:13 34:25 35:2 37:14,22 38:1 40:16,17,18 51:17 52:13 53:4 60:6 68:21 70:13,20,21,25 73:5 74:8 80:1 81:4 89:5 97:8 105:5 110:2,6 114:25 116:2,10 117:4,19 118:1,5 119:6 122:21 123:20,21 127:19 131:16 133:5 142:16 151:24 157:20,22 158:20 159:3 161:2 163:10 164:11,13 168:21 172:5 174:17,18 177:10 179:16 180:14,18 184:2 187:18 191:13 215:11,18 218:14,19 222:10 227:22 233:16,24 237:7,24

**timeframe** 127:22

**timeline** 194:24

**times** 92:18 93:2,5 121:19 129:11, 14 155:19 183:22 185:15 212:17 213:3 226:5 240:17,20

**timing** 64:22

**title** 228:11

**today** 5:7 7:1,9 11:12 88:7 142:16 151:4,6,14,16 167:11 168:11,12 185:21 187:25 203:25 204:24 205:14 220:17,22 231:10 234:25 237:1,17 238:22 241:9

**today's** 23:9 109:6 234:22 238:15

**told** 39:20 43:4,8,13 66:3 86:8,9 97:21 99:21 102:14 115:21 130:17 142:24 143:3 145:14 157:24 178:6 180:8 181:13,25 183:10 196:7 228:23 229:6,11 232:1,2,3,13,18 233:11 236:12

**tool** 13:6,13

**tools** 25:2

**top** 136:15 137:20 147:21

**tossed** 198:15

**totality** 29:17,21 224:23

**totally** 35:24 41:4 85:19 87:16

**Touch** 114:22

**touched** 143:12

**track** 6:17 69:24

**Trade** 214:2

**traffic** 121:16

**train** 69:24,25 241:4,7

**trained** 60:25 61:1,4 102:8

**training** 18:16 38:3 40:16 60:23 61:20,24 68:2 88:8,15,18,22 89:11 90:7 100:23 101:23 102:3,4 114:3 125:14,15,16 126:4 134:18,24 135:4 184:11 186:17,18 219:18,23 221:12 222:1,2

**transcript** 10:1 143:2 205:24

**transcripts** 157:12,17,18 229:4

**transit** 50:13

**translates** 217:7

**transparency** 238:15

**transports** 119:23

**trap** 176:13,20

**treat** 144:1,2,3 198:20

**treated** 144:4 190:1,4,6 191:23 196:3 209:6

**treatises** 213:15

**trial** 11:14 26:20,22 54:19 176:16

**trick** 150:9,11

**trier** 86:13

**trouble** 97:2 227:13

**trouser** 111:4

**trousers** 111:9,13

**true** 17:12,14 18:22 20:24 46:4 49:4 58:11 67:8 69:12,16 89:23 226:6 229:14

**trust** 174:15

**truth** 18:2 115:22 144:17 155:14, 15,16 157:24 165:23 178:6 226:12

**turn** 10:4 16:8 76:4 81:1 153:18 236:5

**turned** 16:21 35:3 49:3,23 73:18 101:9,19 166:25 180:13 222:19

**turning** 14:23 16:19 52:19 73:16 74:14,16

**turns** 15:6

**Twenty** 210:19

**Twenty-seven** 8:12,17,19

**twisted** 154:22

**two-part** 102:5

**tying** 34:16

**type** 31:13 118:16 119:19 120:15 132:2,5 190:11 241:7

**types** 26:9

**U**

**Uh-huh** 14:3

**ultimately** 174:20

**umbrella** 143:18 144:18

**unable** 82:24

**unarmed** 101:9,19 168:17 169:3, 13 207:13 231:4,5

**unconstitutional** 214:20

**understand** 24:12 31:14 37:13 40:1 45:22 48:12 53:21,22 57:3 58:1 70:7 77:19 78:17 86:13 94:1 102:24 107:10 116:23 127:10 136:15 146:21 186:1 191:6 192:14 198:4 235:8

**understanding** 9:22 42:23 49:16 70:12 77:22 107:4 146:22 172:8 187:21 215:5 236:4

**understands** 76:3 77:3

**understood** 33:5 57:4 103:20 176:21 221:10

**underwear** 111:16

**undisputed** 158:1

**unethical** 148:17

**unfit** 134:16 135:2

**unfounded** 138:24

**uniform** 37:18,24 95:12,25 96:7 100:8,15,17,24 120:14 125:17

**unintelligible** 70:8

**unintentional** 99:10

**unique** 122:12 131:10

**unit** 152:19

**United** 1:1 5:6 72:15 117:12,15 201:22

**unknown** 99:20

**unpack** 35:25

**unquote** 228:24

**unreliable** 225:24

**unrest** 232:20

**unwritten** 89:15 196:24 197:3,10, 13 200:19,21 201:7

**usual** 6:11

**V**

**vacuousness** 134:25

**variable** 70:21,25

**variables** 71:24

**variations** 237:12

**Vaughn** 146:11

**Vegas** 202:8,9,10 221:1,14

**vehicle** 221:25

**Venn** 35:18

**verbally** 60:22 61:10 142:20 156:20

**verbatim** 143:2

**verify** 86:9 125:22

**versa** 144:4

**version** 48:2,3 51:16 155:9 175:14 176:1,5 177:5,23 178:1 180:23,24

**versions** 14:25 51:15 85:6 145:10, 20 155:5 179:16,19 180:7

**versus** 5:5 18:12 19:1 22:12 25:15 26:8 28:9 34:15 57:8,13,16 68:13 90:4,10 102:2

**vest** 209:23

**vice** 144:4

**vicinity** 91:9

**victim** 128:13

**video** 7:17,24,25 9:16 12:10,13,18, 19,21,22 13:1,3,5,12,15,23 14:4,22 15:1,6 16:1,11,13,16 17:16,17,18, 19 18:4 34:20,23 48:22 49:20 51:22,23 52:19 53:3,5 59:11,15,21, 22 60:13 63:25 64:13 70:6,12 72:22,25 73:2,3,7,15 74:13 76:19 78:8,11,20 91:1,5,10,13,15,25 92:17 94:25 98:1 101:14 108:18 110:2,10,12,16 111:5,12,21 157:6 166:21 167:3 168:20 177:21 200:23 211:7 224:12 231:17 232:25 233:2,17,25 242:10,11

**videotape** 5:3

**view** 14:5 15:7 17:17 72:23 91:6, 19,22 108:10,13

**viewed** 101:22 193:16,25 195:1

**viewing** 177:4

**viewpoint** 78:22 89:24 135:20

**villages** 120:6

**violated** 28:23 90:9 103:15 130:15 214:22

**violating** 153:25

**violation** 23:7 29:1,3 85:10,13 86:11,12 87:18 143:21 166:20 168:14,16 172:19 173:1,3,12 175:9 177:7,8 203:23 216:13

**violations** 12:3 85:1,6,9 87:12 98:16 106:5 124:6 130:18 132:10 133:11,17,18 159:13 179:1,10 216:9,17 217:7 228:1,13,16

**violent** 30:21 43:24 44:1

**visible** 95:16

**vision** 100:25

**voice** 39:11,21

**voluntarily** 230:20

**W**

**wading** 176:20

**waist** 26:5 91:2 174:17

**waistband** 46:2 178:2 180:25

**wait** 62:10 174:7,11

**waiting** 23:19

**waiver** 210:3

**walk** 50:23 53:8,13 93:16 145:17 187:8 193:14 194:16 197:24 199:14,18,25 200:6 229:22

**walked** 85:20 161:2 194:6 197:14, 17 198:7,8 199:16,20 200:9

**walking** 51:3 180:18 197:8 199:8

**wall** 64:23 65:3 75:8 78:25 79:1,3

**wane** 195:19

**wanted** 20:17 41:24 42:6 93:3 97:7 102:24 106:10 107:6 114:24 116:2, 25 191:13

**wanting** 215:11

**warning** 190:14

**warrants** 119:23

**Washington** 3:3,4 4:6,7,8 5:9,15 8:15,18,21 9:1,3 12:24 13:20 14:10,18 15:8,21,25 16:6 20:6,12, 17 22:2 23:8,17,20 24:4 26:10 27:15 32:16,22 36:12,19 37:6,20 38:6,9,10,11,15,18,21 39:6,10,13, 15,18,22,24 40:2 41:11,16 42:10, 12 43:6,10 44:8 45:6 46:9,13,20 47:14,24 48:7,15,18 50:3,17 51:5 52:15,20 53:7,10,19 54:3,5,8,12, 15,18,24 55:3,7,20 56:4,8 58:24 59:8,17 60:19 61:9,15,18 63:7 64:9,14,24 65:7 66:1,9 67:2 71:16 75:12,15,20 77:9 78:13,17 80:5,10, 14,19 81:6,12,15,18,21 82:14,17 83:1,6,11,18 84:4,12,15 88:24 90:21 91:4 92:6 93:1 94:16,19,22 96:4,17 97:12,19 98:11 100:12 103:18 105:14,23 106:2 108:8 109:8,20 110:1,15,19,22 111:6,11, 12,22,23 112:11 113:15 114:8,18 116:18 131:15 132:20,23 133:3 135:15 136:1,10,21 137:2,11,16,24 139:8 147:10,15,18,22 148:2,7,13, 15,20,24 149:2,9,14,19,23 150:3,8, 12,18,22 151:1,5,9,15,20,25 152:5, 7,10,20 153:7 155:10 156:2 159:4, 23 160:4,9 161:22 162:1,15 165:15,25 170:23,25 171:8,18,25 172:15 174:6,10 175:13,23 178:11 184:5 185:11 189:18 200:1,4,12,15 201:1 202:3 203:18 204:10 205:3, 17 206:14 207:8 211:23 214:24 215:4,8,17 216:14 218:6,13 222:25 223:3,7 225:8 226:14,21 227:21 229:15 231:2,8 232:15 233:1,16,24 234:13,18 235:8,13 236:4,10,14,25 240:10 241:21 242:1,8,12

**wasting** 151:23

**watch** 78:7

**watched** 108:18

**watching** 59:10 111:20 203:16

**ways** 30:23,24 41:21 212:18

**weapon** 14:9,13 26:6 27:11 43:14, 16 58:19,23 59:5,25 62:21 67:1 72:11 78:5 90:15,17,19 101:9 110:3 169:17 173:18 174:3 178:1,2 180:25 222:17,19

**weapons** 25:16 27:9,10 43:5,9,20, 24

**wearing** 95:11 100:8 110:25

**website** 239:16

**weekend** 120:10

**weekends** 120:14

**weekly** 235:24

**weeks** 13:25 241:15

**weight** 229:13

**West** 3:15

**Western** 1:1 5:6

**whatever's** 131:24

**whitewash** 176:12

**why'd** 210:7,8

**window** 16:21 34:17,22,25 73:9 78:10 83:5,7 198:16

**withdrawal** 24:24

**wither** 189:13

**withholding** 148:18,22

**witnesses** 18:6 101:15 144:24 188:7,11,24,25 189:2 193:18 237:6

**Wolf** 120:5

**woman** 157:14

**word** 44:18 103:25 140:7 227:6

**words** 22:24 47:19 48:9 125:15 143:17 166:5 183:14

**work** 9:16 25:16 34:8 80:22 88:11 119:15 120:15 125:17,18 200:23 241:3

**worked** 119:16 120:3,8,13 126:15 141:18 201:17

**working** 9:22 118:4 124:16 146:13

**works** 217:25

**world** 43:3 144:13 238:15

**worn** 8:13 9:6,7 13:24 16:12 73:7 166:24 167:3 232:9

**worry** 122:17

**worse** 35:8

**worst** 69:7

**worth** 124:12

**would've** 16:20 22:7 26:19 43:16 49:12 89:1 99:15,17 101:15 106:18 107:7 111:1 113:3 126:9 127:25 158:19 162:9 168:9 177:12 178:13 188:14 189:22 219:7 231:10 232:7

**wound** 79:10

**wrap** 220:14

**write** 13:12 42:17 123:3

**writing** 145:11

**written** 25:6 112:16 225:17 238:9

**wrong** 41:20 47:22 56:16,19 96:16,18 97:16 103:22 133:20 169:1

**wrongly** 128:8

**wrote** 152:25 166:7 190:24 216:4

**Www.magnals.com** 2:2

**Y**

**y'all** 80:25 81:1,5 136:23 225:2

**yards** 68:21,24 69:1,13

**year** 118:7 119:1,5,7 120:14 123:16 124:1 125:3,9,19 221:14

**years** 27:3 61:5 120:1 168:1,2,4 178:10 222:12,21,25 223:3 236:1 241:8

**York** 118:6,7,23 119:20 126:21 127:23

**young** 86:23 87:3 235:25

**yourself's** 97:9

**Z**

**ZECH** 3:8